**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

DR. ALAN SACERDOTE, et al.,

          Plaintiffs,

v.

NEW YORK UNIVERSITY,

          Defendant.

No. 1:16-CV-06284

ECF Case

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO**
**MOTION TO DISMISS THE AMENDED COMPLAINT [DOC. 44]**

# CONTENTS

Authorities ................................................................................................................ ii

Introduction ............................................................................................................. 1

Background .............................................................................................................. 2

   I.    The Plans ...................................................................................................... 2

   II.   ERISA fiduciary standards ........................................................................... 3

   III.  Plaintiffs' allegations .................................................................................... 4

Argument .................................................................................................................. 5

   I.    Standard of Review ....................................................................................... 5

   II.   The amended complaint states plausible claims for breach of fiduciary duties
       and prohibited transactions. ........................................................................... 6

       A.   Plaintiffs state claims for breaches of 29 U.S.C. §1104(a)(1)(A). ........... 7

       B.   Count I states a plausible claim based on improper bundling of TIAA
           products and services. ........................................................................... 9

       C.   Count III states a claim based on excessive recordkeeping fees. ........... 11

       D.   Count V states plausible claims regarding the Plans' investments. ......... 16

       E.   Counts II, IV, and VI state plausible prohibited transaction claims........ 23

   III.  Plaintiffs did not have "actual knowledge" of their claims. .......................... 24

Conclusion .............................................................................................................. 25

## Cases

*Allen v. GreatBanc Tr. Co.*, 835 F.3d 670 (7th Cir. 2016)............................................5, 24

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ..........................................................5

*Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585 (8th Cir. 2009) ................................passim

*Brown v. Am. Life Holdings, Inc.*, 190 F.3d 856 (8th Cir. 1999) ......................................25

*Caputo v. Pfizer, Inc.*, 267 F.3d 181 (2d Cir. 2001)...........................................................24

*Chao v. Merino*, 452 F.3d 174 (2d Cir. 2006)....................................................................14

*DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410 (4th Cir. 2007) ......................................9, 21

*Donovan v. Bierwirth,* 680 F.2d 263 (2d Cir. 1982) ............................................................3

*Fifth Third Bancorp v. Dudenhoeffer*, 134 S.Ct. 2459 (2014) ............................................7

*Fish v. Greatbanc Tr. Co.*, 749 F.3d 671 (7th Cir. 2014) ............................................24, 25

*George v. Kraft Foods Global, Inc.*, 641 F.3d 786 (7th Cir. 2011) ..........................passim

*Haddock v. Nationwide Fin. Servs.*, 419 F.Supp.2d 156 (D.Conn. 2006) .......................24

*Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238 (2000) ...................4

*Hecker v. Deere & Co.*, 556 F.3d 575 (7th Cir. 2009) .................................................10, 18

*Hecker v. Deere & Co.*, 569 F.3d 708 (7th Cir. 2009) .................................................18, 21

*Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310 (2d Cir. 2011) .............................5, 13, 14

*In re Meridian Funds Grp. Sec. & ERISA Litig.*, 917 F.Supp.2d 231 (S.D.N.Y. 2013) ................................................................................................................................3

*In re Unisys Savings Plan Litig.*, 74 F.3d 420 (3d Cir. 1996)..............................................9

*John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86 (1993) ..........1

*Jones v. Harris Assocs. L.P.*, 559 U.S. 335 (2010) ...........................................................13

*Katsaros v. Cody*, 744 F.2d 270 (2d Cir. 1984) ............................................................3, 16

*Krueger v. Ameriprise Fin., Inc.*, No. 11-02781, 2014 U.S.Dist.LEXIS 36435 (D.Minn. Mar. 20, 2014)....................................................................................................25

*Kruger v. Novant Health, Inc.*, 131 F.Supp.3d 470 (M.D.N.C. 2015) .......................11, 14

*L.I. Head Start Child Dev. Servs. Inc. v. Econ. Opportunity Council of Suffolk, Inc.*, 710 F.3d 57 (2d Cir. 2013).......................................................................................24

*Laboy v. Bd. of Trs. of Bldg. Serv. 32 BJ SRSP*, 2012 U.S.Dist.LEXIS 110858 (S.D.N.Y. Aug. 7, 2012) .............................................................. 15

*Lau v. Metro. Life Ins. Co.*, No. 15-cv-09469 (PKC), 2016 U.S.Dist.LEXIS 134681 (S.D.N.Y. Aug. 22, 2016) ........................................................ 14

*Leber v. Citigroup 401(k) Plan Inv. Comm.*, No. 07-9329, 2014 U.S.Dist.LEXIS 139001 (S.D.N.Y. Sep. 30, 2014 ............................................................... 25

*Loomis v. Exelon Corp.*, 658 F.3d 667 (7th Cir. 2011) .................................... 18

*Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209 (2d Cir. 1987) .................... 23

*Moreno v. Deutsche Bank Ams. Holding Corp.*, No. 15-9936, 2016 U.S.Dist.LEXIS 142601 (S.D.N.Y. Oct. 13, 2016) ............................... 22, 24

*N.J. Carpenters Health Fund v. Royal Bank of Scot. Group, PLC*, 709 F.3d 109 (2d Cir. 2013) ................................................................................. 5

*Pegram v. Herdrich,* 530 U.S. 211 (2000) .......................................................... 3

*Pension Ben. Guar. Corp. (PBGC) v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705 (2d Cir. 2013) ....................................................................... passim

*Renfro v. Unisys Corp.*, 671 F.3d 314 (3d Cir. 2011) ....................................... 18

*Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406 (2d Cir. 2008) .................... 24

*Tibble v. Edison Int'l*, 135 S.Ct. 1823 (2015) ............................................ passim

*Tibble v. Edison Int'l*, 729 F.3d 1110 (9th Cir. 2013) ........................... 17, 18, 24

*Tibble v. Edison Int'l*, No. 07-5359, 2010 U.S.Dist.LEXIS 69119 (C.D.Cal. July 8, 2010) ............................................................................................. 17

*Tibble v. Edison Int'l*, No. 10-56406, 2016 U.S.App.LEXIS 22366 (9th Cir. *en banc* Dec. 16, 2016) ................................................................... passim

*Tussey v. ABB, Inc.*, 746 F.3d 327 (8th Cir. 2014) ................................ 11, 13, 18

*Tussey v. ABB, Inc.*, No. 06-4305, 2012 U.S.Dist.LEXIS 45240 (W.D. Mo. Mar. 31, 2012) ............................................................................................. 16

*White v. Chevron Corp.*, No. 16-0793, 2016 U.S.Dist.LEXIS 115875 (N.D.Cal. Aug. 29, 2016) ............................................................................. 14

*Young v. GM Inv. Mgmt. Corp.*, 325 F.App'x 31 (2d Cir. 2009) ...................... 13

*Young v. GM Inv. Mgmt. Corp.,* 550 F.Supp.2d 416 (S.D.N.Y. 2008) ............. 25

**Statutes**

26 U.S.C. §403(b) ................................................................................................. 2

29 U.S.C. §1002(14)(B) ............................................................... 23

29 U.S.C. §1002(34) ...................................................................... 2

29 U.S.C. §1102(a) ......................................................................... 2

29 U.S.C. §1103(c)(1) ................................................................... 13

29 U.S.C. §1104(a)(1) .................................................................... 2

29 U.S.C. §1104(a)(1)(A) ........................................................... 3, 7

29 U.S.C. §1104(a)(1)(A)(ii) ....................................................... 13

29 U.S.C. §1104(a)(1)(B) ........................................................... 3, 7

29 U.S.C. §1104(a)(1)(C) ............................................................. 21

29 U.S.C. §1106 .............................................................................. 4

29 U.S.C. §1106(a) ....................................................................... 23

29 U.S.C. §1106(a)(1)(C) ............................................................. 13

29 U.S.C. §1108(b)(2) .................................................................. 13

29 U.S.C. §1109(a) ......................................................................... 4

29 U.S.C. §1132(a)(2) .................................................................... 4

**Rules**

2d Cir. R. 32.1.1(a) ...................................................................... 13

Fed.R.Civ.P. 8(a)(2) ....................................................................... 5

Fed.R.Evid. 407 ............................................................................ 15

**Other**

29 C.F.R. §2550.404c-1(b)(3) ...................................................... 21

DOL Adv. Op. 2013-03A .............................................................. 24

