UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X

DR. ALAN SACERDOTE, et al.,

                            Plaintiffs,

                -v-

NEW YORK UNIVERSITY,

                         Defendant.

-------------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: <u>August 25, 2017</u>

16-cv-6284 (KBF)

<u>OPINION & ORDER</u>

KATHERINE B. FORREST, District Judge:

      Plaintiffs, individually and as the representatives of a class, have alleged

that defendant New York University ("NYU") has violated sections 404 and 406 of

the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1104 and

1106 (2012).  The instant action against NYU is one of a number of cases filed in

district courts across the country by the same counsel alleging that university

pension plans, known as "403(b) plans," typically with significant assets, have not

been managed prudently or for the exclusive purpose of providing benefits to

participants and their beneficiaries, in violation of ERISA.  Here, plaintiffs allege a

wide array of acts or omissions by NYU that they assert amount to serious ERISA

violations with regard to two 403(b) plans.

      ERISA requires, inter alia, that NYU comply with its fiduciary obligation to

administer the Plans solely in the interest of Plan participants and to act prudently.

As discussed below, while plaintiffs have adequately plead certain claims, the Court

finds that a number of the bases upon which they rely as support for other claims could not—even if proven—result in a favorable judgment.  For the reasons set forth below, NYU's motion to dismiss is GRANTED in part and DENIED in part.

I.    BACKGROUND

NYU sponsors two defined contribution retirement plans (together, the "Plans"), which are qualified under 26 U.S.C. § 403(b)(1)(A).  (ECF No. 39, Plaintiffs' Amended Complaint ("Am. Compl.") ¶¶ 26, 70.)  Both the New York University Retirement Plan for Members of the Faculty, Professional Research Staff, and Administration ("Faculty Plan") and the NYU School of Medicine Retirement Plan for Members of the Faculty, Professional Research Staff and Administration ("Medical Plan") are defined contribution, individual account, employee pension benefit plans.  (Id. ¶¶ 9, 13.)  The Faculty Plan covers substantially all members of NYU's faculty, professional research staff, and administration, other than employees of the School of Medicine, who are covered by the Medical Plan.  (Id. ¶¶ 11, 15.)

Under the terms of both Plans, participants may contribute a discretionary amount of their annual compensation to the Plans, and NYU makes a matching contribution.  (Id. ¶ 17.)  The Plans' fiduciaries choose the investment Options for the Plans, but it is the participants themselves who direct their contributions into a particular investment option ("Option").  (Id. ¶ 18.)  There is no allegation that any Plan participant was required to invest in any particular investment Option.  Rather, plaintiffs allege that Defendant included expensive or imprudent options

2

among the array of choices, allowed the service providers to mandate inclusion of their own investment products and recordkeeping services, failed to remove poorly performing funds, and engaged in prohibited transactions.

As of December 31, 2014, the Faculty Plan offered 103 total investment Options—25 TIAA-CREF investment Options and 78 Vanguard Options.  (Id. ¶ 107.)  As of that same date, the Medical Plan offered 11 TIAA-CREF investment Options and 73 Vanguard Options, for a total of 84 Options.  (Id. ¶ 108.)  Both Plans offered the TIAA Traditional Annuity, which is a fixed annuity contract that returns a contractually specified minimum interest rate.  (Id. ¶ 112.)  TIAA-CREF requires plans that offer the TIAA Traditional Annuity to also offer the CREF Stock and Money Market accounts and to use TIAA as a recordkeeper for its proprietary products.  (Id. ¶ 110.)  The other TIAA-CREF investment Options in the Plans include variable annuities, an insurance separate account (the TIAA Real Estate Account), and mutual funds.  (Id. ¶¶ 114-19.)  The remaining investment Options in the Plans are Vanguard mutual funds, which charge investment management, distribution, marketing, and other fees.  (Id. ¶ 119.)

The Amended Complaint alleges that the named plaintiffs were invested in a number—but by no means all—of the investment Options, including: the CREF Bond Market, CREF Global Equities, CREF Growth, CREF Stock, TIAA Real Estate, Vanguard Energy, Vanguard Explorer, Vanguard GNMA, Vanguard Health Care, Vanguard High-Yield Corporate, Vanguard Inflation-Protected Securities, Vanguard Institutional Index, Vanguard Long-Term Treasury, Vanguard Morgan

3

Growth, Vanguard Prime Money Market, Vanguard Small Cap Value Index, Vanguard Target Retirement 2015, Vanguard Target Retirement 2050, Vanguard Total Bond Market Index, Vanguard Total International Stock Index, and Vanguard Windsor II accounts.  (Id. ¶ 8(c).)

Both TIAA-CREF and Vanguard are recordkeepers for the Faculty Plan, and NYU did not consolidate the Medical Plan to a single recordkeeper (TIAA-CREF) until late 2012.  (Id. ¶ 126.)  Plaintiffs point to three other Plans, as well as industry reports, to support their assertions that many other Plans have implemented systems with single recordkeepers.  (Id. ¶¶ 87-103.)

In terms of assets, the Faculty Plan is among the largest 0.04% and the Medical Plan is among the largest 0.06% of defined contribution plans in the United States.  (Id. ¶¶ 12, 16.)  According to plaintiffs, plans of such size are referred to as "jumbo plans," and their large size affords them "enormous bargaining power" to command low investment management and recordkeeping fees for their participants.  (Id.)

Plaintiffs allege that NYU breached its fiduciary duties of loyalty and prudence by failing to use "the Plans' bargaining power to reduce expenses and failing to exercise independent judgment to determine what investments to include in the Plans."  (Id. ¶ 4.)  Plaintiffs further allege that defendant allowed the Plans' "conflicted third party service providers—TIAA-CREF and Vanguard—to dictate the Plans' investment lineup, to link its recordkeeping services to the placement of investment products in the Plans, and to collect unlimited asset-based

4

compensation from their own proprietary products." (Id.)  In addition, to the extent defendant delegated any of its fiduciary responsibilities to another fiduciary, plaintiffs allege that defendant breached its duty to monitor.  (Id. ¶¶ 236-39.)

Plaintiffs further allege that NYU engaged in prohibited transactions because plaintiffs, through their investments, "paid a portion of the Plans' excessive administrative and recordkeeping fees, [costs] which would not have been incurred had defendants discharged their fiduciary duties to the Plan." (Id. ¶ 8.)  They also list the particular funds in which each named plaintiff was invested, noting that each paid a portion of these "excessive" fees through revenue sharing payments. (Id.)  They further allege that by "allowing the Plans to be locked into an unreasonable arrangement that required the Plans to include the CREF Stock Account and to use TIAA as the recordkeeper for its proprietary products," (id. ¶ 203), allowing the service providers to collect "unreasonable fees," (id. at ¶ 215), and including Options that cost more than identical alternatives, (id. at ¶ 232), the defendants engaged in exchanges of property prohibited under § 406.

II.    STANDARD OF REVIEW

   A. Motion to Dismiss

When resolving a motion to dismiss, a court must construe the complaint liberally, accepting all factual allegations in the complaint as true and drawing all reasonable inferences in favor of the nonmoving party.  Gregory v. Daly, 243 F.3d 687, 691 (2d Cir. 2001), as amended (Apr. 20, 2001).  A complaint survives a motion to dismiss under Rule 12(b)(6) if it "contain[s] sufficient factual matter, accepted as

5

true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556

U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows

the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." Id.

