REDACTED CONFIDENTIAL MATERIAL - PURSUANT TO PROTECTIVE ORDER

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| DR. ALAN SACERDOTE, et al., | : Case No.: 1:16-cv-06284 (KBF) |
| Plaintiffs, | : |
| v. | : ECF Case |
| NEW YORK UNIVERSITY, | : |
| Defendant. | : |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Mark Muedeking
Ian C. Taylor
Jennifer K. Squillario
Julie Ben-Zev
DLA Piper LLP (US)
500 8th Street, NW
Washington, DC 20004
(202) 799-4000

Brian S. Kaplan
Evan D. Parness
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020
(212) 335-4500

*Counsel for Defendant New York University*

Dated:  January 10, 2018

REDACTED CONFIDENTIAL MATERIAL - PURSUANT TO PROTECTIVE ORDER
**TABLE OF CONTENTS**

**Page**

**PRELIMINARY STATEMENT** ........................................................................ 1

**FACTUAL BACKGROUND** ............................................................................ 2

**ARGUMENT** ...................................................................................................... 5

I. **NYU IS ENTITLED TO SUMMARY JUDGMENT ON COUNT III, ALLEGING BREACH OF THE DUTY OF PRUDENCE REGARDING ADMINISTRATIVE FEES, BECAUSE NYU EMPLOYED A ROBUST AND PRUDENT PROCESS IN MONITORING AND NEGOTIATING SIGNIFICANT FEE REDUCTIONS AND BECAUSE THOSE FEES WERE OBJECTIVELY REASONABLE.**................... 5

    A.    NYU Is Entitled to Summary Judgment Because it Employed a Robust and Prudent Process.......................................................................... 7

        1.   NYU Had a Robust Process for Monitoring Administrative Fees.................. 7

        2.   NYU Retained an Industry Expert to Analyze the Plans' Administrative Fees. ..................................................................... 8

        3.   NYU Negotiated Significant Reductions in Administrative Fees. ................. 9

        4.   NYU Conducted Two Requests for Proposals During the Alleged Class Period. ........................................................................................... 11

        5.   NYU Consolidated Vendors. ........................................................ 13

    B.    NYU Is Also Entitled to Summary Judgment Because the Administrative Fees Were Objectively Prudent......................................................... 15

        1.   NYU's Consolidation of Vendors was Prudent. ............................. 15

        2.   The Plans' Administrative Fees were Objectively Prudent. .......... 16

II. **NYU IS ENTITLED TO SUMMARY JUDGMENT ON COUNT V, ALLEGING BREACH OF THE DUTY OF PRUDENCE REGARDING THE CREF STOCK ACCOUNT AND THE TIAA REAL ESTATE ACCOUNT, BECAUSE NYU EMPLOYED A ROBUST AND PRUDENT PROCESS IN MONITORING THOSE FUNDS AND BECAUSE THOSE FUNDS WERE OBJECTIVELY PRUDENT.**................................................................................... 17

    A.    NYU is Entitled to Summary Judgment Because it Employed a Robust and Prudent Process in Reviewing the Plans' Investment Options, Including the TIAA Real Estate Account and the CREF Stock Account. ..................................... 18

    B.    NYU is Also Entitled to Summary Judgment Because the TIAA Real Estate Account and the CREF Stock Account are Objectively Prudent Investment Alternatives for the Plans............................................................. 22

**CONCLUSION** ................................................................................................. 25

REDACTED CONFIDENTIAL MATERIAL - PURSUANT TO PROTECTIVE ORDER

## TABLE OF AUTHORITIES

CASES                                                                      PAGE NO.

*Amron v. Morgan Stanley Investment Advisors Inc.,*
    464 F.3d 338 (2d Cir. 2006)..............................................................11, 17

*Birmingham v. SoGen-Swiss Int'l Corp. Ret. Plan,*
    718 F.2d 515 (2d Cir. 1983).......................................................................6

*Brotherston, v. Putnam Invs., LLC,*
    No. 15-13825-WGY, 2017 WL 2634361 (D. Mass. June 19, 2017)..................6, 24

*Burke v. Jacoby,*
    981 F. 2d 1372 (2d Cir. 1992)....................................................................5

*Diduck v. Kaszycki & Sons Contractors, Inc.,*
    874 F.2d 912 (2d Cir. 1989).......................................................................6

*DiFelice v. U.S. Airways, Inc.,*
    436 F. Supp. 2d 756 (E.D. Va. 2006) .........................................................7

*Hecker v. Deere & Co.,*
    556 F.3d 575 (7th Cir. 2009) ........................................................... *passim*

*Jenkins v. Yager,*
    444 F.3d 916 (7th Cir. 2006) .....................................................................6

*Kasilag v. Hartford Inv. Fin. Servs., LLC,*
    No. 11-1083, 2012 WL 6568409 (D.N.J. Dec. 17, 2012).....................................17

*Laboy v. Bd. Trs. of Bldg. Serv. 32 BJ SRSP,*
    No. 11 Civ. 5127, 2012 WL 3191961 (S.D.N.Y. Aug. 7, 2012) ............................14

*La Scala v. Scrufari,*
    479 F.3d 213 (2d Cir. 2007).....................................................................22

*Loomis v. Exelon Corp.,*
    658 F.3d 667 (7th Cir. 2011) ....................................................................25

*Manning v. Hayes,*
    212 F.3d 866 (5th Cir. 2000) ....................................................................16

*Martinez v. Schlumberger, Ltd.,*
    338 F.3d 407 (5th Cir. 2003) ....................................................................16

*Oster v. Barco of Cal. Emps.' Ret. Plan,*
    869 F.2d 1215 (9th Cir. 1988) ....................................................................6

REDACTED CONFIDENTIAL MATERIAL - PURSUANT TO PROTECTIVE ORDER

*Pension Benefit Guar. Corp. ex rel St. Vincent Catholic Med. Ctrs. Ret. Plan v.*
 *Morgan Stanley Inv. Mgmt. Inc.*,
 712 F.3d 705 (2d Cir. 2013)............................................................................................5

*Renfro v. Unisys Corp.*,
 671 F.3d 314 (3d Cir. 2011)...........................................................................................4

*Roth v. Sawyer-Cleator Lumber Co.*,
 16 F.3d 915 (8th Cir. 1994) ...........................................................................................7

*Silverman v. Mut. Benefit Life Ins. Co.*,
 138 F.3d 98 (2d Cir. 1998)..........................................................................................5, 6

*Sweda v. Univ. of Pa.*,
 No. CV 16-4329, 2017 WL 4179752 (E.D. Pa. Sept. 21, 2017) .............................6

*Taylor v. United Techs. Corp.*,
 No. 3:06cv1494 (WWE), 2009 WL 535779 (D. Conn. Mar. 3, 2009).........................5, 14, 18

