# EXHIBIT 8

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DR. ALAN SACERDOTE, et al., <br>                    Plaintiffs, <br> v. <br><br> NEW YORK UNIVERSITY, <br>                    Defendant. | No. 1:16-CV-06284 <br><br> ECF Case |

Corrected Expert Report of Michael Geist
February 6, 2018

Confidential

## I.      Engagement

1.      I have been retained by Plaintiffs' counsel in this matter to provide expert analysis and opinions related to the fiduciary process and investment decisions made by New York University ("NYU") and its officers and trustees.

2.      I am compensated at the rate of $500 per hour. My compensation is not dependent on my opinions or on the outcome in this matter. My opinions are based on my review of the documents in this case, deposition testimony, and my professional experience. My opinions on this matter are ongoing. I specifically reserve the right to supplement, revise, or amend these opinions.

3.      My curriculum vitae is attached as Exhibit 1. A list of the materials considered in this matter is attached hereto as Exhibit 2.

## II.     Qualifications and Experience

4.      I am currently consulting primarily in the retirement plan, recordkeeping, and asset management industries. I am an expert in revenue sharing, retirement plan pricing structures, recordkeeping fees, and recordkeeping fee equalization solutions as well as comprehensive business process optimization and governance in the sales, service, marketing, and finance functions of the distribution of asset management services through retirement plans.

5.      Before starting my consulting practice, I spent over ten years in the Retirement Plan Services ("RPS") division of T. Rowe Price holding a variety of senior level roles. Over the course of my employment at T. Rowe Price, I was responsible for delivering, creating, and/or governing over 20,000 pricing proposals for over 10,000 retirement plans. In various roles since 2005, I was directly involved with pricing proposals for recordkeeping and administrative services provided by RPS to defined contribution plans, including recordkeeping-only clients. I had direct experience with large defined contribution plan clients and prospective clients, including those ranging from $500 million to well over $1 billion in total plan assets. In my professional experience at RPS, I developed extensive knowledge of the sales and competitive bidding process for recordkeeping and administrative services provided by RPS and other competitor recordkeeping service providers for large defined contribution plans. I gained a firm understanding and insight into how recordkeepers price recordkeeping services, the costs to provide such services, and how sophisticated recordkeepers respond to Request for Proposals

("RFPs") to maintain or secure business from large defined contribution plan clients. Over my career, I acquired extensive knowledge of fiduciary best practices for defined contribution plans, including those employed by fiduciaries and industry professionals, to ensure that only reasonable recordkeeping and administrative fees are charged to plan participants.

6.      Most recently, I was a Senior Vice President in the Product Development and Management department of RPS from February 2015 until August 2016. I was responsible for the development and management of Recordkeeping Fee services and solutions for RPS. Among other things, I developed and launched the RPS "Fee Allocation Solutions" service which assists plan sponsors in their fiduciary duties to monitor recordkeeping fees and make decisions about the equitable allocation of plan expenses among plan participants. These services utilized database technologies to more precisely account for revenue sharing and recordkeeping credits attributable to the investments selected by plan fiduciaries and made available to plan participants. In that role, I also partnered with the Pricing Governance department to develop enhanced recordkeeping fee pricing solutions for plan sponsors.

7.      I spent approximately two and a half years as the National Pricing Governance and Data Strategy Manager for RPS from August 2012 until February 2015. In that capacity I was responsible for, among other things, the financial evaluation and governance of all retirement plan pricing for RPS. This included developing, leading, and governing the bidding and pricing process as well as the pricing negotiation process for both new and existing business. In that role I was responsible for developing and governing pricing proposals for over 4,000 retirement plans and 8,000 pricing proposals.  Additionally, I was responsible for developing and conducting a regular financial evaluation and pricing review for all current clients. In this role I was also responsible for developing a pricing model and pricing strategy for non-qualified plan administration and overseeing the implementation of that pricing model as T. Rowe Price transitioned the recordkeeping of its Non-Qualified plan business to a new provider.

8.      I was Vice President, Sales Support and Business Development from February 2011 until August 2012. I managed and oversaw multiple departments supporting sales producers including Lead Generation, Product Governance/Underwriting, RFP Response, Internal Sales Support, and the Pricing, Metrics, and Reporting teams. In that role, I was responsible for, among other things, the financial evaluation and governance of all new business retirement plan pricing for RPS which amounted to approximately 2,000 retirement plans and

3

4,000 pricing proposals.  My responsibilities also included developing, leading, and governing the bidding and pricing process for new business as well as the pricing negotiation process for new business. I was also responsible for the analysis and segmentation of the retirement plan market.

9.      From January 2008 until February 2011 I was a Vice President of RPS serving as the National Sales Operations Manager. In that capacity, I was responsible for developing, managing, and governing all aspects of the sales process for RPS, including the bidding and pricing process as well as the pricing negotiation process.  In this role I was responsible for, among other things, the financial evaluation and governance of all new business retirement plan pricing for RPS which amounted to over 4,000 retirement plans and 8,000 pricing proposals. I was also responsible for market analysis that supported the development of sales and segmentation strategies as well as sales targets. From around September 2009 through February 2011 I also served as the National Small Market Sales Manager. I was also responsible for managing a team of sales producers and supporting their efforts to win new business for recordkeeping and administrative services provided by RPS.

10.     From January 2005 through December 2008 I was a sales producer responsible for winning new recordkeeping and asset management business for RPS.  During that period, I provided recordkeeping proposals for over 400 retirement plans and over 800 pricing proposals.

11.     Prior to joining T. Rowe Price, I served as the Director of Marketing for E-centives, a database marketing company. Prior to joining E-centives I practiced law for five years.

12.     I earned my MBA from University of Maryland, Robert H. Smith School of Business and my JD from the University of Baltimore School of Law. While working for T. Rowe Price, I passed the Principal/Supervisory Exam (Series 24 - General Securities Principal Examination), the General Industry/Products Exam (Series 7 - General Securities Representative Examination), and the Maryland State Securities Law Exam (Series 63 - Uniform Securities Agent State Law Examination).

13.     My curriculum vitae outlining my experience is attached as Exhibit 2.

14.     I have not previously testified at trial or by deposition as an expert witness.

### III.   Defined contribution plan recordkeeping industry

15.     Over the past three decades, defined contribution plans, have become the most common employer-sponsored retirement plan. A defined contribution plan allows employees to make pre-tax elective deferrals through payroll deductions to an individual account under the plan. Among many options, employers may make contributions on behalf of all participants and/or making matching contributions based on the employees' elective deferrals. The employees can direct their contributions only among investment options selected by the fiduciary of the plan or through a brokerage window, if available.

16.     The assets of a defined contribution plan are held by a trustee in a single trust. The plan allocates the trust assets among plan participants through a recordkeeper, who keeps accounts of participants' share of plan investments and returns. Recordkeeping and related administrative services thus are necessary for all defined contribution plans. These services include, but are not limited to, those related to maintaining plan records, tracking participant account balances and investment elections, transaction processing, call center support, participant communications, and trust and custody services. Third party service providers provide these services on behalf of a defined contribution plan. Some recordkeepers provide only recordkeeping and related services and some recordkeepers are subsidiaries of financial services and insurance companies that also market mutual funds and insurance products.

17.     Different providers of recordkeeping and administrative services as well as industry research organizations and associations often define segments of the defined contribution plan market differently. In my experience, defined contribution plans are segmented based on both the number of participants with account balances as well as the amount of assets in the plan.  A typical segmentation would be as follows:

**Micro**: Under 50 participants (approx. $0 – $2 million)

**Small**: ~50 – 500 participants (approx. $2 – $25 million)

**Mid**: ~500 – 2,000 participants (approx. $25 – $125 million)

**Large**: ~2,000 – 7,500 participants (approx. $125 – $500 million)

**Mega**: ~7,500 – 30,000 (approx. $500 million – $2 billion)

**Giga**: ~30,000+ (above $2 billion)

18.     The market for defined contribution recordkeeping services is highly competitive, especially for plans that are at the Large and higher levels. As explained in detail below, these plans offer significant economies of scale and provide a valuable opportunity to recordkeepers in the marketplace. There are numerous recordkeepers in the industry that are capable of providing quality recordkeeping and administrative services to Mega and Giga defined contribution plans.

19.     It is not difficult to transition even Large, Mega, and Giga plans to new recordkeepers. The conversion costs are typically waived by the recordkeeper. To the extent that conversion costs are actually charged, they are typically borne by the plan sponsor and not charged to plan participants. The transition to the new recordkeeper can occur easily. Recordkeepers that service large defined contribution plans have dedicated personnel, often referred to as conversion teams, who specialize in transitioning defined contribution plans from the old recordkeeper to the new recordkeeping platform. Because all recordkeepers that service large plans routinely engage in plan transitions, they are fully prepared and equipped to make the transition. They also have personnel who assist the plan sponsor during the conversion and perform other necessary administrative tasks to effectuate the change, such as preparing participant communications.

