**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| DR. ALAN SACERDOTE, et al., | : Case No.: 1:16-cv-06284 (KBF) |
| Plaintiffs, | : |
| v. | : ECF Case |
| NEW YORK UNIVERSITY, | : |
| Defendant. | : |

## DEFENDANT'S LOCAL RULE 56.1
## STATEMENT OF UNDISPUTED MATERIAL FACTS

Mark Muedeking
Ian C. Taylor
Jennifer K. Squillario
Julie Ben-Zev
DLA Piper LLP (US)
500 8th Street, NW
Washington, DC 20004
(202) 799-4000

Brian S. Kaplan
Evan D. Parness
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020
(212) 335-4500

*Counsel for Defendant New York University*

Dated:  January 10, 2018

I.     NATURE OF THE CASE ................................................................................1

II.    403(b) PLANS – BACKGROUND.................................................................2

III.   THE FACULTY PLAN .................................................................................5

IV.   THE MEDICAL PLAN .................................................................................7

V.    PLAN ADMINISTRATIVE SERVICES ......................................................9

VI.   PLAINTIFFS.................................................................................................14

VII.  NYU'S PROCESS FOR MONITORING THE PLANS' ADMINISTRATIVE
       FEES AND NEGOTIATING REDUCTIONS IN FEES ................................20

     A.   NYU Formed the Retirement Committee .........................................20

     B.   NYU Retained an Industry Expert to Assist the Committee and to Analyze
          the Plans' Administrative Fees ..........................................................21

     C.   NYU Conducted Two Requests for Proposals and Consolidated Vendors..........28

     D.   NYU Negotiated Significant Reductions in Administrative Fees ......................35

     E.   Additional Facts Supporting the Objective Prudence of NYU's Retention
          of Vendors ..........................................................................................43

     F.   Additional Facts Supporting the Objective Prudence of the Plans'
          Administrative Fees ............................................................................44

VIII. NYU'S PROCESS FOR MONITORING THE CREF STOCK ACCOUNT AND
       THE TIAA REAL ESTATE ACCOUT ......................................................45

     A.   NYU's Monitoring of the CREF Stock Account and the TIAA Real Estate
          Account ............................................................................................ 54

     B.   Additional Facts Supporting the Objective Prudence of the CREF Stock
          Account and the TIAA Real Estate Account.................................... 60

IX.   DETAILED INFORMATION REGARDING THE PLANS' INVESTMENTS
       WAS PROVIED TO PLAINTIFFS MORE THAN THREE YEARS BEFORE
       THEY FILED THIS SUIT............................................................................61

## I.      NATURE OF THE CASE

1.      Plaintiffs are six highly-educated professors who are participants in two defined-contribution participant directed retirement pension plans made available to certain NYU employees: the New York University Retirement Plan for Members of the Faculty, Professional Research Staff and Administration (the "Faculty Plan") and the New York University School of Medicine Retirement Plan for Members of the Faculty, Professional Research Staff and Administration (the "Medical Plan") (collectively, the "Plans").[1]

2.      This case is one of a dozen nearly identical lawsuits filed in the fall of 2016 by Plaintiffs' counsel alleging that leading private universities breached their fiduciary duties to participants in 403(b) plans.[2]

3.      Plaintiffs allege that NYU violated ERISA's fiduciary rules by causing its retirement plans to pay excessive administration fees and by offering the TIAA Real Estate Account and the CREF Stock Account as investment choices.[3]

4.      Plaintiffs seek to represent a class of all participants in the Plans during the six-year period prior to the filing of the Complaint on August 9, 2016.[4]

---

[1] Ex. 1, Am. Compl., ECF No. 39 at pp. 7-11; Ex. 2, New York University Retirement Plan for Members of the Faculty, Professional Research Staff and Administration, Amended and Restated Effective January 1, 2014 ("Faculty Plan"), (NYU0042542); Ex. 3, New York University School of Medicine Retirement Plan for Members of the Faculty, Professional Research Staff and Administration, Amended and Restated Effective January 1, 2016 ("Medical Plan") (NYU0116960). All exhibit references are to Exhibits annexed to the accompanying Declaration of Ian C. Taylor, dated January 10, 2018.

[2] *See* Attorney Jerry Schlichter opens up about 403(b), 401(k) suits, Aug. 18, 2016, available at http://www.investmentnews.com/article/20160818/FREE/160819927/attorney-jerry-schlichter-opens-up-about-403-b-401-k-suits (last visited Jan. 7, 2018).

[3] Ex. 1, Am. Compl. ECF No. 39 at ¶ 207.

[4] Ex. 1, Am. Compl., ECF No. 39 at ¶ 190-94.

5.      Following the Court's Order on Defendant's Motion to Dismiss the Amended Complaint, two counts of Plaintiffs' Amended Complaint Remains:  (1) Count III and, (2) limited portions of Count V.[5]  In Count III, Plaintiffs allege that NYU breached its fiduciary duties by allowing the Plans to incur excessive recordkeeping fees.[6]  Plaintiffs allege that NYU breached its fiduciary duties by failing to solicit competitive bids from other recordkeepers, allowing the Plans' service providers to collect excessive revenue sharing, failing to leverage the Plans' size to reduce fees and failing to consolidate all recordkeeping services with a single recordkeeper.[7]

6.      Only limited claims with respect to Count V remain at issue.  Specifically, Plaintiffs' allegations that the CREF Stock Account and TIAA Real Estate Account were imprudent investment alternatives remain.[8]  Additionally at issue is Plaintiffs' allegation that NYU breached its fiduciary duties by offering the CREF Stock Account because it is an actively managed fund that allegedly did not have a realistic expectation of higher returns than an index fund.[9]

## II.      403(b) PLANS – BACKGROUND

7.      Section 403(b) of the Internal Revenue Code ("Code") regulates the taxation of annuity contracts and custodial accounts that comprise the assets of 403(b) plans.[10]   When

---

[5] ECF No. 79.

[6] Ex. 1, Am. Compl., ECF No. 39 at ¶ 208.

[7] Ex. 1, Am. Compl., ECF No. 39 at ¶ 210.

[8] Ex. 1, Am. Compl., ECF No. 79 at pp. 23-24.

[9] Ex. 1, Am. Compl., ECF No. 79 at pp. 24-25.

[10] 26 U.S.C. § 403(b), Taxability of Beneficiary Under Annuity Purchased by Section 501(c)(3) Organization or Public School.

Section 403(b) was added to the Code in 1958, it required that all assets of the Plans be invested only in insurance company annuity contracts.[11]

8.      An annuity is an insurance contract that provides a stream of monthly payments in retirement and is typically for life, or a fixed term of years, depending upon the contract.[12] Annuities continued as the only investments available to 403(b) plans until 1974, when the Code was amended to provide that mutual funds held in custodial accounts would be treated as annuity contracts for 403(b) purposes.[13]

9.      In 2009, the Internal Revenue Service ("IRS") issued comprehensive new regulations for plans maintained by governmental and non-profit employers which were governed by Internal Revenue Code section 403(b).[14]  Those new regulations for the first time required sponsoring employers to take an active role in the administration of these plans.  Thus, prior to 2009 when new IRS regulations became effective, Section 403(b) plans gave participants significant individual autonomy in selecting investments and operated much like individual retirement accounts.[15]  Further, prior to 2009, the IRS did not even require plan sponsors to adopt a written plan document.[16]

10.     403(b) plans differ from 401(k) plans in many ways.  Most pertinently, 403(b) plans may be funded with annuity contracts, including individual or group variable annuity

---

[11] *See* Internal Revenue Manual, Chapter 72, 4.72.13.1.1 (07-18-2016) (providing historical background of IRC 403(b) plans).

[12] *See generally* U.S. Securities and Exchange Commission, *Fast Answers: Annuities,* htttps://www/sec/gov/answers/annuity.htm (last modified Apr. 7, 2011).

[13] 72 Fed. Reg. 41127.

[14] 72 Fed. Reg. 41127.

[15] Employee Benefits Sec. Admin., U.S. Dep't of Labor, *Field Assistance Bulletin No. 2009-02* (July 20, 2009).

[16] 72 Fed. Reg. 41127; *see also*, IRS Notice 2009-3, Relief From Immediate Compliance with § 403(b) Written Plan Requirement.

contracts, or they may use custodial accounts to invest in mutual funds.[17]    403(b) plan participants frequently hold individual annuity contracts or retail funds that are under their control rather than under the control of the plan sponsor.[18]    As a result, many 403(b) plans continue to have multiple recordkeepers.[19]    Additionally, annuities require additional services that are not required for mutual funds and therefore drive up administrative costs.[20]

11.    While 403(b) plans have some similarities to employer-sponsored 401(k) plans, in a report to the US Secretary of Labor, the ERISA Advisory Council concluded that "the differences far exceed the similarities."[21]

12.    In the context of NYU, those differences include the expectations of the faculty members regarding NYU's right to make unilateral changes to the operation or administration of the Plans.  As set out in the Principles of Joint and Shared Governance approved by the NYU Board of Trustees, faculty members are entitled to representation on committees responsible for matters regarding academics or administration, information regarding those matters, consultation prior to decisions that may affect them, and a reasoned justification to the extent that NYU does not accept the faculties' advice.[22]

---

[17] 26 C.F.R. § 1.403(b)-1; 26 C.F.R. § 104.3(b)-8(a); Ex. 4, Report of Marcia Wagner, at ¶ 24.

[18] Ex. 4, Report of Marcia Wagner, at ¶¶ 21-22.

[19] Ex.4, Report of Marcia Wagner, at ¶¶ 25-26; Ex. 5, Plan Sponsor Council of America 2017 403(b) Plan Survey (the "PSCA 2017 Survey"), at Table 117, p. 69 (indicating that 50.0% of Higher Education plan sponsors surveyed reported having 6 or more plan service providers).

[20] Ex. 6, Chittenden Dep. at 165:20 – 167:5; Ex.4, Report of Marcia Wagner at ¶ 47.

[21] Advisory Council on Employee Welfare and Pension Benefit Plans, Report to the Honorable Hilda L. Solis, United States Secretary of Labor, *Current Challenges and Best Practices for ERISA Compliance for 403(b) Plan Sponsors* (Nov. 2011), https://www.dol.gov/sites/default/files/ebsa/about-ebsa/about-us/erisa-advisorycouncil/2011ACReport1.pdf, at 6.

[22] *See* Ex. 29, New York University Principles of Joint Shared Governance, available at https://www.nyu.edu/about/leadership-university-administration/university-

### III.     THE FACULTY PLAN.

13.     The Faculty Plan was established in 1952 to provide retirement benefits to certain NYU employees and is funded through voluntary participant contributions and generous NYU contributions.[23]   NYU matches participant contributions in the Faculty Plan up to 5% of a participant's base salary, and also makes a contribution of 5% of a participant's base salary regardless of whether the participant contributes to the plan.[24]

14.     The Faculty Plan provides retirement income for all members of NYU's faculty, professional research staff, and administration, other than employees of the NYU School of Medicine.[25]   As of December 31 in each of the following years, the Faculty Plan had the following total number of participants during the plan year and the following amount of assets:

| Plan | Year | Total Participants During Plan Year | Net Assets at End of Plan Year |
|------|------|-------------------------------------|--------------------------------|
| Faculty Plan | 2010 | 12,868 | $1,793,415,082[26] |
| Faculty Plan | 2011 | 13,692 | $1,792,990,149[27] |
| Faculty Plan | 2012 | 14,368 | $1,982,035,425[28] |

---

senate/membership/councils/tenured-tenure-track-faculty-senators-council/rules-bylaws/principles-of-joint-shared-governance.html, last visited Jan. 7, 2018/; Ex. 23 Petti Dep. at 216:10-217:16, 218:15-219:10.

[23] Ex. 2, Faculty Plan at Art. I (NYU0042546).

[24] Ex. 2, Faculty Plan, at Art. IV, §§ 4.1, 4.2 and 4.3 (NYU0042551-42553).

[25] Ex. 2, Faculty Plan at Art. II §§ 2.10, 2.11 (NYU0042547); Art. 3 (NYU0042551).

[26] Ex. 150, 2010 Form 5500 for Faculty Plan (PLA-NYU-004248;PLA-NYU-004265) (Part II, Line 6f; Schedule H, Part I, Line 1l).

[27] Ex. 151, 2011 Form 5500 for Faculty Plan (PLA-NYU-004290; PLA-NYU-004306) (Part II, Line 6f; Schedule H, Part I, Line 1).

[28] Ex. 152, 2012 Form 5500 for Faculty Plan (PLA-NYU-004331; PLA_NYU_004347) (Part II, Line 6f; Schedule H, Part I, Line 1).

| Faculty Plan | 2013 | 15,151 | $2,285,606,578[29] |
| Faculty Plan | 2014 | 16,447 | $2,423,501,194[30] |
| Faculty Plan | 2015 | 17,858 | $2,444,947,856[31] |
| Faculty Plan | 2016 | 18,551 | $2,619,431,482[32] |

15.    The Faculty Plan is intended to comply with Section 404(c) of ERISA and the regulations thereunder by providing participants with the right to direct the investment of their contributions.[33]   Each participant may direct his or her account balance into one or more investment options on the Faculty Plan's investment menu.[34]   The Faculty Plan offers an investment menu comprised of TIAA and Vanguard investment options.[35]

16.    As of March 31, 2016, the Faculty Plan offered its participants 103 total investment options, including 25 TIAA investments and 78 Vanguard investments.[36]   These investment options included fixed and variable annuity options, as well as mutual funds.[37]

---

[29] Ex. 153, 2013 Form 5500 for Faculty Plan (PLA-NYU-004374; PLA-NYU-004390) (Part II, Line 6f; Schedule H, Part I, Line 1).

[30] Ex. 154, 2014 Form 5500 for Faculty Plan (NYU0000198; NYU0000215) (Part II, Line 6f; Schedule H, Part I, Line 1).

[31] Ex. 155, 2015 Form 5500 for Faculty Plan (PLA-NYU-004167; PLA-NYU-004184) (Part II, Line 6f; Schedule H, Part I, Line 1).

[32] Ex. 7, 2016 Form 5500 for Faculty Plan (NYU0164135; NYU0164152) (Part II, Line 6f; Schedule H, Part I, Line 1).

[33] Ex. 2, Faculty Plan at Art. I (NYU0042546).

[34] Ex. 2, Faculty Plan at Art. IV §4.11 (NYU0042555).

[35] *See, e.g.,* Ex. 9, August 25, 2016 Vanguard All-in fee disclosure (as of June 30, 2016) (NYU0007185-217); Ex. 10, January 1, 2016 to December 31, 2016 TIAA Investment Fee & Expense Disclosure for New York University (TIAA_NYU_00004722-23).

[36] Ex. 12, 2016 Faculty 404a5 (NYU0006838) (listing Vanguard investment options at NYU0006840-41 and providing the performance for available TIAA investment options at NYU0006844-47)).

17.     The Faculty Plan offers participants *both* actively managed and passively managed index funds, including numerous passively managed Vanguard funds, including the Vanguard Institutional Index Fund.[38]

## IV.     THE MEDICAL PLAN.

18.     The Medical Plan was established in 1952 to provide retirement benefits to certain NYU School of Medicine employees and is funded through voluntary participant contributions and generous NYU contributions.[39]   NYU contributes 10% of a participant's salary to the Medical Plan, regardless of whether the participant contributes to the plan.[40]

19.     The Medical Plan provides retirement income for employees of the NYU School of Medicine.[41]   As of December 31 in each of the following years, the Medical Plan had the following total number of participants during the plan year and the following amount of assets:

| Plan | Year | Total Participants During Plan Year | Net Assets at End of Plan Year |
| --- | --- | --- | --- |
| Medical Plan | 2010 | 9,153 | $1,289,237,818[42] |
| Medical Plan | 2011 | 9,322 | $1,295,618,199[43] |

---

[37] Ex. 12, 2016 Faculty 404a5 (NYU0006838-62) (listing performance of investment options by type of investment).

[38] Ex. 12, 2016 Faculty 404a5 (NYU0006838-62) (listing Vanguard investment options at NYU0006840-41 and providing the performance for available TIAA investment options at NYU0006844-47).

[39] Ex. 3, Medical Plan at Art. I (NYU0116964)

[40] Ex. 3, Medical Plan  at Art. IV, § 4.4 (NYU0116973).

[41] Ex. 3, Medical Plan, at Art. III (NYU0116970).

[42] Ex. 107, 2010 Form 5500 for Medical Plan (PLA-NYU-004617, PLA-NYU-004633) (Part II, Line 6f; Schedule H, Part I, Line 1).

