EXHIBIT 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DR. ALAN SACERDOTE, et al.,

§
*Plaintiffs*                                §
§
-v-                                         §          Case No. 1:16-cv-06284
§
NEW YORK UNIVERSITY,                        §
§
*Defendants*                                §

## EXPERT REPORT OF MARCIA S. WAGNER, ESQ.

I, Marcia S. Wagner, Esq., hereby provide this expert Report pursuant to Federal Rule of Civil Procedure 26(a)(2) with respect to my analysis and opinions relating to the New York University Retirement Plan for Members of the Faculty, Professional Research Staff and Administration (the "Faculty Plan") and the New York University School of Medicine Retirement Plan for Members of the Faculty, Professional Research Staff and Administration (the "Medical Plan"), two defined contribution retirement plans (collectively, the "Plans") sponsored by New York University ("NYU" or "Defendant"). Certain of the Plans' participants, Dr. Alan Sacerdote, Dr. Herbert Samuels, Mark Crispin Miller, E. Monaco, and Dr. Shulamith Lala Straussner, are the plaintiffs (collectively, the "Plaintiffs")[1] in a putative class action brought against the Defendant with respect to its role as a fiduciary for the Plans. In particular, the Plaintiffs allege that the Defendant imprudently managed the Plans, resulting in significantly lower investment returns for the Plaintiffs than those provided under similar retirement plans. Based on the assumptions stated herein and my analysis of the material listed in Appendix D, I have prepared this Report containing my opinions.

---

[1] Patrick Lamson-Hall was also originally a named plaintiff. He subsequently withdrew from the case.

# I.    QUALIFICATIONS OF THE EXPERT

1.     I am the principal of The Wagner Law Group, A Professional Corporation, in Boston, Massachusetts, which I founded approximately twenty-one years ago, and an attorney working exclusively in the area of pension and employee benefits law.  I am also a *summa cum laude* and Phi Beta Kappa graduate of Cornell University and a graduate of Harvard Law School. I have practiced law in Boston for over thirty years and have been a partner in two major law firms.

2.     As an employee benefits attorney for over 30 years, I have had numerous engagements representing plan sponsors, fiduciaries and providers of services and investments to plans in their dealings with the U.S. Department of Labor ("DOL") on such matters as fiduciary responsibility and prohibited transactions as well as assignments as an independent fiduciary administering day-to-day plan operations.  I have also advised clients in their dealings with the Internal Revenue Service ("IRS") and the Pension Benefit Guaranty Corporation.  I have been involved in all phases of plan design, plan document preparation and advising plan fiduciaries with respect to the nature of their duties and the specific measures needed to carry them out. With respect to the latter, this has included (i) advising on the structure and establishment of plan investment and administrative committees, (ii) counseling such bodies on the design of investment menus and recommending the processes to be used for selecting investments options appearing thereon, as well as monitoring their performance and expenses, (iii) preparing investment policy statements that allocate fiduciary responsibilities and provide guidance on the criteria  and processes involved in investment selection and monitoring, (iv) guiding committees on the due diligence process for issuing requests for proposals relating to a plan's engagement of recordkeepers and other service providers and the information to be considered, decision-making process and documentation recommended before making a final  selection, (v) advising committees on the criteria for evaluating the performance and fees of service providers, and (vi) attending meetings of fiduciary committees to advise regarding issues arising in the performance of their duties.

3.     I have had the opportunity to serve as an Independent Fiduciary for numerous employee benefit plans.  In this capacity, I have: (i) provided plan participants with an

independent, expert voice with respect to plan design and operational issues; (ii) advised benefit plans with respect to restructuring investment opportunities that might otherwise violate the prohibited transaction provisions contained in the Employee Retirement Income Security Act of 1974, as amended ("ERISA") in order to qualify for an applicable exemption; and (iii) designed policies and procedures to eliminate or mitigate conflicts of interest on the part of plan sponsors and investment providers.

4.        I have been recognized as a national expert in a variety of employee benefits matters, including the fiduciary requirements under ERISA.  I was appointed by the Secretary of the Treasury to serve on the IRS's Advisory Committee on Tax-Exempt and Government Entities, and I am the former Project Chair of its Employee Plans subcommittee.  I am the recipient of the IRS Commissioner's Award (that agency's highest honor) relating to my service on behalf of the IRS Tax Exempt and Government Entities Division.   I have also been inducted as a Fellow of the American College of Employee Benefits Counsel.

5.        I am a frequent lecturer and author on the subject of ERISA/employee benefits, and I have w a Bureau of National Affairs Tax Management Portfolio, entitled "Plan Disqualification and ERISA Litigation," for which I received the BNA Distinguished Author Commendation.  Among other books and articles, I have also written the following: BNA Tax Management Portfolio: "ERISA Litigation, Procedure, Preemption and Other Title I Issues," and BNA Tax Management Portfolio: "EPCRS – Plan Correction and Disqualification."

6.        I have been listed as a "Massachusetts Super Lawyer" by Boston Magazine, and have an AV peer review rating by LexisNexis Martindale-Hubbell indicating a very high to preeminent legal ability and integrity.  I have also been named one of the 100 Most Influential Persons in the Pension Industry by 401(k) Wire for eight years.

7.        My resume is attached as Appendix A to this Report.  A full list of my publications appears in Appendix B, and the cases listed in Appendix C are all those in which I have testified or submitted an expert report.  A list of the documents and materials reviewed for purposes of this Report is contained in Appendix D.

8.      I am being paid an hourly fee of $750 for my services in this engagement.  My fee is not contingent upon the outcome of this action or the conclusions expressed in this Report.  In preparing this Report, I have received assistance from staff employed by The Wagner Law Group.

## II.      PURPOSE OF REPORT

9.      Counsel for the Defendant in this case has asked me, as an expert on the standards of conduct and the practices of retirement plan fiduciaries, to evaluate whether NYU followed a prudent process as to: (i) the monitoring, review and retention of administrative service providers for the Plans and the fees charged by those providers from 2010 to the present; and (ii) the offering and monitoring the TIAA Real Estate Account ("REA") and CREF Stock Account ("Stock Account") as Plan investment options during the period from 2010 to present.

## III.      STATEMENT OF FACTS

### The Plans

10.      In preparing this opinion, I have reviewed the documents and materials listed in Appendix D, which includes thousands of pages of records and information relating to the process by which NYU reviewed and evaluated various alternatives with respect to the administration and operation of the Plans.  This record is extensive and spans a period of several years.  This Statement of Facts is not meant to be a complete recitation of all of the facts I considered, but only a summary for contextual purposes.

11.      The Plans at the center of this litigation are individual account plans governed by Internal Revenue Code ("Code") Section 403(b) that provide retirement benefits to employees of the Defendant and its affiliates funded by employer contributions and employee elective deferrals to the participants' accounts.  The Plans are also considered to be "pension benefit" plans under ERISA, thereby subjecting them to the fiduciary requirements of that statute.

12.     For the Faculty Plan, NYU makes contributions matching employee elective deferrals up to 5% of a participant's base salary, and nonelective employer contributions equal to 5% of a participant's base salary (regardless of whether the participant makes contributions). For the Medical Plan, NYU makes nonelective employer contributions equal to 10% of a participant's base salary (regardless of whether the participant makes contributions). Participant accounts under the Plans are increased or decreased by investment experience net of fees and expenses.

13.     The Faculty Plan provides retirement income for all members of NYU's faculty, professional research staff, and administration, other than employees of the NYU School of Medicine. As of December 31, 2016, the Faculty Plan had approximately $2.61 billion in net assets and 18,551 participants and beneficiaries with account balances.

14.     The Medical Plan provides retirement income for employees of the NYU School of Medicine. As of December 31, 2016, the Medical Plan had approximately $2.01 billion in net assets and 8,560 participants and beneficiaries with account balances.

15.     The Plans are intended to comply with Section 404(c) of ERISA and the regulations thereunder by providing participants with the right to direct the investment of their contributions. Each participant may direct his or her account balance into one or more investment options on the Plans' investment menus. The Plans offer investment menus that consist of TIAA and Vanguard investment options.

16.     As of December 31, 2016, the Faculty Plan offered its participants 101 total investment options, including 27 TIAA investments and 74 Vanguard investments. These investment options included fixed and variable annuity options, as well as mutual funds.

17.     As of December 31, 2016, the Medical Plan's investment menu provided its participants a total of 82 investment options, including 11 TIAA investments and 71 Vanguard

investments.  Like the Faculty Plan, these investments consist of fixed and variable  annuities and mutual funds.

18.     As is the case with the 403(b) plans of many educational institutions, TIAA's investment options have a sizable presence on the Plans' investment menus.  As of December 31, 2016, approximately $1.84 billion (i.e., 71%) of the Faculty Plan's assets were invested in TIAA options, and $1.18 billion (i.e., 58%) of the Medical Plan's assets were invested in TIAA options.

History of 403(b) Plans

19.     Section 403(b) of the Internal Revenue Code ("Code") regulates the taxation of annuity contracts and custodial accounts that comprise the assets of 403(b) plans.  When Section 403(b) was added to the Code in 1958, it required that all assets of the Plans be invested only in insurance company annuity contracts.  Annuities continued as the only investments available to 403(b) plans until 1974, when the Code was amended to provide that mutual funds held in custodial accounts would be treated as annuity contracts for 403(b) purposes.  Accordingly, prior to 2009, a significant amount of the Plans' assets were invested in individual annuity contracts.

20.     An individual annuity is a contract issued by an insurance company in a 403(b) participant's name that guarantees periodic payments at retirement, determined on the basis of premium payments and credited interest or investment earnings during the participant's working years.  Annuities were designed to be a reliable means of securing a steady cash flow for an individual during his or her retirement years, thereby addressing the issue of longevity risk or outliving one's assets.  Deposits into annuity contracts are typically locked up for a period of time, known as the surrender period, and the participant incurs a penalty if all or part of the annuity assets are withdrawn during this time.  These surrender periods can last up to 10 years, depending on the particular product.[2]

---

[2] In recent years, the IRS and Department of Labor have issued regulatory guidance, as well as proposed rules promoting longevity annuities, removing regulatory obstacles to annuity distributions from retirement plans, and requiring disclosures making it easier for plan participants to understand and make better decisions with respect to lifetime income options, such as annuities. One of the goals of these lifetime income initiatives is to improve retirement security by reducing the reluctance of participants to relinquish the ability to demand receipt of all their retirement assets in cash.

21.     Prior to 2009, when new IRS regulations affecting Section 403(b) plans became effective, 403(b) plan participants had a high degree of control over the inception and operation of their plan accounts, including the selection of their investments.  This was true, even though 403(b) plans were nominally established by employers, and in this period, the IRS did not even require them to adopt a written plan document.  In many cases, each 403(b) plan participant held an individual annuity contract and the employer had very limited involvement in administering the plan and merely facilitated payroll contributions to the participant's 403(b) plan account.

22.     This hands-off approach was encouraged by a DOL Safe Harbor under which 403(b) plans were treated as exempt from ERISA if employers limited their administrative involvement.  However, the 2009 IRS regulations required tax-exempt employers to assume a deeper involvement in 403(b) plan administration.  This indirectly caused them to no longer qualify for the DOL Safe Harbor, and this, in turn, resulted in their 403(b) plans being brought under ERISA for the first time.  This meant that these employers would be ERISA fiduciaries, which caused these employers to engage investment and financial consultants in order to help them meet the new compliance requirements.

23.     As noted, the IRS's new regulations required more plan oversight and documentation from sponsors of 403(b) plans.[3]  As a practical matter, the new tax rules forced plan sponsors to centralize the administration of their 403(b) plans, which caused them to look less like decentralized collections of IRAs.  For example, prior to 2009, participants were permitted to self-certify that they had terminated employment and were eligible to take a distribution. But this practice was no longer permitted under the 2009 403(b) regulations, requiring the employer or another party (such as a vendor) to make this administrative determination.  The new regulations also obligated plan sponsors to more closely monitor contract exchanges, i.e., moving 403(b) plan assets from one investment provider to another.

---

[3] For example, plan sponsors were required to adopt a written plan document that specified the plan's terms and conditions for eligibility, benefits, limitations, available investments and distributions.  See 26 CFR §1.403(b)-3(b)(3).

24.     Although 403(b) plans and 401(k) plans share some limited characteristics, they are subject to different restrictions due to their different regulatory origins. Accordingly, the 403(b) marketplace differs from the 401(k) marketplace in many ways.  For example, 403(b) plans may be funded with annuity contracts, including individual or group variable annuity contracts.  Alternatively, they may use custodial accounts to invest in mutual funds.  However, 403(b) plans are generally not permitted to hold other types of investments, including individual securities.

25.     Prior to 2009, many tax-exempt organizations had hired multiple 403(b) vendors to ensure that participants had a reasonable choice of funding vehicles as required under the Safe Harbor exemption from ERISA. Although this need has diminished  now that many tax-exempt organizations are subject to ERISA, it persists, because 403(b) participants frequently hold individual annuity contracts or retail mutual funds that are under the control of the individual participant, rather than the plan sponsor. Thus, even if the plan sponsor wanted to map the assets of unapproved 403(b) investments to the plan's investment menu, it would be unable to do so without the participant's consent.

26.     Moreover, liquidity restrictions originating in the contractual provisions of an annuity frequently prevent its immediate liquidation even if a 403(b) participant has agreed to cooperate in mapping the existing investment to an approved  investment option on the plan menu.   Where surrender charges would be triggered if plan assets were immediately transferred to the new vendor, plan sponsors typically delay the mapping of assets until the relevant surrender period lapses. During the interim period, to facilitate the transition to the new vendor, the investment options offered by the existing 403(b) vendor remain as plan assets but are frozen so that participants are unable to deposit new funds with the old vendor.

27.     While the investment-related fiduciary duties imposed on ERISA 403(b) plan sponsors (tax-exempt organizations) are identical to those imposed on 401(k) plan sponsors, they are applied by taking into consideration the unique circumstances that apply to these plans as described above.

The NYU Committee

28.     NYU also responded to the 2009 IRS regulations by establishing the Retirement Plan Committee (the "Committee"),[4] when it implemented the Retirement Plan Committee Charter (the "Charter"), effective June 1, 2008.[5]  The Charter designated nine management-level employees of NYU  holding certain titles to serve *ex officio* as members of the Committee.  In general, the Charter provides the structure, rules and procedures for how the Committee operates and sets forth the Committee's powers and duties.  Specifically, the Charter requires the Committee to meet at least twice per year, that minutes of all Committee meetings be kept and distributed to Committee members, and that the Committee annually report to NYU's Board of Trustees and Advisory Board on the actions it has taken to discharge its duties under the Plans. The Charter also authorizes the Committee to engage legal counsel, consultants, and recordkeepers to assist with plan administration.  Accordingly, the Committee is responsible for hiring the Plans' service providers.  Under the Charter, the Committee has the express duty to evaluate, select and monitor the Plans' investment options in accordance with an investment policy approved by the NYU Investment Committee and Board of Trustees.

29.     At its initial meeting, the Committee discussed its role and potential functions with respect to the Plans.[6]  Ellen Benson, an attorney for Ropes & Gray, discussed the effect of the 2009 IRS regulations and their impact on the Committee's fiduciary duty to select and monitor the Plans' investment options in a prudent manner.  Ms. Benson recommended that the Committee consider engaging an external investment advisor to assist in that process and the Committee followed up by initiating a Request for Proposal ("RFP") process for the provision of investment consulting services for the Plans.

