*Sacerdote, et al. v. New York University*, 1:16-cv-06284 (KBF) (S.D.N.Y.)

# Joint Pretrial Order

# April 5, 2018

# Defendant's Exhibit 893

## Declaration of Jan Rezler

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DR. ALAN SACERDOTE, et al. | Case No.: 1:16-cv-06284 |
| Plaintiffs | ECF Case |
| vs. | **TRIAL DECLARATION OF JAN REZLER** |
| NEW YORK UNIVERSITY, | |
| Defendant. | |

I, Jan Rezler, declare as follows:

1.      I am Vice President, Client Consulting, at Cammack Retirement Group, Inc. ("Cammack").  I have personal knowledge of the facts set forth herein and, if called as a witness to testify to their truth, could and would do so competently.

2.      Cammack is registered as a Pension Consultant Investment Adviser under the Investment Advisers Act of 1940.  Cammack provides retirement benefit plan consulting and investment advisory services across the country to more than 130 major nonprofit organizations, including to the New York University ("NYU") Retirement Plan Committee (the "Committee") in support of NYU's section 403(b) plans at issue in this lawsuit.  Cammack specializes in 403(b) plans and other defined contribution plans for higher education and health care clients.  Cammack also provides retirement benefit plan consulting and investment advisory services to employers that sponsor 401(k) plans, and also has deep experience with such plans. Cammack's services to the Committee include help with selection and monitoring of plan investments, help with evaluation, selection, and management of the plans' recordkeepers, and help with monitoring the amount of revenue sharing and recordkeeping fees.

4827-0252-4256.1

3.      Cammack has been working with 403(b) plans since 1958, when 403(b) plans were added to the Internal Revenue Code and is able to negotiate for the most cost-effective programs for its clients because it is a privately held company that is not subject to direct or indirect ownership by other companies.

4.      Cammack's independence allows it to engage and negotiate with investment providers, third party administrators, and insurance companies to obtain comprehensive and cost-effective retirement programs for its clients.

5.      I am responsible for overseeing Cammack's seven client consulting teams in New York City.  Separately, I have primary responsibility for more than 12 clients, including the NYU Retirement Committee.  I have focused primarily on 403(b) plans since joining Cammack in 2005, including helping plan fiduciaries evaluate, select, and manage their plans' recordkeepers, helping plan fiduciaries monitor the amount of revenue sharing and recordkeeping fees, and working with our investment services team to help clients select and monitor plan investments.  I have been in the ERISA-regulated retirement plan services industry for over 20 years and hold the Qualified Plan Financial Consultant designation from the American Society of Pension Professionals and Actuaries and Series 6, 63, and 65 securities and investment licenses from the Financial Industry Regulatory Authority.

### NYU ENGAGES CAMMACK IN 2009

6.      NYU conducted an RFP for Defined Contribution Retirement Plan Investment Consulting Services to which Cammack submitted a proposal.[1]

7.      NYU became a Cammack client in 2009 through the Investment Advisory Services Agreement between Cammack LaRhette Advisors, LLC, a

---

[1] DX394 is a true and complete copy of the RFP for Investment Consulting Services, which Cammack received from NYU.  DX411 is a true and complete copy of Cammack's Response to NYU's RFP.

4827-0252-4256.1

Cammack subsidiary, and NYU that has been produced in this litigation.[2]  The
Committee hired Cammack as a co-fiduciary to the Plans with respect to the
investment advisory services it provides to NYU.  I have either been on or led
Cammack's consulting team for the NYU Retirement Committee since that time.

        8.      Cammack's services for the NYU Retirement Committee relate to nine
403(b) plans, four of which cover NYU employees at the Washington Square campus
(the "NYU Washington Square Group") and five of which cover workers at the NYU
Langone Medical Center (the "NYU Langone Group").  Two of those nine 403(b)
plans are at issue in this lawsuit.  The first is the New York University Retirement
Plan for Members of the Faculty, Professional Research Staff and Administration
("NYU Faculty Plan"), which covers certain Washington Square campus faculty and
employees and holds approximately 50% of the $3.9 billion in assets currently within
the NYU Washington Square Group.  The second is the NYU School of Medicine
Retirement Plan for Members of the Faculty, Professional Research Staff and
Administration ("School of Medicine Faculty Plan"), which covers certain Langone
Medical Center faculty and employees of the NYU School of Medicine and holds
approximately 41% of the assets of the $3.7 billion in assets currently within the
NYU Langone Group.  (Together, the NYU Faculty Plan and the NYU School of
Medicine Faculty Plan are referred to as the "Plans.")

        9.      Upon its engagement by NYU in 2009, Cammack worked with the
Committee to set up quarterly due diligence meetings for the purpose of reviewing
and monitoring each of the Plans' investments and fees, among other things. Since
2009, Cammack has provided the Committee with help in evaluating, selecting, and
managing the Plans' recordkeepers, help in monitoring the amount of revenue sharing

---

[2] DX18 is a true and complete copy of the April 8, 2009 Cammack LaRhette
Advisors, LLC Investment Advisory Services Agreement.

and recordkeeping fees, and advising the Committee in the selection and monitoring of recordkeepers and plan investments. Cammack specifically provides the Plans with services relating to investment analysis, plan design, plan administration, vendor services, RFP projects and pricing.

10. Cammack's investment analysis includes determining whether to put funds on watch and deciding whether to recommend fund replacement.  Placing a fund on watch is a typical and common practice followed by prudent fiduciaries and has been part of Cammack's fund analysis when any particular fund has some indicator that may bear some additional scrutiny, including, for example, a fund manager change, market environment or fund performance.

11. Cammack's investment analysis also consists of providing to the Committee an analysis of fund performance, including regularly analyzing performance versus the fund's peer group and relevant benchmark index and evaluating each fund's standard deviation, risk-adjusted return (Sharpe ratio), fees in comparison to peer funds, portfolio manager tenure, and Morningstar ratings.

12. Cammack is responsible for providing the Committee with this investment analysis, presented in the form of a due diligence report, for all of the investment options available in the Plans on a quarterly basis.

