*Sacerdote, et al. v. New York University*, 1:16-cv-06284 (KBF) (S.D.N.Y.)

# Joint Pretrial Order

# April 5, 2018

# Defendant's Exhibit 889

## Declaration of Marcia S. Wagner

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

DR. ALAN SACERDOTE, et. al.,

                              Plaintiffs,   :   Case No.: 1:16-cv-06284 - KBF

- against -

NEW YORK UNIVERSITY,

                              Defendant

------------------------------------

I, Marcia S. Wagner, declare under penalty of perjury pursuant to U.S.C. §1746:

1.     I am the principal of The Wagner Law Group, A Professional Corporation, in Boston, Massachusetts, which I founded over twenty-one years ago, and an attorney working exclusively in the area of pension and employee benefits law. I am also a *summa cum laude* and *Phi Beta Kappa* graduate of Cornell University and a graduate of Harvard Law School. I have practiced law in Boston for over thirty years, and I have been a partner in two major law firms. I have been recognized as a national expert in a variety of employee benefits matters, including the fiduciary requirements under ERISA. I was appointed by the Secretary of the Treasury to serve on the IRS's Advisory Committee on Tax-Exempt and Government Entities, and I am the former Project Chair of its Employee Plans subcommittee. I am the recipient of the IRS Commissioner's Award (that agency's highest honor) relating to my service on behalf of the IRS Tax Exempt and Government Entities Division. I have also been inducted as a Fellow of the American College of Employee Benefits Counsel. I am a frequent lecturer and author on the subject of ERISA/ employee benefits, and I have written a Bureau of National Affairs Tax Management Portfolio, entitled "Plan Disqualification and ERISA Litigation," for which I received the BNA Distinguished Author Commendation. Among my other books and articles, I have also written the following: BNA Tax Management Portfolio: "ERISA Litigation, Procedure, Preemption and

{13440/A0326790.1}                                              1

Other Title I Issues," BNA Tax Management Portfolio: "EPCRS – Plan Correction and Disqualification" and The National Underwriter Company's "The ERISA Fiduciary Compliance Guide". I have been listed as a "Massachusetts Super Lawyer" by Boston Magazine, and have an AV peer review rating by LexisNexis Martindale-Hubbell indicating a very high to preeminent legal ability and integrity. I have also been named one of the 100 Most Influential Persons in the Pension Industry by 401(k) Wire for eight years.

2.  I have extensive experience designing and consulting with respect to 403(b) plans, including the types of 403(b) plans involved in this case. My experience includes (i) advice on the structure and establishment of plan investment and administrative committees, (ii) counseling such bodies on the design of investment menus and recommending the processes to be used for selecting investment options to be included thereon, as well as monitoring their performance and expenses, (iii) preparing investment policy statements that allocate fiduciary responsibilities and provide guidance on the criteria and processes involved in investment selection and monitoring, (iv) guiding plan committees on due diligence processes for issuing requests for proposals relating to a plan's engagement of recordkeepers and other service providers and the information to be considered, decision-making process and documentation recommended before making a final selection, (v) advising plan committees on the criteria for evaluating the performance and fees of service providers, and (vi) attending meetings of fiduciary committees to provide advice regarding issues arising in the performance of their duties. I have advised fiduciary committees, including committees responsible for large plans, on the process and criteria to be used in the selection of recordkeepers, which has given me familiarity with the recordkeeping fees paid by large plans.

3.  Counsel for New York University ("NYU" or "Defendant") asked me, as an expert on the standards of conduct and practices followed by retirement plan fiduciaries, and based on my extensive experience with 403(b) and 401(k) fiduciaries responsible for selecting plan menus and for hiring plan service providers, to evaluate the processes Defendant followed after 2009 with respect to (i) selecting and monitoring plan administrative service providers and reviewing their fees as well as (ii) offering and monitoring the TIAA Real Estate Account and CREF Stock Account under the New York University Retirement Plan for Members of the

Faculty, Professional Research Staff and Administration (the "NYU Faculty Plan") and the New York University School of Medicine Retirement Plan for Members of the Faculty, Professional Research Staff and Administration (the "School of Medicine Faculty Plan"). Each of these plans is a 403(b) defined contribution retirement plan and will be referred to collectively herein as the "Plans". On December 22, 2017, I submitted my Expert Report, a true and complete copy of which is DX812, relating to these issues. On January 22, 2018, I submitted two additional reports ("Rebuttal Reports") refuting the conclusions of Plaintiffs' putative expert witnesses on these matters. DX825 is a true and complete copy of my report rebutting the report of Plaintiffs' witness Michael Geist and DX824 is a true and complete copy of my report rebutting the report of Plaintiffs' witness Gerald W. Buetow.

