I4IASAC1ps

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  DR. ALAN SACERDOTE, et al.,

4                  Plaintiffs,

5          v.                              16 Civ. 6284 (KBF)

6  NEW YORK UNIVERSITY,

7                  Defendant.              Trial

8  ------------------------------x
                                           New York, N.Y.
9                                          April 18, 2018
                                           9:05 a.m.
10
   Before:
11
                    HON. KATHERINE B. FORREST,
12
                                           District Judge
13
                          APPEARANCES
14
   SCHLICHTER BOGARD & DENTON, LLP
15       Attorneys for Plaintiffs
   BY:  JEROME J. SCHLICHTER, ESQ.
16       HEATHER LEA, ESQ.
         JOEL D. ROHLF, ESQ.
17       ETHAN D. HATCH, ESQ.
         SCOTT A. BUMB, ESQ.
18       MARY T. EDWARDS, ESQ.

19  DLA PIPER US LLP
         Attorneys for Defendant
20  BY:  MARK MUEDEKING, ESQ.
         IAN TAYLOR, ESQ.
21       JENNIFER SQUILLARIO, ESQ.
         EVAN D. PARNESS, ESQ.
22       HARRY P. RUDO, ESQ.

23  ALSO PRESENT:  PATRICIA CHEW
                   Sr. Litigation Support Analyst, DLA Piper US LLP
24
   ALSO PRESENT:  REBEKAH FREISINGER
25                 JADE POUNDS
                   Paralegals, Schlichter Bogard & Denton, LLP

EX. 4

I4i1sac4                    Chittenden - Cross

1    case, the NYU plans, till 2015, correct?

2    A.  Well, that's not entirely true.  CREF, CREF accounts are

3    utilized in some of our individual products as well, so as

4    such, you know, I would be involved with the performance of

5    both CREF and TIAA in that regard.

6    Q.  Well, products, yes, but in terms of being involved with

7    NYU's plans' performance as a whole, you weren't involved in

8    any way prior to 2015?

9    A.  In terms of the NYU plan administration, that is correct.

10   Q.  Any knowledge you have then of TIAA's top 200 403(b)

11   clients in 2010 would have to be based on what others have told

12   you, wouldn't it?

13   A.  Yes.

14           MR. SCHLICHTER:  Okay.  In that case, your Honor,

15   we're going to move to strike paragraphs 71 through 77 of his

16   declaration, as well as paragraph 92, under Rule 602.  He's

17   just confirmed, contrary to what he states in his declaration,

18   that these are not based on his personal knowledge and

19   therefore would be hearsay or speculation.

20           THE COURT:  All right.  Let me hear from the defendant

21   in that regard.  And what I want you to do is, just tell me

22   whether or not you're going to be able to build a foundation

23   that will be different from what has been elicited so far, and

24   that would resolve this.

25           MR. TAYLOR:  Yes.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

EX. 4

1                THE COURT:  All right.  So subject to that, I hear the

2       application, I'm not going to resolve the application, I'm not

3       going to deny the application at this time, but we'll come back

4       to it.  We'll circle back.  I've made a note in the declaration

5       itself.

6                MR. SCHLICHTER:  All right.  On a separate matter,

7       your Honor, we'll also move to strike paragraphs 45, 53, 54,

8       63, and 64, which make various statements about TIAA's top 200

9       clients in 2010, and that's under both Rule 602 and Rule 1006.

10      The Court denied our motion *in limine* based on defendant's

11      representations that this testimony would come from

12      Mr. Chittenden's personal knowledge.  Now it's clear it can't

13      be and is not from his personal knowledge because he didn't

14      work in this area in 2010, and any knowledge he said that he

15      has of this would be hearsay or based on someone else.

16               THE COURT:  All right.  So one thing we can do right

17      now, because this may be an issue as to the duration of the

18      cross-examination, and since it goes directly to supplementing

19      the direct testimony, is we could allow Mr. Taylor, or whomever

20      is going to do it on the defense side, to try to build up a

21      foundation, and either they'll succeed or not succeed, but then

22      we'll know whether or not I'm going to strike these paragraphs.