DOL Adv. Op. 97-15A .................................................................. 11

Fiduciary Plan Governance, LLC, *Buying Power for Higher Education Institutions: When you Have It and When You Don't – Part 2* ................................... 12

Internal Rev. Bulletin 2007-36, *Revised Regulations Concerning Section 403(b) Tax-Sheltered Annuity Contracts* (Sept. 4, 2007) ........................................ 6

Reasonable Contract Or Arrangement Under Section 408(b)(2), 72 Fed.Reg. 70988 (Dec. 13, 2007) ..................................................................... 11

RESTATEMENT (THIRD) OF TRUSTS §90 ...................................... 21

SHRM, *Keep Your 401(k) Plan Out of Fiduciary Hot Water* (June 27, 2016) ................. 14

The Standard, *Fixing Your 403(b) Plan: Adopting a Best Practices Approach* ............... 20

Western PA Healthcare News, *403(b) Retirement Plans: Why a Due Diligence Request for Proposal* .................................................................................................... 12

# INTRODUCTION

New York University sponsors two defined contribution retirement plans to allow its employees to save for retirement. To protect the retirement income of workers who invest in such plans, ERISA[1] imposes fiduciary duties "on persons whose actions affect the amount of benefits retirement plan participants will receive," such as NYU. *John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86, 96 (1993). Plaintiffs' amended complaint shows that NYU breached its fiduciary duties and allowed its employees' retirement income to be depleted by excessive fees and imprudent investments.

NYU asserts that Plaintiffs' allegations do not show any breach of fiduciary duty. Yet, NYU's own publicly-available admissions not only confirm the plausibility of Plaintiffs' claims, but unequivocally concede that the alleged actions were imprudent and caused plan losses.

In 2009, NYU recognized that in order to leverage the plans' $3 billion in assets, improve the plans' administrative efficiency and reduce costs, and offer a "best in class fund lineup," it "need[ed] to streamline & reduce the fund lineup and select one vendor as sole recordkeeper[.]"[2] NYU acknowledged that an unbundled platform was preferable to the plans' "bundled" arrangement. *Id*. at 18. It admitted that consolidation would allow the Plans to obtain "better share classes yielding higher returns," which would "result in *significantly lower fee structures for the participant*." *Id*. (emphasis added). Over *seven* years later, NYU had still not taken the action it recognized was "need[ed]" as of 2009. In an October 13, 2016 meeting regarding the Plans—after the filing of the original complaint in this action—NYU admitted that it had still not

---

[1] The Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001 *et seq*.

[2] *Reengineering II, More Opportunities for Self Service*, Slides 11, 12–18 (July 30, 2009), available at: https://www.nyu.edu/content/dam/nyu/execVicePres/documents/13-Appendix-D-Self-Service-Opportunities.ppt; excerpt attached as Exhibit 1. "[I]nformation publicly announced on a party's website" may be considered on a motion to dismiss. *Doron Precision Sys., Inc. v. FAAC, Inc*., 423 F.Supp.2d 173, 179 n.8 (S.D.N.Y. 2006).

met the goal of "reducing duplication and fees[.]"[3] NYU's operation of the plans and inexcusable

delay and failure to "streamline & reduce" funds and recordkeepers compel the conclusion that

NYU has not fulfilled ERISA's stringent fiduciary standards. *See* 29 U.S.C. §1104(a)(1)(A), (B).

Plaintiffs' allegations, which are fully backed by NYU's own admissions, are sufficient to state a

claim for breach of fiduciary duty. Defendants' motion to dismiss should be denied.

## BACKGROUND

## I.       The Plans

Plaintiffs are seven employees of NYU and participants in two NYU-sponsored retirement

plans. Doc. 39, Amended Complaint (AC) ¶¶19–25.[4] The Plans are individual account, defined

contribution plans under 29 U.S.C. §1002(34), and qualified plans under 26 U.S.C. §403(b). *Id*.

¶¶9, 13, 69. In a defined contribution plan, "participants' retirement benefits are limited to the

value of their own individual investment accounts, which is determined by the market

performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 135

S.Ct. 1823, 1826 (2015). "Expenses, such as management or administrative fees, can sometimes

significantly reduce the value of an account in a defined-contribution plan." *Id.* NYU is the

Plans' named fiduciary, with responsibility and discretionary authority to control the operation,

management and administration of the Plans. AC ¶26; 29 U.S.C. §1102(a). NYU's duties include

hiring the Plans' administrative service providers and negotiating their compensation, and

providing the investment options in which participants can invest. AC ¶¶26, 37, 39, 106.

---

[3] *Minutes of the C-Faculty Senators Council Meeting of October 20, 2016*, Document B at 23, available at: https://www.nyu.edu/content/dam/nyu/facultyGovernance/documents/C-FSCMinutes102016.pdf; excerpt, Exhibit 2.

[4] Mark Crispin Miller, Patrick Lamson-Hall, Dr. Shulamith Lala Straussner, and James B. Brown are employed in various NYU departments and participate in the New York University Retirement Plan for Members of the Faculty, Professional Research Staff and Administration ("Faculty Plan"). Dr. Alan Sacerdote, Dr. Herbert Samuels, and Marie Monaco are employed at the NYU School of Medicine and participate in the NYU School of Medicine Retirement Plan for Members of the Faculty, Professional Research Staff and Administration ("Medical Plan"). Plaintiffs refer to the Medical Plan and Faculty Plan collectively as "the Plans."

As of December 31, 2014, the Faculty Plan had $2.4 billion in assets and 16,000 participants with account balances and the Medical Plan had $1.8 billion in assets and 8,000 participants with account balances. *Id.* ¶¶12, 16. They are among the largest 0.06% of all defined contribution plans in the United States. The Plans offer substantially similar investment menus. The Faculty Plan includes 103 investment options, all of which were managed by its recordkeepers, TIAA-CREF (TIAA) and Vanguard Group, Inc. (Vanguard), while the Medical Plan offered 84 of the same TIAA and Vanguard options. *Id.* ¶¶18, 106–08. As of late 2012, TIAA became the Medical Plan's sole recordkeeper, yet NYU retained two recordkeepers for the Faculty Plan. *Id.* ¶126.

## II.     ERISA fiduciary standards

ERISA's fiduciary duties "are those of trustees of an express trust—the highest known to the law." *Donovan v. Bierwirth,* 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982).

The duty of loyalty requires that all fiduciary "decisions must be made with an eye single to the interests of the participants and beneficiaries." *Id.* at 271; 29 U.S.C. §1104(a)(1)(A). The fiduciary must "exclude all selfish interest and all consideration of the interests of third persons[.]" *Pegram v. Herdrich,* 530 U.S. 211, 224 (2000). "An ERISA fiduciary must discharge his responsibility 'with the care, skill, prudence, and diligence' that a prudent person 'acting in a like capacity and familiar with such matters' would use." *Tibble*, 135 S.Ct. at 1828; 29 U.S.C. §1104(a)(1)(B). The prudence standard "does not require merely the level of care expected of a prudent layperson[.]" *In re Meridian Funds Grp. Sec. & ERISA Litig*., 917 F.Supp.2d 231, 240 (S.D.N.Y. 2013). Rather, "prudence is measured against hypothetical sophisticated and prudent investment professionals[.]" *Id*. A fiduciary is required "(1) to employ proper methods to investigate, evaluate and structure the investment; (2) to act in a manner as would others who have a capacity and familiarity with such matters; and (3) to exercise independent judgment when making investment decisions." *Id.*; *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984).

To supplement the general fiduciary duties, Congress enacted §1106, which categorically bars "certain transactions deemed 'likely to injure'" a plan. *Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 241−42 (2000)(citation omitted); 29 U.S.C. §1106.

ERISA's fiduciary duties are ongoing, meaning a fiduciary must remedy excessive fee arrangements, review and remove imprudent investments, and discontinue prohibited transactions, no matter how long ago those practices initially occurred. *Tibble*, 135 S.Ct. at 1826–29. A fiduciary who breaches his duties is "personally liable" for "any losses to the plan resulting from [the] breach" and is subject to disgorgement of any profits and "such other equitable or remedial relief as the court may deem appropriate." 29 U.S.C. §1109(a).