   Where, as here, a complaint alleges that a defendant failed to act prudently

within the meaning of ERISA § 404(a), a failure to plead factual allegations

"referring directly to [defendant's] knowledge, methods, or investigations at the

relevant times" is not, by itself, "fatal to a claim alleging a breach of fiduciary duty"

if the process was flawed. Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic

Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc. (PBGC), 712 F.3d 705,

718 (2d Cir. 2013) (emphasis in original).  ERISA affords such leeway because

plaintiffs "generally lack the inside information necessary to make out their claims

in detail unless and until discovery commences." Id. (quoting Braden v. Wal-Mart

Stores, Inc., 588 F.3d 585, 598 (8th Cir. 2009)).

   At the motion to dismiss stage, "application of th[e] 'plausibility' standard to

particular cases is 'context-specific', and requires assessing 'the allegations of the

complaint as a whole.'" Id. at 19 (2d Cir. 2013) (first quote quoting Iqbal, 556 U.S.

at 679) (second quote quoting Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 47

(2011).  A complaint must therefore "be read as a whole, not parsed piece by piece

to determine whether each allegation, in isolation, is plausible." Braden, 588 F.3d

at 594.[1]  Here, plaintiffs' complaint contains seven counts, each of which include several categories of allegations regarding purported breaches and violations.  (See Am. Compl. ¶¶ 195-240.)  Defendant argues that the individual allegations supporting each count fail to state a claim.  But to the extent one or more allegations plausibly enable the Court to infer that plaintiffs have stated a claim under a particular count, the Court need not assess whether the remaining allegations in such a count could independently support that claim.

B.  Fiduciary Duties and Prohibited Transactions

Under ERISA, the duties owed by fiduciaries to plan participants and beneficiaries "are those of trustees of an express trust—the highest known to the law."  Donovan v. Bierwirth, 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982).  ERISA § 404(a)(1) imposes twin duties of prudence and loyalty on fiduciaries of retirement plans.  The duty of loyalty, codified in ERISA § 404(a)(1)(A), requires fiduciaries to act "solely in the interest of the participants and beneficiaries," and "for the exclusive purpose of providing benefits to participants and their beneficiaries; and defraying reasonable expenses of administering the plan."  ERISA § 404(a)(1)(A). The Supreme Court has "often noted that an ERISA fiduciary's duty is 'derived from the common law of trusts.'"  Tibble v. Edison Int'l, 135 S. Ct. 1823, 1828 (2015) (quoting Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc., 472

---

[1] During oral argument on defendant's motion to dismiss, the Court asked the parties to explain whether and when various allegations that are in and of themselves insufficient to state a claim for imprudence or disloyalty should be viewed in the aggregate, such that they can be said to demonstrate, as a whole, that the complaint plausibly states a claim or claims.  (See ECF No. 59.) The Court has considered the parties' arguments on this point in deciding the present motion.

U.S. 559, 570 (1985)).  The Restatement (Third) of Trusts, which the Supreme Court has turned to "[i]n determining the contours of an ERISA fiduciary's duty," id., explains that that "duty of loyalty" bars trustees from "engaging in transactions that involve self-dealing or that otherwise involve or create a conflict between the trustee's fiduciary duties and personal interests."  Restatement (Third) of Trusts § 78 (2007); see also Pegram v. Herdrich, 530 U.S. 211, 224 (2000) ("Perhaps the most fundamental duty of a trustee is that he must display throughout the administration of the trust complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons.").

The duty of prudence, codified in ERISA § 404(a)(1)(B), requires a pension plan fiduciary to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  ERISA § 404(a)(1)(B).  The "prudent person" standard asks whether "the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment."  Katsaros v. Cody, 744 F.2d 270, 279 (2d Cir. 1984) (quoting Donovan v. Mazzola, 716 F.2d 1226, 1232 (9th Cir. 1983), cert. denied, 464 U.S. 1040 (1984).  Fiduciaries' prudence is measured against an objective standard, and their own "lack of familiarity with investments is

no excuse" for failing to act with the care, skill, prudence and diligence required under the circumstances then prevailing.  Id.

ERISA § 406(a)(1) "supplements the fiduciary's general duty of loyalty to the plan's beneficiaries . . . by categorically barring certain transactions deemed 'likely to injure the pension plan.'"  Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc., 530 U.S. 238, 241 (2000) (quoting Comm'r Internal Revenue v. Keystone Consol. Indus., Inc., 508 U.S. 152, 160 (1993)).  As is relevant here, ERISA provides:

> A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—
> (A) sale or exchange, or leasing, of any property between the plan and a party in interest; . . .
> (C) furnishing of goods, services, or facilities between the plan and a party in interest;
> (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan . . . .

ERISA § 406(a)(1).  To state a claim under ERISA § 406(a)(1)(A), (C), or (D), plaintiffs must allege that the defendant is a fiduciary; the defendant caused the plan to engage in one of the prohibited transactions set forth in § 406(a)(1); the transaction was "between the plan and a 'party in interest'" (for § 406(a)(1)(A) and (C)) or involved plan assets (for § 406(a)(1)(D)); and the defendant knew or should have known that the transaction was prohibited.  See id.

The prohibitions set forth in § 406(a)(1) are subject to a number of statutory exemptions, which are codified in ERISA § 408, and which are affirmative defenses that a defendant bears the burden of proving by a preponderance of the evidence if their applicability is in dispute.  Leber v. Citigroup, Inc., No. 07 CIV. 9329 (SHS),

9

2010 WL 935442, at *11 (S.D.N.Y. Mar. 16, 2010); see also Lowen v. Tower Asset

Mgmt., Inc., 829 F.2d 1209, 1215 (2d Cir. 1987).  Thus, "on a Rule 12(b)(6) motion, it

must be clear from the face of the Complaint or judicially noticed court filings that

the Plan's use of proprietary funds falls within an available exemption."  Moreno v.

Deutsche Bank Americas Holding Corp., No. 15 CIV. 9936 (LGS), 2016 WL

5957307, at *6 (S.D.N.Y. Oct. 13, 2016) (citing Staehr v. Hartford Fin. Servs. Grp.,

Inc., 547 F.3d 406, 425 (2d Cir. 2008)).

III.    COUNTS I, III, AND V—CLAIMS UNDER ERISA § 404(A)(1)(A)

In Counts I, III, and V, Plaintiffs allege breaches of the duties of both loyalty

and prudence.  These are separate claims—but pled in a single count.  Loyalty

claims arise under § 404(a)(1)(A) and prudence claims arise under § 404(a)(1)(B).

The Court addresses alleged breaches of the duty of loyalty in this section and

prudence in the following section.

Plaintiffs' loyalty claims are based on allegations that NYU:

(1) "favor[ed] the financial interests of TIAA-CREF in receiving a steady

stream of revenues from bundled services over the interest of participants"

(Count I) (ECF No. 39 ¶ 198);

(2) "allow[ed] TIAA-CREF and Vanguard to put their proprietary

investments in the Plans without scrutinizing those providers' financial

interest in using funds that provided them a steady stream of revenue

sharing payments" (Count III) (id. ¶ 209); and

(3) failed to consider the conflicts associated with offering the recordkeepers'

own proprietary investments in the Plans (Count V) (id. ¶ 223).