*Tibble v. Edison Int'l.*,
 729 F.3d 1110 (9th Cir. 2013) .....................................................................................16

*Tussey v. ABB, Inc.*,
 746 F.3d 327 (8th Cir. 2014) .....................................................................................4, 6

*White v. Chevron Corp.*,
 No. 16-cv-0793-PJH, 2016 WL 4502808 (N.D. Cal. Aug. 29, 2016) ......................4

*Young v. General Motors Inv. Mgmt. Corp.*,
 325 F. App'x 31 (2d Cir. 2009) ...................................................................................16

**STATUTES & OTHER AUTHORITIES**

29 C.F.R. § 2550.404a-1(b)(2)(i)..................................................................................17

ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B) ........................................................7

Fed. R. Civ. P. 56(c) .........................................................................................................5

Internal Revenue Code § 403(b), 26 U.S.C. § 403(b).....................................................3

Restatement 3d of Trusts, § 90 cmts. e (1) ...................................................................24

REDACTED CONFIDENTIAL MATERIAL - PURSUANT TO PROTECTIVE ORDER

## **PRELIMINARY STATEMENT**

This lawyer-generated, lawyer-financed, and lawyer-driven case brought by a handful of New York University ("NYU") employees is one of a dozen nearly identical cut-and-paste lawsuits filed in the fall of 2016 by Plaintiffs' counsel alleging that leading private universities breached their fiduciary duties to participants in 403(b) plans.[1]  The vast majority of Plaintiffs' claims (five of seven counts) were dismissed outright by this Court for failure to state any viable claim.  Plaintiffs avoided dismissal of the two remaining claims (Count III and very limited portions of Count V) only by alleging facts that were completely false.

Count III alleges that the NYU Retirement Plan for Members of the Faculty, Professional Research Staff and Administration (the "Faculty Plan") and the NYU School of Medicine Retirement Plan for Members of the Faculty, Professional Research Staff and Administration (the "Medical Plan") paid excessive administrative fees because NYU allegedly failed to (1) monitor the amount of fees received by the Plans' service providers, (2) determine if those fees were competitive or reasonable, (3) leverage the Plans' size to reduce administrative fees and obtain rebates, (4) solicit competitive bids from service providers, and (5) consolidate administrative services from two vendors to a single provider.  (ECF No. 39 at ¶ 210.)

Now that discovery has been completed, the undisputed facts prove that NYU (1) carefully monitored administrative services and fees, (2) retained an industry expert to assist in the process, (3) negotiated significant fee reductions, (4) conducted two requests for proposals for administrative services, and (5) consolidated administrative services with a single vendor for the Medical Plan and the Faculty Plan.  *See infra* Argument I. A.

---

[1] *See* Attorney Jerry Schlichter opens up about 403(b), 401(k) suits, Aug. 18, 2016, *available at* http://www.investmentnews.com/article/20160818/FREE/160819927/attorney-jerry-schlichter-opens-up-about-403-b-401-k-suits (last visited Jan. 7, 2018).

1

REDACTED CONFIDENTIAL MATERIAL - PURSUANT TO PROTECTIVE ORDER

Limited portions of Count V survived dismissal because Plaintiffs alleged that (1) NYU failed to monitor the performance of the CREF Stock Account and TIAA Real Estate Account, and (2) the CREF Stock Account did not have a realistic expectation of higher returns than an index fund.  (ECF No. 79 at pp. 23-25.)

Now that discovery has been completed, the undisputed facts prove that (1) NYU had a robust and prudent process for reviewing the performance of all of the investment funds offered by the Plans, including the CREF Stock Account and TIAA Real Estate Account, and (2) the CREF Stock Account actually outperformed those index funds more than 50% of the time.  *See infra* Argument II. A.

Plaintiffs also cannot meet their burden of proving that the Plans' administrative fees and the TIAA Real Estate Account or the CREF Stock Account were objectively imprudent.  The undisputed facts prove that (1) the administrative fees paid by the Plans were objectively prudent based on comparison to fees paid by similar plans for similar services and (2) the CREF Stock Account and TIAA Real Estate Account performed well and were objectively prudent funds that were offered by fiduciaries in a very large number of similar plans.  *See infra* Argument I. B. and II. B.

## FACTUAL BACKGROUND

This factual background section provides contextual information for the Court's convenience.  A complete recitation of the relevant facts is set out in NYU's Rule 56.1 Statement of Material Facts Not in Dispute ("SOF"), filed herewith.

The Plans are "403(b) plans" funded through voluntary participant contributions and generous NYU contributions.  In 2009, the Internal Revenue Service ("IRS") issued comprehensive new regulations for plans maintained by governmental and non-profit employers

2

REDACTED CONFIDENTIAL MATERIAL - PURSUANT TO PROTECTIVE ORDER

that were governed by Internal Revenue Code section 403(b).  Those new regulations for the first time required sponsoring employers to take an active role in the administration of these plans.

Previously, 403(b) plans operated more like individual retirement arrangements than employer-sponsored plans because plan participants had almost unlimited freedom to choose investments and purchase individual annuity contracts and, in later years, mutual fund shares. This made 403(b) plans very different from the typical 401(k) plans in which corporate employers have absolute control over the operation of the plan and the investments offered by the plan.  A report prepared for the U.S. Department of Labor acknowledged that "the differences [between 403(b) and 401(k) plans] far exceed the similarities."[2]  For NYU, those differences include the rights of faculty members who exercised significant control over investments in the Plans.  As set out in the Principles of Joint and Shared Governance approved by the NYU Board of Trustees, faculty members are entitled to representation on committees responsible for matters regarding academics or administration, information regarding those matters, consultation prior to decisions that may affect them, and a reasoned justification to the extent that NYU does not accept the faculty's advice.[3]

NYU was diligent in implementing the new IRS regulations.  In 2008, with assistance from experienced outside legal counsel, NYU established the Retirement Plan Committee (the "Committee") consisting of employees in senior positions with significant financial and human resources management responsibilities and adopted a Committee Charter.  Shortly thereafter, the

---

[2] SOF at ¶ 11, fn. 21, Advisory Council on Employee Welfare and Pension Benefit Plans, Report to the Honorable Hilda L. Solis, United States Secretary of Labor, *Current Challenges and Best Practices for ERISA Compliance for 403(b) Plan Sponsors* (Nov. 2011), available at https://www.dol.gov/sites/default/files/ebsa/about-ebsa/about-us/erisa-advisory-council/ current-challenges-and-best-practices-for-erisa-compliance-for-403b-plan-sponsors.pdf., at 6.
[3] *See* SOF at ¶ 12 and fn. 22, New York University *Principles of Joint Shared Governance, available at* https://www.nyu.edu/about/leadership-university-administration/university-senate/membership/councils/tenured-tenure-track-faculty-senators-council/rules-bylaws/principles-of-joint-shared-governance.html.