20.     Since the mid 2000's, the basic recordkeeping services provided to defined contribution plans have increasingly become viewed as a commodity service. While recordkeepers in the defined contribution industry attempt to distinguish themselves based on the quality of their services, for the core recordkeeping services provided to Mega and Giga defined contribution plans, there are virtually no material differences.

21.     By the early 2000s prudent fiduciaries of large plans and their consultants have demanded recordkeeping and administrative services be priced separately from investment management services. They also sought an "open architecture" investment structure, i.e., the ability to include non-proprietary investment options in the retirement plan where the recordkeeper provides recordkeeping and administrative services for both proprietary and non-proprietary investment options.

22.     Due to the demand for fee transparency for recordkeeping and administrative services, since the mid-2000s, the fees charged for recordkeeping and administrative services have rapidly declined. This decline began with larger defined contribution plans and has migrated to all market segments.

23.     From January 1, 2009 to the present, recordkeeping and administrative fees charged to defined contribution plans have continued to decline. This has occurred primarily due to market competition, ERISA excessive fee litigation, and the fee disclosure regulations under 29 U.S.C. §1108(b)(2) promoting increased fee transparency. In order to remain price competitive in the industry, service providers have invested in additional infrastructure to provide more automation and standardization to many of the recordkeeping services. This has reduced their costs and enabled the recordkeepers to gain efficiencies and reduce their price for recordkeeping services.

### IV.     Pricing of recordkeeping and administrative services for defined contribution plans

24.     The underlying cost to a recordkeeper of providing the core recordkeeping and administrative services to a defined contribution plan is primarily dependent on the number of participant accounts in the plan rather than the amount of assets in a participant's account.

25.     Regardless of the size of the assets invested in a defined contribution plan, or the balance of individual plan participant accounts, the underlying cost of providing the core recordkeeping and administrative services is the same. All else being equal, the incremental cost of recordkeeping a participant's account with a balance of $500,000 is the same as for a participant whose account balance is $5,000 with the same investments. In the aggregate, any differences in investment holdings from one participant compared to another is immaterial from a cost perspective to the recordkeeper.

26.     Service providers for large defined contribution plans experience certain efficiencies of scale that lead to a reduction in the per-participant cost as the number of participants increase because the marginal cost of adding an additional participant to a recordkeeping platform is relatively low. These economies of scale are inherent in all recordkeeping arrangements for defined contribution plans. When the number of participants with an account balance increase in a defined contribution plan, the recordkeeper is able to spread the cost of providing recordkeeping services over a larger participant base, thereby reducing the unit cost of delivering services on a per-participant basis.

27.     These economies of scale are achieved because most costs associated with providing recordkeeping services are fixed, and thus, are not avoided if the client leaves. The portion of the marketing, administrative, and overhead expenses at the firm level that are

allocated to the recordkeeping business unit do not typically change if the recordkeeper loses a plan or acquires a new plan. Additionally, the recordkeeper invests in technology infrastructure necessary to provide recordkeeping and transaction services to all clients (e.g., website, call center, and some print services). These costs also do not materially change with the loss or acquisition of a new plan, and do not vary based on the amount of assets in the plan or in an individual's account. When more participants in a plan are on a recordkeeping platform, the recordkeeper allocates its fixed costs over a larger participant base, thereby reducing the per-participant cost. As a result, the incremental (or marginal) cost to add a new participant to a plan is relatively low.

28.    The chart below illustrates the basic economics of providing recordkeeping services to defined contribution plans.

| Simple Hypothetical Illustration of the Impact of Scale on the Per-Participant Costs of providing Recordkeeping Services | | | |
|---|---|---|---|
| | | Hypothetical fixed costs: | $50,000 |
| | | Hypothetical variable cost per participant: | $20 |
| **Number of Participants** | **Total Plan Costs** | **Average cost per participant** | **Percent of Total Plan Costs derived from Variable Costs** |
| 1 | $50,020 | $50,020.00 | 0.04% |
| 100 | $52,000 | $520.00 | 3.85% |
| 1,000 | $70,000 | $70.00 | 28.57% |
| 5,000 | $150,000 | $30.00 | 66.67% |
| 10,000 | $250,000 | $25.00 | 80.00% |
| 50,000 | $1,050,000 | $21.00 | 95.24% |
| 100,000 | $2,050,000 | $20.50 | 97.56% |

29.    As illustrated in the chart above, as the number of participants increase, the average cost per participant decreases until it approaches the marginal cost per participant. And the variable costs account for a larger portion of the total plan cost, which drives down the average cost per participant and enables a recordkeeper to provide the services at a lower price-point. Due to these economies of scale that are part of a recordkeeping relationship, and because

the incremental variable costs for providing recordkeeping and administrative services are primarily dependent on the number of participants with account balances in a defined contribution plan, the cost on a per-participant basis declines as the number of plan participants increases.

30.     Large defined contribution plans, particularly ones as large as the WS and SOM Plans, would have significant bargaining power to obtain lower-cost recordkeeping and administrative services on a per-participant basis compared to smaller plans.

31.     The economies of scale experienced by larger defined contribution plans were described as far back as 1998 in the "Study of 401(k) Plan Fees and Expenses"[1] submitted to the Pension and Welfare Benefits Administration of the Department of Labor and published by the Department of Labor on its website consistently since 1998:

### Table IV-4
### Average 401(k) Plan Recordkeeping Fees, 1995
By Number of Plan Participants

| Number of Participants | Costs Per Participant |
| --- | --- |
| 200 | $42 |
| 500 | $37 |
| 1,000 | $34 |

32.     Recordkeepers of defined contribution plans typically charge for their services under one of two pricing structures: (1) a per-participant fee based on the number of participants with account balances; or (2) an asset-based fee.

33.     Under a per-participant revenue requirement pricing structure, the plan fiduciary and service provider negotiate a fixed per-participant fee based on the number of participants with account balances. In other words, the recordkeeper agrees that it will receive no more than $X per-participant annually. If the recordkeeper collects more revenue than the agreed-upon per-participant revenue requirement, then the recordkeeper is required to return the excess revenue. This pricing structure has become a standard and customary best practice among plan fiduciaries because the cost of providing recordkeeping services is not dependent on the amount of assets in a retirement plan.  Margaret Meagher, long time co-chair of the Committee, mistakenly states

---

[1] U.S. Dep't of Labor, *Study of 401(k) Plan Fees and Expenses*, §4.2.2 (Apr. 13, 1998), https://www.dol.gov/sites/default/files/ebsa/researchers/analysis/retirement/401kRept.pdf.

that asset size is related to the cost of recordkeeping. Meagher Depo. p. 61. Not only is this wrong, but it contradicts what is widely known throughout the defined contribution industry.

34.     After the revenue requirement is negotiated, the plan fiduciary determines how to pay the negotiated recordkeeping fee. The employer (or plan sponsor) can, but is not obligated to, pay the recordkeeping fee itself. If the employer were paying the fee, it would typically want to negotiate a total fee based on the lowest per-participant rate a suitable recordkeeper would accept. An employer can decide to have the Plan pay the recordkeeping fee instead. If the recordkeeping fee is paid by plan participants, the plan fiduciary must determine how to allocate the recordkeeping fee among participant accounts. This is typically done through a flat dollar amount charged to each plan participant account or pro-rata based on the value of each participant's account.

35.     In an asset-based pricing structure, the amount of compensation received by the service provider is based on a percentage of the total assets in the plan.

36.     Recordkeepers sometimes make arrangements with mutual fund service providers to share some of the fees that these providers take as expenses from the mutual funds for the recordkeeper to use to apply to recordkeeping costs. These revenue sharing arrangements can be with the mutual fund's investment adviser, transfer agent, shareholder services provider, 12b-1 services providers, or others. These revenue sharing arrangements are typically established in a single agreement between the mutual fund service provider and the recordkeeper for payment of a fixed percentage of the value of all the mutual fund investments in all of the retirement plans for which the recordkeeper provides services. However, as those assets increase, the compensation to the recordkeeper increases, even though its services might not change at all.

37.     If a mutual fund has a total expense ratio of 0.75%, one or more of the service providers for the mutual fund may agree to pay a recordkeeper 0.25% for providing services to the participants who invest in that mutual fund. The revenue paid by the investment option to the recordkeeper, in this example the 0.25%, is typically referred to as "revenue sharing." The amount of revenue sharing can vary from mutual fund to mutual fund and by share class within a given mutual fund.

38.     TIAA-CREF and Vanguard characterizes the revenue made available to pay for recordkeeping and administrative services from proprietary investments as a plan service expense or recordkeeping credit.

39.     Because the cost of providing recordkeeping services is not dependent on the amount of assets invested in the plan, as assets increase, the recordkeeper's asset-based compensation paid through revenue sharing likewise increases even though the services provided to the plan, and the cost for providing those services, have not changed.

40.     For instance, from 1985 to 2000, the assets in defined contribution plans increased dramatically. As assets grew, the fees collected by recordkeepers increased in proportion to the asset growth while the services provided by recordkeepers did not materially change. Over time this often resulted in dramatic increases in recordkeeping fees paid by plan participants.