[43] Ex. 106, 2011 Form 5500 for Medical Plan (PLA-NYU-004658; PLA-NYU-004674) (Part II, Line 6f; Schedule H, Part I, Line 1).

| Medical Plan | 2012 | 11,876 | $1,428,468,860[44] |
| Medical Plan | 2013 | 7,765 | $1,651,319,934[45] |
| Medical Plan | 2014 | 7,648 | $1,778,166,384[46] |
| Medical Plan | 2015 | 8,312 | $1,841,858,943[47] |
| Medical Plan | 2016 | 8,560 | $2,018,061,226[48] |

20.     The Medical Plan is intended to comply with Section 404(c) of ERISA and the regulations thereunder by providing participants with the right to direct the investment of their contributions.[49]   Each participant may direct his or her account balance into one or more investment options on the Medical Plan's investment menu.[50]

21.     The Medical Plan offers an investment menu comprised of TIAA and Vanguard investment options.[51]   As of June 20, 2016, the Medical Plan's investment menu provided its

---

[44] Ex. 108, 2012 Form 5500 for Medical Plan (NYU0018988; NYU0019004) (Part II, Line 6f; Schedule H, Part I, Line 1).

[45] Ex. 120, 2013 Form 5500 for Medical Plan (PLA-NYU-004743; PLA-NYU-004759) (Part II, Line 6f; Schedule H, Part I, Line 1).

[46] Ex. 121, 2014 Form 5500 for Medical Plan (NYU0000519; NYU0000536) (Part II, Line 6f; Schedule H, Part I, Line 1).

[47] Ex. 125, 2015 Form 5500 for Medical Plan (PLA-NYU-004833; PLA-NYU-004850) (Part II, Line 6f; Schedule H, Part I, Line 1).

[48] Ex. 8, 2016 Form 5500 for Medical Plan (NYU0164090; NYU0164107) (Part II, Line 6f; Schedule H, Part I, Line 1).

[49] Ex. 3, Medical Plan at Art. I (NYU0116964).

[50] Ex. 3, Medical Plan at Art. IV, §4.10 (NYU0116977).

[51] *See, e.g.,* Ex. 9, August 25, 2016 Vanguard All-in fee disclosure (as of June 30, 2016) at NYU0007185-217;  Ex. 10, January 1, 2016 to December 31, 2016 TIAA Investment Fee & Expense Disclosure for New York University (TIAA_NYU_00004772); Ex. 11, January 1, 2016 to December 31, 2016 Investment Fee & Expense Disclosure for NYU School of Medicine (TIAA_NYU_00000122-25).

participants a total of 80 investment options, including 9 TIAA investments and 71 Vanguard investments.[52]

22.     Like the Faculty Plan, these investments consist of fixed and variable annuities and mutual funds.[53]  Also, like the Faculty Plan, the Medical Plan offers participants *both* actively managed and passively managed index funds, including numerous passively managed Vanguard funds, including the Vanguard Institutional Index Fund.[54]

## V.    PLAN ADMINISTRATION SERVICES.

23.     During the proposed class period, the Plans' administrative services were provided by two service providers:  TIAA and Vanguard.  Until 2018, the Faculty Plan had two vendors that provided administrative services to the plan:  Vanguard provided administrative services, including recordkeeping services, for the Vanguard mutual fund investment options, and TIAA provided administrative services, including recordkeeping services, for the TIAA investment options.[55]  On February 23, 2017, the Faculty Plan consolidated administrative services with TIAA, effective January 1, 2018.[56]

---

[52] Ex. 13, 2016 Medical Plan 404a5 (NYU0163399-420).

[53] Ex. 13, 2016 Medical Plan 404a5 (NYU0163399-420 (listing performance of investment options by type of investment).

[54] Ex. 13, 2016 Medical Plan 404a5 (NYU0163399-420).

[55] *See, e.g.,* Ex. 14, March 10, 2008 TIAA-CREF Recordkeeping Services Agreement (Faculty Plan) (NYU0000244-57); Ex. 15, August 31, 2008 Amendment No. 1 to TIAA-CREF Recordkeeping Services Agreement (Faculty Plan) (NYU0000416); Ex. 16, March 9, 2012 Amendment No. 2 to TIAA-CREF Recordkeeping Services Agreement (Faculty Plan) (NYU0000274-75); Ex. 17, July 9, 2012 Amendment No. 3 to TIAA-CREF Recordkeeping Services Agreement (Faculty Plan) (NYU0000241-43); Ex. 18, September 18, 2015 Amendment No. 4 to the TIAA-CREF Recordkeeping Services Agreement (Faculty Plan) (NYU0000410-15); Ex. 19, January 1, 2012 Vanguard Recordkeeping Fee Agreement (Vanguard-NYU_0000040-50).

[56] Ex 64, February 23, 2017 Meeting Minutes of the Committee at NYU0163208.

24.     The Medical Plan had a service provider arrangement similar to the Faculty Plan's prior arrangement, until November 1, 2012, when TIAA became the sole administrative service provider for both the Vanguard and TIAA investment options.[57]

25.     Vanguard and TIAA are known to be low-cost providers of mutual funds and annuities, respectively.  Courts have recognized Vanguard as a low-cost provider.[58]  In a number of other cases, Plaintiffs' counsel has touted Vanguard as an appropriate low-cost alternative to investments offered in other plans and proffered expert reports using Vanguard funds for comparisons used to calculate alleged damages.[59]

26.     Vanguard has a unique structure in which the underlying Vanguard mutual funds own Vanguard.[60]  This ownership structure eliminates conflicting loyalties and allows Vanguard to provide services "at cost," meaning that "it can charge the funds only enough to cover its cost

---

[57] *See, e.g.,* Ex. 20, October 1, 2012 TIAA-CREF Recordkeeping Services Agreement for the Medical Plan (NYU0000564-85); Ex. 21, August 22, 2016 Amendment No. 1 to TIAA-CREF Recordkeeping Services Agreement (Medical Plan) (NYU0000589-92).

[58] *Amron v. Morgan Stanley Investment Advisors Inc.,* 464 F.3d 338, 345 (2d Cir. 2006) ("That a mutual fund has an expense ratio higher than Vanguard, a firm known for its emphasis on keeping costs low, raises little suspicion."); *Kasilag v. Hartford Inv. Fin. Servs., LLC,* No. 11-1083 (RMB/KMW), 2012 WL 6568409, at *5 (D.N.J. Dec. 17, 2012) ("To be sure, the Vanguard comparison is extremely limited.").

[59] *See, e.g. See, e.g.* Mem. in Opp'n to Def.'s Mot. to Dismiss First Am. Compl. at 10, 12, *Moreno v. Deutsche Bank Americas Holding Corp.*, No. 1:15cv9936 (S.D.N.Y. 2016), ECF No. 34; Mem. in Opp'n to Mot. to Dismiss at 10, 12, *Smith v. BB&T Corp,* No. 1:15-cv-841-CCE-JEP (M.D.N.C. 2016), ECF No. 51; Pl.'s Opp'n to Mot. to Dismiss at 16, *Kruger v. Novant Health Inc.*, 131 F. Supp. 3d 470 (M.D.N.C. 2015) (No. 1:14-cv-208), ECF No. 26; Mem. in Opp'n to Mot. for Summ. J. at 20, *Abbott v. Lockheed Martin Corp.*, 286 F.R.D. 388 (S.D. Ill. 2012) (No. 06-cv-0701-MJR), ECF No. 164; Pl.'s Mem. in Opp'n to Mot. to Dismiss at 9, 30, *Gordan v. Mass. Mut. Life Ins. Co.*, No. 13-CV-30184-MAP  (D. Mass. 2015), ECF No. 26; Mem. in Supp. of Am. Mot. for Class Certification at 6-7, *George v. Kraft Foods Glob.*, *Inc.*, No. 08 C 3799, (N.D. Ill. 2011), ECF No. 271; Pl.'s Mem. of Law in Opp. to Def.'s Mot. to Dismiss First Am. Compl. at 14-15, *Krueger v. Ameriprise Fin., Inc.*, No. 11-cv-02781 (SRN/JSM) (D. Minn. 2012), ECF No. 63; Mem. in Opp'n to Def.'s Mot. for Partial Summ. J. at  10, *Beesley v. Int'l Paper Co.*, No. 3:06-cv-00703-DRH –SCW (S.D. Ill. 2009), ECF No. 276.

[60] Ex. 22, Heming Dep. 61:18-62:9; Ex. 119, The Vanguard Group, "Why Ownership Matters," https://about.vanguard.com/what-sets-vanguard-apart/why-ownership-matters/.

of operations."[61]    Accordingly, Vanguard is able to "return profits to [Vanguard's] fund shareholders in the form of lower expenses."[62]    Vanguard is paid indirectly via investment alternatives; the cost for recordkeeping is "imbedded within the expense ratio of the Plan's available investments through a credit attribution to cover Plan administration fees."[63]

27.    TIAA also operates at cost, and is a not for profit entity that is subject to federal income taxation.[64]    Further, TIAA does not receive any profit for recordkeeping CREF mutual funds.[65]    TIAA is one of only three insurance groups in the United States to hold the highest ratings currently awarded from all four leading independent insurance industry ratings agencies,

---

[61] Ex. 22, Heming Dep. 61:18-62:9; Ex. 119, The Vanguard Group, "Why Ownership Matters," https://about.vanguard.com/what-sets-vanguard-apart/why-ownership-matters/.

[62] Ex. 119, The Vanguard Group, "Why Ownership Matters," https://about.vanguard.com/what-sets-vanguard-apart/why-ownership-matters/.

[63] Ex. 103, May- July 2013 e-mail chain including E. Wrightson, J. Rezler, and P. Tocci, re: NYU Washington Square Shareclass Change, (Vanguard-NYU_0076188); *see also, e.g.,* Ex. 9, Vanguard All-in Fee Disclosure as of June 30, 2016, (NYU0007188-89) (███████████ ██████████████████████████████████████████ ███████████████ )).

[64] Ex. 6, Chittenden Dep. 90:15-90:22 ("Q.  And TIAA is a for-profit business, right?  A.  We do not operate with profit – for profit.  We are not-for-profit."); *see* Ex. 104, TIAA Charter, Article 8 (explaining that the purpose of TIAA is to "aid and strengthen nonprofit colleges, universities, institutions engaged primarily in education or research, governments and their agencies and instrumentalities, and other nonprofit institutions by providing annuities, life insurance, and accident and health insurance, suited to the needs of such entities, their employees and their families, on terms as advantageous to the holders and beneficiaries of such contracts and policies as shall be practicable, and by counseling such entities and individuals concerning pension plans or other measures of security, all without profit to the corporation or its stockholders" (emphasis added)), *available at* https://www.tiaa.org/public/pdf/tiaa_charter.pdf; Ex. 105, Charter of College Retirement Equities Fund, Section I (describing the "nonprofit corporation by the name of College Retirement Equities Fund"), *available at* https://www.tiaa.org/ public/pdf/ cref_charter.pdf;  *see also* United States Securities and Exchange Commission, Inv. Co. Act Release No. IC-31092; 812-14305, at 2.

[65] Ex. 6, Chittenden Dep. 181:20-24.

and has been awarded numerous best-in-class awards for retirement plan participant and plan sponsor services.[66]

28.     For both the Faculty Plan and the Medical Plan, the cost of services and plan administration for the Plans, including recordkeeping services, is covered by a portion of certain investment alternatives' expense ratio; *i.e.*, the fees charged for managing each of the investments offered by Vanguard and TIAA.[67]  This is a typical arrangement, and there is no direct fee charged by either Vanguard or TIAA for recordkeeping or plan administration.[68]

29.     As described in TIAA's recordkeeping agreements, recordkeeping fees are part of administrative fees, which include such services as preparing enrollment kits, maintaining records of each participant's and beneficiary's account balances, providing participants with returns and investment performance, providing information necessary for the annual 5500 reports, delivering investment option information such as fund notices, prospectuses, and financial statements, and delivering investment and savings advice to participants.[69]

30.     TIAA's services included offering investment and savings advice to the Plans' participants, from an independent third party provider, by phone, through the web, and by TIAA consultants in person at NYU.[70]

---

[66] Ex. 101, TIAA, *Awards & Recognition*, *available at*  https://www.tiaa.org/public/about-tiaa/awards-recognition

[67] Ex. 14, March 10, 2008 TIAA-CREF Recordkeeping Services Agreement (Faculty Plan) (NYU0000248), ¶ 8 (fees); Ex. 20, October 1, 2012 TIAA-CREF Recordkeeping Services Agreement (Medical Plan) (NYU0000564), ¶ 8 (fees); Ex. 23, Petti Dep. at 139:4-141:22; Ex. 91, Rezler Declaration ¶ 6; *see* Ex. 6, Chittenden Dep. at 26:12-29:21.

[68] Ex. 22, Heming Dep. at 53:7-54:13; Ex. 91, Rezler Declaration ¶ 6.

[69] Ex. 14, March 10, 2008 TIAA-CREFF Recordkeeping Services Agreement (Faculty Plan) (NYU0000254-56) (Schedule A); Ex. 20, October 1, 2012 TIAA-CREF Recordkeeping Services Agreement (Medical Plan) (NYU0000575-79) (Schedule A).

[70] Ex. 20, October 1, 2012 TIAA Recordkeeping Services Agreement at NYU000577.

31.     Likewise, Vanguard's recordkeeping fees cover such services as handling participant calls and providing participant education and delivering quarterly summary participant statements.[71]   Due to the fact that TIAA provided a number of administrative services, TIAA estimated that recordkeeping services were only 40% of the cost of the administrative services provided to the Plans.[72]

32.     For the Faculty Plan, the majority of contracts with TIAA are individual contracts, meaning that they are executed directly between the participants and TIAA.[73]   As a result, "NYU does not have the ability to direct plan assets to other investments or to move assets to a new vendor."[74]   Accordingly, TIAA is the recordkeeper for TIAA assets that are subject to individual contracts between TIAA and participants.[75]   The Medical Plan also maintained individual contracts until approximately 2012, when the Plan instituted group contracts.[76]

33.     TIAA's investment options have a sizable presence on the Plans' investment menus.  As of December 31, 2016, approximately $1.84 billion of the Faculty Plan's assets were

---

[71] Ex. 22, Heming Dep. at 46:5-49:15; Exhibit 19, January 1, 2012 Vanguard Recordkeeping Fee Agreement (Vanguard-NYU_0000040) (Schedules A & B).

[72] Ex. 173, TIAA Faculty Plan 2012 Service and Fee Disclosure Package Cover Letter, at TIAA_NYU_0015340 (explaining that plan services fees are paid to TIAA "for the full range of services it provides to your plan" and that "the portion of Plan Services Expense that represents the estimated cost to the plan for 'recordkeeping services," can be obtained if you "multiply .4 times the total Plan Services Expense dollar amount").

[73] Ex. 33, March 18, 2010 Meeting Minutes of the Committee (mistakenly marked March 18, 2009), at NYU0002874 (p. 3); *see, e.g.,* Ex. 66, TIAA Supplemental Retirement Annuity Contract (Brown, James B) (TIAA_NYU_00013752).  Exhibit 33 mistakenly says March 18, 2009.  *See, e.g.,* Ex. 176, March 17, 2010 Email re: Retirement Committee Meeting, Thursday March 18, 2010 (CLC0023521); Ex. 177, April 15, 2010 Email re: Agenda for Retirement Committee Meeting Monday April 19th (CLC0023674).

[74] Ex. 33, March 18, 2010 Meeting Minutes of the Committee (mistakenly marked March 18, 2009), at NYU0002874 (p. 3).

[75] Ex. 68, Meagher Dep. 210:22-211:21.

[76] Ex. 67, June 1, 2012 TIAA Group Retirement Annuity Certificate (Monaco, Marie) (TIAA_NYU_00013878).

invested in TIAA options, and $1.18 billion of the Medical Plan's assets were invested in TIAA options.[77]

## VI.   PLAINTIFFS

34.   Plaintiffs are six highly-educated professors, four of whom participate in the Faculty Plan and two of whom participate in the Medical Plan.[78]

### A.   Dr. Mark Crispin Miller

35.   Dr. Mark Crispin Miller has been a Professor with the Department of Media, Culture and Communication at the NYU Steinhardt School since 1997.[79]  He is a participant in the Faculty Plan in which he has only invested in Vanguard funds.[80]

36.   However, he invested in TIAA funds, including the CREF Stock Class R3 fund, in two plans sponsored by his former employers: (1) a plan sponsored by Johns Hopkins University; and (2) a plan sponsored by the University of Pennsylvania.[81]  Mr. Miller is still invested in the CREF Stock Account in both of those plans, and according to Mr. Miller, his investment in that fund grew by approximately ▮▮▮▮▮▮ over 8 years.[82]

37.   When asked about whether he had any complaints regarding the performance of the CREF Stock Account, Mr. Miller responded only that he is "not equipped" to analyze the

---

[77] Ex. 7, Form 5500 for Faculty Plan (NYU0164134); Ex. 8, 2016 Form 5500 for Medical Plan (NYU0164089).

[78] Ex. 1, Am. Compl., ECF No. 39 at pp. 10-11.

[79] Ex. 69, Crispin Miller Dep. 9:21-25.

[80] Ex. 69, Crispin Miller Dep. 18:16-19, 44:4-8, 62:13-22, 85:5-15, 105:4.