30.     In February 2009, after NYU engaged in a significant RFP process, Cammack LaRhette Consulting ("CLC") was selected to provide investment consulting services for the Plans from among several  other well-established firms who responded to the RFP, including

---

[4] See Retirement Plan Committee Charter.
[5] As sponsor of the Plans, NYU is authorized by the Plans and ERISA to appoint one or more additional fiduciaries, and to assign to them certain of its fiduciary duties and responsibilities.  See ERISA §402(c)(3).
[6] See Text for 9/13 RC Minutes.

Mercer, Segal Advisors and RV Kuhns.  CLC had worked with 403(b) plans since 1958 (i.e., when Section 403(b) was added to the Code) and over 90% of its clients are large tax-exempt non-profit organizations.  CLC is one of the few investment consulting firms that regularly services 403(b) plans comparable in size to the Plans.

31.     CLC is a privately held company and is not subject to direct or indirect ownership by other companies.  Thus, CLC's independence allows it to engage and negotiate with investment providers, third party administrators, and insurance companies to obtain the most comprehensive and cost-effective retirement programs for its clients.  In addition, CLC is a full-service consulting firm that implements what it recommends by assisting with the execution of plan operational changes, and it has extensive experience in rolling-out communications and education in order to provide a smooth transition for plan participants.

32.     One of CLC's core strengths is its expertise in investment analysis.  Notably, it has extensive experience in breaking down TIAA's fees and expenses, since it has many 403(b) plan clients with TIAA investment products on their plan investment menus.  CLC performed comprehensive analyses of the investment fee structures and revenue sharing that resulted in substantial reductions in fees for its clients.  CLC reviewed the fit of an investment within a plan's entire investment line-up and also examined the individual investment performance of particular investment options against standard benchmarks, category peers and applicable risk/return characteristics.  CLC's detailed analysis provided valuable information to support the "prudent expert" standard of investment review required under ERISA.

33.     CLC worked with the Committee to develop and implement regular quarterly due diligence reviews to assist the Committee in satisfying its obligation to regularly monitor the Plans' investment options for prudence based on the due diligence criteria CLC identified as relevant.  To assist the Committee with its quarterly due diligence reviews, CLC prepared quarterly reports analyzing the performance and expenses of the Plans' investment options as a whole, by vendor and individually.  CLC typically provided these due diligence reports to Committee members a week before Committee meetings to facilitate their personal review of the same in preparation for discussions about the Plans' investments at the upcoming meeting.

When appropriate or requested, CLC discussed certain issues raised by the due diligence reports with the Committee and suggested action steps to resolve the issue. For example, CLC suggested that the Committee place certain underperforming funds on a watch list for enhanced monitoring. At appropriate intervals, CLC reviewed with the Committee the investment management fees charged for the Plans' investment options, discussed how these costs compared against applicable benchmarks and provided updates on investments that were on the watch list.

34.    Moreover, because CLC has worked with virtually every 403(b) service provider in the marketplace, it had in-depth knowledge and experience regarding vendor costs that served as a basis for evaluating arrangements for its plan clients with respect to administrative and recordkeeping services.

35.    CLC worked with the Committee to develop a clear, concise and realistic investment policy statement ("IPS") to help guide the Committee in executing its fiduciary duty to select and monitor the Plans' investment options. CLC presented the Committee with a draft IPS at the Committee's June 14, 2010 meeting.

36.    The IPS provided the Committee with guidance on the process for monitoring and replacement of the Plans' service providers and investment options. In general, the IPS provided a description of the investment goals and objectives for the Plans, the procedures available to the Committee to discharge its responsibilities, the measuring tools (i.e., benchmarks) for ongoing performance assessment and the manner in which the activities of the Committee would be documented. In addition, the IPS provided criteria[7] for the Committee to take into account, as it deemed appropriate, when selecting and monitoring the Plans' investment options. The IPS suggested that investments not meeting the Committee's expectations be placed on a "watch" list and potentially removed from the Plans.[8]

---

[7] This criteria included that the expense ratio for the investment option should be less than the average expense ratio of its respective peer group.
[8] The Committee agreed to implement CLC's draft IPS and began operating under it, but stopped short of immediately adopting it in order to leave room for further discussion and the ability to make any changes as they deemed appropriate.

37.     After reviewing CLC's quarterly due diligence reports, the Committee would discuss whether any underperforming funds should be placed on a watch list and whether options already on the watch list should be removed and replaced.  Throughout the class period, the Committee regularly removed and replaced underperforming funds that failed to improve after being placed on the watch list.[9]

38.     The Committee regularly monitored the fees being charged to the Plans for recordkeeping services and discussed how these costs compared to fees charged by competitors. During the relevant period, the Committee issued two Requests for Proposals pertaining to administrative services, first in 2009 and again in 2016.

39.     The Committee was persistent in asking CLC to approach the Plans' recordkeepers (i.e., TIAA and Vanguard) to renegotiate fees and lower their rates.  This strategy was successful because the Committee was able to significantly reduce the recordkeeping fees paid by the Plans over this period while maintaining and improving service levels for participants.  From 2010 to present, the Committee negotiated reductions in TIAA fees for recordkeeping and administrative services for the Faculty Plan from 19.9 bps to ▮ bps.  During that same period, recordkeeping and administrative service fees charged by Vanguard for the Faculty Plan fell from 10 bps to 6 bps.  For the Medical Plan, the Committee has been able to lower TIAA's required revenue rate down from 19.9 bps to ▮ bps.[10]

---

[9] See Deposition of Mark Petti, November 14, 2017, pp. 273-275.
[10] See Deposition of Peter Hueber, November 22, 2017 at p. 48 and Committee Meeting Minutes for March 18, 2010 and January 10, 2011.  Over time, the downward revision of TIAA fees pursuant to negotiations was as follows:

| | Faculty Plan | | | Medical Plan | |
| | TIAA Offer | Rate in Effect | | TIAA Offer | Rate in Effect |
|---|---|---|---|---|---|
| 2009 | | 19.9 bps | 2009 | | 19.9 bps |
| 2010 | 15 bps – all plans & new menu | 19.9bps | 2010 | 15 bps – all plans & new menu | 19.9 bps |
| | 10 bps – all plans & new menu | | | 10 bps – all plans & new menu | |
| | 13.8 bps – all plans & all contracts | | | 13.8 bps – all plans & all contracts | |
| 2011 | | 13.8 bps | 2011 | | 19.9 bps |
| 2012 | | 13.8 bps | 2012 | | 16 bps to Oct. |
| | | | | | 10 bps from Nov. |
| 2013 | | 13.8 bps | 2013 | | 10.0  bps |
| 2014 | 12 bps | 13.8 bps | 2014 | | 9.0 bps |

40.     Investment managers typically charge an annual investment management fee to plan investors to cover their operating costs for managing an investment fund's assets.  These fees are usually based on the amount of assets under management and are expressed as "expense ratios".

41.     Investment management fees can vary significantly depending on a number of factors, including but not limited to the investment's style, category, strategy and size.  The expense ratio is the total percentage of the investment's assets used to cover the annual investment management expenses.

42.     Since they can significantly affect returns, expense ratios are one factor  to consider when selecting an investment.  However, the extent to which a portion of the investment fee supports a higher level of plan services is also relevant.

43.     Another expense incurred by participants in individual account plans relates to plan administration.  Plan administration includes the use of recordkeepers, i.e., service providers that track contributions to participant accounts and allocate investment earnings and/or losses to the account based on the investment options held by the account.  Some recordkeepers also provide participants with quarterly account statements, and access to a plan investment website, call center, on-site investment education and related materials.  Recordkeepers, such as TIAA, also provide valuable additional services, such as meeting participants, taking their phone calls, conducting investment seminars and assisting  them with general investment education and investment advice through independent financial experts.[11]  Where annuity products are included on the plan menu, as they were in the case of the NYU Plans, the cost of recordkeeping is driven up by the increased communications and services these products require, such as preparing annuity distribution illustrations and explaining lifetime income options.[12]

---

[11] Deposition of Douglas Chittenden, November 22, 2017 at p. 27.

[12] Id. at p. 166. Annuities also require recordkeepers to track when contributions are made to the annuity and processes to ensure contributions are kept in their appropriate vintage so that interest and dividends are credited at their appropriate rates. Id. at p. 168. Further, there are frequent amendments and updates to annuities (like a new account or new form of payout) which require a revised  prospectus and mailing. Id. at p. 170. These additional administrative duties add to the cost of administering insurance products and annuities, in particular when compared to the cost of administering mutual funds.

44.     It is common and typical that certain investments options on retirement plan menus provide revenue sharing payments.  Under a revenue sharing arrangement, a portion of the expense ratio is paid to the plan's recordkeeper for providing administrative services necessary and appropriate for the administration of the plans.  The amount of revenue sharing may vary based on the investment option and the class of shares held by the plan.

45.     In my experience, it is common for individual account plans to pay for recordkeeping services and plan administration through either an asset-based or per-participant flat fee arrangement.  Both arrangements are common and accepted methods used by 403(b) plans.  Under the asset-based model, the fee for recordkeeping and administration expenses is stated as a percentage of assets, usually as a specified number of basis points.  Flat-fee arrangements determine the amount paid for recordkeeping and administrative services based on a flat annual fee based on the number of plan participants.  To the extent that these fees are charged directly to a participant's account, the asset-based fee has the effect of allocating a greater portion of the recordkeeping fee to participants with larger accounts who are generally more highly compensated, while the per-participant approach results in proportionately higher fees being charged to participants with smaller account balances.[13]

46.     The NYU Plans used revenue sharing to pay for recordkeeping and administrative services on an asset-based arrangement which was, in my experience, typical for 403(b) plans.

47.     There are differences between the costs to provide recordkeeping services for annuity investments compared to investments in mutual funds, because annuities require additional services that are not required for mutual funds.  For example, certain annuities provide lifetime income options that mutual funds do not.  As a result, annuities often require recordkeepers to calculate participants' lifetime payment amounts and provide communications to participants about the payout options available along with the amount of income each option would provide.  In addition, because annuity contracts can be amended or updated, annuity recordkeepers are often required to provide participants with these amendments.  In addition,

---

[13] Id. at p. 190.

TIAA's Traditional Annuity has many unique features that make it challenging for recordkeepers to track, including a vintage based system of crediting interest. This requires recordkeepers to track when contributions are made to the TIAA account to ensure that they are credited to the appropriate vintage.

48.     As previously noted, TIAA has an agreement to charge a certain fee for recordkeeping services expressed in basis points, and that fee is offset by revenues available within investment options to pay for recordkeeping. TIAA has established a plan reimbursement account to receive the excess of these revenue sharing amounts over TIAA's revenue requirement. The Committee returns all excess revenues received from TIAA to participants accounts.

49.     As with most very large organizations, the consolidation of recordkeepers has been a complex process for NYU, and the Committee has had to take into account many specific issues throughout the transition to one recordkeeper for the Plans. The Faculty Plan and Medical Plan have two different human resources departments, each with different goals, priorities and abilities. While the Medical Plan's human resources department had the project management skills and  technology in place to move forward with recordkeeper consolidation in 2012, this was not the case of the Faculty Plan. Moreover, before 2012, the Committee was circumspect about TIAA's technological capacity to successfully implement a single recordkeeper regime, because it was aware that in 2009, TIAA had just completed revamping its systems from orientation to individual insurance contracts to a plan-based reporting system.[14]

50.     The Committee also felt that the Faculty Plan entailed special consideration, because the change to a single recordkeeper had a greater potential for participant disruption. This could have taken the form of resistance to the elimination of certain Vanguard mutual fund investment options if TIAA were selected as the sole recordkeeper. TIAA executives testified that they knew of  similar faculty complaints at other institutions which sponsored 403(b)

---

[14] Deposition of Peter Hueber, November 22, 2017, pp. 26-27.  As Mr. Hueber, a TIAA executive noted, "Our technology was very new at the time, and there's a pretty long learning curve that exists."

plans.[15] These considerations as well as other factors, benefits-related and otherwise (e.g., new NYU health insurance initiatives and university leadership changes), convinced the Committee that it would be more prudent to delay recordkeeping consolidation for the Faculty Plan until 2018.

51.     In addition to such technological matters, the Committee explored the ability of the RFP bidders to deliver particular services, such as enhanced and branded electronic messaging tied to particular events (e.g. plan enrollment and on-line elections for salary deferrals).[16] Another key issue was the vendor's ability and/or willingness to provide on-site participant investment education, a feature where TIAA was particularly adept.  CLC informed the Committee that such additional services had the effect of increasing the fee required by an RFP responder.

<u>TIAA Real Estate Account</u>

52.     One of the investments made available to participants of the NYU Plans was the TIAA Real Estate Account ("REA"), which is an insurance separate account maintained by TIAA.[17]  The REA is an actively managed real estate strategy, containing over 100 directly held real properties, including commercial and retail space and farms.  In other words, the REA's assets primarily consist of brick and mortar real estate.  The REA provides average investors with access to the types of investments that typically are only available to larger institutional investors, <u>i.e.</u>, direct returns based on the direct ownership of real estate.  Its holdings give it a low correlation to stocks and bonds and this gives it value as a diversifying element.[18]  Since there is no index of directly held real estate, the REA is difficult to benchmark.  TIAA offers only one share class for the REA.

---

[15] Id. at p. 24; see also Deposition of Douglas Chittenden, November 22, 2017 at p. 233.
[16] See Committee Meeting Minutes of March 18, 2009.
[17] An insurance separate account is a pooled investment vehicle that aggregates assets from more than one retirement plan for a given investment strategy, but is segregated from the insurance company's general account assets.  A separate account allows an investor to choose an investment category according to his individual risk tolerance, and desire for performance.
[18] See comments in Deposition of Douglas Chittenden, November 22, 2017 at pp. 156 – 157.

53.     The Committee has consistently monitored the REA on a quarterly basis throughout the relevant period.  CLC has included detailed information about the REA in the quarterly due diligence reports that it provides to the Committee.

54.     CLC placed the REA on its watch list for seven consecutive quarters during 2010 through 2011 after it had failed to meet the performance criteria (i.e., its peer group benchmark) specified in the Plans' IPS.  At its April 1, 2011 meeting, the Committee expressed concerns regarding the methodology that CLC used in placing the REA on the watch list, since the investment was not a real estate investment trust ("REIT") and instead held real property directly.  The Committee discussed the possibility that the REA may be viewed as a bond fund and invested in this way by participants.  CLC representatives at the meeting responded by noting that the REA's investments in actual properties makes it unique, which made it difficult to benchmark.  CLC agreed to provide further details about the REA in a separate report so that the Committee could review the investment in greater detail.  The Committee also expressed the view that before placing an investment on a watch list, consideration must first be given to participants' concerns to ensure that there is no perception of anything being taken away from them.

55.     At its June 9, 2011 meeting, the Committee continued its discussions with CLC about the REA's perceived underperformance and whether it should be placed on the watch list. CLC reiterated that the REA was difficult to benchmark given its unique structure of owning real properties but noted that the REA had begun to recover from the recent financial downturn along with the rest of the U.S. real estate market.  In view of these facts, CLC recommended that the Committee not place the REA on the watch list at that time.

56.     At its August 15, 2011 meeting, the Committee reviewed the Plans' investments with CLC providing additional detail on funds that failed to meet three or more performance metrics.  For TIAA, the only investment that met this criteria was the REA.  CLC recommended that the Committee continue to carefully monitor the REA, but not remove it from the Plans' menus, because of the difficulty in obtaining comparative statistics for both the index and peer group due to the investment's unique structure of owning real properties.  CLC further noted

that, year to date, the REA had positive returns and it was expected to continue to recover as the US commercial real estate market recovered.