13. Recommendations to place funds on watch would be included in the due diligence report, which is reviewed by the Committee at every meeting.  The Committee discusses the funds that are recommended for watch by Cammack at Committee meetings, as needed, and also discusses the addition or removal of funds to or from watch status where applicable.  Funds on watch are not automatically removed from the investment lineup; rather, they are analyzed and discussed by the Committee at length.  Determining whether to remove or replace an investment option that is on watch from the investment lineup requires the consideration of

multiple factors, including whether a fund is unique and whether there is any difficulty in benchmarking that could impact the reporting of fund performance and/or other metrics in comparison to standard or custom indexes. This is standard industry practice.

14.     With Cammack's assistance, the Committee constructed, used, and adopted an Investment Policy Statement ("IPS") and regularly reviewed and updated the terms of the IPS, as appropriate.  The IPS documents the Committee's strategy and criteria for evaluating funds, determining what those criteria are, stating how often funds are to be reviewed, and detailing Cammack's responsibilities. As intended, the Committee used the IPS to monitor the Plans' investment options even when the IPS was in draft form.

15.     The Committee, with the assistance of Cammack, considered several factors commonly used by fiduciaries in monitoring plan investment funds, including volatility (standard deviation), risk and return characteristics, risk-adjusted returns (Sharpe ratio), up capture and down capture, expense ratio, category rankings, alpha, portfolio turnover, R-squared, and style drift.  The Committee was also aware that Cammack would routinely speak directly to portfolio managers of the various investment funds, as may have been warranted based on the ongoing investment monitoring process.

**2009 RFP**

16.     On July 31, 2009, Cammack issued a request for proposal ("RFP") on behalf of the Committee for recordkeeping and other administrative services, seeking bids from prospective vendors premised on the selected vendor being potentially being named sole vendor and on any plan balances under participant control not being transferred to the selected vendor.[3]  The reason the RFP specified that plan balances

---

[3] DX20 is a true and complete copy of the July 31, 2009 RFP.

under participant control would not be transferred to the selected vendor was because the annuity investments under the Plans were made through individual annuity contracts between the participant and TIAA, or group annuity contracts between TIAA and NYU, under which the participants retained certain rights to control any transfer of their account balances in these investments.  Those balances cannot be transferred to a different vendor, nor to a different investment within the Plans, except to the extent that each participant individually chooses to do so, and then only in the amounts and on the time frame allowed under the contracts.  As a result, even if the Committee ultimately elected to move to a single vendor, and it selected a vendor other than TIAA, the Plans still would still have to engage TIAA to recordkeep the legacy balances that would be expected to have remained under the participants' control.

17.     The RFP also sought detailed information from then-current and potential vendors to the Plans, including information regarding service capabilities, available investment alternatives, restrictions on offering investments, investment characteristics of available investments, revenue sharing, minimum fund revenue requirements, fiduciary status of vendor, communication and education services for participants, systems and recordkeeping, compliance, and expenses.

18.     One of the goals of the RFP process was to try to achieve cost savings in the Plans' recordkeeping and administrative fees.  The fees of service providers are one important consideration in deciding which vendor to retain and whether to go from a multi-vendor model to a single-vendor program, but they are hardly the only consideration.  Vendor services for the fees, expected participant experience, plan vendor history, and funds line-up are also important considerations.  For 403(b) plans, which offer annuities, the analysis can be complicated by the fact that annuity-fund

investment balances often, as is the case with the Plans here, are under participant control.

19.     Further, while the number of record-keepers used by a program is one factor affecting the pricing of record-keeping services, other factors also typically affect pricing, including: (a) the level of average account balances across the plan or program's participant base; (b) the breadth of services being provided by the record-keeper to the program; (c) the actual usage by the plan sponsor and participants of the record-keeper's services; and (d) the level of competition in the record-keeping marketplace.

20.     In response to the RFP, the NYU Retirement Committee received detailed  bids from five vendors, including TIAA and Vanguard, the Plans' two incumbent recordkeepers.[4]  A third recordkeeper, Prudential, was also used by the plans of the NYU Langone Group, but Prudential declined to participate in the RFP process and told Cammack that decision was due in large part to the realization that, even if they had been selected as the new sole recordkeeper, plan assets under participant control would not be able to be moved to Prudential at the instruction of the Committee.

21.     TIAA submitted a 402-page response to the RFP, in which TIAA provided extensive responses to all of questions posed and provided a detailed expense projection for the initial plan year which proposed the best fund available in each asset class that would fit the pricing model.  The RFP response explained that NYU could move to NYU-controlled group annuity contracts for future contributions, and that each participant with individual annuity contracts could elect to transfer

---

[4] DX21 is the September 25, 2008 e-mail I received from TIAA, with TIAA's response to the RFP.  DX397 is Vanguard's response to the RFP.  DX395 is an e-mail which attaches Fidelity's response to the RFP

assets from their individual annuity contracts to the group annuity contracts. TIAA also created an excel spreadsheet detailing an investment array for the plan that included information regarding performance history versus benchmarks and standard deviation versus benchmarks as well as all fees, including investment management fees, revenue sharing, and the total expense ratio.

22.     Vanguard and Fidelity likewise provided detailed information in their response to the RFP, including extensive information detailing fees, fund performance, and fund expenses.

23.     Each responding vendor submitted a bid to provide services to the Plans on the basis that it would be compensated through revenue sharing as provided by the investments that might be offered through the Plans. Revenue sharing is common across the defined contribution retirement plan world, including with 403(b) plans, and works as follows. A 403(b) plan, including the Plans, offers participants a variety of investments, in the form of annuity funds and mutual funds. Those funds typically charge investors a fee to cover costs, expressed as a percentage of a fund's assets. This is known as the fund's expense ratio, which is measured in basis points ("bps"). One basis point is 1/100th of 1%, so that if a fund's fee is .75%, its expense ratio is 75 bps. With revenue sharing, the investment fund agrees with the recordkeeper to transfer to the recordkeeper a portion of the fee received by the fund in order to contribute to the cost of the recordkeeping services and to compensate the recordkeeper for having acted as a distribution channel for the investment fund.