4. My Expert Report included a brief discussion of important regulatory developments relating to 403(b) plans leading up to 2010 which changed the manner in which the fiduciary principles of prudence and loyalty applied to these plans and recounted some of the unique issues these changes required the typical 403(b) plan fiduciary to address. As discussed in detail in my Expert Report, based on my experience, Defendant was thoughtful and diligent and very successful in creating and implementing a robust, detailed and well-documented fiduciary process that included retention of industry experts to provide assistance. I concluded that the selection of TIAA as the Plans' recordkeeper was based on a thoughtful, robust and diligent process that took into account all relevant facts and circumstances, including but not limited to TIAA's unique circumstances as the issuer of individual annuity contracts funding the Plans, the inability of any vendor other than TIAA to provide recordkeeping services for those annuities, technological and participant support capabilities, the level and quality of services provided, and the continuing renegotiation of TIAA's administrative fees, resulting in an 85% reduction over time. Based on my experience as a lawyer practicing in this area, as an author and lecturer and independent fiduciary, I further concluded that the procedures followed by Defendant were consistent with those followed by diligent fiduciaries under these circumstances, including but not limited to: (i) establishing the Plan Committee which met on a regular and consistent basis beginning in 2007, (ii) conducting RFPs in 2009/2010 and again in 2016 for vendors to provide recordkeeping and Plan services, (iii) engaging independent experts to obtain fiduciary and investment advice, (iv) analyzing and accommodating the Defendant's inability to

direct or control investments in individual annuity contracts to which the Defendant was not a party, (v) monitoring administrative fees, (vi) establishing a Plan reimbursement account to return revenue sharing to participants' accounts, and (vi) carefully implementing a single recordkeeper arrangement for the School of Medicine Faculty Plan in 2011 and the NYU Faculty Plan in 2018.

5.   As to retention of the TIAA Real Estate Account and the CREF Stock Account on the Plans' investment menus, my Expert Report concludes that the Defendant diligently and persistently monitored these investment options, seeking expert advice when needed, and was ultimately justified in exercising its discretion to continue making the strategies employed by these funds available to participants of the Plans. In this respect, the Defendant took steps to: (i) implement a quarterly due diligence review and analysis of the Plans' investment options, (ii) establish and use an investment policy statement to guide the process for reviewing and replacing Plan investment options, (iii) monitor, analyze, remove and replace underperforming investment options, (iv) meet with investment providers to discuss the structure, management and performance of these investment options, and (v) obtain and consider an expert investment adviser's assistance in analyzing measures of performance, style drift, volatility, expense ratios, ratings, risk and return characteristics, risk-adjusted returns and deviations.

6.   My Rebuttal Report relating to the Expert Report of Gerald Buetow reflects my view that he has a limited grasp of and exposure to how fiduciary concepts are applied with respect to 403(b) plans, since his Report showed a complete lack of understanding that, for historical reasons, certain investments are in the form of annuity contracts between individual plan participants and an investment provider and cannot be overridden or changed by 403(b) plan fiduciaries. A very large percentage of the Plan assets in this case were of this nature. I also considered Mr. Buetow's Report to be off the mark with respect to the implications of what he argued was the inability of some Plan Committee members to use specialized investment terminology or converse fluently on investment minutia. Obtaining access to this expertise is a well-accepted approach and is the reason the Committee engaged an investment advisory firm. Although the Committee reviewed and asked its adviser questions on multiple occasions with respect to the two Plan investment options questioned by the Buetow Report (the TIAA Real

Estate Account and the CREF Stock Fund), it ultimately followed its adviser's recommendation to retain these funds. My Rebuttal concluded that this was reasonable in light of the process followed in assessing the investment performance of these long-term investments, even though such performance was not consistently positive from one year to the next. I found that Mr. Buetow's analysis was undermined by the use of inappropriate comparators and selective use of investment results.

7.     Similar to my assessment of Mr. Buetow's lack of familiarity with 403(b) plans, my Rebuttal Report relating to the Expert Report of Michael Geist questioned his qualifications as an expert, because his professional experience does not consist of advising retirement plan committees but is limited to working with a single plan vendor. Mr. Geist's Report also indicates a complete lack of knowledge and familiarity with basic 403(b) plan structures and operations, including the scope of a plan committee's authority to control individual investment contracts between participants and investment providers and the fact that 403(b) plans cannot hold their assets in a trust vehicle. The most problematic issue, however, related to Mr. Geist's methodology for determining the maximum amount of reasonable recordkeeping fees, since he provided no data to support his figures. My Rebuttal Report concluded that Mr. Geist's assertions about fee levels should be disregarded. Although Mr. Geist implied that the asset-based fee model negotiated by the Defendant was per se imprudent and that only a flat-dollar per participant fee for recordkeeping could be prudent, this has never been the case and, in my experience, both models continue in wide use. Mr. Geist's Report was also incorrect to claim that an RFP is the only way for a Plan to obtain the best fee in the marketplace, since less expensive and time-consuming alternatives were and are available. Finally, the Geist Report was too cavalier in alleging that recordkeeper consolidation to obtain a lower fee could have been accomplished. Such a consolidation is a major undertaking and requires substantial planning, technological expertise, detailed notices to participants regarding the changes, the imposition of blackout periods limiting participants' access to their plan accounts, detailed accounting reconciliations, and consensus among all of a plan sponsor's constituents. Contrary to the Geist Report, my Rebuttal Report concluded that the Defendant reasonably determined that School of Medicine Faculty Plan was prepared for this change in 2012 but that the NYU Faculty Plan was not.

8. I was deposed by Plaintiffs' counsel on February 23, 2018. Among other things, my testimony at that time covered matters discussed in my Expert Report and in my Rebuttal Reports, as summarized above.

* * * * * * * *

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
Marcia S. Wagner

Date: April 4, 2018