23      Do you want to just go ahead and do it that way?

24               MR. SCHLICHTER:  Yes, your Honor.

25               THE COURT:  The alternative would be to have you

EX. 4

I4i1sac4                    Chittenden - Redirect

1    proceed --

2              MR. SCHLICHTER:  I think that's more efficient.

3              THE COURT:  So Mr. Taylor, we're going to have you

4    attempt to address the issues, through testimony, that

5    Mr. Schlichter has now raised.

6    REDIRECT EXAMINATION

7    BY MR. TAYLOR:

8    Q.  Mr. Chittenden, plaintiff's counsel has raised the issue

9    that your declaration contains certain statements regarding

10   TIAA's top 200 clients.  Do you recall those statements?

11   A.  Yes.

12   Q.  And, well, first, what did you base those statements on?

13             THE COURT:  Now let's just be specific.  Paragraph 63,

14   64, are you talking about those?

15             MR. TAYLOR:  You're right, your Honor.  Let me be

16   specific.

17             THE COURT:  Well, it's actually paragraphs 45, 53, 54,

18   63, and 64.

19             MR. TAYLOR:  All right.  Let's start with paragraph 45

20   then.

21             THE COURT:  So the question is, what's the basis for

22   your knowledge of the statement in that paragraph?

23             MR. SCHLICHTER:  And your Honor, just for

24   clarification, I would assume that this is not on our time.

25             THE COURT:  This is not on your time.

EX. 4

I4i1sac4                    Chittenden - Redirect

1           MR. SCHLICHTER:  Good.

2    BY MR. TAYLOR:

3    Q.  So paragraph 45.

4    A.  I mean, the -- we maintain data about our largest 200

5    clients.  It's historical data.  It's data that I look at in my

6    present role all the time.  You know, it's -- it contains

7    information about who they are, how much, what their assets

8    are, what their plan designs are, you know, we have that data

9    that goes back a long, long time.

10   Q.  And is that data that's been maintained in the ordinary

11   course of TIAA's business?

12   A.  Oh, yes.

13   Q.  Do you have any reason to question the reliability of that

14   data?

15   A.  No.

16           THE COURT:  So let me just make sure, when you say

17   that there is a variety of historical data that you use

18   regarding the 200 largest clients, that I understand how

19   historical that historical data is.  Does it go back to 2010?

20           THE WITNESS:  Certainly.

21           THE COURT:  All right.  And does it cover the 200

22   largest clients or just all clients generally, in terms of what

23   you're talking about?

24           THE WITNESS:  The -- so the database, you know, as you

25   might imagine, we have extensive data around all of our

EX. 4

I4i1sac4                    Chittenden - Redirect

1    institutions that we service.  We can cut that and look at it

2    pretty much through any lens we wish to.  The top 200 is a

3    common lens that we use.  And so we'll pull reports to say,

4    well, how are contributions doing, what are the investments,

5    things of that nature, and we use that all the time.

6              THE COURT:  All right.  Now let me then, in that

7    regard, ask you specifically if you could look at paragraph 45,

8    which says, "The majority of TIAA's largest 200 clients," all

9    right, and that I think corresponds with what you just said, is

10   that right?

11             THE WITNESS:  Mm-hmm.

12             THE COURT:  Yes?

13             THE WITNESS:  Yes.

14             THE COURT:  The court reporter can't get that.  The

15   "mm-hmm" and the "uh-uh" sound sort of the same.

16             THE WITNESS:  Yes.

17             THE COURT:  Now if you turn to paragraph 53, it talks

18   about 200 largest institutional clients.  Is that a separate

19   cut from paragraph 45 or is that just that paragraph 45 left

20   out the word "institutional"?

21             THE WITNESS:  It's the latter; left out the

22   "institutional."