## III.    Plaintiffs' allegations

The amended complaint asserts that NYU breached its fiduciary duties to the Plans and committed prohibited transactions in multiple ways: (1) allowing one of the Plans' recordkeepers, TIAA, to obligate the Plans to include itw own proprietary investment options in the Plans regardless of whether they were or remained prudent (Counts I and II); (2) allowing the Plans' recordkeepers to collect unlimited, and excessive asset-based compensation from their own proprietary products (Counts III and IV); and (3) including dozens of retail-share class mutual funds designed for small investors instead of *identical* institutional-class funds designed for large investors like the Plans, and retaining funds that consistently underperformed prudent alternatives that were readily-available to the Plans (Counts V and VI). As a result, the Plans and their participants lost millions of dollars in retirement savings. Plaintiffs bring this action under 29 U.S.C. §1132(a)(2) to obtain the Plans' remedies under §1109(a), and seek to represent a class of all participants and beneficiaries in the Plans since August 9, 2010. AC ¶¶5, 191.

**ARGUMENT**

## I.  Standard of Review

"Fed.R.Civ.P. 8(a)(2) 'requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the ... claim is and the grounds upon which it rests[.]'" *Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 323 (2d Cir. 2011)(quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A complaint "does not need detailed factual allegations,'" but only enough facts "'to make the claim 'plausible,'" and "to raise a reasonable expectation that discovery will reveal evidence of illegal[ity].'" *Id*. at 324 (quoting *Twombly*, 550 U.S. at 555, 570). Further, "a reasonable inference need not be 'as compelling as any opposing inference' one might draw from the same factual allegations." *N.J. Carpenters Health Fund v. Royal Bank of Scot. Group, PLC*, 709 F.3d 109, 121 (2d Cir. 2013).

"[A]pplication of the plausibility standard … is context-specific, and requires assessing the allegations of the complaint as a whole." *Pension Ben. Guar. Corp. (PBGC) v. Morgan Stanley Inv. Mgmt*., 712 F.3d 705, 719 (2d Cir. 2013)(quotations and citations omitted). In the "practical context of ERISA litigation," certain facts "tend systemically to be in the sole possession of defendants." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009). "ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences." *PBGC*, 712 F.3d at 718 (quoting *Braden*, 588 F.3d at 598). Even if a complaint does not "directly address[ ] the process by which the Plan was managed," a fiduciary breach claim is sufficient if the court "may reasonably 'infer from what is alleged that the process was flawed.'" *Id*. at 718 (quoting *Braden*, 588 F.3d at 596); *Allen v. GreatBanc Tr. Co*., 835 F.3d 670, 678 (7th Cir. 2016). A claim is plausible if the court can reasonably infer that "a prudent fiduciary in like circumstances would have acted differently." *PBGC*, 712 F.3d at

720.[5] A complaint states a claim by alleging that "a superior alternative investment was readily apparent such that an adequate investigation would have uncovered that alternative." *Id*. at 719.

NYU suggests that purported "significant differences" between 403(b) plans and 401(k) plans require a heightened pleading standard to state a claim in the 403(b) context than would be required in the context of a 401(k) plan. Doc. 45 at 7–8.[6] But as the IRS recognized in 2007, legislative and regulatory developments over a number of decades had "diminish[ed] the extent to which the rules governing section 403(b) plans differ from the rules governing other tax-favored employer-based retirement plans" such as 401(k) plans.[7] *See also* AC ¶71. Regardless of any historical differences between 401(k) and 403(b) plans, both types of plans have the same fundamental objective: allowing employees to save for a secure retirement. AC ¶74. Just as expenses "significantly reduce the value" of a defined contribution account in a 401(k) plan, the same is true in a 403(b) plan. *Tibble*, 135 S.Ct. at 1826. Thus, fiduciaries in both must keep fees reasonable and include only prudent investments in their plans.[8]

## II. The amended complaint states plausible claims for breach of fiduciary duties and prohibited transactions.

Considered "as a whole," Plaintiffs' amended complaint raises a plausible inference that the process by which NYU managed the Plans "was flawed," *PBGC*, 712 F.3d at 718–19, and "tainted by failure of effort, competence, or loyalty," *Braden*, 588 F.3d at 594, 596. Instead of addressing the complaint as a whole, NYU "parses the complaint piece by piece" to argue that isolated allegations, standing alone, do not show a breach of fiduciary duty. *Cf. id.* at 594. NYU

---

[5] The *PBGC* court held that plaintiff to a higher pleading standard because the plaintiff was the plan administrator and thus had access to the "inside information" denied to plan participants. 712 F.3d at 709, 723.

[6] "Doc." page citations refer to the page numbers shown on the ECF header.

[7] Internal Rev. Bulletin 2007-36, *Revised Regulations Concerning Section 403(b) Tax-Sheltered Annuity Contracts* (Sept. 4, 2007), available at: https://www.irs.gov/irb/2007-36_IRB/ar13.html. These IRS regulations did not amend any ERISA fiduciary requirements. The Plans were subject to ERISA fiduciary requirements years before the IRS published its 403(b) regulations in 2007. AC ¶72.

[8] NYU's position is also undermined by its heavy reliance on cases involving 401(k) plans, which would be inapposite if a different standard applied to 403(b) fiduciaries.

also mischaracterizes Plaintiffs' claims as *per se* challenges to revenue sharing, retail mutual funds, and active management, while ignoring extensive facts showing that it (1) failed to monitor and control the *amount* of revenue sharing; (2) used higher-cost "retail-class" mutual funds when the *exact same* funds were available in lower-cost "institutional-class" shares available to billion dollar investors, and (3) continued to waste participants' money on higher active management fees long after it would have been clear to a prudent fiduciary that continued payment of those fees was not justified by a reasonable expectation of superior performance.

### A.     Plaintiffs state claims for breaches of 29 U.S.C. §1104(a)(1)(A).

A breach of fiduciary duty claim is sufficient if it shows a plausible failure of "effort, competence, *or* loyalty," *Braden*, 588 F.3d at 596 (emphasis added). Determining the reason for a particular breach is a matter for discovery. Moreover, §1104(a)(1)(A) is not limited to acts of "disloyalty," as NYU defines them. *Cf*. Doc. 45 at 11.[9] The Supreme Court recently explained that §1104(a)(1)(A) informs the duty of prudence under §1104(a)(1)(B). *Fifth Third Bancorp v. Dudenhoeffer*, 134 S.Ct. 2459, 2468 (2014). "Read in the context of ERISA as a whole, the term 'benefits'" in §1104(a)(1)(A), means "*financial* benefits." *Id*. A fiduciary acting for the exclusive purpose of "providing benefits to participants" will seek to preserve and maximize those benefits by paying only the "reasonable expenses" permitted by §1104(a)(1)(A), rather than allowing benefits to be depleted by excessive fees and imprudent investments, as NYU did here.

The complaint also shows a plausible failure of loyalty because NYU advanced the financial interests of the Plans' recordkeepers in including their proprietary funds in the Plans. *Braden* is instructive. The Wal-Mart 401(k) plan offered mostly retail mutual funds that made revenue sharing payments to the plan's trustee and recordkeeper, Merrill Lynch. 588 F.3d at 590. The

---

[9] "[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—**(A)** for the exclusive purpose of: **(i)** providing benefits to participants and their beneficiaries; and **(ii)** defraying reasonable expenses of administering the plan[.]" 29 U.S.C. §1104(a)(1)(A).

fund selection process was allegedly "tainted by [the fiduciaries'] failure to consider trustee Merrill Lynch's interest in including funds that shared their fees with the trustee." *Id*. The Eighth Circuit concluded that the plaintiff stated a plausible claim for breach of fiduciary duty. *Id*. at 594–95. Instead of using "institutional-class shares of mutual funds" available to large retirement plans, the plan offered "retail-class shares, "which charge significantly higher fees … for the same return on investment." *Id*. at 595. Several of the funds included fees "from which participants derive no benefit." *Id*. at 596. The fiduciaries "did not change the options included in the Plan," even though most of them underperformed their benchmarks, as shown by "specific comparisons … to an allegedly similar but more cost effective fund available in the market." *Id*. at 590, 596. "[C]onsidered as a whole," the complaint alleged that plan fiduciaries assembled a menu of inferior investment options "despite the ready availability of better options," and that the plan's funds "were chosen to benefit the trustee at the expense of the participants." *Id*. at 596.