Defendant argues that plaintiffs have failed to plead sufficient facts to

support the loyalty-based claims.  (ECF No. 45 at 6.)  The Court agrees.  To state a

loyalty-based claim under ERISA § 404(a)(1)(A), a plaintiff must do more than

simply recast purported breaches of the duty of prudence as disloyal acts.  See, e.g.,

White v. Chevron Corp., No. 16-CV-0793-PJH, 2017 WL 2352137, at *7 (N.D. Cal.

May 31, 2017) (holding plaintiff failed to state claim under ERISA § 404(a)(1)(A)

where "most of the allegations . . . do not relate to the duty of loyalty, as

distinguished from the duty of prudence").  Turning to the Restatement (Third) of

Trusts as guidance, the Court finds that, to state a claim under ERISA

§ 404(a)(1)(A), a plaintiff must allege facts that permit a plausible inference that the

defendant "engag[ed] in transactions involving self-dealing or otherwise involve or

create a conflict between the trustee's fiduciary duties and personal interests."

Restatement (Third) of Trusts § 78 (2007); see also Gearren v. McGraw-Hill

Companies, Inc., 690 F. Supp. 2d 254, 261 (S.D.N.Y. 2010), aff'd sub nom. Gearren

v. The McGraw-Hill Companies, Inc., 660 F.3d 605 (2d Cir. 2011) ("To state a claim

for breach of fiduciary duty under ERISA, Plaintiffs must adequately allege that (1)

Defendants were fiduciaries of the plan who, (2) while acting within their capacities

as plan fiduciaries, (3) engaged in conduct constituting a breach of an ERISA

fiduciary duty.").

Put differently, a plaintiff does not adequately plead a claim simply by making a conclusory assertion that a defendant failed to act "for the exclusive purpose of" providing benefits to participants and defraying reasonable administration expenses; instead, to implicate the concept of "loyalty," a plaintiff must allege plausible facts supporting an inference that the defendant acted <u>for the purpose</u> of providing benefits to itself or someone else.  <u>Compare</u> <u>White</u>, 2017 WL 2352137, at *6 (stating that original complaint failed to plead facts "sufficient to raise a plausible inference that defendants had engaged in self-dealing or had taken any of the actions alleged for the purpose of benefitting themselves or a third-party entity . . . or that they had acted under any actual or perceived conflict of interest in administering the Plan"), <u>with</u> <u>In re Am. Int'l Grp., Inc. ERISA Litig. II</u>, No. 08 CIV. 5722 LTS KNF, 2011 WL 1226459 (S.D.N.Y. Mar. 31, 2011) (denying motion to dismiss breach of loyalty claim where plaintiffs alleged that certain fiduciary defendants knowingly allowed company to make employer-contribution matching obligations with overvalued stock, which benefitted company over plan participants), <u>and</u> <u>Terraza v. Safeway Inc.</u>, No. 16-CV-03994-JST, 2017 WL 952896, at *7 (N.D. Cal. Mar. 13, 2017) (denying motion to dismiss breach of loyalty claim where plaintiffs alleged that plan administrators permitted trustee to confirm value of its own trusts and to "engag[e] in unlawful product-steering practices to influence its customers to invest in its own proprietary funds").

Implicit in the above-referenced caselaw is that an act which has the effect of furthering the interests of a third party is fundamentally different from an act

12

taken with that as a goal.  The former may well not be a violation of the duty of loyalty, but the latter may well be.  Here, no factual allegations support purposeful action by NYU to benefit another (let alone itself).  If the Court were to allow mere allegations that defendant's conduct "advanced the financial interests" of a third party to state a claim under ERISA § 404(a)(1)(A), then the duties of loyalty and prudence would collapse into a single claim.

Reviewed according to these principles, plaintiffs' allegations in Counts I, III, and V fail to plead a breach of a duty of loyalty.  In Count I, plaintiffs' allegations are principally based on NYU purportedly allowing TIAA-CREF and Vanguard to include their proprietary investments in the Plans without considering potential conflicts, which favored TIAA-CREF's and Vanguard's own interests through the provision of allegedly bundled services.[2]  As pled, these allegations do not include facts suggesting that defendant entered into the transaction for the purpose of (rather than merely having the effect of) benefitting TIAA-CREF.  (See Am. Compl. ¶¶ 195-99.)  Similarly, in Count III, the allegation that defendant allowed TIAA-CREF (or itself) and Vanguard to include proprietary investments in the Plans "without scrutinizing those providers' financial interests in using funds that provided them a steady stream of revenue sharing payments," (Am. Compl. ¶ 209), is a claim that NYU followed an imprudent process—not that it acted disloyally.  Finally, in Count V, plaintiffs allege that "[a]ll of the Plans' options were the

---

[2] The Court also notes an allegation that defendant "favored" another's financial interests cannot carry the weight of Count I because the word "favor" does not provide factual context on its own.

recordkeepers' own proprietary investments." (Am. Compl. ¶ 223.) But that allegation does not support an inference that defendant failed to act solely in the interest of participants.

In support of its breach of the duty of loyalty claim, plaintiffs point to the Eighth Circuit's decision <u>Braden</u>. There, as here, plaintiffs alleged that the Plan included a limited number and type of funds that were selected despite readily available alternatives, and that the investment options were chosen to benefit the trustee at the expense of the participants. <u>Id.</u> at 596. The <u>Braden</u> court determined that such allegations, if substantiated, would demonstrate that "the process by which appellees selected and managed the funds in the Plan [had] been tainted by failure of effort, competence, or loyalty." <u>Id.</u> Plaintiffs assert that the same result should apply here. But in <u>Braden</u>, the Court made clear that its conclusion "rest[ed] on the totality of the specific allegations in th[e] case," <u>id.</u> 596 n.7, and the <u>Braden</u> plaintiffs—unlike the current plaintiffs—alleged facts indicating that the defendant had failed to disclose material information regarding the funds' performance and fees, including the fact that funds purportedly made revenue sharing payments (of concealed amounts) to the trustee in exchange for inclusion in the plan, <u>id.</u> at 598-600. Such purported kickbacks, and the fiduciaries' concealment thereof, plausibly supported concerns regarding "latent conflicts of interest which affect participants' ability to make informed decisions about their benefits." <u>Id.</u> at 600. Plaintiffs here have not pled similar facts.

Accordingly, the loyalty claims included in Counts I, III, and V are dismissed.

IV.     COUNTS I, III AND V—CLAIMS UNDER ERISA § 404(A)(1)(B)

As stated above, ERISA provides for separate duties of prudence and loyalty. The Court addressed the loyalty-based claims in the preceding section and here addresses the prudence claims arising under § 404 (a)(1)(B).

A. <u>Count I</u>

In Count I, plaintiffs allege that defendant breached the duty of prudence set forth in ERISA § 404(a)(1)(B) by acting or failing to act in the following ways:

(1) Entering into an arrangement that required the Plans to include and retain particular investment Options (specifically, the CREF Stock Account and Money Market Account) regardless of their prudence; and

(2) Retaining TIAA-CREF as a recordkeeper, regardless of its cost-effectiveness and quality of service.  (Am. Compl. ¶¶ 196-99.)