REDACTED CONFIDENTIAL MATERIAL - PURSUANT TO PROTECTIVE ORDER

Committee conducted a request for proposal ("RFP") process to engage an investment advisor with substantial expertise with 403(b) plans of similar size and complexity, and selected Cammack LaRhette ("Cammack") from a long list of qualified firms.

The Committee, with the assistance of legal counsel and Cammack, developed and implemented robust monitoring procedures.  Between September 2007 and September 2017, the Committee formally met at least 41 times, often for two hours or more.  In the six years preceding the filing of the Complaint on August 9, 2016, the Committee met at least 25 times and consistently monitored Vanguard and TIAA, the Plans' administrative service providers and the fees they charged; conducted two vendor RFPs; negotiated very significant fee reductions while at the same time maintaining and improving service levels; consolidated vendors; and carefully monitored the Plans' investments.

The Committee negotiated administrative fee agreements with Vanguard and TIAA in which administrative fees were expressed in basis points, each of which represented one-hundredth of one percent of plan assets being administered, and were paid with revenue sharing credits that were fully disclosed to the Committee, the Plans, and their participants.  This method of paying administrative fees is normal, customary and well-accepted as a matter of law.  (ECF No. 79 at p. 21 (recognizing that revenue sharing is a "common industry practice")); *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) (asset-based revenue sharing is a "common" and "acceptable investment industry practice"); *see also Renfro v. Unisys Corp.*, 671 F.3d 314, 326-28 (3d Cir. 2011); *Hecker v. Deere & Co.*, 556 F.3d 575, 585 (7th Cir. 2009); *White v. Chevron Corp.*, No. 16-cv-0793-PJH, 2016 WL 4502808, at *15 (N.D. Cal. Aug. 29, 2016).[4]

---

[4] *See also* SOF Ex. 176, Henning Dep. Tr. at 256:18-257:10 (explaining that asset-based revenue sharing arrangements are common and that flat per-participant fees are no more transparent than revenue sharing arrangements); *id.* at 259:18-260:8 (same); SOF at ¶¶ 95-99, ¶ 122; Ex. 91, Declaration of Jan Rezler at ¶ 6; Ex. 4, Expert Report of Marcia Wagner at ¶¶ 44-46.

REDACTED CONFIDENTIAL MATERIAL - PURSUANT TO PROTECTIVE ORDER

## ARGUMENT

Summary judgment is warranted when "there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c).  To survive summary judgment, it is Plaintiffs' burden to establish that NYU breached ERISA's duty of prudence.  *Silverman v. Mut. Benefit Life Ins. Co.*, 138 F.3d 98, 105 (2d Cir. 1998).  If there is an absence of sufficient proof as to any essential element of a claim, "any factual disputes with respect to other elements of the claim become immaterial and cannot defeat a motion for summary judgment."  *Burke v. Jacoby*, 981 F.2d 1372, 1379 (2d Cir. 1992).  In this case, Plaintiffs cannot present evidence sufficient to establish the elements of their claims, and NYU is, therefore, entitled to summary judgment.

I.  **NYU IS ENTITLED TO SUMMARY JUDGMENT ON COUNT III, ALLEGING BREACH OF THE DUTY OF PRUDENCE REGARDING ADMINISTRATIVE FEES, BECAUSE NYU EMPLOYED A ROBUST AND PRUDENT PROCESS IN MONITORING AND NEGOTIATING SIGNIFICANT FEE REDUCTIONS AND BECAUSE THOSE FEES WERE OBJECTIVELY REASONABLE.**

The duty of prudence under ERISA focuses only on the *process* employed by the fiduciary in making decisions.  Recognizing that fiduciary decisions are almost never black-and-white and that it is easy to second-guess decisions with 20/20 hindsight, the ERISA "prudent person" standard "asks whether 'the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of [any decision or action].'"  (ECF No. 79, at p. 8 (quoting *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984))); *see also Pension Benefit Guar. Corp. ex rel St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 716 (2d Cir. 2013) ("*St. Vincent*") (The standard focuses on "whether [the] fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment."); *Taylor v. United Techs. Corp.*, No. 3:06cv1494 (WWE), 2009 WL 535779, at *8 (D. Conn. Mar. 3, 2009) (citing *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 424 (4th Cir. 2007)) ("Whether a fiduciary's actions are prudent

REDACTED CONFIDENTIAL MATERIAL - PURSUANT TO PROTECTIVE ORDER

cannot be measured from the vantage point of hindsight; the prudent person standard is not concerned with results but is a test of how the fiduciary acted when viewed from the perspective of the time of the challenged decision.").

Because NYU employed a robust and prudent process, Plaintiffs have no right to challenge NYU's actions even if, in their opinion, another approach might have been preferable, more to their liking, or even more beneficial to the Plans from a financial standpoint. *Diduck v. Kaszycki & Sons Contractors, Inc.*, 874 F.2d 912, 917 (2d Cir. 1989). Because NYU employed a robust and prudent decision making process, its decisions are entitled to deference by this Court. *Birmingham v. SoGen-Swiss Int'l Corp. Ret. Plan*, 718 F.2d 515, 522 (2d Cir. 1983) (the court's authority "does not include the power to overrule a specific and valid exercise of the Retirement Committee's authority under the Plan and ERISA.").[5]

Finally, to prevail, Plaintiffs must also prove that they were harmed by any alleged breach. "ERISA requires plaintiffs to prove losses to the plan for any breach of fiduciary duty claim." *Brotherston, v. Putnam Invs., LLC,* No. 15-13825-WGY, 2017 WL 2634361, at \*5 (D. Mass. June 19, 2017) (citing *Evans v. Akers*, 534 F.3d 65, 74 (1st Cir. 2008)).[6] The Second Circuit has refused to adopt burden shifting in ERISA breach of fiduciary duty claims. *Silverman*, 138 F.3d at 104. Therefore, even if Plaintiffs could establish that NYU did not follow a prudent process in monitoring administrative fees and investments, to recover any damages they must also prove that a similarly situated fiduciary would not have paid similar

---

[5] *See also Oster v. Barco of Cal. Emps.' Ret. Plan*, 869 F.2d 1215, 1220 (9th Cir. 1988) ("We will not second-guess the Committee unless its actions were unreasonable."); *Jenkins v. Yager*, 444 F.3d 916, 924-26 (7th Cir. 2006) (fiduciary's decisions are not actionable if they are the result of an appropriate process); *Sweda v. Univ. of Pa.*, No. CV 16-4329, 2017 WL 4179752, at \*8 (E.D. Pa. Sept. 21, 2017) ("It is not up to courts to second-guess how fiduciaries allocate that cost, only that the fiduciary 'discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries' as a whole."); *Tussey*, 746 F.3d at 335 (deference "reflects our general hesitancy to interfere with the administration of a benefits plan").