41.     An asset-based revenue sharing arrangement to pay for recordkeeping and administrative services is more common in Micro to Small defined contribution plans. This is because for those smaller plans the asset-based fee usually does not cover the recordkeeping expenses. For Mega and Giga defined contribution plans, due to the economies of scale experienced by recordkeepers, the opposite is true. As a result, prudent fiduciaries for Mega and Giga plans if they use an asset based fee for recordkeeping, negotiate a per-participant revenue requirement and recover excessive revenue sharing for the plan.

V.     **A fiduciary's obligations when administering a defined contribution plan**

42.     The Employee Retirement Income Security Act of 1974 (ERISA) sets forth the fiduciary obligations that a fiduciary owes to participants and beneficiaries when administering a defined contribution plan.

43.     Under 29 U.S.C. §1104(a)(1), a fiduciary must "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries". When performing his duties, the fiduciary must act "for the exclusive purpose" of "providing benefits to participants and their beneficiaries" and "defraying reasonable expenses of administering the plan".[2]

44.     The fiduciary also must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims".[3] Both of these standards, including the duty to act solely in the interest of plan participants, incurring only reasonable expenses, and acting in conformity with the standards of fiduciaries of Mega-

---

[2] 29 U.S.C. §1104(a)(1)(A).
[3] 29 U.S.C. §1104(a)(1)(B).

and Giga-size defined contribution plans, are part of what I described here as the actions of a "prudent fiduciary."

## VI.     Prudent fiduciary practices for defined contribution recordkeeping fees

45.     Based on my extensive experience in the recordkeeping industry, provided below are fiduciary best practices a prudent fiduciary would follow when establishing, monitoring and overseeing the recordkeeping and administrative fees charged to a defined contribution plan.

46.     Because the total cost of providing recordkeeping and administrative services for Mega and Giga plans is primarily driven by the number of participants with account balances in the defined contribution plan, a prudent fiduciary would negotiate a per-participant revenue requirement (or per-participant revenue threshold) based on the number of participants with account balances. This negotiated per-participant fee would be set forth in a written agreement between the recordkeeper and the plan sponsor or plan fiduciary.

47.     A fiduciary is required to fully understand **all** sources of revenue received by a recordkeeper. It must regularly monitor that revenue to ensure that the compensation received by the recordkeeper is and remains reasonable for the services provided.[4]

48.     This duty to monitor is critical when recordkeeping services are paid through an asset-based pricing structure. Under this structure, the amount paid for services may dramatically increase based on an increase in plan assets even though the services provided do not materially change. In this circumstance, the recordkeeper's compensation can easily exceed the negotiated fee. A prudent fiduciary would take prompt and corrective action to remedy this overpayment caused by an increase in plan assets to ensure that the recordkeeper only receives reasonable compensation.

49.     If the asset-based compensation through revenue sharing exceeds the negotiated per-participant revenue threshold, a prudent fiduciary would require the return or rebate of this excess revenue sharing directly to the plan and/or plan participants.

50.     Since before 2008, in my personal experience, if asked by the plan fiduciary, a recordkeeper will allocate excess revenue sharing to a plan account (often referred to as a revenue credit account or ERISA budget) to be allocated back to participant accounts or pay eligible plan expenses. If the excess was not initially returned to the participant accounts, then

---

[4] In the WS Plan and the SOM Plan, a source of revenue NYU allowed TIAA to collect is revenue from marketing and selling their proprietary, non-plan related products and services.

any amounts remaining after the payment of plan expenses would be credited back to plan participants. The allocation of excess revenue to participant accounts is typically done on a quarterly or annual basis.

51.     In most cases, it is a best practice to allocate all revenue sharing back to participants who generated the revenue sharing, and separately deduct the per-participant revenue requirement directly from all participants' accounts. The use of a per-participant revenue requirement pricing structure ensures that the recordkeeper does not receive compensation that exceeds the negotiated fee.

52.     A prudent fiduciary would engage in a Request for Proposal ("RFP") competitive bidding process to obtain a reasonable recordkeeping fee for a defined contribution plan. This is the surest way to obtain the lowest recordkeeping fee for a desired level of services provided to the plan, and the only reliable way a plan fiduciary can maximize its bargaining power to obtain the best fee available in the marketplace.

53.     Under a RFP competitive bidding process, the plan fiduciary, often with the assistance of an independent fiduciary or consultant, sends out a formal request seeking proposals from vendors to provide recordkeeping and administrative services to a defined contribution plan. The request will provide detailed information on the services requested and the characteristics of the plan, and a questionnaire for detailed information about the bidder and the services it will provide and the fees it would charge. Large defined contribution plans that put out RFPs can expect to receive several responses from sophisticated recordkeepers because such large plans are highly valued sources of business for such providers.

54.     An effective RFP process is not complete once responses are received from bidders. Rather, the pricing proposals along with the written responses are only the starting point for negotiations. Once the responses are received, a prudent fiduciary begins negotiations with each provider and separately evaluates the recordkeeping fee as well as the total investment management fee (the total expense ratio) and the net investment management fee associated with each investment option.[5] To do this properly, it is critical to determine the crediting rate that would be made available by each investment option to pay for recordkeeping and administrative services.

---

[5] The net investment management fee is derived by subtracting the crediting rate of a particular investment option (or revenue sharing) from the total expense ratio.

55.     Regardless of the pricing assumptions underlying each bid, prudent fiduciaries analyze potential plan investment options independent of their decision on the recordkeeping service provider. Following an appropriate investment selection process, the plan fiduciary should take advantage of any discounts that may obtained from the recordkeeper based on any proprietary investment options included in the plan. Throughout this process, the plan fiduciary must ensure it is acting solely in the interest of plan participants in both the selection of the recordkeeper and the negotiation of the recordkeeping fee, as well as the selection of the investment options made available to participants in the retirement plan and ensuring both the fees of the selected investment options and the compensation for recordkeeping and related services are reasonable.

56.     When evaluating RFP responses and the clarifying responses, the plan fiduciary would compare the services offered and the pricing proposals across vendors. If any further information is necessary to evaluate any material differences in the services offered by each provider, the plan fiduciary would promptly request that information. With the detailed information provided by the bidders, the plan fiduciary can break the pricing proposals down on a per-participant basis to ensure an "apples-to-apples" comparison is made. This process allows the plan fiduciary to gain a detailed understanding of the pricing approaches among various recordkeepers.

57.     After evaluating the pricing proposals on an "apples-to-apples" basis, and considering other detailed information provided in the RFP responses, a prudent fiduciary would separately negotiate with each provider. The fiduciary would provide each provider and the incumbent the comparative pricing of their competitors and request that each provider provide pricing reductions to remain under consideration. The plan fiduciary would then narrow the list of providers to a total of three or four finalists, including the incumbent.

58.     When nearing a final decision on the recordkeeper, the plan fiduciary requests that each finalist provides its final bid. If the incumbent was not the lowest bid, the plan fiduciary requests that incumbent beat the competitor's price to remain under consideration. In these situations, the incumbent recordkeeper will conduct a financial analysis comparing the scenario of keeping the business at the lower recordkeeping price or losing the client, which would include the inherent risk of losing any proprietary investments and other supplementary revenue

derived from the relationship. In most cases, the incumbent determines that maintaining the client at the lower price is in their economic interest.

59.    Due to the competition among candidates, and their motivation to secure the business, the final fee quotes presented to the plan fiduciary are substantially lower than the initial bids. Even the threat of engaging in a RFP process can cause the incumbent to renegotiate its contract to reduce its compensation significantly.

60.    A prudent fiduciary should engage in a RFP competitive bidding process every three years.[6] Throughout my professional career, this has been the accepted best practice among prudent fiduciaries and industry professionals. Over a three-year period, enhancements in recordkeeping services occur and recordkeeping prices have been trending lower through competitive market pressures, among other factors, which provide the plan fiduciary an opportunity to obtain a lower fee for the desired level of services. There are some triggering events that significantly change the characteristics and demographics of a plan, however, that warrant engaging in this process earlier.

61.    A prudent fiduciary regularly evaluates the reasonableness of the recordkeeping and administrative fees charged to the plan even if no significant changes in the plan have occurred in the intervening three years.

62.    In a RFI or benchmarking process, the identity of the plan and plan sponsor may or may not be disclosed, although some minimal plan characteristics (i.e., number of participants, value of the assets, and cashflow) are always included to enable the recordkeepers to provide a pricing bid.  The information received from respondents in an RFI is less detailed than what would be provided under a formal RFP process. Although candidates submit informal pricing proposals under a RFI or benchmarking process, these do not result in the lowest fee for the desired level of service. This is because, among other reasons, a formal RFP process sends a clearer message to vendors that the plan fiduciary is actually considering a change in service provider and the recordkeeping and administrative services are open to competitive bidding. In contrast, under a RFI or benchmarking process, a recordkeeper may not provide the most competitive pricing proposal if it determines that the plan fiduciary is not committed to considering a change in providers.