[81] Ex. 69, Crispin Miller Dep. 45:16-20, 70:14-21.

[82] Ex. 69, Crispin Miller Dep. 45:16-20, 47:20-48:3.

growth of his own investment in the CREF Stock Account and that he simply "trust[s] the gist of the complaint."[83]

38.     As of September 30, 2016, Mr. Miller was invested in the Vanguard LifeStrategy Moderate Growth fund and Vanguard Institutional Index fund, with a total account balance of ████████ for his investments in the Faculty Plan.[84]  Mr. Miller noted that he would not deem an entire program imprudent because of one "failed fund."[85]

39.     With respect to fees, Mr. Miller does not know what recordkeeping services are, does not know whether he would want to pay a flat rate for recordkeeping, and does not personally know any facts that would suggest that the fees are imprudent.[86]

**B.     Ms. Marie Ellen Monaco**

40.     Ms. Marie Ellen Monaco is an Associate Professor with the Department of Neuroscience and Physiology at the NYU School of Medicine.[87]  She is a participant in the Medical Plan as well as other retirement plans offered by NYU.[88]

41.     As a participant in the Medical Plan, Ms. Monaco invested in CREF Stock, CREF Growth, CRE Global Equities, TIAA Traditional and TIAA Real Estate in 2009 and has never made any changes to her investment portfolio.[89]  As of June 30, 2017, Ms. Monaco had

---

[83] Ex. 69, Crispin Miller Dep. 49:10-20.

[84] Ex. 70, Crispin Miller Vanguard Quarterly Statement for 3rd Quarter, at NYU0084118-19.

[85] Ex. 69, Crispin Miller Dep. 129:16-24.

[86] Ex. 69, Crispin Miller Dep. 82:5-13, 85:16-25, 93:8-13.

[87] Ex. 71, Monaco Dep. 60:7-12; Ex. 72, NYU website profile for Monaco at: https://med.nyu.edu/faculty/marie-e-monaco.

[88] Ex. 71, Monaco Dep. 20:4-14; Ex. 73, Sampling of Monaco's Quarterly Statements 2009-2017.

[89] Ex. 71, Monaco Dep. 267:7-12; Ex. 73, Sampling of Monaco's Quarterly Statements 2009-2017.

███████ in investments in the Medical Plan.[90]  Indeed, Ms. Monaco's portfolio for all of the NYU plans she participates in performed well and nearly doubled over the past seven years—going from approximately ███████ in 2009 to approximately ███████ in 2017.[91]

42.     Ms. Monaco testified that she does not know whether she was harmed by the inclusion of the CREF Stock Account or the TIAA Real Estate Account, nor does she know whether any of her investments underperformed in the past seven years.[92]

43.     Indeed, Ms. Monaco testified that she "wouldn't change anything in [her] TIAA-CREF account based on this lawsuit."[93]  Further, when asked if she is alleging that Vanguard or TIAA obtained any excessive revenue in the Complaint, Ms. Monaco stated "not to [her] knowledge."[94]

## C.     Dr. Shulamith Lala Straussner

44.     Dr. Shulamith Lala Straussner is an Associate Professor with the NYU School of Social Work.[95]  Dr. Straussner is a participant in the Faculty Plan as well as a participant in other NYU retirement plans.[96]

---

[90] Ex. 73, Sampling of Monaco's Quarterly Statements 2009-2017 (Monaco TIAA 2017 Quarterly Statement for 2nd Quarter, at TIAA_NYU_00016753).

[91] Ex. 71, Monaco Dep. 269:21-270:6; Ex. 73, Sampling of Monaco's Quarterly Statements 2009-2017 (compare Monaco TIAA 2009 Quarterly Statement for 3rd Quarter, at TIAA_NYU_00016635, with Monaco TIAA 2017 Quarterly Statement for 2nd Quarter, at TIAA_NYU_00016749).

[92] Ex. 71, Monaco Dep. 356:12-20, 255:5-12.

[93] Ex. 71, Monaco Dep. 164:12-14.

[94] Ex. 71, Monaco Dep. 286:3-7.

[95] Ex. 74, NYU website profile for Straussner at http://socialwork.nyu.edu/our-faculty/full-time/shulamith-lala-ashenberg-straussner.html.

[96] Ex. 75, Straussner Dep. 67:17-25; Ex. 76, Sampling of Straussner TIAA Quarterly Statements 2009-2017.

45.     Dr. Straussner has been invested in TIAA Traditional, TIAA Real Estate, CREF Bond Market R3, CREF Stock R3, and CREF Global Equities R3 as part of her participation in the Faculty Plan since 2009.[97]  Dr. Straussner's largest single investment in the Faculty Plan is in the CREF Stock Account, which accounts for approximately one-third of her investment portfolio.[98]  As of December 31, 2016, Dr. Straussner's personal rate of return for her TIAA investments in the Faculty Plan over five years was 7.1%.[99]

46.     As of September 2016, Dr. Straussner was also invested in the following Vanguard funds as a participant in the Faculty Plan: Vanguard GNMA Fund Investor, Vanguard Long-Term Treasury Investor, Vanguard High-Yield Corp Fund Investor, and Vanguard Inflation-Protect Sec Investor.[100]  As of June 30, 2017, Dr. Straussner's balance for all of her TIAA investments in all of her NYU retirement plans was ████████ and for her TIAA investments in the Faculty Plan alone was ██████.[101]

**D.     James Brown**

47.     James Brown is an Associate Professor at NYU.[102]  Mr. Brown participates in the Faculty Plan.[103]  Mr. Brown did not invest in any TIAA investments as a member of the Faculty

---

[97] Ex. 75, Straussner Dep. 68:12-70:18; Ex. 76, Sampling of Straussner TIAA Quarterly Statements 2009-2017.

[98] Ex. 75, Straussner Dep. 69:7-12.

[99] Ex. 75, Straussner Dep. 70:19-71:4; Ex. 77, Straussner TIAA Participant Account Statement as of December 312016 (NYU0026998).

[100] Ex. 78, Straussner Vanguard 2016 Quarterly Statement for 3rd Quarter, at NYU0084044.

[101] Ex. 76, Sampling of Straussner TIAA Quarterly Statements 2009-2017 (Straussner TIAA 2017 Quarterly Statement for 2nd  Quarter, at TIAA_NYU_00016873-75).

[102] Ex. 79, Brown Dep. 10:11-12.

[103] *See, e.g.,* Ex. 80, Brown 2014 Vanguard Quarterly Statement for 1st Quarter (PLA-NYU-000305); Ex. 81, Brown 2016 Vanguard Quarterly Statement for 3rd Quarter (PLA-NYU-000628).

Plan, but only chose to invest in Vanguard options--Vanguard Prime Money Market, Vanguard Long-Term Treasury Investor, Vanguard Small Cap Value Index, Vanguard Energy Fund Investor, and Vanguard Precious Metals and Mining funds in 2010.[104]

48.     Mr. Brown also elected in 2016 to add investments in the Vanguard Health Care Fund Investor, Vanguard Federal Money Market, and Vanguard Target Retirement 2015 funds[105] Mr. Brown never invested in the TIAA Real Estate Account as a participant of any plan, and only invested in the CREF Stock Account as a participant in the NYU Supplemental Tax Deferred Annuity Plan.[106]   As of September 30, 2016, Mr. Brown's account balance for investments in the Faculty Plan was ▮▮▮▮▮▮.[107]

49.     Mr. Brown testified that he does not know what recordkeeping services are, nor does he know whether he paid excessive recordkeeping services.[108]  Further, Mr. Brown testified that he does not know how consolidating recordkeepers would reduce rates.[109]

**E.     Dr. Alan Sacerdote**

50.     Dr. Alan Sacerdote is a Clinical Professor of Medicine at NYU and the Chief of Endocrinology for the Woodhull Medical Group, which is associated with NYU and at which Dr.

---

[104] Ex. 80, Brown 2014 Vanguard Quarterly Statement for 1st Quarter (PLA-NYU-000305).

[105] Ex. 81, Brown 2016 Vanguard Quarterly Statement for 3rd Quarter (PLA-NYU-000629).

[106] Ex. 79, Brown Dep. 38:5-10; 32:23-25, 33:19-22; *see, e.g.*, Ex. 82, Brown 2017 TIAA Quarterly Statement for the 2nd Quarter (TIAA_NYU_00016683) (NYU Supplemental Tax Deferred Annuity Plan).

[107] Ex. 81, Brown 2016 Vanguard Quarterly Statement for 3rd Quarter (PLA-NYU-000628).

[108] Ex. 79, Brown Dep. 88:14-17, 89:3-11, 92:15-21, 95:19-23.

[109] Ex. 79, Brown Dep. 121:16-17.

Sacerdote's salary and benefits are funded by NYU.[110]  Dr. Sacerdote participates in the Medical Plan.[111]

51.     Dr. Sacerdote invested solely in Vanguard funds and did not invest in the TIAA Real Estate Account or the CREF Stock Fund as part of his participation in the Medical Plan.[112] The total balance of Dr. Sacerdote's investments in the Medical Plan as of June 30, 2017 was ██████████.[113]

### F.     Dr. Herbert Samuels

52.     Dr. Herbert Samuels is the Helen and Milton A. Kimmelman Professor of Pharmacology at the Department of Biochemistry and Molecular Pharmacology and Professor at the Department of Medicine.[114]  Dr. Samuels participates in the Medical Plan.[115]

53.     Dr. Samuels never invested in the TIAA Real Estate Account and has been invested in the CREF Stock, CREF Growth, and CREF Global Equities.[116]  Dr. Samuels had a balance of ██████████ in the Medical Plan as of June 30, 2017.[117]

---

[110] Ex. 83, Sacerdote Dep. 56:12-57:19.

[111] Ex. 83, Sacerdote Dep. 12:10-13:5.

[112] Ex. 84, Sampling of Sacerdote TIAA Quarterly Statements 2012-2017.

[113] Ex. 84, Sampling of Sacerdote TIAA Quarterly Statements 2012-2017 (Sacerdote 2017 TIAA Quarterly Statement for 2nd Quarter (TIAA_NYU_00016795)).

[114] Ex. 85, Samuels Dep. 27:9-13; Ex. 86, NYU website profile for Samuels at https://med.nyu.edu/faculty/herbert-h-samuels.

[115] Ex. 85, Samuels Dep. 37:10-16.

[116] Ex. 85, Samuels Dep. 48:11-14; Ex. 87, Sampling of Samuels TIAA Quarterly Statements 2009-2017.

[117] Ex. 87, Sampling of Samuels TIAA Quarterly Statements 2009-2017 (Samuels 2017 TIAA Quarterly Statement for 2nd Quarter (TIAA_NYU_00016838)).

## VII.   NYU'S PROCESS FOR MONITORING THE PLANS' ADMINISTRATIVE FEES AND NEGOTIATING REDUCTIONS IN FEES.

### A.   NYU Formed the Retirement Committee.

54.   To implement the new 403(b) regulations, on September 13, 2007, NYU determined that a Retirement Plan Committee (the "Committee") should be formed to provide "consistency and clarity in plan governance."[118]

55.   This determination was made during a meeting held between future Committee members and highly-respected external legal counsel Ropes & Gray, LLC ("Ropes & Gray").[119] The group discussed the next steps needed for approval of the Committee, including finalizing a formal charter.[120]

56.   In May 2009, the Executive Committee of the Board of Trustees of New York University formally approved the Retirement Plan Committee Charter (the "Charter"), effective June 1, 2008, which formally established the Committee.[121]   Ropes & Gray assisted the Committee in drafting the Charter.[122]

57.   The Charter designates the Committee as the Plan Administrator for a number of defined benefit, defined contribution, and deferred compensation plans, including the Faculty Plan and the Medical Plan.[123]   The Charter also designates nine Committee members serving ex-officio: (1) NYU Chief Investment Officer; (2) NYU Senior Vice President of Finance; (3) NYU

---

[118] Ex. 24, September 13, 2007 Meeting Minutes of the Committee (NYU0002387).

[119] Ex. 24, September 13, 2007 Meeting Minutes of the Committee (NYU0002387).

[120] Ex. 24, September 13, 2007 Meeting Minutes of the Committee (NYU0002387).

[121] Ex. 88, Retirement Plan Committee Charter (NYU00034912-21); *see also* Ex. 23, Petti Dep. 58:13-62:15; Ex. 68, Meagher Dep. 26:13-18.

[122] *See, e.g.*, Ex. 25, January 31, 2008 Meeting Minutes of the Committee (NYU0003846-48).

[123] Ex. 88, Retirement Plan Committee Charter (NYU0034914); *see also* Ex. 23, Petti Dep. 62:8-63:2.

Langone Medical Center ("NYULMC") Senior Vice President of Finance; (4) NYULMC Controller; (5) NYU Vice President of Human Resources; (6) NYULMC Senior Vice President of Human Resources; (7) NYU Director of Benefits; (8) NYULMC Director of Benefits; and (9) NYU Provost or designee.[124]

**B.      NYU Retained an Industry Expert to Assist the Committee and to Analyze the Plans' Administrative Fees.**

58.      Recognizing its fiduciary responsibilities and on the advice of Ropes & Gray, the Committee sought out an highly experienced investment advisor to assist the Committee in monitoring the performance and expenses of the funds in the 403(b) plans it would oversee.[125]

59.      NYU conducted a Request for Proposal ("RFP"), to which four different investment firms—Cammack Lahrette Consulting ("Cammack"), Segal Marco Advisors, Mercer, and RV Kuhns—responded.[126]

60.      Cammack, an expert in the industry and one of only a handful of firms that work with 403(b) plans comparable in size to those overseen by the Committee, was ultimately selected.[127]  Cammack has been working with 403(b) plans since 1958, when 403(b) plans were added to the Internal Revenue Code and is able to negotiate for the most cost-effective programs

---

[124] Ex. 88, Retirement Plan Committee Charter (NYU0034914).

[125] Ex. 27, February 4, 2009 Meeting Minutes of the Committee (NYU00833304-05).

[126] Ex. 27, February 4, 2009 Meeting Minutes of the Committee (NYU00833304-05); *see also* Ex. 89, Rezler Dep. at 36:25- 37:18.

[127] Ex. 90, May 2008 Cammack Defined Contribution Retirement Plan Investment Consulting Services Proposal (CLC0000285-318); Ex. 27, February 4, 2009 Meeting Minutes of the Committee (NYU00833304-05); *see also* Ex. 26, October 8, 2008 Meeting Minutes of the Committee (NYU0003671-73).

for its clients because it is a privately held company that is not subject to direct or indirect ownership by other companies.[128]

61.    Further, Cammack has extensive experience in reviewing and understanding TIAA's fees and expenses since it has numerous 403(b) plan clients with TIAA investment products on their plan investment menus.[129]

62.    Ropes & Gray also continued to advise the Committee with respect to the Committee's legal duties in administering the plans.[130]

63.    The Committee hired Cammack as a co-fiduciary to the Plans with respect to investment advisory services.[131]  Since 2009, Cammack has provided the Committee with help in evaluating, selecting, and managing the Plans' recordkeepers and "advising them in the selection and monitoring of plan investments."[132]  Cammack specifically provides the Plans with investment analysis, plan design, plan administration, vendor services, RFP projects and pricing.[133]

64.    Cammack's investment analysis includes determining whether to put funds on a watch list and deciding whether to recommend fund replacement.[134]  This is a typical and common practice followed by prudent fiduciaries and was part of Cammack's fund analysis

---

[128] Ex. 90, May 2008 Cammack Defined Contribution Retirement Plan Investment Consulting Services Proposal (CLC0000287, CLC0000289-90).

[129] Ex. 89, Rezler Dep. at 33:23-34:21; Exhibit 90, May 2008 Cammack Defined Contribution Retirement Plan Investment Consulting Services Proposal (CLC0000287, CLC0000295).

[130] Ex. 23, Petti Dep. at 79:17-80:15.

[131] Ex. 92, April 8, 2009 Cammack Larhette Advisors, LLC Investment Advisory Services Agreement ¶ 5 b (NYU0096711); *see also* Ex. 89, Rezler Dep. at 84:16-90:7; 92:10-20.

[132] Ex. 91, Rezler Declaration ¶4.

[133] Ex. 89, Rezler Dep. at 51:5-23.

[134] Ex. 89, Rezler Dep. at 52:5-20

when a particular fund has some indicator that may bear some additional scrutiny, including, for example, a fund manager change, market environment or fund performance.[135]

65.    Cammack's investment analysis also consists of providing to the Committee an analysis of fund performance, including analyzing performance versus the fund's peer group and the benchmark index and evaluating each fund's standard deviation, risk adjusted return (Sharpe ratio), fees in comparison to peer funds, portfolio manager tenure, and Morningstar ratings.[136]

66.    Cammack is responsible for providing the Committee with this investment analysis for all of the investment options available in the Plans on a quarterly basis.[137]   The Committee considered several factors commonly used by fiduciaries in monitoring plan investment funds, including volatility, ratings, risk and return characteristics, risk-adjusted returns, performance deviations and style drift.[138]   One of the factors used by Cammack and the Committee to analyze the funds was a widely-used measure of performance called "alpha," which is defined as the difference between the actual return and expected return.[139]

---

[135] Ex. 89, Rezler Dep. at 129:6-129:14; 130:17-131:7; 132:6-133:6.