57.     At the Committee's February 21, 2012 meeting, TIAA's Elina Steinberg confirmed that TIAA would be introducing a new benchmark for the REA in the near future and noted that the strong performance of the account that was seen in 2011 had continued into 2012. One year later, at the Committee's February 22, 2013 meeting, TIAA's Tom Callahan presented TIAA's annual review to the Committee during which he discussed TIAA's introduction of a customized independent  index[19] to assist plan sponsors with the challenge of benchmarking the REA due to the lack of peer funds.

58.     At the Committee's September 9, 2016 meeting, CLC followed up these reviews by calling attention to the REA's recent underperformance compared to the custom benchmark. CLC clarified that the REA's perceived underperformance was driven by the fact that it is less leveraged and has lower risk than the custom benchmark.  In response, the Committee determined that it did not need to take further action with respect to the REA at that time.

<u>The CREF Stock Account</u>

59.     Another TIAA investment made available to the Plans' participants was the CREF Stock Account, which is the investment option holding the largest amount of the Plans' assets.  The Stock Account is a broadly diversified account that seeks a favorable long-term rate of return through capital appreciation and investment income from investing in a broadly diversified portfolio of common stocks.  The Stock Account contains value, growth, core, foreign developed and emerging markets exposure.  The Stock Account may invest in companies of any market capitalization size, including small, medium and large companies.  Typically, the Stock Account seeks to maintain the weightings of its holdings as approximately 70 percent domestic equity and 30 percent foreign equities.

---

[19] The National Council of Real Estate Investment Fiduciaries ("NCREIF") Index- Open End Diversified Core ("ODCE"), which is an equal-weighted index of the investment returns from a collection of 30 open-end funds that focus on a core real estate investment strategy.

60.     The Committee consistently monitored the Stock Account on a quarterly basis beginning in 2011.  In furtherance of this objective, CLC included detailed information about the Stock Account, including its performance and costs, in the quarterly due diligence reports that it provided to the Committee.  CLC's quarterly due diligence reports confirmed that the Stock Account had never been considered for watch list review.

61.     At its April 1, 2011 meeting, the Committee asked CLC to comment on the investments in the Plans' menus that may warrant specialized discussion.  CLC responded by identifying the Stock Account, and explained that while it invests in small, mid, and large company domestic equities and as much as 30 percent foreign equities, it is benchmarked against large domestic funds.  In response, the Committee discussed how best to reasonably evaluate the Stock Account, the criteria used to place it on the watch list, and how to remove it from the Plans' menus, if warranted.

62.     CLC expressed its concerns to the Committee about the Stock Account being typically benchmarked against large cap domestic equities only, because those indices do not reflect how the account invests.  To resolve this concern, CLC developed a custom benchmark for the Stock Account, i.e., a composite index of 70 percent domestic equities and 30 percent foreign equities mixture. [20] CLC believes that its custom benchmark for the Stock Account is more in line with how the account actually operates.

63.     Committee members have confirmed that the Committee reviews the Stock Account in the context of the Plans' total investment lineup and against the context of broad category benchmarks as provided by CLC.[21]

64.     At the Committee's February 21, 2012 meeting, TIAA's Ms. Steinberg presented TIAA's annual review to the Committee.  Ms. Steinberg discussed the Stock Account, noting that it is a broadly diversified fund that contains value, growth, core, foreign developed and

---

[20] Rezler deposition at 249:18.
[21] Surh deposition at 253:10.

emerging markets exposure.  Ms. Steinberg noted that the Stock  Account had 65 portfolio managers and had shown strong performance year to date.

65.     At its February 22, 2013 meeting, TIAA's Mr. Callahan presented TIAA's annual review. Mr. Callahan discussed the Stock Account and explained that it was designed to provide participants with exposure to a variety of equity markets by investing in companies of any market size, including small cap companies. Mr. Callahan further explained that the Stock Account seeks to maintain approximately 70 percent in domestic equities and the balance in foreign equities.

### IV.     APPLICABLE ERISA PRUDENCE STANDARDS AND PRINCIPLES

#### A.  Overview of Standards of Care

66.     The core duties of a plan fiduciary, such as the Committee in this case, are formally set forth in the "prudent man standard of care" under Section 404(a)(1) of ERISA.  A fiduciary must act with the *care, skill, prudence and diligence* that a *prudent person* acting in a like capacity and *familiar with such matters* would use in the conduct of an enterprise of a like character and with like aims.  Thus, when choosing a plan's investment menu, plan fiduciaries should make the initial selection prudently and monitor these selections continuously in accordance with this standard of care.

#### B.  Prudent Selection of Plan Service Providers

67.     Any decision to hire or engage a service provider, such as a recordkeeper, on behalf of a 403(b) plan should be made pursuant to a prudent decision-making process.[22]  As part of its decision-making process, it is important for the plan sponsor to establish and follow a procedure that satisfies the procedural requirements of ERISA.  According to the DOL, the decision-maker must engage in an "objective process" designed to elicit the information necessary to evaluate the following three criteria:

---

[22] ERISA Section 404(a)(1).

(1)     the qualifications of the service provider,

(2)     the quality of services provided, and

(3)     the reasonableness of the provider's fees in light of the services provided.[23]

68.     Thus, in the case of the prospective engagement of a firm to render plan services, the fiduciary should consider the qualifications of the firm and the firm's personnel, the firm's experience and track record in providing the relevant services, and the background and experience of the firm's employees and management team. Given the highly technical nature of any provider of services, all relevant facts need to be considered as they relate to the administration of the plan.

69.     When considering the quality of the services offered by the prospective vendor, it is especially important for the plan sponsor to identify the scope of the duties and responsibilities that would be assumed by the vendor in connection with the proposed engagement. One source of that information is the fee disclosures mandated under ERISA Section 408(b)(2) (the "408(b)(2) Fee Disclosures").

70.     In order to evaluate the reasonableness of the fees quoted by the prospective service provider, plan fiduciaries should ensure they understand the provider's total fees, including both direct compensation from the plan or sponsor and any indirect compensation flowing from plan investments. A fiduciary may also seek competitive pricing information which may include bids or quotes from other comparable firms to help it determine the prevailing rate for similar services. Benchmarking information may also be available from various sources.

71.     Service fees can be charged under various types of formulae (*e.g.*, flat dollar fee, per-participant fee, transaction fee, asset-based fee, combination of fee formulae, etc.).

---

[23] DOL Advisory Opinion 2002-08A. See also DOL Field Assistance Bulletin 2002-3 and DOL Information Letters to D. Ceresi (February 19, 1998) and to T. Konshak (December 1, 1997).

### C.   Selection And Monitoring of Plan Investments Must Be Done Prudently

72.     Plan fiduciaries have a duty to select investments for the plan's menu properly in accordance with the Duty of Prudence under ERISA.  The fiduciary obligations under this Duty of Prudence do not dissipate after the fiduciary has made an investment selection, even if the initial choice is made in a perfectly prudent manner.[24]  Plan fiduciaries have a duty to monitor the selected investments continuously, in order to ensure that the menu options "remain suitable and prudent investment alternatives for the plan."[25]

73.     Although the duty to "monitor" sounds like a passive responsibility, it actually requires plan fiduciaries to manage the plan's investment menu proactively.  Specifically, this duty requires plan fiduciaries to conduct periodic reviews of the investment menu at regular times on an ongoing basis (e.g., quarterly or annually).  It also requires plan fiduciaries to remove or replace investment options that have become imprudent or no longer fit the plan's needs on a timely basis as necessary.

74.     The Duty of Prudence is primarily a procedural fiduciary requirement, and it is accepted that this duty requires plan fiduciaries to conduct an independent investigation of the merits of the plan's proposed or existing investments.[26]  Thus, in order to discharge their investment duties prudently, fiduciaries must appropriately investigate the pertinent facts relating to the applicable investment before deciding to select or continue it.

75.     One critical step in a prudent investigation of the merits of adding or keeping an investment option on the plan's menu is gathering the relevant information before arriving at an investment decision.[27]  According to the DOL, the necessary information includes "those facts and circumstances that … the fiduciary knows or should know are relevant to the particular investment," including the role the investment will play in the plan's investment menu.[28]  For

---

[24] See, e.g., Keach v. U.S. Trust Co., N.A., 313 F. Supp. 2d 818 (C.D. Ill. 2004).
[25] Preamble to DOL regulations under ERISA Section 404(c), 57 Fed. Reg. 46922 (Oct. 13, 1992); Tibble v. Edison International, 135 S.Ct. 1823 (U.S. 2015).
[26] See, e.g., Donovan v. Cunningham, 716 F.2d. 1455 (5th Cir. 1983), cert. denied, 469 U.S. 1072 (1984).
[27] See, e.g., In re Unisys Savings Plan Litigation, 74 F.3d. 420 (3d Cir.) cert. denied, 519 U.S. 810 (1996).
[28] See 29 C.F.R. 2550.404a-1(b)(1).

example, relevant information may include both quantitative metrics (*e.g.*, investment performance, historical volatility) and qualitative factors (*e.g.*, the investment manager's investment and risk management processes). Plan fiduciaries will also need to determine the investment's intended role in the plan menu and how this will be affected by its investment style (*e.g.*, actively managed U.S. equity large cap strategy, passively managed intermediate-term fixed income strategy, etc.).

76.     Once the relevant information has been gathered, the next step is to appropriately evaluate it.[29] Appropriate consideration includes, but is not necessarily limited to, a determination that the particular investment is reasonably designed, as part of the plan investment menu, "to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain."[30] Thus, once a plan fiduciary has gathered all of the pertinent information surrounding a particular investment option and defined its role in the investment menu, the fiduciary must determine whether the investment is reasonably designed to serve as an appropriate investment choice for participants in the plan's menu, given the investment's expected risk and return characteristics.

77.     During the course of a routine investigation into an existing investment option, if an area of dissatisfaction is identified with respect to a particular investment, the responsible fiduciary must decide if further action must be taken. If the investment does not improve or the sponsor otherwise decides to eliminate it, the investment should be replaced by an alternative. To determine if further action is necessary, it is helpful to place the problematic investment on a watch list and subject it to additional monitoring (*e.g.*, by reviewing it on a more frequent basis and using additional investment tools to evaluate performance). However, because each plan and investment are affected by varying factors, a fiduciary is entitled to exercise discretion in determining the appropriate course of action.

78.     The Duty of Prudence is a procedure-based fiduciary standard, giving plan fiduciaries the responsibility to develop their own particular standards for selecting and

---

[29] See 29 C.F.R. 2550.404a-1(b)(2).
[30] Id.

monitoring the plan investment menu.  Because this fiduciary standard is open-ended, the establishment of written guidelines, such as an investment policy statement ("IPS") is extremely helpful.  An IPS is a written statement designed to further the purposes of the plan, providing guidelines for the plan's investments, as well as courses of action for the plan's investment fiduciaries.  The DOL encourages plan fiduciaries to establish an IPS for the plan, and it has stated that the maintenance of an IPS is consistent with a plan sponsor's fiduciary obligations under ERISA, including the Duties of Loyalty and Prudence. [31]  An IPS can be customized to address the plan's individual investment objectives and needs, and typically includes a statement of the plan's investment objectives, a definition of the roles and responsibilities of plan fiduciaries and guidelines for selecting and monitoring the plan's investment options without setting iron-clad rules.

79.     The Duty of Prudence holds plan fiduciaries to the standard of a hypothetical person who is both familiar with the investment of plan assets and also equipped with the required investment skills; this standard is sometimes referred to as the "prudent expert" standard.  The *procedural* aspect of the prudence standard requires an investigation of the merits of a proposed investment.

80.     The procedural aspect of the prudence standard poses a problem for plan sponsors that may not have the necessary experience or confidence to conduct an independent investigation of the plan's investments, which necessarily entails:  (i) collecting the relevant quantitative and qualitative information regarding each applicable investment, (ii) defining the role of each investment in the plan's menu, (iii) giving appropriate consideration to all relevant information about each investment and determining whether it should be included in the menu, and (iv) establishing and following investment guidelines under an IPS tailored to the particular needs of the plan.

81.     In order to meet the standard of expertise required by ERISA, plan fiduciaries must seek independent advice whenever the responsible fiduciary lacks the experience or skills to be able to conduct a reasonable, independent investigation and evaluation of the risks and

---

[31] DOL Interpretive Bulletin 2016-01, 29 CFR 2509. 2016-01.

other characteristics of a particular plan investment.[32]  Accordingly, plan sponsors should seek the advice of a qualified expert whenever necessary.[33]  If a plan sponsor does not have the investment knowledge or expertise to conduct any aspect of the procedural investigation properly as required under the Duty of Prudence, the sponsor should seek the assistance of a qualified financial advisor and meet with the advisor regularly.  Plan fiduciaries should take care to evaluate the expert advisor's recommendations or investigate the basis of the expert's conclusions.

82.     Documentation of fiduciary reviews can be in the form of meeting minutes. These minutes do not need to be lengthy, but they should describe the: (i) fiduciary topics discussed, (ii) type of investment information considered for the fiduciary review, and (iii) the rationale for resulting investment decisions.  Any related documents or data considered for purposes of the investment review (e.g., prospectuses, plan investment reports, market data, etc.) should be included as attachments to the meeting minutes.  Without proper documentation of the investment decision-making process, plan fiduciaries are potentially liable to claims that their decisions were made in an imprudent or conflicted manner.

### D.  Investment Fees And Expenses Must Be Reasonable

83.     Similar to the discussion above relating to service provider fees, the DOL has articulated three guiding principles that can be applied by plan fiduciaries in order to satisfy ERISA's fee-related duties with respect to investments.  These principles are based on the following chain of logic.  First, the responsible plan fiduciary must ensure that the compensation paid directly or indirectly by the plan to its investment provider is reasonable.  Second, in order to assess the reasonableness of such compensation, the fiduciary must obtain sufficient information regarding the fees or other compensation received by the investment provider. Third, to obtain sufficient information, the fiduciary must engage in an objective process designed to elicit the information necessary to assess:  (a) the qualifications of the provider, (b)

---

[32] See, e.g., Liss v. Smith, 991 F.Supp. 278 (S.D.N.Y.1998).
[33] See, e.g., U.S. Department of Labor Interpretive Bulletin 95-1.

the type and quality of services offered, and (c) the reasonableness of the fees charged in light of the services provided.[34]

84.     For purposes of evaluating a fund manager's qualifications and fund investment performance, plan fiduciaries can rely on the applicable procedural guidelines in the plan's IPS. For example, an actively managed fund's investment performance may be judged on a relative basis against relevant benchmark metrics or as otherwise provided under the guidelines of the IPS.  Similarly, the performance of a passively managed fund or ETF may be evaluated based on the fund's "tracking error," transaction costs and other factors prescribed under the IPS.

85.     For purposes of evaluating the annual fund operating expenses of an investment, plan fiduciaries should obtain competitive pricing information (i.e., fees charged by other comparable investment funds to similarly situated plans).  This type of information can be obtained through mutual fund data services, such as Morningstar and Lipper, or with the assistance of the plan's advisor.  Very large plans may be able to qualify for lower fees on the basis of the level of plan assets deposited in the investment or the number of plan participants who choose to invest in the fund, and comparators may reflect this fact.  In this regard, it is common and prudent for a fiduciary to consider the extent to which revenue sharing payments from an investment fund's expense ratio are used to provide recordkeeping and other administrative services for the plan and its participants.