24.     In the typical vendor agreement with 403(b) plans, a "required revenue rate" is specified in the form of a minimum number of basis points that the vendor requires in order to be compensated for its services to the plan. In TIAA's current agreements covering the Plans, revenue sharing amounts received in excess of the required revenue rate are returned to the Plans and credited to a revenue credit

8

account in each of the Plans.  While these excess amounts could be used to pay for certain permitted Plan expenses, the Committee made a decision to reallocate 100% of these amounts to participants in the Plans.  If revenue sharing amounts fall below the required revenue rate, NYU is obligated to pay for the difference.  In fact, this has never happened in the Plans.

25.     Vanguard had historically operated differently than TIAA and many other firms in the retirement industry.  Vanguard's funds do not technically provide for any revenue sharing, nor had Vanguard defined its required revenue rate to provide recordkeeping services to the Plans.  Rather, Vanguard's historical practice had been to agree that if the plans for which Vanguard was providing recordkeeping services made available to participants Vanguard's "Investor class" investment funds, then the management expense ratios charged by those funds would be sufficient for Vanguard both to operate the funds and to provide recordkeeping services for the client.  The portion of such management fees used by Vanguard to cover its cost of providing recordkeeping services is commonly referred to as "recordkeeping offsets."

26.     The required revenue rates set forth in the five submitted bids in response to the 2009 RFP ranged from a low of 13 bps to a high of 18 bps, each based on the assumption that the vendor would become the Plans' sole vendor.  TIAA's proposed rate for becoming the Plans' sole recordkeeper was 15 bps on all Plan assets.  Cammack estimated Vanguard's proposed rate to be equivalent to approximately 17 bps.  Cammack was required to estimate it because, as described above, Vanguard's practice had been not to express a required revenue rate.  The fact that Vanguard's proposal to be sole recordkeeper did not straightforwardly disclose a required revenue rate and forced Cammack to estimate it was viewed negatively by the Committee.

4827-0252-4256.1

27.     TIAA's bid confirmed that it was earning approximately 20 bps from the Plans at that time.  TIAA also indicated that if it became a frozen vendor (*i.e.*, if the Plans decided to move to a single vendor other than TIAA), TIAA would continue to collect approximately 20 bps in revenue sharing from amounts Plan participants had previously invested in individual annuity contracts unless these participants individually elected to transfer their account balances to the selected sole vendor to the Plans (*i.e.*, there would be no revenue recapture by the Plans).  Importantly, the majority of the Plans' assets had historically been, and continue to be, held in the individual annuity contracts for which the Committee does not have the unilateral ability to move away from TIAA.  Because freezing TIAA as a vendor would take away leverage by the Committee to obtain future price reductions or revenue recaptures from TIAA for keeping the records for the large percentage of the Plans' assets represented by the participant-controlled balances, it would have been difficult not to continue to offer TIAA as an active vendor.

28.     At the same time, the incumbent vendors (TIAA and Vanguard) were delivering a high level of services to the Plans.  Cammackunderstood from Committee members that plan participants were enjoying and benefiting from having both TIAA and Vanguard as vendors.  While many participants had a strong preference for the services through TIAA (e.g., website, call center, no added cost investment advice, etc.), others strongly preferred the services offered by Vanguard (e.g., website, call center, onsite investment guidance).  Committee members expressed their belief that participants would be sorely dissatisfied with losing either of the two incumbent vendors.

29.     TIAA was offering a wide range of services to the Plans: full-service state-of-the-art recordkeeping platform, trained call center staff, fund-level independent investment advice at no added cost to participants or the Plans (online or

in-person), representatives that visited the NYU campuses as frequently as requested by the Committee or NYU.  TIAA also provided a strong investment menu that included the TIAA Traditional Annuity, with its industry leading crediting rates at a 3.00% guaranteed minimum rate (and actual crediting rates typically higher), and the TIAA/CREF variable annuities, which have good investment results at reasonable costs and offer participants the ability to annuitize from within the plan, which was unique to TIAA/CREF as compared to the other vendors seeking the business.

30.     Vanguard was also offering a wide range of services and a strong investment menu at very reasonable costs.  Vanguard's services included a state-of-the-art recordkeeping platform, trained call center staff, fund-level independent investment advice (at added cost to participants if delivered in-person), and representatives that visited the NYU campuses as frequently as requested by the Committee or NYU.

31.     From a pricing perspective, there did not seem to be a compelling reason to move to a single vendor, as TIAA and Vanguard appeared similar in price under their respective single vendor proposals and the other vendors that submitted bids were not meaningfully lower in price.

## TIAA RETROACTIVE RATE REDUCTIONS

32.     From the time the 2009 RFP responses were received until the NYU Langone Group moved to a single-vendor model in 2012 and the NYU Washington Square Group began to reconsider a move to a single-vendor model in 2016, Cammack and the Committee continued discussing the advantages and disadvantages of a single-vendor program.  These discussions focused on the participant experience, as well as service fees, investment alternatives and investment performance.

33.     Because the likely financial benefits of moving to a single-vendor program did not outweigh the competing concerns regarding participant preference

for the incumbent vendors, the Committee decided for the time being to pursue, and in 2011 did enter into, revised services agreements with TIAA for the Plans.  Under the revised agreements, TIAA's required revenue rate for the plans of the NYU Washington Square Group, including the NYU Faculty Plan, was set at 13.8 bps on all assets, applied retroactively to 2011 (*i.e.,* the Plan was credited with an amount equal to the difference in revenue between the old 20 bps rate and the new 13.8 bps rate, going back to 2011), and for the plans of the NYU Langone Group, including the School of Medicine Faculty Plan, was set at 16 bps, also applied retroactively to 2011.  The difference in pricing related to the lower average account balance for participants in the plans of the NYU Langone Group as compared to those in the plans of the NYU Washington Square Group at that time.  Once again, per the Committee's decision, 100% of the excess revenue sharing amounts were reallocated each year back to participants' accounts and were not used to pay for other permitted expenses of the Plans.

34.     Vanguard continued to retain all internal recordkeeping offsets generated by the Plans' investments in Vanguard funds.  Eventually, Vanguard disclosed its internal recordkeeping offset from its own funds to be approximately 9 bps.  This rate varies by investment fund; it decreased over time as Vanguard reduced the fees charged by its funds. Importantly, while most of its Investor class funds provided for a recordkeeping offset, its lower cost Institutional class funds do not provide for any recordkeeping offsets.  Plans that choose to use the Institutional class funds would need to compensate Vanguard separately for its recordkeeping services.