23             THE COURT:  So paragraph 45 should be modified to say

24   "The majority of TIAA's largest" and insert the word

25   "institutional"?

EX. 4

I4i1sac6                    Chittenden - Cross

1    A.   That's the point.  This is a unique, very different kind of

2    investment, so as a result, there's not an easily available

3    commercial manufactured benchmark that we can use.

4    Q.   In the event the Court allows it, I want to ask you a

5    couple of questions about these 200 comparison clients of TIAA.

6            First of all, some 403(b) plans are under ERISA and

7    some are not.  You know that, I believe, don't you?

8            MR. TAYLOR:  Objection.

9            THE COURT:  No.  If he knows, he knows.

10   A.   Yeah, public universities of which some of our top 200 are,

11   are not subject to ERISA and private universities are.

12   Q.   But some don't have all of the employer involvement that it

13   takes to be under ERISA, unlike NYU, for example, right?

14           MR. TAYLOR:  Objection, your Honor.

15           THE COURT:  Well, is NYU under ERISA, to the best of

16   your understanding, or not?

17           THE WITNESS:  To the best of my understanding, it is.

18           THE COURT:  All right.  And then so what was the other

19   question about the --

20   BY MR. SCHLICHTER:

21   Q.   As to the 200 -- again, if it's in -- as to the 200, some

22   of them are not under ERISA, correct?

23   A.   Public universities are typically not governed by ERISA.

24   Q.   Apart from public universities, if universities or medical

25   or other nonprofits don't have certain characteristics, they

EX. 4

I4i1sac6                    Chittenden - Cross

1   don't come under ERISA, right?

2           THE COURT:  Is the question how many of the 200

3   largest institutional clients that are referenced in, for

4   instance, paragraphs 63 and 64 and 53 and 54, how many of those

5   are under ERISA and how many are not, if you know?

6   Approximately.

7           THE WITNESS:  Approximately, I'd say half and half.

8           THE COURT:  All right.  So to the best of your

9   understanding, about 50 percent, so if you were to say a

10  hundred of our largest institutional clients who are under

11  ERISA, would the statements in 53 and 54 and 63 and 64 still be

12  correct, or do you need to modify the statements?  Do you want

13  to look at each of the statements?

14          THE WITNESS:  Yeah.  You're talking about -- yeah.

15          THE COURT:  What I want to do is figure out -- and I

16  think this is where Mr. Schlichter is going -- if we looked

17  only at those who are under ERISA, are the statements

18  nonetheless true?  Is that what you want to ask?

19          All right.  So let's just turn to 53 and 54, and let's

20  limit then this statement in 53 to think about only

21  institutional clients, the largest institutional clients, with

22  at least one 403(b) plan, governed by ERISA, and tell me

23  whether or not this statement is still true.

24          THE WITNESS:  No.  As regards to statement 63 --

25          THE COURT:  Fifty-three.  We'll start at 53.  And 54.

EX. 4

I4i1sac6                    Chittenden - Cross

1    Then we'll go to 63 and 64.

2              MR. SCHLICHTER:  Your Honor, I think he said those

3    governed by ERISA.  The question I was proposing was how many.

4              THE COURT:  He said about a hundred of the 200 were

5    governed by ERISA.

6              Is that about right?

7              THE WITNESS:  I'm -- yes, that's probably

8    directionally accurate.

9              THE COURT:  All right.  So if you were to limit

10   paragraphs 53 and 54 to just those who are governed by ERISA,

11   are those statements correct, materially?

12             THE WITNESS:  I think they are probably directionally

13   accurate, although I think it is fair to say that institutions

14   governed by ERISA, their percentages might not be quite as

15   high, but it's -- it's, you know -- I'd have to look at -- I

16   think it is probably directionally accurate.

17             THE COURT:  Okay.  And then how about 63, 64?

18             THE WITNESS:  Let's see.  Sixty-three.  Sixty-three, I

19   mean, there's only two that don't, so -- I don't think that

20   changes it much.