The complaint here alleges all of the same elements. As in *Braden*, Plaintiffs allege that NYU squandered the $4 billion Plans' ability to command very low institutional rates by including a large number of retail-class mutual funds in the Plans and funds which charged layers of fees that provided no benefit to participants. AC ¶¶105–08, 139–162. Like *Braden*, Plaintiffs allege that these funds were included in the Plans not because of an independent analysis of what was in the best interest of participants, but because the funds made revenue sharing payments to the Plans' recordkeepers, TIAA and Vanguard. *Id*. ¶¶4, 170, 198, 223. As in *Braden*, Plaintiffs allege that NYU failed to consider TIAA and Vanguard's financial interest in including funds that paid them revenue sharing, and that those payments were not reasonable compensation for services rendered, but rather provided TIAA and Vanguard millions of dollars in unreasonable fees. *Id*. ¶¶111, 131, 198, 209, 220, 223. Like *Braden*, Plaintiffs also allege that

NYU did not remove options that underperformed their benchmarks. providing specific comparisons to more cost-effective funds with superior performance. *Id.* ¶¶163–89. Considered as a whole, the complaint alleges that NYU selected and retained excessive cost and underperforming funds for the Plans despite the ready availability of better options, and that the funds "were chosen to benefit TIAA and Vanguard "at the expense of the participants." *Braden*, 588 F.3d at 596. The inference that NYU's process for managing the Plans was flawed and "tainted by failure of effort, competence, *or* loyalty" is at least as strong here as it was in *Braden*.

### B. Count I states a plausible claim based on improper bundling of TIAA products and services.

"[T]he duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litig.*, 74 F.3d 420, 435 (3d Cir. 1996). Fiduciaries must "initially determine, and continue to monitor, the prudence of *each* investment option available to plan participants," *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007)(emphasis original), and "remove imprudent ones[.]" *Tibble*, 135 S.Ct. at 1828–29.

Plaintiffs allege that instead of evaluating the prudence of each investment option in the Plans, NYU agreed to a bundled arrangement that obligated the Plans to use TIAA as recordkeeper and to offer the CREF Stock and Money Market accounts, thus locking the Plans into an arrangement in which those funds had not been analyzed for prudence and could not be removed even if ongoing monitoring showed that the funds were imprudent. AC ¶¶83, 110–11, 170, 198. Prudent fiduciaries do not enter arrangements that place the recordkeeper's proprietary funds in the plan to drive revenue to the recordkeeper or that prevent them from removing imprudent funds. *Id.* ¶¶110–11. These allegations raise a plausible inference that by entering this arrangement, NYU could not fulfill its ongoing monitoring duty as to each fund in the Plans. By

binding the Plans to retain the CREF Stock Account as it continued to perform abysmally year after year, NYU caused millions of dollars in losses to the Plans. *Id.* ¶¶111, 199.

NYU largely ignore these allegations, and instead attempts to rebut what it perceives as Plaintiffs "maligning" TIAA-CREF. Doc. 45 at 12. The amended complaint discusses TIAA's corporate status because NYU originally sought to create the impression that TIAA-CREF is a charitable organization. Doc. 33 at 11. It is not. AC ¶¶78–82. Plaintiffs do not condemn the use of TIAA's products or services, provided the terms are reasonable. *Cf*. Doc. 45 at 12–13. Here, by binding the Plans to include the CREF Stock Account regardless of the circumstances, NYU agreed to unreasonable terms that served to maximize TIAA's profits at the Plans' expense.

Plaintiffs do not allege that all "bundled services" arrangements are imprudent. *Cf*. Doc. 45 at 13. In a typical bundled package, the fiduciary retains the ability to remove funds from the plan. *See, e.g., Hecker v. Deere & Co.*, 556 F.3d 575, 583 (7th Cir. 2009). Plaintiffs contend that NYU abdicated its duty to remove the CREF Stock Account when required by agreeing to keep it in the Plans regardless of whether it remained prudent.

NYU disputes these allegations because the Plans purportedly authorized NYU to "change the investment options offered under the Plan at any time[.]" Doc. 45 at 13. However, NYU omits the clause stating that such removals can only be done "*to the extent consistent with the Annuity Contracts or Custodial Agreements*." Doc. 46-1 at 15 (§4.11(c)); Doc. 46-2 at 19 (§4.10(c)). Plaintiffs allege NYU entered into contracts that did not allow it to remove CREF Stock. An independent source confirms these are standard TIAA contract terms:

> [D]epending on the contract type, TIAA-CREF contract provisions may impact the Plan's flexibility. For legacy [Retirement Annuity, RA] and [Group] RA contracts, there are three annuities that ***must*** be offered: TIAA Traditional, CREF Stock, and CREF Money Market.

AonHewitt, *TIAA-CREF Asset Management*, INBRIEF, at 3 (July 2012)(recommending removal of CREF Stock Account from retirement plans), cited at AC ¶180.[10]

### C. Count III states a claim based on excessive recordkeeping fees.

The duty of prudence includes a duty to be cost-conscious and "to minimize costs", because "[w]asting beneficiaries' money is imprudent[.]" *Tibble v. Edison Int'l*, No. 10-56406, 2016 U.S.App.LEXIS 22366, at *21–22 (9th Cir. *en banc* Dec. 16, 2016). A failure to properly "monitor and control recordkeeping fees" is a breach of fiduciary duties. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014); *Kruger v. Novant Health, Inc.*, 131 F.Supp.3d 470, 479 (M.D.N.C. 2015)(plausible fiduciary breach claim based on 403(b) fiduciaries' "failure to monitor the sudden spike in recordkeeping fees"). Fiduciaries must obtain information regarding all sources of a recordkeeper's compensation, and then assess whether the amount is reasonable for the services provided. *Tussey*, 746 F.3d at 336; Reasonable Contract Or Arrangement Under Section 408(b)(2), 72 Fed.Reg. 70988, 70989 (Dec. 13, 2007)("fiduciaries need information concerning all [service provider] compensation"); DOL Adv. Op. 97-15A.

Recordkeeping is a commodity service for defined contribution plans. Numerous providers in the market are capable of providing a high level of service and will provide competitive bids in an attempt to win the business of a multi-billion dollar plan. AC ¶¶43–44. Plans with more participants can obtain lower rates for recordkeeping; a 16,000 participant plan can obtain better per-participant pricing than an 8,000 participant plan. *Id.* ¶59. The surest way to determine if a recordkeeper's compensation level is reasonable is to obtain competitive bids. *Id.* ¶¶66, 124; *see George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 800 (7th Cir. 2011)(denying summary judgment where consultant "could not comment on the competitiveness of [the recordkeeper's] fee" without "a bid from another service provider"). Similarly situated fiduciaries recognize that

---

[10] Available at http://system.nevada.edu/Nshe/?LinkServID=82B25D1E-9128-6E45-1094320FC2037740.

a periodic competitive bidding process is the superior means to "negotiate fee and service improvements" and is "a critical part of fulfilling the fiduciary duty." AC ¶66.[11] If a plan overpays for recordkeeping services due to the fiduciaries' "failure to solicit bids" from other recordkeepers—under circumstances in which a prudent fiduciary would have done so—the fiduciaries have breached their duty of prudence. *See George*, 641 F.3d at 798–99.

The complaint shows that the Plans grossly overpaid for recordkeeping compared to reasonable market rates. AC ¶¶123–38. Instead of using each Plan's full participant base to obtain favorable pricing from a single recordkeeper, NYU cut the Plans' leverage in half by needlessly maintaining two recordkeepers for the Faculty Plan to date and until late 2012 for the Medical Plan. *Id*. ¶¶125–26. Maintaining a multi-recordkeeper structure created additional administrative complexity and higher costs for the Plans. *Id*. ¶125.[12] While similarly situated fiduciaries at universities such as Loyola Marymount, Pepperdine, Purdue, CalTech, and Notre Dame consolidated recordkeepers after initiating comprehensive reviews of their plans, NYU failed to engage in a similar analysis. *Id*. ¶¶87–104. Aside from maintaining an inefficient and costly multi-recordkeeper structure, NYU also failed to monitor the amount of TIAA and Vanguard's compensation, particularly the amount of asset-based revenue sharing they received from their proprietary investment funds, failed to obtain competitive bids to determine if those

---

[11] Fiduciary Plan Governance, LLC, *Buying Power for Higher Education Institutions: When you Have It and When You Don't – Part 2* (http://www.fiduciaryplangovernance.com/blog/buying-power-for-higher-education-institutions-when-you-have-it-and-when-you-dont-part-2); Western PA Healthcare News, *403(b) Retirement Plans: Why a Due Diligence Request for Proposal* (http://www.wphealthcarenews.com/403b-retirement-plans-why-a-due-diligence-request-for-proposal/).