Plaintiffs refer to both of these as "lock-in" arrangements (Am. Compl.¶ 202) and assert that they singly or together constitute a breach of ERISA § 404(a)(1)(B) because they prevented defendant from fulfilling its ongoing duty to independently assess the prudence of each investment Option in the Plans and to remove any investments that became, for whatever reason, imprudent.  (<u>Id.</u> ¶ 198.)

In <u>Tibble v. Edison Int'l</u>, 135 S. Ct. 1823 (2015), the Supreme Court held that "[a] plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones."  <u>Id.</u> at 1829; <u>see also</u> <u>Henderson v. Emory Univ.</u>, No. 1:16-CV-2920-CAP, 2017 WL 2558565, at *6 (N.D. Ga. May 10, 2017) (declining to dismiss a nearly identical count in a nearly identical

15

suit filed against Emory University).  The facts in <u>Tibble</u>, however, are not on all fours with this case.  In <u>Tibble</u>, the defendant initially offered only six investment options; when the plaintiffs sought more, the defendant added fifty.  Brief for the Respondents at 7, <u>Tibble</u>, 135 S. Ct. 1823 (2014) (No 13-550); <u>see also</u> Brief for the Petitioners at 5-8, <u>id.</u>  All told, in <u>Tibble</u>, about 11% of the investment Options were being challenged.  Here, in contrast, plaintiffs allege that defendant offered more than 100 investment Options in the Faculty Plan and 84 in the Medical Plan at all times material to this litigation—the challenged Options therefore amount to 1.9% of the available Options in the Faculty Plan and 2.4% of those in the Medical Plan.

Moreover, while plaintiffs allege that NYU was contractually required by the service providers to include certain investment Options, there is no allegation that plaintiffs were required to invest in any particular investment Option.  In fact, the Amended Complaint alleges that plaintiffs had myriad different investment Options from which they could choose; dozens of investment Options are not alleged to be subject to any "lock-in."

In addition, the Second Circuit requires that, in order to state a claim for breach of the duty of prudence connected to the retention of certain investment Options, plaintiffs must raise a plausible inference that "the investments at issue were so plainly risky at the relevant times that an adequate investigation would have revealed their imprudence, or that a superior alternative investment was readily apparent such that an adequate investigation would have uncovered that alternative"; that is, that "a prudent fiduciary in like circumstances would have

16

acted differently." PBGC, 712 F.3d at 719-20.  Defendant's contractual agreement to include certain investment Options does not, by itself, demonstrate imprudence— plaintiffs have not demonstrated that this arrangement resulted in the Plans' inclusion of "plainly risky" Options.  In other words, plaintiffs have not plausibly alleged that defendant engaged in a transaction that in fact (versus in theory) contractually precluded the Plans' fiduciaries from fulfilling their broad duties of prudence to monitor and review investments under this standard.

As an additional basis for their prudence claim in Count I, plaintiffs allege that defendant entered into a binding contractual arrangement with TIAA-CREF requiring NYU to use its recordkeeping services.  However, merely having a contractual arrangement for recordkeeping services does not, as a matter of law, constitute a breach of the duty of prudence—to support a claim on this basis, plaintiff must make a plausible factual allegation that the arrangement is otherwise infirm.  Plaintiffs have failed to do so here.  Instead, plaintiffs attempt to support their claim by adding a series of assertions that alternative recordkeepers— with whom NYU was allegedly precluded from contracting—could have provided "superior services at a lower cost."  (Am. Compl. ¶ 198.)  But, as defendant argues, this fact alone does not support imprudence.  (ECF No. 45 at 27.)  If it did, the mere entry into the market of a lower-cost and superior provider would lead to a breach of fiduciary duty.  This is not the law.  While defendant is certainly bound by the fiduciary duty when selecting service providers, Leber, 2010 WL 935442, at *5, a

contract that restricts NYU's ability to seek less expensive service providers, standing alone, does not breach this duty.

Count I is therefore dismissed in its entirety, as both the loyalty and prudence claims alleged in it are unsupported.

B. <u>Count III</u>

In Count III, plaintiffs allege that defendant breached its duty of prudence with regard to incurring excessive administrative fees relating to recordkeeping. According to plaintiffs, the breach arose from the following actions or inactions:

(1) NYU failed to solicit competitive bids from other recordkeepers;

(2) It failed to monitor and control recordkeeping fees by not (a) monitoring the amount of revenue sharing received by the Plans' recordkeepers, (b) determining the competitiveness/reasonability of those amounts, or (c) leveraging the Plans' size to reduce fees; and

(3) It failed "to engage in a timely and reasoned decisionmaking process" to determine whether the Plans should use a single recordkeeper.

(Am. Compl. ¶¶ 217-29.)

Defendant argues that plaintiffs have failed to allege why the fees in question were excessive relative to the services rendered.  According to defendant, and as set forth in the Second Circuit's decision in <u>Young v. Gen. Motors Inv. Mgmt. Corp.</u>, 325 F. App'x 31 (2d Cir. 2009), whether fees are excessive or not is relative to the quality of services provided.  In other words, under <u>Young</u>, in certain circumstances,

paying more for superior services might be more prudent than paying less for inferior ones.

In <u>Young</u>, the Second Circuit stated that to support a prudence claim based on excessive fees, a plaintiff must allege facts concerning factors "relevant to determining whether a fee is excessive under the circumstances." <u>Young</u>, 325 F. App'x at 33 (citing <u>Krinsk v. Fund Asset Mgmt., Inc.</u>, 875 F.2d 404, 409 (2d Cir. 1989)).  Facts may go to "the independence and conscientiousness of the [fiduciaries]," <u>Krinsk</u>, 875 F.2d at 409, and may tend to show whether a fiduciary failed to adequately tether fees to the services rendered or employed an imprudent process.

Here, however, plaintiffs allege more—they allege several forms of procedural deficiencies with regard to recordkeeping which both individually and combined are sufficient to separate the case from <u>Young</u>.  For example, they claim that defendant failed to seek bids from other recordkeepers and to ensure that participants were not being overcharged for services.  While ERISA does not dictate "any particular course of action," it does require a "fiduciary . . . to exercise care prudently and with diligence." <u>Chao v. Merino</u>, 452 F.3d 174, 182 (2d Cir. 2006) (first quote quoting <u>Diduck v. Kaszycki & Sons Contractors, Inc.</u>, 874 F.2d 912, 917 (2d Cir. 1989)).  The general requirements may be satisfied at the pleading stage with a variety of allegations, including certain of those here.  Thus, the principles set forth in <u>Young</u> do not, at this stage, defeat Count III.