[6] *Brotherston*, 2017 WL 2634361 at \*5 ("Courts have consistently ruled that plaintiffs bear the burden of persuasion to establish loss to the plan as a result of the breach.").

REDACTED CONFIDENTIAL MATERIAL - PURSUANT TO PROTECTIVE ORDER

administrative fees or offered similar investments.  ERISA § 404(a)(1)(B); *see also DiFelice v.*

*U.S. Airways, Inc.*, 436 F. Supp. 2d 756, 785-86 (E.D. Va. 2006) (fiduciary behavior is assessed

in light of industry standards).  "Even if a [fiduciary] failed to conduct an investigation before

making a decision, he is insulated from liability if a hypothetical prudent fiduciary would have

made the same decision anyway."  *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 919 (8th

Cir. 1994).

### A.   NYU is Entitled to Summary Judgment Because it Employed a Robust and Prudent Process.

Plaintiffs avoided dismissal of Count III by alleging that NYU failed to monitor

administrative fees paid by the Plans, analyze whether those fees were reasonable, negotiate fee

reductions, conduct RFPs, and analyze the potential benefits of consolidating with a single

recordkeeper.  (ECF No. 39 ¶¶ 207-10.)  None of these allegations are true.

### 1.   NYU had a Robust Process for Monitoring Administrative Fees.

NYU had a robust and prudent process for monitoring administrative fees paid to

Vanguard and TIAA.  The written record of the Committee's actions includes hundreds of pages

documenting detailed analysis of those fees.  Those records include Committee meeting

minutes,[7] Committee materials prepared by Cammack,[8] responses to RFPs from various vendors

(including but not limited to Vanguard and TIAA),[9] and detailed disclosures made by Vanguard

and TIAA regarding the amount of administrative fees they received.[10]  Moreover, the

undisputed facts demonstrate that, throughout the putative class period, the Committee and

Cammack negotiated significant reductions in the administrative fees paid to Vanguard and

---

[7] SOF at ¶¶ 69-70, 73-92; Exs. 24-65.
[8] SOF at ¶¶ 68-70, 128; Exs. 145-149.
[9] SOF at ¶¶ 73-92; Exs. 94, 96, 97, 98, 138.
[10] SOF at ¶¶ 95-118; Exs. 8, 9, 10, 110-118, 122-124, 144, 156-172.

REDACTED CONFIDENTIAL MATERIAL - PURSUANT TO PROTECTIVE ORDER

TIAA, which is the best evidence of NYU's monitoring the Plans' fees. *See infra* Argument I.

A. 3.



**2.     NYU Retained an Industry Expert to Analyze the Plans' Administrative Fees.**

Plaintiffs alleged that NYU also failed to determine whether the administrative fees paid

to TIAA and Vanguard were competitive or reasonable. (ECF No. 39 at ¶ 208); (ECF No. 79 at

p. 21). The undisputed facts again demonstrate that Plaintiffs' allegations are wrong. The

Committee, with the assistance of Cammack, repeatedly analyzed whether the fees paid to

---

[11] *See* SOF at ¶¶ 93-94; Ex. 4, Expert Report of Marcia Wagner at ¶ 109.
[12] Ex. 4, Expert Report of Marcia Wagner.

REDACTED CONFIDENTIAL MATERIAL - PURSUANT TO PROTECTIVE ORDER

Vanguard and TIAA were competitive and reasonable.  That process included multiple RFPs, numerous discussions with Cammack, and negotiations with Vanguard and TIAA.[13]  This process allowed the Committee to benchmark the administrative fees paid to TIAA and Vanguard against those charged to other plans and those charged by other providers.[14]  Based on this record, Cammack concluded that NYU went through "a due diligence exercise to provide participants with a *low cost and competitive* plan."[15]

In considering the reasonableness of the fees, the Committee gave appropriate consideration to the type, nature, and quality of the administrative services the Plans required, the different needs and circumstances of the two Plans, the different expectations of participants in the two Plans, the capabilities of various vendors to provide all of the services required by the Plans, the unique nature of the TIAA annuities, the fact that no other vendor could administer the TIAA annuities, the fact that participants in the Plans had previously invested billions of dollars in these TIAA annuities, and the fact that the Committee could not override the participants' investment elections in the TIAA annuities without their consent.[16]

### 3. NYU Negotiated Significant Reductions in Administrative Fees.

The Committee negotiated significant reductions in the administrative fees paid by the Plans.  When the Committee began its review of fees in 2009, TIAA was receiving administrative fees of approximately 19.9 basis points on the individual annuity contracts in effect prior to the effective date of the new 403(b) regulations.[17]  In response to the first RFP issued by the Committee for administrative services in 2009, TIAA initially offered to reduce

---

[13] SOF at ¶¶ 59-118.
[14] SOF at ¶¶ 59-118.
[15] SOF at ¶¶ 99-110; Ex. 33 (emphasis added).
[16] SOF at ¶¶ 70, 81.
[17] SOF at ¶¶ 100, 115.

REDACTED CONFIDENTIAL MATERIAL - PURSUANT TO PROTECTIVE ORDER

that rate to 15 basis points for new investments if TIAA were selected as the sole administrator for all plans across the NYU system (including the Plans at issue and over a dozen more).[18]  The Committee rejected this proposal because it would have allowed TIAA to continue to earn the 19.9 basis points on existing contracts.[19]  As a result, TIAA offered 10 basis points, again with the same conditions that TIAA become sole recordkeeper for the entire system and that the fees would apply only to new investments.[20]  The Committee rejected that offer, and TIAA countered with an offer of 13.8 basis points on all plans and all contracts, subject, again, to the Committee agreeing that TIAA would be the sole administrator of all NYU Plans.  Finally, after further negotiations with TIAA, TIAA agreed to a fee of 13.8 basis points on all TIAA assets for the Faculty Plan and 10 basis points on all assets for the Medical Plan.[21]

The Committee continued to monitor and negotiate reductions of TIAA's administrative fees over the entire putative class period.  In 2014, the Committee negotiated a further reduction of TIAA's fees for the Medical Plan from 10 to 9 basis points and in 2016 the Committee negotiated a reduction of the Faculty Plan's fees from 13.8 to 10 basis points.[22]  TIAA agreed to reduce the Faculty Plan fees to 3.2 basis points and the Medical Plan fees to 4 basis points, effective January 1 and April 1, 2017, respectively.[23]  Accordingly, during the past 6 years, the Committee successfully negotiated an *84% reduction* in the rate of administrative fees charged by TIAA.