---

[6] Cammack told NYU in their very first report to the Committee that "[e]ven if vendor relationships are ideal" NYU should conduct an RFP every 3-5 years to ensure the Plans service providers are competitive for the market place. CLC0021496. NYU failed to conduct an RFP from 2009 to late 2016. NYU096264.

63.     Surveys also may not focus on recordkeeping fees, but instead just describe total plan cost or the "all-in" fee. Total plan cost includes recordkeeping fees and investment management fees of plan investment options and may also include other plan expenses, such as investment advisor or consultant fees, often making the comparison "apples to oranges." In defined contribution plans that pay for recordkeeping and administrative services through revenue sharing, such as in a bundled arrangement, this total expense would be identified through the weighted average of the total expense ratios of all of the plan's investment options. This provides practically no information about what those plans are paying for recordkeeping and administrative services or other services. The fees paid for each service provided to a defined contribution plan must be independently evaluated for reasonableness.

64.     A prudent fiduciary therefore does not rely on the total plan cost of a defined contribution plan to determine whether the portion paid for recordkeeping and administrative services is reasonable for the services provided. These surveys are less reliable indicators of a reasonable recordkeeping fee than an RFP. For one, they may not include information as to plans that are at the same or similar participant count or asset size as the plan, and may involve the provision of different services than would be provided to the plan. Second, these surveys depend on information provided by an employee at a company who responds to a questionnaire but who may not fully understand the services provided or total recordkeeping costs for the plan.

65.     Hewitt Associates (n/k/a AonHewitt) provides investment consulting and recordkeeping and administrative services to retirement plan clients. In October 2008, Hewitt published an article, "Be A Responsible Fiduciary: Ask the Right Questions About 401(k) Plan Fees", that emphasizes the inherent flaw in relying on the total plan cost to determine the reasonableness of recordkeeping and administrative fees.[7] Hewitt reinforced that the "actual cost of administrative services is more dependent on the number of participants in the plan", and as such, administrative fees charged through an asset-based fee can increase as plan assets increase over time.[8] To illustrate the problem of relying on the total plan cost to assess recordkeeping and administrative fees, Hewitt provided the following hypothetical scenario:

---

[7] Hewitt Associates, *Be a Responsible Fiduciary: Ask the Right Questions About 401(k) Plan Fees* (Oct. 2008).

[8] *Id.* at 3.

16

To understand the potentially negative impact of a bundled arrangement, consider ABC Company's plan containing $300 million in assets with 10,000 participants that utilizes a bundled provider of asset management, record keeping, and trustee services. The total fee charged is 75 basis points. This includes a 50-basis point charge for asset management and a 25-basis point charge for administrative and trustee services. At the beginning of the contract, 25 basis points translates to $75 per participant, or $750,000 in total fees.

Over a period of three years, plan assets increase to $600 million through contributions, rollovers, and investment returns. The participant count remains the same, and fees remain at 75 basis points. The asset growth means that the fees for the administration and other non-asset-related costs have now increased to $150 per participant, or $1,500,000 in total fees. This means that fees have doubled while no additional work or services have been provided.

66.     The *Prudent Practices for Investment Stewards* handbook written by Fiduciary360 defines the Global Fiduciary Standard of Excellence. It was developed from a prior publication (Prudent Investment Practices) co-produced by the Foundation for Fiduciary Studies and the American Institute of Certified Public Accountants. This publication is widely used in the industry by plan fiduciaries, investment advisors and investment managers. According to the handbook published in 2007, a prudent fiduciary must determine "whether the fees are reasonable in light of the services provided."[9] Fiduciary360 further noted that in bundled arrangements, a prudent fiduciary should determine whether the recordkeeping portion of the all-in fee is reasonable for the services provided compared to an unbundled arrangement:

> In the case of an all-inclusive fee (sometimes referred to as a "bundled" or "wrap" fee) investment product, **the Steward should investigate how the various service vendors associated with each component of the all-inclusive fee are compensated to ensure that no one vendor is receiving unreasonable compensation,** and to compare the costs of the same services on an à la carte basis.[10]

67.     The prudent practices outlined above are accepted and recognized among plan fiduciaries and industry professionals. These practices have been employed by prudent plan sponsors and their advisors and consultants when administering defined contribution plans throughout my career and well before 2009.

---

[9] Fiduciary360, *Prudent Practices for Investment Stewards*, Practice 4.4 (2007).
[10] *Id.*, Practice 4.5 (emphasis added).

| Assets | | | |
|---|---|---|---|
| | 2009 | 2010 | 2011 | 2012 |
| WS Plan | $1,623,348,680 | $1,786,975,566 | $1,785,653,896 | $1,975,486,318 |
| SOM Plan | $1,180,426,765 | $1,286,531,411 | $1,291,975,826 | $1,424,054,985 |

| Assets | | | |
|---|---|---|---|
| | 2013 | 2014 | 2015 | 2016 |
| WS Plan | $2,278,744,452 | $2,415,714,661 | $2,442,670,037 | $2,609,782,090 |
| SOM Plan | $1,647,604,664 | $1,770,350,627 | $1,833,008,636 | $2,008,569,706 |

## VII.   Factual Background

### A.   The Plans

68.     NYU sponsors several defined contribution plans for the benefit of its employees, including the two plans at issue here: New York University Retirement Plan for Members of the Faculty, Professional Research Staff and Administration ("WS Plan") and New York University School of Medicine Retirement Plan for Members of the Faculty, Professional Research Staff and Administration ("SOM Plan")

69.     From 2009 to 2016, both the WS Plan and the SOM Plan grew by almost a billion dollars each. Similarly, the number of participants in each Plan grew by 25-55%.

| Participants | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
| WS Plan | 11,064 | 11,678 | 12,428 | 13,004 | 13,618 | 16,302 | 16,922 | 17,299 |
| SOM Plan | 6,720 | 8,085 | 8,164 | 10,572 | 7,658 | 7,862 | 8,250 | 8,481 |

### B.   The Plans' Fiduciaries

70.     The WS Plan is established and maintained under a written plan document titled "New York University Retirement Plan for Members of the Faculty, Professional Research Staff and Administration."[11]  The WS Plan document has been amended and restated several times.

71.     The SOM Plan is established and maintained under a written plan document titled New York University School of Medicine Retirement Plan for Members of the Faculty, Professional Research Staff and Administration."[12]

---

[11] *See*, *e.g.*, NYU0006863–99.

72.     Section 2.1 of the WS Plan document names NYU as the WS Plan's administrator and Section 7.2 of the WS Plan document states NYU, as the WS Plan administrator is also a named fiduciary to the WS Plan under section 402(a)(1) of ERISA.[13] The same sections of the SOM Plan document name NYU as the SOM Plan's administrator and as a named fiduciary to the SOM Plan.[14]

73.     While the Board of Trustees for both WS and SOM passed a resolution to create the Retirement Plan Committee ( the "Committee") that would make decisions related to both Plans as well as several other NYU-sponsored retirement plans, some amount of discretion was retained by the Board and other officers of NYU.[15] When asked whether NYU delegated all fiduciary responsibility and authority to the Committee, Mark Petti—NYU's Associate Director of Retirement Plans and Benefits—testified on behalf of NYU that "[w]hen you say 'retirement plan committee,' I think NYU. It's one in the same in my mind."[16]

74.     Neither the minutes nor any of the Committee member's depositions show any consideration or evaluation made of the benefits the recordkeeper received from float and securities lending or the opportunities. In fact, the longtime chair of the Committee is one which does not know what float is; doesn't know of the DOL rule on float requiring that it be taken into consideration; and has never even heard of float. Meagher Dep. at 178–179. She is equally unaware of securities lending. *Id.* Being oblivious to what they are, she also does not know they produce revenue in defined contribution plans. *Id.*

75.     The Committee Chair also does not know what fees are in the CREF Stock Account, how many layers of fess there are, or the categories of fees. *Id.* at 175. Neither she nor anyone on the Committee even asked about any of these, though it has been in the plan for decades. *Id.* at 172–173.

76.     Moreover, while the Committee co-chair knows that size matters in obtaining lower fees, after the nine years as chair, she does not know the relative size of the Plans, and was surprised to learn one week ago that the NYU Plans are in the largest fraction of 1% of all defined contribution plans. *Id.* at 120–121.

---

[12] *See, e.g.,* CLC0002586.
[13] NYU0006867, 6892.
[14] CLC0002591, 2621.
[15] NYU0034912; NYU0003846; NYU0095486.
[16] Deposition of Mark Petti ("Petti Dep.") at 82:25–83:11.

77.     Further, the Committee chair also does not know that for a Large, Mega, and Giga plan, such as NYU's, mutual fund companies will readily waive minimums for lower fees. *Id.* at 122.

### C.  NYU Multiple Vendor Platform

78.     NYU has provided a multiple recordkeeper arrangement for the retirement plans it sponsors.[17] For example, as of 2009, Prudential, TIAA-CREF, and Vanguard each provided recordkeeping services to the SOM Plan.[18] And as of this report, Vanguard and TIAA-CREF each provide recordkeeping services to the WS Plan.[19]

79.     The Plans only offer investment products of the Plans' vendors—i.e., TIAA-CREF and Vanguard.  More than 70 investment options have been included in each of the Plans for decades in many cases. Meagher Depo. p. 26.