[136] Ex. 89, Rezler Dep. at 52:21-53:13; 63:9-70:10.

[137] Ex. 89, Rezler Dep. at 53:8-55:10.

[138] *See, e.g.,* Ex. 93, May 10, 2012 Email re: NYU/NYU Langone Retirement Committee Meeting – May 17, 2012 with attachments (CLC0033507-08, CLC0033520, CLC0033525, CLC0033539, CLC0033585); Exhibit 146, November 18, 2013 email re Retirement Committee Meeting Materials for November 25 2013 meeting with attachments (CLC0038690, CLC0038698, CLC0038702, CLC0038718, CLC0038721); Ex. 51, February 26, 2014 Meeting Minutes of the Committee (NYU0004590); Ex, 89, Rezler Dep. at 52:21-53:7; Ex. 4, Expert Report of Marcia Wagner, at p. 37.

[139] *See, e.g.*, Ex. 93, May 10, 2012 Email re: NYU/NYU Langone Retirement Committee Meeting – May 17, 2012 with attachments (CLC0033585); Exhibit 146, November 18, 2013 email re Retirement Committee Meeting Materials for November 25 2013 meeting with attachments (CLC0038720); Ex, 89, Rezler Dep. at 52:21-53:7; Ex. 4, Expert Report of Marcia Wagner, at p. 37.

67.     Cammack typically provides the investment analysis to the Committee in the form of a due diligence report about a week before each Committee meeting.[140]  The purpose of these due diligence reports is "[t]o provide NYU the information needed to perform their oversight responsibilities for the investments and other areas relating to the plans."[141]

68.     Since being retained, Cammack repeatedly analyzed whether the fees paid to TIAA and Vanguard were competitive and reasonable, and the Committee's minutes reflect discussion of administrative fees at numerous meetings, including:

- October 8, 2008[142]
- May 15, 2009[143]
- January 21, 2010[144]
- February 18, 2010[145]
- March 18, 2010[146]
- April 19, 2010[147]
- June 14, 2010[148]
- September 23, 2010[149]
- November 2, 2010[150]

---

[140] Ex. 89, Rezler Dep. at 53:8-55:10; 66:24-67:3; *see, e.g.,* Ex. 93, May 10, 2012 Email re: NYU/NYU Langone Retirement Committee Meeting – May 17, 2012 with attachments (CLC0033465-682).

[141] Ex. 89, Rezler Dep. at 60:9-20.

[142] Ex. 26, October 8, 2008 Meeting Minutes of the Committee (NYU0003673).

[143] Ex. 28, May 15, 2009 Meeting Minutes of the Committee (NYU0003087).

[144] Ex. 31, January 21, 2010 Meeting Minutes of the Committee (NYU0094055).

[145] Ex. 32, February 18, 2010 Meeting Minutes of the Committee (NYU0094133-34).

[146] Ex. 33, March 18, 2010 Meeting Minutes of the Committee (mistakenly marked March 18, 2009) (NYU0002873).

[147] Ex. 34, April 19, 2010 Meeting Minutes of the Committee (NYU0004041).

[148] Ex. 35, June 14, 2010 Meeting Minutes of the Committee (NYU0002882).

[149] Ex. 36, September 23, 2010 Meeting Minutes of the Committee (NYU0002389).

[150] Ex. 37, November 2, 2010 Meeting Minutes of the Committee (NYU0005075).

- January 10, 2011[151]
- March 21, 2011[152]
- May 17, 2012[153]
- September 4, 2012[154]
- November 16, 2012[155]
- June 14, 2013[156]
- November 25, 2013[157]
- August 19, 2014[158]
- December 11, 2014[159]
- February 26, 2015[160]
- June 9, 2015[161]
- September 15, 2015[162]
- December 16, 2015[163]
- June 1, 2016[164]
- September 8, 2016[165]
- December 12, 2016[166]

---

[151] Ex. 38, January 10, 2011 Meeting Minutes of the Committee (NYU0003674).

[152] Ex. 39, March 21, 2011 Meeting Minutes of the Committee (NY0002099).

[153] Ex. 45, May 17, 2012 Meeting Minutes of the Committee (NYU0004056).

[154] Ex. 46, September 4, 2012 Meeting Minutes of the Committee (NYU0004051-52).

[155] Ex. 47, November 16, 2012 Meeting Minutes of the Committee (NYU0001942-43).

[156] Ex. 49, June 14, 2013 Meeting Minutes of the Committee (NYU0002393).

[157] Ex. 50, November 25, 2013 Meeting Minutes of the Committee (NYU00020994).

[158] Ex. 53, August 19, 2014 Meeting Minutes of the Committee (NYU0002865-66).

[159] Ex. 55, December 11, 2014 Meeting Minutes of the Committee (NYU0002780).

[160] Ex. 56, February 26, 2015 Meeting Minutes of the Committee (NYU0003949).

[161] Ex. 57, June 9, 2015 Meeting Minutes of the Committee (NYU0003849).

[162] Ex. 58, September 15, 2015 Meeting Minutes of the Committee (NYU0005069).

[163] Ex. 59, December 16, 2015 Meeting Minutes of the Committee (NYU0003276-77).

[164] Ex. 61, June 1, 2016 Meeting Minutes of the Committee (NYU0002890).

[165] Ex. 62, September 8, 2016 Meeting Minutes of the Committee (NYU00026304).

- February 23, 2017[167]
- May 24, 2017[168]

69.    In considering the reasonableness of the fees, the Committee gave appropriate

consideration to numerous factors, including:

- the type, nature and the quality of the administrative services,[169]

- the different needs and circumstances of the two Plans,[170]

- the different expectations of participants in the two Plans,[171]

- the capabilities of various vendors to provide all of the services required by the Plans,[172]

-  the unique nature of the TIAA annuities and the fact that no other vendor could administer the TIAA annuities,[173]

- the fact that participants in the Plans had previously invested billions of dollar in these TIAA annuities,[174]

---

[166] Ex. 63, December 12, 2016 Meeting Minutes of the Committee (NYU00026298).

[167] Ex. 64, February 23, 2017 Meeting Minutes of the Committee (NYU0163208).

[168] Ex. 65, May 24, 2017 Meeting Minutes of the Committee (NYU0162850).

[169] Ex. 31, January 21, 2010 Meeting Minutes of the Committee (NYU0094055-56); Ex. 32, February 18, 2010 Meeting Minutes of the Committee (NYU0094133-35); Ex. 33, March 18, 2010 Meeting Minutes of the Committee (mistakenly marked March 18, 2009) (NYU0002872-73); Ex. 34, April 19, 2010 Meeting Minutes of the Committee (NYU0004040); Ex. 38, January 10, 2011 Meeting Minutes of the Committee (NYU0003675); Ex. 39, March 21, 2011 Meeting Minutes of the Committee (NYU0002099-2101).

[170] Ex. 39, March 21, 2011 Meeting Minutes of the Committee (NYU0002100-01); Ex. 23, Petti Dep. 106:24-107:20; 288:9-290:10.

[171] Ex. 39, March 21, 2011 Meeting Minutes of the Committee (NYU0002100-01); Ex. 23, Petti Dep. 106:24-107:20; 288:9-290:10.

[172] Ex. 31, January 21, 2010 Meeting Minutes of the Committee (NYU0094055-56); Ex. 32, February 18, 2010 Meeting Minutes of the Committee (NYU0094133-35).

[173] Ex. 31, January 21, 2010 Meeting Minutes of the Committee (NYU0094055-56).

[174] Ex. 30, December 9, 2009 Meeting Minutes of the Committee, at NYU0002885; Ex. 68, Meagher Dep. 117:10-25; Ex. 23, Petti Dep. 80:24-81:8; Ex. 99, Halley Dep. 291:25-294:3.

- the fact that the Committee could not override the participants' investment elections in the TIAA annuities without their consent,[175]

- the fact that participants were provided detailed information regarding the Plans and the Plans' investment alternatives,[176]

- the potential advantages of consolidating administrative services with a single vendor,[177]

- the services being offered, the investment vehicles available on the vendors' platforms, and participant preferences,[178]

70.     Early on, Cammack also advised that it believed that, with regards to "Fiduciary Compliance," "that in general the New York University and NYU Langone retirement plans are very compliant and are run exceptionally well."[179]

71.     Since that first meeting in September 2007, the Committee has met regularly to review, monitor, discuss, and oversee the various plans assigned to its purview.   Between September 2007 and September 2017, the Committee met at least 42 times.[180]   And, in the six years preceding the filing of the Complaint on August 9, 2016, the Committee met at least 25 times.[181]

---

[175] Ex. 26, October 8, 2008 Meeting Minutes of the Committee (NYU0003672); Ex. 28, May 15, 2009 Meeting Minutes of the Committee (NYU0003088);  Ex. 30, December 9, 2009 Meeting Minutes of the Committee (NYU0002885-86); Ex. 31, January 21, 2010 Meeting Minutes of the Committee (NYU0094055-56); Ex. 33, March 18, 2010 Meeting Minutes of the Committee (mistakenly marked March 18, 2009) (NYU0002874);  Ex. 39, March 21, 2011 Meeting Minutes of the Committee (NYU0002100-01).

[176] Ex. 89, Rezler Dep. at 297:24-298:20.

[177] Ex. 89, Rezler Dep. at 300:18-301:8.

[178] Ex. 89, Rezler Dep. at 304:11-22.

[179] Ex. 28, May 15, 2009 Meeting Minutes of the Committee (NYU0003088).

[180] *See* Exs. 24-65.

[181] *See* Exs. 36-61.

C.     NYU Conducted Two Requests for Proposals and Consolidated Vendors.

72.     Early on, the Committee began to consider the potential benefits of vendor consolidation, although it noted that it was not a short-term priority because of the history and complexity of the Plans, the unique nature of the TIAA contracts, and the expectations of Plan participants, and the consideration of NYU's Shared Governance Principles.[182]

73.     In 2009, Cammack assisted the Committee in conducting an extensive RFP for administrative services to the Plans, including recordkeeping services.[183]   The RFP was conducted "as part of [the Committee's] review of its multiple vendor 403(b) program with the goal of possibly consolidating future contributions to a single vendor."[184]

74.     The RFP sought detailed information from then-current and potential vendors to the Plans, including information regarding service capabilities, available investment alternatives, restrictions on offering investments, investment characteristics of available investments, revenue sharing, minimum fund revenue requirements, fiduciary status of vendor, communication and education services for participants, systems and recordkeeping, compliance, and expenses.[185]

75.     The Committee also sought information regarding potential vendors' abilities to deliver various electronic services for participants, such as enhanced and branded electronic

---

[182] Ex. 26, October 8, 2008 Meeting Minutes of the Committee (NYU0003671) ("vendor consolidation is not a short-term priority"); Ex. 39, March 21, 2011 Meeting Minutes of the Committee (NYU0002100-01); Ex. 23, Petti Dep. 106:24-107:20; 288:9-290:10.

[183] Ex. 94, New York University, New York University School of Medicine, NYU Hospitals Center, Polytechnic Institute of NYU Defined Contribution  Retirement Programs Request for Proposal, July 31, 2009 (CLC0022136).  Ex. 31, January 21, 2010 Meeting Minutes at NYU0094055-56; Ex. 23, Petti Dep. at 232:14-18; Ex. 89, Rezler Dep. at 25:24-26:17.

[184] Ex. 94, New York University, New York University School of Medicine, NYU Hospitals Center, Polytechnic Institute of NYU Defined Contribution  Retirement Programs Request for Proposal, July 31, 2009 (CLC0022138).

[185] Ex. 94, New York University, New York University School of Medicine, NYU Hospitals Center, Polytechnic Institute of NYU Defined Contribution  Retirement Programs Request for Proposal, July 31, 2009 (CLC0022136-22156).

messaging, NYU-dedicated web and phone assistance, online plan enrollment and to provide on-site participant investment education.[186]

76.    The Committee reviewed the "services and costs of several leading retirement vendors: Fidelity, Diversified Investment Advisors, GreatWest, and two incumbents: TIAA-CREF and Vanguard.  Prudential (the third incumbent), ACS, and Hewitt each declined to submit a proposal."[187]

77.    The Committee reviewed extensive and detailed responses to its RFP.  TIAA submitted a 402 page response to the RFP, in which TIAA provided extensive responses to all of questions posed and provided a detailed expense projection for the initial plan year which proposed the best fund available in each asset class that would fit the pricing model.[188]  TIAA also created an excel spreadsheet detailing an investment array for the plan that included information regarding performance history versus benchmarks and standard deviation versus benchmarks as well as all fees, including investment management fees, revenue sharing, and the total expense ratio.[189]

---

[186] Ex. 33, March 18, 2010 Meeting Minutes of the Committee (mistakenly marked March 18, 2009), at NYU0002872-74; Ex. 34, April 19, 2010 RCC Meeting Minutes (NYU0004040); Ex. 38, January 10, 2011 RCC Meeting Minutes (NYU0094055-56).

[187] Ex. 95, January 2011 Retirement Plan Vendor Consolidation presentation (CLC0025191); *see also* Ex. 33, March 18, 2010 Meeting Minutes of the Committee (mistakenly marked March 18, 2009) (NYU0002872-76).

[188] Ex. 96, September 2009 TIAA Response to Request for Proposal Submission (TIAA_NYU_00031579- TIAA_NYU_00031980).

[189] Ex. 96, September 2009 TIAA Response to Request for Proposal Submission (TIAA_NYU_00031997) (and following non-bates labeled printout of corresponding excel document).

78.     Vanguard and Fidelity likewise provided detailed information in their response to the RFP as well, including extensive information detailing fees, fund performance, and fund expenses.[190]

79.     As part of the selection process and in addition to reviewing the RFP responses, the Committee also considered two other factors: the various interests of the Plans' respective participants, and, the Committee's ability to direct or "map" investments held in individual contracts (between the respective participant and TIAA).[191]   Regarding the former, the Committee's record reflects consideration and discussion of the varying interests of the constituencies of the Faculty Plan and the Medical Plan, including the disruption that would occur with a consolidation of vendors.[192]

80.     Regarding the latter, the Committee's record reflects consideration of the fact that much of the assets held by TIAA at that time, and particularly in the Faculty Plan, were held in individual annuity contracts between the individual participant and TIAA.[193]   Accordingly, the Committee appropriately considered the fact that much of the Plans' assets were held in

---

[190] Ex. 97, September 25, 2009 Vanguard Response to Request for Proposal (CLC0019278-329); Ex. 98, September 2009 Fidelity Investments' Response to Request for Proposal (CLC0022812-869).

[191] Ex. 33, March 18, 2010 Meeting Minutes of the Committee (mistakenly marked March 18, 2009) (NYU0002874);  Ex. 68, Meagher Dep. 117:10-25; Ex. 38, January 10, 2011 Meeting Minutes of the Committee (NYU0094055-56).

[192] Ex. 34, April 19, 2010 Meeting Minutes of the Committee (NYU000404); *see also* Ex. 33, March 18, 2010 Meeting Minutes of the Committee (mistakenly marked March 18, 2009) (NYU0002876); Ex. 39, March 21, 2011 Meeting Minutes of the Committee (NYU0002100-2101).

[193] Ex. 33, March 18, 2010 Meeting Minutes of the Committee (mistakenly marked March 18, 2009) (NYU0002874); *see also* Ex. 68, Meagher Dep. 103:4-14, 117:10-25; Ex. 23, Petti Dep. 80:24-81:8; Ex. 99, Halley Dep. 291:25-294:3.

investments that were not mappable by NYU; meaning, NYU could not, independent of the participants' consent, direct the investment of those accounts to other investment alternatives.[194]

81.    Moreover, the Committee considered the fact that the other recordkeepers could not recordkeep TIAA's annuity investments.[195]   Accordingly, if Fidelity or Vanguard were selected to be a sole recordkeeper for the Plans, TIAA would still recordkeep the TIAA annuities.[196]

82.    Fidelity and TIAA were the two finalists, and both Fidelity and TIAA were invited to attend Committee meetings to present to the Committee and address the Committee's questions and concerns.[197]

83.    Fidelity presented twice to the Committee and the Committee requested information to better understand "Fidelity's system and technology."[198]   Additionally, TIAA presented the Committee with an "in-depth look at website capabilities and a timeline of scheduling web enhancements" at the February 18, 2009 meeting, and provided answers to a series of follow-up questions, which were discussed extensively by the Committee at the March 18, 2009 meeting.[199]

---

[194] Ex. 33, March 18, 2010 Meeting Minutes of the Committee (mistakenly marked March 18, 2009) (NYU0002874); *see also* Ex. 68, Meagher Dep. 117:10-25; Ex. 23, Petti Dep. 80:24-81:8; Ex. 99, Halley Dep. 291:25-294:3.