## V.   CONCLUSIONS REGARDING NYU'S ADHERENCE TO FIDUCIARY STANDARDS WITH RESPECT TO RETENTION OF RECORDKEEPER AND SELECTION AND MONITORING OF CERTAIN TIAA INVESTMENTS

### A.   Recordkeeper Selection Process – General Observations

86.     In counseling 403(b) fiduciaries on the selection of recordkeepers and other service providers, I always base my advice on the principles outlined in Section IV.C, above, to ensure the fiduciary investigates the qualifications of the provider, the nature and quality of the services and the reasonableness of fees, allowing for the likelihood that the fiduciary may need the assistance of a financial advisor in obtaining access to and evaluating this information.  I

---

[34] See, e.g., DOL Field Assistance Bulletin 2002-3 and DOL Advisory Opinions 97-15A and 97-16A.

conclude that the Committee was extraordinarily diligent in establishing and following such a process and making sensible fiduciary decisions with regard to recordkeeping.

87.     The Committee was established in response to and shortly after the issuance of the IRS proposed regulations which, when they ultimately became effective in 2009, dramatically changed the regulatory landscape for 403(b) plans.[35]  From its inception, the Committee considered as long-term goals the potential benefits of consolidating recordkeepers and limiting the number of investment options in the context of the new regulatory regime for 403(b) plans.  The Committee recognized that these potential changes would be complex and involve consideration of all relevant facts and circumstances, including the fact that the vast majority of the Plans' assets (as much as 71%) were invested in TIAA annuities that were owned and controlled by plan participants consistent with the prior operation of 403(b) plans and that participants had an historic expectation, and in many cases a contractual right, to preserve existing investment options.[36]  The Committee was acutely aware of these rights and of participants' sensitivities with respect to the appearance of "taking away" rights to which participants were entitled and accustomed, which could have a detrimental impact on the plans and participants.[37]  Nevertheless, the Committee demonstrated a prudent process of reviewing and considering the extent to which those long-term goals could be accomplished in the context of these plans.

88.     This prudent process included the Committee's actions with respect to reviewing candidates for purposes of selecting a single recordkeeper which commenced with the issuance of an RFP covering each of NYU's 403(b) Plans in May 2008 with responses being delivered in September 2009.  The Committee's ongoing involvement in the review process, led by CLC, is reflected in its meeting minutes and covered bids by at least five competitors, with TIAA and Fidelity being the finalists.[38]  In addition to their RFP responses, multiple presentations were

---

[35] Committee Meeting Minutes, March 18, 2009.
[36] Cammack Due Diligence Report, December 31, 2011.
[37] In the Committee Meeting Minutes of December 9, 2009, it was noted that "Much of the TIAA money cannot be moved and the asset base they hold is very large."
[38] Those bidding on the RFP included: (i) TIAA, (ii) Fidelity, (iii) Diversified Investment Advisors, (iv) Great West, and (v) Vanguard. (See Cammack Report, December 2010 under Tab S (p. 5).)

made to the Committee by the finalists in which the Committee explored their technological and other capabilities, as well as pricing issues.

89.     A key issue in the RFP process was "Vendor Consolidation", which meant moving from multiple recordkeepers, each keeping track of only those investments issued by the recordkeeper's related investment provider (e.g., TIAA kept records and administered only those Plan assets invested in TIAA annuities and other TIAA investment products) to an environment in which all Plan assets would be administered and recordkept by a single provider.  All of the RFP bidders offered open architecture, meaning that their investment platforms were theoretically not restricted to investments offered by the recordkeeper.  However, a major impediment to the goal of a single recordkeeper which emerged was that, given their unique features, certain TIAA investments could not appear on the investment platform of other recordkeepers, although the reverse was not true.  Thus, although participants and management could obtain a view of the total balance of an account by means of workarounds, such an aggregate would not be available on a daily basis for purposes of engaging in Plan transactions such as distributions, hardship withdrawals and loans.  In other words, if Fidelity or Vanguard were to be the sole recordkeeper, an element of coordination with TIAA, administrative complexity and two vendor management would continue.[39]

90.     In addition to such technological matters, the Committee explored the ability of the RFP bidders to deliver particular services important to NYU Plan participants, such as enhanced and branded electronic messaging tied to particular events (e.g. plan enrollment and on-line elections for salary deferrals).[40]  Another key issue was the vendor's ability and/or willingness to provide on-site participant investment education, a feature where TIAA was particularly adept.  CLC informed the Committee that such additional services had the effect of increasing the fee required by an RFP responder.

91.     Pricing offers by the bidders for recordkeeping services were handled by CLC and relayed to the Committee.  TIAA's final bid was 13.8 bps of total Plan assets, down from their

---

[39] See Committee Meeting Minutes of January 21, 2010 and March 11, 2011.
[40] See Committee Meeting Minutes of March 18, 2009.

original bid of 15 bps of revenue from future flows to a new proposed menu, and their intervening bid of 10 bps on assets in a new investment menu under new contracts only. As noted in Committee Meeting minutes,  CLC responded to Committee questioning on this point by stating that, given the level of services involved, TIAA's offer was more competitive than the offers of all other RFP responders.[41]

92.     As discussed above, a number of formulae are available to determine the pricing for recordkeeping services.  The responses to the Committee's RFP were based primarily on two models: (i) a per participant charge, and (ii) a fee equal to a percentage (commonly expressed as basis points or "bps", with one bp equal to one one-hundredth of a percent) of plan assets on the recordkeeper's platform.  I have always advised and continue to advise my clients that ERISA does not mandate utilization of a particular model or formula and that each has its advantages and disadvantages, provided the best interest of participants is taken into account in deciding upon and implementing the appropriate methodology.[42]  To the extent that the asset-based model allows fees to increase automatically over time as plan assets increase, a fiduciary has the option of renegotiating the rate.[43]

93.     This is, in fact, what actually occurred.  After it had selected TIAA as the Plans' recordkeeper, the Committee asked CLC to renegotiate TIAA's fees.  As a result, TIAA agreed to reduce the required revenue rate from 10 bps to 9 bps for the Medical Plan, effective January 1, 2014 and the Faculty Plan's rate was reduced from 13.8 bps to 12 bps.[44]  Further reductions were subsequently discussed and implemented in several steps until the current rate of 3.2 bps for the Faculty Plan which will become  applicable in 2018.  A further reduction negotiated pursuant to a new RFP issued in 2016 reduced the rate to 3.0 bps.  Given the Committee's

---

[41] Committee meeting minutes, January 10, 2011.

[42] Under a per participant fee formula, accounts with low investment levels effectively subsidize larger accounts which are often maintained by high income individuals.  On the other hand, under an asset-based model, individuals must pay a pro-rata share of the fee based on their investments, thereby increasing the burden imposed on high-income individuals.  When the financial markets are increasing, asset-based plan fees will go up, but they will fall when markets decline, as was the case in 2009 and 2010 when the recordkeeping arrangement was being negotiated.  Where fees are being paid by revenue sharing, the recordkeeper bears the risk of revenue sharing not reaching a level sufficient to pay for the services being provided.

[43] Although the record-keeping agreement with TIAA was for a five-year duration, the contract included a 90-day termination clause that allowed the Committee to seek a new provider if TIAA was not cooperative in providing efficient pricing.

[44] Committee Meeting Minutes of November 25, 2013.

persistence on the pricing issue, it is clear that the Committee was diligent, followed a prudent process of continuing to monitor and renegotiate fees and that participants were not disadvantaged by use of an asset-based pricing model.

94.    It should not be forgotten that the Committee made a reasonable judgment that the recordkeeper for the Plans would need to provide significantly more services than merely keeping track of contributions and earnings in participants' accounts. Thus, TIAA's fees could be expected to cover the cost of such things as enhanced communications, as well participant financial and investment education and consultation. In fact, TIAA staffed an office which Plan participants could visit six days a week. The unique nature of TIAA's annuity products with their various interest crediting guarantees also required additional and specialized recordkeeping capability. As one who regularly advises clients on these matters, I am of the opinion that, based on the voluminous record of the Committee's actions with respect to administrative services and fees over this period of time, the Committee acted prudently in considering these factors in assessing the needs of the Plans and participants and the reasonableness of the cost of the services provided by TIAA and acted accordingly.

95.    On the issue of Vendor Consolidation, the Committee initially questioned whether it had enough information to recommend such a change.[45] However, at its meeting on April 21, 2011, the Committee approved the Medical Plan moving forward with TIAA as the sole recordkeeper. In its decision-making, the Committee discussed the fact that the Faculty Plan and Medical Plan had different participant needs and determined that the advantages of consolidation would be more beneficial to the Medical Plan at that time. As noted above, TIAA considered the Medical Plan to be more ready than the Faculty Plan for Vendor Consolidation from a technological perspective. Moreover, the Committee anticipated participant disruption and resistance with respect to changes to the Faculty Plan's investment structure. The Committee's decision to delay moving the Faculty Plan to a single recordkeeper environment was similar to that of many other long educational institutions. TIAA has furnished information with respect to its 200 largest 403(b) plan clients (attached Appendix E) indicating that in 2013, fully two-thirds of them remained in a multi-vendor system for recordkeeping. Even in 2016, a majority of this

---

[45] Committee Meeting Minutes of April 19, 2010.

group rely on multiple recordkeepers.  Given the difficult technological and employee relations issues that were raised by moving to a sole recordkeeper, I conclude, based on my experience, that the Committee's decision was a reasonable and prudent determination that a fiduciary would make under the unique circumstances involving 403(b) plans that have historically invested in TIAA annuity products.

96.     Although some members of the retirement industry  believe that a dual recordkeeping structure results in participants paying higher fees for overlapping services, this is not always true.  The experience of the NYU Plans demonstrates that use of multiple recordkeepers does not always result in higher fees.  The average recordkeeping and administrative fees paid by the Medical Plan calculated on a per- participant basis following its conversion to a sole recordkeeper in 2012 have generally exceeded the average per-participant fees paid in the Faculty Plan, which remained in a multi-vendor environment.

97.     The pricing arrangement reached by the Committee with TIAA included another feature intended to ensure that recordkeeping costs were not excessive, specifically the establishment of an ERISA expense account which receives any revenue sharing from investment providers holding Plan assets that exceed the contractually specified asset-based fee that TIAA stated it needed to administer the Plans.  These accounts, which are typically utilized to pay for plan expenses (*e.g.*, consulting, accounting or legal fees), have become common plan features.  However, the Committee took this one-step further and, on its own initiative, determined that expense account balances should be returned to participants by additional allocations to their Plan accounts.

> B.     Prudence of Retaining The TIAA Real Estate Fund As
> An Investment Option for the 403(b) Plans

98.     The Plaintiffs argue that the Committee was imprudent in retaining the TIAA Real Estate Account  ("REA") on the Plans' menu of investment options, because of its underperformance and excessive fees.  As indicated above, the records of the Committee reflect that it followed a diligent and prudent process in reviewing and evaluating the performance of the REA and, based on that process, decided to retain this investment option.

99.     403(b) advisors recognize that TIAA provides certain unique investment products that are not available from other providers.[46]  The REA is an example of such an investment vehicle in that its portfolio consists of actively managed direct holdings of real estate properties, including commercial rental and retail space and farms.  One of the key advantages of this type of investment is that it has a low correlation to stocks and bonds so that it provides diversification and potentially performs better when there is a downturn in the financial markets.  However, every real property asset is different and, since there is no public market with daily trading for real estate, it is both hard to value and not easily benchmarked.  TIAA itself initially used the S&P 500 index as the REA's comparator but by 2012 had identified a widely adopted private real estate benchmark, the National Council of Real Estate Investment Fiduciaries Property Index, or "NCREIF", as the comparator.  The NCREIF is based on averages of real estate appraisals calculated quarterly and is more reflective of the real estate holdings of the REA.  Although the REA at times underperformed the NCREIF, for example in 2016, in its quarterly review of the Plans' investments, CLC explained to the Committee that this was attributable to the fact that the REA was less leveraged than the NCREIF properties which resulted in lower returns but also had the advantage of reducing the level of risk.[47]

100.     The Committee, with the assistance of CLC, regularly monitored the performance of the REA.  The year-end returns for the REA as reflected in CLC's due diligence reports were as follows:

|  | 1yr | 3yr | 5yr |
|---|---|---|---|
| 12/31/2010 | 13.3 | -11.05 | -1.8 |
| 12/31/2011 | 12.99 | -2.52 | -1.97 |
| 12/31/2012 | 10.06 | 12.11 | -2.63 |
| 12/31/2013 | 9.65 | 10.89 | 2.25 |
| 12/31/2014 | 12.22 | 10.64 | 11.63 |
| 12/31/2015 | 8.16 | 10 | 10.06 |
| 12/31/2016 | 5.6 | 8.6 | 9.3 |

---

[46] See e.g., Deposition of Jan Rezler, November 16, 2017, at p.269-270 commenting on different perceptions in the 403(b) marketplace with respect to the value of TIAA investment vehicles.

[47] Committee Meeting Minutes of September 8, 2016.

In absolute terms, the one year performance gains are impressive. The three and five year returns reflect the effects of the financial downturn of 2008-2009, but this eventually disappears as the economic environment normalized. Given the REA's unique characteristics and positive performance, I would not have advised any other 403(b) fiduciary that it would be imprudent not to replace it, and in my view, the Committee was justified in retaining the REA based on these figures. I note that other large 403(b) plans take a similar view of this investment. Thus, TIAA has surveyed its 200 largest 403(b) plan clients and determined that, during the relevant period of time, as much as 99% of them offered the REA as a plan investment.

101.    In contrast to the NCREIF, the plaintiffs chose to benchmark the REA with the Vanguard REIT Index Fund, reflecting a fundamentally different investment opportunity consisting of publicly-traded securities with daily valuations and leveraging. Compared to this index, the REA's 1-, 3-, and 10-year returns for 2009 were inferior, but given the differences in the investments being measured and the timing of the measurement (i.e., the lowest point of the financial downturn), I would feel compelled to advise plan fiduciaries that the comparison is meaningless. The Plaintiffs also make 1-, 5- and 10-year return comparisons for 2014. This essentially boils down to asserting that because the Vanguard REIT Index Fund apparently had an 18% return for 2014, any other investment related to real estate that returned only 12.22%, such as the REA, could not be prudent and would need to be replaced. Based on long experience, I could not in good conscience render this advice. I note that the 5- and 10-year comparisons the Plaintiffs make for 2014 are not relevant for purposes of evaluating prudence for the reasons explained above, namely that they are affected by the extraordinary circumstance of the 2008-2009 financial downturn.

102.    The Plaintiffs also argue that the REA's expense ratio of 87 bps compared unfavorably with the 8.0 bps expense charge of the Vanguard REIT Index Fund. However, the reason for this disparity is that these are different investments and that the REA requires far more active management than an index of REITs. My advice to plan committees responsible for investment line-ups is that while investment management expenses are not to be ignored, some investments are inherently more expensive than others because of the additional advantages they

bring to the table.  While the unique features of the REA might be irrelevant to an investor only interested in some exposure to real estate, to others, the reduced volatility and greater security of the REA is worth the additional price.  Given that Committee meetings frequently addressed[48] the issues raised by the REA and that its expense was disclosed,[49] I cannot fault the Committee for joining the latter camp.