## SCHOOL OF MEDICINE FACULTY PLAN MOVES TO SINGLE VENDOR

35.     Prior to making its final decision to move to a single vendor, the Committee vetted the two finalists, Fidelity and TIAA.  Both Fidelity and TIAA were

invited to attend Committee meetings to present to the Committee and to address the Committee's questions and concerns. Fidelity presented twice to the Committee, and the Committee requested information to better understand Fidelity's system and technology. Additionally, TIAA presented the Committee with an "in-depth look at website capabilities and a timeline of scheduling web enhancements" at the February 18, 2010 meeting, and provided answers to a series of follow-up questions, which were discussed extensively by the Committee at the March 18, 2010 meeting.[5] The Committee formally approved TIAA as the sole service provider for the NYU Langone Group plans on April 1, 2011.

36.     The Committee concluded that the participants in the plans of the NYU Langone Group, including the School of Medicine Faculty Plan, would accept a switch to a single-vendor program. The Committee determined that these participants would benefit from such a switch and, since it was expected that participants would be receptive to it, voted to move forward with this change for the plans of the NYU Langone Group.

37.     Of the three vendors who were providing services to the plans of the NYU Langone Group, two vendors – Vanguard and Prudential – were eliminated, and the third – TIAA – became the sole recordkeeper. TIAA's required revenue rate was negotiated down to 10 bps. Plan assets at Prudential were able to be liquidated and were mapped to TIAA, and Plan assets at Vanguard were transferred in-kind, thereby retaining all Vanguard funds onto the TIAA platform. The Vanguard funds also were moved to the lowest-cost share classes. The reason that the lowest cost share classes could now be used was that Vanguard no longer would be recordkeeping its funds,

---

[5] DX400, DX401, and DX402 are true and complete copies of the additional questions posed by the Committee regarding TIAA's recordkeeping capabilities and services and TIAA's responses thereto.

and thus no longer would have to be compensated for providing that service to the NYU Langone Group plans, nor would any class of Vanguard funds have shared revenue with TIAA for performing those services.  Thus, the lowest cost share class became the most appropriate to include in the fund menu.

### NYU FACULTY PLAN OBTAINS FURTHER FEE REDUCTIONS

38.     At the same time, the Committee separately determined that the participant population in the plans of the NYU Washington Square Group, including the NYU Faculty Plan, continued to benefit from and enjoy the existing two-vendor program for those plans, and would not be accepting of a change to a single-vendor program.  As a result, the Committee decided to retain the dual-vendor program.

39.     In consultation with and at the direction of the Committee, Cammack maintained ongoing discussions with Vanguard and TIAA to explore options for reducing recordkeeping and administrative fees for the NYU Faculty Plan and the other plans of the NYU Washington Square Group.

40.     In June 2013, the Committee obtained a fee-savings from Vanguard for the NYU Washington Square Group of about $50,000 per year through a switch to lower-cost share classes of three Vanguard funds.  This was implemented in April 2014.  Expressed on per-participant per-year basis, this savings reduced Vanguard's fee from $63 to $58 per-participant per-year.  Vanguard offered to switch all of its funds to the lowest cost class, as had been done for the NYU Langone Group plans, but this would have removed virtually all recordkeeping offsets which were being used to compensate Vanguard for its recordkeeping services.  With the loss of these recordkeeping offsets, however, Vanguard would have then charged a fee to the NYU Retirement Plan and the other plans of the NYU Washington Square group, bringing Vanguard's fee back to $58 per-participant per-year.  Thus, there was no cost-savings benefit for participants or the Plans to switch the entire Vanguard fund menu to its

lowest cost class of funds since Vanguard would earn the same per-participant per-year fee under either scenario.

41.     In Cammack's discussions with TIAA, they offered alternate pricing models that generally came with strings attached (*e.g.,* requiring that the number of available participant loans be reduced and that the remittance process be revised to SPARK format that was not compatible with NYU HRIS systems), which the Committee determined after discussion with Cammack were not worth the trade-offs.

42.     At the June 9, 2015 Committee meeting, Cammack discussed with the Committee a new pricing offer from TIAA for the required revenue rate of 6.5 bps for the NYU Washington Square Group program if the Committee would eliminate Vanguard as a vendor.  The Committee considered the offer but concluded that participants were continuing to benefit from the dual-vendor program and wanted it, and that they would not accept losing the ability to choose between TIAA and Vanguard.

43.     Cammack continued periodically to contact TIAA and Vanguard (with respect to the NYU Washington Square Group plans only) on behalf of the Committee to have those vendors reevaluate their fees.

44.     Effective January 1, 2015, TIAA agreed to lower its required revenue rate for the NYU Langone Group plans, including the School of Medicine Faculty Plan. The new required revenue rate was set at 9 bps.  Additionally, a switch was made to a new Institutional Class of the Vanguard Target Retirement series, which saved the NYU Langone Group plans approximately $200,000 per-year.

45.     On November 18, 2015, Vanguard presented the NYU Washington Square Group with a pricing analysis and new pricing offer.  In the report, Vanguard indicated that they were then earning 7.06 bps from the NYU Washington Square Group plans.  Additionally, Vanguard indicated that due to expected future

recordkeeping offset reductions from its funds, the total offset received going forward would be approximately 6.20 bps.  Based on then-current plan assets and the then-current count of approximately 13,000 participants, Vanguard indicated they were earning a fee of $43 per-participant per-year.  According to Vanguard, this represented a shortfall in desired fees of $77,000 per-year.  The report also provided a new pricing offer whereby Vanguard would seek to continue to earn a target of $43 per-participant per-year.  It was clear from the report that Vanguard desired to lock in at the $43 per-participant per-year fee requirement, given its expectation that the recordkeeping offsets from its funds were expected to continue to decrease in the future.

46.     Effective January 1, 2016, in large part due to the impact of increased competitiveness in the market, TIAA agreed to reduce the fee for the NYU Washington Square Group plans, including the NYU Faculty Plan, to 10 bps without requiring the elimination of Vanguard or imposing any other conditions.  The Committee accepted the offer and this was implemented via an amended services agreement with TIAA.