21             THE COURT:  When you say 63, there's only two that

22   don't, you're saying 198 of the largest institutional clients

23   are governed by ERISA.

24             THE WITNESS:  Of the 200 largest clients, with at

25   least one 403(b) plan, all but one plan held assets in a real

EX. 4

I4i1sac6                    Chittenden - Cross

1   estate account, so there's only one that doesn't.  And all but

2   two held assets in TIAA, so it's one and two, so I don't think

3   that changes much.  Of the 200 clients, 84 percent had plans

4   that receive contributions, you know, I think it's probably

5   directionally accurate, but the percentage for private

6   institutions might be south of that and the percentage for

7   public might be a little north of that.

8           THE COURT:  How easy was it to run these numbers?

9           THE WITNESS:  Oh, this is quite simple.

10          THE COURT:  If you were to run these numbers with just

11  the ERISA-governed plans, would that be relatively

12  straightforward?

13          THE WITNESS:  Yes.  We could -- if we could do it on

14  the public/private and take that as a -- as a proxy, we could

15  do it very easily.

16          THE COURT:  All right.

17  BY MR. SCHLICHTER:

18  Q.  These are just TIAA's customers, and you're talking about

19  how many of them have CREF stock or TIAA real estate?

20  A.  Correct.

21  Q.  The marketplace is far bigger; this isn't any kind of

22  market survey.

23  A.  No, this is just our clients.

24  Q.  And as to your clients, you require that the CREF stock has

25  to be in these plans, don't you?

EX. 4

I4i1sac6                    Chittenden - Cross

1   A.   If you use the retirement annuity as a part of your

2   retirement plan, the CREF stock account is included within that

3   contract.

4   Q.   And what percentage would you say of these 200 clients

5   would have the requirement that CREF stock be in them?

6   A.   What you're asking is what percentage of these 200 use the

7   retirement annuity contract, is that what you're asking?

8   Q.   Well, because --

9        THE COURT:   That would be another way of approaching

10  the same question.

11  A.   That's what I'm trying to -- no, I wouldn't want to

12  speculate.   I'm sorry.   I --

13  Q.   Wait a minute.   If I may, you did this data and you made a

14  point of saying that these data are something you work with all

15  the time and you're aware of, and you've gone into the data.

16  You didn't look at how many of them require CREF stock when

17  you're making an opinion about how many have CREF stock?

18       THE COURT:   He's not doing an opinion.   He's giving

19  you a factual statement.   So you can ask it differently.

20  Q.   Okay.   So after determining what number had, in your

21  opinion, CREF stock in the plans, did you determine how many of

22  them had a plan that TIAA required them to have in CREF stock?

23  A.   What I'm trying to recall, in the top 200, is, there would

24  be sort of two categories of institutions that offer CREF

25  stock.   There would be the institutions who have chosen to stay

EX. 4

I4i1sac6                    Chittenden - Cross

1    with the retirement annuity contract, and I'd say that's

2    probably at least half, going back to when we were talking

3    about publics and privates, but then there's also institutions

4    which have switched to Retirement Choice programs, but have

5    chosen to continue to offer CREF stock, and I'd have to, you

6    know -- so I -- I feel -- I don't know.  I'd have to look, you

7    know -- I'm trying to do the mental math and, you know, I'm

8    sorry, I just can't come up with an accurate number for you.

9    Q.  Nobody asked you to look at this and nobody asked you to

10   look at that at the latter of my question, did they?

11   A.  Well, we look at it all the time, and just sitting here

12   right now, trying to come up with the exact numbers for you --

13   Q.  And TIAA real estate, you don't require that to be in the

14   plans, do you?

15   A.  That's correct.

16   Q.  But TIAA real estate, at 82 basis points, is the single

17   highest expense ratio of your funds, isn't it?

18   A.  It is.

19   Q.  It's the one you market heavily because you say it's got a

20   unique structure and because it's fees, right?