[12] Although NYU suggests that 403(b) plans inherently involve more "administrative complexity" and higher costs (Doc. 45 at 8), NYU *admitted* that it *could* reduce costs and complexity through consolidation. Ex. 1 at 11–18. Similarly situated 403(b) fiduciaries also eliminated complexity and costs by consolidating service providers and investment options, which NYU failed to do. AC ¶¶86–98, 104. That *some* 403(b) plans were managed differently in the past does not make a failure to obtain reasonable fees prudent where "a prudent fiduciary in like circumstances would have acted differently" (*PBGC*, 712 F.3d at 720)—and, indeed, *did* act differently (AC ¶¶86–98).

amounts were reasonable for the services provided to the Plans, and failed to negotiate for

rebates of excessive fee payments to TIAA and Vanguard. *Id.* ¶¶127–31, 134–37.

Based on consultation with experts in the recordkeeping industry, the Plans' features, the

nature and type of administrative services actually provided by the Plans' recordkeepers, the

Plans' participant level, and the market rates for similar plans, a reasonable annual recordkeeping

fee for both Plans combined would have been approximately $840,000, roughly $35 per-

participant. *Id.* ¶132. NYU caused the Faculty Plan to pay $3.1 to $3.8 million per year ($230 to

$270 per participant)—*six to seven times more* than the reasonable market rate, and the Medical

Plan to pay $2.1 to $2.6 million per year ($220 to $340 per participant)—*six to nine times more*

than the available market rate. *Id.* ¶¶133–34. As a result, the Plans lost over $43 million in

retirement savings. *Id.* ¶138. These facts plausibly show that Defendants breached their duty to

minimize costs, *Tibble*, 2016 U.S.App.LEXIS 22366, at *21–22, and to monitor and control fees,

*Tussey*, 746 F.3d at 336,[13] *George*, 641 F.3d at 798–99, and that their process for doing so was

"flawed" and "tainted by failure of effort, competence, or loyalty," *Braden*, 588 F.3d at 596.

NYU does not dispute that the Plans paid these amounts to TIAA and Vanguard. Instead, it

asserts that Plaintiffs have not sufficiently explained why fees six to nine times market rates

"were excessive relative to the services rendered." Doc. 45 at 14.[14] Such "detailed factual

allegations" are unnecessary at this stage. *Ideal Steel*, 652 F.3d at 324; *Lau v. Metro. Life Ins.*

---

[13] NYU attempts to distinguish *Tussey* on the ground that the excessive fees paid by the plan allowed the sponsor to obtain a corporate benefit. Doc. 45 at 14 n.27. The finding of breach was also based on failures to "calculate the amount the Plan was paying," to "determine whether [the recordkeeper's] pricing was competitive," and to "leverage the Plan's size to reduce fees," 746 F.3d at 336, all of which are present here.

[14] NYU relies on an unreported summary order that has no precedential value in this circuit. *Young v. GM Inv. Mgmt. Corp.*, 325 F.App'x 31 (2d Cir. 2009); 2d Cir. R. 32.1.1(a). *Young* relied on the standard for excessive fee claims under §36(b) of the Investment Company Act, which as the Supreme Court later explained, does "not permit a compensation agreement to be reviewed in court for 'reasonableness.'" *Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 341 (2010). ERISA explicitly requires reasonableness. 29 U.S.C. §1103(c)(1), §1104(a)(1)(A)(ii), §1106(a)(1)(C), §1108(b)(2); *George*, 641 F.3d at 789 (ERISA "states that plan administrative costs must be 'reasonable.'"). Moreover, unlike the plaintiff in *Young*, who alleged "no facts" bearing on the reasonableness of the fees, 325 F.App'x at 33, Plaintiffs here have alleged extensive facts. AC ¶¶41–45, 58–66, 123–38.

*Co.*, No. 15-cv-09469 (PKC), 2016 U.S.Dist.LEXIS 134681, at *10, 16 (S.D.N.Y. Aug. 22, 2016)(denying motion to dismiss similar ERISA claims because the reasonableness of service provider's compensation could not be determined without discovery); *Kruger*, 131 F. Supp. 3d at 479 (denying motion to dismiss claim because determining whether the fees were excessive in light of the services provided were "the types of facts warranting discovery"). The complaint references the Plans' features, the services "actually provided" by TIAA-CREF and Vanguard, and the rates obtained by similar plans for similar services. AC ¶132. That is sufficient to provide NYU "fair notice of what the ... claim is and the grounds upon which it rests." *Ideal Steel*, 652 F.3d at 323. Any greater level of detail is properly the subject of expert reports and testimony.

NYU contends that ERISA did not require it to solicit competitive bids. Doc. 45 at 14. But the law firm representing NYU *in this case* recently recommended that fiduciaries "periodically put[] vendor contracts out to bid, such as by sending out requests for information (RIFs) every three years, and requests for proposals (RFPs) every five years."[15] While ERISA does not require "any particular course of action," it requires fiduciaries to meet the "prudent person" standard. *Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006). Plaintiffs allege extensive facts showing that "a prudent fiduciary in like circumstances would have" solicited competitive bids. AC ¶¶66, 89, 124, 132, 136;[16] *see PBGC*, 712 F.3d at 720. Thus, NYU's failure to do so was a plausible breach of the prudent person standard. *George*, 641 F.3d at 798–99.[17]

---

[15] SHRM, *Keep Your 401(k) Plan Out of Fiduciary Hot Water* (June 27, 2016), https://www.shrm.org/resourcesandtools/hr-topics/benefits/pages/avoid-fiduciary-hot-water.aspx, attached as Ex. 3.

[16] The complaint in *White v. Chevron Corp*., No. 16-0793, 2016 U.S.Dist.LEXIS 115875 (N.D.Cal. Aug. 29, 2016), did not allege "that the same services were available for less on the market." *Id*. at *46. Plaintiffs have done so here.

[17] NYU attempts to distinguish *George* as involving "concrete evidence about the objective level of fees and why they were unreasonable." Doc. 45 at 14 n.28. *George* was decided at summary judgment, so of course there was more evidence. Plaintiffs' allegation that a bidding process would have reduced fees from $220–$340/participant to $35/participant is just as concrete and objective as the evidence in *George* that bids would have reduced fees from $43–$65/participant to $20–$27/participant. 641 F.3d at 798.While Plaintiffs do not yet know if NYU's failure to obtain bids is as long as the 15 years in *George*, there is no basis for inferring that it obtained bids more recently.

Next, NYU disputes that the use of two recordkeepers is imprudent, because a survey found that 50% of "higher education 403(b) plans" used *even more* than two. Doc. 45 at 15. NYU has not shown that prudence is defined on an industry-specific basis, without regard to the practices of other defined contribution plans or other 403(b) plans in all industries. The survey shows that 76% of all 403(b) plans used a single recordkeeper,[18] and only 1.4% used six. Doc. 45-7 at 76 (Table 114).[19] Moreover, surveys cannot show whether plans using multiple recordkeepers did so as the result of a reasoned conclusion that it was beneficial, or due to historical practice and inertia. *See George*, 641 F.3d at 796 & n.7. The plan reviews by Loyola Marymount, Pepperdine, Purdue, CalTech, and Notre Dame show that where a fiduciary actually analyzes whether to continue using multiple recordkeepers, the benefits of consolidation become clear. AC ¶¶88–96. Since each of those schools, as examples, moved to a single recordkeeper after analyzing the issue, it is more than plausible that "a prudent fiduciary in like circumstances would have acted differently" than NYU. *PBGC*, 712 F.3d at 720. Further, NYU itself moved to one recordkeeper for the Medical Plan (albeit not until late 2012), demonstrating its feasibility. NYU offers no explanation for why it could not have done the same for the Faculty Plan.[20]

Plaintiffs do not claim that recordkeeping or mutual fund fees may only be charged on a "flat per-participant" basis or that ERISA prohibits revenue sharing. *Cf.* Doc. 45 at 16–17; *see* AC ¶¶62, 64–65. Although NYU cites *Tussey* for the proposition that asset-based "revenue sharing" is a "common" and "acceptable" practice, it ignores the court's fundamental holding

---

[18] PSCA surveys from other years similarly show that approximately 80% of 403(b) plans use a single recordkeeper. AC ¶98. Those figures are consistent with the 2013 LIMRA survey cited by Plaintiffs showing that 90% of 403(b) plans use a single recordkeeper. AC ¶97. Although NYU attacks the statistical validity of the LIMRA survey (Doc. 45 at 10 n.29), such a "battle of the surveys" cannot be  resolved on the pleadings.