Defendant also challenges plaintiff's claim that defendant breached its duty of prudence regarding administrative fees by failing to solicit bids from other recordkeepers, pointing out that competitive bidding is not per se required under ERISA. See White, 2016 WL 4502808, at *14. That is true. However, there are circumstances where a failure to run a competitive bidding process may be imprudent. See George v. Kraft Foods Glob., Inc., 641 F.3d 786, 800 (7th Cir. 2011) (holding "a trier of fact could reasonably conclude that defendants did not satisfy their duty to ensure that [recordkeeper's] fees were reasonable" where plan fiduciaries failed to solicit competitive bidding for more than fifteen years). Here, in addition, plaintiffs allege that a competitive bid would have benefitted the Plan or the Plan participants; the series of allegations on the "failure to get bids" claim is sufficient to support Count III. (Am. Compl. ¶ 136.) See also White, 2016 WL 4502808 at *14.

In addition, caselaw also supports claims for imprudence based on specific allegations of the level of fees and why such fees were/are unreasonable. Such allegations exist here. Plaintiffs allege that "[e]xperts in the recordkeeping industry" determined that the "market rate" for administrative fees for plans like those at issue in this case was $35 per participant, and that the Plans' recordkeeping fees far exceeded that amount. (Am. Compl. ¶ 132; ECF No. 47 at 13-14.) Thus, the "excessive recordkeeping fees" claim is sufficient to support Count III.

Defendant also attacks plaintiffs' allegations regarding revenue sharing with recordkeepers as a basis for a prudence claim.  In this regard, plaintiffs allege that defendant allowed TIAA-CREF to share in revenues obtained from administrative fees associated with certain investment Options.  According to plaintiffs, TIAA-CREF did not separately charge for recordkeeping, but rather obtained compensation for its services through the revenue share—they allege that this arrangement was imprudent.  While revenue sharing is a "common industry practice," a fiduciary's failure to ensure that "recordkeepers charged appropriate fees and did not receive overpayments for their services" may be a violation of ERISA.  <u>Henderson</u>, 2017 WL 2558565, at *5.  Accordingly, these "revenue-sharing" allegations are sufficient at this stage to support Count III.

In addition, plaintiffs claim that defendant's failure to use a single recordkeeper for each Plan itself demonstrates a lack of prudence.  Plaintiffs allege that a number of other plans consolidated into single recordkeeper arrangements to save costs; industry evidence is alleged as part of this.  (Am. Compl. ¶¶ 89-103.) While it should be noted that having a single recordkeeper is not required as a matter of law, based on the facts here alleged (for instance, that it consolidated recordkeeping for one plan but not the other), the allegation that a prudent fiduciary would have chosen fewer recordkeepers and thus reduced costs for Plan participants—the "recordkeeping consolidation" allegation—is sufficient at this stage to support Count III.  (<u>Id.</u> at *6.)

More broadly, when plaintiffs' prudence allegations in Count III are viewed as a whole, they plausibly support an assertion that the Plan fiduciaries failed to diligently investigate and monitor recordkeeping costs.  Such a holistic approach was applied in Tussey v. ABB, Inc., 746 F.3d 327 (8th Cir. 2014), in which the Eighth Circuit determined that a host of allegations, viewed together, amounted to a breach of the duty of prudence.  Id. at 336 (affirming the district court's holding that plan administrators breached their fiduciary duty by "fail[ing] to (1) calculate the amount the Plan was paying Fidelity for recordkeeping through revenue sharing, (2) determine whether Fidelity's pricing was competitive, (3) adequately leverage the Plan's size to reduce fees, and (4) 'make a good faith effort to prevent the subsidization of administration costs of [company's] corporate services' with Plan assets").[3]

Count III—insofar as it alleges a prudence claim—therefore survives defendant's motion to dismiss.

C.  Count V

In Count V, plaintiffs allege that defendant failed to prudently select and evaluate Plan investment Options in the following ways:

---

[3] Defendant seeks to distinguish Tussey on the ground that there, unlike here, plaintiffs alleged that "the revenue sharing went to pay expenses of the plan sponsor rather than plan expenses."  (ECF No. 45 at 9 n.27.)  Tussey does not require dismissal of this claim at this stage.  Allegations regarding misuse of revenue sharing payments go to a breach of the duty of loyalty, which defendant argues (and this Court agrees) is analytically distinct from the breach of the duty of prudence.  The Tussey court made a number of factual findings that concern the duty of prudence (e.g., the failure to calculate the amount of revenue sharing payments, to determine whether the recordkeepers' pricing was competitive, and to adequately leverage the plan's size to reduce fees), and similar allegations are present here.  Plaintiffs have therefore not failed, as a matter of law, to state facts that may amount to a breach of ERISA § 404(a)(1)(B).

(1) Continuing to offer two funds with high fees and poor performance—namely, the CREF Stock Account and the TIAA Real Estate Account;

(2) Including in the mix actively managed mutual funds and retail class options with high expenses and poor performance instead of other readily available Options;

(3) Including investment Options that had unnecessary layers of fees; and

(4) Failing to consolidate the Plans' offerings into a "core investment lineup." (Am. Compl. ¶ 217-229.)  Of these allegations, the first two support a claim of prudence while the others do not.

Count V may stand as long as any portion of plaintiff's allegations suffice to support the proposition that defendant failed to "employ[] the appropriate methods" in making investment decisions.  See Katsaros v. Cody, 744 F.2d 270, 279 (2d Cir. 1984) (quoting Donovan v. Mazzola, 716 F.2d 1226, 1232 (9th Cir. 1983)).  Plaintiffs have carried their pleading burden on the prudence claim included in Count V.

First, plaintiffs plausibly allege that NYU imprudently maintained investments in the CREF Stock Account and TIAA Real Estate Account.  Plaintiffs allege that these particular funds underperformed comparable lower-cost alternatives over the preceding one-, five-, and ten-year periods, and that other industry players had recommended removing at least the CREF Stock Account from client plans.  (Am. Compl. ¶¶ 178-89.)  Plaintiffs' "specific comparisons" to "allegedly similar but more cost effective fund[s]" support a claim of imprudence.  See Braden, 588 F.3d at 590; cf. Taylor, 2009 WL 535779, at *10 (finding plaintiffs' claims

23

regarding allegedly underperforming actively-managed mutual funds to be implausible because "plaintiffs have not addressed the imprudence of selecting any particular actively-managed mutual funds").

Defendant's assertion that plaintiffs "use patently inappropriate benchmarks over jury-rigged performance periods" raises factual questions that are not appropriately addressed at this time.  While it is true that a decline in price indicates only that, in hindsight, the investment may have been a poor one (rather than a continuing breach of a fiduciary duty), PBGC, 712 F.3d at 721 (dismissing claims of imprudence based on investments in subprime mortgage-backed securities that suffered losses in 2007 and 2008), here there is the additional allegation of a ten-year record of consistent underperformance.  Such an allegation, combined with an allegation of inaction, plausibly supports a claim.

Second, plaintiffs' allegations that NYU breached its fiduciary duties by offering actively managed funds that did not have a "realistic expectation of higher returns" also plausibly support a prudence claim at this stage.  Defendant points to Taylor v. United Techs. Corp., No. 3:06-CV-1494-WWE, 2009 WL 535779 (D. Conn. Mar. 3, 2009), aff'd, 354 F. App'x 525 (2d Cir. 2009), in which a district court in this circuit rejected similar allegations.  However, the Taylor Court's reasoning turned in large part on the plaintiffs' failure to address (1) the "imprudence of . . . any particular actively-managed funds" and (2) "the fact that two of the selected mutual fund options outperformed market benchmarks."  Id. at *10.  Here, by contrast, plaintiffs do challenge the performance of a specific actively managed fund (the

24

CREF Stock Account, (Am. Compl. ¶ 225)), and they allege that the fund has consistently "underperform[ed] its benchmark and lower-cost actively and passively managed investments that were available to the Plans," (Am. Compl. ¶ 165).