---

[18] SOF at ¶¶ 95-118.
[19] SOF at ¶¶ 95-118.
[20] SOF at ¶¶ 95-118.
[21] SOF at ¶¶ 95-118.
[22] SOF at ¶¶ 95-118.
[23] SOF at ¶¶ 95-118.

REDACTED CONFIDENTIAL MATERIAL - PURSUANT TO PROTECTIVE ORDER

The Committee also continually monitored and negotiated Vanguard's fees. During this period, the Committee negotiated a *40% reduction* in Vanguard's administrative fees for the Faculty Plan, reducing them from approximately 10 basis points to 6 basis points.[24]

Plaintiffs cannot credibly dispute that Vanguard and TIAA are known to be low-cost providers of mutual funds and annuities, respectively,[25] and that the Committee was extremely successful in negotiating significant reductions in the Plans' administrative fees over this period of time. Between 2012 and 2016, total administrative fees for the Faculty Plan were reduced from ▮▮▮▮▮▮▮ to ▮▮▮▮▮▮▮.[26] During this period, assets increased from $1.98 billion to $2.62 billion and the number of Plan participants increased from 14,368 to 18,551.[27] Likewise, the Medical Plan's total administrative fees fell from ▮▮▮▮▮▮ in 2013 to ▮▮▮▮▮▮ in 2016, despite the fact that during that period of time that Plan's assets grew from $1.65 billion to $2.02 billion and the number of Plan participants grew from 7,765 to 8,560.[28]

### 4. NYU Conducted Two Requests for Proposals During the Alleged Class Period.

Although Count III alleges that NYU was imprudent for failing to solicit bids for administrative services, (ECF No. 39 at ¶ 208),[29] NYU did in fact conduct *two* RFPs for administrative services during the alleged putative class period. In 2009 NYU issued its first RFP to a number of potential vendors, including TIAA, Vanguard, Fidelity, Diversified

---

[24] SOF at ¶ 113.

[25] *See Amron v. Morgan Stanley Investment Advisors Inc.,* 464 F.3d 338, 345 (2d Cir. 2006) ("That a mutual fund has an expense ratio higher than Vanguard, a firm known for its emphasis on keeping costs low, raises little suspicion"); TIAA, *Ratings and Rankings, available at* https://www.tiaa.org/public/about-tiaa/awards-recognition (last accessed Jan. 7, 2018).

[26] SOF at ¶¶ 115-118; Ex. 140, Declaration of Adel Turki.

[27] SOF at ¶¶ 115-118; Ex. 140, Declaration of Adel Turki.

[28] SOF at ¶¶ 115-118; Ex. 140, Declaration of Adel Turki.

[29] *See also* ECF No. 79 at p. 20.

REDACTED CONFIDENTIAL MATERIAL - PURSUANT TO PROTECTIVE ORDER

Investment Advisors, Great West, Prudential, Hewitt, and ACS.[30]  The Committee received and carefully reviewed proposals from all of these vendors except Prudential, Hewitt, and ACS, who declined to respond.[31]  The Committee considered numerous factors regarding the vendors' proposals, including critical technological capabilities, ability to provide enhanced and branded electronic messaging, ability to provide NYU-dedicated web and phone assistance, on-site participant investment education, investment alternatives, and, of course, fees and expenses.[32] After an extensive review of these proposals, consideration of the needs of the Plans and their participants, the capabilities of each of the vendors submitting proposals, advice from Cammack, and consideration of fees, the Committee engaged TIAA and Vanguard to provide administrative services to the Plans.[33]

The Committee conducted a second RFP in 2016.[34]  That RFP was sent to TIAA, Vanguard, Fidelity, VALIC, and Voya Financial.[35]  The Committee received and carefully reviewed responses from all of these vendors other than Fidelity, which declined to submit a proposal.  Again, the Committee considered hundreds of pages of responses that provided detailed information regarding the capabilities and experience of these vendors, their ability to provide the nature and quality of the services expected by Plan participants, and the fees and expenses they proposed to provide those services.[36]  As a result of this competitive RFP process, the Committee retained TIAA as the sole administrator, but only after it agreed to a 70% reduction in the rates it was then charging for administrative services, as described above.

---

[30] SOF at ¶¶ 73-94.
[31] SOF at ¶¶ 73-94.
[32] SOF at ¶¶ 73-94.
[33] SOF at ¶¶ 73-94.
[34] SOF at ¶¶ 73-94.
[35] SOF at ¶¶ 73-94.
[36] SOF at ¶¶ 73-94.

REDACTED CONFIDENTIAL MATERIAL - PURSUANT TO PROTECTIVE ORDER

5.     **NYU Consolidated Vendors.**

Count III likewise fails because there is no truth to the allegation that NYU "failed to engage in a timely and reasoned decisionmaking [sic] process to determine whether the Plans would similarly benefit from consolidating the Plans' administrative and recordkeeping services under a single provider."  (ECF No. 39 at ¶ 210) (ECF 79 at p. 21).  To the contrary, the Committee employed a robust and prudent process to determine whether and when to consolidate recordkeeping services.

Early on, the Committee began to consider the potential benefits of vendor consolidation, although it noted that this was not a short-term priority because of the history and complexity of the Plans, the unique nature of the TIAA contracts, the expectations of Plan participants, and consideration of NYU's Shared Governance Principles.[37]

In 2012, the Committee consolidated the Medical Plan's administrative services with TIAA but did not make the same decision for the Faculty Plan.[38]  In doing so, the Committee discussed and considered the fact that the Faculty Plan and the Medical Plan had different participant needs and expectations, and determined that the advantages of consolidation outweighed the perceived risks and would be beneficial and appropriate for the Medical Plan at that time.[39]  The record reflects that the Committee determined that the Medical Plan would benefit more than the Faculty Plan from vendor consolidation from a technological perspective. In deciding that it was not appropriate to consolidate vendors for the Faculty Plan at that time, the Committee was concerned that this would have been a significant change affecting the faculty that needed further consensus, consistent with the Principles of Joint and Shared

---

[37] SOF at ¶ 73.
[38] SOF at ¶¶ 73-94.
[39] SOF at ¶¶ 73-94.

REDACTED CONFIDENTIAL MATERIAL - PURSUANT TO PROTECTIVE ORDER

Governance, and that the human resources department at Washington Square, which administers the Faculty Plan on a day to day basis, was undergoing a significant software transition at that time that effectively prevented making significant changes to the Faculty Plan until the transition was completed.[40]

In 2016, after completion of the software transition at Washington Square, and based on development of faculty consensus, TIAA's significant service upgrades, and significant TIAA fee reductions negotiated in 2017 in connection with the second RFP, the Committee decided that it was appropriate to consolidate the administration of the Faculty Plan with TIAA effective in 2018.[41]

Although Plaintiffs allege that a single vendor is always in the best interests of plan participants because the consolidation will always result in lower administrative fees, they are wrong.[42]

Because NYU employed a prudent process in reviewing and monitoring administrative fees, Plaintiffs cannot prevail even if they could prove that it may have been possible to have

_____

[40] SOF at ¶ 86.