### D.  Cammack LaRhette Advisors

80.     On April 8, 2009, NYU Hired Cammack LaRhette Advisors, LLP ("Cammack") as an adviser to several defined contribution plans sponsored by NYU, including the WS Plan and the SOM Plan.[20]

81.     The April 2009 investment advisory agreement between Cammack and NYU detailed the scope of the initial RFP project for which Cammack was engaged, and was subsequently amended effective May 2010 to identify additional "ongoing services" Cammack would provide as a consultant to the Plans. [21]

82.     At the May 15, 2009, Committee meeting, Cammack recommended that the committee streamline Plans' investment lineups to avoid confusion and to make it possible to effectively monitor the Plans' funds and consolidate service providers.[22]  Cammack specifically recommended that the Committee seek consolidation of the plan's vendors through an RFP given than an "RFP would yield valuable concessions" and "[t]he competition between the vendors would almost certainly result in lower expenses."[23]

---

[17] Petti Dep. at 84:23–85:5.
[18] Petti Dep. at 84:23–85:5.
[19] Petti Dep. at 84:23–85:5.
[20] CLC49951–50203.
[21] CLC49951–50203; CLC0049958; CLC0049962
[22] NYU3086–89.
[23] NYU3089.

### E.  TIAA Recordkeeping Contracts

83.     NYU continued to use TIAA to be one of the recordkeepers for both the WS Plan
and the SOM Plan.[24]

84.     NYU also negotiated and executed separate recordkeeping contracts with
Vanguard for the WS Plan and the SOM Plan.[25]

85.     NYU's corporate representative admitted that TIAA's compensation for providing
recordkeeping services to the Plans is and always has been paid by participants through
uncapped revenue sharing.[26]

86.     The earliest recordkeeping agreement I have reviewed between NYU and TIAA is
dated March 10, 2008, and relates to the services TIAA will provide to the WS Plan only.[27]
NYU's corporate representative testified that he does not recall there being a recordkeeping
agreement between TIAA and the SOM Plan as of March 2008, even though the SOM Plan's
participants were compensating TIAA for recordkeeping services at that time.[28]

87.     The March 2008 contract between TIAA and NYU covering the WS Plan states
TIAA will be compensated for its recordkeeping services and vaguely describes the method by
which TIAA will be compensated for the services provided to the WS Plan. Paragraph 8 of the
March 2008 contract is titled "Fees" and states, in its entirety:

> [NYU] understands and accepts that TIAA may be compensated for its services under
> this Agreement by payments made by providers of mutual funds, or their affiliates, used
> as allocation options under the [WS Plan] and from fees under the TIAA-CREF annuity
> contracts. This shall include sharing, on a periodic basis, in the revenue derived by such
> mutual funds providers and TIAA-CREF.[29]

88.     NYU admits it is not possible from the March 2008 contract to determine the
amount it agreed to cause the WS Plan participants to pay TIAA for recordkeeping services.[30]

89.     The earliest recordkeeping agreement I have reviewed between TIAA and NYU
covering the SOM Plan is dated October 1, 2012.[31] As with the contract NYU executed with

---

[24] NYU244–257; NYU106544.
[25] Petti Dep. 125:14-126:2.
[26] Petti Dep. 149:25–155:5.
[27] NYU244–257.
[28] Petti Dep. at 101:3–103:9.
[29] NYU248.
[30] Petti Dep. 143:18–148:18.
[31] NYU106544–65.

TIAA on behalf of the WS Plan in March 2008, the October 2012 recordkeeping agreement between TIAA and NYU regarding services being provided to the SOM Plan vaguely describes the method by which TIAA will be compensated for the services provided to the SOM Plan. Paragraph 8.1 of the October 2012 within a section titled "Fees" states, in its entirety:

> The Employer understands and accepts that TIAA may be compensated for its services under this Agreement by payments made by providers of mutual funds, or their affiliates, used as allocation options under the Plans and from fees under the TIAA-CREF annuity contracts. This shall include sharing, on a periodic basis, in the revenue derived by such mutual fund providers and TIAA-CREF, which revenue sharing, if any, is described in Schedule B hereto.[32]

90.     Because the October 2012 agreement does not say the amount TIAA will be paid for recordkeeping services, it is not possible from the October 2012 contract to determine the amount NYU agreed to cause the SOM Plan participants to pay TIAA for recordkeeping services.[33]

91.     Even when NYU executed amended recordkeeping agreements with NYU, the amount the Plans' participants would pay for recordkeeping services is unclear because the amount to be paid is expressed in basis points.[34]

92.     This use of uncapped revenue sharing in basis points has continued to date in the Plans as opposed to a flat rate per participant fee.[35]

93.     TIAA quoted NYU a "required revenue rate," to provide recordkeeping services, and always expressed that figure in basis points.[36]  In the recordkeeping agreement NYU executed with TIAA, it is made clear that TIAA is "[b]ased on assets under management" in TIAA's platform.[37]

94.     Neither NYU nor the Committee ever determined the total dollar amount or per-participant fee of TIAA's required revenue rate to provide recordkeeping services to the Plans.[38]

---

[32] NYU106548.
[33] *See* Petti Dep. 143:18–148:18.
[34] NYU241–43.
[35] While there have bene reductions in the number of uncapped basis points charged for recordkeeping, NYU has never negotiated a flat per-participant fee. Meagher Depo. p. 114.
[36] *See, e.g.*, NYU106558.
[37] NYU106558; Petti Dep. 157:13–24.
[38] Petti Dep. 204:25-205:6.

95.     Moreover, the co-chair of the Committee admitted that the Committee takes TIAA's word for what its costs are and that NYU made no attempt to determine if TIAA's representations were accurate. Meagher Depo. p. 59.

96.     The unquestioning acceptance of whatever the recordkeeper said was their cost was done despite the fact that Cammack insisted to NYU that it is necessary "to push TIAA to offer a better price." CLC0038999.

97.     The Plans began receiving revenue credits from TIAA in 2013, which were credited back to the Plans' participants.  The amount credited back to the Plans is the amount of revenue sharing paid to TIAA in excess of the "required revenue rate."  The amounts of the revenue credits were not negotiated by the Committee or NYU even though the recordkeeping revenue TIAA received exceeded a reasonable per-participant fee.

### F.  Vanguard Recordkeeping Contracts

98.     NYU hired Vanguard to be one of the recordkeepers for both the WS Plan and the SOM Plan.[39]

99.     NYU negotiated and executed separate recordkeeping contracts with Vanguard for the WS Plan and the SOM Plan.[40]

100.    NYU has the authority to terminate the agreements with Vanguard regarding recordkeeping services for the WS Plan and the SOM Plan.

101.    NYU's corporate representative admits that Vanguard's compensation for providing recordkeeping services to the Plans is and always has been paid by participants through uncapped revenue sharing.[41]

102.    The earliest recordkeeping agreement I have reviewed is dated January 1, 2008, and relates to the services Vanguard will provide to the WS Plan only.[42]  NYU's corporate representative testified that he does not recall there being a recordkeeping agreement between Vanguard and the SOM Plan as of January 2008, even though the SOM Plan's participants were compensating Vanguard for recordkeeping services at that time.[43]

---

[39] *See* NYU99925–53; NYU110843–61.
[40] Petti. Dep. 125:14-126:2.
[41] Petti Dep.175:22-176:8.
[42] NYU99925–53.
[43] Petti Dep. 125:6-13; 129:19-130:3.

103.    The January 2008 contract between Vanguard and NYU covering the WS Plan states Vanguard will be compensated for its recordkeeping services and vaguely describes the method by which Vanguard will be compensated for the services provided to the WS Plan. Paragraph 9.3 of the January 2008 contract is titled "Custodian Fees" and states, in its entirety:

> **9.3 Custodian Fees.** The Custodian shall be entitled to reasonable compensation for its services with respect to the maintenance and administration of the Account as set forth in any fee schedule delivered to the Employer. Any change in the Custodian's fees shall be effective upon 30 days written notice to the Employer. The Custodian's fees shall be collected from the assets of the Account unless they are paid directly to the Custodian by the Employer.[44]

104.    NYU admits it is not possible from the January 2008 agreement to determine the amount it agreed to cause the WS Plan participants to pay Vanguard for recordkeeping services.[45]

105.    The earliest recordkeeping agreement I have reviewed between Vanguard and NYU covering the SOM Plan is dated May 6, 2009.[46] As with the contract NYU executed with Vanguard on behalf of the WS Plan in January 2008, the May 2009 recordkeeping agreement between Vanguard and NYU regarding services being provided to the SOM Plan vaguely describes the method by which Vanguard will be compensated for the services provided to the SOM Plan. Paragraph 9.5 of the May 2009 agreement is titled "Custodian Fees" and states, in its entirety:

> **9.5 Custodian Fees.** The Custodian shall be entitled to reasonable compensation for its services with respect to the maintenance and administration of the Account as set forth in any fee schedule delivered to the Employer. Any change in the Custodian's fees shall be effective upon 30 days written notice to the Employer.[47]