[195] Ex. 31, January 21, 2010 Meeting Minutes of the Committee (NYU0094055-56).

[196] Ex. 31, January 21, 2010 Meeting Minutes of the Committee (NYU0094055); Ex. 39, March 21, 2011 Meeting Minutes of the Committee (NYU0002100).

[197] Ex. 31, January 21, 2010 Meeting Minutes of the Committee (NYU0094055-56); Ex. 32, February 18, 2010 Meeting Minutes of the Committee (NYU0094132-135); *see also* Ex. 33, March 18, 2010 Meeting Minutes of the Committee (mistakenly marked March 18, 2009) (NYU0002872-76).

[198] Ex. 31, January 21, 2010 Meeting Minutes of the Committee (NYU0094055).

[199] Ex. 39, March 21, 2011 Meeting Minutes of the Committee (NYU0002100-01).

84.     TIAA was ultimately selected as the service provider for the Medical Plan and TIAA and Vanguard were selected to provide administrative services for the Faculty Plan.[200] TIAA was to fulfill numerous duties above and beyond ordinary recordkeeping services, including administrative duties such as ensuring compliance and providing investment education and advice to participants.[201]

85.     The Committee ultimately determined that it would retain both vendors for the Faculty Plan, but would consolidate services for the Medical Plan because the Plans have "different constituent needs, and, therefore, the results of consolidation to a sole vendor would be more beneficial" for the Faculty Plan.[202]   Moreover, TIAA and the Committee considered the Medical Plan to be more ready than the Faculty Plan for vendor consolidation from a technological perspective, as the human resources department at Washington Square, which administers the Faculty Plan on a day-to-day basis, was undergoing a software transition at that time.[203]  Finally, consolidation to one vendor for the Faculty Plan was particularly likely to result in substantial participant disruption, therefore delaying consolidation to provide time to ensure that the necessary time, attention and care could be given to the project was beneficial.[204] Accordingly, the Medical Plan consolidated services with TIAA.[205]

---

[200] Ex. 31, January 21, 2010 Meeting Minutes of the Committee (NYU0094056-57).

[201] Ex. 6, Chittenden Dep. 27:6-15; Ex. 4, Wagner Expert Report ¶43; Ex. 20, October 1, 2012 TIAA-CREF Recordkeeping Services Agreement (Medical Plan) (NYU0000564) (Schedule A).

[202] Ex. 39, March 21, 2011 Meeting Minutes of the Committee (NYU0002100-01); *see also* Ex. 41, June 9, 2011 Meeting Minutes of the Committee (NYU0004054); Ex. 89, Rezler Dep. at 100:25-101:21; Ex.68, Meagher Dep. at 159:13-19.

[203] Ex. 68, Meagher Dep. 159:13-161:6.

[204] Ex. 100, Hueber Dep. 24:5-25:16; Ex. 6, Chittenden Dep. 233:6-20.

[205] Ex. 102, October 1, 2012 Custodial Account Agreement for 403(b) Plan (Medical Plan) (NYU0000597).

86.     Cammack concluded that NYU went through "a due diligence exercise to provide participants with a *low cost and competitive* plan."[206]

87.     The Committee conducted a second RFP in 2016, again with the assistance of Cammack.[207]   The second RFP sought "proposals for third party recordkeeping services for [NYU Square's] six defined contribution retirement plans."[208]

88.     The RFP was conducted to "[e]nsure optimal pricing and full service delivery from the selected service provider" and "[i]ncrease participant engagement and financial education, as well as improve the overall user experience for NYU faculty and staff," among other goals.[209]   The RFP sought information regarding each potential vendor's operations, products and investments, services offered in relation to participant experience, administration and recordkeeping, compliance, expenses, and service capabilities, in addition to requesting a list of references.[210]

89.     The Committee sent the RFP to a number of different vendors, including Fidelity, VALIC, and VOYA, in addition to incumbents TIAA and Vanguard.[211]   Fidelity declined to bid,

---

[206] Ex. 33. March 18, 2010 Meeting Minutes of the Committee (mistakenly marked March 18, 2009) (NYU0002875).

[207] Ex. 23, Petti Dep. at 233:25- 234:5; Ex. 137, October 2016 RFP for Defined Contribution Recordkeeping Services (CLC0056516-43).

[208] Ex. 137, October 2016 RFP for Defined Contribution Recordkeeping Services (CLC0056516-43).

[209] Ex. 137, October 2016 RFP for Defined Contribution Recordkeeping Services (CLC0056519).

[210] Ex. 137, October 2016 RFP for Defined Contribution Recordkeeping Services (CLC0056516-43).

[211] Ex. 62, September 8, 2016 Meeting Minutes of the Committee (NYU0026304); Ex. 23, Petti Dep. at 234:11-15; Ex. 138, Cammack Summary of Responses to 2016 RFP (CLC0058919).

citing a concern that the contracts were participant-controlled and participants would likely retain their TIAA investments.[212]

90.     The Committee reviewed, analyzed and compared the responses received from the four vendors.  Cammack crafted a detailed presentation analyzing and comparing the four responses to the RFPs with respect to key criteria for NYU.[213]

91.     TIAA and Vanguard were selected as finalists and vendor finalist meetings were held on February 1, 2017.[214]  The Committee requested that Cammack provide a "follow-up analysis illustrating the impact on the plan and its participants of the section of one vendor over the other" after the finalist meetings were held.[215]  TIAA was ultimately selected to be the sole recordkeeper for the Faculty Plan.[216]

92.     Marcia Wagner, a well-recognized employee benefits attorney with over 30 years of experience advising plan sponsors, fiduciaries, and service providers, reviewed the Committee's process and decisions and rendered a detailed opinion that concluded that:

- "Based on the forgoing analysis and my extensive experience in counseling 403(b) and 401(k) fiduciaries responsible for selecting plan menus and hiring plan service providers with respect to their fiduciary duties, I conclude without reservation that during the class period, the NYU Retirement Committee followed procedures that were prudent and fully consistent with its fiduciary duties under ERISA with respect to its decision to retain TIAA as

---

[212] Ex. 63, December 12, 2016 Meeting Minutes of the Committee (NYU0026298).

[213] Ex. 138, Cammack Summary of Responses to 2016 RFP (CLC0058915-48).

[214] Ex. 64, February 23, 2017 Meeting Minutes of the Committee (NYU0163208).

[215] Ex. 64, February 23, 2017 Meeting Minutes of the Committee (NYU0163208).

[216] Ex. 64, February 23, 2017 Meeting Minutes of the Committee (NYU0163208); *see also*  Ex. 65, May 24, 2017 Meeting Minutes of the Committee (NYU0162850).

the recordkeeper for the Faculty and Medical Plans and with respect to the related fees paid as compensation for these services."[217]

93.     Ms. Wagner has extensive experience counseling fiduciaries of 403(b) and 401(k) plans and has extensive experience in dealings with the all of the government agencies that govern ERISA plans.[218]   She has served as an independent fiduciary for numerous employee benefit plans, has been retained to serve as an expert for both plaintiffs and defendants in cases involving questions of compliance with ERISA's fiduciary duties, and was appointed by the Secretary of the Treasury to serve on the IRS's Advisory Committee on Tax-Exempt and Government Entities.[219]

**D.     NYU Negotiated Significant Reductions in Administrative Fees.**

94.     As noted above, NYU and the Plans participants do not pay direct fees to TIAA or Vanguard for the services, including recordkeeping services, they provide to the Plans.  Rather, fees are collected through the process of revenue sharing, "which is common across the defined contribution retirement plan world, including with 403(b) plans."[220]

95.     In fact, in 2010, Cammack advised the Committee that pricing administrative services through a revenue sharing arrangement was typical in that "the retirement market has transitioned to this type of pricing scenario and there should not be any concerns with the pricing scenario" on a revenue sharing arrangement.[221]

---

[217] Ex. 4, Expert Report of Marcia Wagner at ¶ 109.

[218] Ex. 4, Expert Report of Marcia Wagner ¶¶ 2-3.

[219] Ex. 4, Expert Report of Marcia Wagner ¶ 4.

[220] Ex. 91, Rezler Declaration ¶ 6.

[221] Ex. 33, March 10, 2010 Meeting Minutes of the Committee (mistakenly marked March 18, 2009) (NYU0002875).

96.     In a recent survey of 250 not-for-profit organizations that currently sponsor a 403(b) plan, 60.7% of respondents that sponsor plans with more than 1,000 participants indicated that they use revenue sharing to pay plan expenses.[222]

97.     In a revenue sharing arrangement, a portion of a fund's fees, expressed as a percentage of a fund's assets known as the expense ratio, are transferred to the recordkeeper in order to contribute to the cost of administrative services.[223] The TIAA investment alternatives in the Plans have revenue sharing arrangements with TIAA and the Vanguard alternatives have revenue sharing arrangements with Vanguard.[224]

98.     The Committee negotiated significant reductions to TIAA's required revenue rate, the amount of revenue sharing that TIAA would retain to provide services to the Plans, for both Plans, "to provide participants with a low cost and competitive plan."[225]

99.     TIAA's revenue rate was approximately 19.9 basis points from 2008-2011 for both Plans.[226] Initially, TIAA offered to reduce that rate to 15 basis points, but that offer was contingent on two important requirements:  (1) TIAA would become the sole recordkeeper for all Plans across the NYU system (including the Plans at issue and over a dozen more); and (2) the 15 basis points required revenue would apply only to new investments on a new menu under new

---

[222] Ex. 5, Plan Sponsor Council of America, Fee Structure and Evaluation in 403(b) Plans, p. 7, table 5 (2017).

[223] Ex. 91, Rezler Declaration ¶ 6.

[224] Ex. 32, February 18, 2010 Meeting Minutes of the Committee (NYU0094134); Ex. 33 March 10, 2010 Meeting Minutes of the Committee( mistakenly marked March 18, 2009) (NYU0002875); Ex. 35, June 14, 2010 Meeting Minutes of the Committee (NYU0002882).

[225] Ex. 33, March 18, 2010 Meeting Minutes of the Committee (mistakenly marked March 18, 2009) (NYU0002875).

[226] Ex. 38, January 10, 2011 Meeting Minutes of the Committee (NYU0003674); Ex. 17, July 9, 2012 Amendment No. 3 to TIAA-CREF Recordkeeping Services Agreement (Faculty Plan) (TIAA_NYU_00015513).

group contracts.[227]  As a result, the investments in individual agreements held by participants would remain at 19.9 basis points.[228]

100.    The Committee questioned whether this "original proposal from TIAA was truly competitive, since it did not factor in the current revenue and the future revenue TIAA would receive under the existing contracts."[229]  Cammack advised that TIAA's pricing in response to the RFP was "more competitive than any of the other proposals."[230]

101.    Nevertheless, the Committee rejected TIAA's first offer, and TIAA countered with an offer of 10 basis points, again with the same conditions that TIAA become sole recordkeeper for the entire system and that the limited revenue requirement apply only to new investments.[231]

102.    The Committee also rejected this offer, and TIAA countered with an offer of 13.8 basis points on all plans and all contracts and the condition that any revenue received in excess of the 13.8 basis points would be funded to an expense reimbursement account to be returned to participants.[232]

103.    Although TIAA's offer was originally conditioned upon NYU agreeing to consolidate the Faculty Plan's and the Medical Plan's services with TIAA, the Committee

---

[227] Ex. 96, September 2009 TIAA Response to Request for Proposal Submission (TIAA_NYU_00031579-31980); Ex. 33, March 18, 2010 Meeting Minutes of the Committee (mistakenly marked March 18, 2009) (NYU0002875).

[228] September 2009 TIAA Response to Request for Proposal Submission, (TIAA_NYU_00031579-31980); Ex. 33, March 18, 2010 Meeting Minutes of the Committee (mistakenly marked March 18, 2009) (NYU0002875); Ex. 38, January 10, 2011 Meeting Minutes of the Committee (NYU0003674).

[229] Ex. 38, January 10, 2011 Meeting Minutes of the Committee (NYU0003674).

[230] Ex. 38, January 10, 2011 Meeting Minutes of the Committee (NYU0003674).

[231] Ex. 33, March 18, 2010 Meeting Minutes of the Committee (mistakenly marked March 18, 2009) (NYU0002875).

[232] Ex. 38, January 10, 2011 Meeting Minutes of the Committee (NYU0003674).

convinced TIAA to agree to a 13.8 required revenue rate for the Faculty Plan, despite NYU not agreeing to have TIAA serve as the sole recordkeeper for all of NYU's plans.[233]  Moreover, TIAA agreed to apply the 13.8 basis points for the Faculty Plan retroactively to 2011 in the form of a revenue credit.[234]

104.    In addition, TIAA agreed that, upon consolidation of the Medical Plan with TIAA as sole recordkeeper, TIAA would reduce its required return rate to 10 basis points for that plan.[235]  Specifically, in 2012, the required revenue rate was negotiated down to 16 basis points and was then further negotiated down to 10 basis points for the Medical Plan when TIAA became the sole recordkeeper.[236]

105.    The Committee continued to negotiate down the required revenue rate over the class period.  In 2014, the pricing for the Medical Plan was again reduced to 9 basis points.[237]

106.    And, in March 2017, the five-year recordkeeping services agreement between TIAA and NYU expired, at which time the required revenue rate for the Medical Plan was again

---

[233] Ex. 39, March 21, 2011 Meeting Minutes of the Committee (NY0002099).

[234] *See* Ex. 114, TIAA 2014 Service Provider Summary for NYU Square (TIAA_NYU_00003139) (showing a revenue credit of $928,377.00);  Ex. 38, January 10, 2011 Meeting Minutes of the Committee (NYU0003674) ("Total fund revenue received in excess of 13.8 bps will be funded by TIAA to an expense reimbursement account which NYU expects to return to plan participants.");  Ex. 17, July 9, 2012 Amendment No. 3 to TIAA-CREF Recordkeeping Services Agreement (Faculty Plan) (NYU0000241), paragraph 1.16. (explaining that TIAA will "reconcile the actual revenue earned for the 2011 calendar year against the revenue requirement of 13.8 basis points" and that any excess "will be deposited into the Revenue Credit Accounts of the Plans as soon as administratively feasible but no later than sixty (60) days after this Agreement has been signed by both parties").

[235] Ex. 20, October 1, 2012 TIAA-CREF Recordkeeping Services Agreement (Medical Plan), Schedule A ¶16 (NYU0000587).

[236] Ex. 100, Hueber Dep. at 47:3-25; Ex. 20, October 1, 2012 TIAA-CREF Recordkeeping Services Agreement (Medical Plan), Schedule A ¶16 (NYU0000587).

[237] Ex. 100, Hueber Dep. at 47:3-25; Ex. 58, September 15, 2015 Meeting Minutes of the Committee (NYU0005069) ("It was noted that the current pricing, 9 basis points (0.09%), has been in place since January 2014 when a 1bps reduction was implemented.")

renegotiated to 4 basis points.[238]   The reduced revenue rate of 4 basis points was applied retroactively starting January 1, 2017.[239]

107.    Likewise, in 2012, pricing for the Faculty Plan was reduced to 13.8 basis points retroactive to 2011.[240]   The pricing remained the same until 2016, when the Committee negotiated another reduction in TIAA's required revenue rate for the Faculty Plan to 10 basis points effective January 1, 2016.[241]

108.    TIAA's required revenue rate was again reduced on April 1, 2017 to 3.2 basis points.[242]   TIAA subsequently agreed to reduce its required revenue rate further to 3.0 basis points, effective April 2018.[243]

109.    TIAA's required revenue rate was reduced effective January 1, 2017 to 4 basis points for the Medical Plan to align the Medical Plan's required revenue rate with that of the Faculty Plan.[244]

110.    Additionally, NYU, assisted by Cammack, conducted an audit of the Plans' vendors' services and fees in 2012, and subsequently committed to conducting semi-annual

---

[238] Ex. 100, Hueber Dep. at 47:3-25; Ex. 50, November 25, 2013 Meeting Minutes of the Committee (NYU0002093); Ex. 64, February 23, 2017 Meeting Minutes of the Committee (NYU0163208).

[239] Ex. 64, February 23, 2017 Meeting Minutes of the Committee (NYU0163208).

[240] Ex. 17, July 9, 2012 Amendment No. 3 to TIAA-CREF Recordkeeping Services Agreement (Faculty Plan) (NYU0000241).

[241] Ex. 58, September 15, 2015 Meeting Minutes of the Committee (NYU0005070); Ex. 57, June 9, 2015 Meeting Minutes of the Committee (NYU0003849).

[242] Ex. 64, February 23, 2017 Meeting Minutes of the Committee (NYU0163208).

[243] Ex. 64, February 23, 2017 Meeting Minutes of the Committee (NYU0163208).