C.  Prudence of Retaining Stock Account
as An Investment Option for The 403(b) Plans

103.    The Plaintiffs also argue that the Committee was imprudent in retaining the CREF Stock Account on the Plan's investment menu, because of a high expense ratio (44 bps) and underperformance.  CLC's due diligence reports that were provided to and reviewed by Committee members showed that the Stock Account's performance for the period 2010 - 2016 was as follows:

|      | 1yr   | 3yr   | 5yr   |
|------|-------|-------|-------|
| 2010 | 15.73 | -2.68 | 3.13  |
| 2011 | -4.94 | 13.25 | -1.1  |
| 2012 | 17.26 | 8.86  | 0.54  |
| 2013 | 27.83 | 12.53 | 16.84 |
| 2014 | 6.4   | 16.8  | 11.9  |
| 2015 | -0.84 | 10.49 | 8.5   |
| 2016 | 9.2   | 4.8   | 11.6  |

In addition, publicly available information[50] shows that the Stock Account's returns for 2009 were:

|      | 1yr   | 5yr  | 10yr |
|------|-------|------|------|
| 2009 | 32.04 | 1.62 | 0.10 |

---

[48] Committee Meeting Minutes of April 1, 2011, June 9, 2011, February 21, 2012, May 17, 2012, November 16, 2012,  February 22, 2013 and September 8, 2016.
[49] *See e.g.*, TIAA Investment & Fee Disclosure for Reporting Period: 01/01/2009 – 12/31/2009.
[50] https://www.tiaa.org/public/pdf/fact_sheets/Retirement_Annuities.pdf

104.    The Plaintiffs' approach to showing underperformance was to focus on two years: 2009 and 2014.  In 2009, the Stock Account achieved a return of more than 32%, presumably attributable to recovery after hitting a nadir in 2008 due to the financial downturn.  The Stock Account outperformed its then designated benchmark, the Russell 3000 index, which generated a 2009 return of 28.34%.  However, the Plaintiffs complain that the Stock Account was imprudent, because each of three actively managed Vanguard equity funds had gains for 2009 that were 6% to 53% greater than the Stock Account's gain.  Five and ten year  performance figures for the three Vanguard funds were also higher.  However, due to the extreme volatility of the period, none of these comparisons relate to the Stock Account's investment strategy or execution of that strategy and therefore have little  significance from a fiduciary perspective.  I would have counseled any fiduciary in that period that the better performance of the Plaintiffs' comparators in relation to the Stock Account was not a one-time phenomenon resulting from unpredictable market forces that were not likely to repeat.

105.    The Plaintiffs also compared the Stock Account's results for 2014 with the Russell 3000 and several Vanguard equity-based funds.  In that year, the Stock Account had a modest gain of 6.4% after having had an excellent return of almost 28% in the prior year.  However, in 2014, the Plaintiffs' comparators approximately doubled the Stock Account's gain.  Nevertheless, in a similar situation, I would remind a plan fiduciary that investing for retirement purposes is a long-term proposition  and that underperformance in the short-term is not a valid reason for removing a fund.

106.    The Stock Account's investment strategy, its role on the investment menu and the appropriateness of the Plaintiffs' comparators are also worth discussing.  Thus, the Stock Account invested in small, mid, and large company domestic securities.  In addition, up to 30% of its assets are held in foreign equities in both developed and emerging markets.  Because of its comprehensive nature, including its international component, many in the academic community view the Stock Account as the only stock investment they need.  The Stock Account is formally constituted as a component of an annuity product and provides for distributions in that form, which is regarded as another advantage to investing in it.  Many investors in the Stock Account consider these benefits as justifying its relatively high expense ratio.  Like the REA, TIAA's

records show that virtually all of its 200 largest 403(b) plan clients offer the Stock Account as a plan investment option. In my view, this is strong evidence of the prudence of any plan fiduciary that includes the Stock Account on a plan investment menu.

107.    The breadth of the Stock Account's holdings also make it difficult to benchmark, and the benchmark has, in fact, evolved over time so that it is now a blend that includes the MSCI All Country World Investable Market Index in addition to the Russell 3000. The Plaintiffs have made no attempt to show that the equity comparators they utilize are a good measure for the Stock Account as presently constituted, particularly with respect to its international component. Since there is no precise comparator for the Stock Account, investment committees and other plan fiduciaries have a wider latitude to use their discretion in deciding whether it warrants a continued presence on a plan's menu even if other equity funds may have higher returns for particular period.

## Conclusion

108.    The facts indicate that the Committee was thoughtful and diligent, and was very successful in creating and implementing a robust, detailed and well-documented process that included the retention and assistance of industry experts. Indeed, to implement the 2009 IRS regulations, NYU and the Committee:

- Established the Committee by way of a formal Charter;

- Engaged outside counsel to advise the Committee on the effect of the 2009 IRS regulations and their impact on the Committee's fiduciary duties;

- Conducted an RFP for consulting services and considered multiple well-established firms;

- Engaged an independent expert, CLC, to provide investment advisory services to the Committee;

- Conducted an RFP in 2009-2010 for vendors to provide recordkeeping and plan services to the Plans, and considered proposals from, among others, TIAA, Vanguard and Fidelity;

- Analyzed the Committee's inability to direct or "map" investments held in individual contracts (between the participants and TIAA) to a group annuity contract;

- Considered numerous factors regarding Plan service providers, including the vendors' technological capabilities, ability to provide enhanced and branded electronic messaging, NYU-dedicated web and phone assistance for participants, and on-site participant investment education;

- Considered the various interests of the Plans' respective participants;

- Implemented a quarterly due diligence review to regularly review, analyze and monitor the Plans and the Plans' investment alternatives;

- Met on a regular and consistent basis; between September 2007 and September 2017, the Committee formally met at least 42 times, often for hours at a time; and, in the six years preceding the filing of the Complaint on August 9, 2016, the Committee met at least 25 times;

- Used and established an IPS to assist in the Committee's process for reviewing, monitoring and replacing certain of the Plans' investment options;

- Analyzed, monitored and removed and replaced underperforming funds;

- Negotiated lower-cost share classes of certain funds;

- Reviewed and monitored TIAA's and Vanguard's administrative fees;

- Negotiated and established a plan reimbursement account and returned millions of dollars of revenue credits to participants' accounts;

- Met with representatives from TIAA and Vanguard to discuss the performance, structure and management of certain funds;

- Assisted by independent experts (CLC), considered numerous factors and analyses of the investment alternatives offered under the Plans, including measures of fund managers' performance, volatility, expense ratios, ratings, risk and return characteristics, risk-adjusted returns, deviations and style drift;

- Conducted a second RFP in 2016 for vendors to provide plan services and, again, considered service providers beyond those already providing services to the Plans;

- Carefully considered and approved a single recordkeeper arrangement for the Medical Plan in 2011 and for the Faculty Plan in 2017;

- Negotiated reduced Vanguard administrative fees; and

- Negotiated an █████ reduction in TIAA's administrative fees.

109.    Based on the forgoing analysis and my extensive experience in counseling 403(b) and 401(k) fiduciaries responsible for selecting plan menus and hiring plan service providers with respect to their fiduciary duties, I conclude without reservation that during the class period, the NYU Retirement Committee followed procedures that were prudent and fully consistent with its fiduciary duties under ERISA with respect to its decision to retain TIAA as the recordkeeper for the Faculty and Medical Plans and with respect to the related fees paid as compensation for these services.  Based on my experience in advising plan fiduciaries with respect to plan investment menus, I further conclude that the NYU Retirement Committee followed appropriate procedures and exercised prudent judgment in retaining the TIAA Real Estate Account and CREF Stock Account on the investment menus of the Plans.

* * * * * * * * *

I attest to everything in this report as stated above and declare under penalty of perjury that the forgoing is true and correct and that this report is executed this 22nd day of December 2017 at Boston, Massachusetts.

_____
Marcia S. Wagner, Esq.

## Appendix A

## MARCIA S. WAGNER, ESQ.

---

### *PROFESSIONAL EXPERIENCE*

**The Wagner Law Group, A Professional Corporation, formerly known as Marcia S. Wagner, Esq. & Associates, P.C.,** Managing Director, Specializing in ERISA/Employee Benefits Law (August 1996 – Present)

**K&L Gates,** formerly known as Warner & Stackpole, Partner, Specializing in ERISA/Employee Benefits Law; Head of ERISA/Employee Benefits Practice Group (July 1995 – August 1996)

**Powers & Hall,** Of Counsel, Specializing in ERISA/Employee Benefits Law; Head of ERISA/Employee Benefits Practice Group (July 1993 – July 1995)

**Choate, Hall & Stewart,** Associate, ERISA/Employee Benefits (January 1989 - June 1993)

**Bingham, Dana & Gould,** Associate, Corporate Taxation/ERISA/Employee Benefits (September 1987 - January 1989)

**Harvard Law School,** Teaching Assistant, Legal Writing Course (December 1986 - February 1987)

**Harvard College,** Economics Teaching Fellow (August 1985 - June 1986)

**Cornell University,** Teaching Assistant, Government Course (graduate level) (August 1983 – June 984)

### *EDUCATION*

**Harvard Law School,** Juris Doctorate, 1987

> Honors: John M. Olin Law and Economics Research Fellowship, Who's Who Among American Law Students, Economics Teaching Fellowship at Harvard College

**Cornell University,** Bachelor of Arts, 1984
Courses: Double major in Economics and Government
Honors: Summa cum laude, dean's list every semester, distinction in all subjects, honor societies: Phi Beta Kappa, Phi Kappa Phi, Alpha Lambda Delta

**London School of Economics and Political Science,** General Course Degree, 1983
Courses: Graduate level Economics
Honors: Class One Distinction, top 5% of all foreign students

## *PROFESSIONAL ACTIVITIES*

**Bar Admissions**          Massachusetts, November 1987
                            District of Columbia, December 1987

**Appointments
and Committee
Memberships**               IRS Advisory Committee on Tax Exempt and Government Entities (June 2007
                            – June 2010; 2010 Employee Benefits Subcommittee Chair) – Advice and
                            consultation to the IRS on pension matters:

                                    2010 – Analysis and Recommendations Regarding the IRS's
                                    Determination Letter Program

                                    2009 – International Pension Issues in a Global Economy: A Survey
                                    and Assessment of IRS' Role in Breaking Down the Barriers

                                    2008 – Improving the Employee Plans Compliance Resolution
                                    System: A Roadmap for Greater Compliance

                            Legg Mason Retirement Advisory Council (March 2010 - )

                            Fellow, American College of Employee Benefits Counsel, September 2008

                            Harvard Law School, 10th, 15th, 20th, 25th and 30th Reunion Committee

                            Membership to the National Association of Professional Women (2007 - )

                            Advisory Board on Compensation Planning for Tax Management, Inc. (1993 - )

                            Advisory Council for Foundation for Fiduciary Studies, Joseph M. Katz School
                            of Business, University of Pittsburgh (2004- )

                            Advisory Board for Pension Assistance Project of Gerontology Institute of UMass
                            Boston (1993 - 1997)

                            American Arbitration Association, Council of Arbitrators (Focus areas: ERISA /
                            employee benefits law) (1993 - 1995)

                            Commonwealth Institute – Million Dollar Circle Member (2005 - )

                            Editorial Advisory Committee for Profit Sharing/401(k) Council of America (2005 - )

                            Editorial Board for Law Firm Partnership & Benefits Report (1999 - )

Employee Benefits Committee, American Bar Association Tax Section (1990 - )

ERISA/Employee Benefits Law Committee, Boston Bar Association (1990 - )

Pension Liaison Committee, IRS Key District Office, Brooklyn, NY (1992 - )

Tax Section Council, Massachusetts Bar Association (1992 - )

**Courses Taught**   "Controlled Group, Affiliated Service Group, Leased Employee and Independent Contractor Issues," Continuing Professional Education for Internal Revenue Service Employee Plans Audit Agents, Northeast Division of Internal Revenue Service (2005)

"Federal Employment Rights," Guest Lecturer for ERISA Portion of Course, Massachusetts School of Law, Fall 2001

"Pension Law," Bentley College, Fall 1999 and Fall 2000

**Commendation/
Honors**          Massachusetts Super Lawyers, Boston Magazine – Top 50 Women Attorneys 2016

Top Rated Lawyer by New England's Legal Leaders Magazine, 2013 – 2016

100 Most Influential People in The 401(k) Industry for 2015, 401(k) Wire (Ms. Wagner is No. 15)

100 Most Influential People in The 401(k) Industry for 2013, 401(k) Wire (Ms. Wagner is No. 21)

New England's Best Lawyers 2013 – 2015

2013-2016 New England Super Lawyers in Employee Benefits/ERISA

Super Lawyers in Massachusetts, New England Super Lawyers Magazine, 2012 – 2016

Boston's Top Rated Lawyers, The Boston Globe, 2012

100 Most Influential People in The 401(k) Industry for 2012, 401(k) Wire (Ms. Wagner is No. 21)

Top Women of Law, Massachusetts Lawyers Weekly, 2011

Marcia nominated by Fiduciary News readers as "Top ERISA Attorney", June 2011

Marcia is listed as one of the top 25 attorneys in the inaugural issue of Boston

Business Journal's Who's Who of Attorneys in New England, 2011

100 Most Influential People in The 401(k) Industry for 2011, 401(k) Wire (Ms. Wagner is No. 27)

Super Lawyers in Massachusetts, New England Super Lawyers Magazine, October 2010 and 2011

Commissioner's Award, IRS Tax Exempt & Government Entities Division, 2010

Boston's Best Lawyers, The Boston Globe and Boston.com, 2010

100 Most Influential People in The 401(k) Industry for 2010, 401(k) Wire (Ms. Wagner is No. 40)

Top 50 Women Lawyers in New England, New England Super Lawyers Magazine, 2009 and 2010

Top 50 Female Attorneys in Massachusetts and New England, Law and Politics Magazine, 2009 and 2010

New England Super Lawyers, New England Super Lawyers Magazine and Corporate Counsel Edition, 2009

Massachusetts Super Lawyers List, New England Super Lawyers Magazine, 2009

New England Super Lawyers, American Registry – Top Attorneys in New England, May 2009

Boston's Best Lawyers, The Boston Globe and Boston.com, 2009

Top 10 Corporate Lawyers, Boston Women's Business Journal and The Boston Herald, January 2009

100 Most Influential People in The 401(k) Industry for 2009, 401(k) Wire (Ms. Wagner is No. 76)

The Best Lawyers in America: Employee Benefits Law, 2009

Boston's Best Lawyers, The Boston Globe Magazine and Boston.com, 2008

Massachusetts Super Lawyers, Boston Magazine – Top 100 Lawyers Overall and Top 50 Female Lawyers, 2008

New England Super Lawyers, New England Super Lawyers Magazine – Top 100 Lawyers Overall and Top 50 Female Lawyers, 2008

Massachusetts Super Lawyers List, New England Super Lawyers Magazine, October 2008

List of the Best Lawyers, The Best of the U.S. 2008

100 Most Influential People in The 401(k) Industry for 2008, 401(k) Wire (Ms. Wagner is No. 73)

Selected to be in The Best Lawyers in America: 2008 edition

Top 50 Women Lawyers, Boston Magazine, November 2007

Special 25th Anniversary Edition of Best Lawyers in America: Employee Benefits Law, 2007

New England Super Lawyers, New England Super Lawyers Magazine, November 2007

Who's Who Among Executives and Professional Women – Honors Edition, Representing Boston, MA, Biltmore Who's Who, January 2007

International Biographical Centre Lifetime Achievement Award, International Biographical Centre, Cambridge, England January 2007

Top 50 Women Lawyers, Boston Magazine, November 2006

Top 100 Massachusetts Lawyers, Boston Magazine, November 2006

A Great Mind of the 21st Century: ERISA/Employee Benefits, American Biographical Institute, October 2006

Massachusetts Super Lawyers: ERISA/Employee Benefits, Boston Magazine, October 2006