## NYU FACULTY PLAN MOVES TO SINGLE VENDOR

47.     In June 2016, following periodic discussions among Committee members and Cammack representatives at due diligence meetings about conducting a new RFP for a single-vendor recordkeeping arrangement for the NYU Washington Square Group plans, and considering the pricing offers from Vanguard and from TIAA, the Committee determined that the time was right to initiate such an RFP.[6]

48.     Committee members expressed their belief that due to the apparent success of the single-vendor migration for the NYU Langone Group plans, the

_____

[6] DX42 is a true and complete copy of the New York University October 2016 Request for Proposal for Defined Contribution Recordkeeping Services.

16

increasing pricing competitiveness in the marketplace, as well as changes in the retirement programs at peer institutions (for example, where several Ivy Plus peer schools had or were switching to a single-vendor program), participants in the NYU Washington Square Group plans would be more receptive to such changes.

49.    With Cammack's assistance, the Committee considered and evaluated several large recordkeepers to invite to participate in the new RFP process.  The RFP was conducted to ensure optimal pricing and full-service delivery from the selected service provider and increase participant engagement and financial education, as well as improve the overall user experience for NYU faculty and staff, among other goals. The RFP sought information regarding each potential vendor's operations, products and investments, services offered in relation to participant experience, administration and recordkeeping, compliance, expenses, and service capabilities, in addition to requesting a list of references.

50.    Ultimately, the Committee selected TIAA, Vanguard, VALIC, Voya, and Fidelity to receive the RFP.[7]  Fidelity declined to submit a proposal due to the expected challenges related to the participant-controlled balances in the TIAA annuities (*i.e.*, Fidelity indicated it would not receive a sufficient amount of those balances to make it worthwhile).

51.    With the assistance of Cammack, the Committee reviewed, analyzed and compared the responses received from the four vendors.  The comparison and evaluation of the vendor submissions were presented by Cammack to the Committee on December 20, 2016,[8] and both TIAA and Vanguard were invited to present to the

---

[7] DX405, DX406, and DX407 are true and complete copies of the TIAA, VALIC, and Vanguard responses to the RFP.

[8] DX404 is a true and complete copy of Cammack's comparison of the responses to the RFP.

Committee on February 1, 2017.  Both Vanguard and TIAA offered very favorable plan pricing.  On a per-participant basis, the pricing between the two vendors worked out to be virtually identical.  Pricing negotiations settled on TIAA applying a 3.2 bps required revenue rate upon the affirmative selection of TIAA as the sole recordkeeper, with a further reduction to 3.0 bps once the assets from Vanguard are transferred to TIAA and TIAA begins to receive all ongoing contributions to the NYU Washington Square Group's plans.  Additionally, the Committee concluded that TIAA offered distinct advantages to participants and selected it to be the single recordkeeper.  Those advantages included: fund-level investment advice to participants at no added cost, the industry-leading crediting rate on the TIAA Traditional Annuity Account, and state-of-the-art technology.

      52.    TIAA's non-discretionary fund-level investment advice service to the Washington Square Group's plans and their participants was a valuable added service.  The term "fund-level investment advice" refers to arrangements under which the recordkeeper, generally through an independent registered investment advisory firm, will provide specific recommendations as to how the participant should allocate their account balance across the investment options made available through the plan. Many recordkeepers do not provide investment advice to participants, for fear of taking on fiduciary responsibility.  For those recordkeepers that do offer such advice services, it is common that participants would be required to pay an additional fee for the services.  TIAA has provided and continues to provide this service to participants in the Plans, without additional fees, both in-person and via its national call center. Vanguard also provides fund-level investment advice at no added cost to participants, via its on-line Personal Online Advisor service. Vanguard does not provide advice in-person.

4827-0252-4256.1

53.     An example of TIAA's state-of-the-art technology was that TIAA could administer the salary deferral process whereby participants could simply elect that they wanted to "max out," and in doing so could be assured that their individual annual salary deferral limits would be reached and that the maximum employer matching contributions would be made for them.  Vanguard could not offer this to NYU.  Additionally, in retaining TIAA, all of the Vanguard funds would be transferred to the TIAA platform, as had been done for the NYU Langone Group's single vendor conversion.  Had Vanguard been selected, the participant-controlled balances under the annuity contracts would have remained at TIAA unless participants elected to move their account balances.  This would effectively have retained a dual-vendor program, one active and one frozen.  These were meaningful benefits for participants.

54.     One of the Committee's considerations in deciding whether to eliminate a recordkeeper and move to a single-vendor model was the conversion process itself.  Conversions to plan recordkeepers are resource-intensive projects for human resources, benefits, payroll, and information technology staff members.  There are substantial amounts of time and money devoted to such projects, which typically require significant advance planning and many months to complete.  Additionally, for plan participants, recordkeeper conversions are disruptive to account management and the participant experience.  This was an ongoing concern of the Committee.  The transfer of data from the terminating recordkeeper to the ongoing recordkeeper will generally require participants to have little to no account access for some period of time, typically several weeks to more than a month.  This transfer of data and the transfer of plan assets requires a "blackout period" during which participants will not be able to gain access to their accounts.  During this time, requests for example for new loans, withdrawals and even investment changes are restricted. For many

19

participants, this may be a non-event.  But for many others, this can be frustrating and create problems.  Relating specifically to the transfer of plan assets, the plan fiduciaries need to decide the method to be used.  One method is that existing investments are liquidated and proceeds then sent to the continuing recordkeeper. Another option available to some plans is for an "in-kind" transfer, whereby the investments are re-registered to the ongoing recordkeeper.  Either method involves cost and proper accounting to ensure accuracy of processing.

55.     To facilitate a smooth transition to a single vendor, NYU hired Cammack to assist NYU's benefits staff to communicate with NYU senior management and the benefits committees of the Faculty Senators Council and the Administrators Management Council as to the value of moving to a single vendor to plan participants and to NYU.[9]

56.     Implementation of the single-vendor recordkeeping program began in April 2017 and is expected to be completed in May 2018.