21   A.  We don't really do much marketing of products specifically.

22   I mean, we certainly wouldn't do it because of the expense

23   ratio.  Remember, all the CREF accounts, all the variable

24   annuities, at the end of the day are at cost.  There's no --

25   there's no margin associated with it.  The costs investors pay

EX. 4

I4i1sac6                    Chittenden - Cross

1    are the costs associated with managing the account.

2    Q.  But the costs that are associated with managing the

3    accounts, Mr. Chittenden, are costs you decide and allocate the

4    way you want to, correct?

5    A.  They are the costs that are allocated to that product.

6    I -- I would take issue with your characterization the way we

7    want to.  There's independent auditors, there's an independent

8    board, there's regulators, all of whom we're accountable to how

9    we do this.

10   Q.  You pay income taxes, don't you?

11   A.  Me personally?

12            THE COURT:  He says in his declaration that they are

13   no longer tax exempt, as of '98, am I right?

14            THE WITNESS:  That is correct.

15   Q.  Finally, with regard to these statistics, according to the

16   information, I believe, 85 percent of the -- well, first of

17   all, before that, it's a fact, is it not, that Columbia has

18   frozen the CREF stock account?

19   A.  I don't know.

20   Q.  Is it a fact that Duke has frozen --

21            THE COURT:  Just do it as a does he know whether,

22   because I don't want to take it as a fact just from your

23   statement.

24            MR. SCHLICHTER:  As to the CREF stock in Columbia,

25   that is a fact in evidence now.  That was the document that we

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

EX. 4

I4i1sac6                    Chittenden - Redirect

1    went through --

2            THE COURT:  But the question is whether he knows one

3    way or the other, whether or not.

4    Q.  Do you know -- so you don't know about Columbia.  Do you

5    know whether or not Duke is freezing its CREF stock account and

6    TIAA real estate account?

7    A.  I know that they intend to, yes.

8    Q.  And at the first of the year, right?

9    A.  Somewhere around that neighborhood.

10           THE COURT:  First of '19?

11           THE WITNESS:  '19, if current plan unfolds as it's

12   been articulated to me, at least.

13           THE COURT:  All right.

14   Q.  And finally, the number of these top clients, more than

15   50 percent have a single recordkeeper, don't they?

16   A.  I -- that sounds about, again, in the ballpark.

17   Q.  And 85 percent have less than a hundred investment options,

18   don't they?

19   A.  I -- less than a hundred?  If they have a single

20   recordkeeper, that might be directionally accurate.

21           THE COURT:  Don't speculate.  Are you speculating, or

22   do you know?

23           THE WITNESS:  I'm speculating.

24           THE COURT:  All right.  Don't speculate.

25           MR. SCHLICHTER:  Your Honor, we'll offer Exhibit 929.

EX. 4

I4i1sac6                    Chittenden – Redirect

1            THE COURT:  929.

2            Any objection to PX929?

3            MR. TAYLOR:  No, your Honor.

4            THE COURT:  All right.

5            (Plaintiff's Exhibit 929 received in evidence)

6            THE COURT:  Thank you.  Let's take our midafternoon

7    break, until 4:00.  We'll come back and have redirect is where

8    we are now.  So --

9            THE DEPUTY CLERK:  All rise.

10           (Recess)

11           (In open court)

12           THE COURT:  Mr. Taylor, is it you again?

13           MR. TAYLOR:  Yes, your Honor.

14           THE COURT:  All right.  You can proceed.

15   REDIRECT EXAMINATION

16   BY MR. TAYLOR:

17   Q.  Mr. Chittenden, before we took a break, one of the things

18   you said was that CREF operates at cost.  Do you recall that?

19   A.  Yes.

20   Q.  What does that mean?

21   A.  Well, like the name implies, all -- the only expenses that

22   are borne by investors in the CREF portfolios are those

23   expenses that are related to the operation of those accounts.

24   There's no margin or -- or profitability into the expense

25   ratios.

EX. 4