[19] Only 58% of the surveyed "higher education" plans are even covered by ERISA. *Id*. at 31 (Table 4).

[20] NYU relies on *Laboy v. Bd. of Trs. of Bldg. Serv. 32 BJ SRSP*, 2012 U.S.Dist.LEXIS 110858, at *12 (S.D.N.Y. Aug. 7, 2012), as prohibiting evidence of "subsequent remedial measures" to prove a breach of fiduciary duty. Assuming recordkeeping consolidation is such a measure, such evidence can still be considered to refute NYU's contention that it was not feasible to do so. Fed.R.Evid. 407; *cf*. Doc. 45 at 16 (disputing whether a single vendor "could and would provide" the Plans' required services).

that a failure to "monitor and control" the *amount* of such revenue sharing is a breach of fiduciary duty. 746 F.3d at 336. Similarly, recordkeeping fees must be *negotiated* and *priced* based on the number of participants in a plan rather than asset size, because the cost of defined contribution recordkeeping depends on the number of accounts and has nothing to do with the amount of assets. AC ¶¶64–65; *Tussey v. ABB, Inc.*, No. 06-4305, 2012 U.S.Dist.LEXIS 45240, at *27–31, 33–37 (W.D. Mo. Mar. 31, 2012), *aff'd in relevant part*, 746 F.3d 327 (8th Cir. 2014). If the amount is excessive, then the fiduciary must obtain a rebate for the plan. *Tussey*, 2012 U.S.Dist.LEXIS 45240, at *30–31, 37–38; AC ¶¶65, 127. Once that is done, the fixed total recordkeeping amount could then be *allocate*d as a percentage of assets, such that participants with small balances (*e.g.*, $200) would pay a much smaller amount than $35 per year. AC ¶62.

**D.      Count V states plausible claims regarding the Plans' investments.**

NYU again mischaracterizes the claims in Count V as a series of "*per se*" challenges to common practices. Plaintiffs do not contend that ERISA prohibits actively managed funds or retail mutual funds in all circumstances, or that it places a limit on the number of investments that may be offered in a plan. *Cf.* Doc. 45 at 17–22. But ERISA also does not provide that any and all actively managed and retail mutual funds are automatically prudent, or that a fiduciary need not analyze whether using such funds is reasonable and will benefit participants. *See Tatum*, 761 F.3d at 360 (finding a "*per se* approach" to be "directly at odds" with ERISA's duty of prudence; noting DOL had declined to "create 'any list of investments …' deemed permissible or impermissible under the prudence rule"). The complaint raises a plausible inference that NYU failed to use "the appropriate methods" to make investment decisions. *Katsaros*, 744 F.2d at 279.

**1. NYU wasted participants' money by using higher-cost shares instead of available lower-cost shares of the same funds.**

Many mutual funds offer different share classes. AC ¶50. "Retail" shares are marketed to individuals with small amounts to invest, while "institutional" shares are marketed to large investors such as retirement plans. *Tibble*, 135 S.Ct. at 1826. With the exception of fees, the different share classes of a given mutual fund are identical in all respects. *Id*. Higher-cost shares cause losses of "not only the money spent on higher fees, but also 'lost investment opportunity'; that is, the money that the portion of the investment spent on unnecessary fees would have earned over time." *Tibble*, 2016 U.S.App.LEXIS 22366, at *22. Thus, using higher priced shares instead of available lower priced shares is a recognized breach. *Id*. at *5; *Tibble v. Edison Int'l*, 729 F.3d 1110, 1137–39 (9th Cir. 2013), *vacated on other grounds*, 135 S. Ct. 1823 (2015). A fiduciary "cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical—other than their lower cost—to products the trustee has already selected." *Tibble*, 2016 U.S. App. LEXIS 22366, at *22–23.

The complaint identifies *63 funds* for which NYU included a higher-cost share class in the Plans instead of an identified available lower-cost share class. AC ¶¶143–48. The availability of the lower-cost share classes was "readily apparent," because the available share classes of each fund are listed in the funds' prospectuses. *PBGC*, 712 F.3d at 719; AC ¶140.[21] These facts raise a plausible inference that NYU failed to use the $4 billion Plans' bargaining power to obtain favorable products and imprudently wasted participants' money on wholly unnecessary fees.

---

[21] Even if the Plans did not meet the minimum investment thresholds for all 70 funds, a fiduciary using the level of care of a sophisticated investment professional with experience dealing with mutual funds (*Meridian*, 917 F. Supp. 2d at 240), would have known that the fund companies would waive the investment minimum for these multi-billion dollar plans if NYU had requested it, *Tibble v. Edison Int'l*, No. 07-5359, 2010 U.S.Dist.LEXIS 69119, at *28–29;  (C.D.Cal. July 8, 2010); AC ¶142.

NYU does not even attempt to argue that it can be prudent to use a higher-cost share class instead of an identical lower-cost share class of the same fund. Instead, it relies on cases addressing the inapposite issue of whether 401(k) fiduciaries have a duty to avoid mutual funds altogether and to offer only non-mutual fund alternatives such as "commingled pools" and "separate accounts." Doc. 45 at 18–19; *Loomis v. Exelon Corp.*, 658 F.3d 667, 671–72 (7th Cir. 2011); *Tibble*, 729 F.3d at 1134; *see also Hecker*, 556 F.3d at 586; *Renfro v. Unisys Corp.*, 671 F.3d 314, 319 (3d Cir. 2011). Plaintiffs here do not make such a claim. As NYU admits, 403(b) plans cannot even offer such vehicles. Doc. 45 at 8. *Hecker*, *Loomis*, and *Renfro* do not address the prudence of investing in a retail-class share when an identical lower-cost share of the same fund is available. Because there are no "salient differences" between mutual fund share classes (*Tibble*, 729 F.3d at 1137), there is no possibility of the lower-cost shares being "plagued by other problems." *Cf. Hecker*, 556 F.3d at 586.[22]

## 2. The Plans' funds charged fees that benefited TIAA but not participants.

ERISA fiduciaries have a duty to "minimize costs" and to "incur only costs that are reasonable[.]" *Tibble*, 2016 U.S. App. LEXIS 22366, at *21–22. The complaint shows that TIAA's proprietary CREF variable annuities included *four layers* of expense charges—two of which were excessive for the services provided (administrative and investment management), and two of which provided no benefit at all to participants (distribution/12b-1 fees and "mortality and expense risk"). AC ¶¶114–16. It alleges and the TIAA Real Estate Account included those same four layers while adding a fifth layer of layer for "liquidity guarantee." *Id*. ¶117. Distribution expenses pay for marketing and advertising the account to potential investors, which provides no benefit to participants who do not choose the investment lineup in a retirement plan.

---

[22] Moreover, fiduciary breach claims are "inevitably fact intensive," and *Hecker*, *Loomis*, and *Renfro* "carefully limited their decisions to the facts presented." *Tussey*, 746 F.3d at 336. *Hecker* itself expressly notes that it is "tethered closely" to its facts. *Hecker v. Deere & Co*., 569 F.3d 708, 711 (7th Cir. 2009).

*Id.* ¶115(b). The mortality and expense charge only benefits a participant if she elects upon retirement to annuitize her holdings; prior to doing so, the participant derives no conceivable benefit for paying that charge because the election is not made until retirement. *Id.* ¶115(c). Each of the 4–5 layers of expenses reduces the value of participants' investments, while enriching TIAA. *Id.* ¶114. Including funds in a plan that charge 12b-1 fees that "benefit the fund companies but not Plan participants" raises an inference that the investment selection process is flawed. *Braden*, 588 F.3d at 590, 595–96. NYU suggests these fees are appropriate because other funds in the market have even higher charges. Doc. 45 at 14 n.33. But the existence of worse products does not make these funds prudent. Had NYU made a reasoned decision, it would not have exposed participants' retirement assets to multiple layers of excessive and unnecessary fees.