While the above allegations support the prudence claim included in Count V, the plaintiffs' remaining allegations therein would not support a claim. As to plaintiffs' allegations regarding the Plans' inclusion of retail class mutual funds, the Court finds the Third, Seventh, and Ninth Circuit opinions dismissing claims that fiduciaries breached their duties by including retail class mutual funds among their investment Options persuasive. See Tibble v. Edison Int'l, 729 F.3d 1110, 1135 (9th Cir. 2013), vacated on other grounds, 135 S. Ct. 1823; Renfro v. Unisys Corp., 671 F.3d 314, 319 (3d Cir. 2012); Loomis v. Exelon Corp., 658 F.3d 667, 669-70 (7th Cir. 2011); Hecker v. Deere & Co., 556 F.3d 575, 586 (7th Cir. 2009). In analyzing an allegation against the mix of investment options offered, courts have "looked first to the characteristics of the mix and range of options and then evaluated the plausibility of claims challenging fund selection against the backdrop of the reasonableness of the mix and range of investment options." Renfro, 671 F.3d at 326 (citing Braden, 588 F.3d at 596; Hecker, 556 F.3d at 586). When retail funds are just several of a wide range of options, courts have held that their inclusion was not imprudent. See Renfro, 671 F.3d at 326-27; Hecker, 556 F.3d at 586. Conversely, when a fiduciary offered ten retail options and only three others, the court concluded that "[t]he far narrower range of investment options available in

this case makes more plausible the claim that this Plan was imprudently managed." Braden, 556 F.3d at 596 n.6.

Plaintiffs have identified funds for which NYU included a higher-cost share class in the Plans instead of an identified available lower-cost share class of the "exact same mutual fund option." (See Am. Compl. ¶¶ 143-48.) But this does not constitute evidence of imprudence. As the court noted in Loomis, prudent fiduciaries may very well choose to offer retail class shares over institutional class shares (presumably even where, as here, both versions have identical portfolio managers, underlying investments, and asset allocation (see Am. Compl. ¶ 147)), because retail class shares necessarily offer higher liquidity than institutional investment vehicles. 658 F.3d at 672 ("The retail funds that Exelon offers allow daily transfers. Participants can move their money from one vehicle to another whenever they wish, without paying a fee. In retirement, they can withdraw money daily. Institutional trusts and pools do not offer that choice. It is not clear that participants would gain from lower expense ratios at the cost of lower liquidity."). The same reasoning precludes plaintiffs' reliance on such allegations here. Moreover, the fees offered for the sixty-three identified retail funds included in NYU's Options ranged from 4-77 basis points—a lower range than that permitted by the Third, Seventh, and Ninth Circuits. See Tibble, 729 F.3d at 1135; Renfro, 671 F.3d at 319; Loomis, 658 F.3d at 669; Hecker, 556 F.3d at 586. Thus, as the inclusion of retail options does not, on its own, suggest imprudence, the low fees

26

associated with these particular retail options indicates that their inclusion in the range of Options does not demonstrate an unwise choice.

Likewise, the Court finds that plaintiffs' allegations regarding unnecessary and excessive fee layers are insufficient (as pled) to support a prudence claim. In a series of paragraphs, plaintiffs assert that certain administrative and investment advisory fees are unreasonable in terms of the actual services provided to Plan participants, and that the distribution fees and mortality and expense risk charges provide no benefit to participants. (See Am. Compl. ¶¶ 115-21.) However, plaintiffs have not alleged that the inclusion of investment products with these fees led to higher fees overall. Without such an allegation, it is not clear that plaintiffs have plausibly alleged that the overall fee structure was unreasonable. (Even with these categories of fees, they still appear to be within the ranges accepted by various Circuits.)

Finally, the Court agrees with defendant that plaintiffs' allegations regarding NYU's purportedly "dizzying array" of investments in the same "investment style" do not support a prudence claim. (See ECF No. 45 at 15.) Plaintiffs allege that NYU breached its fiduciary duty by failing to whittle down the investment Options available to class participants, thereby diluting the Plans' bargaining power and confusing participants. (See Am Compl. ¶¶ 107-08, 149-55, 223.) While a "[p]lan fiduciary can[not] insulate itself from liability by the simple expedient of including a very large number of investment alternatives in its portfolio and then shifting to the participants the responsibility for choosing among them," Hecker, 569 F.3d at 711,

27

plaintiffs simply have not alleged any facts to suggest that the Plans' beneficiaries were harmed in an actionable way by NYU's failure to consolidate the Plans' investment Options.  Plaintiffs allege that each investment style included "duplicative funds," but they do not allege that the Plans offered identical funds or different index funds that tracked the same index or had the same results.  (See ECF No. 52 at 6.)  And plaintiffs allege that an excessively large array of investment Options confuses participants, but they do not allege that any participants were, in fact, confused or overwhelmed.  (Id.)  In effect, then, plaintiffs' theory boils down to a claim that having too many investments limited the Plans' "ability to qualify for lower cost share classes of certain investments."  (Am. Compl. ¶ 109.)  But while ERISA requires fiduciaries to "monitor and remove imprudent investments," Tibble, 135 S. Ct. at 1829, nothing in ERISA requires fiduciaries to limit plan participants' investment Options in order to increase the Plan's ability to offer a particular type of investment (such as funds offering institutional share classes).  Indeed, courts have bristled at "paternalistic" theories that suggest ERISA "forbids plan sponsors to allow participants to make their own choices."  Loomis, 658 F.3d at 673.

For the reasons set forth above, Count V survives—but only as to certain prudence claims.

V.     COUNTS II, IV, AND VI—CLAIMS UNDER ERISA § 406(A)(1)

In Counts II, IV, and VI, plaintiffs allege that defendant engaged in prohibited transactions in violation of ERISA § 406(a)(1)(A), (C), and (D).  In

particular, Count II alleges that defendant's lock-in arrangement with TIAA-CREF regarding the CREF Stock Account and TIAA's recordkeeping services caused the Plans to engage in prohibited sales or exchanges of property, provision of services, and transfers of "plan assets" between the Plan and TIAA-CREF.  (Am Compl. ¶¶ 200-04.)  According to plaintiffs, these prohibited transactions occurred each time the Plans paid fees to TIAA-CREF in connection with the Plans' investment in the CREF Stock Account and other proprietary options that paid revenue sharing to TIAA.  (Id. ¶ 203.)

In Count IV, plaintiffs allege that defendant violated ERISA § 406(a)(1)(A), (C), and (D) when it caused the Plans to pay unreasonable administrative fees to TIAA-CREF and Vanguard.  (Id. ¶¶ 213-16.)  Plaintiffs allege that such prohibited transactions occurred each time the Plans paid fees to TIAA-CREF or Vanguard in connection with the Plans' investments in funds that made revenue sharing payments to TIAA or Vanguard.  (Id. ¶ 215.)