[41] Moreover, the fact that the Medical Plan consolidated services with a single provider before the Faculty Plan did the same does not support a claim of imprudence. Prudent conduct is not evidence of imprudent conduct. *Laboy v. Bd. of Trs. of Bldg. Serv. 32 BJ SRSP*, No. 11 Civ. 5127 (HB), 2012 WL 3191961, at *3 (S.D.N.Y. Aug. 7, 2012) ("It would turn the law on its head were we to embrace a concept where a plaintiff could use allegations of prudent measures to prove a defendant's imprudence . . . .").

[42] Ex. 1, Am. Compl. (ECF No. 39); SOF at ¶ 118; Ex. 140, Declaration of Adel Turki.

[43] SOF at ¶ 118; Ex. 140, Declaration of Adel Turki.

[44] SOF at ¶ 118; Ex. 140, Declaration of Adel Turki.

REDACTED CONFIDENTIAL MATERIAL - PURSUANT TO PROTECTIVE ORDER

negotiated or obtained lower fees at any point in time. *Taylor*, 2009 WL 535779 at *8 ("The

prudent person standard does not require the fiduciary to take any particular course of action

even if another approach seems preferable." (citing *Chao v. Merino*, 452 F.3d 174, 182 (2d Cir.

2006))).  NYU was not required to scour the market to find the lowest fees available. *Hecker*,

556 F.3d at 586.

### B.   NYU is Also Entitled to Summary Judgment Because the Administrative Fees Were Objectively Prudent.

Defendant is entitled to summary judgment because NYU's decisions regarding

administrative fees and services were objectively prudent, and Plaintiffs cannot establish that a

fiduciary standing in NYU's shoes would have acted differently, would have consolidated

vendors earlier than it did, or would have negotiated even lower administrative fees.

### 1.   NYU's Consolidation of Vendors was Prudent.

Plaintiffs cannot establish that they suffered any harm based on their "one vendor is

prudent but two vendors is imprudent" argument.  Due to the structure and history of 403(b)

plans, it is typical to have more than one vendor, especially where 403(b) plans have legacy

TIAA annuity contracts that can only be administered by TIAA. ██████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

---

[45] SOF at ¶¶ 119-121; Ex. 132, Declaration of Glenn Freidman.
[46] SOF at ¶¶ 119-121; Ex. 132, Declaration of Glenn Freidman.

REDACTED CONFIDENTIAL MATERIAL - PURSUANT TO PROTECTIVE ORDER

███████████████████████████████████████████████████

████████████████████████████████

Finally, as described in Argument I. A. 5, *supra*, the facts demonstrate that in this case, Plaintiffs' cut-and-paste argument that a single vendor always results in lower administrative fees is wrong.  This is another example of why courts are reluctant to draw bright-line standards in ERISA contexts.  *See, e.g., Tibble v. Edison Int'l.,* 729 F.3d 1110, 1135 (9th Cir. 2013) ("There are simply too many relevant considerations for a fiduciary" for a court to adopt a "bright-line approach to prudence."); *Martinez v. Schlumberger, Ltd.*, 338 F.3d 407, 428 (5th Cir. 2003) (rejecting a bright-line approach to ERISA fiduciary duties); *Manning v. Hayes*, 212 F.3d 866, 872 (5th Cir. 2000) (rejecting a bright-line rule and noting that "simplicity comes at too great a cost").

### 2.     The Plans' Administrative Fees were Objectively Prudent.

Plaintiffs cannot prove that the Plans' administrative fees were objectively imprudent even if some similar plans may have paid less fees during this period of time.  *Hecker*, 556 F.3d at 586 (explaining that fees need only be reasonable and that the "fact that it is possible that some other funds might have had even lower ratios is beside the point"); *Young v. General Motors Inv. Mgmt. Corp.*, 325 F. App'x 31, 33 (2d Cir. 2009) (Sotomayor, J.) (explaining that an excessive fee claim is one of imprudent investment and requiring excessive fee claim plaintiffs to establish that fees "were excessive relative 'to the services rendered'" (quoting *Gartenberg v. Merrill Lynch Asset Mgmt.*, 694 F.2d 923, 928 (2d Cir. 1982))).

██████████████████████████████████████████████████

███████████████████████████████████████████████████

---

[47] SOF at ¶¶ 121; Ex. 91, Declaration of Jan Rezler.

REDACTED CONFIDENTIAL MATERIAL - PURSUANT TO PROTECTIVE ORDER



    With respect to Vanguard, a number of courts, including the Second Circuit, have

recognized that Vanguard is a well-recognized low cost provider.[52]  Vanguard is owned by the

Vanguard mutual funds and operates "at cost" and specifically markets itself as a low-cost

mutual fund provider.[53]  In fact, in numerous other cases, Plaintiffs' counsel has repeatedly

touted Vanguard as a low-cost alternative.[54]

**II.    NYU IS ENTITLED TO SUMMARY JUDGMENT ON COUNT V, ALLEGING BREACH OF THE DUTY OF PRUDENCE REGARDING THE CREF STOCK ACCOUNT AND THE TIAA REAL ESTATE ACCOUNT BECAUSE NYU EMPLOYED A ROBUST AND PRUDENT PROCESS IN MONITORING THOSE FUNDS AND BECAUSE THOSE FUNDS WERE OBJECTIVELY PRUDENT.**

    The Committee had a robust and prudent process that monitored the performance of all

investment options including the CREF Stock Account and the TIAA Real Estate Account,

---

[48] SOF at ¶¶ 122-124; Ex. 91, Declaration of Jan Rezler.

[49] SOF at ¶¶ 122-124; Ex. 91, Declaration of Jan Rezler.

[50] SOF at ¶¶ 122-124; Ex. 91, Declaration of Jan Rezler.

[51] SOF at ¶¶ 122-124; Ex. 91, Declaration of Jan Rezler.

[52] *See Amron,* 464 F.3d at 345 ("That a mutual fund has an expense ratio higher than Vanguard, a firm known for its emphasis on keeping costs low, raises little suspicion"); *Kasilag v. Hartford Inv. Fin. Servs., LLC,* No. 11-1083 (RMB/KMW), 2012 WL 6568409, at *5 (D.N.J. Dec. 17, 2012) ("To be sure, the Vanguard comparison is extremely limited.").

[53] SOF at ¶¶ 25-27.

[54] SOF at ¶ 25, fn. 59.