106.    Because the May 2009 agreement does not say the amount Vanguard will be paid for recordkeeping services, it is not possible from the May 2009 agreement to determine the amount NYU agreed to cause the SOM Plan participants to pay TIAA for recordkeeping services.[48] NYU concedes it is important for recordkeeping agreements to identify the amount of

---

[44] NYU99950.
[45] Petti Dep. at 164:20–165:12.
[46] NYU110843–
[47] NYU110860
[48] Petti Dep. at 168:4–170:7.

compensation being paid to the recordkeeper and that would be prudent to do so, even though it failed to do so in its agreement with Vanguard for both the WS Plan and the SOM Plan.[49]

107.    Vanguard has never rebated to the Plans any revenue sharing payments it has received from the Plans' participants.[50]

### G. Benchmarking of the Plans' recordkeeping fees

108.    NYU testified that Cammack conducted benchmarking of the Plans RK fees. Petti Dep. at 73:19–75:6. However, NYU cannot identify how often, if ever, Cammack provided it or the Committee with information sufficient to benchmark the Plans' recordkeeping fees. Petti Dep. at 76:5–23. NYU does not recall the name of the document, if any, that contained the information sufficient to benchmark the Plans' recordkeeping fees that Cammack supposedly provided to the Committee. Petti Dep. at 76:24–77:12. NYU does not recall the type of information, if any, Cammack provided it or the Committee to benchmark the Plans' recordkeeping fees. 77:13–77:18.

109.    No attempt was made by NYU to determine either recordkeepers fees on a flat basis or to obtain the amount of their costs. Meagher Depo. p. 113-114.

### H. 2009 Request for Proposal

110.    In 2009, the Plans issued an RFP that was submitted to eight recordkeeping vendors to provide services to seven defined contribution plans sponsored by NYU.[51] These plans had over 13,000 combined participants and contained the following assets:

| Provider | Est.  Plan Assets ($M) As of 1/1/09 |
|---|---|
| TIAA-CREF | $2,405 |
| Vanguard | $637 |
| Prudential | $41 |
| AIG VALIC | $3 |
| Total | $3,086 |

111.    Five vendors responded to the 2009 RFP and provided NYU opening bids.[52] All vendors were asked to assume a tentative timeline of:

---

[49] Petti Dep. at 168:4–170:7.
[50] Petti Dep. at 177:17-21.
[51] CLC0022348.
[52] NYU0028134.

| Task | Date |
|------|------|
| RFP delivered to potential Vendors | September 4, 2009 |
| Responses due from potential Vendors | September 25, 2009 |
| Selection of Finalists | October 30, 2009 |
| Finalists' Presentations | November 9, 2009 |
| Selection of Vendor | November 16, 2009 |
| Commence Implementation of Services | November 23, 2009 |

112.     The Committee met on October 28, 2009 to consider the responses and two finalists were chosen: TIAA and Fidelity.[53] TIAA and Fidelity presented to the Committee a month later than tentatively scheduled, on December 16, 2009.[54]

113.     The RFP process was tainted by the secret, behind the scenes involvement of the co-chair of the Committee with TIAA. It is clear that Ms. Meagher's actions demonstrate an attempt to give TIAA the contract:

- She met secretly with TIAA for lunches and dinners which TIAA paid for to discuss the RFP process. Meagher Depo. p. 89.
- She hid the fact of these meetings occurring from Committee members. Meagher Depo. p. 73.
- She told TIAA that she did not want to "lose ground" with them, yet refused to explain what she meant by that. Meagher Depo. p. 95.
- She provided intelligence on Committee members' leanings on the RFP, describing one as a "wild card." Meagher Depo. p. 81.
- She requested that the RFP pricing be given to her first before any Committee member. Meagher Depo. p. 101.
- She has no recollection of telling committee members that she was communicating directly with TIAA outside of Committee meetings. Meagher Depo. p. 104.
- She initially denied in her deposition meeting with TIAA outside the Committee meetings and only admitted that she did when confronted with emails. Meagher Depo. p. 65.

114.     In addition, another Committee member, Nancy Sanchez, is on TIAA's Advisory Council. CLC0023729.

**I. Cammack advised the Committee to consolidate the Plans' vendors.**

115.     Cammack regularly expressed to the Committee the advantages of consolidating the Plans to a single recordkeeper including "lower plan costs," among many others.[55]

---

[53] TIAA_NYU_00057405; CLC0022650.
[54] TIAA_NYU_00057405; CLC0022650; TIAA_NYU_00051127.
[55] *See, e.g.*, NYU96380.

116.    In May 2010, Cammack created a supplemental presentation for the Committee that included slides dedicated to the advantages of vendor consolidation.[56]

### Advantages of Consolidating the 403(b) Program into a Single Vendor Arrangement

- **Increased purchasing power brings lower cost investments and expanded services** (consolidating assets with one vendor allows use of collective purchasing power to obtain more competitively priced program and broader array of services for participants)

- **Improved appreciation of benefits package by employees (c**onsolidation allows for better participant communication and education, as multiple-vendor 403(b) programs are most often "sold" by product providers, rather than "bought" by participants)

- **Today's "open architecture" programs eliminate the need to use multiple vendors (**open architecture platform allows the vendor to offer not only its own investment products, but also the investment products of many other organizations)

- **Eases the overall administrative burden of the program** (full transactional outsourcing - e.g. loans, withdrawals, etc. - is only available if a single vendor is used)

- **Simplifies & reduces DOL compliance costs** (plan sponsor is responsible for coordination of loans, hardships, etc. across ALL vendors; new 5500 filing and audit requirements; written plan documents, etc.)

- **Enhanced NYU control of plan assets** (eliminating or consolidating contracts with assets not under the control of plan sponsor maximizes the negotiation ability of the program in the future)

- **Fiduciary monitoring process is significantly more efficient** (reduced number of funds, ease of collecting information, ability to focus investment reviews and asset categories, etc. all serve to reduce the time and expense required to meet the fiduciary standards)



fidential Information – For Plan Sponsor Only   © 2010 All Rights Reserved                    Page 11

### J.   NYU did not follow Cammack's advice to consolidate the Plans' vendors.

117.    On March 18, 2010, the Committee unanimously recommended both Plans move to a sole recordkeeping arrangement with TIAA. The Committee determined that the next step was "to communicate to senior level leadership at NYU and NYU Langone to [e]nsure the support needed for the change[.]"[57]

118.    Despite this vote and the passage of almost 8 years, NYU never consolidated the recordkeepers for the WS Plan. The SOM Plan finally was consolidated to a single recordkeeper, TIAA, effective March 25, 2013, three years after the Committee's recommendation.[58]

---

[56] NYU98647–67.
[57] CLC0023676.
[58] CLC0038995.

119.     No reasonable explanation is in the Committee minutes or materials or has been given by any deponent as to why the delay in consolidation for the SOM Plan and WS Plan was not also consolidated.[59]

120.     In fact, after consolidation, the SOM Plan consolidation has worked well. Meagher Depo. p. 134.

## VIII.   TIAA's and Vanguard's recordkeeping revenue derived through its relationship to the plans

121.     TIAA, unlike Vanguard, has numerous supplementary lines of business that were and are marketed to NYU Plan participants. Vanguard does not market other products outside the Plans. Meagher Depo. p. 186. TIAA was given unfettered access to market and sell its products and services outside the Plans to participants and do so with no competition from other providers. TIAA knows each participant's account balance, gender, age, deferral rate, among many other things.  TIAA benefited from knowing this information about potential customers. and being able to market to potential customers who are already familiar with a company's brand.  In fact, many companies pay for marketing lists of potential customers with demographic information.  The more segmented and precise the requirements, the higher the cost to purchase the list. Similar to the purchase of targeted lists of potential customers, there is a value to being able to advertise and communicate to a targeted audience.  Firms like TIAA pay to advertise to different audiences through, e.g., television, radio, magazines, etc.  The more targeted the audience is likely to be, the higher the cost.  In contrast, however, TIAA did not pay to advertise and sell to Plan participants. Instead, TIAA actually charges the participants for the unchecked ability to market, advertise, and sell other products to plan participants.

## IX.     Reasonable recordkeeping in marketplace

122.     The prices available for recordkeeping services for some 403(b) plans within the defined contribution space do not reflect a transparent or moderately efficient market for services due primarily to the failure of some plan fiduciaries to take the time to understand the fees and negotiate prudently with recordkeepers regarding the recordkeeping fees.  Accordingly, the

---

[59] Margaret Meagher described a change in the University payroll system and IT issues. However, she never could answer why these could have taken years, much less eight years, or how the SOM Plan did it in 2013.

prices charged in some 403(b) plans are not necessarily "reasonable," especially in light of the heavy proprietary nature of some 403(b) plans.

123.    That said, the NYU Plans' fiduciaries paid far more for recordkeeping services than what they could have obtained in the market if Plan fiduciaries followed a prudent RFP, sales, and negotiation process.  The Plans' losses are calculated by determining the total revenue to the Plans' recordkeepers and subtracting the market rate for the same services received from the fourth quarter of 2010 to the present.