[244] Ex. 64, February 23, 2017 Meeting Minutes of the Committee (NYU0163208).

audits of plan expenses.[245]   NYU determined that TIAA was receiving "revenue in excess of the amount it needed" following the audit.[246]   As a result, NYU negotiated the payment of revenue sharing credits, which are rebates for any amount of revenue collected in excess of what participants agreed to pay, to be assessed semi-annually.[247]   Revenue credits may be "used to pay "permitted" plan expenses and/or be credited back to participant accounts" or some combination of the two.[248]   The Committee returns *all* revenue credits received from TIAA directly to the plan participants rather than using any or all of this money to pay plan expenses.[249]

111.   Indeed, the Committee voted to return all revenue credits— $1,349,375 for NYU Square and $533,943 for the School of Medicine—to plan participants in December 2012.[250] Similarly, in 2013, the Committee voted to return all $859,270 of revenue credits from NYU Square and all $470,810 of revenue credits from the School of Medicine to participants.[251]

---

[245] Ex. 109, February 4, 2013 email from J. Rezler, attaching Cammack's responses to NYU questions and memo drafted by M. Petti (CLC00366520).

[246] Ex. 109, February 4, 2013 email from J. Rezler, attaching Cammack's responses to NYU questions and memo drafted by M. Petti (CLC00366520).

[247] Ex. 23, Petti Dep. at 176:16-177:16.

[248] Ex. 109, February 4, 2013 email from J. Rezler, attaching Vendor Expense Reconciliation and Funding of ERUSA Expense Accounts slide deck (CLC0036517); *see also* Ex. 100, Hueber Dep. at 82:9-83:18.

[249] Ex. 100, Hueber Dep. at 82:9-83:18; Ex. 109, February 4, 2013 email from J. Rezler, attaching Cammack's responses to NYU questions and memo drafted by M. Petti, (CLC00366520); Ex. 50, November 25, 2013 Meeting Minutes of the Committee (NYU0002094); Ex. 51, February 26, 2014, Meeting Minutes of the Committee (NYU0004589); Ex. 59, December 16, 2015 Meeting Minutes of the Committee (NYU0003277).

[250] Ex. 109, February 4, 2013 email from J. Rezler, attaching Cammack's responses to NYU questions and memo drafted by M. Petti (CLC00366520); Ex. 110, TIAA 2012 Service Provider Summary for NYU Square (TIAA_NYU_00001612); Ex. 111, TIAA 2012 Service Provider Summary for the School of Medicine (TIAA_NYU_00000060); Ex. 46, September 4, 2012 Meeting Minutes of the Committee (NYU0004052).

[251] Ex. 50, November 25, 2013 Meeting Minutes of the Committee (NYU0002094); February 26, 2014, Meeting Minutes of the Committee (NYU0004589); Ex. 112, TIAA 2013 Service Provider

112.     The Committee likewise returned all revenue credits in 2014, 2015 and 2016 to participants—$928,377 in revenue credits from NYU Square and $693,560 in revenue credits in 2014[252]; $717,665 in revenue credits from NYU Square and $373,700 from the School of Medicine in 2015[253]; and $156,697 in revenue credits from NYU Square in 2016.[254]

113.     The Committee also continually monitored and negotiated Vanguard's fees.  For the Faculty Plan, Vanguard's administrative services fee was 10 basis points in 2011 and 2012.[255]  This rate was subsequently decreased to 8 basis points as of April 2013.[256]  The rate was again reduced to 6 basis points as of June 2016.[257]

---

Summary for NYU Square (TIAA_NYU_000002345); Ex. 113, TIAA 2013 Service Provider Summary for the School of Medicine (TIAA_NYU_00000074).

[252] Ex. 114, TIAA 2014 Service Provider Summary for NYU Square (TIAA_NYU_00003139); Ex. 115, TIAA 2014 Service Provider Summary for the School of Medicine (TIAA_NYU_000000088); Ex. 55, December 11, 2014 Meeting Minutes of the Committee (NYU00002782).

[253] Ex. 116, TIAA 2015 Service Provider Summary for NYU Square (TIAA_NYU_00003985); Ex. 117, TIAA 2015 Service Provider Summary for the School of Medicine (TIAA_NYU_00000112); *see also e.g.* Ex. 76, Sampling of Straussner TIAA Quarterly Statements 2009-2017 (2015 Straussner TIAA Quarterly Statement for 4th Quarter) (TIAA_NYU_00013515-16).

[254] Ex. 118, TIAA 2016 Service Provider Summary for NYU Square (TIAA_NYU_00004819); Ex. 62, September 8, 2016 Meeting Minutes of the Committee (NYU00026303).

[255] , Vanguard All-in Fee Report as of June 30, 2011 (Vanguard-NYU_0001203-18); Ex. 124, Vanguard All-in Fee Disclosure (calculated as of April 30, 2012) (NYU0000386).  Vanguard discloses fees in fee disclosure reports once a year and the rate of 10 basis points was calculated as of June 30, 2011, and April 30, 2012.

[256] Ex. 160, Vanguard All-in Fee Disclosure (calculated as of April 30, 2013) (NYU0000311); Ex. 126, Vanguard All-in Fee Disclosure (calculated as of April 30, 2015) (NYU0000278).

[257] Ex. 9, August 25, 2016 Vanguard All-in Fee Disclosure (calculated as of June 30, 2016) (NYU0007185).

114.     The Medical Plan did not pay Vanguard any administrative fees following the consolidation of the plan's services with TIAA.[258]

115.     During the putative class period, the Medical Plan's and the Faculty Plan's administrative services fees decreased very substantially.  From a basis point perspective, TIAA's administrative services fees for the Faculty Plan were decreased from 19.9 basis points to 3.0 basis points.[259]  TIAA's administrative fees for the Medical Plan were decreased from 19.9 basis points to 4 basis points.[260]  Vanguard's administrative fees also decreased, from 10 basis points to 6 basis points.[261]

116.     The actual amount of administrative fees paid also decreased during the putative class period, despite the fact that the number of the Plans' participants and the Plans' assets increased.  In 2012 total administrative fees for the Faculty Plan was $2.88 million.[262]  In 2016, that total fell to $2.37 million.  During this period, assets increased from $1.98 billion to $2.62 billion and the number of Plan participants increased from 14,368 to 18,551.[263]

117.     Likewise, the Medical Plan's total administrative fees fell from $1.56 million in 2013 to $1.48 million in 2016, despite the fact that during that period of time that Plan's assets

---

[258] Ex. 122, 2013 TIAA Fee Disclosure as of January 1, 2013 (TIAA_NYU_0000069-73) (showing plan expenses as zero).

[259] Ex. 64, February 23, 2017 Meeting Minutes of the Committee (NYU0163208).

[260] Ex. 64, February 23, 2017 Meeting Minutes of the Committee (NYU0163208).

[261] Ex. 9, August 25, 2016 Vanguard All-in Fee Disclosure (calculated as of June 30, 2016) (NYU0007185).

[262] Ex. 140, Summary Declaration of Adel Turki; *see also*, Ex. 9, Faculty Vanguard 2016 June Fee Disclosure; Ex. 10, Faculty TIAA 2016 Investment Fee Expense Disclosure; Ex. 11, SOM TIAA 2016 Investment Fee Expense Disclosure; Exs. 156-172 (Faculty and Medical Plan Fee Disclosures).

[263] Ex. 140, Summary Declaration of Adel Turki; Ex. 152, 2012 Faculty Plan form 5500; Ex. 7, 2016 Faculty Plan form 5500.

grew from $1.65 billion to $2.02 billion and the number of Plan participants grew from 7,765 to 8,560.[264]

118.    Further, on a per participant basis, administrative fees for the Faculty Plan were actually *lower* than for the Medical Plan, in every year following the consolidation of the Medical Plan with a sole recordkeeper in 2012.[265]   On average, in each of the years following consolidating of the Medical Plan's recordkeeping, the administrative fees in the Faculty Plan, when analyzed on the per-participant basis which Plaintiffs seem to prefer, were 7%-26% *less* than in the Medical Plan.[266]

### E.    Additional Facts Supporting the Objective Prudence of NYU's Retention of Vendors.

119.    The majority of TIAA's largest 200 clients use multiple recordkeepers.[267]   Of the clients that have consolidated to a sole recordkeeper, the overwhelming majority chose to consolidate with TIAA as their sole recordkeeper.[268]

120.    For the period of 2010 through 2016, demonstrates that between 110 and 147 of those TIAA clients employed a multi-vendor approach to recordkeeping.[269]   In other words, for every year during the putative class period, the *majority* of TIAA's largest 200 clients with at least one 403(b) plan used a multi-vendor approach.[270]

---

[264] Ex. 140, Summary Declaration of Adel Turki; Ex. 120, 2013 Medical Plan form 5500; Ex. 8, 2016 Medical Plan form 5500

[265] Ex. 140, Summary Declaration of Adel Turki.

[266] Ex. 140, Summary Declaration of Adel Turki.

[267] *See* Ex. 132, Declaration of Glenn Friedman ¶ 10.

[268] *See* Ex. 132, Declaration of Glenn Friedman ¶¶ 10-11.

[269] *See* Ex. 132, Declaration of Glenn Friedman ¶¶ 10-11.

[270] *See* Ex. 132, Declaration of Glenn Friedman ¶¶ 10-11.

121.    Indeed, in 2016, 110 of TIAA's largest 200 clients used multiple recordkeepers and only twelve consolidated to a single recordkeeper other than TIAA.[271]  In addition, the most recent Plan Sponsor Council of America 401(b) Plan Survey indicates that 50% of Higher Education plan sponsors surveyed reported having 6 or more plan service providers.[272]  Similarly, Cammack reviewed its relevant client base and confirmed that, among relevant Cammack clients (403(b) plans with TIAA assets ranging from approximately $900 million to more than $7 billion) in 2011, two of the three relevant clients employed a multiple-recordkeeper arrangement, while in 2016, six of the thirteen employed a multiple record-keeper arrangement.[273]

### F.    Additional Facts Supporting the Objective Prudence of the Plans' Administrative Fees.

122.    Cammack has provided "retirement plan consulting and investment advisory services to a growing number of higher education and health care defined contribution retirement programs," thirteen of which "included plan assets held on TIAA's recordkeeping platform ranging from approximately $900 million to more than $7 billion, with an average of $2.3 billion (the "Comparison Group")."[274]  TIAA receives all or a portion of the recordkeeping fee through revenue sharing, "which is common across the defined contribution retirement world, including with 403(b) plans."[275]

---

[271] Ex. 132, Declaration of Glenn Friedman ¶¶ 10-11.

[272] Ex. 5, Plan Sponsor Council of America 2017 403(b) Plan Survey (the "PSCA 2017 Survey"), at Table 117, p. 69 (indicating that 50.0% of Higher Education plan sponsors surveyed reported having 6 or more plan service providers).

[273] Ex. 91, Rezler Declaration ¶ 7.

[274] Ex. 91, Rezler Declaration ¶ 5.

[275] Ex. 91, Rezler Declaration ¶ 6; *see also* Ex. 22, Heming Dep. at 262:4-20 (explaining that asset-based revenue sharing arrangements are common and that flat per-participant fees are no more transparent than revenue sharing arrangements); *id.* at 259:18-260:8 (same).

123.    In 2011, TIAA's required revenue rates across the Comparison Group ranged "from a high of 18 bps to a low of 9 bps," and in 2016 ranged from "a high of ███ to a low of ███." [276]   Of the Comparison Group, in 2010, the NYU Washington Square Group had the highest plan assets and was in the second-lowest quartile for fees paid to TIAA, and, in 2016, "NYU Washington Square Group ranked in the ███-highest quartile of plan assets, while its fees paid to TIAA ranked in the ███-lowest quartile."[277]

124.    Additionally, of the Comparison Group, in 2016, NYU Langone Group ranked in the ███ highest quartile of plan assets, and the ███ lowest quartile of fees paid to TIAA.[278] NYU Langone Group's fees dropped after it consolidated to one recordkeeper, although it's prior "use of a multiple record-keeper arrangement was not unusual."[279]

## VIII.   NYU'S PROCESS FOR MONITORING THE CREF STOCK ACCOUNT AND THE TIAA REAL ESTATE ACCOUNT.

125.    The Committee closely monitored the performance of all of the investment alternatives offered in the Plans.   Although not required under ERISA, the Committee constructed, used, and adopted an Investment Policy Statement ("IPS") and regularly reviewed and updated the terms of the IPS.[280]

---

[276] Ex. 91, Rezler Declaration ¶ 7.

[277] Ex. 91, Rezler Declaration ¶ 8.

[278] Ex. 91, Rezler Declaration ¶ 9.

[279] Ex. 91, Rezler Declaration ¶ 9.  Further, Mr. Rezler's declaration explains that although "the number of record-keepers used by a program is one factor affecting the pricing of record-keeping services, other factors also typically affect pricing, including: (a) the level of average account balances across the plan or program's participant base; (b) the breadth of services being provided by the record-keeper to the program; (c) the actual usage by the plan sponsor and participants of the record-keeper's services; and (d) the level of competition in the record-keeping marketplace." *Id.* ¶ 7.

[280] Ex. 26, October 8, 2008 Meeting Minutes of the Committee, at NYU)003672 (Cammack to draft investment policies); Ex. 28, May 15, 2009 Due Diligence Meeting Notes (NYU0003086) ("NYU will adopt an investment policy to establish guidelines for the maintenance of the

126.    The IPS "documents the retirement plans committee's strategy and criteria for evaluating funds, determining what those criteria are," stating how often funds are to be reviewed, and detailing Cammack's responsibilities."[281]   Cammack advised the Committee that by utilizing an IPS along with "periodic due diligence reviews, the Committee is following a . . . sound process, which aids in meeting its fiduciary duty."[282]   As intended, the Committee used the IPS to monitor the Plans' investment options even when the IPS was in draft form.[283]

---

investment arrays held under [the Plans]"); Ex. 35, June 14, 2010 Meeting Minutes of the Retirement Committee (NYU0002882) (Cammack recommends using working draft of IPS until IPS is finalized and Committee agrees IPS will reviewed by legal counsel and implemented); Ex. 38, January 10, 2011 Meeting Minutes of the Committee (NYU0003677) (Committee will adopt an IPS); Ex. 39, March 21, 2011 Meeting Minutes of the Committee (NYU0002102) (Committee expresses concerns regarding various aspects of the IPS and decides Cammack will provide a "customized and more detailed version to be reviewed by the Committee"); Ex. 40, April 1, 2011 Meeting Minutes of the Committee (NYU0004049) (Committee discusses fund performance in light of IPS draft and discusses final steps for finalizing IPS); Ex. 127, Draft IPS distributed at April 1, 2011 Meeting of the Committee (CLC0026042); Ex. 41, June 9, 2011 Meeting Minutes of the Committee (NYU0004053-54) (Committee approves updated version of IPS as working draft "to be modified ongoing as needed" and discussed fund performance in light of the IPS); Ex. 128, June 17, 2011 Email re: June 9 Retirement Committee Materials (CL0027134) (attaching for the Committee the approved working draft of the IPS); Ex. 42, August 15, 2011 Meeting Minutes of the Committee (NYU0004043) ("[Cammack] comments that by adopting an Investment Policy Statement and conducting periodic due diligence reviews. . . the committee is following  a sound process" to meet its fiduciary responsibilities); Ex. 45, May 17, 2012 Meeting Minutes of the Committee (NYU0004057) (Committee discusses potential revisions to the IPS); Ex. 50, November 25, 2013 Meeting Minutes of the Committee, at NYU0002093 (Cammack provides Committee with revised IPS for review and Committee determines that changes will be discussed and voted on in February 2014 meeting); Ex. 51, February 26, 2014 Meeting Minutes of the Committee, at NYU0004590 (Committee discusses possible changes to the IPS); Ex. 52, May 22, 2014 ("The Committee agreed to adopt the new version contingent upon a final review by NYU's in-house counsel.").

[281] Ex. 99, Halley Dep. 96:19-97:4.

[282] Ex. 42, August 15, 2011 Meeting Minutes of the Committee (NYU0004043).

[283] Ex. 99, Halley Dep. 155:3-12 (". . . I was aware that there was a[n] investment policy statement draft that the committee was using before it was necessarily formally adopted, and they were following the guidelines of that statement."); Ex. 99, Halley Dep. 232:8-18 (explaining that the IPS was used in draft form); Ex. 45, May 17, 2012 Meeting Minutes of the Committee (NYU0004057) ("Regarding the watch list funds, CLC commented that all funds in the TIAA-CREF array met the criteria of the draft IPS."); Ex. 46, September 4, 2012 Meeting Minutes of

127.    Though ERISA does not set a specific frequency for fund performance review, in 2010, the Committee determined that it should review fund performance on a quarterly basis.[284] As such, Cammack provides the Committee with quarterly due diligence reports on the funds at Committee meetings, which the Committee analyzes at their meetings.[285]

the Committee (NYU0004051) ("Regarding the fund analysis in the report, CLC commented that all funds in the TIAA-CREF array met the criteria of the draft investment policy. CLC noted that there were 8 funds plus the Vanguard Life Strategy Series that did not meet the criteria of the draft investment policy. The Committee approved the funds for inclusion in the 2Q 2012 watch list.")' Ex. 89, Rezler Dep. 239:2-7 ("I recall that there was a time period where a draft IPS was being relied on in addition to our reports and recommendations in the monitoring of the investments prior to the formal adoption of the IPS.").