Best Lawyers: Employee Benefits, Corporate Counsel, October 2006

Massachusetts Super Lawyers: ERISA/Employee Benefits, Boston Magazine, October 2005

Who's Who Among Executive and Professional Women – Honors Edition, Representing Boston, MA, Empire Who's Who, July 2005

Who's Who Among Executive and Professional Women – Honors Edition, Manchester's Who's Who, July 2005

AV Peer Review Rating, Very High to Preeminent Legal Ability and Integrity, LexisNexis Martindale-Hubbell, June 2005

Selected to be in Best Lawyers in America: 2005, 2006 and 2007 editions

Delegate, Harvard Law School (2003 – )

Best Lawyers: Employee Benefits, Corporate Counsel, September 2003 and May 2005

New England Employee Benefits Council Best Practices Award, 2002

Distinguished Author, presented by Bureau of National Affairs, Tax Management, Inc., 1994

Life Member of the National Registry of Who's Who, published in 1999 edition

## Appendix B

## Books Published

Exploring Advice: What You Need to Know About Good Financial Advice, a Quality Financial Plan and the Role of a Fiduciary, Kevin Knull, CFP (Marcia S. Wagner, contributing author)

Quick Reference to HIPAA Compliance, Aspen Publishers, 2016-2017 edition

The Advisor's Guide to the DOL Fiduciary Rule - The National Underwriter Company, division of ALM Media, LLC, 2016

Financial Aspects of Divorce in Massachusetts, MCLE New England, 2016

Quick Reference to HIPAA Compliance, Aspen Publishers, 2015-2016 edition

*Quick Reference to HIPAA Compliance,* Aspen Publishers, 2014-2015 edition

*BNA Tax Management Portfolio:* "EPCRS - Plan Correction and Disqualification", 2014

Advising Small Businesses: "Qualified Retirement Plans", West Services, Inc. 2007-2014 editions

Health Care Reform Tool Kit, editor, WorldatWork.org, 2012

The ERISA Fiduciary Compliance Guide, The National Underwriter Company, 2012

BNA Tax Management Portfolio: "ERISA-Litigation, Procedure, Preemption and Other Title I Issues", 2005, 2012 and 2013 editions

Bender's Federal Income Taxation of Retirement Plans, (Chapter 1:  Introduction to Retirement Legislation and Guide to Application:  From ERISA to Pension Protection Act) and (Chapter 11:  Controlled Groups and Affiliated Service Groups) 2008 edition

Advising Small Businesses: "Qualified Retirement Plans", West Services, Inc. 2007, 2008 and 2009 editions

BNA Tax Management Portfolio: "EPCRS – Plan Correction and  Disqualification", 2004, 2009, 2010 and 2014 editions

Quick Reference to HIPAA Compliance, Aspen Publishers, annual editions 2004 - 2015

BNA Tax Management Portfolio:  "Plan Disqualification and ERISA Litigation" (1993); update 1999

Labor and Employment Law:  Compliance and Litigation, Contributor for ERISA - employee benefits chapters, Clark, Boardman, Callaghan, 1997

## Articles Published

Trump Executive Order May Prevent Guidance on Employee Benefits Issues", investmentnews.com, February 7, 2017

"Why it Would be a Mistake For Advisers to Stop Implementing the DOL Fiduciary Rule", investmentnews.com, December 1, 2016

"Process Remains Critical Factor in ERISA 401(k) Plan Litigation", 401(k) Advisor, December, 2016

"Plan Reflection: Satisfying Nondiscrimination Testing at Closed DC Plans", Plan Sponsor, November, 2016

"Managed Accounts and the Conflicts of Interest Rule", 401(k) Advisor, November, 2016

"What The DOL's Final Fiduciary Rule Means for Plan Committees", 401(k) Advisor, October, 2016

"IRS Restricts Salary Deferrals for NQDC Plans", PlanAdviser, September-October, 2016

"IRS Proposal to Modify Rules for Deferred Compensation Plans of Governmental and Tax-Exempt Plans", 401(k) Advisor, September, 2016

"Governmental Plans Will Receive Face-Lift", PlanSponsor, July-August, 2016

"Level Fee Fiduciaries and the BICE", 401(k) Advisor, August, 2016

"Impact of New Fiduciary Rules on an Excess Fee Lawsuit", 401(k) Advisor July, 2016

"What the DOL's Final Fiduciary Rule Means for 401(k) Plans", 401(k) Advisor June, 2016

"The Fiduciary Status of Investment Platform Providers", 401(k) Advisor, May 2016

"Ethical Considerations - Understanding The Limitations With Which Advisers Operate", Plan Sponsor, May 2016

"Mid-Year Amendments to Safe Harbor 401(k) Plans Made Easier", 401(k) Advisor, April 2016

"Fiduciary Fitness:  Expanding Coverage", PlanAdviser, March-April 2016

"The Evolution of ERISA Fiduciary Best Practices", IMCA Investments & Wealth Monitor, March/April 2016

"Supreme Court's Amgen Decision Clarifies Treatment of Inside Information in Stock Drop Cases", 401(k) Advisor, March 2016

"They Are Back:  New Theories from the Plaintiffs' Bar in 401(k) Litigation", 401(k) Advisor, February 2016

"De-Risking Strategies", PlanSponsor, February 2016

"Raising the Plaintiffs' Bar", PlanAdviser, January-February 2016

"Intel Class Action Opens New Frontier in 401(k) Litigation", 401(k) Advisor, January 2016

"Politics and Economically Targeted Investments", 401(k) Advisor, December 2015

"Fiduciary Standards for ESG Funds", PlanAdviser, November/December 2015

"DOL Amicus Brief Preserves Sinking Float Guidance", 401(k) Advisor, November 2015

"The New Fiduciary Rule and Annuities", PlanAdviser, September-October 2015

"New Fiduciary Rule Affects IRA Rollovers", 401(k) Advisor, October 2015

"Impact of Platform Provider Carve-Out on 401(k) Plans Remains Unclear", 401(k) Advisor, September 2015

"The Great Divide:  The Different Effect of the DOL's Fiduciary Proposal on Large and Small Plans", 401(k) Advisor, August 2015

"Same-Sex Marriage Ruling", PlanAdviser, July/August 2015

"Supreme Court Issues Tibble Decision, but the Case Drags On", 401(k) Advisor, July 2015

"Proposed New Fiduciary Rule for 401(k) Advisers", 401(k) Advisor, June 2015

"EPCRS's Makeover", <u>PlanAdviser</u>, May/June 2015

"Whither Float?", <u>401(k) Advisor</u>, May 2015

"ERISA Reins in PBGC", <u>PlanAdviser</u>, March-April, 2015

"Promoting Lifetime Plan Participation", <u>401(k) Advisor</u>, March 2015

"DOL Issues New Guidance on Locating Missing Participants",
<u>Confero</u> (quarterly publication of Westminster Consulting), Winter Issue 2015

"Continuing Violation", <u>PlanAdviser</u>, January-February 2015

"Nationwide Settlement: One for the Books?", <u>401(k) Advisor</u>, February 2015

"Mortality Table Updates", <u>PlanSponsor</u>, January 2015

"Tussey v. ABB, Inc.: What's Next?", <u>401(k) Advisor</u>, January 2015

"Clouds on the Horizon as ERISA Turns 40", <u>Tax Management Compensation Planning Journal</u>, January 2015

"Using Target Date Funds to Provide Lifetime Income", <u>401(k) Advisor</u>, December 2014

"When ERISA Applies to HSAs", <u>PlanAdviser</u>, November-December, 2014

"Impending Changes to Private Retirement Plans", <u>The Politics of Retirement</u>, November/December 2014

"A Road Less Travelled: Including Alternative Investments in a 401(k) Plan", <u>401(k) Advisor</u>, November 2014

"Offering Longevity Annuities in 401(k) Plans", <u>401(k) Advisor</u>, October 2014

"Fiduciary Considerations – The Post-Dudenhoeffer Era", <u>PlanAdviser</u>, September/October 2014

"Will ERISA Be Balkanized?", <u>401(k) Advisor</u>, September 2014

"Fund Revenue Equalization", <u>PlanAdviser</u>, July-August 2014

"ERISA Accounts and Fiduciary Duties", <u>401(k) Advisor</u>, August 2014

"Fiduciary Status for Service Providers", <u>401(k) Advisor</u>, July 2014

"Please Respond to This RFP", <u>PlanAdviser</u>, May-June 2014

"Expert Q&A on the Effects of Health Care Reform on Retirement Plans", <u>Practical Law The Journal</u>, June 2014

"How Tax for Retirement Plans Can Affect Risk and Compliance", <u>Practical Compliance & Risk Management for the Securities Industry</u>, May-June 2014

"ABB: Affirmed, Reversed, and Vacated", <u>401(k) Advisor</u>, June 2014

"Compliance Refresher:  Fee Disclosures and Comparative Charts", <u>401(k) Advisor</u>, May 2014

"How Tax Reform for Retirement Plans Can Affect Risk and Compliance", <u>Practical Compliance & Risk Management for the Securities Industry</u>, May-June 2014

"Supreme Court to Hear Stock-Drop Case", <u>401(k) Advisor</u>, April 2014

"The Tax Reform Act of 2014", <u>PlanAdviser</u>, March-April 2014

"Expert Q&A on the Effects of Health Care Reform on Retirement Plans", <u>uspracticallaw.com</u>, April 2014

"ERISA Fee Disclosures:  Best Practices for Fiduciaries", <u>Journal of Pension Benefits</u>, April 2014

"Another Regulator Heard from on Capturing Rollovers", <u>401(k) Advisor</u>, March 2014

"Regulation of CIFs - The Advantages of Collective Investment Funds", <u>PlanAdvisor</u>, January-February 2014

"Another Regulator Heard from on Capturing Rollovers", <u>401(k) Advisor</u>, February 2014

"IRS Creates Level Playing Field for Suspensions of 401(k) Safe Harbor Contributions", <u>401(k) Advisor</u>, January 2014

"Back to a Classic - Revisiting Collective Investment Funds", <u>PlanAdviser,</u> November-December 2013

"ERISA Compliance Policies and Procedures:  Where Are Yours?", <u>401(k) Advisor</u>, December 2013

"Administrators Come In Many Flavors", <u>401(k) Advisor</u>, November 2013

"IRS Comes Out with Same-Sex Guidance", <u>401(k) Advisor</u>, October 2013

"Revenue-Sharing Tasks – Meeting DOL Fiduciary Requirements", <u>PlanAdvisor</u>, September-October, 2013

"ERISA Accounts Meet Plan Asset Rules in New DOL Guidance", 401(k) Advisor,
September 2013

"DOL Offers Tips on TDFs", PlanAdviser, July-August 2013

"Lifetime Income Illustrations Come of Age", 401(k) Advisor, July 2013

"Buyer Beware:  Choosing A 3(16) Fiduciary", Plan Consultant magazine,
Summer 2013

"How to Be a Functional Fiduciary without Doing Anything – The Seventh Circuit
Rejects DOL Theory", 401(k) Advisor, June 2013

"Tibble v. Edison Affirmed, But Plaintiffs May Not Be Celebrating", 401(k) Advisor,
May 2013

"DOL Offers Tips on TDFs", 401(k) Advisor, April 2013

"In-Roth Conversions Expanded Under Fiscal Cliff Tax Law", 401(k) Advisor, March
2013

"Fixing 403(b) Plans", PlanAdviser, March-April 2013

"More on Moench", 401(k) Advisor, February 2013

"Class Action Litigation Settlements and ERISA:  What Does PTE 2003-39 Really
Require?", Tax Management Compensation Planning Journal, February 1, 2013

"Fee Information Has Been Delivered – Now What", PlanAdviser, January-February
2013

"Standing and Statute of Limitations Issues in New Proprietary Funds Case", 401(k)
Advisor, January 2013

"Giveth and Taketh", PlanAdviser, November-December 2012

"Implications of 408(b)(2) Regulations for Plan Sponsors", 401(k) Advisor, December
2012

"The Fiduciary Duty to Recover Securities Class Action Settlement Awards Under
ERISA", Tax Management Compensation Planning Journal, December 7, 2012

"Explaining the USI Settlement", 401(k) Advisor, November 2012

"Bidwell Confirms That QDIA Safe Harbor Applies to Re-Enrollments", 401(k) Advisor, October 2012

"Disclosure Obligations Could Be Broader Than DOL Regulations", Plan Consultant Magazine, (an official publication of ASPPA), Fall 2012

"My Experience Starting a Business in the Retirement Plan Industry", Women In Pension Network the WiPN Newsletter/Fall 2012

"Giveth and Taketh", PlanAdviser, September-October 2012

"DOL Shifts Stance on Brokerage Windows but Questions Remain", 401(k) Advisor, September 2012

"Update on DOL Guidance Regarding Disclosure Rules", 401(k) Advisor, August 2012

"DOL Advisory Opinions Only A Speed Bump for Open MEPs?", 401(k) Advisor, July 2012

"ABB Blockbuster", 401(k) Advisor, June 2012

"Attention to Details Government Debuts Lifetime Income Initiatives", Plan Adviser, May-June 2012

"Encouraging Annuitization", Plan Adviser, March-April 2012

"Tax Guidance on Lifetime Income Options", 401(k) Advisor, March 2012

"Understanding the Rules for Electronic Disclosure of Fee Information", Plan Adviser, January-February 2012

"The Fiduciary Duty to Investigate Plan Investments", 401(k) Advisor, February 2012

"Capitalizing on Fee Disclosure Rules", DC Edge Magazine, Quarter 1, 2012

"DOL Issues Final Regulations on ERISA 408(b)(2)", Market Watch, February 6, 2012

"SEC Gives Participant-Level Disclosure a Pass", 401(k) Advisor, January 2012

"The Savings Crisis of Working Americans:  The Retirement Industry Call to Action", Legg Mason Retirement Advisory Council, January 3, 2012

"Class Certification Requirements in 401(k) Fee Litigation", 401(k) Advisor, December 2011

"Consequences of Tax Reform Proposals Relating to 401(k) Plan Contributions", Plan Adviser, November-December 2011

"Future Investment Advice Regulation", 401(k) Advisor, November 2011

"Asserting the Attorney-Client Privilege in ERISA Cases", Law Firm Partnership & Benefits Report, October 2011

"Pyrrhic Victory for Plaintiffs in Tibble v. Edison", 401(k) Advisor, September 2011

"Investing with Confidence", Plan Adviser, September-October 2011

"Review of DOL Amicus Filings", 401(k) Advisor, August 2011

"Cause and Effect the Influence of 401(k) Fee Litigation", Plan Adviser, July-August 2011

"Case Suggests that RFPs May be Necessary to Fulfill Fiduciary Duties", 401(k) Advisor, July 2011

"New Puerto Rico Tax Code Requires Big Changes to Retirement Plans for Puerto Rico Employees", 401(k) Advisor, June 2011

"Public Pension Plans and the Retirement Gap:  Understanding the Crisis and Possible Solutions", Pension & Benefits Daily, June 7, 2011

"In Plan" Roth Conversions and New Electronic Deposit Rules for Payment of Retirement Plan Withholding Taxes", 401(k) Advisor, May 2011

"Education Nation", Plan Adviser, March-April 2011

"Tools Help Fiduciaries Evaluate Plan Fees", 401(k) Advisor, February 2011

"DOL Issues Final Regulations on Mandatory Fee Disclosures", Law Firm Partnership & Benefits Report, February 2011