57.     NYU, assisted by Cammack, conducted an audit of the Plans' vendors' services and fees in 2012, and subsequently committed to conducting semi-annual audits of plan expenses.  NYU determined that TIAA was receiving revenue in excess of the amount it needed following the audit. Revenue credits may be used to pay permitted plan expenses and/or be credited back to participant accounts or some combination of the two.   The Committee returns *all* revenue credits received from TIAA directly to the plan participants rather than using any or all of this money to pay plan expenses.

58.     During the period from 2011 through 2016, Cammack provided retirement plan consulting and investment advisory services to a growing number of

---

[9] DX423 is a true and complete copy of the Special Projects to Investment Advisory Services Agreement.

higher education and health care defined contribution retirement programs, including NYU, which by 2016 numbered 13 programs that included plan assets held on TIAA's recordkeeping platform ranging from approximately $900 million to more than $7 billion (the "Comparison Group"). Cammack reviewed its relevant client base and confirmed that, among the relevant Comparison Group, in 2011, two of the three relevant clients employed a multiple-recordkeeper arrangement, while in 2016, six of the thirteen employed a multiple record-keeper arrangement.

59.     In 2011, TIAA"s required revenue rates across the Comparison Group ranged from a high of 18bps to a low of 9bps, and in 2016 ranged from a high of 12bps to a low of 5bps. Of the Comparison Group, in 2010, the NYU Washington Square Group had the highest plan assets and was in the second-lowest quartile for fees paid to TIAA, and, in 2016, NYU Washington Square Group ranked in the third-highest quartile of plan assets, while its fees paid to TIAA ranked in the second-lowest quartile. Additionally, of the Comparison Group, in 2016, NYU Langone Group ranked in the second highest quartile of plan assets, and the second lowest quartile of fees paid to TIAA.

## SCHOOL OF MEDICINE FACULTY PLAN TAKES ADVANTAGE OF FURTHER RECORDKEEPING AND SHARE CLASS FEE REDUCTIONS

60.     In February 2017, during its negotiations with TIAA on behalf of the NYU Washington Square Group regarding the RFP, Cammack also negotiated with TIAA on behalf of the NYU Langone Group to seek further price reductions.

61.     TIAA agreed to a further reduction of the required revenue rate applied to the NYU Langone Group plans. Effective January 1, 2017, TIAA's required revenue rate became 4 bps.

62.     Cammack also continued to work on behalf of the NYU Langone Group plans to seek further share class fee reductions on the Vanguard funds. With an

expected implementation date of April 20, 2018, several Vanguard funds will be switched to lower cost share classes now available.  The cost savings from these changes were estimated to be approximately $53,000 per-year.

## TIAA REAL ESTATE ACCOUNT

63.     Beginning in the first quarter of 2010, the Committee put the TIAA Real Estate Account (the "REA") on the watch list on Cammack's advice based on the REA's trailing three- and five-year performance following the real estate sector crash and the REA's performance compared to the Dow Jones U.S. Select Real Estate Investment Trust index.  After noting that the REA suffered losses in 2009, Cammack also highlighted statements by the REA's managers that they expected the REA to recover along with the broad commercial real estate market. Given that the REA's performance appeared to reflect what had occurred in the broader real estate sector, Cammack did not feel that the REA should have been closed to new investments in the Plans. Additionally, while the standard benchmarking for the REA included a comparison to the Dow Jones U.S. REIT Index, the analysis of the REA by Cammack fully considered that the REA invested in real estate properties and was not a REIT investment.

64.     In the April 2011 due diligence meeting, Cammack discussed benchmarking the REA with the Committee.  Cammack noted the unique nature of the REA's investment in direct-owned real properties (*i.e.*, that the REA is not an investment in real estate investment trusts, commonly referred to as REITs), and indicated that an appropriate benchmark would need to be found.  The REA's performance was shown alongside a REIT index as standard practice, and Cammack and the Committee discussed the inadequacy of this comparison.  Cammack and the Committee also discussed the fact that the REA provides investors with the ability to diversify using an investment that is highly negatively correlated to other available

22

investments.  This level of negative correlation is not achieved by REIT mutual funds, which generally move more in tandem with the equity markets.  This negative correlation is, in large part, what makes the REA such a unique investment, as it helps provide participants with the means to build a diversified portfolio.

65.    After the April 2011 due diligence meeting, Cammack's benchmark for the REA was the Russell 3000 Index.  The idea was that this index would serve as a placeholder to show how the REA performed in comparison to the broad domestic equity market until such time that a suitable benchmark could be identified or developed.  In the meantime, Cammack and the Committee placed the REA on watch status until the benchmark issue was resolved.

66.    In February 2012, Elina Sternberg of TIAA joined a scheduled Committee due diligence meeting to discuss several investments, including the REA. Among the issues discussed were that the REA is actively managed, that it has direct investments in more than 100 properties, and that its investment portfolio includes commercial and retail space.  Ms. Sternberg was of the view that the REA's low correlation to stocks and bonds made it a good addition to a portfolio, but its uniqueness made it challenging to benchmark.  Cammack and the Committee understood in that meeting that TIAA would be introducing a new benchmark for the REA in the near future.  Cammack's analysis of the REA continued to consider that the REA invested in real estate properties, which required the REA to be evaluated against what was happening in the broader commercial real estate sector. Given that the REA's performance appeared to reflect what was occurring in the real estate sector, it was deemed appropriate to remove the REA from watch status.

67.    In the fourth quarter of 2012, Cammack began benchmarking the REA to a National Council of Real Estate Investment Fiduciaries ("NCREIF") Index – specifically, the NCREIF Fund Index – Open End Diversified Core Equity (the "NFI-

ODCE").  NCREIF is a leading provider of investment performance indices and data for United States commercial properties.  Cammack believed the NFI-ODCE to be a more suitable comparable but noted its limitations.  Significantly, while the REA needs to maintain a cash position to cover redemptions that may be requested by participants, the institutional accounts included in the NCREIF-ODCE do not.  The REA typically holds 15%-20% in publicly traded, liquid investments to cover redemptions and also to take advantage of real estate purchase opportunities.  The NCREIF-ODCE funds thus remain fully invested and have the ability to achieve greater returns than the REA during strong real estate markets.  Despite the limitations, Cammack and the Committee concluded it was the appropriate benchmark for the REA.