### 3. NYU failed to make a reasoned decision whether to reduce the Plans' 100 investment options.

A fiduciary must "'systematic[ally] conside[r] all the investments of the trust at regular intervals' to ensure that they are appropriate." *Tibble*, 2016 U.S.App.LEXIS 22366, at *20–21 (quoting *Tibble*, 135 S. Ct. at 1828). Failing to "balance the relevant factors and make a reasoned decision as to the preferred course of action" is a fiduciary breach. *George*, 641 F.3d at 788.

Instead of using the Plans' $4 billion in assets to obtain favorable pricing from "best in class" managers, NYU diluted that bargaining power by including 103 of TIAA and Vanguard's proprietary retail funds in the Faculty Plan and 84 such funds in the Medical Plan. AC ¶¶107–08, 149. This included duplicative investments in every major asset class and investment style. *Id.* ¶¶155–60.[23] These options were not included based on their merits, but because TIAA and Vanguard demanded it. *Id.* ¶223. Offering too many choices is overwhelming and confuses

---

[23] For example, the Plans had *17–20* large cap domestic equity funds and *17* bond funds. AC ¶155.

participants. *Id.* ¶¶149–50, 223.[24] Consolidating duplicative options would have allowed NYU to

significantly reduce the Plans' fees. *Id.* ¶¶151, 161, 223. Similarly situated fiduciaries who have

conducted comprehensive reviews of similar fund lineups have greatly reduced the number of

options in their plans. *Id.* ¶¶86–97. The average defined contribution plan includes only 15

options, while the average 403(b) plan includes 28 options. AC ¶¶98, 150. NYU's own survey

shows an average of 47 options—less than half of the number in the Faculty Plan. Doc. 45 at 22.

Tellingly, NYU *itself* recognized in 2009 that it "*need[ed] to streamline & reduce the fund

lineup*" to reduce costs and offer a "best in class fund lineup," (Ex. 1 at 11), yet failed to do so.

NYU's maintenance of a haphazard lineup of over 100 duplicative, high-cost funds

proprietary to the Plans' recordkeepers—while shifting to participants the burden to screen those

options—does not reflect a prudent investment selection process, but instead a flawed process (or

no process at all).[25] Of the thousands of mutual funds available in the market, NYU selected only

its recordkeepers' funds, and not a single fund from an outside family. The complaint raises a

plausible inference that had NYU engaged in a reasoned decisionmaking process, it would not

have maintained the status quo, but instead would have "streamline[d] and reduce[d]" the fund

lineup as it concluded was necessary years ago.

NYU contends that because the plan in *Hecker* included a "brokerage window" that

provided access to 2,500 mutual funds,[26] a fiduciary cannot breach its duty by offering too many

alternatives. Doc. 45 at 20. In a supplemental opinion, the *Hecker* panel explicitly rejected the

notion that a fiduciary could "insulate itself from liability" simply by including a large number of

---

[24] The Standard, *Fixing Your 403(b) Plan: Adopting a Best Practices Approach*, at 2 ("Numerous studies have demonstrated that when people are given too many choices … they lose confidence or make no decision.")(cited at AC ¶99, available at: https://www.standard.com/pensions/publications/14883_1109.pdf).

[25] Reviewing the prospectuses of such a vast number of funds would have required participants to read thousands of pages. For the TIAA-CREF Lifecycle Funds alone, the prospectuses and supporting materials span almost *650* printed pages, *see* https://www.sec.gov/Archives/edgar/data/1084380/000093041316008290/c85911_485bpos.htm.

[26] The core fund lineup of the *Hecker* plan had only 26 options. 556 F.3d at 586.

options. *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009). While ERISA's 404(c)

regulation does not place a maximum limit on the number of funds (Doc. 45 at 20),[27] ERISA

does require that a fiduciary evaluate "the prudence of *each* investment option available to plan

participants." *DiFelice*, 497 F.3d at 423.

### 4. NYU retained underperforming actively managed funds instead of replacing them with superior low-cost alternatives.

"[C]ost-conscious management is fundamental to prudence in the investment function," and

should be applied "in monitoring and reviewing investments." *Tibble*, 2016 U.S. App. LEXIS

22366, at *21 (quoting RESTATEMENT (THIRD) OF TRUSTS §90, cmt. b). Virtually no active

investment manager consistently beats the market over time after accounting for higher active

management fees, particularly in efficient markets, such as large capitalization U.S. stocks. *Id.*

¶¶48, 53–56, 166–68. Thus, while a fiduciary may consider higher-cost, actively-managed

mutual funds as an alternative to index funds, "active management strategies involve

investigation expenses and other transaction costs . . . that must be considered, realistically, in

relation to the likelihood of increased return from such strategies." RESTATEMENT (THIRD) OF

TRUSTS, ch. 17, intro. note; *id.* §90 cmt. h(2); AC ¶¶52, 57, 166, 169, 220. Moreover, the worst

performing funds show a persistent tendency to continue their poor performance. AC ¶56. Thus,

when an actively managed fund has a sustained record of poor performance over a number of

years, sophisticated investment professionals understand it is unrealistic to expect that continuing

to pay higher active management fees will be justified by superior performance.

As of year-end 2009, the CREF Stock and TIAA Real Estate accounts had both drastically

underperformed comparable lower-cost alternatives over the preceding one-, five-, and ten-year

---

[27] NYU's suggestion that the duty to diversify requires a large number of investment alternatives is baseless. Each investment option in a defined contribution plan is typically diversified at the fund level. *See* 29 C.F.R. §2550.404c-1(b)(3). NYU fails to show that it is necessary to include anywhere close to 100 such options in a plan in order to "minimize the risk of large losses." 29 U.S.C. §1104(a)(1)(C).

periods. AC ¶¶178–79, 186–87. In March 2012, independent investment consultant AonHewitt recommended removing the CREF Stock Account due to its historical underperformance and investment strategy which greatly reduced the fund's ability to generate excess returns over substantial periods. *Id*. ¶180. Despite this, NYU did nothing to monitor these funds, and instead allowed them to remain in the Plans. *Id*. ¶¶180–182, 188. As a result, the Plans suffered losses due to poor performance and excessive fees. After 2009, the CREF Stock and TIAA Real Estate accounts continued to underperform the same alternatives, as well as other benchmarks, resulting in millions of dollars in losses to the Plans that would have been avoided if NYU had prudently reviewed and monitored these funds. *Id*. ¶¶175, 177, 182–83, 187–89. Such "specific comparisons" showing that actively managed funds underperformed "similar but more cost effective funds available in the market" are sufficient to state a claim. *Braden*, 588 F.3d at 585.[28]

NYU's assertions that these funds should be evaluated based on different benchmarks and performance periods "raise factual issues that cannot be resolved" at this stage. *Moreno v. Deutsche Bank Ams. Holding Corp.*, No. 15-9936, 2016 U.S.Dist.LEXIS 142601, at *18 (S.D.N.Y. Oct. 13, 2016). NYU and TIAA also have repeatedly informed participants that the Russell 3000 index is the proper benchmark for CREF Stock. AC ¶¶174; Doc. 46-5 at 8; Doc. 46-8 at 3. NYU cam explain at trial why it now believes that benchmark was inappropriate.

NYU contends that the Vanguard REIT Index, a mutual fund, is not a proper benchmark for the TIAA Real Estate Account, an annuity. Doc. 45 at 23–24. The benchmark that NYU uses is S&P 500 index, which is also not an annuity and not a real estate fund at all. Doc. 46-5 at 11. The comparison to the Vanguard REIT Index is proper because it was *already* in the Plans. Doc. 46-8 at 9; Doc. 46-9 at 7. Ultimately, the proper index is a factual question for trial. That TIAA

---

[28] The plaintiffs in *Taylor v. United Techs. Corp.*, No. 06-1494, 2009 U.S.Dist.LEXIS 19059, at *28–29 (D.Conn. Mar. 3, 2009), did "not address[] the imprudence of selecting any particular actively-managed mutual funds," and there was evidence that the fiduciaries analyzed the impact of higher fees on fund returns, which is not the case here.