Finally, plaintiffs allege in Count VI that defendant engaged in prohibited transactions by paying unreasonable investment management fees and unnecessary marketing and distribution fees and mortality and risk expense fees to TIAA-CREF and Vanguard.  (Id. ¶¶ 230-33.)  Plaintiffs claim that these prohibited transactions occurred each time that the Plans paid fees to TIAA-CREF and Vanguard in connection with the Plans' investments in TIAA-CREF and Vanguard investment options.  (Id. ¶ 232.)  For the reasons set forth below, plaintiffs' prohibited transactions claims fail as a matter of law.

As an initial matter, any revenue sharing payments or other fee payments drawn from mutual funds' assets and paid to Vanguard and TIAA-CREF are not "transactions" involving plan assets.[4]  Payments drawn from plan assets for administrative purposes do not become "transactions" involving plan assets when they are transferred to the service provider.

Plaintiffs have similarly failed to state a claim under ERISA § 406(a)(1)(A). Though this provision does not necessarily require the transfer of "plan assets" between the plan and a party in interest, it does require plaintiffs to have plausibly alleged that NYU caused the "sale or exchange, or leasing, of any property between the plan and a party in interest."  ERISA § 406(a)(1)(A).  "Property," which is not a defined term in ERISA, must be given its "'ordinary meaning' while 'attempt[ing] to ascertain how a reasonable reader would understand the statutory text, considered as a whole.'"  Deutsche Bank Nat. Tr. Co. v. Quicken Loans Inc., 810 F.3d 861, 868 (2d Cir. 2015).  The term "Property" in § 406(a)(1) can mean anything from

---

[4] Citing Haddock v. Nationwide Fin. Servs., 419 F. Supp. 2d 156 (D. Conn. 2006), plaintiffs claim that revenue sharing payments delivered to a plan recordkeeper from mutual funds are plan assets. But Haddock is not applicable here.  In Haddock, the court determined that revenue sharing payments from mutual funds can become plan assets when they are received by a fiduciary at the expense of plan participants or beneficiaries.  Id. at 170.  The implication, then, is that revenue sharing payments from mutual funds remain non-plan assets when they are received by non-fiduciaries, and plaintiffs in no way allege that Vanguard or TIAA-CREF were fiduciaries of the NYU Plans.  Accordingly, plaintiffs' reliance on Haddock is misplaced.  See Hecker, 556 F.3d at 584 (finding that Haddock was neither "helpful [n]or persuasive [in resolving case where service provider was not alleged to be fiduciary], since the service provider in [Haddock] had the authority to delete and substitute mutual funds from the plan without seeking approval from the named fiduciary"). See also Dep't of Labor, Advisory Opinion 2013-03A (July 3, 2013) (advising that revenue sharing payments from mutual funds to recordkeepers are not plan assets where, as here, the recordkeeper made "no representations to the plan fiduciaries or to any plan participants or beneficiaries that revenue sharing amounts it receives will be set aside for the benefit of the plan or represent a separate fund for payment of benefits or expenses under the plan"); Phones Plus, Inc. v. The Hartford Fin. Servs. Grp., Inc., No. CIV. 3:06-CV-01835AVC, 2007 WL 3124733, at *4 (D. Conn. Oct. 23, 2007) (finding that Department of Labor advisory opinions are entitled to Skidmore deference).

"something owned or possessed" to "an attribute common to all members of a class." Merriam-Webster Online, https://www.merriam-webster.com/dictionary/property. Courts tend to find that a transfer of property is a "prohibited transaction" under ERISA when real property or stock are transferred, or when improper payments are made from the pension fund.  See, e.g., Keystone Consol. Indus., 508 U.S. at 162 (holding that a transfer of unencumbered real property, as well as encumbered real property, to a pension trust in order to satisfy an obligation is a prohibited transaction); Henry v. Champlain Enterprises, Inc., 445 F.3d 610, 618 (2d Cir. 2006) (noting that the sale of convertible preferred stock is a prohibited transaction under § 406); N.Y. State Teamsters Council Health & Hosp. Fund v. Estate of DePerno, 18 F.3d 179, 183 (2d Cir. 1994) (holding that payment out of a health and hospital fund to two maintenance workers who were "parties in interest" was a prohibited transaction under ERISA).

However, as commonly and reasonably understood, the statute is not equating "property" with compensation payments simply paid by plan investments to plan recordkeepers for workaday recordkeeping transactions.  Indeed, payment of a fee for services rendered is a core aspect of a pension plan under ERISA—and most retirement savings plans.  Depending on the circumstances, overpayment of fees may be an issue under other provisions of ERISA, but a payment for services rendered cannot be a "prohibited transaction."  As much is clear when ERISA § 406(a)(1)(A) is read in conjunction with ERISA § 408(b)(2), which provides that "[c]ontracting or making reasonable arrangements with a party in interest for . . .

31

services necessary for the establishment or operation of the plan" is not proscribed under ERISA § 406, so long as "no more than reasonable compensation is paid therefor."  ERISA § 408(b)(2).

The Second, Seventh, and Eighth Circuits (at least) have held that the statutory exemptions set forth in ERISA § 408 are affirmative defenses that a defendant bears the burden of proving.  See Allen v. GreatBanc Tr. Co., 835 F.3d 670, 676 (7th Cir. 2016); Braden, 588 F.3d at 601; Lowen, 829 F.2d at 1215.  Given this precedent, it would be nonsensical to read § 406(a)(1)(A)'s proscription on the transfer of "property" to include the revenue sharing or fee payments from plan investments to recordkeepers, as such an interpretation would mean plan beneficiaries and participants can make out a prima facie case for prohibited transactions every time a recordkeeper is compensated for its services—which the plan fiduciary would then have to contest in court by affirmatively pleading and proving, under ERISA § 408, that the fee payments and revenue sharing payments were "no more than reasonable compensation."  Surely, Congress and the courts did not intend § 406(a)(1)(A) to be read so broadly, and plaintiffs have not pointed the Court to any case suggesting otherwise.[5]

Finally, ERISA § 406(a)(1)(C) does not provide a viable hook for plaintiffs' claim of prohibited transactions.  According to plaintiffs, "a plaintiff states a § [406](a)(1)(C) claim based on allegations that recordkeeper/party in interest

---

[5] In Braden, the Eighth Circuit held that the plaintiff had stated a claim under § 406(a)(1)(C) by alleging that a plan administrator had "received undisclosed amounts of revenue sharing payments in exchange for services rendered to the Plan."  588 F.3d at 601.  Braden did not consider the applicability of § 406(a)(1)(A) to the plaintiff's claims.

received 'revenue sharing payments in exchange for services rendered to the Plan.'" (ECF No. 47 at 23 (citing <u>Braden</u>, 588 F.3d at 601).)  But it is circular to suggest that an entity which becomes a party in interest by providing services to the Plans has engaged in a prohibited transaction simply because the Plans have paid for those services.