REDACTED CONFIDENTIAL MATERIAL - PURSUANT TO PROTECTIVE ORDER

"taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment" and the overall menu of investment options available to Plan participants. 29 C.F.R. § 2550.404a-1(b)(2)(i). ERISA requires only that the Committee engaged in a reasonable process, and Plaintiffs' opinions, investment theories, and preference for one style of investment over another cannot overturn the prudent process followed by the Committee and its expert advisers. *Taylor*, 2009 WL 535779 at *8 ("The prudent person standard does not require the fiduciary to take any particular course of action even if another approach seems preferable." (citing *Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006))).

> **A.   NYU is Entitled to Summary Judgment Because it Employed a Robust and Prudent Process in Reviewing the Plans' Investment Options, Including the TIAA Real Estate Account and the CREF Stock Account.**

The evidence shows that NYU employed a highly sophisticated, systematic review of all of the Plans' investment options, including the CREF Stock Account and the TIAA Real Estate Account. The Retirement Committee's independent expert, Cammack, provided detailed due diligence reports on all of the Plans' investment alternatives, including the CREF Stock Account and the TIAA Real Estate Account.[55] The Committee met on a regular and consistent basis, and met at least 25 times in the six years preceding the filing of the Complaint in this case, to review and monitor the performance of Plan investment alternatives.[56] The process included the review of voluminous materials regarding the Plans' investment alternatives, including the CREF Stock Account and the TIAA Real Estate Account.[57] The process also included in-person meetings with TIAA personnel specifically regarding the performance and evaluation of the CREF Stock Account and the TIAA Real Estate Account.[58]

---

[55] SOF at ¶¶ 125-139.
[56] SOF at ¶¶ 70-72.
[57] SOF at ¶¶ 125-164.
[58] SOF at ¶¶ 83, 139, 140-159.

REDACTED CONFIDENTIAL MATERIAL - PURSUANT TO PROTECTIVE ORDER

The Committee considered several factors commonly used by fiduciaries in reviewing plan investment funds, including volatility, ratings, risk and return characteristics, risk-adjusted returns, performance deviations, and style drift.[59] One of the factors used by Cammack and the Committee to analyze the funds was a widely-used measure of performance called "alpha," which is defined as the difference between the actual return and expected return.[60] This is an important and relevant measure of a fund's performance ███████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████ .

The Committee process as set out in its Investment Policy Statement included the use of a "watch list" for funds requiring additional or special scrutiny.[62] This is a typical and common practice followed by prudent fiduciaries and was part of Cammack's fund analysis when a particular fund had some indicator that may bear some additional scrutiny, including, for example, a fund manager change, market environment, or fund performance.[63]

The CREF Stock Account was never on the watch list because nothing regarding its performance warranted including it on the list.[64] Nevertheless, the Committee specifically analyzed and considered the CREF Stock Account's performance, considering its unique diversified blend of small, mid, and large company domestic equities and up to 30 percent foreign equities.[65] Cammack and the Committee analyzed the performance of the CREF Stock Account in light of a composite benchmark comprised of 70 percent domestic equities and 30

---

[59] SOF at ¶¶ 66–68; Ex. 4, Expert Report of Marcia Wagner, at p. 37.
[60] SOF at ¶¶ 66–68.
[61] SOF at ¶¶ 66–68, Ex. 141, Expert Report of Dan Fischel, at pp. 17, 21.
[62] SOF at ¶¶ 135-136.
[63] SOF at ¶¶ 135-136, Ex. 89, Dep. of J. Rezler at 129:6-129:14; 130:17-131:7; 132:6-133:6.
[64] SOF at ¶¶ 140-147.
[65] SOF at ¶¶ 140-147.

REDACTED CONFIDENTIAL MATERIAL - PURSUANT TO PROTECTIVE ORDER

percent foreign equities mixture, in addition to reviewing its performance compared to the Russell 3000, which does not have this level of diversification.[66] The Committee also analyzed the CREF Stock Account in the context of the Plans' total investment lineup, which also included stock index funds for participants who preferred that style of investment.[67]

From Q1 2010 through Q3 2011, the Committee did put the TIAA Real Estate Account on the watch list based on Cammack's advice, considering the account's then 3 and 5 year trailing performance following the crash of the U.S. real estate market, and its performance compared to the Dow Jones U.S. Select Real Estate Investment Trust ("REIT") index.[68] During that period of time, the Committee acted prudently by questioning Cammack and TIAA regarding the fund's management, investments, performance, and benchmark.[69]

At its April 1, 2011 meeting, the Committee raised concerns about benchmarking the Real Estate Account against a REIT index because of the significant differences between the Real Estate Account, which held direct investments in real property, and REITs, which were publicly traded and derived value from market perceptions of value.[70] Cammack and the Committee understood and considered that because of these differences, the Real Estate Account was difficult to benchmark.[71] At that time, the Committee also reviewed supplemental meeting materials provided by Cammack, which contained over 25 pages of detailed information regarding the TIAA Real Estate Account, its composition, investment strategy, account

---

[66] SOF at ¶¶ 140-147.
[67] SOF at ¶¶ 140-147.
[68] SOF at ¶¶ 148-159.
[69] SOF at ¶¶ 148-159.
[70] SOF at ¶¶ 148-159.
[71] SOF at ¶¶ 148-159.

REDACTED CONFIDENTIAL MATERIAL - PURSUANT TO PROTECTIVE ORDER

management, risks, liquid asset holdings, and performance versus various comparisons and indexes.[72]

At its next meeting two months later, the Committee again discussed the TIAA Real Estate Account's performance and at that time, Cammack noted that the Account continued to recover from the financial downturn along with the rest of the U.S. real estate market.[73] Although the account remained on the watch list, based on this review, Cammack did not recommend removal of the fund because the Account had "begun to recover along with the general recovery of the US commercial real estate market."[74]

Two months after that, at the Committee's August 2011 meeting, Cammack advised that the Committee continue to carefully monitor the TIAA Real Estate Account, but not remove it from the Plans' menus because it had positive returns and was "expected to continue to recover as the U.S. commercial real estate market recovers."[75]

The Committee continued to give this Account special scrutiny and invited TIAA representatives to attend its February 21, 2012, Committee meeting to address its concerns and provide further information about the performance of the Real Estate Account.[76] TIAA representatives addressed the Account's performance, which was strong in 2011 and was expected to continue to perform well in 2012.  TIAA also addressed the Committee's questions about appropriate measures for evaluating the Account's performance, acknowledging the unique nature of the Account, and provided an additional benchmark, which was designed to provide the Committee with additional information regarding the performance of that fund based

---

[72] SOF at ¶¶ 148-159.
[73] SOF at ¶¶ 148-159.
[74] SOF at ¶¶ 148-159.
[75] SOF at ¶¶ 148-159.
[76] SOF at ¶¶ 148-159.