For Faculty plan

| Year(s) | Reasonable Fee (per participant) |
|---|---|
| 4Q2010–2Q2013 | $31 |
| 3Q2013–2Q2016 | $27 |
| 3Q2016–3Q2017 | $23 |

For Medical Plan

| Year(s) | Reasonable Fee (per participant) |
|---|---|
| 4Q2010–2Q2013 | $35 |
| 3Q2013–2Q2016 | $31 |
| 3Q2016–3Q2017 | $27 |

124.    While Commack informed the Plans' fiduciaries of the benefits of negotiating for lower recordkeeping fees, the fiduciaries failed to do that effectively throughout the stages of the sales and negotiation process.

125.    First of all, a prudent fiduciary would not allow an RFP process to be tainted by secret meetings between fiduciaries making the decision to recommend a recordkeeper and the recordkeeper contending for the business. Second, a prudent fiduciary would prohibit fiduciaries who will make the recommendation from taking perks or meals from a contending recordkeeper. Third, a prudent fiduciary would not allow its fiduciary Committee members to be advising the contending recordkeeper. NYU improperly allowed this conduct and the result was a tainted process.

126.    A prudent fiduciary would use competing bids in an RFP to negotiate a lower fee with the incumbent as well as prospective new recordkeepers. During this negotiation process, the plan fiduciary would leverage the asset management revenue generated from the proprietary

29

investments to demand a discounted fee. The incumbent recordkeeper would perform a detailed financial analysis to determine the financial consequences of losing the client when there is a strong likelihood that the plan might divest from the incumbent's proprietary investments.

127.    To illustrate the bargaining power that was available to the Plan during a competitive bidding process to obtain a reduced recordkeeping fee from TIAA and Vanguard because of the proprietary investments in the Plans, I prepared several financial models. These financial models are based on similar analyses I performed in my professional capacity when evaluating thousands of pricing proposals and the impact of losing proprietary investments if the incumbent recordkeeper is replaced.

128.    Under the first three financial models, I prepared a detailed analysis illustrating the financial evaluation an incumbent recordkeeper would undertake if a plan fiduciary was negotiating for a lower recordkeeping fee. The appropriate analysis would compare the firm's financial results under a scenario in which the firm retains the client and if the firm loses the client. The incumbent recordkeeper would have to make assumptions about the amount of proprietary assets that would be lost if the client leaves for another recordkeeper.

129.    For illustration purposes, I used each Plans' characteristics as of 4Q2009 because that is how the fiduciaries and bidders would initially create a snapshot financial view of the plan as if it were consolidated to one provider.

130.    I then evaluated each Plans' attractiveness and bargaining power with both the incumbent recordkeeper and potential competitors in the context of the potential for consolidation.

131.    Based on the timeline set forth by Cammack, both plans should have consolidated by Q4 2010.  I used the 4Q2009 data to evaluate the Plan's attractiveness going into the consolidation, and I used the 4Q2012 data to evaluate the Plan's attractiveness and bargaining power when going through a competitive RFP process within a prudent amount of time (three years) from the new prices that should have been obtained from the RFP and consolidation process.

132.    Under each of these scenarios, I assumed TIAA-CREF maintained the annuity products under management but lost the rest of their proprietary investment options.

133.     This is conservative because the governing Plan documents for both Plans, along with the Charter for the Committee, grant NYU the authority to choose the investment options

for the Plans. NYU0034912; NYU0007315; CLC0002586. Any annuity contract or custodial contract that differs from this is invalid and the Plan document governs. *Id*.

134.    It is common in the industry that a change in recordkeeper leads to a change in investment options.

135.    Under each of these scenarios, TIAA would lose several million dollars in  net asset management revenue The risk of losing this net asset management revenue would give TIAA an economic incentive to reduce the recordkeeping fee to retain the Plan as a recordkeeping client if the Plan fiduciaries conducted a prudent recordkeeping fee negotiation process through a RFP.

136.    In my analysis, I used reasonable industry cost and other assumptions, based on my knowledge and experience in the industry. Any cost assumptions within reasonable industry ranges would not change the conclusions that can be drawn from the hypothetical scenario analysis. My scenario analysis does not require any assumption about the marketing value per participant for the other supplementary revenue TIAA gained from having participants on the recordkeeper's platform, and the unfettered access to sell proprietary products and services outside the Plans that NYU handed over to TIAA.

137.    I prepared break-even recordkeeping fee models to illustrate the value of proprietary investments offered by an incumbent recordkeeper in a defined contribution plan and the bargaining power a client may have with an incumbent recordkeeper when proprietary assets are at risk. The Break-Even Recordkeeping (BE-RK) Fee is the minimum recordkeeping fee required to maintain the same financial impact to the recordkeeping firm in a scenario in which the recordkeeper reduces its recordkeeping fee in order to keep the client, as compared to a scenario in which the client leaves the recordkeeper and the recordkeeping firm then loses asset management revenue.

138.    Simply stated, the BE-RK Fee equals the marginal cost per participant minus the total estimated lost revenue per participant. For example, if the marginal cost per participant is $35, and the estimated lost revenue is $20 per participant, then the BE-RK Fee is $15 per participant. In another example that is more appropriate in this case, if the marginal cost is $35, and the estimated lost revenue is $100, then the BE-RK Fee is -$65, which means that the recordkeeping firm is better off retaining the client as long as the recordkeeping fee is greater than -$65. In other words, the recordkeeping firm would be better off actually paying each

participant to be in the plan than losing the client and all supplementary revenue associated with the relationship.

139.    Under one model, I calculate the BE-RK Fee and show how it varies depending on the average proprietary account balance and the percent of assets under management potentially lost, along with assumptions about the marginal costs and the net asset management fee rate.

**Illustration of Evaluation of Incumbent Recordkeeper on Impact of Average Proprietary Assets Under Mgmt, Percent of Assets Under Mgmt Lost, and Net Asset Mgmt Fee Rate on Ability to Profitably Reduce Recordkeeping Fees**

| | **Break-even Recordkeeping Fee Rate\*** | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Hypothetical Weighted Average Net Asset Mgmt Fee Rate of Proprietary Assets Lost: | | | | | | | 0.30% |
| | Hypothetical Incremental Supplementary Contribution per Participant: | | | | | | | $0 |
| | Hypothetical Marginal RK Costs: | | | | | | | $35 |
| | **Percent of Proprietary Assets under Management Lost** | | | | | | | |
| **Average Proprietary Account Balance** | **35%** | **40%** | **45%** | **50%** | **55%** | **70%** | **80%** | **100%** |
| $10,000 | $25 | $23 | $22 | $20 | $19 | $14 | $11 | $5 |
| $35,000 | ($2) | ($7) | ($12) | ($18) | ($23) | ($39) | ($49) | ($70) |
| $60,000 | ($28) | ($37) | ($46) | ($55) | ($64) | ($91) | ($109) | ($145) |
| $85,000 | ($54) | ($67) | ($80) | ($93) | ($105) | ($144) | ($169) | ($220) |
| $110,000 | ($81) | ($97) | ($114) | ($130) | ($147) | ($196) | ($229) | ($295) |
| $125,000 | ($96) | ($115) | ($134) | ($153) | ($171) | ($228) | ($265) | ($340) |
| $150,000 | ($123) | ($145) | ($168) | ($190) | ($213) | ($280) | ($325) | ($415) |
| $175,000 | ($149) | ($175) | ($201) | ($228) | ($254) | ($333) | ($385) | ($490) |
| $200,000 | ($175) | ($205) | ($235) | ($265) | ($295) | ($385) | ($445) | ($565) |
| $225,000 | ($201) | ($235) | ($269) | ($303) | ($336) | ($438) | ($505) | ($640) |

140.    As shown above, as the average account balance in proprietary assets increases, and the percentage of assets under management is reduced, the more the incumbent recordkeeping firm can reduce the recordkeeping fee and still be better off financially than if they refuse to reduce the fee and the client leaves.

141.    I also prepared a financial model to illustrate how the BE-RK Fee changes based on changes in the marginal cost per participant for providing recordkeeping services and the weighted-average net asset management revenue while keeping other assumptions static.