[284] Ex. 34, April 19, 2010 Meeting Minutes of the Committee (NYU0004041); Ex.99, Halley Dep. 24:7-17, 28:8-14; Ex. 129, January 7, 2011 E-mail from J. Rezler re: NYU Ret Comm Mtg agenda (CLC0025238).

[285] See, e.g., Ex. 93, May 10, 2012 Email re: NYU/NYU Langone Retirement Committee Meeting – May 17, 2012 with attachments (CLC0033466); Ex. 35, June 14, 2010 Meeting Minutes of the Committee (NYU0002883) (review of Due Diligence Report); Ex. 40, April 1, 2011 Meeting Minutes of the Committee (NYU0004047) (review of Due Diligence Report); Ex. 41, June 9, 2011 Meeting Minutes of the Committee (NYU0004053) (review of Due Diligence Report); Ex. 42, August 15, 2011 Meeting Minutes of the Committee (NYU0004044) (review of Due Diligence Report  and review of Plans' investments); Ex. 43, November 14, 2011 Meeting Minutes of the Committee (NYU0003084) (review of Due Diligence Report); Ex. 45, May 17, 2012 Meeting Minutes of the Committee (NYU0004056) (review of Due Diligence Report); Ex. 46, September 4, 2012 Meeting Minutes of the Committee (NYU0004050-51) (review of Due Diligence Report and discussion of whether funds are meeting IPS guidelines); Ex. 47, November 16, 2012 Meeting Minutes of the Committee (NYU0001944) (review of Due Diligence Report and discussion of whether funds are meeting IPS guidelines); Ex. 48, February 22, 2013 Meeting Minutes of the Committee (NYU0002558) (review of Due Diligence Report discussion of whether funds are meeting IPS guidelines); Ex. 49, June 14, 2013 Meeting Minutes of the Committee (NYU0002393) (review of Due Diligence Report and discussion of whether funds are meeting IPS guidelines); Ex. 50, November 25, 2013 Meeting Minutes of the Committee (NYU0002093) (review of Due Diligence Report and discussion of whether funds are meeting IPS guidelines); Ex. 51, February 16, 2014 Meeting Minutes of the Committee (NYU0004590-91) (review of Due Diligence Report); Ex. 52, May 22, 2014 Meeting Minutes of the Committee (NYU0002385) (review of Due Diligence Report and discussion of whether funds are meeting IPS guidelines); Ex. 53, August 19, 2014 Meeting Minutes of the Committee (NYU0002865) (review of Due Diligence Report); Ex. 55, December 11, 2012 Meeting Minutes of the Committee (NYU0002780-81) (review of Due Diligence Report); Ex. 56, February 26, 2015 Meeting Minutes of the Committee (NYU0003948) (review of Due Diligence Report); Ex. 57, June 9, 2015 Meeting Minutes of the Committee (NYU0003850) (review of Due Diligence Report and discussion of whether funds are meeting IPS guidelines); Ex. 58, September 15, 2015

128.    The Committee's minutes reflect discussion of the investment performance at numerous meetings, including:

- June 14, 2010[286]
- March 21, 2011[287]
- April 1, 2011[288]
- June 9, 2011[289]
- August 15, 2011[290]
- November 14, 2011[291]
- May 17, 2012[292]
- September 4, 2012[293]
- November 16, 2012[294]
- February 22, 2013[295]
- June 14, 2013[296]

---

Meeting Minutes of the Committee, at NYU0005070 (review of Due Diligence Report and discussion of whether funds are meeting IPS guidelines); Ex. 59, December 16, 2015 Meeting Minutes of the Committee, at NYU0003276 (review of Due Diligence Report); Ex. 60, March 2, 2016 Meeting Minutes of the Committee (NYU0113121) (review of Due Diligence Report and discussion of whether funds are meeting IPS guidelines); Ex. 62, September 8, 2016 Meeting Minutes of the Committee (NYU0026305) (review of Due Diligence Report); Ex. 63, December 12, 2016 Meeting Minutes of the Committee (NYU0026299-300) (review of Due Diligence Report); Ex. 64, February 23, 2017 Meeting Minutes of the Committee (NYU0163209-210) (review of Due Diligence Report ); Ex. 65, May 24, 2017 Meeting Minutes of the Committee (NYU0162851-52) (review of Due Diligence Report and discussion of whether funds are meeting IPS guidelines).

[286] Ex. 35, June 14, 2010 Meeting Minutes of the Committee (NYU0002882).

[287] Ex. 39, March 21, 2011 Meeting Minutes of the Committee (NY0002099).

[288] Ex. 40, April 1, 2011 Meeting Minutes of the Committee (NYU0004047).

[289] Ex. 41, June 9, 2011 Meeting Minutes of the Committee (NYU0004053).

[290] Ex. 42, August 15, 2011 Meeting Minutes of the Committee (NYU0004044).

[291] Ex. 43, November 14, 2011 Meeting Minutes of the Committee (NYU0003084).

[292] Ex. 45, May 17, 2012 Meeting Minutes of the Committee (NYU0004056).

[293] Ex. 46, September 4, 2012 Meeting Minutes of the Committee (NYU0004051-52).

[294] Ex. 47, November 16, 2012 Meeting Minutes of the Committee (NYU0001942-43).

[295] Ex. 48, February 22, 2013 Meeting Minutes of the Committee (NYU0002558).

- November 25, 2013[297]
- February 26, 2014[298]
- May 22, 2014[299]
- August 19, 2014[300]
- December 11, 2014[301]
- February 26, 2015[302]
- June 9, 2015[303]
- September 15, 2015[304]
- December 16, 2015[305]
- March 2, 2016[306]
- June 1, 2016[307]
- September 8, 2016[308]
- December 12, 2016[309]
- February 23, 2017[310]
- May 24, 2017[311]

---

[296] Ex. 49, June 14, 2013 Meeting Minutes of the Committee (NYU0002393).

[297] Ex. 50, November 25, 2013 Meeting Minutes of the Committee (NYU00020993).

[298] Ex. 51, February 26, 2014 Meeting Minutes of the Committee (NYU0004590).

[299] Ex. 52, May 22, 2014 Meeting Minutes of the Committee (NYU0002385).

[300] Ex. 53, August 19, 2014 Meeting Minutes of the Committee (NYU0002865-66).

[301] Ex. 55, December 11, 2014 Meeting Minutes of the Committee (NYU0002780).

[302] Ex. 56, February 26, 2015 Meeting Minutes of the Committee (NYU0003948).

[303] Ex. 57, June 9, 2015 Meeting Minutes of the Committee (NYU0003850).

[304] Ex. 58, September 15, 2015 Meeting Minutes of the Committee (NYU0005070).

[305] Ex. 59, December 16, 2015 Meeting Minutes of the Committee (NYU0003276).

[306] Ex. 60, March 2, 2016 Meeting Minutes of the Committee (NYU0113121).

[307] Ex. 61, June 1, 2016 Meeting Minutes of the Committee (NYU0002890).

[308] Ex. 62, September 8, 2016 Meeting Minutes of the Committee (NYU00026304).

[309] Ex. 63, December 12, 2016 Meeting Minutes of the Committee (NYU00026299).

[310] Ex. 64, February 23, 2017 Meeting Minutes of the Committee (NYU0163209).

[311] Ex. 65, May 24, 2017 Meeting Minutes of the Committee (NYU0162851).

129.    The due diligence reports provided by Cammack and reviewed by the Committee contain detailed information regarding the Plans and the Plans' investments, including summaries of the Plans' total assets, summaries of the Plans' asset allocations (e.g., bond, money market, fixed income, large cap, small cap, etc.), a capital markets review and analysis, quarterly economic reports (including discussion of equities, bonds, real estate markets, consumer sentiment, energy prices, and expert predictions), and detailed analysis of the Plans' investment alternatives (including managers, ratings, expense ratios, performance against benchmarks on a quarterly, year to date, 1-year, 3-year, 5-year and 10-year basis).[312]

130.    The due diligence reports also included various methodologies employed by Cammack to analyze the Plans' investments, including manager tenure, category ranking, risk, risk adjusted return, net expense ratio, style drift, sharpe ratio, turnover ratio, and Morningstar rating.[313]

131.    In its review of the Plans' investment alternatives, the Committee also considered the respective investments' alphas.[314]  Alpha is the difference between a fund's actual returns

---

[312] *See, e.g.,* Ex. 93, May 10, 2012 Email re: NYU/NYU Langone Retirement Committee Meeting – May 17, 2012 with attachments (CLC0033466-666); Ex. 145, February 15, 2012 email re: Agenda and Materials for 2/21 Retirement Committee Meeting (NYU0012454-567); Ex. 146, November 18, 2013 email re: Retirement Committee Meeting Materials for November 25, 2013 (CLC0038654-783); Ex. 147, May 16, 2014 email re: Retirement Committee Meeting on May 22, 2014 (CLC0040669-836); Ex. 148, September 11, 2015 email re: Retirement Committee Meeting on September 15, 2015 (CLC0048252-408).

[313] *See, e.g.*, Ex. 93, May 10, 2012 Email re: NYU/NYU Langone Retirement Committee Meeting – May 17, 2012 with attachments (CLC0033466-666); Ex. 145, February 15, 2012 email re: Agenda and Materials for 2/21 Retirement Committee Meeting (NYU0012454-567); Ex. 146, November 18, 2013 email re: Retirement Committee Meeting Materials for November 25, 2013 (CLC0038654-783); Ex. 147, May 16, 2014 email re: Retirement Committee Meeting on May 22, 2014 (CLC0040669-836); Ex. 148, September 11, 2015 email re: Retirement Committee Meeting on September 15, 2015 (CLC0048252-408).

[314] *See, e.g.*, Ex. 93, May 10, 2012 Email re: NYU/NYU Langone Retirement Committee Meeting – May 17, 2012 with attachments (CLC0033585); Exhibit 146, November 18, 2013 email re Retirement Committee Meeting Materials for November 25 2013 meeting with

and its expected performance, given its level of risk measured by beta.[315]  Positive alpha indicates that the fund has performed better than its beta would predict.  Negative alpha indicates that the fund underperformed given the expectations established by the fund's beta.[316]

132.  The Committee devotes the majority of its time during each of its meetings to monitor the funds.[317]  To monitor the investments on a quarterly basis, consistent with the IPS, the Committee evaluates performance versus peer group, performance versus standard benchmark, risk, risk-adjusted performance, and manager fees.[318]  The Committee further reviews the "one, three [and] five year[] Morningstar ratings for all of the funds appropriate."[319]

133.  Certain funds are "highlighted" and "discussed in greater detail" than others, although "monitoring is provided on all the funds available in the plan."[320]  Every fund was discussed on a quarterly basis, whether that fund was individually addressed or whether it was addressed as part of the group of funds to which it belongs, such as target date funds.[321]

---

attachments (CLC0038720); Ex, 89, Dep. of J. Rezler at 52:21-53:7; Ex. 4, Expert Report of Marcia Wagner, at p. 37.

[315] *See, e.g.*, Ex. 93, May 10, 2012 Email re: NYU/NYU Langone Retirement Committee Meeting – May 17, 2012 with attachments (CLC0033585); Exhibit 146, November 18, 2013 email re Retirement Committee Meeting Materials for November 25 2013 meeting with attachments (CLC0038720).

[316] *See, e.g.*, Ex. 93, May 10, 2012 Email re: NYU/NYU Langone Retirement Committee Meeting – May 17, 2012 with attachments (CLC0033585); Exhibit 146, November 18, 2013 email re Retirement Committee Meeting Materials for November 25 2013 meeting with attachments (CLC0038720).

[317] Ex. 99, Halley Dep. 35:18-23.

[318] Ex. 99, Halley Dep. 137:5-138:4.

[319] Ex. 99, Halley Dep. 28:19-29:15.

[320] Ex. 99, Halley Dep. 28:19-29:15.

[321] Ex. 99, Halley Dep. 37:6-23.

134.    Committee members were provided with the Quarterly Due Diligence Reports approximately a week in advance of the Committee meetings for review and Committee meetings typically involved questions raised by Committee members regarding the Reports.[322]

135.    Using the IPS for guidance "on the types of metrics used to evaluate and monitor investments," the Committee also constructed a watch list to help monitor certain funds as part of its quarterly review.[323]   Funds may be put on the watch list for a number of different reasons, such as "a fund manager change or a sub-adviser change or . . . underperformance."[324]

136.    The watch list is included in the due diligence report, which is reviewed by the Committee at every meeting.[325]   The Committee analyzes the funds on the watch list at every Committee meeting and discusses the addition or removal of funds to or from the watch list where applicable.[326]

---

[322] Ex. 99, Halley Dep. 28:19-29:15; 29:18-30:7.

[323] Ex. 40, April 1, 2011 Meeting Minutes of the Committee (NYU0004049).

[324] Ex. 99, Halley Dep. 103:9-21.

[325] Ex. 99, Halley Dep. 101:17-25; 103:9-21.

[326] Ex. 35, June 14, 2010 Meeting Minutes of the Committee (NYU0002883) (recommending certain funds be placed on watch list); Ex. 39, March 21, 2011 Meeting Minutes of the Committee (NYU00002099-102) (reviewing funds listed on watch list and scheduling a meeting specifically for "a full investment review with a focus on the Watch List funds and recommendations for elimination of any of the Watch List funds should the Committee deem it necessary"); Ex. 40, April 1, 2011 Meeting Minutes of the Committee (NYU0004047-49) (review of funds on watch list); Ex. 41, June 9, 2011 Meeting Minutes of the Committee, at (NYU0004054) (discussing potential addition of fund to watch list and directing Cammack to provide a timeline for mapping assets out of Vanguard watch list funds); Ex. 43, November 14, 2011 Meeting Minutes of the Committee (NYU0003084) (discussing funds on watch list); Ex. 45, May 17, 2012 Meeting Minutes of the Committee (NYU0004057) (discussing funds on watch list); Ex. 46, September 4, 2012 Meeting Minutes of the Committee (NYU0004050-51) (discussing funds on watch list); Ex. 47, November 16, 2012 Meeting Minutes of the Committee (NYU0001942-43) (Vanguard discusses Vanguard funds on watch list); Ex. 50, November 25, 2013 Meeting Minutes of the Committee (NYU0002093) (removing funds from watch list); Ex. 51, February 26, 2014 Meeting Minutes of the Committee (NYU0004590-91) (discussing funds on watch list); Ex. 52, May 22, 2014 Meeting Minutes of the Committee (NYU0002385) (discussing funds on watch list and removing fund from watch list); Ex. 53, August 19, 2014

137.    Funds on the watch list are not automatically removed from the investment lineup; rather, they are analyzed and discussed by the Committee at length.[327]  Determining whether to remove or replace an investment option on the watch list from the investment lineup requires the consideration of "multiple factors," including whether a fund "is unique" and whether difficulty benchmarking which could impact performance.[328]

138.    The Committee does remove funds on the watch list for underperformance.  For instance, the Committee removed the Vanguard Asset Allocation Fund[329] and the Vanguard Precious Metals and Mining Fund.[330]

139.    The Committee also commonly requested that representatives of TIAA and Vanguard attend Committee meetings to present information and answer questions regarding

---

Meeting Minutes of the Committee (NYU0002866) (discussing funds on watch list and adding fund to watch list); Ex. 55, December 11, 2014 Meeting Minutes of the Committee (NYU0002780-81) (discussing funds on watch list); Ex. 56, February 26, 2015 Meeting Minutes of the Committee (NYU0003948) (discussing funds on watch list); Ex. 57, June 9, 2015 Meeting Minutes of the Committee (NYU0003850) (discussing funds on watch list and adding new funds to watch list); Ex. 58, September 15, 2015 Meeting Minutes of the Committee (NYU0005070) (discussing funds on watch list); Ex. 59, December 16, 2015 Meeting Minutes of the Committee (NYU0003276) (discussing funds on watch list); Ex. 60, March 2, 2016 Meeting Minutes of the Committee (NYU0113121) (discussing funds on watch list and adding new fund to watch list); Ex. 61, June 1, 2016 Meeting Minutes of the Committee (NYU00028899) (discussing funds on watch list and voting to replace underperforming fund); Ex. 62, September 8, 2016 Meeting Minutes of the Committee (NYU0026305) (discussing funds on watch list and removing fund from watch list and adding funds to watch list); Ex. 63, December 12, 2016 Meeting Minutes of the Committee (NYU0026300) (discussing funds on watch list and replacing fund on watch list and adding fund to watch list); Ex. 64, February 23, 2017 Meeting Minutes of the Committee (NYU0163210) (discussing funds on watch list and replacing funds and removing funds from watch list); Ex. 65, May 24, 2017 Meeting Minutes of the Committee (NYU0162851) (adding fund to watch list).

[327] Ex. 99, Halley Dep. 103:22-104:3; *see supra* FN 326.