"Brace for Impact", Plan Adviser, January-February 2011

"Partial Plan Terminations of Qualified Plans", The ASPPA Journal, Winter 2011

"Constitutional Challenges to the Patient Protection and Affordable Care Act", New York University Review of Employee Benefits and Executive Compensation, 2010

"Re-Defining Moment DOL Proposes Broadening the Definition of Fiduciary", Plan Adviser, December 2010

"Voluntary Correction Program for Nonqualified Deferred Compensation Document Failures", <u>401(k) Advisor</u>, December 2010

"Health Care Reform Overview" <u>healthcarereformmagazine.com</u>, December 6, 2010

"Court Ruling on Mutual Fund Fees to 401(k) Plans", <u>401(k) Advisor</u>, November 2010

"Exercising Fiduciary Authority and Control Over the Investment Menu in §403(b) Plans Subject to ERISA", <u>Tax Management Compensation Planning Journal</u>, November 5, 2010

"FBAR Rules for Employee Benefit Plans", <u>Law Firm Partnership & Benefits Report</u>, October 2010

"Selecting Benchmarking Services to Help Meet Fiduciary Requirements", <u>Compensation & Benefits Review</u>, October 2010

"IRS Determination Letter Program for Tax-Qualified Retirement Plans", <u>401(k) Advisor</u>, October 2010

"Conflict of Interest", <u>Planadviser.com</u>, October 2010

"Plan Sponsor's Duty to Avoid Conflicts of Interest", <u>Journal of Pension Benefits</u>, October 2010

"Partial Plan Liability", <u>401(k) Advisor</u>, September 2010

"Lifetime Income Options", <u>401(k) Advisor</u>, August 2010

"Exercising Fiduciary Authority and Control over the Investment Menu in ERISA 403(b) Plans", <u>PlanSponsor.com</u>, August 3, 2010

"Benchmarking Services:  A Potential Solution to Every 401(k) Plan Fiduciary's Problem", BNA <u>Tax Management Memorandum</u>, Vol. 51, No. 16, August 2, 2010

"How to Deal With the DOL's Campaign Against Cross-Selling", <u>Plan adviser.com</u>, August 2010

"Best Practices Evolving from 401(k) Fee Litigation", <u>Planadviser.com</u>, August 2010

"Taxation of Deferred Compensation:  Overview of 409A and 457", <u>Compensation and Benefits Review</u>, July/August 2010

"Avoiding Conflicts of Interest as Your Business Grows", <u>401(k) Advisor</u>, July 2010

"Health Care Reform:  An Overview of Health Care Reform with Recommended Action Steps to Take", <u>BNA Insights</u>, July 29, 2010

"Tactical Asset Allocation Under ERISA," <u>401(k) Advisor</u>, June 28, 2010

"Investment Advice Regulations Update," <u>401(k) Advisor</u>, May 2010

"DOL Proposes New Regulations for Investment Advice," <u>401(k) Advisor</u>, April 2010

"A Plan Sponsor's Fiduciary Duties Under ERISA:  With Great Responsibility Comes Great Potential Liability," <u>401(k) Advisor</u>, March 2010

"Best Practices Evolving From 401(k) Fee Litigation," <u>401(k) Advisor</u>, February 2010

"Is It Now Time for Managed Accounts?" <u>New York University Review of Employee Benefits and Executive Compensation</u>, 2009

"Partial Plan Terminations," <u>Law Firm Partnership & Benefits Report</u>, Vol. 15, No. 5, July 2009

"A Meditation on the Definition of Plan Assets," <u>The ASPPA Journal</u>, Vol. 39, No. 1, Winter 2009

"Proposed DOL Rules On 401(k) Fee Disclosures," <u>Law Firm Partnership & Benefits Report</u>, June, 2008

"Criminal Issues Regarding Title I Investment Breaches," <u>Tax Management Compensation Planning Journal</u>, March, 2008

"The Senate Tax Patent Bill, Even Worse that the House Provision," <u>Tax Management Compensation Planning Journal</u>, February, 2008

"Where Fiduciary & Preemption Issues are Headed in 2008," <u>ERISA Litigation Update for CFDD</u>, February 21, 2008

"Commentary on the Patent Reform Act of 2007 Issued Patents and Patent Applications," <u>Tax Management Compensation Planning Journal</u>, November, 2007

"Fiduciary Issues Associated with Default Investment Alternatives Under Participant Directed Individual Account Plans," <u>NYU Employee Benefits and Executive Compensation Review</u>, August 2007

"Will ERISA Preemption Derail Massachusetts Health Care Reform?" <u>NYU Employee Benefits and Executive Compensation Review</u>, August 2007

"MA Health Care Reform Law," <u>Law Firm Partnership & Benefits Report</u>, July 2007

"Will ERISA Preemption Derail Massachusetts Health Care Reform?" Compensation Planning Journal, June 2007

"Preserve ERISA Plans with Proactive, Voluntary Changes," Business Insurance, February 2007

"Learn to Uncover Hidden 401(k) Fees," Boston Women's Business Journal, February 2007

"Fiduciary Issues Associated with Default Investment Alternatives Under Participant-Directed Individual Account Plans," Compensation Planning Journal, January 2007

"Is Medical Tourism the Right Option?" Boston Women's Business Journal, November 2006

"ERISA Plan Corrections:  An Attractive Alternative to Hefty Penalties," New England In-House, October 2006

"Medical Tourism:  What are Your Options?" Employee Benefits News, October 2006

"Medical Tourism and Group Health Plans," Journal of Compensation and Benefits, September/October 2006

"Employee Benefits Bankruptcy Issues That Law Firms Need to Know," Law Firm Partnership & Benefits Report, May 2006

"What Is the Uniformed Services Employment and Reemployment Rights Act of 1994?" Law Firm Partnership & Benefits Report, July 2005

"Fiduciary Issues Associated with Life Cycle Funds in Individual Account Plans," Tax Management Compensation Planning Journal, May 2005

"An Update on USERRA as it Affects Plans," 401(k) Advisor, March 2005

"The Mutual Fund Scandals:  What's A Plan Sponsor To Do?" Law Firm Partnership and Benefits Report, October 2004

"Same Sex Spouses in Massachusetts: The Affect on Employee Benefits," Law Firm Partnership and Benefits Report, February 2004

"Managed Accounts:  Still the Best, Least Risky Solution Yet Developed," Tax Management Compensation Planning Journal, November 2003

"Paying Expenses from Plan Assets," 401(k) Advisor, October 2003

"Managed Accounts:  Are They the Answer?," <u>Tax Management Compensation Planning Journal</u>, August 2003

"HIPAA Health Data Privacy Rules:  Final Regs. Issued," <u>Law Firm Partnership & Benefits Report</u>, February 2003

"Understanding Split-Dollar Arrangement Rules," <u>Law Firm Partnership & Benefits Report</u>, May 2002

"Qualified State Tuition Programs: Differentiating Among the Two Types," <u>Law Firm Partnership & Benefits Report</u>, August 2001

"Department of Labor Establishes New Fiduciary Self-Correction Program," <u>Law Firm Partnership & Benefits Report</u>, January 2001

"Friend or Foe?  The Pros and Cons of the New Department of Labor Voluntary Fiduciary Correction Program," University of Denver College of Law, <u>Preventive Law Reporter</u>, Summer 2000

"Friend or Foe? The Pros and Cons of the New Department of Labor Voluntary Fiduciary Correction Program," BNA <u>Tax Management Memorandum</u>, June 2000

"Participant Self Direction of Account Balances:  Investment Advice or Investment Education", <u>Villanova Journal of Law and Investment Management,</u> Vol. 1, Issue 1, Winter 1999

"Correcting Plan Defects," <u>Massachusetts Bar Association Taxation Section Newsletter</u>, October 1999

"IRS Consolidates Employer Options for Correcting Pension Plan Defects," <u>Law Firm Partnership and Benefits Report</u>, June 1999

"ERISA, Employee Benefits and Employment Update", <u>Massachusetts Society of Certified Public Accountants On-Line</u>, March 1999

"Changes to IRS Correction Programs", <u>Massachusetts Bar Association Section Review</u>, December 1998

"Law Firm Tax-Qualified Pension Plans: A Case Study," <u>Law Firm Partnership and Benefits Report</u>, December 1998

"Eliminating Preteirement Distributions to Employees", <u>Massachusetts Bar Association Section Review</u>, December 1998

"The Provision of Investment Advice Under PTE 97-60", <u>Trust & Investments</u>, September/ October 1998

"The Provision of Investment Advice Under Prohibited Transaction Exemption 97-60," American Bankers Association, September 1998

"The Provision of Investment Advice Under Prohibited Transaction Exemption 97-60," American Bar Association, Taxation Section Employee Benefits Committee meeting materials, January 1998

"The Provision of Investment Advice Under Prohibited Transaction Exemption 97-60," Tax Management Compensation Planning Journal, January 1998

"Tax-Qualified Retirement and Annuity Plans May Self-Correct Operational Violations," MBA Section of Taxation Newsletter, February 1997

"Pension Simplification Highlights," MBA Section of Taxation Newsletter, November 1996

"Alternatives to Plan Disqualification, Including Discussion of 403(b) Plans," New York University Fifty-Third Institute on Federal Taxation (Matthew Bender), October 1995

"The Department of Labor Delinquent Filer Voluntary Compliance Program," MBA Section of Taxation Newsletter, October 1995

"Crime and Punishment - The Theory, Evolution and Future of Alternatives to Plan Disqualification," Tax Management Compensation Planning Journal (Special ERISA 20th Anniversary Issue), December 1994

"A General Introduction to Employee Benefit Plans," The Best of MCLE Journal, February 1994

"Qualified Plans With Disqualifying Defects:  The Changing Face of Enforcement," MBA Section of Taxation Newsletter, September 1993; reprinted in Massachusetts Bar Association's Best of the Sections 1993-1994

"New Direct Transfer and Tax Withholding Rules for Benefit Plan Distributions," MBA Section of Taxation Newsletter, October 1992; reprinted in Massachusetts Bar Association's Best of the Sections 1992-1993

## Appendix C

### Cases in which Marcia S. Wagner, Esq. has Previously Testified or Submitted an Expert Report

<u>Moreno et al. v. Deutsche Bank Matched Savings Plan Investment Committee, et al.</u>
**(Served as Expert for Plaintiff)**
**United States District Court, Southern District of New York**
**2017**

Ms. Wagner provided an expert report on behalf of participants in a 401(k) plan concluding that the defendants had failed to adhere to a prudent process regarding the selection and monitoring of investment options for the plan's investment menu by favoring proprietary investments issued by the plan sponsor and disregarding the plan's investment policy statement in the selection and monitoring process.

<u>Urakhchin et al. v. Allianz Asset Mgmt. of America, L.P. et al.</u>
**(Served as Expert for Plaintiff)**
**United States District Court, Central District of California**
**2017**

Ms. Wagner produced an expert report on behalf of participants in a 401(k) plan relating to the duties owed to them by Allianz Asset Management of America, L.P. ("Allianz") with respect to its role as the plan's sponsor and fiduciary for the plan.  In particular, the report provided an evaluation of: (i) whether it was consistent with the applicable standard of care and the best interests of participants and beneficiaries to maintain a plan investment menu consisting  entirely of investments affiliated with Allianz; (ii) whether Allianz prudently and objectively evaluated and monitored the investments in the plan's investment menu; (iii) whether Allianz' conduct in approving the addition of certain proprietary funds and a new default investment option to the plan's investment menu was consistent with fiduciary standards and the best interests of participants and beneficiaries; and (iv) whether Allianz adequately addressed potential conflicts-of-interest.

<u>Austin v. Union Bond & Trust Company</u>
**(Served as Expert for Plaintiff)**
**United States District Court, District of Oregon, Portland Division**
**2017**

Ms. Wagner produced an expert report on behalf of participants in an employee stock ownership plan ("ESOP") relating to the duties owed by Union Bond & Trust Company ("Union") and Morley Capital Management, Inc. ("Morley") with respect to their roles as fiduciaries for a collective investment trust that was an investment option under the ESOP.  The report discussed the duties of prudence and loyalty and whether Union and Morley had breached these duties by imprudently managing the fund, thereby resulting in significantly lower investment returns than those of its peers.

**Bentley et al. v. Equity Trust Company**
**(Served as Expert for Defendant)**
**Court of Common Pleas, Lorain County Ohio**
**2017**

Ms. Wagner produced an expert report on behalf of a custodian for certain self-directed individual retirement accounts ("IRA"s), relating to the standards of conduct imposed on custodians under the Internal Revenue Code and ERISA and how such standards relate to custodians holding IRA assets. In addition, the report discussed what level of monitoring can be expected from providers of custodial services, particularly in the context of fraudulent activity by third parties rendering investment advice to IRA owners and providing plan investments to their IRAs.

**Main et al. v. American Airlines, Inc. et al.**
**(Served as Expert for Plaintiff)**
**Texas Northern District Court**
**2017**

Ms. Wagner produced an expert report on behalf of participants in an employer-sponsored defined contribution plan relating to the duties owed to them by American Airlines, Inc. ("American") with respect to its role as the plan's sponsor and fiduciary for the plan. The report discussed the duties of prudence and loyalty and whether American violated these duties with its decision to continue to offer mutual funds issued by a controlled-group member investment advisory firm as designated investment alternatives for plan participants. In addition, the report evaluated an independent fiduciary's process for determining whether it was prudent and in the interest of the plan to retain the controlled-group member as the plan's investment manager responsible for selecting and monitoring the plan's designated investment alternatives. Finally, the report appraised the process used by American's benefit plan committees for addressing potential conflicts of interest and whether those processes were adequate.

**Sgroi v. Edward D. Jones and Company, L.P.**
**(Served as Expert for the Plaintiff)**
**2015**

Ms. Wagner produced an expert report on behalf of a participant in a simplified employee pension plan ("SEP"), as defined under Section 408(k) of the Internal Revenue Code, relating to the duties owed by Edward D. Jones and Company in recommending the establishment of the SEP to the participant's Wyoming governmental employer where adoption of such a plan by a Wyoming governmental entity was prohibited by state law. The report discussed an adviser's duty of prudence with respect to recommendations relating to the selection of a viable retirement benefits plan.

**DeLollis et al. v. Investment Performance Services, LLC**
**(Served as Expert for the Defendant)**
**United States District Court, Eastern District of New York**
**2014**

Ms. Wagner prepared an expert report and on behalf of a national investment consulting firm on investment allocation practices by Taft-Hartley plans seeking recovery of funds lost as a result of investment in Madoff feeder funds. The case entails issues of adherence to investment policy guidelines with respect to alternative investments and following appropriate steps to comply with ERISA standards of procedural prudence.

**Dunkin' Brands, Inc. v. Pernod Ricard USA, LLC**
**(Served as Expert for the Defendant)**
**2013**

Ms. Wagner delivered an expert report in a case involving a dispute over the allocation of plan expenses between formerly affiliated plan sponsors under an administrative cost sharing agreement. The report included a review of plan expenses, discussion of those expenses properly paid from plan assets and an explanation of required procedures for reimbursement of expenses paid by an employer.

**Tax Deferred Services Group v. Cetera Advisors Network, LLC**
**(Served as Expert for the Defendant)**
**Arbitration Matter**
**2013**

Ms. Wagner furnished an expert report and was engaged as an expert witness in arbitration proceedings contesting a third party administrator's putative authority to exercise signature authority on behalf of a plan sponsor and, pursuant to such purported authority, to transfer 457(b) plan accounts to investment providers selected by the administrator. Ms. Wagner concluded that such an assumption of fiduciary authority would violate the exclusive benefit and prudence standards of ERISA and California law. Moreover, based on Ms. Wagner's experience, it would have exceeded the authority of the typical administrator so that a specific delegation of fiduciary authority (not mere signatory authority) would have been required to move funds.