68.     Cammack's view was and is that if the REA is not appropriately benchmarked – for example, if it is benchmarked to a REIT index – it could at times appear to provide poor comparative investment returns.  But when appropriately benchmarked, and also given its high level of negative correlation to other core investment options, the REA was and remains an appropriate investment option for the Plans.  As with other TIAA annuities, the REA also provides participants with the ability to annuitize directly from the Plan at a very reasonable annuity cost.

69.     Regarding the REA's fees, the expense ratio of the REA was stated to be 92 bps, but 24 bps of that amount was for recordkeeping and administration expense that was credited back to the Plans via the revenue sharing arrangement, thereby making the net management fees 68 bps.  When compared to other variable annuity investment options offered in the marketplace, many that are well in excess of 150-200 bps, even the total fee of 92 bps was a reasonable cost for such a unique investment.

4827-0252-4256.1

70.     Based on the comparison of the REA's investment results, net of investment fees charged by REA, versus the returns of the NCREIF-ODCE Index for the 1-year period ending September 30, 2012, the REA returned 10.63% vs. 10.69% for the NCREIF-ODCE.  For the 3-year period, the REA returned 9.45% vs 10.88% for the NCREIF-ODCE Index.  For the 5-year period, the REA returned -2.61% vs -2.34% for the NCREIF-ODCE Index.  And for the 10-year period, the REA returned 4.46% vs 5.30% for the NCREIF-ODCE Index.  The investment results for REA, when appropriately benchmarked, did not lead to a conclusion that offering REA in the Plan's investment menu was imprudent.  To the contrary, its inclusion was prudent.

71.     In sum, Cammack, and the Committee, concluded that there was good value to participants from having the REA as an available investment option: reasonable investment returns when appropriately benchmarked, a unique diversification opportunity, reasonable fees of the investment itself, and a low-cost opportunity for participants to annuitize directly from the investment.

## CREF STOCK ACCOUNT

72.     The Committee reviewed the CREF Stock Account on a quarterly basis and in the context of the Plans' total investment lineup which also included stock index funds for participants who preferred that style of investment.  In the April 2011 due diligence meeting, at the request of the Committee, Cammack discussed benchmarking the CREF Stock Account.  The CREF Stock Account is a unique investment given its mandate to invest in a mix of 70% domestic and 30% foreign equities, and its ability to invest in all market capitalizations from small cap to large cap equity securities.  This investment option gives participants the ability to diversify globally and by market capitalization from within a single equity fund. Cammack noted that the CREF Stock Account generally is benchmarked against

large cap domestic equities, which may not be the best comparative.  An appropriate means of benchmarking CREF Stock would have to consider the uniqueness of the allocation of the investment portfolio.

73.     Beginning at the outset of its engagement by the Committee, Cammack benchmarked the CREF Stock Account to the S&P 500 Index since Morningstar categorized the CREF Stock Account as a large-cap blend investment. But starting in the second quarter of 2013 and continuing to today, Cammack began benchmarking the CREF Stock Account to a composite index reflecting 70% domestic and 30% foreign equities. This composite index consists of 70% Russell 3000 Index (which measures performance of the broad U.S. stock market) and 30% MSCI All Country World excluding the U.S. Investable Index (which measures performance of large-, mid- and small-cap stocks in 44 developed and emerging market nations throughout the world, excluding the U.S.) (the "Composite Index").

74.     Like most other investment firms, TIAA generally relies on standard market benchmarks, often those provided by Morningstar.  But the Morningstar universe of benchmarks does not include one that maintains a 70% domestic/30% international equity split, with an all-cap approach.  By default, the CREF Stock Account has been placed in the large cap blend category by Morningstar, typically benchmarked to the S&P 500 Index.  But the S&P 500 Index is comprised of 100% domestic large cap equities, making it an inappropriate benchmark for the CREF Stock Account given the Account's 70% domestic/30% international equity allocation.  If the S&P 500 Index is used to benchmark the CREF Stock Account, the CREF Stock Account will, for example, appear to underperform when domestic equities outperform international equities.  This was true, for example, in the three- to five-year period leading up to 2017.

26

75.     Regarding the CREF Stock Account's fees, the expense ratio was stated to be 49 bps, but 24 bps of that amount was for recordkeeping and administration expense that was credited back to the Plans via the revenue sharing arrangement, thereby making the net management fees 25 bps.  When compared to other variable annuity investment options offered in the marketplace, many that are well in excess of 150-200 bps, even the total fee of 49 bps was a reasonable cost for such a unique investment.  Effective April 24, 2015, TIAA split the CREF Stock Account and other CREF annuity accounts into three distinct share classes.  The determination of which share class would be offered by each plan using the annuity accounts was made based on total plan assets across the CREF annuity program.  For the Plans, the lowest cost R3 share class were adopted.  For the CREF Stock Account R3 share class, the expense ratio is 32 bps, with 10 bps of that amount allotted to the recordkeeping and administration expense and credited back to the Plans via the revenue sharing arrangement, thereby making the net management fee for CREF Stock Account R3 to be 22 bps.

76.     Based on the comparison of the CREF Stock Account's investment results, net of investment fees charged by CREF Stock Account, versus the returns of the Composite Index for the 1-year period ending June 30, 2013, the CREF Stock Account returned 18.74% vs. 19.23% for the Composite Index.  For the 3-year period, the CREF Stock Account returned 15.12% vs 15.46% for the Composite Index.  For the 5-year period, the CREF Stock Account returned 4.73% vs 4.97% for the Composite Index. And for the 10-year period, the CREF Stock Account returned 7.35% vs 7.62% for the Composite Index.  The investment results for the CREF Stock Account, when appropriately benchmarked, did not lead to a conclusion that offering the CREF Stock Account in the Plans' investment menu was imprudent.  To the contrary, it's inclusion was prudent.

77.     In sum, Cammack and the Committee concluded that there was good value to participants from having CREF Stock Account as an available investment option: reasonable investment returns when appropriately benchmarked, reasonable fees of the investment itself, and a low-cost opportunity for participants to annuitize directly from the investment.

## BENCHMARKING OF FUND PERFORMANCE AND FEES

78.     Benchmarking is a standard part of the analysis of any investment option.  The goal of benchmarking is to assist the investor or fiduciary in the determination of how well an investment compares to other similar investments.  Just as there are many different ways that a fund may be managed, even within a given asset class, there are many different benchmarks that may be used to make these comparisons. The use of any particular benchmark is just the starting point in the analysis of a given investment.