Real Estate purportedly outperformed the Vanguard REIT Index in certain years *after* 2009 and underperformed in others does not negate the inference that TIAA Real Estate should have been removed based on the information available to NYU in 2009. NYU's attempt to show prudence based on mixed results after 2009 is an impermissible use of hindsight. *Cf.* Doc. 45 at 22.[29]

### E.      Counts II, IV, and VI state plausible prohibited transaction claims.

ERISA's definition of "party in interest" includes service providers such as TIAA and Vanguard. 29 U.S.C. §1002(14)(B). NYU contends that the *mutual funds* that paid TIAA and Vanguard are not "parties in interest" under §1106(a). Doc. 45 at 25. But TIAA and Vanguard themselves provided the "services" furnished between the Plans and TIAA and Vanguard. 29 U.S.C. §1106(a)(1)(C). A plaintiff states a §1106(a)(1)(C) claim based on allegations that a recordkeeper/party in interest received "revenue sharing payments in exchange for services rendered to the Plan." *Braden*, 588 F.3d at 601. That is what Plaintiffs allege here. AC ¶¶214–15. Further, in the Plans' annual reports filed with the DOL, NYU admits that the management of the Plans' investments by TIAA-CREF and Vanguard "qualify as party-in-interest transactions."[30]

NYU erroneously contends that revenue sharing payments from mutual funds cannot violate §1106(a) because mutual fund assets are not "plan assets." Doc. 45 at 26. Section 1106(a)(1) is not limited to "plan assets," but instead includes "exchange of *any property*" (A) and furnishing of "services" (C). These provisions are intended to be read broadly. *Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1213 (2d Cir. 1987). Revenue sharing arrangements that pay for recordkeeping are covered by §1106(a)(1)(C). *Braden*, 588 F.3d at 601.[31] Moreover, revenue sharing that is delivered to a plan recordkeeper *is* a plan asset. *Haddock v. Nationwide Fin.*

---

[29] Because Plaintiffs have sufficiently alleged claims under Counts I–VI, NYU's argument regarding the failure-to-monitor claim fails. *Moreno*, 2016 U.S.Dist.LEXIS 142601, at *23–24; *cf.* Doc. 45 at 23.

[30] Relevant excerpts attached as Exhibits 4 and 5.

[31] *Hecker* did not address §1106(a) and its "plan asset" analysis addressed only whether a mutual fund adviser that decides how much of the mutual fund's fees to share with a recordkeeper is a plan fiduciary. 556 F.3d at 584.

*Servs.*, 419 F.Supp.2d 156, 167–71 (D.Conn. 2006); DOL Adv. Op. 2013-03A at 2–3.

Plaintiffs are not required to disprove application of the exemption in §1108(b)(2), because it is an affirmative defense that NYU bears the burden of pleading and proving. *Allen*, 835 F.3d at 676; *Braden*, 588 F.3d at 601–02; *Moreno*, 2016 U.S.Dist.LEXIS 142601, at *18–19; *see also Lowen*, 829 F.2d at 1215; *Fish v. Greatbanc Tr. Co.*, 749 F.3d 671, 685 (7th Cir. 2014). In any event, the complaint amply shows that the compensation paid to TIAA and Vanguard was not reasonable, two recordkeepers were not necessary, and the exemption thus does not apply.[32]

## III.     Plaintiffs did not have "actual knowledge" of their claims.

Because it involves an affirmative defense, dismissal on limitations grounds is warranted only if "it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law." *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 425 (2d Cir. 2008); *Moreno*, 2016 U.S.Dist.LEXIS 142601, at *10.

ERISA's "actual knowledge" requirement is "strictly construed[.]" *L.I. Head Start Child Dev. Servs. Inc. v. Econ. Opportunity Council of Suffolk, Inc*., 710 F.3d 57, 67 (2d Cir. 2013). It requires "knowledge of all facts necessary to constitute a claim." *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 193 (2d Cir. 2001). This may "include necessary opinions of experts, knowledge of a transaction's harmful consequences, or even actual harm." *Id*. "[D]isclosure of a transaction that is not inherently a statutory breach of fiduciary duty … cannot communicate the existence of an underlying breach." *Id*. Constructive knowledge is not "actual knowledge." *Id*. at 194. When beneficiaries claim 'the fiduciary made an *imprudent* investment, actual knowledge of the breach will usually require some knowledge of how the fiduciary selected the investment.'" *Tibble*, 729

---

[32] NYU suggests that it qualifies for an §1108(b)(2) exemption unless it failed to disclose fees or revenue sharing. Doc. 45 at 28. Disclosure is a condition to satisfying only *one* of the three elements under §1108(b)(2), that the "contract or arrangement" is "reasonable." *See* 29 CFR §2550.408b-2(c)(1)(i). The fiduciary must separately show that the service is "necessary" and *compensation* no more than "reasonable." 29 U.S.C. §1108(b)(2); 29 CFR §2550.408b-2(a)(1). Those elements have nothing to do with disclosure, and the complaint shows they are not met.

F.3d at 1121, *vacated on other grounds*, 135 S. Ct. 1823 (citation omitted). "[A] plaintiff asserting a process-based claim under §1104, §1106(a), or both does not have actual knowledge of the procedural breach of fiduciary duties unless and until she has actual knowledge of the procedures used or not used[.]" *Fish*, 749 F.3d at 681.

Plaintiffs' claims do not involve transactions that are "inherently a statutory breach of fiduciary duties," but rather are based on a flawed process. Thus, "actual knowledge" requires knowledge of the process (or lack thereof) that NYU used to manage the Plans. The charts that NYU cites provide only basic information about the Plans' investments and service providers. The charts do not disclose the process or failure of process that NYU used resulting in the Plans' lineup and fees, its failures to solicit competitive recordkeeping bids, to obtain lower-cost share classes available to the Plans, and to consider consolidation. The charts also do not disclose the fees and performance of "comparable funds." *See Leber v. Citigroup 401(k) Plan Inv. Comm.*, No. 07-9329, 2014 U.S.Dist.LEXIS 139001, at *15 (S.D.N.Y. Sep. 30, 2014)(finding that "Plaintiffs could not have known that the fees were excessive" without such a comparison).[33]

The charts also did not supply knowledge of prohibited transactions. When a fiduciary claims a §1108 exception applies, as NYU does here (Doc. 45 at 27; Ex. 4 (Med. Plan 5500)), a "plaintiff does not have actual knowledge … until she knows that the exception does not apply." *Fish*, 749 F.3d at 687. The charts do not show the inapplicability of any §1108(b) exceptions.

## CONCLUSION

For the above reasons, Defendants' motion to dismiss should be denied.

---

[33] *Young v. GM Inv. Mgmt. Corp.*, 550 F.Supp.2d 416 (S.D.N.Y. 2008), is inapposite because the plaintiffs' claims were not based on facts regarding the fees and performance of comparable alternatives that were available to the plan, while Plaintiffs' claims here are based on such comparisons. Without knowledge of the fees and performance of those alternative funds, Plaintiffs could not have known of NYU's breach of fiduciary duty. *Leber*, 2014 U.S. Dist.LEXIS 139001, at *15. The court in *Krueger v. Ameriprise Fin., Inc.*, No. 11-02781, 2014 U.S.Dist.LEXIS 36435, at *32 (D.Minn. Mar. 20, 2014), felt bound to follow as circuit law dictum in *Brown v. Am. Life Holdings, Inc.*, 190 F.3d 856, 859 (8th Cir. 1999)(dictum because no prohibited transaction claim). This Court is not so bound.

January 9, 2017                          Respectfully submitted,

                                         /s/ Jerome J. Schlichter
                                         SCHLICHTER BOGARD & DENTON LLP
                                         Andrew D. Schlichter, Bar No. 4403267
                                         Jerome J. Schlichter*
                                         Michael A. Wolff*
                                         Troy A. Doles*
                                         Heather Lea*
                                         Stephen M. Hoeplinger*
                                         James Redd, IV*
                                         100 South Fourth Street, Suite 1200
                                         St. Louis, Missouri 63102
                                         (314) 621-6115, (314) 621-7151 (fax)
                                         aschlichter@uselaws.com
                                         jschlichter@uselaws.com
                                         mwolff@uselaws.com
                                         tdoles@uselaws.com
                                         hlea@uselaws.com
                                         shoeplinger@uselaws.com
                                         jredd@uselaws.com

                                         *Attorneys for Plaintiffs*