The Court recognizes, of course, that the Eighth Circuit appeared to endorse this theory of liability in <u>Braden</u> when it held that plaintiffs had stated claim under ERISA § 406(a)(1)(C) by alleging that a 401(k) plan's sponsor "caused the Plan to enter into an arrangement with [plan trustee/administrator] Merrill Lynch, a party in interest, under which Merrill Lynch received undisclosed amounts of revenue sharing payments in exchange for services rendered to the Plan."  588 F.3d at 601. But in <u>Braden</u>, unlike here, the revenue sharing payments were <u>undisclosed</u>; in fact, the complaint alleged that the plan fiduciary in <u>Braden</u> had agreed to keep the amounts of the revenue sharing payments confidential.  <u>Id.</u> at 591.  Such factual allegations raise the reasonable inference that the plan's fiduciaries caused the plan to engage in the type of transactions ERISA § 406(a) was intended to avoid—namely, transactions in which "the fiduciary allow[s] himself to be placed in a position where his personal interest might conflict with the interest of the beneficiary."  <u>See</u> <u>Fulton Nat'l Bank v. Tate</u>, 363 F.2d 562, 571 (5th Cir. 1966); <u>see also</u> <u>Braden</u>, 588 F.3d at 602 (noting that "prohibited transactions [under § 1106(a)(1)] involve self-dealing") (alterations in the original).

As discussed above, plaintiffs have offered only conclusory allegations suggesting self-dealing or disloyal conduct.  Accordingly, allegations that the Plans violated § 406(a) by paying Vanguard and TIAA-CREF for recordkeeping services— even allegations that the Plans paid too much for those services—do not, without more, state a claim.  To hold otherwise would transform § 406—a statutory provision meant to "categorically bar[] certain transactions deemed 'likely to injure the pension plan,'" Harris Tr. & Sav. Bank, 530 U.S. at 241—into a statutory provision that proscribes retirement pension plan's most basic operations.

## VI.   COUNT VII—CLAIM FOR FAILURE TO MONITOR FIDUCIARIES

Plaintiffs allege in Count VII that NYU breached its fiduciary monitoring duties by failing to monitor its delegates, to the extent there were any.  (Am. Compl. ¶¶ 23-39.)  With regard to this claim, plaintiff claims only that defendant is in exclusive possession of information as to whether NYU delegated its fiduciary duties and responsibilities.  (Am. Compl. ¶ 28.)  This on its own does not sufficiently support a claim that the defendant failed to monitor the Plans.  See Lerwick v. Kelsey, 150 F. App'x 62, 65 (2d Cir. 2005) (holding that the district court did not abuse its discretion in denying a cross-motion for discovery where the "[p]laintiff did not explain with any specificity, inter alia, how he was prevented from obtaining discovery; indeed, his remaining discovery requests appear to be more of a 'fishing expedition' than a good-faith effort to fill in evidentiary gaps"); Paddington Partners v. Bouchard, 34 F.3d 1132, 1138 (2d Cir. 1994) ("[A] bare assertion that the evidence supporting a plaintiff's allegation is in the hands of the defendant is insufficient to

justify a denial of a motion for summary judgment under Rule 56(f)." (quoting

Sundsvallsbanken v. Fondmetal, Inc., 624 F. Supp. 811, 815 (S.D.N.Y. 1985)));

Waldron v. Cities Serv. Co., 361 F.2d 671, 673 (2d Cir. 1966), aff'd sub nom. First

Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253 (1968) ("The court quite

properly denied the Rule 56(f) motion for further discovery by which plaintiff sought

to engage in still another 'fishing expedition' in the hope that he could come up with

some tenable cause of action."). If plaintiffs do possess additional facts in support of

Count VII, they should inform the Court and may file for reconsideration.

## VII.   STATUTE OF LIMITATIONS

Defendant argues that any alleged breaches before August 9, 2013 are time-

barred by ERISA's three-year statute of limitations. (ECF No. 45 at 24.) Dismissal

on statute of limitations grounds is warranted only if "it is clear from the face of the

complaint, and matters of which the court may take judicial notice, that the

plaintiff's claims are barred as a matter of law." Staehr v. Hartford Fin. Servs.

Grp., 547 F.3d 406, 425 (2d Cir. 2008).

Under ERISA's statute of limitations, a plaintiff must bring suit within the

earlier of six years after "the date of the last action which constituted a part of the

breach," or "three years after the earliest date on which the plaintiff had actual

knowledge of the breach or violation." ERISA § 413(2). "[A] plaintiff has 'actual

knowledge of the breach or violation' within the meaning of ERISA § 413(2) . . .

when he has knowledge of all material facts necessary to understand that an ERISA

fiduciary has breached his or her duty or otherwise violated the Act." Caputo v.

Pfizer, Inc., 267 F.3d 181, 193 (2d Cir. 2001) (quoting ERISA § 413(2)).  "Such

material facts 'could include necessary opinions of experts, knowledge of a

transaction's harmful consequences, or even actual harm.'"  Id. (quoting Gluck v.

Unisys Corp., 960 F.2d 1168, 1177 (3d Cir. 1992)).  "While disclosure of 'a

transaction that is not inherently a statutory breach of fiduciary duty . . . cannot

communicate the existence of the underlying breach,' it follows that where the

alleged breach stems from a transaction that a plaintiff claims is 'inherently a

statutory breach of fiduciary duty,' knowledge of the transaction 'standing alone'

may be sufficient to trigger the obligation to file suit."  Young, 550 F. Supp. 2d at

419 (S.D.N.Y. 2008), aff'd, 325 F. App'x 31 (2d Cir. 2009) (quoting Caputo, 267 F.3d

at 193).  By contrast, where a "plaintiff [is] asserting a process-based claim under §

[4]04, § [4]06(a), or both," she "does not have actual knowledge of the procedural

breach of fiduciary duties unless and until she has actual knowledge of the

procedures used or not used by the fiduciary."  Fish v. GreatBanc Tr. Co., 749 F.3d

671, 681 (7th Cir. 2014).

Defendant frames plaintiffs' claims as alleging "inherent" breaches of

fiduciary duties.  (See ECF No. 52 at 9-10.)  As a result, defendant argues that

plaintiffs gained "actual knowledge" of their claims for excessive fees when they

received disclosures in 2012 detailing the Plans' investments, expense ratios,

benchmarks, performance summaries and fees.  (ECF No. 45 at 24-25.)  In the same

vein, defendant contends that plaintiffs had actual knowledge of their claims under

§ 406(a) when they learned about "the affiliation between [the various parties] and

the fact that the funds paid trustee, recordkeeping, and management fees." (ECF No. 45 at 24 (citing <u>Krueger v. Ameriprise Fin., Inc.</u>, No. 11-CV-02781-SRN/JSM, 2014 WL 1117018, at *14 (D. Minn. Mar. 20, 2014))).

On the circumstances here, the Court cannot dismiss any claims based on the statute of limitations at this time.  A fuller record is needed.  Whether or not plaintiffs had actual knowledge of defendant's alleged breach before August 13, 2013 is a question for another day.

## VIII.   CONCLUSION

For the foregoing reasons, defendant's motion to dismiss is GRANTED in part and DENIED in part.  Counts I, II, IV, VI, and VII are dismissed in their entirety.  The prudence claims in Counts III and V remain to the extent discussed above, as do any claims regarding the statute of limitations.

SO ORDERED.

Dated:   New York, New York
         August 25, 2017

_____
KATHERINE B. FORREST
United States District Judge