REDACTED CONFIDENTIAL MATERIAL - PURSUANT TO PROTECTIVE ORDER

on its unique structure and lack of peer funds.[77]  Thereafter, the Committee continued to closely monitor the Real Estate Account, and continues to do so to this day.



**B.      NYU is Also Entitled to Summary Judgment Because the TIAA Real Estate Account and the CREF Stock Account are Objectively Prudent Investment Alternatives for the Plans.**

Plaintiffs cannot recover because ERISA's prudence standard is objective and the undisputed facts in this case prove that a large number of similarly situated fiduciaries have determined that the CREF Stock Account and the TIAA Real Estate Account are prudent investment options for their plans. *La Scala v. Scrufari*, 479 F.3d 213, 219 (2d Cir. 2007).  In the six years prior to the filing of the Complaint, 99% of TIAA's 200 largest 403(b) plan clients had investments in the CREF Stock Account and the TIAA Real Estate Account.[79]  During that same time, 99% of TIAA's 200 largest 403(b) plan clients offered the CREF Stock Account as an investment option for ongoing 403(b) contributions, and between 86% and 95% of those same clients offered the TIAA Real Estate Account as an investment option for ongoing 403(b) contributions.[80]  As a further indication of the objective prudence of these funds, the CalTech

---

[77] SOF at ¶¶ 148-159.
[78] Ex. 4, Expert Report of Marcia Wagner, at ¶ 109.
[79] SOF at ¶¶ 160-164, Ex. 132, Declaration of Glenn Friedman.
[80] SOF at ¶¶ 160-164, Ex. 132, Declaration of Glenn Friedman.

REDACTED CONFIDENTIAL MATERIAL - PURSUANT TO PROTECTIVE ORDER

403(b) plan, which Plaintiffs hold out as an example of prudent management, offers the TIAA

Real Estate Account.[81]

Plaintiffs' allegation that these funds consistently underperformed based on 20/20

hindsight is simply wrong.

The fact that the CREF Stock Account and the TIAA Real Estate Account have

performed well has not been lost on Plaintiffs.  Plaintiffs Crispin Miller, Monaco, Samuels and

Straussner remain invested in the CREF Stock Account to this day.[86]  Plaintiff Straussner invests

a third of her Medical Plan account in the CREF Stock Account.[87]  Likewise, Plaintiffs Monaco

and Straussner apparently do not believe the allegations made in the Amended Complaint

---

[81] SOF at ¶¶ 160-164, Ex. 141, Expert Report of Dan Fischel, at ¶¶ 22, 28.
[82] SOF at ¶¶ 160-164, Ex. 132, Ex 141, Expert Report of Dan Fischel at 25; Ex. 4, Expert Report of Marcia Wagner at 32.
[83] SOF at ¶¶ 160-164; Ex. 141, Expert report of Dan Fischel, at ¶¶ 22, 28.
[84] SOF at ¶¶ 160-164; Ex. 141, Expert report of Dan Fischel, at ¶¶ 22, 28.
[85] SOF at ¶¶ 160-164; Ex. 141, Expert report of Dan Fischel, at ¶¶ 22, 28.
[86] SOF at ¶¶ 36, 41, 46, 54.
[87] SOF at ¶ 46.

REDACTED CONFIDENTIAL MATERIAL - PURSUANT TO PROTECTIVE ORDER

regarding the performance of the TIAA Real Estate Account, as they both continue to maintain significant investments in that fund.[88]

Plaintiffs' assertion that NYU breached ERISA's duty of prudence by offering the actively managed CREF Stock Account instead of a passive index account is simply wrong as a matter of law and fact. Nothing in ERISA creates a preference for one type of fund over another. *See Hecker*, 556 F.3d at 586 ("We see nothing in [ERISA] that requires plan fiduciaries to include any particular mix of investment vehicles in their plan."). The U.S. Department of Labor recognizes that plans typically offer "actively managed" funds.[89] The law of trusts, upon which the ERISA duty of prudence is based, recognizes the prudence of using active management. Restatement 3d of Trusts, § 90 cmts. e(1) and f at 304, 307 (observing that "active management strategies" are permissible and "[t]here are no universally accepted and enduring theories of financial markets or prescriptions for investment that can provide clear and specific guidance to trustees and courts, varied approaches to the prudent investment of trust funds are therefore permitted by the law"). Finally, courts have specifically rejected the theory that a plaintiff can establish a breach of the duty of prudence by comparing a passively-managed Vanguard index fund to an actively-managed fund. *See, e.g., Brotherston v. Putnam Invs.,* No. 15-13825-WGY, 2017 WL 1196648, at *74 (D. Mass. Mar. 30, 2017) (rejecting, on written record, damage model that compared active and passive funds as "apples and oranges").

Moreover, Plaintiffs' claim that the CREF Stock Account consistently underperformed the Russell 3000 Index and two passively managed index funds (VITPX and VIIIX) is also wrong. ████████████████████████████████████████

---

[88] SOF at ¶¶ 41, 46.
[89] U.S. Dep't of Labor, Emp. Benefits Sec. Admin., *A Look at 401(k) Plan Fees*, at 7 (Aug. 2013).

REDACTED CONFIDENTIAL MATERIAL - PURSUANT TO PROTECTIVE ORDER

███████████████████████████████████████████████████

████████████████████████████

Finally, it is important to recognize that the Plans in this case offered participants *both* actively and passively managed index funds, including the passively managed Vanguard funds Plaintiffs use as inapt comparisons to the CREF Stock Account.[91] Thus, NYU "left choice to the people who have the most interest in the outcome, and it cannot be faulted for doing this." *Loomis v. Exelon Corp.*, 658 F.3d 667, 673-74 (7th Cir. 2011). The Plans disclosed to participants the CREF Stock Account's investment managers, performance, investment strategy, fees, and that it was an actively managed fund.[92] "Given the numerous investment options, varied in type and fee, [defendants] can be held responsible for those choices." *Hecker*, 556 F.3d at 590.

## CONCLUSION

For the reasons set forth above, Defendant respectfully requests that the Court grant summary judgment in favor of Defendant on all of Plaintiffs' claims, and dismiss the Amended Complaint (ECF No. 39) with prejudice.

Respectfully submitted,

/s/ Mark Muedeking
Mark Muedeking
Ian C. Taylor
Jennifer K. Squillario
Julie Ben-Zev

---

[90] SOF at ¶¶ 160-164; Ex. 141, Expert report of Dan Fischel.
[91] SOF at ¶ 17.
[92] SOF at ¶¶ 165; Exs. 174, 175.

REDACTED CONFIDENTIAL MATERIAL - PURSUANT TO PROTECTIVE ORDER

DLA Piper LLP (US)
500 8th Street, NW
Washington, DC 20004
(202) 799-4000

Brian S. Kaplan
Evan D. Parness
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020
(212) 335-4500

*Counsel for Defendant New York University*