**Impact of Marginal Costs, Weighted Average Incremental Net Asset Mgmt Fee Rate, Estimated Proprietary Assets Under Mgmt, Estimated Incremental Supplemental Contribution, and Target Contribution Margin Rate on Incremental Asset Mgmt Revenue on Recordkeeping Fee**

| | Break-Even RK Fee to Achieve Given Margin Rate on Net Asset Mgmt Revenue* | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | Average Account Balance: | | $ 60,000 |
| | | | | | Estimated Proprietary Assets Captured: | | | 30% |
| | | | | Estimated Supplemental Revenue per participant: | | | | $0 |
| | | | Margin Rate for Revenue Attributable to Mgmt & Other: | | | | | 75% |
| Hypothetical Marginal Costs | Weighted Average Net Asset Mgmt Revenue Rate | | | | | | | |
| | 0.02% | 0.05% | 0.13% | 0.20% | 0.30% | 0.40% | 0.50% | 0.60% |
| $10 | $9 | $8 | $4 | $1 | ($4) | ($8) | ($13) | ($17) |
| $15 | $14 | $13 | $9 | $6 | $2 | ($3) | ($8) | ($12) |
| $20 | $19 | $18 | $14 | $11 | $7 | $2 | ($3) | ($7) |
| $25 | $24 | $23 | $19 | $16 | $12 | $7 | $3 | ($2) |
| $30 | $29 | $28 | $24 | $21 | $17 | $12 | $8 | $3 |
| $35 | $34 | $33 | $29 | $26 | $22 | $17 | $13 | $8 |
| $40 | $39 | $38 | $34 | $31 | $27 | $22 | $18 | $13 |
| $45 | $44 | $43 | $39 | $36 | $32 | $27 | $23 | $18 |
| $50 | $49 | $48 | $44 | $41 | $37 | $32 | $28 | $23 |
| $55 | $54 | $53 | $49 | $46 | $42 | $37 | $33 | $28 |

142.     This model can be used to understand how competitors to an incumbent recordkeeper will evaluate the revenue opportunity based on the potential for supplementary revenue derived from proprietary investments.  This model is more indicative of aggressive pricing for Large, Mega and Giga plans because, for those plans, the average cost per participant often approaches the marginal cost per participant. As shown above, as the marginal costs decline and the weighted average net asset management revenue rate increases, the break-even recordkeeping fee materially declines, and may reach a negative recordkeeping fee. Thus, as net asset management revenue increases based on a weighted average, from a financial perspective, the recordkeeper could charge a reduced recordkeeping fee while still maintaining a financially beneficial relationship to the firm.

143.     This model assumes the firm maintains 75% of the net asset management revenue. It is worth noting that the incremental marginal cost of an extra dollar invested into a mutual fund that has achieved scale is close to $0. Thus, for large mutual funds, which have reached the scale to cover their operating costs with their existing assets, the majority of the incremental net management revenue derived from each incremental dollar invested is available as contribution to the profit of the firm as a whole.

## X.      The administration of 403(b) Plans and 401(k) are comparable.

144.    From a recordkeeping perspective, there are no differences to the extent that mutual funds or other non-annuity options are available to participants.  To the extent that annuities are offered, any differences from a recordkeeping perspective are not material.  Some aspects of administering a 403(b) plan are easier than 401(k) plans because some 403(b) plans have fewer testing and compliance obligations.  The primary difference in the market in the delivery of 403(b) services relates to the fairly common request / expectation that the recordkeeper would provide onsite education / advice.  In other words, many 403(b) plan sponsors expected the recordkeeper to commit to having employees of the recordkeeper at the location of the plan sponsor's employees on a regular basis, often 4-5 days a week.  The recordkeeper's employee was expected to answer questions about the plan including questions about investments within the plan as well as other investment options and services offered outside the plan.  In the case of NYU, it is clear that the employees of TIAA who provided these services at NYU functioned as aggressive salespeople for TIAA both within the plan and for supplementary lines of business provided by TIAA.[60] They were given unlimited access and no one even inquired as to what they were selling or how much revenue they were earning based on their connection with the Plans. Meagher Depo. p. 192.

145.    While working at T. Rowe Price I was responsible for the financial evaluation and pricing or several large 403(b) plans. I did not use a different pricing model and the financial evaluation of our 403(b) plan clients was the same as the financial evaluation of our 401(k) plan clients.  We did not use a different pricing/bidding model to propose services for new business or when negotiating with our existing 403(b) clients.

## XI.     Damages

146.    A chart of the reasonable fees in contrast with the amount paid by Plan participants from January 1, 2009 through September 30, 2017 is set forth below.[61]

---

[60]*See* Gretchen Morgenson, The Finger-Pointing at the Finance Firm TIAA, N.Y. Times, Oct. 21, 2017, https://www.nytimes.com/2017/10/21/business/the-finger-pointing-at-the-financefirm-tiaa.html. Gretchen Morgenson, TIAA Receives New York Subpoena on Sales Practices, N.Y. Times, Nov. 9, 2017, https://www.nytimes.com/2017/11/09/business/tiaasubpoena.html; *See also* Tara Siegel Bernard, If You Bought In to TIAA Based On Reputation, Check Your Accounts, N.Y. Times, Nov. 13, 2017, https://www.nytimes.com/2017/11/13/your-money/tiaa-403b.html.

[61] For purposes of this chart, annualized per-participant fees as of 4Q were used from 2010–2016, and 3Q for 2017.

147.    For the NYU WS Plan, from October 1, 2010 estimating through December 31, 2017, and using the S&P 500 index to compound the Plan's annual losses, Plan participants lost $25,818,880 through unreasonable recordkeeping and administrative fees without taking into account the value of the marketing benefit to TIAA.[62]

148.    For the NYU SOM Plan, from October 1, 2010 estimating through December 31, 2017, and using the S&P 500 index to compound the Plan's annual losses, Plan participants lost $17,074,702 through unreasonable recordkeeping and administrative fees without taking into account the value of the marketing benefit to TIAA.

149.    For the NYU WS Plan, from October 1, 2010 estimating through December 31, 2017, and using the S&P 500 index to compound the Plan's annual losses, Plan participants lost $4,086,269 through the fiduciary's failure to obtain the marketing value of the plan relationship for the benefit of the participants.[63]

150.    For the NYU SOM Plan, from October 1, 2010 estimating through December 31, 2017, and using the S&P 500 index to compound the Plan's annual losses, Plan participants lost $3,310,636 through the fiduciary's failure to obtain the marketing value of the plan relationship for the benefit of the participants.

151.    The Plans' losses from excessive recordkeeping and administrative fees must account for the lost investment opportunity from the deduction of those fees from the Plan. Had the excessive fees not been deducted from the Plan, they would have been invested and grown through to the date of judgment. To calculate that lost investment opportunity, I used an investible version S&P 500 index (VIIIX) as a proxy to calculate the investment returns the Plan participants could have achieved if the excess amounts paid for recordkeeping and administrative services were invested. The S&P 500 index is a widely-recognized proxy for the U.S. stock market. It also is the most widely used benchmark and most recognized benchmarks among investors.

---

[62] Plan losses will be brought forward through the date of judgment.
[63] Plan losses will be brought forward through the date of judgment.

| Estimated as of 12/31/17 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Total Combined Compounded Excess Recordkeeping Fees and Marketing Value of the Plan Relationship Damages | ($50,290,487) | | | | | | | |
| NYU WS Plan Total Combined Compounded Excess RK Fees and Marketing Value | ($29,905,149) | | | | | | | |
| NYU SOM Plan Total Combined Compounded Excess RK Fees and Marketing Value | ($20,385,338) | | | | | | | |
| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
| Total Combined Excess Recordkeeping Fee Damages | ($1,144,616) | ($5,930,730) | ($9,473,762) | ($16,325,061) | ($22,351,253) | ($26,309,128) | ($32,777,966) | ($42,893,582) |
| NYU WS Plan Compounded Excess Recordkeeping Fees | ($677,655) | ($3,513,877) | ($5,615,763) | ($9,788,654) | ($13,596,130) | ($15,847,193) | ($19,735,098) | ($25,818,880) |
| NYU SOM Plan Compounded Excess Recordkeeping Fees | ($466,962) | ($2,416,853.07) | ($3,857,999) | ($6,536,407) | ($8,755,123) | ($10,461,935) | ($13,042,867) | ($17,074,702) |
| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
| Total Combined Marketing Value of Plan Relationship Damages | ($150,974) | ($770,614) | ($1,607,104) | ($2,746,835) | ($3,744,026) | ($4,432,171) | ($5,605,370) | ($7,396,905) |
| NYU WS Plan Compounded Marketing Value of Plan Relationship | ($75,350) | ($385,839) | ($778,419) | ($1,378,074) | ($1,935,681) | ($2,358,257) | ($3,050,770) | ($4,086,269) |
| NYU SOM Plan Compounded Marketing Value of Plan Relationship | ($75,624) | ($384,775) | ($828,685) | ($1,368,761) | ($1,808,345) | ($2,073,914) | ($2,554,600) | ($3,310,636) |

| NYU WS Plan | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|---|
| Plan Fee / pps | $270 | $266 | $153 | $205 | $194 | $152 | $140 | $141 |
| Reasonable Fee | $31 | $31 | $31 | $27 | $27 | $27 | $23 | $23 |
| Excess | $239 | $235 | $122 | $178 | $167 | $125 | $117 | $118 |

| NYU SOM Plan | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|---|
| Plan Fee / pps | $291 | $274 | $152 | $183 | $202 | $229 | $186 | $187 |
| Reasonable Fee | $35 | $35 | $35 | $31 | $31 | $31 | $27 | $27 |
| Excess | $256 | $239 | $117 | $152 | $171 | $198 | $159 | $160 |

Respectfully submitted,

Michael J. Geist

36