[328] Ex. 99, Halley Dep. 106:19-24; 110:10-113:5.

[329] Ex. 42, August 15, 2011 Meeting Minutes of the Committee (NYU0004044).

[330] Ex. 61, June 1, 2016 Meeting Minutes of the Committee (NYU0002890); *see also* Ex. 99, Halley Dep.147:11-148:4.

such topics as fund performance, including indices for measuring fund performance and funds on the watch list, fund selection, participant communications, and fees.[331]

### A. NYU's Monitoring of the CREF Stock Account and the TIAA Real Estate Account.

140. The CREF Stock Account is a tax-deferred variable annuity offered by CREF.[332] It provides participants an opportunity to invest in a unique investment and is popular—99.5% of TIAA's largest 200 clients offered the fund in their investment lineup in 2015 and 2016.[333]

141. The "CREF Stock was the first stock fund established in 1952" and was therefore "developed to be an all-cap fund, containing large, mid and small cap stocks as well as international exposure."[334]

142. The account's "Investment Objective" is to provide "[a] favorable long-term rate of return through capital appreciation and investment income by investing primarily in a broadly

---

[331] *See, e.g.,* Ex. 130, September 28, 2011 E-mail from J. Rezler to Vanguard (CLC0027969); September 28, Ex. 43, November 14, 2011 Meeting Minutes of the Committee (NYU0003083-85) (Vanguard invited to discuss funds that have not met the criteria of the draft Investment Policy Statement and consequent action to be taken); Ex. 45, May 17, 2012 Meeting Minutes of the Committee (NYU0004055-56) (TIAA invited to discuss communications campaign to participations on topics such as participation, diversification and retirement readiness); Ex. 47, November 16, 2012 Meeting Minutes of the Committee (NYU0001942-43) (Vanguard invited to discuss changes to indices used by Vanguard index funds and funds on the watch list); Ex. 48, February 22, 2013 Meeting Minutes of the Committee (NYU0002557-58) (TIAA invited to present annual review and specifically discussed TIAA Traditional Annuity, CREF Stock and TIAA Real Estate Accounts).

[332] Ex. 131, CREF Stock Account Factsheet, as of September 30, 2017; Ex. 133, May 1, 2017 CREF Prospectus, at 3, 27.

[333] Ex. 99, Halley Dep. 304:25-305:19; Ex. 132, Declaration of Glenn Friedman ¶ 5.

[334] Ex. 47, November 16, 2012 Meeting Minutes of the Committee (NYU0001944).

diversified portfolio of common stocks."[335]   Three different investment strategies are used—active management, quantitative, and indexing—to manage the account.[336]

143.   The CREF Stock Account is unique because it invests in a mix of domestic and international securities.[337]   As a result, however, the CREF Stock Account is difficult to benchmark.[338]

144.   The Committee reviewed the CREF Stock Account on a quarterly basis and in the context of the Plans' total investment lineup which also included stock index funds for participants who preferred that style of investment.[339]   The Committee commonly focused on the difficulties with benchmarking that the CREF Stock Account presents due to its composition.[340] The Committee determined that, as a result of these benchmarking concerns, the CREF Stock Account was one that warranted "specialized discussions."[341]   The Committee specifically noted

---

[335] Ex. 133, May 1, 2017 CREF Prospectus, at 27.

[336] Ex. 133, May 1, 2017 CREF Prospectus, at 27.

[337] Ex. 99, Halley Dep. at 302:21-303:5; Ex. 133, May 1, 2017 CREF Prospectus, at 28 ("Under normal circumstances, the Account seeks to maintain the weightings of its holdings as approximately 65-75% domestic equities and 25-35% foreign equities."); Ex.40, April 1, 2011 Meeting Minutes of the Committee (NYU0004048).

[338] Ex. 47, November 16, 2012 Meeting Minutes of the Committee (NYU0001944).

[339]  Ex. 142, Surh Dep. at 253:10.  *See, e.g.,* Ex. 93, May 10, 2012 Email re: NYU/NYU Langone Retirement Committee Meeting – May 17, 2012 with attachments (CLC033484, CLC0033525, CLC0033531); Ex. 146, November 18, 2013 email re: Retirement Committee Meeting Materials for November 25 2013 (CLC0038671, CLC0038699); Ex.1 47, May 16, 2014 email re Retirement Committee Meeting May 22, 2014 (CLC0040692, CLC0040705, CLC0040725); Ex. 148, September 11, 2015 email re: Retirement Committee Meeting for September 15, 2015 (CLC0048271, CLC0048307); Ex. 149, September 1, 2016 email re: Retirement Committee Meeting Materials (CLC0054834, CLC0054868).

[340] Ex. 99, Halley Dep. 113:20-24; Ex. 89, Rezler Dep. 247:8 –248:17.

[341] Ex. 40, April 1, 2011 Meeting minutes of the Committee (NYU0004048).

that the CREF Stock Account was getting benchmarked against "large cap domestic equities only," when that was not how the fund invested.[342]

145.    In April 2011, the Committee asked Cammack to shed light on the fact although the CREF Stock Account "invests in small/mid/large company domestic equities and as much 30% of [its] assets in foreign equities," the Fund "gets benchmarked against large company domestic funds."[343]

146.    In mid-2011, the account's benchmark was changed to a composite index of two unmanaged indices: (1) Russell 3000 Index (70%); and (2) the MSCI All Country World ex-US Investable Market Index (30%).[344]  The Committee also had representatives from TIAA discuss the CREF Stock Account with the Committee at the February 22, 2013 meeting, during which a TIAA representative explained that the fund benchmark to the Committee.[345]

147.    The Committee further reviewed and specifically discussed the performance of the CREF Stock Account at the September 8, 2016 meeting.[346]

148.    The TIAA Real Estate Account is a tax-deferred variable annuity contract offered by TIAA.[347] The TIAA Real Estate Account invests in actual real estate properties and, to Cammack's knowledge, "there are no other investments made available to defined contribution plans that are similar to it.[348]  "[A]t least 75% of the Account's net assets have comprised . . .

---

[342] Ex. 89, Rezler Dep. 247:8 –248:17.

[343] Ex. 40, April 1, 2011 Meeting Minutes of the Committee (NYU0004048).

[344] Ex. 48, February 22, 2013 Meeting Minutes of the Committee (NYU0002558); Ex. 134, June 30, 2011 CREF Semiannual Report, at 3, 7.

[345] Ex. 48, February 22, 2013 Meeting Minutes of the Committee (NYU0002558).

[346] Ex. 62, September 8, 2016 Meeting Minutes of the Committee (NYU0026304).

[347] Ex. 135, May 1, 2017 TIAA Real Estate Account Prospectus, at 3; Ex. 136, TIAA Real Estate Stock Account Factsheet, as of September 30, 2017.

[348] Ex. 89, Rezler Dep. 250:13-251:16.

direct ownership interests in real estate" and typically less than 10% of the account's net assets have been comprised of interests in liquid real estate securities.[349]

149.   The TIAA Real Estate Account also maintains 15% to 20% cash, therefore providing liquidity coupled with an opportunity to invest in properties.[350]   Additionally, TIAA guarantees liquidity for the TIAA Real Estate Account via a "liquidity guarantee" under which the TIAA General Account will purchase accumulation units issued by the TIAA Real Estate Account if there are issues with liquidity.[351]

150.   The TIAA Real Estate Account gives investors the opportunity to invest in the types of investments that are typically only available to institutional investors and is therefore a "very valuable diversifying element of a retirement portfolio."[352]   Like the CREF Stock Account, the TIAA Real Estate Account is also a popular investment with participants.[353]

151.   Similar to the CREF Stock Account, the TIAA Real Estate Account is difficult to benchmark.[354]   The TIAA Real Estate Account's performance had been compared to a Real Estate Investment Trust ("REIT") index, which was a concern as the TIAA Real Estate Account is not a REIT.[355]   Cammack realized the benchmarking issue early on and addressed with the Committee.[356]

---

[349] Ex. 135, May 1, 2017 TIAA Real Estate Prospectus, at 3.

[350] Ex. 99, Halley Dep. 295:14-296:11.

[351] Ex. 135, May 1, 2017 TIAA Real Estate Prospectus, at 46-47.

[352] Ex. 6, Chittenden Dep. 156:15-157:6.

[353] Ex. 99, Halley Dep. 295:18-296:5; Ex. 132, Declaration of Friedman ¶ 6.

[354] Ex. 99, Halley Dep. 113:6-24.

[355] Ex. 89, Rezler Dep. at 250:13-251:16.

[356] Ex. 89, Rezler Dep. at 251:17-256:2.

152.    The Committee's discussions of the fund consistently focused on the fact that the TIAA Real Estate Account is unique because it "provides participants with the ability to gain exposure to actual real estate" given that it "actually holds real property," and that this unique feature makes the fund extremely difficult to benchmark.[357]

153.    The uniqueness of the TIAA Real Estate Account and the attendant difficulties in benchmarking that fund were a critical factor discussed during the Committee's quarterly evaluations of the fund's performance.  The TIAA Real Estate Account was put on the watch list for consecutive quarters in 2010 and 2011 for underperforming in comparison to the Dow Jones U.S. Select Real Estate Investment Trust ("REIT") index.[358]

154.    At the April 1, 2011 meeting, the Committee discussed that, due to the fund's unique nature, the methodology used for placing other funds on the watch list cannot be utilized for the TIAA Real Estate Account.[359]  Further, for the April 1, 2011 meeting, TIAA provided the Committee with a detailed analysis of the TIAA Real Estate Account, which contained over 25 pages of detailed information regarding the TIAA Real Estate Account, its composition,

---

[357] Ex. 47, November 16, 2012 Meeting Minutes of the Committee (NYU0001944); *see also* Ex. 40, April 1, 2011 Meeting Minutes of the Committee (NYU0004048); Ex. 41, June 9, 2011Meeting Minutes of the Committee (NYU0004054); Ex. 42, August 15, 2011 Meeting Minutes of the Committee (NYU0004044); Ex. 48, February 22, 2013 Meeting Minutes of the Committee (NYU0002558). The difficulties in benchmarking were relayed to investors via TIAA's quarterly performance analyses for the TIAA Real Estate Account, which explained that "there are relatively few sources of returns that can be used as a direct comparison for assessing the performance of the [a]ccount."  *See, e.g.,* Ex. 139, TIAA Real Estate Account Quarterly Performance Analysis for 3rd Quarter, Quarter Ended September 30, 2015, at 1

[358] Ex. 99, Halley Dep. at 106:2-10.

[359] Ex. 40, April 1, 2011 Meeting Minutes of the Committee (NYU0004048).

investment strategy, account management, risks, liquid asset holdings, and performance versus various comparisons and indexes.[360]

155.    In June 2011, the Committee discussed the difficulties in benchmarking the TIAA Real Estate Account and determined that the fund should not be put on the watch list because it began to "recover along with the general recovery of the US commercial real estate market."[361]

156.    The Committee continued to discuss the TIAA Real Estate Account's performance in August 2011 and, on Cammack's recommendation, determined that the fund should not be replaced at that time because "of the difficulty in obtaining comparative statistics for both the index and peer group due to the fund's unique structure" and because "the fund has positive of 8% and it is expected to continue to recover as the U.S. commercial real estate market recovers."[362]

157.    At the February 21, 2012 meeting, TIAA informed the Committee that they were working to develop a benchmark for the fund due to the challenges in benchmarking.[363]

158.    In February 2013, a TIAA representative discussed the usage of a custom index for the TIAA Real Estate Account with the Committee, explaining that the custom index was "designed to assist plan sponsors with the challenge of benchmarking the [TIAA Real Estate Account] due to the lack of peer funds."[364] The custom index used "the National Council of Real Estate Investment Fiduciaries (NCREIF) Index- Open End Diversified Core (OCDE), which is

---

[360] Ex. 40, April 1, 2011 Meeting Minutes of the Committee (NYU0004048); Ex. 127, TIAA Quarterly Analysis of the TIAA Real Estate Account, attached to March 29, 2011 e-mail from J. Rezler (CLC0026015-40).

[361] Ex. 41, June 9, 2011 Meeting Minutes of the Committee (NYU0004054).

[362] Ex. 42, August 15, 2011 Meeting Minutes of the Committee (NYU0004044).

[363] Ex. 44, February 21, 2012 Meeting Minutes of the Committee (NYU0094960); *see also* Ex. 47, November 16, 2012 Meeting Minutes of the Committee (NYU0001944).

[364] Ex. 48, February 22, 2013 Meeting Minutes of the Committee (NYU0002558).

an equal-weighted index of the investment returns from a collection of 30 open-end funds that focus on a core real estate investment strategy."[365]

159.   At the September 8, 2016 meeting, the Committee reviewed the TIAA Real Estate Account's performance and found that the fund underperformed the NCREIF benchmark, but that this was "driven by the fact that the Real Estate Account is less leveraged and has lower risk than the index."[366]   Accordingly, the Committee concluded that no further action was needed at the time.[367]

### B.   Additional Facts Supporting the Objective Prudence of the CREF Stock Account and the TIAA Real Estate Account.

160.   Virtually all of TIAA's top clients offered the CREF Stock Account and TIAA Real Estate Account in the investment lineup for their 403(b) plans.  Indeed, all of TIAA's top 200 clients offered the CREF Stock Account from 2010-2014 and 99.5% of TIAA's top 200 clients offered the fund in 2015 and 2016.[368]

161.   Similarly, 99.5% of TIAA's top 200 clients offered the TIAA Real Estate Account from 2010-2014, and 99% offered the fund in 2015 and 2016.[369]

162.   Additionally, for each year from 2010 to 2016, a minimum of 93% of TIAA's largest 200 clients received contributions into the CREF Stock Account and a minimum of 84% received contributions into the TIAA Real Estate Account.[370]

---

[365] Ex. 48, February 22, 2013 Meeting Minutes of the Committee (NYU0002558); Ex.89, Rezler Dep. at 251:17-256:2.  TIAA further adjusts the total return of the account for "costs and cash drag embedded in the product" because the account has a liquidity guarantee.  Ex. 139, TIAA Real Estate Account Quarterly Performance Analysis for 3rd Quarter, Quarter Ended September 30, 2015, at 2

[366] Ex. 62, September 8, 2016 Meeting Minutes of the Committee (NYU0026304).

[367] Ex. 62, September 8, 2016 Meeting Minutes of the Committee (NYU0026304).

[368] Ex. 132, Declaration of Glenn Friedman, at ¶ 5.

[369] Ex. 132, Declaration of Glenn Friedman, at ¶ 6.

163.    As summarized by Defendant's expert Dan Fischel, the alphas analysis for both the TIAA Real Estate Account and the CREF Stock Fund confirm that each performed well based on their relative level of risk.[371]

164.    The CREF Stock Account had a 1-year return of 32% in 2009, followed by 15.73% in 2010.[372]  The TIAA Real Estate Account's returns in 2010 were 13.3, and by 2014, the account had 3-year returns of 10.64 and 5-year returns of 11.63.[373]

## IX.    DETAILED INFORMATION REGARDING THE PLANS' INVESTMENTS WAS PROVIDED TO PLAINTIFFS MORE THAN THREE YEARS BEFORE THEY FILED THIS SUIT.

165.    Prior to three years before they filed suit, Plaintiffs were provided with detailed information regarding the Plans' investments, including performance, strategy, and whether the funds were actively or passively managed.[374]  Plaintiffs, and all participants in the Plans, were also provided detailed information regarding all of the Plans' investments expenses, including expense ratios.[375]

---

[370] Ex. 132, Declaration of Glenn Friedman, at ¶¶ 7-8.

[371] Ex. 141, Expert Report of Dan Fischel, at ¶¶ 24, 30.

[372]  Ex. 141, Expert Report of Dan Fischel, at Ex. 3.

[373]  Ex. 141, Expert Report of Dan Fischel, at Ex. 3.

[374] Ex. 174, Faculty Plan 2012 Investment Options Comparative Chart; Ex. 175, Medical Plan 2012 Investment Options Comparative Chart.

[375] Ex. 174, Faculty Plan 2012 Investment Options Comparative Chart; Ex. 175, Medical Plan 2012 Investment Options Comparative Chart.

Dated:  New York, New York
            January 10, 2018

Respectfully submitted,

DLA PIPER LLP (US)

Mark Muedeking (*pro hac vice*)
Ian C. Taylor (*pro hac vice*)
Jennifer K. Squillario (*pro hac vice*)
Julie Ben-Zev (*pro hac vice*)
DLA Piper LLP (US)
500 8th Street, NW
Washington, DC 20004
(202) 799-4000
Mark.Muedeking@dlapiper.com
Ian.Taylor@dlapiper.com
Jennifer.Squillario@dlapiper.com
Julie.BenZev@dlapiper.com

Brian S. Kaplan (BK4922)
Evan D. Parness (EP6680)
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020
(212) 335-4500
Brian.Kaplan@dlapiper.com
Evan.Parness@dlapiper.com

*Counsel for Defendant New York University*