**Spaz Beverage Co. Defined Benefit Pension Plan v. 1st Global Advisors**
**(Served as Expert for the Defendant)**
**Arbitration Matter**
**2012**

Ms. Wagner was retained by defendants to provide an expert report and to testify in arbitration proceedings as an expert in rebuttal to a claim that ERISA fiduciary standards require liquidation of defined benefit pension plan assets within a precise period of time following notice of the plan's impending termination. The plan in question suffered severe losses in the financial downturn of 2008 - 2009 as a result of its equity investments which were liquidated by the plan without the concurrence of the defendant investment advisor.

**Harris et al. v. Koenig et al.**
**(Served as Expert for the Plaintiff)**
**United States District Court, District of Columbia**
**2011**

Ms. Wagner was asked by plaintiffs to evaluate the conduct of State Street Bank and Trust Company, as plan trustee, in settling securities law claims held by the Waste Management Retirement Savings Plan against the plan sponsor. Wagner concluded that State Street's actions and omissions in responding to the offer of settlement violated the standard of care applicable to fiduciaries settling and releasing claims, as prescribed by statute as well administrative guidance, such as Prohibited Transaction Exemption 2003-39. These duties are premised on the assumption that a claim for fiduciary breach is an asset of the plan and that a fiduciary's decision whether to opt out of a class action settlement must include an evaluation of the dollar value of the claim to be relinquished and whether the terms of the release are too broad and might be modified to preserve ERISA claims.

**Shirk v. Fifth Third Bancorp**
**(Served as Expert for the Plaintiff)**
**United States District Court for the Southern District of Ohio, Western Division**
**2008**

Shirk was a stock drop-case in which participants in a 401(k) plan that also qualified as an ESOP incurred losses due to the decline in value of the plan's investment in employer stock. Ms. Wagner was requested by plaintiffs to render an opinion on the fiduciary standards that applied to the plan fiduciary's decision to continue the plan's investment in employer stock in light of the employer's deteriorating financial condition. Ms. Wagner concluded that, given the plan's structure and the facts applicable to the employer, the plan fiduciaries could and should have exercised their fiduciary duty to terminate the investment in employer stock.

**Walker et al. v. Monsanto Company Pension Plan and Monsanto Company**
**(Served as Expert for the Plaintiff)**
**United States District Court for the Southern District of Illinois**
**2008**

Monsanto involved a cash balance plan where the plan sponsor had discontinued making interest credits on behalf of participants after the attainment of age 55. Ms. Wagner rendered an expert opinion on behalf of the plaintiffs that this practice failed to meet statutory requirements prohibiting age discrimination.

**Abbott et al. v. Lockheed Martin Corporation**
**(Served as Expert for the Plaintiff)**
**United States District Court for the Southern District of Illinois**
**2008**

Ms. Wagner was retained by plaintiffs to render an expert opinion as to the operational procedures employed by Lockheed Martin with respect to its 401(k) plans for the purpose of meeting the requirements of section 404(c) of ERISA. That provision relieves ERISA fiduciaries of liability where investment losses result from a plan participant's exercise of discretion and control with respect to the investment of his or her plan account, provided the plan sponsor furnishes participants with sufficient investment information and discloses certain material facts about the plan and its administration. Ms. Wagner concluded that Lockheed Martin's actions during a specified period consistently fell short of what was required to obtain this relief from fiduciary responsibility.

**Appendix D**

**Documents and Materials Reviewed by Marcia S. Wagner, Esq. for Purposes of this Report**

**Plan Documents**

Retirement Plan Committee Charter (2009, 2012, 2014, 2017)

Investment Policy Statement (2011, 2014)

Faculty Plan

2002 Amendments (First and Second)

2010 Amendment (First)

2010 Amended and Restated Plan document

2014 Amendments (First and Second)

2014 Amended and Restated Plan document

2017 Amended and Restated Plan document

Medical Plan

2002 Amendment (Second)

2002 Amendment (Third)

2006 Amendment (First)

2009 Amendment (First and Second)

2012 Amendment (First)

2012 Amendment and Restatement

2016 Amendment and Restatement

Investment Policy Statements (2011 and 2014)

**Plan Information**

Fund Assets by Month: TIAA (2010-16)

Number of Participants by Quarter: TIAA (2010-16)

**Due Diligence Reports**

NYU/NYU Langone (Quarterly) Fiduciary Due Diligence Report (March 2010-December 2016)

NYU/NYU Langone Supplemental Due Diligence Report (3.31.2010)

NYU/NYU Langone Supplemental Fiduciary Committee Report (6.14.2010)

NYU/NYU Langone Supplemental Due Diligence Report (4.1.2011)

NYU/NYU Langone Supplemental Investment Information Report (12.31.2012)

NYU/NYU Langone Supplemental Investment Information Report (6.30.2013)

NYU/NYU Langone Supplemental Investment Information Report (9.30.2013)

NYU/NYU Langone Supplemental Investment Information Report (12.31.2013)

NYU/NYU Langone Supplemental Investment Information Report (3.31.2014)

NYU Watch List by Quarter (6.30.2014 Due Diligence Report)

NYU/NYU Langone Supplemental Investment Information Report (6.30.2014)

NYU/NYU Langone Supplemental Investment Information Report (9.30.2014)

NYU/NYU Langone Supplemental Investment Information Report (12.31.2014)

NYU/NYU Langone Fiduciary Due Diligence Report – Abridged (3.31.2011)

NYU/NYU Langone Fiduciary Due Diligence Report – Abridged (6.30.2011)

NYU/NYU Langone Fiduciary Due Diligence Report – Abridged (9.30.2011)

NYU/NYU Langone Fiduciary Due Diligence Report – Abridged (12.31.2011)

NYU/NYU Langone Fiduciary Due Diligence Report – Abridged (3.31.2012)

NYU/NYU Langone Fiduciary Due Diligence Report – Abridged (6.30.2012)

NYU/NYU Langone Fiduciary Due Diligence Report – Abridged (9.30.2012)

NYU/NYU Langone Fiduciary Due Diligence Report – Abridged (3.31.2013)

NYU/NYU Langone Fiduciary Due Diligence Report – Abridged (12.31.2013)

NYU/NYU Langone Fiduciary Due Diligence Report – Executive Summary (12.31.2010)

Fiduciary Due Diligence Report: TIAA (1.15.2009)

Fiduciary Due Diligence Report: TIAA Langone (1.15.2009)

Fiduciary Due Diligence Report: Vanguard (1.15.2009)

Fiduciary Due Diligence Report: Vanguard Langone (1.15.2009)

Fiduciary Due Diligence Report: Vanguard NYU (1.15.2009)

Fiduciary Due Diligence Report: Pru NYU (1.15.2009)

Watch List Addendum (3.31.2010)

NYU/NYU Langone Fiduciary Due Diligence Report (5.15. 2009)

Retirement Plan Vendor Consolidation (July 2010)

Retirement Plan Vendor Consolidation (September 2010)

Retirement Plan Vendor Consolidation (November 2010)

Retirement Plan Vendor Consolidation (December 2010)

Retirement Plan Vendor Consolidation (January 2011)

Retirement Plan (Langone) Vendor Consolidation (January 2011)

Fiduciary Responsibility and Process Review (June 2011)

Assets by Source (June 2012)

Vanguard Fund Usage (June 2012)

NYU Retirement Committee Meeting Materials (September 4, 2012)

Current and Sample Investment Grids (September 2012)

Vendor Consolidation Reports (September 2010, June 2013)

403(b) Plan Merger Considerations (March 2015)

NYU Retirement Committee Meeting Materials (September 15, 2015)

NYU Retirement Committee Meeting Materials (December 16, 2015)

Streamlined Investment Array (December 31, 2015)

Plan Design Changes (February 2016)

NYU Retirement Committee Meeting Materials (June 1, 2016)

NYU Retirement Committee Meeting Materials (September 8, 2016)

NYU Retirement Committee Meeting Materials (February 27, 2017)

NYU Retirement Committee Meeting Materials (May 24, 2017)

NYU Retirement Committee Meeting Materials (September 9, 2017)

**Retirement Committee Meeting Minutes**

NYU Retirement Committee Meeting Minutes (9.13.2007)

NYU Retirement Committee Meeting Minutes (1.31.2008)

NYU Retirement Committee Meeting Minutes (10.8.2008)

NYU Retirement Committee Meeting Minutes (2.4.2009)

NYU Retirement Committee Meeting Minutes – RFP Follow Up (3.18.2009)

NYU Retirement Committee Meeting Minutes (5.15.2009)

NYU Retirement Committee Meeting Minutes (5.18.2009)

NYU Retirement Committee Meeting Minutes (12.9.2009)

NYU Retirement Committee Meeting Minutes (1.21.2010)

NYU Retirement Committee Meeting Minutes (2.18.2010)

NYU Retirement Committee Meeting Minutes – RFP Follow Up (3.18.2010)

NYU Retirement Committee Meeting Minutes (4.19.2010)

NYU Retirement Committee Meeting Minutes (6.14.2010)

NYU Retirement Committee Meeting Minutes (9.23.2010)

NYU Retirement Committee Meeting Minutes (11.2.2010)

NYU Retirement Committee Meeting Minutes (1.10.2011)

NYU Retirement Committee Meeting Minutes (3.21.2011)

NYU Retirement Committee Meeting Minutes (4.1.2011)

NYU Retirement Committee Meeting Minutes (6.9.2011)

NYU Retirement Committee Meeting Minutes (8.15.2011)

NYU Retirement Committee Meeting Minutes (11.14.2011)

NYU Retirement Committee Meeting Minutes (2.21.2012)

NYU Retirement Committee Meeting Minutes (5.17.2012)

NYU Retirement Committee Meeting Minutes (9.4.2012)

NYU Retirement Committee Meeting Minutes (11.16.2012)

NYU Retirement Committee Meeting Minutes (2.22.2013)

NYU Retirement Committee Meeting Minutes (6.14.2013)

NYU Retirement Committee Meeting Minutes (11.25.2013)

NYU Retirement Committee Meeting Minutes (2.26.2014)

NYU Retirement Committee Meeting Minutes (5.22.2014)

NYU Retirement Committee Meeting Minutes (8.19.2014)

NYU Retirement Committee Meeting Minutes – Ad Hoc Defined Benefit (10.3.2014)

NYU Retirement Committee Meeting Minutes (12.11.2014)

NYU Retirement Committee Meeting Minutes (2.26.2015)

NYU Retirement Committee Meeting Minutes (6.9.2015)

NYU Retirement Committee Meeting Minutes (9.15.2015)

NYU Retirement Committee Meeting Minutes (12.16.2015)

NYU Retirement Committee Meeting Minutes (3.2.2016)

NYU Retirement Committee Meeting Minutes (6.1.2016)

NYU Retirement Committee Meeting Minutes (9.8.2016)

NYU Retirement Committee Meeting Minutes (12.12.2016)

NYU Retirement Committee Meeting Minutes (2.23.2017)

NYU Retirement Committee Meeting Minutes (5.24.2017)

NYU Retirement Committee Meeting Minutes (9.7.2017)

**Depositions**

Deposition of Susanna Hollnsteiner and exhibits

Deposition of Linda Woodruff and exhibits

Deposition of Patricia Halley and exhibits

Deposition of Tina Surh and exhibits

Deposition of Mark Petti and exhibits

Deposition of Jan Renzler and exhibits

Deposition of Nancy Sanchez and exhibits

Deposition of Douglas Chittenden and exhibits

Deposition of Peter Hueber and exhibits

**Discovery Documents**

Defendant's Responses and Objections to First Set of Requests for Production

Defendant's Responses and Objections to First Set of Interrogatories

Plaintiff James Brown's Answers and Objections to Defendant's Second Set of Interrogatories

Plaintiff Mark Crispin Miller's Answers and Objections to Defendant's Second Set of Interrogatories

Plaintiff Marie Monaco's Answers and Objections to Defendant's Second Set of Interrogatories

Plaintiff Dr. Alan Sacerdote's Answers and Objections to Defendant's Second Set of Interrogatories

Plaintiff Herbert Samuels' Answers and Objections to Defendant's Second Set of Interrogatories

Plaintiff Shulamith Lala Straussner's Answers and Objections to Defendant's Second Set of Interrogatories

Defendant's Second Set of Interrogatories Directed to Plaintiff Dr. Alan Sacerdote

Defendant's Second Set of Interrogatories Directed to Plaintiff Herbert Samuels

Defendant's Second Set of Interrogatories Directed to Plaintiff Shulamith Lala Straussner

Defendant's Second Set of Interrogatories Directed to Plaintiff James Brown

Defendant's Second Set of Interrogatories Directed to Plaintiff Marie E. Monaco

Defendant's Second Set of Interrogatories Directed to Plaintiff Mark Crispin Miller

Defendant's Second Set of Interrogatories Directed to Plaintiff Patrick Lamson-Hall

NYU Defendant's First Set of Interrogatories

NYU Defendant's First Request for Production

Objections and Responses to Plaintiffs' Second Set of Interrogatories

Plaintiff James Brown's Answer and Objections to Defendant's First Set of Interrogatories

Plaintiffs' Third Set of Interrogatories directed at Defendant

Defendant's Answer to Third Set of Interrogatories

**404a5 Disclosures – Faculty Plan**

Summary of Plan Services and Costs: TIAA (2012-17)

**404a5 Disclosures – Medical Plan**

Summary of Plan Services and Costs: TIAA (2012-17)

**408b2 Disclosures – Faculty Plan**

Fee Summary: TIAA (2009-16)

Investment Fee Expense Disclosure: TIAA (2009-16)

Service Provider Summary: TIAA (2009-16

All-in Fee Disclosure: Vanguard (2012-16)

**408b2 Disclosures – Medical Plan**

Fee Summary: TIAA (2009-16)

Investment Fee Expense Disclosure: TIAA (2009-16)

Service Provider Summary: TIAA (2009-16

All-in Fee Disclosure: Vanguard (2012-16)

**Responses to Requests for Proposal**

<u>Investment Consulting</u>

New York University Defined Contribution Retirement Plan Consulting Services (June 4, 2008)

Defined Contribution Retirement Plan Investment Consulting Services Proposal: Cammack LaRhette (May 2008)

Retirement Plan Consulting Services Proposal: Cammack LaRhette (March 2010)

<u>Recordkeeping</u>

Fidelity Investments Response to Request for Proposal (2009)

TIAA-CREF Response to Request for Proposal (2009)

Vanguard Response to Request for Proposal (2009)

TIAA-CREF Response to Request for Proposal (2016)

Vanguard Response to Request for Proposal (2016)

VALIC Response to Request for Proposal (2016)

**Forms 5500**

Faculty Plan (2009-16)

Medical Plan (2009-16)

## Appendix E

| Top 200 Clients with at least one 403(b) Plan (based on 12-31-10 403(b) assets) | | | | | | | |
|---|---|---|---|---|---|---|---|
| RK Arrangement* | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
| SRK TIAA | 50 | 59 | 62 | 68 | 73 | 77 | 79 |
| Multi-vendor | 147 | 135 | 132 | 123 | 117 | 111 | 109 |
| SRK-Another Vendor | 3 | 6 | 6 | 9 | 10 | 12 | 12 |
| **Total** | **200** | **200** | **200** | **200** | **200** | **200** | **200** |
| *Follows RK Arrangement for Top 200 Clients (based on  12-31-10  403b assets) at the end of each subsequent year | | | | | | | |