79.     Typically, while funds are benchmarked to an appropriate index, investment returns of the funds are also compared to the average returns and average fees of the peer group of similar funds.  For this comparison, the industry standard uses the Morningstar peer group/category averages. The benchmarking of fund performance to Morningstar peer group/category averages, like benchmarking to a particular index, is an additional means to assess the appropriateness of an investment.  But as with benchmarking to an index, variations in fund management styles must always be considered.

80.     Effective investment analysis looks beyond the numbers because the numbers do not always tell the entire story.

81.     This is also true of the benchmarking of fund fees. It is also a standard industry practice to benchmark fund fees against average fees of the Morningstar peer

28

group/category.  This too is a valid part of investment analysis, but also requires further consideration.

82.      Within the average fees of the Morningstar peer group/category averages will be funds of higher fees and lower fees.  Additionally, some of those funds will have revenue sharing arrangements of varying amounts depending on the share class of the funds, commonly in amounts ranging from 25 bps to 75 bps, while some of those funds will have no revenue sharing arrangements.

83.      The analysis of any given fund will need to take this variation in share classes and revenue sharing into account.  If, for example, the retirement plan is making use of revenue sharing arrangements to compensate the recordkeeper for its services, then the use of fund share classes that include revenue sharing arrangements would be expected.  Further, the fees of the funds in this scenario would be higher as compared to a retirement plan that was not using revenue sharing to compensate its recordkeeper.  The retirement plan not using revenue sharing to compensate its recordkeeper and/or to pay other permitted expenses would be expected to use a share class of the same fund that is lower in cost.

84.      This is true of large retirement plans as well as small retirement plans. The method used to compensate the plans' service providers will in large part determine which share class is used for any given fund.

85.      Relating specifically to the Plans, since revenue sharing or recordkeeping offset arrangements were being used to compensate the recordkeepers (TIAA and Vanguard), such arrangements could not be disregarded in Cammack's analysis of investment fees and performance.  In meetings with the Committee, Cammack specifically discussed that fund fees may be higher than otherwise expected because the fees included revenue recapture amounts paid by the funds to the recordkeepers as compensation for services provided to the Plans.

29

## CONSIDERATION OF STREAMLINING FUND LINEUP

86.    Beginning in 2009 and continuing into 2016, Cammack periodically discussed with the Committee the issue of whether to streamline the fund menu in the Plans (*i.e.,* reduce the number of funds offered).  Cammack's view has been and remains that there can be benefits to participants and to plan fiduciaries from such streamlining, including reducing potential participant confusion and reducing the burden of ERISA fiduciary duty compliance on the plan fiduciaries, but that there also can be countervailing considerations, such as providing participants with the benefit of greater investment choice despite the additional fiduciary compliance burden, that can lead a reasonably prudent plan fiduciary to offer a large choice of funds rather than streamline.

87.    In these discussions, the Committee consistently expressed its belief that participants were benefiting from and enjoying the availability of the existing fund menu with each vendor.  In fact, it was not uncommon for participants to request that new funds be added to the program.  The Committee weighed the potential benefits of fund consolidation against the benefits of making a large number of investment options available to participants, and consistently decided against streamlining.

## BUNDLING AND TIAA CONTRACTS

88.    Before 2005, TIAA's annuity contracts provided for participant control over any transfer of their plan balances.  Under these legacy contracts, plan sponsors who wished to change investment lineup providers could not "map," or transfer, participant balances in the TIAA investments over to the new funds being provided by the new vendor.  Beginning in 2005, TIAA introduced a new generation of annuity contracts that does allow for employer mapping.

4827-0252-4256.1

89.     Another difference between the older and newer generation of contracts is that the older generation require that the CREF Stock Account, the CREF Money Market Account and the TIAA Traditional Annuity Account all be offered as active investment options for ongoing contributions. This requirement has been eliminated in the newer generation.

90.     The TIAA annuity contracts in place under the Plans are all the older types that predated the 2005 generation.

91.     Plan fiduciaries thinking about switching away from the older contract types and into the new-generation contracts must consider the tradeoffs.  For one thing, existing plan assets invested under any of the older style TIAA contracts annuities cannot be moved at the fiduciary's instruction to any other investments; individual participants would need to direct such an asset transfer for their own accounts.  In addition, no new contributions and balance transfers would be allowed into the legacy contracts.  Another tradeoff is that the 3% minimum crediting rate guarantee for monies invested in the popular TIAA Traditional Annuity Account under the older-style contracts was replaced with a 1% guaranteed minimum crediting rate for ongoing contributions and balances under the newer generation contracts.

92.     Cammack periodically discussed the different TIAA contract types with the Committee and the pros and cons of remaining with the older contract types versus moving to the newer contract types.

93.     Committee members expressed concern that forcing participants into the new contracts, which would take away the 3% minimum rate guarantee and replace it with the 1% guaranteed minimum rate for monies put into the new contracts, would not be in the participants' best interest.  The Committee also believed that it would not be in participants' bests interests to preclude them from making any new contributions or balance transfers to the legacy contracts, which

31

would occur if the Committee elected to move to the newer generation of contracts. At the same time, the Committee was well aware that continued use of the legacy contracts would require that the CREF Stock Account, the CREF Money Market Account, and the TIAA Traditional Annuity Account be offered as active investment options for ongoing contributions. But this was not a concern for the Committee, as these were found to be appropriate, prudent investments for the Plans in the regular quarterly evaluations of the Plans' investments.

## THE RETIREMENT COMMITTEE

94.      Cammack routinely discussed matters of fiduciary responsibility and duty with the Committee members, and periodically provided fiduciary training sessions that included written materials which highlighted that plan fiduciaries have the responsibility always to act prudently and in the best interests of participants.

95.      At no time did it appear to Cammack that any of the NYU committee members were acting in their own self-interest. To the contrary, as far as Cammack could perceive, decisions to act, or not to act, always were made based on consideration of what was in the best interest of the participants.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 5th day of April 2018.

New York, NY                                              _____
                                                                      Jan Rezler

4827-0252-4256.1