**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| DR. ALAN SACERDOTE, et al., | : | Case No.: 1:16-cv-06284 (KBF) |
|  | : |  |
| Plaintiffs, | : |  |
|  | : | ECF Case |
| v. | : |  |
|  | : |  |
| NEW YORK UNIVERSITY, | : |  |
|  | : |  |
| Defendant. | : |  |

**DEFENDANT'S UPDATED AND SUPPLEMENTED PROPOSED FINDINGS OF FACT**
**AND CONCLUSIONS OF LAW**

Mark Muedeking
Ian C. Taylor
Jennifer K. Squillario
Adam Pié
Harry P. Rudo
Emily Steiner
DLA Piper LLP (US)
500 8th Street, NW
Washington, DC 20004
(202) 799-4000

Evan D. Parness
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020
(212) 335-4500

*Counsel for Defendant New York University*

Dated:  May 13, 2018

## TABLE OF CONTENTS

**Page**

PROPOSED FINDINGS OF FACT .................................................................................1

I.    THE PLANS-BACKGROUND.................................................................................1

     A.    The NYU Faculty Plan..................................................................................5

     B.    The School of Medicine Faculty Plan...........................................................7

II.    PLAN ADMINISTRATION SERVICES.................................................................9

III.    PLAINTIFFS .........................................................................................................15

     A.    Dr. Mark Crispin Miller............................................................................15

     B.    Ms. Marie Ellen Monaco ...........................................................................16

     C.    Dr. Shulamith Lala Straussner ...................................................................17

     D.    ~~James Brown~~.........................................................................................18

     E.    Dr. Alan Sacerdote ....................................................................................18

     F.    ~~Dr. Herbert Samuels~~..............................................................................19

IV.    NYU HAD A PRUDENT PROCESS FOR MONITORING THE PLANS'
ADMINISTRATIVE FEES AND NEGOTIATING REDUCTIONS IN FEES. .............19

     A.    NYU Formed the Retirement Committee to Implement the New 403(b)
Regulations. ..............................................................................................19

     B.    NYU Retained an Industry Expert, Cammack, to Assist the Committee
and to Analyze the Plans' Administrative Fees. .........................................21

     C.    NYU Conducted Two Requests for Proposals and Consolidated Vendors. ..........28

     D.    NYU Negotiated Significant Reductions in Administrative Fees. .......................44

     E.    Additional Facts Supporting the Objective Prudence of NYU's Retention
of Vendors. ................................................................................................56

     F.    Additional Facts Supporting the Objective Prudence of the Plans'
Administrative Fees. ..................................................................................57

V.    NYU'S PROCESS FOR MONITORING THE CREF STOCK ACCOUNT AND
THE TIAA REAL ESTATE ACCOUNT...............................................................58

     A.    NYU's Monitoring of the CREF Stock Account and the TIAA Real Estate
Account. ....................................................................................................68

          1.    The CREF Stock Account............................................................68

          2.    The TIAA Real Estate Account ...................................................72

PROPOSED CONCLUSIONS OF LAW ....................................................................80

I.    DEFENDANT IS ENTITLED TO JUDGMENT ON THE MERITS BECAUSE
PLAINTIFFS HAVE FAILED TO PROVE THE ELEMENTS FOR BREACH
OF FIDUCIARY DUTY.........................................................................................80

     A.    Plaintiffs Have Failed to Demonstrate that Defendant Acted Imprudently
With Respect to Administrative Fees. ........................................................83

EAST\154252389.9

**TABLE OF CONTENTS**
**(continued)**

Page

1. NYU Engaged in A Prudent Process in Reviewing and Monitoring Administrative Fees. ...................................................83

   a. NYU Had a Robust Process for Monitoring Administrative Fees. ...................................................84

   b. NYU Retained an Industry Expert to Analyze the Plans' Administrative Fees. ...................................................85

   c. NYU Negotiated Significant Reductions in Administrative Fees. ...................................................86

   d. NYU Conducted Two Requests for Proposals During the Class Period. ...................................................89

   e. NYU Consolidated Vendors. ...................................................90

2. NYU's Decisions Regarding Administrative Fees Were Objectively Prudent. ...................................................92

B. Plaintiffs Cannot Demonstrate That Defendant Acted Imprudently With Respect to the Monitoring of the CREF Stock Account and the TIAA Real Estate Account. ...................................................96

1. The Committee Had a Robust and Prudent Process in Reviewing the Plans' Investment Options, Including the TIAA Real Estate Account and the CREF Stock Account. ...................................................96

2. The TIAA Real Estate Account and CREF Stock Account are Objectively Prudent Investment Alternatives for the Plans. ...................................................101

DEFENDANT'S SUPPLEMENTAL FINDINGS OF FACT AND CONCLUSIONS OF LAW ...................................................106

I. **NYU DID NOT HAVE FIDUCIARY AUTHORITY OR CONTROL OVER THE TIAA ANNUITY CONTRACTS.** ...................................................106

A. Additional Facts Regarding the Plans and the TIAA Annuity Contracts. ...................................................106

1. The TIAA Annuity Contracts. ...................................................106

2. The Terms of the TIAA Legacy Contracts Provide Participants with Exclusive Control and Do Not Give NYU any Authority or Discretion to Override Participant Investment Elections or to Map Participant Investments to Other Investments. ...................................................114

3. The Plans' Terms are Consistent with the Provisions of the TIAA Legacy Contracts. ...................................................116

4. NYU Has No Authority or Discretion to Change Participant Investment Elections in the TIAA Annuity Contracts. ...................................................117

B. Conclusions of Law Regarding the Plans and the Annuity Contracts. ...................................................119

II. **NYU'S PRUDENT PROCESS** ...................................................124

A. Additional Facts Regarding NYU's Prudent Process. ...................................................124

**TABLE OF CONTENTS**
**(continued)**

Page

    1.    Additional Facts Regarding the Committee and Cammack....................124

    2.    Additional Facts Regarding NYU's Prudent Process for Monitoring and Negotiating Administrative Fees. ...................130

        a.    The 2009 RFP. .........................................................130

        b.    NYU Weighed and Considered TIAA's RC and RCP Contracts. ...........................................................141

        c.    NYU Negotiated Significant Administrative Fee Reductions...........................................................144

    3.    Additional Facts Regarding NYU's Prudent Process for Monitoring the Plans' Investment Alternatives. ....................146

        a.    NYU Conducted Regular and Extensive Due Diligence on All of the Plans' Investments. ......................................146

        b.    NYU Prudently Monitored the CREF Stock Account. ...............153

        c.    NYU Prudently Monitored the TIAA Real Estate Account. .......154

        d.    NYU Analyzed the Performance of the CREF Stock Account and the TIAA Real Estate Account using Appropriate Benchmarks and Other Comparison Data. .............156

B.    Conclusions of Law Regarding NYU's Prudent Process. ...................163

    1.    The Committee, and not the Individual Members Serving Ex Officio, is the Fiduciary. ........................................164

    2.    NYU Acted Prudently in Engaging and Relying on Cammack as a Co-Fiduciary to the Plans............................................166

    3.    NYU Employed A Prudent Process for Monitoring and Negotiating Administrative Fees. ..........................................173

    4.    NYU Employed A Prudent Process for Monitoring the Plans' Investment Alternatives, Including the CREF Stock Account and the TIAA Real Estate Account. ............................................175

III.    **PLAINTIFFS FAILED TO MEET THEIR BURDEN OF PROVING THAT NYU'S DECISIONS WERE NOT OBJECTIVELY PRUDENT AND HAVE NOT PROVEN THAT PLAN PARTICIPANTS INCURRED ANY DAMAGES** ...........................................................................178

A.    Additional Facts Regarding the Objective Prudence of NYU's Decisions. ........178

    1.    Plaintiffs Have Not Met Their Burden of Proving that the NYU Plans Paid Excessive Administrative Fees. ..............................178

        a.    Annuities are Different than Mutual Funds, Resulting in Differences in Administrative Fees and Costs............................178

        b.    Plaintiffs Offered No Evidence to Support Their Claim That the NYU Plans Paid Excessive Administrative Fees..........180

**TABLE OF CONTENTS**
**(continued)**

**Page**

2.   The CREF Stock Account and the TIAA Real Estate Account are Objectively Prudent Investment Options. ...............................................184

    a.   The CREF Stock Account. .........................................................184

    b.   TIAA Real Estate Account. ......................................................189

B.   Conclusions of Law Regarding the Objective Prudence of NYU's Decisions. ...........................................................................................197

   1.   Plaintiffs Bear the Burden of Establishing A Breach, Causation and Damages. ...........................................................................................197

   2.   Plaintiffs Failed to Meet Their Burden of Demonstrating that NYU Paid Excessive Administrative Fees. ......................................................200

   3.   Plaintiffs Failed to Meet Their Burden of Establishing that a Similarly Situated Fiduciary Would Not Have the Same Decisions Regarding Maintaining the CREF Stock Account and the TIAA Real Estate Account. .................................................................................203

IV.   **EVEN IF PLAINTIFFS HAD ESTABLISHED ANY BREACH OF FIDUCIARY DUTY, THEIR CLAIMS ARE LIMITED BY ERISA'S THREE-YEAR STATUTE OF LIMITATIONS.** ......................................................205

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Lockheed Martin Corp.*,
    286 F.R.D. 388 (S.D. Ill. 2012) ......................................................100

*Abbott v. Lockheed Martin Corp.*,
    725 F.3d 803 (7th Cir. 2013) .........................................................127

*Amorgianos v. Nat'l R.R. Passenger Corp*,
    303 F.3d 256 (2d Cir. 2002)..........................................................209

*Amron v. Morgan Stanley Inv. Advisors Inc.*,
    464 F.3d 338 (2d Cir. 2006)......................................................93, 99

*Beesley v. Int'l Paper Co.*,
    No. 06-CV-703-DRH, 2007 WL 2458228 (S.D. Ill. Aug. 24, 2007) ...................127

*Birmingham v. SoGen-Swiss Int'l Corp. Ret. Plan*,
    718 F.2d 515 (2d Cir. 1983)...........................................................86

*Board of Trustees of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*,
    860 F. Supp. 2d 251 (S.D.N.Y. 2012)............................87, 201, 202, 203

*Board of Trustees of Local 295/Local 851-IBT Emp. Pension Fund v. Callan
Assocs., Inc.*,
    No. 97 Civ. 1741(HB), 1998 WL 289697 (S.D.N.Y. June 4, 1998).................209

*Brieger v. Tellabs, Inc.*,
    659 F. Supp. 2d 967 (N.D. Ill. 2009) .................................................169

*Brotherston v. Putnam Invs., LLC*,
    No. 15-13825-WGY, 2017 WL 1196648 (D. Mass. Mar. 30, 2017)..................108

*Brotherston, v. Putnam Invs., LLC*,
    No. 15-13825-WGY, 2017 WL 2634361 (D. Mass. June 19, 2017)...............86, 87

*Bussian v. RJR Nabisco, Inc.*,
    223 F.3d 286 (5th Cir. 2000) .............................................173, 174, 175

*Caputo v. Pfizer*,
    267 F.3d 181 (2d Cir. 2001)......................................................109, 209

*Casey v. Merck & Co., Inc.*,
    653 F.3d 95 (2d Cir. 2011).............................................................205

*Chao v. Merino*,
    452 F.3d 174 (2d Cir. 2006)..................................................................89, 102, 204

*Chesemore v. All. Holdings, Inc.*,
    886 F. Supp. 2d 1007 (W.D. Wis. 2012) ............................................................175

*Coulter v. Morgan Stanley & Co. Inc.*,
    753 F.3d 361 (2d Cir. 2014)................................................................................125

*DeBruyne v. Equitable Life Assurance Soc'y of the U.S.*,
    920 F.2d 457 (7th Cir. 1990) ..............................................................................174

*Diduck v. Kaszycki & Sons Contractors, Inc.*,
    874 F.2d 912 (2d Cir. 1989)..................................................................................86

*Diduck v. Kaszycki & Sons Contractors, Inc.*,
    974 F.2d 270 (2d Cir. 1992)................................................................................204

*DiFelice v. U.S. Airways, Inc.*,
    436 F. Supp. 2d 756 (E.D. Va. 2006) ..............................................................87, 98

*DiFelice v. U.S. Airways, Inc.*,
    497 F.3d 410 (4th Cir. 2007) ........................................................................85, 168

*Donovan v. Bierwirth*,
    680 F.2d 263 (2d Cir 1982)................................................................................175

*Donovan v. Cunningham*,
    716 F.2d 1455 (5th Cir. 1983) ...........................................................................171

*Evans v. Akers*,
    534 F.3d 65 (1st Cir. 2008).................................................................................86

*Foltz v. U.S. News & World Report, Inc.*,
    663 F. Supp. 1494 (D.D.C. 1987) ......................................................................169

*Foltz v. U.S. News & World Report, Inc.*,
    865 F.2d 364 (D.C. Cir. 1989) ...........................................................................169

*Franklin H. Williams Ins. Tr. v. Travelers Ins. Co.*,
    50 F.3d 144 (2d Cir. 1995)................................................................................128

*Gartenberg v. Merrill Lynch Asset Mgmt.*,
    694 F.2d 923 (2d Cir. 1982)..............................................................................101

*George v. Kraft Foods Glob., Inc.*,
    Nos. 07-C-1713, 07-C-1954, 2008 WL 780629 (N.D. Ill. Mar. 20, 2008)...........127

*George v. Kraft Foods Glob., Inc.*,
   800 F. Supp. 2d 911 (N.D. Ill. 2011) ...................................................................127

*Gregg v. Transp. Workers of Am.*,
   343 F.3d 833 (6th Cir. 2003) ..............................................................................169

*Harley v. Minn. Mining & Mfg. Co.*,
   42 F. Supp. 2d 898 (D. Minn. 1999) ....................................................................172

*Harley v. Minn. Mining & Mfg. Co.*,
   284 F.3d 901 (8th Cir. 2002) ..............................................................................172

*Hecker v. Deere & Co.*,
   556 F.3d 575 (7th Cir. 2009) ..................................................................... *passim*

*Hightshue v. AIG Life Ins. Co.*,
   135 F.3d 1144 (7th Cir. 1998) ...........................................................173, 174, 176

*Howard v. Shay*,
   100 F.3d 1484 (9th Cir. 1996) ............................................................................175

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
   763 F. Supp. 2d 423 (S.D.N.Y. 2011)..................................................................176

*In re Northrop Grumman Corp. ERISA Litig.*,
   No. CV-06-06213 MMM (JCx), 2015 WL 10433713 (C.D. Cal. Nov. 24,
   2015) ....................................................................................................................127

*In re State Street Bank & Trust Co. Fixed Income Inv. Litig.*,
   842 F. Supp. 2d 614 (S.D.N.Y. 2012)............................................87, 201, 203, 204

*In re Unisys Sav. Plan Litig.*,
   74 F.3d 420 (3d Cir. 1996)..................................................................................175

*In re Unisys Sav. Plan Litig.*,
   173 F.3d 145 (3d Cir. 1999)................................................................................203

*In re WorldCom, Inc. ERISA Litig.*,
   354 F. Supp. 2d 423 (S.D.N.Y. 2005)..................................................................177

*Jenkins v. Yager*,
   444 F.3d 916 (7th Cir. 2006) .......................................................................86, 175

*Kanawi v. Bechtel Corp.*,
   590 F. Supp.2d 1213 (N.D. Cal. Nov. 3, 2008) ....................................................127

*Kasilag v. Hartford Inv. Fin. Servs., LLC*,
   No. 11-1083, 2012 WL 6568409 (D.N.J. Dec. 17, 2012)......................................100

*Katsaros v. Cody*,
  744 F.2d 270 (2d Cir. 1984)............................................................85, 168, 171, 178

*Krinsk v. Fund Asset. Mgmt., Inc.*,
  875 F.2d 404 (2d Cir. 1989)..........................................................................97

*Krueger v. Ameriprise Fin. Inc.*,
  No. 11-cv-02781, 2014 WL 1117018 (D. Minn. Mar. 20, 2014) .........................110

*Kruger v. Novant Health Inc.*,
  131 F. Supp. 3d 470 (M.D.N.C. 2015) ......................................................100, 127

*La Scala v. Scrufari*,
  479 F.3d 213 (2d Cir. 2007)........................................................................106

*Laboy v. Bd. of Trs. of Bldg. Serv. 32 BJ SRSP*,
  No. 11 Civ. 5127 (HB), 2012 WL 3191961 (S.D.N.Y. Aug. 7, 2012) ..................97

*Lippe v. Bairnco Corp.*,
  288 B.R. 678 (S.D.N.Y. 2003).....................................................................205

*Liss v. Smith*,
  991 F. Supp. 278 (S.D.N.Y. 1998) ...............................................................171

*Loomis v. Exelon Corp.*,
  658 F.3d 667 (7th Cir. 2011) .......................................................................109

*Manning v. Hayes*,
  212 F.3d 866 (5th Cir. 2000) .........................................................................99

*Martin v. Caterpillar, Inc*,
  No. 07–CV–1009, 2008 WL 5082981 (C.D. Ill. Sept. 25, 2008).........................127

*Martinez v. Schlumberger, Ltd.*,
  338 F.3d 407 (5th Cir. 2003) ..........................................................................99

*N.Y. Teamsters Council Health & Hosp. Fund v. Estate of DePerno*,
  18 F.3d 179 (2d Cir. 1994)....................................................................87, 202

*Oster v. Barco of Cal. Emps.' Ret. Plan*,
  869 F.2d 1215 (9th Cir. 1988) .......................................................................86

*Pension Benefit Guar. Corp. ex rel St. Vincent Catholic Med. Ctrs. Ret. Plan v.
  Morgan Stanley Inv. Mgmt. Inc.*,
  712 F.3d 705 (2d Cir. 2013).......................................................85, 168, 208

*Oster v. Barco of Cal. Emps.' Ret. Plan*,
  869 F.2d 1215 (9th Cir. 1988) .......................................................................86

*Perez v. Bruister*,
    54 F. Supp. 3d 629 (S.D. Miss. 2014).................................................................173

*Perez v. First Bankers Trust Servs., Inc.*,
    No. 12-cv-8648 (GBD), 2016 WL 5475997 (S.D.N.Y. Sept. 28, 2016) ..............171

*Primavera Familienstifung v. Askin*,
    130 F. Supp. 2d 450 (S.D.N.Y. 2001).................................................................205

*Renfro v. Unisys Corp.*,
    671 F.3d 314 (3d Cir. 2011)..................................................................................91

*Roth v. Sawyer-Cleator Lumber Co.*,
    16 F.3d 915 (8th Cir. 1994) ...........................................................................87, 98

*Roth v. Sawyer-Cleator Lumber Co.*,
    16 F.3d 915 (8th Cir. 1994) ...........................................................................87, 98

*Ruggiero v. Warner-Lambert Co.*,
    424 F.3d 249 (2d Cir. 2005)................................................................................209

*Scentsational Techns. v. Pepsi, Inc.*,
    No. 13-cv-8645 (KBF), 2018 WL 910587 (S.D.N.Y. Feb. 14, 2018)..........205, 206

*SEC v. Tourre*,
    950 F. Supp. 2d 666 (S.D.N.Y. 2013)..........................................................205, 206

*Silverman v. Mut. Benefit Life Ins. Co.*,
    138 F.3d 98 (2d Cir. 1998)...................................................86, 87, 201, 203

*Spano v. The Boeing Co.*,
    633 F.3d 574 (7th Cir. 2011) .............................................................................127

*Sweda v. Univ. of Pa.*,
    No. CV 16-4329, 2017 WL 4179752 (E.D. Pa. Sept. 21, 2017) ...........................86

*Tatum v. RJR Pension Inv. Committee*,
    761 F.3d 346 (4th Cir. 2014) ........................................................................87, 203

*Taylor v. United Techs. Corp.*,
    No. 3:06cv1494 (WWE), 2009 WL 535779 (D. Conn. Mar. 3, 2009) ........... *passim*

*Thompson v. Avondale Indus., Inc.*,
    No. CIV.A. 99-3439, 2003 WL 359932 (E.D. La. Feb. 14, 2003) .......................168

*Tibble v. Edison Int'l*,
    729 F.3d 1110 (9th Cir. 2013) .............................................................................99

*Tibble v. Edison Int'l*,
No. CV-07-5359 SVW (AGRx), 2017 WL 3523737 (C.D. Cal. Aug. 16, 2017)................126

*Trapani v. Consol. Edison Emps.' Mut. Aid Soc., Inc.*,
693 F. Supp. 1509 (S.D.N.Y. 1988)................................................................171

*Tussey v. ABB, Inc.*,
746 F.3d 327 (8th Cir. 2014) .........................................................................86, 91

*Ulico Cas. Co. v. Clover Capital Mgmt.*,
335 F. Supp.2d 335 (N.D.N.Y. 2004)................................................................208

*Walker v. Merrill Lynch & Co. Inc.*,
181 F. Supp. 3d 223 (S.D.N.Y. 2016)................................................................125

*White v. Chevron Corp.*,
No. 16-cv-0793-PJH, 2016 WL 4502808 (N.D. Cal. Aug. 29, 2016) ....................91

*Will v. Gen. Dynamics Corp.*,
Civil No. 06–698–GPM, 2009 WL 3835883 (S.D. Ill. Nov. 14, 2009)................127

*Young v. Gen. Motors Inv. Mgmt. Corp.*,
325 F. App'x 31 (2d Cir. 2009) ................................................................97, 101

*Young v. Gen. Motors Inv. Mgmt. Corp.*,
550 F. Supp. 2d 416 (S.D.N.Y. 2008)................................................109, 110, 209

**Statutes**

29 C.F.R. § 1002(21) .......................................................................................124

29 C.F.R. § 1102(a)..........................................................................................169

29 C.F.R. § 1103(a)..........................................................................................126

29 C.F.R. § 1104(a)..........................................................................................169

29 C.F.R. § 1104(a)(1)(B)................................................................................207

29 C.F.R. § 1105(a)..........................................................................................177

29 C.F.R. § 1109(a)..........................................................................................201

29 C.F.R. § 1132(a)(2)......................................................................................201

29 C.F.R. § 1144(a)..........................................................................................128

29 C.F.R. § 2550.404a-1(b)(2)(i)......................................................................101

ERISA § 3(21) ..........................................................................................................124

ERISA § 403(a).................................................................................................126, 128

ERISA § 404(a)(1)(B)..................................................................................... *passim*

ERISA § 404(c).....................................................................................................7, 10

ERISA § 408(b)(2)......................................................................................................186

ERISA § 412(2)...........................................................................................................109

ERISA § 413(1)...........................................................................................................209

ERISA § 413(2)...........................................................................................................209

ERISA § 514(a)...........................................................................................................128

**Other Authorities**

75 Fed. Reg. 202 (Oct. 20, 2010)..................................................................165, 182

John B. Brescher, Jr., *Leading Lawyers on Understanding ERISA Changes,*
    *Navigating Disclosure Guidelines, and Designing Compliance Strategies*,
    Recent Changes in Employee Benefits and Executive Compensation,
    No. CV-06-06213 MMM (JCx), 2015 WL 10433713 (C.D. Cal. Nov. 24,
    2015) ......................................................................................................................173

Restatement 3d of Trusts, § 90 cmts. e(1) ...............................................................108

U.S. Dep't of Labor, Emp. Benefits Sec. Admin., *A Look at 401(k) Plan Fees*
    (Aug. 2013)...........................................................................................................109

EAST\154252389.9

## PROPOSED FINDINGS OF FACT

### I.      THE PLANS-BACKGROUND

1.      Plaintiffs are six highly-educated professors who are participants in two defined-contribution participant directed 403(b) retirement pension plans made available to certain NYU employees: the New York University Retirement Plan for Members of the Faculty, Professional Research Staff and Administration (the "NYU Faculty Plan") and the New York University School of Medicine Retirement Plan for Members of the Faculty, Professional Research Staff and Administration (the "School of Medicine Faculty Plan") (collectively, the "Plans").  (ECF No. 39, Am. Compl. ¶ 1; PX1683 Declaration of Marie Monaco ¶ 2 ("Monaco Decl."); PX1682 Declaration of Mark Crispin Miller ¶¶ 2-3 ("Miller Decl."); PX1685 Declaration of Alan Sacerdote ¶ 2 ("Sacerdote Decl."); PX1684 Declaration of Shulamith Lala Straussner ¶ 2 ("Straussner Decl."); PX0940 (New York University Retirement Plan for Members of the Faculty, Professional Research Staff and Administration, Amended and Restated Effective January 1, 2014 (NYU Faculty Plan), (NYU0111632)); DX386 (New York University School of Medicine Retirement Plan for Members of the Faculty, Professional Research Staff and Administration, Amended and Restated Effective January 1, 2016 (School of Medicine Faculty Plan), at NYU0116960)).

2.      The NYU Faculty Plan and the School of Medicine Faculty Plan were established in 1952, long before the new IRS regulations affecting 403(b) plans became effective.  (PX0940 (NYU Faculty Plan, at NYU0111636); DX386 (School of Medicine Faculty Plan, at NYU0116960); DX889B Revised Declaration of Marcia Wagner ("Wagner Revised Decl.") ¶ 6 (incorporating ¶ 21))).

3.      Prior to 2009, the year when new IRS regulations affecting Section 403(b) plans became effective, 403(b) plan participants had a high degree of control over the inception and

operation of their plan accounts, including the selection of their investments.  (Wagner Revised Decl. ¶¶ 5, 6 (incorporating ¶ 21)).  This was true, even though 403(b) plans were nominally established by employers, and in this period, the IRS did not even require them to adopt a written plan document.  (Wagner Revised Decl. ¶¶ 5, 6 (incorporating ¶ 21)).  In many cases, each 403(b) plan participant held an individual annuity contract and the employer had very limited involvement in administering the plan and merely facilitated payroll contributions to the participant's 403(b) plan account.  (Wagner Revised Decl. ¶¶ 5, 6 (incorporating ¶ 22)).

4.      This hands-off approach was encouraged by a DOL Safe Harbor under which 403(b) plans were treated as exempt from ERISA if employers limited their administrative involvement.  (Wagner Revised Decl. ¶¶ 5, 6 (incorporating ¶ 22)).  However, the 2009 IRS regulations required tax-exempt employers to assume a deeper involvement in 403(b) plan administration.  (Meagher Trial Testimony, Tr. at 238:6-10, 244:6-18; Wagner Revised Decl. ¶¶ 5, 6 (incorporating ¶ 22)).  This indirectly caused them to no longer qualify for the DOL Safe Harbor, and this, in turn, resulted in their 403(b) plans, including the Plans, being brought under ERISA for the first time.  (Wagner Revised Decl. ¶¶ 5, 6 (incorporating ¶ 22)).  This meant that these employers, including NYU, would be ERISA fiduciaries, which caused these employers to engage investment and financial consultants in order to help them meet the new compliance requirements.  (Meagher Trial Testimony, Tr. at 244:6-18; Sanchez Trial Testimony, Tr. at 423:24-424:3; Wagner Revised Decl. ¶¶ 5, 6 (incorporating ¶ 22)).

5.      The IRS's new regulations required more plan oversight and documentation from sponsors of 403(b) plans.  (Meagher Trial Testimony, Tr. at 238:6-10, 153:4-13; Wagner Revised Decl. ¶¶ 5, 6 (incorporating ¶ 23)).  As a practical matter, the new tax rules forced plan

- 2 -

sponsors to centralize the administration of their 403(b) plans, which caused them to look less like decentralized collections of IRAs.  (Wagner Revised Decl. ¶¶ 5, 6 (incorporating ¶ 23)).

6.     403(b) plans, like the Plans, differ from 401(k) plans in many ways.  (Geist Trial Testimony, Tr. at 769:14-770:3, 808:2-22; Wagner Trial Testimony, Tr. at 1402:8-22, 1406:20-25).  Most pertinently, 403(b) plans may be funded with annuity contracts, including individual or group variable annuity contracts, or they may use custodial accounts to invest in mutual funds. (Wagner Revised Decl. ¶ 6 (incorporating ¶ 24)).  403(b) plan participants frequently hold individual annuity contracts or retail funds that are under their control rather than under the control of the plan sponsor.  (Meagher Trial Testimony, Tr. at 179:21-180:2; Geist Trial Testimony, Tr. at 808:9-22; Wagner Trial Testimony, Tr. at 1418:3-8; Wagner Revised Decl. ¶ 6 (incorporating ¶¶ 21-22, 25)).  The NYU Faculty Plan and the School of Medicine Faculty Plan are primarily funded with TIAA individual annuity contracts.  (DX893 (Declaration of Jan Rezler ("Rezler Decl.") ¶ 16); PX0731 (TIAA Retirement Annuity Contract of Marie Monaco, at TIAA_NYU_00014168); DX560 (March 18, 2010 Meeting Minutes, at NYU0002874)).  Thus, even if the plan sponsor wanted to map the assets of unapproved 403(b) investments to the plan's investment menu, it would be unable to do so without the participant's consent.  (Rezler Decl. ¶ 16; Meagher Trial Testimony, Tr. at 323:1-7; Rezler Trial Testimony, Tr. at 1238:4-1240:4; Wagner Trial Testimony, Tr. at 1418:3-8; Wagner Revised Decl. ¶ 6 (incorporating ¶ 25); *see also* DX892 Declaration of Douglas Chittenden ("Chittenden Decl.") ¶¶ 23, 27, Chittenden Trial Testimony, Tr. at 619:14-20, 658:4-7).

7.     An individual annuity is a contract issued by an insurance company in a 403(b) participant's name that guarantees periodic payments at retirement, determined on the basis of premium payments and credited interest or investment earnings during the participant's working

years.  (Chittenden Decl. ¶¶ 23-25; Wagner Revised Decl. ¶ 6 (incorporating ¶ 20)).  Annuities

were designed to be a reliable means of securing a steady cash flow for an individual during his

or her retirement years, thereby addressing the issue of longevity risk or outliving one's assets.

(Wagner Revised Decl. ¶ 6 (incorporating ¶ 20)).  Deposits into annuity contracts are typically

locked up for a period of time, known as the surrender period, and the participant incurs a

penalty if all or part of the annuity assets are withdrawn during this time.  (Wagner Revised

Decl. ¶ 6 (incorporating ¶ 20)).

    8.    As a result of the individual annuity contracts, many 403(b) plans continue to

have multiple recordkeepers.  (Wagner Revised Decl. ¶ 6 (incorporating ¶¶ 25-26).  Additionally,

annuities require additional services that are not required for mutual funds and therefore drive up

administrative costs.  (Chittenden Trial Testimony, Tr. at 614:16-22, 625:16-19, 665:14-666:24;

Wagner Trial Testimony, Tr. at 1406:20-25; Wagner Revised Decl. ¶ 6 (incorporating ¶ 47)).

    9.    While the investment-related fiduciary duties imposed on ERISA 403(b) plan

sponsors (tax-exempt organizations) are identical to those imposed on 401(k) plan sponsors, they

are applied by taking into consideration the unique circumstances that apply to these plans as

described above.  (Wagner Revised Decl. ¶ 6 (incorporating ¶ 27)).

    10.    In the context of NYU and the Plans, another such unique situation includes the

expectations of the faculty members regarding NYU's right to make unilateral changes to the

operation or administration of the Plans.  (*See, e.g.*, DX886 (Declaration of Mark Petti ("Petti

Decl.") ¶¶ 26, 32); DX888 (Declaration of Martin Dorph ("Dorph Decl.") ¶¶ 13, 17)).  As part of

the NYU shared governance model, faculty members are entitled to representation on

committees responsible for matters regarding academics or administration, information regarding

those matters, consultation prior to decisions that may affect them, and a reasoned justification to

the extent that NYU does not accept the faculty's advice.  (Dorph Trial Testimony, Tr. at 1342:1-22; DX887 (Declaration of Trish Halley ("Halley Decl.") ¶ 34).

A.     **The NYU Faculty Plan**

11.     The NYU Faculty Plan was established in 1952 to provide retirement benefits to certain NYU employees and is funded through voluntary participant contributions and generous NYU contributions.  (Halley Decl. ¶ 5; PX0940 (NYU Faculty Plan at Art. I (NYU0111636)). NYU matches participant contributions in the NYU Faculty Plan up to 5% of a participant's base salary, and also makes a contribution of 5% of a participant's base salary regardless of whether the participant contributes to the plan.  (Halley Decl. ¶ 5; PX0940 (NYU Faculty Plan, at Art. IV, §§ 4.1, 4.2 and 4.3 (NYU0111641-43))).

12.     The NYU Faculty Plan provides retirement income for all members of NYU's faculty, professional research staff, and administration, other than employees of the NYU School of Medicine.  (Halley Decl. ¶ 6; PX0940 (NYU Faculty Plan at Art. II §§ 2.10, 2.11 (NYU0111637-38); Art. 3 (NYU0111641)).  As of December 31 in each of the years listed in the chart below, the NYU Faculty Plan had the following total number of participants during the plan year and the following amount of assets:

| Plan | Year | Total Participants During Plan Year | Net Assets at End of Plan Year |
|---|---|---|---|
| NYU Faculty | 2010 | 12,868 | $1,793,415,082 |
| NYU Faculty | 2011 | 13,692 | $1,792,990,149 |
| NYU Faculty | 2012 | 14,368 | $1,982,035,425 |
| NYU Faculty | 2013 | 15,151 | $2,285,606,578 |
| NYU Faculty | 2014 | 16,447 | $2,423,501,194 |

| NYU Faculty | 2015 | 17,858 | $2,444,947,856 |
| NYU Faculty | 2016 | 18,551 | $2,619,431,482 |

(DX046 (2010 Form 5500 for NYU Faculty Plan (Part II, Line 6f at PLA-NYU-004249,
Schedule H, Part I, Line 1l at PLA-NYU-004265)); DX047 (2011 Form 5500 for NYU Faculty
Plan (PLA-NYU-004290; PLA-NYU-004306) (Part II, Line 6f at PLA-NYU-004290, Schedule
H, Part I, Line 1l at PLA-NYU-004306)); DX048 (2012 Form 5500 for NYU Faculty Plan (Part
II, Line 6f at PLA-NYU-004331, Schedule H, Part I, Line 1l at PLA_NYU_004347)); DX049
(2013 Form 5500 for NYU Faculty Plan (Part II, Line 6f at PLA-NYU-004374, Schedule H, Part
I, Line 1l at PLA-NYU-004390)); DX050 (2014 Form 5500 for NYU Faculty Plan (Part II, Line
6f at NYU0000198, Schedule H, Part I, Line 1l at NYU0000215)); DX051 (2015 Form 5500 for
NYU Faculty Plan (Part II, Line 6f at PLA-NYU-004167, Schedule H, Part I, Line 1l at PLA-
NYU-004184)); DX003 (2016 Form 5500 for NYU Faculty Plan (Part II, Line 6f at
NYU0164135, Schedule H, Part I, Line 1l at NYU0164152))).

13.     The NYU Faculty Plan is intended to comply with Section 404(c) of ERISA and
the regulations thereunder by providing participants with the right to direct the investment of
their contributions.  (PX0940 (NYU Faculty Plan at Art. I (NYU0111636)).  Each participant
may direct his or her account balance into one or more investment options on the NYU Faculty
Plan's investment menu.  (PX0940 (NYU Faculty Plan at Art. IV §4.11 (NYU0111645)).  The
NYU Faculty Plan offers an investment menu comprised of TIAA and Vanguard investment
options.  (*See, e.g.*, PX0497 (August 25, 2016 Vanguard All-in fee disclosure (as of June 30,
2016) (NYU0007185-217); PX0718 (January 1, 2016 to December 31, 2016 TIAA Investment
Fee & Expense Disclosure for New York University (TIAA_NYU_00004772-73)).

14.     As of March 31, 2016, the NYU Faculty Plan offered its participants 103 total investment options, including 25 TIAA investments and 78 Vanguard investments.  (DX087 (2016 Faculty 404a5 (NYU0006838)).  These investment options included fixed and variable annuity options, as well as mutual funds.  (DX087 (2016 Faculty 404a5 (NYU0006838-62))).

15.     The NYU Faculty Plan offers participants both actively managed and passively managed index funds, including numerous passively managed Vanguard funds, including the Vanguard Institutional Index Fund.  (DX087 (2016 Faculty 404a5 (NYU0006838-62))).

**B.      The School of Medicine Faculty Plan.**

16.     The School of Medicine Faculty Plan was established in 1952 to provide retirement benefits to certain NYU School of Medicine employees and is funded through voluntary participant contributions and generous NYU contributions.  (Halley Decl. ¶ 5; DX386 (School of Medicine Faculty Plan at Art. I (NYU0116964))).  NYU contributes 10% of a participant's salary to the School of Medicine Faculty Plan, regardless of whether the participant contributes to the plan.  (Meagher Decl. ¶ 7; DX386 (School of Medicine Faculty Plan at Art. IV, § 4.4 (NYU0116973))).

17.     The School of Medicine Faculty Plan provides retirement income for employees of the NYU School of Medicine.  (Meagher Decl. ¶ 8; DX386 (School of Medicine Faculty Plan, at Art. III (NYU0116970))).  As of December 31 in each of the years listed in the chart below, the School of Medicine Faculty Plan had the following total number of participants during the plan year and the following amount of assets:

| Plan | Year | Total Participants During Plan Year | Net Assets at End of Plan Year |
| --- | --- | --- | --- |
| SOM Faculty | 2010 | 9,153 | $1,289,237,818 |

| SOM Faculty | 2011 | 9,322 | $1,295,618,199 |
| SOM Faculty | 2012 | 11,876 | $1,428,468,860 |
| SOM Faculty | 2013 | 7,765 | $1,651,319,934 |
| SOM Faculty | 2014 | 7,648 | $1,778,166,384 |
| SOM Faculty | 2015 | 8,312 | $1,841,858,943 |
| SOM Faculty | 2016 | 8,560 | $2,018,061,226 |

(DX027 (2010 Form 5500 for School of Medicine Faculty Plan (Part II, Line 6f at PLA-NYU-

004617, Schedule H, Part I, Line 1l at PLA-NYU-004633); DX026 2011 Form 5500 for School

of Medicine Faculty Plan (Part II, Line 6f at PLA-NYU-004658, Schedule H, Part I, Line 1l at

PLA-NYU-004674)); DX028 (2012 Form 5500 for School of Medicine Faculty Plan (Part II,

Line 6f at NYU0018988, Schedule H, Part I, Line 1l at NYU0019004)); DX032, (2013 Form

5500 for School of Medicine Faculty Plan (Part II, Line 6f at PLA-NYU-004743; Schedule H,

Part I, Line 1l at PLA-NYU-004759)); DX033 (2014 Form 5500 for School of Medicine Faculty

Plan (Part II, Line 6f at NYU0000519; Schedule H, Part I, Line 1l at NYU0000536)); DX035

(2015 Form 5500 for School of Medicine Faculty Plan (Part II, Line 6f at PLA-NYU-004833;

Schedule H, Part I, Line 1l at PLA-NYU-004850)); DX004 (2016 Form 5500 for School of

Medicine Faculty Plan (Part II, Line 6f at NYU0164090; Schedule H, Part I, Line 1l at

NYU0164107))).

18.     The School of Medicine Faculty Plan is intended to comply with Section 404(c)

of ERISA and the regulations thereunder by providing participants with the right to direct the

investment of their contributions.  (DX386 School of Medicine Faculty Plan at Art. I

(NYU0116964)).  Each participant may direct his or her account balance into one or more

investment options on the School of Medicine Faculty Plan's investment menu.  (DX386 (School of Medicine Faculty Plan at Art. IV, §4.10 (NYU0116977))).

19.     The School of Medicine Faculty Plan offers an investment menu comprised of TIAA and Vanguard investment options.  (PX0688 (January 1, 2016 to December 31, 2016 Investment Fee & Expense Disclosure for NYU School of Medicine, at TIAA_NYU_00000122-25)).  As of June 20, 2016, the School of Medicine Faculty Plan's investment menu provided its participants a total of 80 investment options, including 9 TIAA investments and 71 Vanguard investments.  (DX149 (2016 School of Medicine Faculty Plan 404a5 (NYU0163399-420))).

20.     Like the NYU Faculty Plan, these investments consist of fixed and variable annuities and mutual funds.  (DX149 (School of Medicine Faculty Plan 404a5, at NYU0163399-420)).  Also, like the Faculty Plan, the School of Medicine Faculty Plan offers participants *both* actively managed and passively managed index funds, including numerous passively managed Vanguard funds, such as the Vanguard Institutional Index Fund.  (DX149 (School of Medicine Faculty Plan 404a5, at NYU0163399-420)).

## II.     PLAN ADMINISTRATION SERVICES.

21.     During the proposed class period, the Plans' administrative services were provided by two service providers:  TIAA and Vanguard.  (*See, e.g.*, Rezler Decl. ¶¶ 20-31).  Until May 2018, the NYU Faculty Plan had two vendors that provided administrative services to the plan:  Vanguard provided administrative services, including recordkeeping services, for the Vanguard mutual fund investment options, and TIAA provided administrative services, including recordkeeping services, for the TIAA investment options.  (DX526 (March 10, 2008 TIAA-CREF Recordkeeping Services Agreement (NYU Faculty Plan), at NYU0000244-57); DX527 (August 31, 2008 Amendment No. 1 to TIAA-CREF Recordkeeping Services Agreement (NYU Faculty Plan), at NYU0000416); DX528 (March 9, 2012 Amendment No. 2 to TIAA-CREF

- 9 -

Recordkeeping Services Agreement (NYU Faculty Plan), at NYU0000274-75); DX529 (July 9, 2012 Amendment No. 3 to TIAA-CREF Recordkeeping Services Agreement (NYU Faculty Plan) (NYU0000241-43); DX530 (September 18, 2015 Amendment No. 4 to the TIAA-CREF Recordkeeping Services Agreement (NYU Faculty Plan), at NYU0000410-15); DX005 (January 1, 2012 Vanguard Recordkeeping Fee Agreement, at Vanguard-NYU_0000040-50).  The NYU Faculty Plan is to consolidate administrative services with TIAA, effective May 1, 2018.  (Rezler Decl. ¶ 56; DX520 (December 11, 2017 Meeting Minutes of the Committee, at NYU0164822)).

22.     The School of Medicine Faculty Plan had a service provider arrangement similar to the NYU Faculty Plan's prior arrangement, until March of 2013 when TIAA became the sole administrative service provider for both the Vanguard and TIAA investment options.  (Meagher Decl. ¶ 59; Petti Decl. ¶ 30; DX532 (October 1, 2012 TIAA-CREF Recordkeeping Services Agreement for the School of Medicine Faculty Plan, at NYU0000564-85); DX533 (August 22, 2016 Amendment No. 1 to TIAA-CREF Recordkeeping Services Agreement (School of Medicine Faculty Plan), at NYU0000589-92)).  Originally, TIAA was to become the sole recordkeeper in November of 2012, but the date was delayed until March 2013 due to Hurricane Sandy.  (Petti Decl. ¶ 30).

23.     Vanguard and TIAA are known to be low-cost providers of mutual funds and annuities, respectively.  (ECF No. 283-1, Heming Dep. Designation 69:5-16; Chittenden Decl. ¶¶ 6-10).

24.     Vanguard has a unique structure in which the underlying Vanguard mutual funds own Vanguard.  (ECF No. 283-1, Heming Dep. Designation 58:25-59:5).  This ownership structure eliminates conflicting loyalties and allows Vanguard to provide services at cost, meaning that it can charge the funds only enough to cover its cost of operations.  (ECF No. 283-

1, Heming Dep. Designation 58:25-59:5, 58:12-19, 80:5-24, 83:12-15, 83:18-24, 92:3-12).

Accordingly, Vanguard is able to "return profits to [Vanguard's] fund shareholders in the form

of lower expenses."  (ECF No. 283-1, Heming Dep. Designation 69:5-16).  Vanguard is paid

indirectly via investment alternatives; the cost for recordkeeping is embedded within the expense

ratio of the Plan's available investments through a credit attribution to cover Plan administration

fees.  (ECF No. 283-1, Heming Dep. Designation 82:23-83:15, 83:18-24, 164:9-17; Rezler Decl.

¶ 25, Vanguard All-in Fee Disclosure as of June 30, 2016, (NYU0007188-89) (noting that annual

administrative fees are included in the current service offer provided and listing total direct

compensation as $0)).

     25.     TIAA also operates at cost, and is a not for profit entity that is subject to federal

income taxation.  (Chittenden Decl. ¶¶ 6-10).  TIAA is one of only three insurance groups in the

United States to hold the highest ratings currently awarded from all four leading independent

insurance industry ratings agencies, and has been awarded numerous best-in-class awards for

retirement plan participant and plan sponsor services.  (Chittenden Decl. ¶ 11).

     26.     For both the NYU Faculty Plan and the School of Medicine Faculty Plan, the cost

of services and plan administration for the Plans, including recordkeeping services, is covered by

a portion of certain investment alternatives' expense ratio; *i.e.*, the fees charged for managing

each of the investments offered by Vanguard and TIAA.  (Petti Decl. ¶ 38; Rezler Decl. ¶ 23;

DX526 (March 10, 2008 TIAA-CREF Recordkeeping Services Agreement (NYU Faculty Plan)

(NYU0000248), ¶ 8 (fees)); DX532 (October 1, 2012 TIAA-CREF Recordkeeping Services

Agreement (School of Medicine Faculty Plan) (NYU0000568), ¶ 8 (fees)).  This is a typical

arrangement, and there is no direct fee charged by either Vanguard or TIAA for recordkeeping or

plan administration.  (ECF No. 283-1, Heming Dep. Designation 51:18-20; 51:23-25; Rezler Decl. ¶¶ 23-24).

28.     As described in TIAA's recordkeeping agreements, recordkeeping fees are part of administrative fees, which include such services as preparing enrollment kits, maintaining records of each participant's and beneficiary's account balances, providing participants with returns and investment performance, providing information necessary for the annual 5500 reports, delivering investment option information such as fund notices, prospectuses, and financial statements, and delivering investment and savings advice to participants.  (Halley Decl. ¶ 30; DX526 (March 10, 2008 TIAA-CREFF Recordkeeping Services Agreement (NYU Faculty Plan) (NYU0000254-56) (Schedule A)); DX532 (October 1, 2012 TIAA-CREF Recordkeeping Services Agreement (School of Medicine Faculty Plan) (NYU0000575-79) (Schedule A))).

28.     TIAA's services included offering investment and savings advice to the Plans' participants at no additional cost to the participants, from an independent third party provider, by phone, through the web, and by TIAA consultants in person at NYU.  (Chittenden Decl. ¶¶ 84-109; Halley Decl. ¶ 31; DX532 (October 1, 2012 TIAA Recordkeeping Services Agreement at NYU000577)).

29.     Likewise, Vanguard's recordkeeping fees cover such services as handling participant calls, providing participant education, and delivering quarterly summary participant statements.  (Halley Decl. ¶ 32; ECF No. 283-1, Heming Dep. Designation 44:4-47:12; DX005 (January 1, 2012 Vanguard Recordkeeping Fee Agreement (Vanguard-NYU_0000040) (Schedules A & B))).

30.     Due to the fact that TIAA provided a number of administrative services, TIAA estimated that recordkeeping services were only 40% of the cost of the administrative services

provided to the Plans.  (Chittenden Decl. ¶ 68; PX0743 (TIAA NYU Faculty Plan 2012 Service and Fee Disclosure Package Cover Letter, at TIAA_NYU_0015340 (explaining that plan services fees are paid to TIAA "for the full range of services it provides to your plan" and that "the portion of Plan Services Expense that represents the estimated cost to the plan for 'recordkeeping services" can be obtained if you "multiply .4 times the total Plan Services Expense dollar amount")); PX0670 (TIAA School of Medicine Faculty Plan 2012 Service and Fee Disclosure Package Cover Letter, at TIAA_NYU_00000051)).

31.     The NYU Faculty Plan and the NYU School of Medicine Faculty Plan are funded with what TIAA refers to as "legacy" contracts: Retirement Annuity ("RA"), Group Retirement Annuity ("GRA"), Supplemental Retirement Annuity ("SRA") and Group Supplemental Retirement Annuity ("GSRA") contracts.  (Chittenden Decl. ¶¶ 22-37, 84; Meagher Decl. ¶¶ 27-29).  Because the contracting parties to an RA and an SRA contract are the participants and TIAA (*i.e.*, it is individually-owned), NYU cannot direct the transfer of those assets to another investment.  Likewise, because the certificates under the GRA and GSRA are individually-controlled, NYU cannot direct the transfer of those assets to another investment.  (Chittenden Decl. ¶¶ 22-37; Meagher Decl. ¶¶ 27-29, Chittenden Trial Testimony, Tr. at 619:14-20, 658:4-7, Meagher Trial Testimony, Tr. at 176:9-17, 178:20-21; 179:12-13).  Although the NYU Faculty Plan and the School of Medicine Faculty Plan also have Retirement Choice Plus ("RCP") TIAA contracts, those contracts are used for forfeitures and deposit of revenue credits only. (Chittenden Decl. ¶ 84; Meagher Decl. ¶¶ 27-29); DX021 (TIAA Response to 2009 Request for Proposal); DX405 (TIAA Response to 2016 Request for Proposal); DX560 (March 18, 2010

- 13 -

Meeting Minutes of the Committee (mistakenly marked March 18, 2009), at NYU0002874 (p. 3))).[1]

32.     For example, Plaintiff Dr. Marie Monaco, a participant in the School of Medicine Faculty Plan, has such a Retirement Annuity ("RA") Contract with TIAA.  (Monaco Trial Testimony, Tr.at 1048:16-25; DX782 (TIAA Retirement Annuity Contract 2013.08.01 (TIAA_NYU_00015042))).  Dr. Monaco's Retirement Annuity Contract with TIAA states: "This is a contact between you, as its owner (Annuitant), and TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA ("TIAA").  No other person or institution is a party to this contract."  (DX782 (TIAA Retirement Annuity Contract 2013.08.01, at TIAA_NYU_00014172)).  NYU does not have the ability to direct plan assets to other investments or to move assets to a new vendor.  (Chittenden Decl. ¶¶ 23-25; Rezler Decl. ¶ 27; *see, e.g.*, DX560 (March 18, 2010 Meeting Minutes of the Committee (mistakenly marked March 18, 2009), at NYU0002874 (p. 3))).  Accordingly, TIAA, and only TIAA, is and can be the recordkeeper for TIAA assets that are subject to individual contracts between TIAA and participants in the NYU Faculty Plan.  (Rezler Decl. ¶ 27; Meagher Decl. ¶¶ 27-29, Chittenden Trial Testimony, Tr. at 595:24-596:10).

33.     The School of Medicine Faculty Plan is funded with RA contracts and, starting in approximately 2012, GRA and GSRA contracts.  (Meagher Decl. ¶¶ 28-29).  The RA contracts entered into by plan participants prior to 2012 remain in place unless the participant has elected to make a transfer to the group contract.  (*See, e.g.*, Rezler Decl. ¶ 16).  The group GRA and GSRA contracts, like the individual contracts, however, do not provide NYU with the ability to direct, *i.e.* "map," the annuity plan assets to other investments or to a new vendor.  (Chittenden

[1] PX0173 and PX0174 (March 17, 2010 Email re: Retirement Committee Meeting, Thursday March 18, 2010 (CLC0023521).

Decl. ¶¶ 23-38, Chittenden Trial Testimony, Tr. at 619:14-20, 658:4-7, Meagher Trial

Testimony, Tr. 284:24-286:5).

34.     TIAA's investment options have a sizable presence on the Plans' investment

menus.  (Rezler Decl. ¶ 27).  As of December 31, 2016, approximately $1.84 billion of the NYU

Faculty Plan's assets were invested in TIAA options, and $1.18 billion of the School of Medicine

Faculty Plan's assets were invested in TIAA options.  (DX003 (2016 Form 5500 for NYU

Faculty Plan (NYU0164134)); DX004 (2016 Form 5500 for School of Medicine Faculty Plan

(NYU0164089))).

35.     The Committee also considered other sources of information to assess the plans'

arrangements.  (Halley Decl. ¶ 33).  Cammack provided the Committee with an annual survey of

higher education plan sponsors.  (Halley Decl. ¶ 33).[2]  NYU was also part of the "Ivy Plus"

group, which surveyed a number of higher education plan sponsors for information regarding

various topics such as number of recordkeepers, number of investment alternatives offered to

participants, and plan design issues.  (Halley Decl. ¶ 33).

## III.   PLAINTIFFS

36.     Plaintiffs are six highly-educated professors, three of whom participate in the

NYU Faculty Plan and three of whom participate in the School of Medicine Faculty Plan.  (ECF

No. 39, Am. Compl. ¶ 1; Monaco Decl. ¶ 2; Miller Decl. ¶¶ 2-3; Sacerdote Decl. ¶ 2; Straussner

Decl. ¶ 2).

### A.    Dr. Mark Crispin Miller

37.     Dr. Mark Crispin Miller has been a Professor with the Department of Media,

Culture and Communication at the NYU Steinhardt School since 1997.  (Miller Decl. ¶ 2).  He is

---

[2] *See, e.g.*, DX415 and DX418.

a participant in the NYU Faculty Plan in which he has only invested in Vanguard funds.  (Miller Decl. ¶ 3).

38.     However, he invested in TIAA funds, including the CREF Stock Class R3 fund, in two plans sponsored by his former employers: (1) a plan sponsored by Johns Hopkins University; and (2) a plan sponsored by the University of Pennsylvania.  (Miller Trial Testimony, Tr. at 1031:14-15, 1031:19).  Mr. Miller is still invested in the CREF Stock Account in both of those plans, and his investment in that fund grew by approximately $200,000 over 8 years. (Miller Trial Testimony, Tr. at 1032:13-17; DX260 (Miller TIAA 2017 Quarterly Statement for 2nd Quarter).  The CREF Stock Account represents a majority of Mr. Miller's holdings in his TIAA account; these investments have not been altered since the beginning of Plaintiffs' lawsuit against NYU.  (Miller Trial Testimony, Tr. at 1032:18-1033:6).

39.     ~~As of September 30, 2016, Mr. Miller was invested in the Vanguard LifeStrategy Moderate Growth fund and Vanguard Institutional Index fund, with a total account balance of $471,444.56 for his investments in the NYU Faculty Plan.  (Testimony at Trial; DX257 (Crispin Miller Vanguard Quarterly Statement for 3rd Quarter, at NYU0084118-19)).~~

**B.     Ms. Marie Ellen Monaco**

40.     Ms. Marie Ellen Monaco is an Associate Professor with the Department of Neuroscience and Physiology at the NYU School of Medicine.  (Monaco Decl. ¶ 2).  She is a participant in the School of Medicine Faculty Plan as well as other retirement plans offered by NYU.  (Monaco Decl. ¶ 2).

41.     As a participant in the School of Medicine Faculty Plan, Ms. Monaco invested in CREF Stock, CREF Growth, CRE Global Equities, TIAA Traditional and TIAA Real Estate in 2009 and has never made any changes to her investment portfolio.  (Monaco Trial Testimony, Tr. at 1047:8-17; Monaco Decl. ¶ 3; DX874 (Monaco TIAA 2017 Quarterly Statement for 4th

- 16 -

Quarter)).  As of December 31, 2017, Ms. Monaco had $319,649.92 in investments in the School of Medicine Faculty Plan.  (Monaco Trial Testimony, Tr. at 1047:8-17;DX874 (Monaco TIAA 2017 Quarterly Statement for 2nd Quarter, at PLA-NYU-007985)).

42.     Ms. Monaco testified that she does not know whether she was harmed by the inclusion of the CREF Stock Account or the TIAA Real Estate Account, nor does she know whether any of her investments underperformed in the past seven years.  (Monaco Trial Testimony, Tr. at 1055:16-1056:8).

### C.     Dr. Shulamith Lala Straussner

43.     Dr. Shulamith Lala Straussner is an Associate Professor with the NYU School of Social Work.  (Straussner Decl. ¶ 2).  Dr. Straussner is a participant in the NYU Faculty Plan as well as a participant in other NYU retirement plans.  (Straussner Decl. ¶ 2; DX344, DX376-DX377 (Straussner TIAA Quarterly Statements 2009-2017)).

44.     Dr. Straussner has been invested in TIAA Traditional, TIAA Real Estate, CREF Bond Market R3, CREF Stock R3, and CREF Global Equities R3 as part of her participation in the NYU Faculty Plan since 2009.  (Straussner Decl. ¶ 3; DX344, DX376-DX377 (Straussner TIAA Quarterly Statements 2009-2017)).  Dr. Straussner's largest single investment in the NYU Faculty Plan is in the CREF Stock Account, which accounts for approximately one-third of her investment portfolio.  (Straussner Trial Testimony, Tr. at 1023:17-1024:9; DX377 (Straussner TIAA 2017 Quarterly Statement for 2nd Quarter, at TIAA_NYU_00016875)).

45.     As of June 30, 2017, Dr. Straussner's balance for all of her TIAA investments in all of her NYU retirement plans was $602,469.42 and the balance for her TIAA investments in the NYU Faculty Plan alone was $406,305.12.  (Straussner Trial Testimony, Tr. at 1022:3-5, 20-22; DX377 (Straussner TIAA 2017 Quarterly Statement for 2nd Quarter, at TIAA_NYU_00016873-75)).

- 17 -

### D. ~~James Brown~~

46. ~~James Brown is an Associate Professor at NYU. (Trial Testimony). Mr. Brown participates in the NYU Faculty Plan. (Testimony at Trial; DX209 (Brown 2014 Vanguard Quarterly Statement for 1st Quarter (PLA-NYU-000305)); DX221 (Brown 2016 Vanguard Quarterly Statement for 3rd Quarter (PLA-NYU-000628))). Mr. Brown did not invest in any TIAA investments as a member of the NYU Faculty Plan, but only chose to invest in Vanguard options--Vanguard Prime Money Market, Vanguard Long-Term Treasury Investor, Vanguard Small Cap Value Index, Vanguard Energy Fund Investor, and Vanguard Precious Metals and Mining funds in 2010. (Trial Testimony; DX209 (Brown 2014 Vanguard Quarterly Statement for 1st Quarter (PLA-NYU-000305))).~~

47. ~~Mr. Brown also elected in 2016 to add investments in the Vanguard Health Care Fund Investor, Vanguard Federal Money Market, and Vanguard Target Retirement 2015 funds. (Testimony at Trial; DX221 (Brown 2016 Vanguard Quarterly Statement for 3rd Quarter (PLA-NYU-000629))). Mr. Brown never invested in the TIAA Real Estate Account as a participant of any plan, and only invested in the CREF Stock Account as a participant in the NYU Supplemental Tax Deferred Annuity Plan. (Testimony at Trial; DX225 (Brown 2017 TIAA Quarterly Statement for the 2nd Quarter (TIAA_NYU_00016683) (NYU Supplemental Tax Deferred Annuity Plan))). As of September 30, 2016, Mr. Brown's account balance for investments in the NYU Faculty Plan was ██████████ (Testimony at Trial; DX221 (Brown 2016 Vanguard Quarterly Statement for 3rd Quarter (PLA-NYU-000628))).~~

### E. Dr. Alan Sacerdote

48. Dr. Alan Sacerdote is a Clinical Professor of Medicine at NYU and the Chief of Endocrinology for the Woodhull Medical Group, which is associated with NYU and at which Dr.

- 18 -

Sacerdote's salary and benefits are funded by NYU.  (Sacerdote Decl. ¶ 2).  Dr. Sacerdote participates in the School of Medicine Faculty Plan.  (Sacerdote Decl. ¶ 2).

49.     Dr. Sacerdote invested solely in Vanguard funds and did not invest in the TIAA Real Estate Account or the CREF Stock Account as part of his participation in the School of Medicine Faculty Plan.  (Sacerdote Trial Testimony, Tr. at 1036:18-23; DX293-312 (Sacerdote TIAA Quarterly Statements 2012-2017)).

F.     ~~Dr. Herbert Samuels~~

50.     ~~Dr. Herbert Samuels is the Helen and Milton A. Kimmelman Professor of Pharmacology at the Department of Biochemistry and Molecular Pharmacology and Professor at the Department of Medicine.  (Testimony at Trial).  Dr. Samuels participates in the School of Medicine Faculty Plan.  (Trial Testimony).~~

51.     ~~Dr. Samuels never invested in the TIAA Real Estate Account and has been invested in the CREF Stock, CREF Growth, and CREF Global Equities.  (Testimony at Trial; DX313-343 (Samuels TIAA Quarterly Statements 2009-2017)).  Dr. Samuels had a balance of~~ ███████ ~~in the School of Medicine Faculty Plan as of June 30, 2017.  (Testimony at Trial; DX343 (Samuels 2017 TIAA Quarterly Statement for 2nd Quarter (TIAA_NYU_00016838)))~~.

IV.     **NYU HAD A PRUDENT PROCESS FOR MONITORING THE PLANS' ADMINISTRATIVE FEES AND NEGOTIATING REDUCTIONS IN FEES.**

52.     NYU established and followed a prudent process and made sensible fiduciary decisions with regard to the Plans' fees.  (Wagner Trial Testimony, Tr. at 1414:15-1415:17; Wagner Revised Decl. ¶¶ 5, 6 (incorporating ¶ 86)).

A.     **NYU Formed the Retirement Committee to Implement the New 403(b) Regulations.**

53.     To implement the new 403(b) regulations, on September 13, 2007, NYU determined that a Retirement Plan Committee (the "Committee") should be formed to provide

consistency and clarity in plan governance.  (Meagher Decl. ¶ 10; Dorph Decl. ¶ 4; PX0462

(September 13, 2007 Meeting Minutes of the Committee (NYU0002387))).

54.     This determination was made during a meeting held between future Committee

members and highly-respected external legal counsel Ropes & Gray, LLP ("Ropes & Gray").

(Meagher Decl. ¶ 11, Dorph Decl. ¶ 5; PX0462 (September 13, 2007 Meeting Minutes of the

Committee (NYU0002387))).  The group discussed the next steps needed for approval of the

Committee, including finalizing a formal charter.  (Meagher Decl. ¶ 11; Dorph Decl. ¶ 5;

PX0462 (September 13, 2007 Meeting Minutes of the Committee (NYU0002387))).

55.     In May 2009, the Executive Committee of the Board of Trustees of New York

University formally approved the Retirement Plan Committee Charter (the "Charter"), effective

June 1, 2008, which formally established the Committee.  (Meagher Decl. ¶ 12; Dorph Decl. ¶ 5;

PX0533 (Retirement Plan Committee Charter (NYU00034912-21))).  Ropes & Gray assisted the

Committee in drafting the Charter.  (Meagher Decl. ¶ 11; *see, e.g.*, PX0478 (January 31, 2008

Meeting Minutes of the Committee (NYU0003846-48))).

56.     The Charter designates the Committee as the Plan Administrator for a number of

defined benefit, defined contribution, and deferred compensation plans, including the NYU

Faculty Plan and the School of Medicine Faculty Plan.  (Meagher Decl. ¶ 12, Halley Decl. ¶ 7;

PX0533 (Retirement Plan Committee Charter (NYU0034914))).  The Charter also designates

nine Committee members serving ex-officio: (1) NYU Chief Investment Officer; (2) NYU

Senior Vice President of Finance; (3) NYU Langone Medical Center ("NYULMC") Senior Vice

President of Finance; (4) NYULMC Controller; (5) NYU Vice President of Human Resources;

(6) NYULMC Senior Vice President of Human Resources; (7) NYU Director of Benefits; (8)

NYULMC Director of Benefits; and (9) NYU Provost or designee.  (Meager Decl. ¶ 12; DX885,

Declaration of Nancy Sanchez ("Sanchez Decl.") ¶ 6 n.1; PX0533 (Retirement Plan Committee Charter (NYU0034914))).[3]

**B.     NYU Retained an Industry Expert, Cammack, to Assist the Committee and to Analyze the Plans' Administrative Fees.**

57.     Recognizing its fiduciary responsibilities and on the advice of Ropes & Gray, the Committee sought out a highly experienced investment advisor to assist the Committee in monitoring the performance and expenses of the funds in the 403(b) plans it would oversee. (Meagher Decl. ¶¶ 16-18; Dorph Decl. ¶ 8; Rezler Decl. ¶¶ 2-6, Meagher Trial Testimony, Tr. at 116:14-16, DX554 (February 4, 2009 Meeting Minutes of the Committee, at NYU00833304-05).

58.     NYU conducted a Request for Proposal ("RFP"), to which four different investment firms—Cammack Larhette Consulting ("Cammack"), Segal Marco Advisors, Mercer, and RV Kuhns—responded.  (Meagher Decl. ¶ 16, Dorph Decl. ¶ 8, Rezler Decl. ¶ 6; DX554 (February 4, 2009 Meeting Minutes of the Committee (NYU00833304-05))).

59.     Cammack, an expert in the industry and one of only a handful of firms that work with 403(b) plans comparable in size to those overseen by the Committee, was ultimately selected.  (Rezler Decl. ¶¶ 2-7; Sanchez Trial Testimony, Tr. at 423:24-424:3; PX0002 (May 2008 Cammack Defined Contribution Retirement Plan Investment Consulting Services Proposal (CLC0000285-318)); DX554 (February 4, 2009 Meeting Minutes of the Committee (NYU00833304-05))).  Cammack has been working with 403(b) plans since 1958, when 403(b) plans were added to the Internal Revenue Code, and is able to negotiate for the most cost-effective programs for its clients because it is a privately held company that is not subject to

---

[3] In 2012, the position of NYU Senior Vice President of Finance changed to NYU Chief Financial Officer; NYULMC Controller changed to NYULMC Vice President of Finance; NYU Director of Benefits changed to NYU Associate Vice President, Global Compensation and Benefits.  (PX0466 (Retirement Plan Charter Amended September 28, 2012)).  In 2017, the position of NYULMC Director of Benefits changed to NYULMC Senior Director of Benefits. (PX0518 (Retirement Plan Charter, effective January 1, 2017)).

direct or indirect ownership by other companies.  (Rezler Decl. ¶ 3; PX0002 (May 2008 Cammack Defined Contribution Retirement Plan Investment Consulting Services Proposal (CLC0000287, CLC0000289-90))).  Cammack's independence allows it to engage and negotiate with investment providers, third-party administrators, and insurance companies to obtain the most comprehensive and cost-effective retirement programs for its clients.  (Rezler Decl. ¶ 4; Wagner Revised Decl. ¶ 6 (incorporating ¶ 31)).

60.     Further, Cammack has extensive experience in reviewing and understanding TIAA's fees and expenses since it has numerous 403(b) plan clients with TIAA investment products on their plan investment menus.  (Sanchez Trial Testimony, Tr. at 423:24-424:3; Wagner Revised Decl. ¶ 6 (incorporating ¶ 32); PX0002 (May 2008 Cammack Defined Contribution Retirement Plan Investment Consulting Services Proposal (CLC0000287, CLC0000295))).

61.     Ropes & Gray also continued to advise the Committee with respect to the Committee's legal duties in administering the plans.  (Meagher Decl. ¶ 11).

62.     The Committee hired Cammack as a co-fiduciary to the Plans with respect to investment advisory services.  (Rezler Decl. ¶ 7; Meagher Decl. ¶ 17, PX0114 (2009 Cammack Larhette Advisors, LLC Investment Advisory Services Agreement ¶ 5b (NYU0096711))).  Since 2009, Cammack has provided the Committee with help in evaluating, selecting, and managing the Plans' recordkeepers and advising them on the selection and monitoring of plan investments. (Rezler Decl. ¶ 9; Rezler Trial Testimony, Tr. at 1283:18-1293:12; Sanchez Trial Testimony, Tr. at 423:24-424).  Cammack specifically provides the Plans with investment analysis, plan design, plan administration, vendor services, RFP projects and pricing.  (Sanchez Trial Testimony, Tr. at 423:24-424; Rezler Decl. ¶ 9).

63.   Cammack's investment analysis includes determining whether to put funds on a watch list and deciding whether to recommend fund replacement.  (Rezler Decl. ¶ 10).  This is a typical and common practice followed by prudent fiduciaries and is part of Cammack's fund analysis when a particular fund has some indicator that may bear some additional scrutiny, including, for example, a fund manager change, market environment or fund performance. (Rezler Decl. ¶ 10; Wagner Revised Decl. ¶ 6 (incorporating ¶ 33, 108, 109), ¶ 8 (incorporating ¶ 98)).

64.   Cammack's investment analysis also consists of providing to the Committee an analysis of fund performance, including analyzing performance versus the fund's peer group and the benchmark index and evaluating each fund's standard deviation, risk adjusted return (Sharpe ratio), fees in comparison to peer funds, portfolio manager tenure, and Morningstar ratings. (Rezler Decl. ¶¶ 11, 15).

65.   Cammack is responsible for providing the Committee with this investment analysis for all of the investment options available in the Plans on a quarterly basis.  (Rezler Decl. ¶ 12; Rezler Trial Testimony, Tr. at 1263:3-7).  The Committee considered several factors commonly used by fiduciaries in monitoring plan investment funds, including volatility, ratings, risk and return characteristics, risk-adjusted returns, performance deviations and style drift. (Rezler Decl. ¶ 15; Wagner Revised Decl. ¶ 6 (incorporating ¶ 108)).[4]  One of the factors used by Cammack and the Committee to analyze the funds was a widely-used measure of performance

---

[4] *See, e.g.*, DX019 (May 10, 2012 Email re: NYU/NYU Langone Retirement Committee Meeting – May 17, 2012 with attachments (CLC0033507-08, CLC0033520, CLC0033525, CLC0033539, CLC0033585)); PX1221-PX1228 (November 18, 2013 email re: Retirement Committee Meeting Materials for November 25 2013 meeting with attachments (CLC0038690, CLC0038698, CLC0038702, CLC0038718, CLC0038721)); PX1240 (February 26, 2014 Meeting Minutes of the Committee (CLC0040659))).

called "alpha," which is defined as the difference between the actual return and expected return. (Rezler Decl. ¶ 15; Wagner Revised Decl. ¶ 6 (incorporating ¶ 108)).[5]

66.     Cammack typically provides the investment analysis to the Committee in the form of a due diligence report about a week before each Committee meeting.  (Meagher Trial Testimony, Tr. at 113:20-114:6, 303:12-304:25; Meagher Decl. ¶ 20; Halley Decl. ¶ 10; Rezler Decl. ¶ 12).[6]  The purpose of these due diligence reports is to provide NYU the information needed to perform its oversight responsibilities for the investments and other areas relating to the plans.  (Meagher Trial Testimony, Tr. at 262: 7-11, 302:19-303:2; 339:13-19; Meagher Decl. ¶ 20; Halley Decl. ¶ 10; Rezler Decl. ¶¶ 9-12).

67.     Since being retained, Cammack repeatedly analyzed whether the fees paid to TIAA and Vanguard were competitive and reasonable, and the Committee's minutes reflect discussion of administrative fees at numerous meetings (Rezler Decl. ¶¶ 9, 43; Halley Decl. ¶ 23; Petti Decl. ¶¶ 24-63; Wagner Revised Decl. ¶ 6 (incorporating ¶ 108)), including those held on:

- October 8, 2008[7]
- May 15, 2009[8]
- January 21, 2010[9]
- February 18, 2010[10]
- March 18, 2010[11]

---

[5] *See, e.g.*, DX019 (May 10, 2012 Email re: NYU/NYU Langone Retirement Committee Meeting – May 17, 2012 with attachments (CLC0033585)); PX1221-PX1228 (November 18, 2013 email re: Retirement Committee Meeting Materials for November 25 2013 meeting with attachments (CLC0038720)).

[6] *See, e.g.*, DX019 (May 10, 2012 Email re: NYU/NYU Langone Retirement Committee Meeting – May 17, 2012 with attachments (CLC0033465-682)).

[7] PX0476 (October 8, 2008 Meeting Minutes of the Committee (NYU0003673)).

[8] PX0473 (May 15, 2009 Meeting Minutes of the Committee (NYU0003087)).

[9] PX0494 (January 21, 2010 Meeting Minutes of the Committee (NYU0006123)).

[10] PX0553 (February 18, 2010 Meeting Minutes of the Committee (NYU0084726-27)).

- April 19, 2010[12]
- June 14, 2010[13]
- September 23, 2010[14]
- November 2, 2010[15]
- January 10, 2011[16]
- March 21, 2011[17]
- May 17, 2012[18]
- September 4, 2012[19]
- November 16, 2012[20]
- June 14, 2013[21]
- November 25, 2013[22]
- August 19, 2014[23]
- December 11, 2014[24]
- February 26, 2015[25]
- June 9, 2015[26]

---

[11] DX560 (March 18, 2010 Meeting Minutes of the Committee (mistakenly marked March 18, 2009) (NYU0002873)).

[12] PX0480 (April 19, 2010 Meeting Minutes of the Committee (NYU0004041)).

[13] DX562 (June 14, 2010 Meeting Minutes of the Committee (NYU0002882)).

[14] PX0463 (September 23, 2010 Meeting Minutes of the Committee (NYU0002389)).

[15] PX0485 (November 2, 2010 Meeting Minutes of the Committee (NYU0005075)).

[16] PX0477 (January 10, 2011 Meeting Minutes of the Committee (NYU0003674)).

[17] PX0460 (March 21, 2011 Meeting Minutes of the Committee (NY0002099)).

[18] PX0482 (May 17, 2012 Meeting Minutes of the Committee (NYU0004056)).

[19] PX0382 (September 4, 2012 Meeting Minutes of the Committee (CLC0039029-30)).

[20] PX0380 (November 16, 2012 Meeting Minutes of the Committee (CLC0039022-23)).

[21] PX0368 (June 14, 2013 Meeting Minutes of the Committee (CLC0038983)).

[22] PX0458 (November 25, 2013 Meeting Minutes of the Committee (NYU0002094)).

[23] PX0049 (August 19, 2014 Meeting Minutes of the Committee (CLC0016624-25)).

[24] PX0469 (December 11, 2014 Meeting Minutes of the Committee (NYU0002780)).

[25] PX0479 (February 26, 2015 Meeting Minutes of the Committee (NYU0003949)).

- 25 -

- September 15, 2015[27]
- December 16, 2015[28]
- June 1, 2016[29]
- September 8, 2016[30]
- December 12, 2016[31]
- February 23, 2017[32]
- May 24, 2017[33]
- September 7, 2017[34]

68.    In considering the reasonableness of the fees, the Committee gave appropriate consideration to numerous factors,[35] including:

- the type, nature and quality of the administrative services,[36]
- the different needs and circumstances of the two Plans,[37]
- the different expectations of participants in the two Plans,[38]

---

[26] PX1303 (June 9, 2015 Meeting Minutes of the Committee (CLC0048249)).

[27] PX0484 (September 15, 2015 Meeting Minutes of the Committee (NYU0005069)).

[28] PX0474 (December 16, 2015 Meeting Minutes of the Committee (NYU0003276-77)).

[29] PX0471 (June 1, 2016 Meeting Minutes of the Committee (NYU0002890)).

[30] PX0520 (September 8, 2016 Meeting Minutes of the Committee (NYU0026304)).

[31] PX0519 (December 12, 2016 Meeting Minutes of the Committee (NYU0026298)).

[32] PX1366 (February 23, 2017 Meeting Minutes of the Committee (CLC0063888)).

[33] PX0662 (May 24, 2017 Meeting Minutes of the Committee (NYU0162850)).

[34] PX0959 (September 7, 2017 Meeting Minutes of the Committee (NYU0164400)).

[35] Wagner Revised Decl. ¶5.

[36] PX0494 (January 21, 2010 Meeting Minutes of the Committee (NYU0006123-24)); PX0553 (February 18, 2010 Meeting Minutes of the Committee (NYU0084726-28)); DX560 (March 18, 2010 Meeting Minutes of the Committee (mistakenly marked March 18, 2009) (NYU0002872-73)); PX0480 (April 19, 2010 Meeting Minutes of the Committee (NYU0004040)); PX0477 (January 10, 2011 Meeting Minutes of the Committee (NYU0003675)); PX0460 (March 21, 2011 Meeting Minutes of the Committee (NYU0002099-2101)).

[37] Petti Decl. ¶¶26, 32, 34-36; Dorph Decl. ¶¶14-18; PX0460 (March 21, 2011 Meeting Minutes of the Committee (NYU0002100-01)).

- 26 -

- the capabilities of various vendors to provide all of the services required by the Plans,[39]

- the unique nature of the TIAA annuities and the fact that no other vendor could administer the TIAA annuities,[40]

- the fact that participants in the Plans had previously invested billions of dollars in these TIAA annuities,[41]

- the fact that the Committee could not override the participants' investment elections in the TIAA annuities without their consent,[42]

- the fact that participants were provided detailed information regarding the Plans and the Plans' investment alternatives,[43]

- the potential advantages and disadvantages of consolidating administrative services with a single vendor,[44] and

- the services being offered, the investment vehicles available on the vendors' platforms, and participant preferences.[45]

---

[38] Petti Decl. ¶¶26, 32, 34-36; Dorph Decl. ¶¶14-18; PX0460 (March 21, 2011 Meeting Minutes of the Committee, at NYU0002100-01).

[39] Rezler Decl. ¶¶17-19; PX0494 (January 21, 2010 Meeting Minutes of the Committee, at NYU0006123-24); PX0553 (February 18, 2010 Meeting Minutes of the Committee, at NYU0084726-28).

[40] Petti Decl. ¶¶48-49, 66; PX0494 (January 21, 2010 Meeting Minutes of the Committee, at NYU0006123-24).

[41] PX0470 (December 9, 2009 Meeting Minutes of the Committee, at NYU0002885).

[42] Petti Decl. ¶¶48-49; PX0476 October 8, 2008 Meeting Minutes of the Committee, at NYU0003672); PX0473 (May 15, 2009 Meeting Minutes of the Committee, at NYU0003088); PX0470 (December 9, 2009 Meeting Minutes of the Committee, at NYU0002885-86); PX0494 (January 21, 2010 Meeting Minutes of the Committee, at NYU0006123-24); DX560 (March 18, 2010 Meeting Minutes of the Committee (mistakenly marked March 18, 2009), at NYU0002874); PX0460 (March 21, 2011 Meeting Minutes of the Committee, at NYU0002100-01)).

[43] Rezler Decl. ¶¶9-13.

[44] Rezler Decl. ¶32; see, e.g., PX0480 (April 19, 2010 Meeting Minutes of the Committee, at NYU0004040).

[45] See, e.g., Rezler Decl. ¶¶17, 19, 28-29 Meagher Trial Testimony, Tr. at 162:24-164:2.

- 27 -

69.     Early on, Cammack also advised that it believed that, with regards to "Fiduciary Compliance," "in general the New York University and NYU Langone retirement plans are very compliant and are run exceptionally well." (Sanchez Decl. ¶ 42; PX0473 (May 15, 2009 Meeting Minutes of the Committee, at NYU0003088)).

70.     Since that first meeting in September 2007, the Committee has met regularly to review, monitor, discuss, and oversee the various plans assigned to its purview. (Meagher Decl. ¶ 13; Rezler Decl. ¶ 9; Petti Decl. ¶ 8, Halley Decl. ¶ 11). Between September 2007 and December 2017, the Committee met at least 43 times.[46] And, in the six years preceding the filing of the Complaint on August 9, 2016, the Committee met at least 25 times.[47]

## C.     NYU Conducted Two Requests for Proposals and Consolidated Vendors.

71.     Beginning at least as early as the October 8, 2008 meeting, the Committee considered as a long-term goal the potential benefit of consolidating recordkeepers. (Dorph Trial Testimony, Tr. at 1317:22:-1318:10; Meagher Decl. ¶ 22; Meagher Trial Testimony, Tr. at 336:13-20; PX0476 (October 8, 2008 Meeting Minutes of the Committee, at NYU0003671)). The Committee demonstrated a prudent process of reviewing and considering the extent to which, and when, this long-term goal could be accomplished in the context of these Plans. (Dorph Trial Testimony, Tr. at 1317:22:-1318:10; Meagher Decl. ¶ 22; Wagner Revised Decl. ¶¶ 5, 6 (incorporating ¶ 87)).

---

[46] PX0462, PX0478, PX0476, DX554, PX0473, PX0470, PX0494, PX0553, DX560, PX0480, DX562, PX0463, PX0485, PX0477, PX0460, PX0481, PX0375, DX569, PX0472, PX0040, PX0482, PX0382, PX0380, PX0467, PX0368, PX0458, PX1240, PX0461, PX0049, PX0468, PX0469, PX0479, PX1303, PX0484, PX0474, PX1331, PX0471, PX0520, PX0519, PX1366, DX513, PX0662, PX0959, PX0962.

[47] PX0462, PX0478, PX0476, DX554, PX0473, PX0470, PX0494, PX0553, DX560, PX0480, DX562, PX0463, PX0485, PX0477, PX0460, PX0481, PX0375, DX569, PX0472, PX0040, PX0482, PX0382, PX0380, PX0467, PX0368, PX0458, PX1240, PX0461, PX0049, PX0468, PX0469, PX0479, PX1303, PX0484, PX0474, PX1331, PX0471.

- 28 -

footerEAST\154252389.9

72.     Early on, the Committee began to consider the potential benefits of vendor consolidation, although it noted that it was not a short-term priority because of the history and complexity of the Plans, the unique nature of the TIAA contracts, the expectations of Plan participants, and the consideration of NYU's Shared Governance Principles.  (Meagher Decl. ¶ 22; PX0476 (October 8, 2008 Meeting Minutes of the Committee, at NYU0003671 ("vendor consolidation is not a short-term priority")); PX0460 (March 21, 2011 Meeting Minutes of the Committee, at NYU0002100-01); *see also* Wagner Revised Decl. ¶ 6 (incorporating ¶ 87); Meagher Trial Testimony, Tr. at 160:7-14, 312:5-313:1, 331:8-334:14).

73.     In 2009, as part of this prudent process, Cammack assisted the Committee in conducting an extensive RFP for administrative services to the Plans, including recordkeeping services.  (Rezler Decl. ¶ 16; Meagher Decl. ¶¶ 22-30; Dorph Decl. ¶¶ 9-11; PX0119 (New York University, New York University School of Medicine, NYU Hospitals Center, Polytechnic Institute of NYU Defined Contribution Retirement Programs Request for Proposal, July 31, 2009); PX0494 (January 21, 2010 Meeting Minutes, at NYU0006123-24)).  The RFP was conducted "as part of [the Committee's] review of its multiple vendor 403(b) program with the goal of possibly consolidating future contributions to a single vendor."  PX0119 (New York University, New York University School of Medicine, NYU Hospitals Center, Polytechnic Institute of NYU Defined Contribution  Retirement Programs Request for Proposal, July 31, 2009 (CLC0022136)).

74.     Prior to issuance of the RFP, in the May 15, 2009 Retirement Committee materials, Cammack suggested to the Committee that NYU use TIAA-CREF as the single recordkeeper.  (Sanchez Decl. ¶ 20).  The Cammack Due Diligence materials for that meeting state:

Though the University has done a remarkable job dealing with the complexities that render most multiple vendor arrangements unworkable for plan sponsors, it makes sense to consider the TIAA-CREF single provider solution for a variety of reasons:

- TIAA-CREF can offer all Vanguard funds, so the distinction between the vendors for participants is eroded

- Vanguard could not offer all TIAA-CREF funds

- A single vendor platform will make it more likely that nearly all plan transactions could be successfully outsourced to TIAA-CREF, eliminating a significant in-house administrative burden.

(Sanchez Decl. ¶ 20; PX0095-PX0096 (May 13, 2009 Email to Meagher and Sanchez, attaching May 2009 Cammack Due Diligence Report (CLC0021493-643, at CLC0021518)).  The Committee considered these points and chose to conduct an RFP.  (Sanchez Decl. ¶ 21; Meagher Decl. ¶ 20; PX0473 (May 15, 2009 Meeting Minutes of the Committee, at NYU0003086; PX0119 (New York University, New York University School of Medicine, NYU Hospitals Center, Polytechnic Institute of NYU Defined Contribution  Retirement Programs Request for Proposal, July 31, 2009)).

75.    The RFP to the potential vendors indicated that vendor consolidation may not be a short-term goal.  (PX0119 (New York University, New York University School of Medicine, NYU Hospitals Center, Polytechnic Institute of NYU Defined Contribution  Retirement Programs Request for Proposal, July 31, 2009, at CLC0022138)).

76.    The RFP sought detailed information from then-current and potential vendors to the Plans, including information regarding service capabilities, available investment alternatives, restrictions on offering investments, investment characteristics of available investments, revenue sharing, minimum fund revenue requirements, fiduciary status of vendors, communication and education services for participants, systems and recordkeeping, compliance, and expenses.  (Rezler Decl. ¶ 17; Meagher Decl. ¶ 23; Dorph Decl. ¶¶ 9-13; PX0119 (New York University, New York University School of Medicine, NYU Hospitals Center, Polytechnic Institute of NYU

- 30 -

Defined Contribution  Retirement Programs Request for Proposal, July 31, 2009, at

CLC0022140, CLC0022143-56)).

77.     The RFP also notes, in providing the Plans' characteristics, that a large portion of

the Plans' assets "may not be transferred to a new investment provider without individual

participant consent."  (Rezler Decl. ¶ 16; Meagher Decl. ¶ 27; Sanchez Decl. ¶ 23; PX0119 (New

York University, New York University School of Medicine, NYU Hospitals Center, Polytechnic

Institute of NYU Defined Contribution  Retirement Programs Request for Proposal, July 31,

2009, at CLC0022138-39)).

78.     The Committee also sought follow-up information regarding potential vendors'

abilities to deliver various electronic services for participants, such as enhanced and branded

electronic messaging, NYU-dedicated web and phone assistance, online plan enrollment and to

provide on-site participant investment education.  (Rezler Decl. ¶¶ 18-19; Meagher Decl. ¶ 24;

DX560 (March 18, 2010 Meeting Minutes of the Committee (mistakenly marked March 18,

2009), at NYU0002872-74); PX0480 (April 19, 2010 Meeting Minutes of the Committee, at

NYU0004040); PX0494 (January 21, 2010 Meeting Minutes of the Committee, at

NYU0006123-24)).

79.     On a number of occasions, the Committee reviewed the services and costs of

several leading retirement vendors: Fidelity, Diversified Investment Advisors, GreatWest, and

two incumbents: TIAA-CREF and Vanguard.  Prudential (the third incumbent), ACS, and Hewitt

each declined to submit a proposal.  (Meagher Decl. ¶ 25; PX0133-PX0134 (October 27, 2009 e-

mail to Meagher with Cammack's RFP Analysis, at CLC0022519-45); PX0470 (December 9,

2009 Meeting Minutes of the Committee, at NYU0002885-86); PX0477 (January 10, 2011

Meeting Minutes of the Committee (NYU0003674); PX1040-PX1044 (January 10, 2011 e-mail

to the Retirement Committee with meeting materials, including January 2011 Retirement Plan Vendor Consolidation presentation, at CLC0025247-73)).

80.    The RFP respondents submitted detailed responses to the RFP.  (Rezler Decl. ¶ 20; Meagher Decl. ¶ 26; Sanchez Decl. ¶ 24; Dorph Decl. ¶ 10).  TIAA submitted a 402 page response to the RFP, in which TIAA provided extensive responses to all of the questions posed and provided a detailed expense projection for the initial plan year which proposed the best fund available in each asset class that would fit the pricing model.  (Chittenden Decl. ¶ 21; Rezler Decl. ¶ 21;  DX021 (September 2009 TIAA Response to Request for Proposal Submission (including cover email to Cammack), at TIAA_NYU_00031578- TIAA_NYU_00031980)).  The RFP response explained that TIAA was making available to NYU the opportunity to move to group annuity contracts for future contributions, and that participants with individual annuity contracts can elect to transfer assets from their individual annuity contracts to the group annuity contracts.  (Rezler Decl. ¶ 21; DX021 (September 2009 TIAA Response to Request for Proposal Submission, at TIAA_NYU_00031584-85)).  TIAA also created an excel spreadsheet detailing an investment array for the plan that included information regarding performance history versus benchmarks and standard deviation versus benchmarks as well as all fees, including investment management fees, revenue sharing, and the total expense ratio.  (Rezler Decl. ¶ 21; DX021 (September 2009 TIAA Response to Request for Proposal Submission (TIAA_NYU_00031997) (and following non-bates labeled printout of corresponding excel document)).

81.    Vanguard and Fidelity likewise provided detailed information in their response to the RFP as well, including extensive information detailing fees, fund performance, and fund expenses.  (Rezler Decl. ¶ 22; PX0065 (September 25, 2009 Vanguard Response to Request for

Proposal, at CLC0019278-329); PX0144, PX0146, PX0153 (September 2009 Fidelity

Investments' Response to Request for Proposal, at CLC0022812-869)).

82.     Cammack presented the RFP responses to the Committee.  (Meagher Decl. ¶ 35;

Sanchez Decl. ¶ 25; PX0133-PX0134 (October 27, 2009 e-mail to Meagher with Cammack's

RFP Analysis, at CLC0022519-45); PX0470 (December 9, 2009 Meeting Minutes of the

Committee, at NYU0002885)). The Committee's key considerations in analyzing the RFP

responses were:

- Overall cost structure
- Participant education and communications
- Investment platform offered to participants
- Competitiveness of outsourcing services
- Conversion
- Compliance

(Meagher Decl. ¶ 38; Sanchez Decl. ¶ 25; PX0133-PX0134 (October 27, 2009 e-mail to

Meagher with Cammack's RFP Analysis, at CLC0022529)).

83.     TIAA's initial pricing bid response was 15 basis points ("bps"), or 0.15%, on new

assets.  (Rezler Decl. ¶ 26; Chittenden Decl. ¶ 72; PX0133-PX0134 (October 27, 2009 e-mail to

Meagher with Cammack's RFP Analysis, at CLC0022541).  As to pricing for the other RFP

respondents, Cammack explained that each vendor "will have made an assumption as to the level

of participant-directed transfers of existing non-mappable account balances from TIAA."

(Meagher Trial Testimony, Tr. 319:22-320:17; Rezler Decl. ¶ 16; PX0133-PX0134 (October 27,

2009 e-mail to Meagher with Cammack's RFP Analysis, at CLC0022543)).  For instance, Great

West proposed a fee of 13 bps, assuming no participant directed transfers from participants with

individual annuity contracts.  (PX0133-PX0134 (October 27, 2009 e-mail to Meagher with

Cammack's RFP Analysis, at CLC0022541)).  With that same proviso, Fidelity proposed 18 bps,

Diversified proposed 15 bps, and Vanguard proposed 17 bps.  (Rezler Decl. ¶ 26; PX0133-PX0134 (October 27, 2009 e-mail to Meagher with Cammack's RFP Analysis, at CLC0022541)).  Though Fidelity alternatively offered a flat dollar per-participant fee of $85/year, certain services such as employee education and counseling would be offered on a fee for service basis.  (Meagher Decl. ¶ 40, PX0133-PX0134 (October 27, 2009 e-mail to Meagher with Cammack's RFP Analysis, at CLC0022543)).  Cammack thus advised the Committee that "TIAA's pricing was more competitive than any of the other proposals."  (PX0477 (January 10, 2011 Meeting Minutes of the Committee, at NYU0003674)).

84.      As part of the vendor selection process, the Committee considered the Committee's ability to direct or map investments held in the individual annuity contracts between the plan participants and TIAA.  (Meagher Decl. ¶¶ 27, 32; Rezler Decl.¶¶ 16, 21, 27; Sanchez Decl. ¶ 27; Dorph Decl. ¶¶ 11-12).  The Committee considered the fact that much of the assets held by TIAA are held in individual annuity contracts between the individual participant and TIAA.  (Meagher Decl. ¶¶ 27, 32; Rezler Decl. ¶ 27; Sanchez Decl. ¶ 27; DX560 (March 18, 2010 Meeting Minutes of the Committee (mistakenly marked March 18, 2009), at NYU0002874)).  Accordingly, the Committee appropriately considered the fact that much of the Plans' assets were held in investments that were not mappable by NYU; meaning, NYU could not, independent of the participants' consent, direct the investment of those accounts to other investment alternatives.  (Meagher Decl. ¶¶ 32-33; Rezler Decl.¶¶ 16, 21, 27; Sanchez Decl. ¶ 27; Dorph Decl. ¶¶ 11-12; Rezler Trial Testimony, Tr. at 1232:17-19; DX560 (March 18, 2010 Meeting Minutes of the Committee (mistakenly marked March 18, 2009), at NYU0002874); Meagher Trial Testimony, Tr. at   340:20-341:9, 341:24-344:16).

- 34 -

85.     As part of the selection process and in addition to reviewing the RFP responses, the Committee also considered the various interests of the Plans' respective participants. (Meagher Decl. ¶¶ 30-42; Rezler Decl. ¶¶ 33, 36; Sanchez Decl. ¶ 28; Dorph Decl. ¶ 13; PX1040-1044 (January 10, 2011 e-mail to the Retirement Committee with meeting materials, including January 2011 Retirement Plan Vendor Consolidation presentation, at CLC0025256); Meagher Trial Testimony, Tr. at 152:8-16, 152:24-153:3, 159:16-25, 160:7-14, 319:22-320:17). The Committee considered and discussed the varying interests of the constituencies of the NYU Faculty Plan and the School of Medicine Faculty Plan, including the disruption that would occur with a consolidation of vendors.  (Rezler Decl. ¶¶ 28, 33, 36; PX0480 (April 19, 2010 Meeting Minutes of the Committee, at NYU0004041);  PX0460 March 21, 2011 Meeting Minutes of the Committee, at NYU0002100-01) Meagher Trial Testimony, Tr. at 160:7-14).

86.     Moreover, the Committee considered the fact that the other recordkeepers could not recordkeep TIAA's annuity investments.  (Meagher Decl. ¶ 29; Rezler Decl. ¶ 16; Dorph Decl. ¶¶ 11-12; PX0494 (January 21, 2010 Meeting Minutes of the Committee, at NYU0006123-24) Meagher Trial Testimony, Tr. at 323:8-13).  Accordingly, if either Fidelity or Vanguard, for instance, were selected to be a sole recordkeeper for the Plans, TIAA would still recordkeep the TIAA annuities.  (Meagher Decl. ¶¶ 29-33; Rezler Decl. ¶ 27; Dorph Decl. ¶¶ 11-12; PX0494 (January 21, 2010 Meeting Minutes of the Committee, at NYU0006123; PX0460 (March 21, 2011 Meeting Minutes of the Committee at NYU0002100) Meagher Trial Testimony, Tr. at 341:21-344:16).

87.     Fidelity and TIAA were the two finalists, and both Fidelity and TIAA were invited to attend Committee meetings to present to the Committee and address the Committee's questions and concerns.  (Rezler Decl. ¶ 35; Meagher Decl. ¶¶ 35-36; Dorph Decl. ¶ 12; PX0494

(January 21, 2010 Meeting Minutes of the Committee, at NYU0006123-24); PX0553 (February 18, 2010 Meeting Minutes of the Committee, at NYU0084725-28)).

88.    Fidelity presented twice to the Committee and the Committee requested information to better understand Fidelity's system and technology.  (Meagher Decl. ¶¶ 35-36; Rezler Decl. ¶ 35; Sanchez Decl. ¶ 30; Dorph Decl. ¶ 12; PX0494 (January 21, 2010 Meeting Minutes of the Committee, at NYU0006123)).  Additionally, TIAA presented the Committee with an "in-depth look at website capabilities and a timeline of scheduling web enhancements" at the February 18, 2010 meeting, and provided answers to a series of follow-up questions, which were discussed extensively by the Committee at the March 18, 2010 meeting.  (Meagher Decl. ¶¶ 35-36; Rezler Decl. ¶ 35; Sanchez Decl. ¶¶ 30-31; PX0460 (March 21, 2011 Meeting Minutes of the Committee, at NYU0002100-01)).

89.    The Committee formally approved TIAA as the service provider for the School of Medicine Faculty Plan at its April 2011 meeting.  (DX884 (Declaration of Tina Surh "Surh Decl." ¶ 41); Meagher Decl. ¶ 37; Rezler Decl. ¶ 35; Sanchez Decl. ¶ 32; Dorph Decl. ¶ 14; PX0481 (April 1, 2011 Meeting Minutes of the Committee, at NYU0004047)).  Prior to this time, the Committee was still vetting TIAA and negotiating its pricing offer.  (Chittenden Decl. ¶ 73; Rezler Decl. ¶¶ 32-35; Sanchez Decl. ¶ 33).[48]  During this same time, the Retirement

---

[48] PX0480 (April 19, 2010 Meeting Minutes of the Committee, at NYU0004040 ("CLC provided follow-up information including answers to some additional questions posed to TIAA-CREF, a summary of the RFP process and next steps, and the advantages of consolidating to a single vendor.")); DX562 (June 14, 2010 Meeting Minutes of the Committee, at NYU0002881 ("The Committee requested additional materials from CLC in order to make a final decision regarding vendor consolidation.")); PX0463 (September 23, 2010 Meeting Minutes of the Committee, at NYU0002389 ("The remainder of the discussion focused on the advantages of consolidating a single provider arrangement . . . .")); PX0477 (January 10, 2011 Meeting Minutes of the Committee, at NYU0003674 (discussing TIAA's revised pricing offer)); PX0460 March 21, 2011 Meeting Minutes of the Committee, at NYU0002099 (discussing TIAA's revised pricing offer)).

Committee worked with its lawyers to assess whether they should institute a brokerage window with the move to TIAA as a sole recordkeeper.  (Sanchez Decl. ¶ 34; Surh Decl. ¶ 42).[49] Moreover, TIAA had reported to the Retirement Committee in early 2010 that its data aggregator services from other websites (scraping abilities) and other participant web enhancements would not be completed until the end of 2010.  (Surh Decl. ¶ 36; Sanchez Decl. ¶ 35).[50]

90.     TIAA was to fulfill numerous duties above and beyond ordinary recordkeeping services, including administrative duties such as ensuring compliance and providing investment education and advice to participants.  (Rezler Decl. ¶ 29; Chittenden Decl. ¶¶ 84-109; Wagner Revised Decl. ¶¶ 5, 6 (incorporating ¶ 43); DX532 (October 1, 2012 TIAA-CREF Recordkeeping Services Agreement (School of Medicine Faculty Plan) (Schedule A))).

91.     The Committee ultimately determined that, although the change would be difficult and time-consuming to implement, it would consolidate services for the School of Medicine Faculty Plan in part because the School of Medicine had the necessary technological and systems capability to implement and benefit from this change, but also because the Plans have "different constituent needs, and, therefore, the results of consolidation to a sole vendor would be more beneficial" for the School of Medicine Faculty Plan.  (Meagher Decl. ¶ 42;

---

[49] *See* PX0463 (September 23, 2010 Meeting Minutes of the Committee, at NYU0002388 (noting the need to get a "legal opinion regarding the possible establishment of a brokerage window")); PX0485 (November 2, 2010 Meeting Minutes of the Committee, at NYU0005075 (analyzing use of a brokerage window)); PX0477 (January 10, 2011 Meeting Minutes of the Committee, NYU0003674, at NYU0003676 (discussing possible use of brokerage window)); PX1040-PX1044 (January 10, 2011 e-mail to the Retirement Committee with meeting materials, including January 2011 Retirement Plan Vendor Consolidation presentation, at CLC0025257; ECF No. 283-1, Woodruff Dep. Designation 345:14-349:24.

[50] *See* DX400 (January 15, 2010 TIAA-CREF Response to Follow Up Questions, CLC0019135, at CLC0019138); PX0147, PX0150 (January 29, 2010 Email from Rezler to NYU re: Follow-up for TIAA-CREF, CLC0023345, at CLC0023346); PX0773 (February 11, 2010 TIAA-CREF Response to Additional Questions for NYU, TIAA_NYU_00028444, at TIAA_NYU_00028445); DX560 (March 18, 2010 Meeting Minutes of the Committee, at NYU0002873).

- 37 -

Rezler Decl.¶ 36; Dorph Decl. ¶ 14; Dorph Trial Testimony, Tr. at 1364:4-1365:7, Meagher Trial

Testimony, Tr. at 311:4-18, 331:8-334:14; PX0460 (March 21, 2011 Meeting Minutes of the

Committee, at NYU0002100-01); PX0375 (June 9, 2011 Meeting Minutes of the Committee, at

CLC0039007)).

92.    Cammack concluded that NYU went through "a due diligence exercise to provide

participants with a *low cost and competitive* plan." (Sanchez Decl. ¶ 38; DX560 (March 18,

2010 Meeting Minutes of the Committee (mistakenly marked March 18, 2009), at NYU0002875)

(emphasis added)).

93.    The Committee believed that consolidation to one vendor for the NYU Faculty

Plan was particularly likely to result in substantial participant disruption, making it beneficial to

delay consolidation to provide time to ensure that the necessary time, attention and care could be

given to the project. (Meagher Decl. ¶¶ 32, 42; Rezler Decl. ¶¶ 36, 47-48; Dorph Decl. ¶ 14

Meagher Trial Testimony, Tr. at 164:15-165:13, 311:4-18). At the time, NYU Washington

Square was beginning the complex process of updating multiple computer systems and programs

at the University, including updating and modernizing all of NYU's systems for payroll, finance,

student records and human resources systems. (Dorph Decl. ¶ 15; Dorph Trial Testimony, Tr. at

1319:3-17). The planning for this process began in 2008 and NYU subsequently undertook a

series of major system implementation projects that were completed in 2015. (Dorph Decl. ¶

15). NYU concluded that until these updates were completed, it would not be possible to make

any significant changes to the NYU Faculty Plan because a change in recordkeepers for that plan

would entail significant coordination with and changes to NYU's payroll and human resources

systems and additional staff time and effort. (Dorph Decl. ¶ 15; Meagher Decl. ¶¶ 22, 38; Petti

Decl. ¶ 36; Dorph Trial Testimony, Tr. at 1314:20-1315:2). NYU believed these changes could

not be completed without risk of significant errors or additional changes prior to completion of this global update of NYU's systems and technology.  (Dorph Decl. ¶ 15; Meagher Decl. ¶¶ 22, 38; Petti Decl. ¶ 36; Dorph Trial Testimony, Tr. at 1364:4-1365:7).

94.     These factors were considered because consolidation to one recordkeeper is a complex and time-consuming process.  (Meagher Decl. ¶ 42; Dorph Decl. ¶ 18; Petti Decl. ¶¶ 25-28 Meagher Trial Testimony, Tr. at 331:8-334:14).  Consolidation requires significant planning and a long and detailed implementation process which requires significant coordination of vendors and the plan sponsor, and a detailed implementation plan that includes drafting detailed notices and communications to participants, negotiation of legal agreements, disruption of plan operations as a result of the need to temporarily freeze contributions, distributions, loans, changes in investment elections, a blackout period with applicable notices to participants, fund mapping (to the extent that is possible), reconfiguration of existing support systems, default investment processes and multistage communication to plan participants, all with appropriate review and auditing of implementation.  (Meagher Decl. ¶ 42; Dorph Decl. ¶ 18; Petti Decl. ¶¶ 25-28).  This is in addition to any systems reconfiguration that has to be made and tested for new or changing file interfaces.  (Meagher Decl. ¶ 42; Dorph Decl. ¶ 18; Petti Decl. ¶¶ 25-28).  A move to consolidate retirement plan vendors requires a substantial amount of organizational resources in technology, time, personnel and money.  (Meagher Decl. ¶ 42; Dorph Decl. ¶ 18; Petti Decl. ¶¶ 25-28; Meagher Trial Testimony, Tr. at 311:4-18).

95.     After considering conducting an RFP in 2015 and early 2016, the Committee conducted a second RFP in 2016, again with the assistance of Cammack.  (Rezler Decl. ¶ 47; Halley Decl. ¶¶ 29, 38; Petti Decl. ¶¶ 64-74; DX042 (October 2016 RFP for Defined Contribution Recordkeeping Services, at CLC0056516-43)).  The 2016 RFP sought "proposals

for third party recordkeeping services for [NYU Square's] six defined contribution retirement plans," including the NYU Faculty Plan.  DX042 (October 2016 RFP for Defined Contribution Recordkeeping Services, at CLC0056519)).

96.     The Committee chose to wait until 2016 for the second RFP for a number of reasons:

- The Committee considered the likelihood of a successful project, considering the resources that would be necessary to ensure the consolidation is complete with the least disruption possible to participants.  (Halley Decl. ¶ 35).

- The Committee thought it best to stage the implementations of the move to a single recordkeeper.  (Rezler Decl. ¶ 48; Surh Decl.¶ 39; Petti Decl. ¶ 36; Dorph Decl. ¶¶ 14-18; Dorph Trial Testimony, Tr. at 1364:4-1365:7).

- NYU was in the process of updating and modernizing all of its systems for payroll, finance, student records and human resources.  (Dorph Decl. ¶¶ 14-18).

- NYU's process of implementing a new payroll application was expected to take 18 months to 2 years, and was considered a "massive" undertaking, impinging NYU's ability to implement a change in recordkeepers for the NYU Faculty Plan at the same time.  (Dorph Decl. ¶ 15; Meagher Decl. ¶¶ 22, 38; Petti Decl. ¶¶ 32, 36; Halley Decl. ¶ 35).

- In May of 2013, there was a vote of no confidence by NYU faculty in NYU President John Sexton, resulting in a "period of disruption."  (Petti Decl. ¶ 36).

- In 2014, NYU incorporated  the NYU Polytechnic school into NYU, which was completed in September 2014.  (Petti Decl. ¶ 36; Halley Decl. ¶ 35; Petti Trial Testimony, Tr. at 542:1-16).

- The Committee was concerned about the NYU Faculty Plan's participant disruption about which Cammack had warned.  (Surh Decl. ¶ 39; Petti Decl. ¶¶ 32, 36; Dorph Decl. ¶¶ 16-18).  Which is why, in 2017, in assessing the vendors' responses to the RFP, NYU held a meeting that included faculty representatives at which Vanguard and TIAA presented their proposals on consolidation.  (Halley Decl. ¶ 34; Petti Decl. ¶ 36).

97.     The RFP was conducted to "[e]nsure optimal pricing and full service delivery from the selected service provider" and "[i]ncrease participant engagement and financial education, as well as improve the overall user experience for NYU faculty and staff," among other goals.  (Halley Decl. ¶ 41; Rezler Decl. ¶ 49; Petti Trial Testimony, Tr. at 513:6-13; DX042 (October 2016 RFP for Defined Contribution Recordkeeping Services, at

- 40 -

CLC0056519)).  The RFP sought information regarding each potential vendor's operations, products and investments, services offered in relation to participant experience, administration and recordkeeping, compliance, expenses, and service capabilities, in addition to requesting a list of references.  (Rezler Decl. ¶ 49; Halley Decl. ¶ 45; DX042 (October 2016 RFP for Defined Contribution Recordkeeping Services, at CLC0056516-43)).

98.     The Committee sent the RFP to a number of different vendors, including Fidelity, VALIC, and VOYA, in addition to incumbents TIAA and Vanguard.  (Rezler Decl. ¶ 50; Halley Decl. ¶ 42; Petti Decl. ¶ 68; PX0520 (September 8, 2016 Meeting Minutes of the Committee, at NYU0026304); DX404 (Cammack Summary of Responses to 2016 RFP, at CLC0058919)).  Fidelity declined to bid, citing a concern that the contracts were participant-controlled, and participants would likely retain their TIAA investments.  (Rezler Decl. ¶ 50; Halley Decl. ¶ 42; Petti Decl. ¶ 68; PX0519 (December 12, 2016 Meeting Minutes of the Committee, at NYU0026298)).

99.     The Committee reviewed, analyzed and compared the responses received from the four vendors.  (Rezler Decl. ¶ 51; Halley Decl. ¶ 43; Petti Decl. ¶ 69).  Cammack crafted a detailed presentation analyzing and comparing the four responses to the RFPs with respect to key criteria for NYU.  (Rezler Decl. ¶ 51; Halley Decl. ¶ 44; Petti Decl. ¶ 69; DX404 (Cammack Summary of Responses to 2016 RFP, at CLC0058915-48)).

100.    TIAA and Vanguard were selected as finalists and vendor finalist meetings were held on February 1, 2017.  (Rezler Decl. ¶ 51; Halley Decl. ¶ 45; Petti Decl. ¶ 72; PX1366 (February 23, 2017 Meeting Minutes of the Committee, at CLC0063888)).  The Committee requested that Cammack provide a "follow-up analysis illustrating the impact on the plan and its participants of the selection of one vendor over the other" after the finalist meetings were held.

- 41 -

(Halley Decl. ¶ 45; Petti Decl. ¶ 72; PX1366 (February 23, 2017 Meeting Minutes of the Committee, at CLC0063888)). TIAA was ultimately selected to be the sole recordkeeper for the NYU Faculty Plan. (Halley Decl. ¶ 45; Petti Decl. ¶ 72; PX1366 (February 23, 2017 Meeting Minutes of the Committee, at CLC0063888)).

101.    NYU has a shared governance model of representation, consultation, and communication. (Halley Decl. ¶ 34; Dorph Decl. ¶¶ 14-18). Consistent with that culture, it was important that the benefits committee of the Faculty and Administrators' Senators Councils be included in the process of transitioning to a single recordkeeper. (Halley Decl. ¶ 34; Dorph Decl. ¶¶ 14-18). The councils were represented at the single recordkeeper finalist meetings and provided their input based on those meetings and the shared RFP responses furnished by the finalists. (Halley Decl. ¶ 34; PX1451-PX1452; Rezler Decl. ¶ 55).

102.    The Committee also discussed the various contracts offered by TIAA, and whether a plan sponsor can direct or "map" investments from one investment alternative to another. (Halley Decl. ¶¶ 29, 39). The contracts that provide that the plan sponsor can map a participants' investments—the RC and the RCP contracts—have different terms than the contracts in place at NYU—the RA, SRA and GRA contracts. (Halley Decl. ¶ 29; Chittenden Trial Testimony, Tr. 591:2-15, 664:12-23). Accordingly, although the Committee considered the potential advantages and potential disadvantages that could come with moving to RC and RCP contracts, the Committee decided to not move to those contracts as part of the most recent RFP conducted in 2016. (Halley Decl. ¶ 29; Petti Trial Testimony, Tr. at 520:15-521:7).

103.    The Committee also considered the fact that a significant amount of the NYU Faculty Plan's assets are held in individual annuity and variable annuity contracts between the participants and TIAA. (Halley Decl. ¶ 39). As such, the Committee considered the fact that

NYU cannot make participants move their investments in the TIAA Traditional Annuity, the CREF Stock Account or the TIAA Real Estate Account to any other investment alternatives. (Halley Decl. ¶ 39).

104.    In addition, the Committee considered the fact that other vendors would not recordkeep TIAA annuities on their own platforms, and therefore as a practical matter TIAA would continue to provide recordkeeping for TIAA annuity products.  (Halley Decl. ¶ 41; Chittenden Trial Testimony, Tr. at 595:24-596:10).

105.    Marcia Wagner, a well-recognized employee benefits attorney with over 30 years of experience advising plan sponsors, fiduciaries, and service providers, reviewed the Committee's process and decisions and rendered a detailed opinion that concluded that:

> Based on the forgoing analysis and my extensive experience in counseling 403(b) and 401(k) fiduciaries responsible for selecting plan menus and hiring plan service providers with respect to their fiduciary duties, I conclude without reservation that during the class period, the NYU Retirement Committee followed procedures that were prudent and fully consistent with its fiduciary duties under ERISA with respect to its decision to retain TIAA as the recordkeeper for the Faculty and Medical Plans and with respect to the related fees paid as compensation for these services.

(Wagner Revised Decl. ¶¶ 2, 5, 6 (incorporating ¶ 109)).

106.    Ms. Wagner has extensive experience counseling fiduciaries of 403(b) and 401(k) plans and has extensive experience in dealings with all of the government agencies that govern ERISA plans.  (Wagner Revised Decl. ¶ 2).  She has served as an independent fiduciary for numerous employee benefit plans, has been retained to serve as an expert for both plaintiffs and defendants in cases involving questions of compliance with ERISA's fiduciary duties, and was appointed by the Secretary of the Treasury to serve on the IRS's Advisory Committee on Tax-Exempt and Government Entities.  (Wagner Revised Decl. ¶¶ 1-2).

### D.     NYU Negotiated Significant Reductions in Administrative Fees.

107.    As noted above, NYU and the Plans' participants do not pay direct fees to TIAA
or Vanguard for the services, including recordkeeping services, they provide to the Plans.
(Rezler Decl. ¶¶ 23, 83-85).  Rather, fees are collected through the process of revenue sharing,
which is common across the defined contribution retirement plan world, including with 403(b)
plans.  (Rezler Decl. ¶¶ 23-24; Wagner Revised Decl. ¶ 6 (incorporating ¶ 92)DX812 (Wagner
Expert Report ¶ 92); Halley Decl. ¶ 24).

108.    In fact, in 2010, Cammack advised the Committee that pricing administrative
services through a revenue sharing arrangement was typical in that "the retirement market has
transitioned to this type of pricing scenario and there should not be any concerns with the pricing
scenario" on a revenue sharing arrangement.  (Meagher Decl. ¶ 13; DX560 (March 18, 2010
Meeting Minutes of the Committee (mistakenly marked March 18, 2009), at NYU0002875); *see
also* Rezler Decl. ¶¶ 23-24).

109.    In a revenue sharing arrangement, a portion of a fund's fees, expressed as a
percentage of a fund's assets known as the expense ratio, are transferred to the recordkeeper in
order to contribute to the cost of administrative services.  (Rezler Decl. ¶¶ 23-24; Halley Decl. ¶
24).  The TIAA investment alternatives in the Plans have revenue sharing arrangements with
TIAA, and the Vanguard alternatives have revenue sharing arrangements with Vanguard.[51]

---

[51] Vanguard had historically operated differently than TIAA and many other firms in the
retirement industry.  (Rezler Decl. ¶25).  Vanguard's funds do not technically provide for any
revenue sharing, nor had Vanguard defined its required revenue rate to provide recordkeeping
services to the Plans.  (Rezler Decl. ¶25).  Rather, Vanguard's historical practice had been to
agree that if the plans for which Vanguard was providing recordkeeping services made available
to participants Vanguard's "Investor class" investment funds, then the management expense
ratios charged by those funds would be sufficient for Vanguard both to operate the funds and to
provide recordkeeping services for the client.  (Rezler Decl. ¶25).  The portion of such
management fees used by Vanguard to cover its cost of providing recordkeeping services is
commonly referred to as "recordkeeping offsets."  (Rezler Decl. ¶25).

- 44 -

(Rezler Decl. ¶¶ 33, 85; PX0553 (February 18, 2010 Meeting Minutes of the Committee, at NYU0084727); DX560 (March 18, 2010 Meeting Minutes of the Committee (mistakenly marked March 18, 2009), at NYU0002875); DX562 (June 14, 2010 Meeting Minutes of the Committee, at NYU0002882).

110.     From the time the 2009 RFP responses were received until the NYU Langone Group moved to a single-vendor model in 2012 and the NYU Washington Square Group began to reconsider a move to a single-vendor model in 2016, Cammack and the Committee continued discussing the advantages and disadvantages of a single-vendor program.  (Rezler Decl. ¶ 32; PX1309; Petti Trial Testimony, Tr. at 514:6-24).  These discussions focused on the participant experience, as well as service fees, investment alternatives and investment performance.  (Rezler Decl. ¶ 32; Meagher Trial Testimony, Tr. 160:7-14 310:1-311:3, 312:5-313:1).

111.     The Committee negotiated significant reductions to TIAA's required revenue rate, the amount of revenue sharing that TIAA would retain to provide services to the Plans, for both Plans, "to provide participants with a low cost and competitive plan."  (Rezler Decl. ¶¶ 33-34; Halley Decl. ¶ 25; Petti Trial Testimony, Tr. at 495:24-496:1, 539:8-20; *see, e.g.*, DX560 (March 18, 2010 Meeting Minutes of the Committee (mistakenly marked March 18, 2009), at NYU0002875)).

112.     From 2008 to 2011, TIAA collected approximately 19.9 basis points from both Plans to pay for the Plans' administrative services.  (Chittenden Decl. ¶¶ 74, 76; Rezler Decl. ¶ 27;  PX0477 (January 10, 2011 Meeting Minutes of the Committee, at NYU0003674); DX529 (July 9, 2012 Amendment No. 3 to TIAA-CREF Recordkeeping Services Agreement (NYU Faculty Plan), at NYU0000241)).  Initially, as part of its first response to the 2009 RFP, TIAA offered to reduce that rate to 15 basis points, but that offer was contingent on two important

- 45 -

requirements:  (1) TIAA would become the sole recordkeeper for all Plans across the NYU

system (including the Plans at issue and over a dozen more); and (2) the 15 basis points required

revenue would apply only to new investments on a new menu under new group contracts.

(Chittenden Decl. ¶ 72; Meagher Decl. ¶ 57; Rezler Decl. ¶ 26; DX021 (September 2009 TIAA

Response to Request for Proposal Submission, at TIAA_NYU_00031579-31980)).  Instead of

accepting the 15 bps offer and its conditions, the Committee continued to negotiate a decreased

price with TIAA.  (Meagher Decl. ¶ 59; Rezler Decl. ¶¶ 32-34; DX560 (March 18, 2010 Meeting

Minutes of the Committee (mistakenly marked March 18, 2009), at NYU0002875)).  As a result,

the investments in individual agreements held by participants would remain at 19.9 basis points

for the time being.  (Meagher Decl. ¶ 58; DX021 (September 2009 TIAA Response to Request

for Proposal Submission, at TIAA_NYU_00031579-31980); DX560 (March 18, 2010 Meeting

Minutes of the Committee (mistakenly marked March 18, 2009), at NYU0002875); PX0477

(January 10, 2011 Meeting Minutes of the Committee, at NYU0003674)).

113.    The Committee questioned whether this "original proposal from TIAA was truly

competitive, as it did not factor in the current revenue and the future revenue TIAA would

receive under the existing contracts."  (PX0477 (January 10, 2011 Meeting Minutes of the

Committee, at NYU0003674)).  Cammack advised that TIAA's pricing in response to the RFP

was "more competitive than any of the other proposals."  (Meagher Decl. ¶ 13; PX0477 (January

10, 2011 Meeting Minutes of the Committee, at NYU0003674)).

114.    Nevertheless, the Committee rejected TIAA's first offer, and TIAA countered

with an offer of 10 basis points, again with the same conditions that TIAA become sole

recordkeeper for the entire system and that the limited revenue requirement apply only to new

investments.  (Meagher Decl. ¶¶ 58-62; DX560 (March 18, 2010 Meeting Minutes of the Committee (mistakenly marked March 18, 2009), at NYU0002875)).

115.     The Committee also rejected this offer, and TIAA countered with an offer of 13.8 basis points on all plans and all contracts and the condition that any revenue received in excess of the 13.8 basis points would be funded to an expense reimbursement account to be returned to participants.  (Rezler Decl. ¶ 33; Meagher Decl. ¶ 64; PX0477 (January 10, 2011 Meeting Minutes of the Committee, at NYU0003674)).

116.     Although TIAA's offer was originally conditioned upon NYU agreeing to consolidate the NYU Faculty Plan's and the School of Medicine Faculty Plan's services with TIAA, the Committee convinced TIAA to agree to a 13.8 required revenue rate for the NYU Faculty Plan, despite NYU not agreeing to have TIAA serve as the sole recordkeeper for all of NYU's plans.  (Chittenden Decl. ¶¶ 74, 76; Petti Decl. ¶ 42; Rezler Decl. ¶ 33; Meagher Decl. ¶¶ 58-59; PX0460 (March 21, 2011 Meeting Minutes of the Committee, at NY0002099)). Moreover, TIAA agreed to apply the 13.8 basis points for the NYU Faculty Plan retroactively to 2011 in the form of a revenue credit.  (Chittenden Decl. ¶¶ 74-75; Meagher Decl. ¶¶ 58-64; Rezler Decl. ¶ 33; Petti Decl. ¶ 42).[52]

117.     The Committee also negotiated a retroactive reduction in TIAA's administrative fees for the School of Medicine Faculty Plan; specifically, in 2012, the Committee negotiated a

---

[52] *See* PX0711 (TIAA 2014 Service Provider Summary for NYU Square, at TIAA_NYU_00003139 (showing a revenue credit of $928,377.00)); PX0477 (January 10, 2011 Meeting Minutes of the Committee, at NYU0003674 ("Total fund revenue received in excess of 13.8 bps will be funded by TIAA to an expense reimbursement account which NYU expects to return to plan participants.")); DX529 (July 9, 2012 Amendment No. 3 to TIAA-CREF Recordkeeping Services Agreement (Faculty Plan), at NYU0000241, ¶1.16. (explaining that TIAA will "reconcile the actual revenue earned for the 2011 calendar year against the revenue requirement of 13.8 basis points" and that any excess "will be deposited into the Revenue Credit Accounts of the Plans as soon as administratively feasible but no later than sixty (60) days after this Agreement has been signed by both parties")).

retroactive revenue credit of $371,874.00 for 2011 for the School of Medicine Faculty Plan, which effectively reduced TIAA's required revenue rate for 2011 to below 16 basis points. (Meagher Decl. ¶¶ 58-64; Petti Decl. ¶ 43; DX849 (New York University and NYU Langone Medical Center:  2012 Update on the Establishment of the Revenue Credit Accounts, at NYU0027004); PX0747 (NYU School of Medicine Investment Fee & Expense Disclosure, 2011, at TIAA_NYU_00015726); PX0748 (NYU School of Medicine Service Provider Summary 2011, at TIAA_NYU_00015750); PX0749 (NYU School of Medicine Summary of Fees and Compensation for Your Plan, 2011, at TIAA_NYU_00015756)).

118.    In addition, TIAA agreed that, upon consolidation of the School of Medicine Faculty Plan with TIAA as sole recordkeeper, TIAA would reduce its required return rate to 10 basis points for that plan.  (Chittenden Decl. ¶ 74; Rezler Decl. ¶ 37; Meagher Decl. ¶¶ 58-64; DX532 (October 1, 2012 TIAA-CREF Recordkeeping Services Agreement (School of Medicine Faculty Plan), Schedule A ¶ 16, at NYU0000578-79)).  Specifically, in 2012, the required revenue rate was negotiated down to 16 basis points and was then further negotiated down to 10 basis points for the School of Medicine Faculty Plan when TIAA became the sole recordkeeper. (Chittenden Decl. ¶ 74; Rezler Decl. ¶ 37; Meagher Decl. ¶ 61; DX532 (October 1, 2012 TIAA-CREF Recordkeeping Services Agreement (School of Medicine Faculty Plan), Schedule A ¶ 16, at NYU0000578-79)).

119.    The Committee continued to negotiate down the required revenue rate over the class period.  (Halley Decl. ¶ 25; Petti Decl. ¶¶ 42-46; Petti Trial Testimony, Tr. at 539:8-20; Sanchez Trial Testimony, Tr. at 392:14:23; Surh Trial Testimony, Tr. at 1146:1-6; Rezler Trial Testimony, Tr. at 1249:11-19).  In 2014, the pricing for the School of Medicine Faculty Plan was reduced to 9 basis points.  (Chittenden Decl. ¶ 77; Halley Decl. ¶ 25 Rezler Trial Testimony, Tr.

at 1249:11-19; PX0484 (September 15, 2015 Meeting Minutes of the Committee, at NYU0005069) ("It was noted that the current pricing, 9 basis points (0.09%), has been in place since January 2014 when a 1bps reduction was implemented.")).

120.    And, in March 2017, the five-year recordkeeping services agreement between TIAA and NYU expired, at which time the required revenue rate for the School of Medicine Faculty Plan was renegotiated to 4 basis points.  (Chittenden Decl. ¶ 83; PX0458 (November 25, 2013 Meeting Minutes of the Committee, at NYU0002093); PX1366 (February 23, 2017 Meeting Minutes of the Committee, at CLC0063888)).  The reduced revenue rate of 4 basis points was applied retroactively starting January 1, 2017.  (Chittenden Decl. ¶ 83; PX1366 (February 23, 2017 Meeting Minutes of the Committee, at CLC0063888)).

121.    Likewise, in 2012, TIAA's pricing for the NYU Faculty Plan was reduced to 13.8 basis points retroactive to 2011.  (Chittenden Decl. ¶ 76; DX529 (July 9, 2012 Amendment No. 3 to TIAA-CREF Recordkeeping Services Agreement (NYU Faculty Plan), at NYU0000241)). The pricing remained the same until 2016, when the Committee negotiated another reduction in TIAA's required revenue rate for the NYU Faculty Plan to 10 basis points effective January 1, 2016.  (Petti Decl. ¶¶ 44, 47; Chittenden Decl. ¶ 78; Halley Decl. ¶ 25; PX0484 (September 15, 2015 Meeting Minutes of the Committee, at NYU0005070); PX1303 (June 9, 2015 Meeting Minutes of the Committee, at CLC0048249)).

122.    TIAA's required revenue rate was again reduced on March 1, 2017 to 3.2 basis points.  (Chittenden Decl. ¶ 82; Halley Decl. ¶ 47; PX1366 (February 23, 2017 Meeting Minutes of the Committee, at CLC0063888)).

123.    As part of the negotiation and the 2016 RFP, the Committee also negotiated additional reductions in TIAA's required revenue for the NYU Faculty Plan and the School of

- 49 -

Medicine Faculty Plan. (Halley Decl. ¶ 46; Petti Trial Testimony, Tr. at 539:8-20). To date, the Committee, assisted by Cammack, has negotiated a reduction in the required revenue rate for the NYU Faculty Plan to 3.0 (from 10 basis points) basis points, effective May 1, 2018, and a reduction in the required revenue rate for the School of Medicine Faculty Plan to 4.0 (from 9 basis points) basis points. (Halley Decl. ¶ 46).

124.    Additionally, NYU, assisted by Cammack, conducted an audit of the Plans' vendors' services and fees in 2012, and subsequently committed to conducting semi-annual audits of plan expenses. (Petti Decl. ¶¶ 3, 33; Rezler Decl. ¶ 57; DX029[53] (February 4, 2013 email from J. Rezler, attaching Cammack's responses to NYU questions and memo drafted by M. Petti, at CLC0036520). NYU determined that TIAA was receiving "revenue in excess of the amount it needed" following the audit. (Petti Decl. ¶ 33; Rezler Decl. ¶ 57; DX029 (February 4, 2013 email from J. Rezler, attaching Cammack's responses to NYU questions and memo drafted by M. Petti, at CLC0036520). As a result, NYU negotiated the payment of revenue sharing credits, which are rebates for any amount of revenue collected in excess of what participants agreed to pay, to be assessed semi-annually. (Halley Decl. ¶ 26). Revenue credits may be "used to pay 'permitted' plan expenses and/or be credited back to participant accounts" or some combination of the two. (Chittenden Decl. ¶ 75; DX029 February 4, 2013 email from J. Rezler, attaching Vendor Expense Reconciliation and Funding of ERISA Expense Accounts slide deck, at CLC0036517). The Committee returns *all* revenue credits received from TIAA directly to the plan participants rather than using any or all of this money to pay plan expenses. (Halley Decl. ¶ 26; Rezler Decl. ¶ 57; DX029 (February 4, 2013 email from J. Rezler, attaching Cammack's

---

[53] DX029 contains necessary, additional pages from PX0363, although these exhibits are listed as duplicates on the list provided to the Court on April 30, 2018. DX029 entered the record without objection by being cited in Mark Petti's declaration.

responses to NYU questions and memo drafted by M. Petti, at CLC0036520); PX0458 (November 25, 2013 Meeting Minutes of the Committee, at NYU0002094); PX1240 (February 26, 2014, Meeting Minutes of the Committee, at CLC0040658); PX0474 (December 16, 2015 Meeting Minutes of the Committee, at NYU0003277).

125.     Indeed, the Committee voted to return all revenue credits— $1,349,375 for NYU Square and $533,943 for the School of Medicine—to plan participants in December 2012.  (Petti Decl. ¶ 45; DX029 (February 4, 2013 email from J. Rezler, attaching Cammack's responses to NYU questions and memo drafted by M. Petti, at CLC0036520); PX0701 (TIAA 2012 Service Provider Summary for NYU Square (TIAA_NYU_00001612)); PX0673 (TIAA 2012 Service Provider Summary for the School of Medicine (TIAA_NYU_00000060)); PX0382 (September 4, 2012 Meeting Minutes of the Committee, at CLC0039030).  Similarly, in 2013, the Committee voted to return all $859,270 of revenue credits from NYU Square and all $470,810 of revenue credits from the School of Medicine to participants.  (Petti Decl. ¶ 45; PX0458 (November 25, 2013 Meeting Minutes of the Committee, at NYU0002094); PX1240 (February 26, 2014, Meeting Minutes of the Committee, at CLC0040658); PX0706 (TIAA 2013 Service Provider Summary for NYU Square (TIAA_NYU_00002345)); PX0677 (TIAA 2013 Service Provider Summary for the School of Medicine (TIAA_NYU_00000074))).

126.     The Committee likewise returned all revenue credits in 2014, 2015 and 2016 to participants—$928,377 in revenue credits from NYU Square and $693,560 in revenue credits from the School of Medicine in 2014[54]; $717,665 in revenue credits from NYU Square and

---

[54] PX0711 (TIAA 2014 Service Provider Summary for NYU Square (TIAA_NYU_00003139)); PX0681 (TIAA 2014 Service Provider Summary for the School of Medicine (TIAA_NYU_00000088)); PX0469 (December 11, 2014 Meeting Minutes of the Committee, at NYU00002782).

- 51 -

$373,700 from the School of Medicine in 2015[55]; and $156,697 in revenue credits from NYU Square in 2016.  (Petti Decl. ¶ 46).[56]

127.    The Committee also continually monitored and negotiated Vanguard's fees. (Halley Decl. ¶ 36; Petti Decl. ¶ 57).  For the NYU Faculty Plan, Vanguard's administrative services fee was 10 basis points in 2011 and 2012.  (Petti Decl. ¶ 57; PX0902 (Vanguard All-in Fee Report as of June 30, 2011, at Vanguard-NYU_0001203-18); PX0457 (Vanguard All-in Fee Disclosure (calculated as of April 30, 2012), at NYU0000396).[57]  This rate was subsequently decreased to 8 basis points as of April 2013.  (Petti Decl. ¶ 57; DX139 (Vanguard All-in Fee Disclosure (calculated as of April 30, 2013), at NYU0000316); PX0456 (Vanguard All-in Fee Disclosure (calculated as of April 30, 2015), at NYU0000286)).  The rate was again reduced to 6 basis points as of June 2016.  (Halley Decl. ¶ 36; Petti Decl. ¶ 57; PX0497 (August 25, 2016 Vanguard All-in Fee Disclosure (calculated as of June 30, 2016), at NYU0007210)).

128.    The School of Medicine Faculty Plan did not pay Vanguard any administrative fees following the consolidation of the plan's services with TIAA.  (Halley Decl. ¶ 36; PX0676 2013 (TIAA Fee Disclosure as of January 1, 2013, at TIAA_NYU_00000069-73) (showing plan expenses as zero for Vanguard funds).

129.    During the putative class period, the School of Medicine Faculty Plan's and the NYU Faculty Plan's administrative services fees decreased substantially.  (Chittenden Decl. ¶¶ 70-84)  From a basis point perspective, TIAA's administrative services fees for the NYU Faculty

---

[55] PX0715 (TIAA 2015 Service Provider Summary for NYU Square (TIAA_NYU_00003985)); PX0685 (TIAA 2015 Service Provider Summary for the School of Medicine (TIAA_NYU_00000112)).

[56] PX0720 (TIAA 2016 Service Provider Summary for NYU Square (TIAA_NYU_00004819)); PX0520 (September 8, 2016 Meeting Minutes of the Committee (NYU0026303)).

[57] Vanguard discloses fees in fee disclosure reports once a year, and the rate of 10 basis points was calculated as of June 30, 2011, and April 30, 2012.  (Petti Decl. ¶57 n.28).

Plan were decreased from 19.9 basis points to 3.0 basis points.  (Chittenden Decl. ¶¶ 70-84; PX1366 (February 23, 2017 Meeting Minutes of the Committee, at CLC0063888)).  TIAA's administrative fees for the School of Medicine Faculty Plan were decreased from 19.9 basis points to 4 basis points.  (Chittenden Decl. ¶¶ 70-84; PX1366 (February 23, 2017 Meeting Minutes of the Committee, at CLC0063888)).  Vanguard's administrative fees for the NYU Faculty Plan also decreased, from 10 basis points to 6 basis points.  (PX0497 (August 25, 2016 Vanguard All-in Fee Disclosure (calculated as of June 30, 2016), at NYU0007210).

130.    The actual amount of administrative fees paid also decreased during the putative class period, despite the fact that the number of the Plans' participants and the Plans' assets increased.  (PX0700 January 1, 2012 to December 31, 2012 TIAA Investment Fee & Expense Disclosure for New York University (TIAA_NYU_00001578-79); PX0718 January 1, 2016 to December 31, 2016 TIAA Investment Fee & Expense Disclosure for New York University (TIAA_NYU_00004772-73); DX048 (2012 NYU Faculty Plan Form 5500); DX003 (2016 NYU Faculty Plan Form 5500)).  In 2012 total administrative fees for the NYU Faculty Plan were $2.88 million.  (PX0700 January 1, 2012 to December 31, 2012 TIAA Investment Fee & Expense Disclosure for New York University (TIAA_NYU_00001578-79)).  In 2016, that total fell to $2.37 million.[58]  (PX0718 January 1, 2016 to December 31, 2016 TIAA Investment Fee & Expense Disclosure for New York University (TIAA_NYU_00004772-73); PX0720 January 1, 2016 to December 31, 2016 TIAA Service Provider Summary for New York University (TIAA_NYU_00004819)).  During this period, assets increased from $1.98 billion to $2.62

---

[58] *See also* PX0497 (Faculty Vanguard 2016 June Fee Disclosure); PX0718 (Faculty TIAA 2016 Investment Fee Expense Disclosure); PX0688 (SOM TIAA 2016 Investment Fee Expense Disclosure).

billion and the number of Plan participants increased from 14,368 to 18,551.  (DX048 (2012 NYU Faculty Plan Form 5500); DX003 (2016 NYU Faculty Plan Form 5500)).

131.    Likewise, the School of Medicine Faculty Plan's total administrative fees fell from $1.56 million in 2013 to $1.48 million in 2016, despite the fact that during that period of time that Plan's assets grew from $1.65 billion to $2.02 billion and the number of Plan participants grew from 7,765 to 8,560.  (PX0676 January 1, 2013 to December 31, 2013 TIAA Investment Fee & Expense Disclosure for School of Medicine (TIAA_NYU_00000069-73); PX0677 January 1, 2013 to December 31, 2013 TIAA Service Provider Summary for School of Medicine (TIAA_NYU_00000074); PX0688 January 1, 2016 to December 31, 2016 TIAA Investment Fee & Expense Disclosure for School of Medicine (TIAA_NYU_00000122-25); DX032 (2013 School of Medicine Faculty Plan Form 5500); DX004 (2016 School of Medicine Faculty Plan Form 5500)).

132.    The Committee also considered the potential of paying for recordkeeping services on a flat per-participant basis.  (Halley Decl. ¶ 37; Sanchez Trial Testimony, Tr. at 401:9-19). The Committee's discussions included consideration of a number of issues related to paying for services on a flat per-participant basis, including whether the Committee thought the arrangement would be fair, given that a participant with a large account balance might pay the same as a participant with a relatively small account balance.  (Halley Decl. ¶ 37).  The Committee also inquired as to whether TIAA could charge for recordkeeping services on a flat per-participant fee basis.  (Halley Decl. ¶ 37).  TIAA explained, however, that flat dollar fees cannot be assets against the TIAA and CREF annuity account balances in the Plans.  (Halley Decl. ¶¶ 37, 48).

- 54 -

133.     Further, on a per-participant basis, administrative fees for the NYU Faculty Plan were actually *lower* than for the School of Medicine Faculty Plan, in every year following the consolidation of the School of Medicine Faculty Plan with a sole recordkeeper in 2012.  (Wagner Revised Decl. at ¶ 6 (incorporating ¶ 96), ¶ 12 (incorporating ¶ 8)).  On average, in each of the years following the consolidation of the School of Medicine Faculty Plan's recordkeeping, the administrative fees in the NYU Faculty Plan, when analyzed on the per-participant basis which Plaintiffs seem to prefer, were 7%-26% *less* than in the School of Medicine Faculty Plan.  (Wagner Revised Decl. at ¶ 6 (incorporating ¶ 96); DX890A (Revised Declaration of Adel Turki ("Turki Revised Decl.") at ¶ 17 (incorporating ¶ 11, Ex. 1))).

134.     In analyzing the fees negotiated for the NYU Faculty Plan and the School of Medicine Faculty Plan, the Committee discussed not just the amount of fees paid, but also the type, nature and quality of services provided by the Plans' service providers.  (Sanchez Trial Testimony, Tr. at 401:9-19; Halley Decl. ¶ 27; Rezler Decl. ¶ 9).  That included discussions regarding the various types of investments offered to the Plans' participants, the communications provided to the Plans' participants and services that were particularly important to NYU Faculty Plan's participants, including the ability to send customized, targeted communications, access to user-friendly web-based services and mobile apps, as well as one-on-one financial counseling sessions providing education and advice services.  (Halley Decl. ¶ 27).

135.     Although the Committee considered the fees paid for the investments made available in the Plans and considered the fees paid for the services provided to the Plans, including recordkeeping services, it also considered that fees are only one factor to consider when administering a plan that is designed to provide retirement savings.  (Sanchez Trial Testimony, Tr. at 401:9-19; Halley Decl. ¶ 28).  It was, and is, important for the Committee that

- 55 -

the NYU Faculty Plan and the School of Medicine Faculty Plan are designed to provide for the participants during retirement, and, therefore, the Committee considered a number of factors that are important in administering such plans, such as participation rates, asset allocations, communication and participant education.   (Halley Decl. ¶ 28).

136.    As part of the presentation to NYU leadership in May 2015, consideration was given to a Master Administrator option as well as a single record keeper.  (Halley Decl. ¶ 49). Although a Master Administrator arrangement can provide participants with functionality that has the look and the feel of a single recordkeeper, there would still be dual recordkeepers given that NYU could not move individual annuity contracts.  Moreover, Vanguard at the time was not offering Master Administrator services.  (Halley Decl. ¶ 49).  The Committee concluded that, at this point in time, there would not be the same cost savings opportunities with a Master Administrator.  (Halley Decl. ¶ 49).

   E.    **Additional Facts Supporting the Objective Prudence of NYU's Retention of Vendors.**

137.    The majority of TIAA's largest 200 clients use multiple recordkeepers. (Chittenden Decl. ¶ 45).  Of the clients that have consolidated to a sole recordkeeper, the overwhelming majority chose to consolidate with TIAA as their sole recordkeeper.  (Chittenden Decl. ¶ 45).

138.    Similarly, Cammack reviewed its relevant client base and confirmed that, among relevant Cammack clients (403(b) plans with TIAA assets ranging from approximately $900 million to more than $7 billion) in 2011, two of the three relevant clients employed a multiple-recordkeeper arrangement, while in 2016, six of the thirteen employed a multiple recordkeeper arrangement.  (Rezler Decl. ¶ 58).

F.     **Additional Facts Supporting the Objective Prudence of the Plans'**
       **Administrative Fees.**

139.    Cammack has provided "retirement plan consulting and investment advisory
services to a growing number of higher education and health care defined contribution retirement
programs," thirteen of which "included plan assets held on TIAA's recordkeeping platform
ranging from approximately $900 million to more than $7 billion, with an average of $2.3 billion
(the "Comparison Group")."  (Rezler Decl. ¶ 58).  TIAA receives all or a portion of the
recordkeeping fee through revenue sharing, which is common across the defined contribution
retirement world, including with 403(b) plans.  (Rezler Decl. ¶ 23).[59]

140.    In 2011, TIAA's required revenue rates across the Comparison Group ranged
"from a high of 18 bps to a low of 9 bps," and in 2016 ranged from "a high of 12 bps to a low of
5 bps."  (Rezler Decl. ¶¶ 58-59).  Of the Comparison Group, in 2010, the NYU Washington
Square Group had the highest plan assets and was in the second-lowest quartile for fees paid to
TIAA and, in 2016, "NYU Washington Square Group ranked in the third-highest quartile of plan
assets, while its fees paid to TIAA ranked in the second-lowest quartile."  (Rezler Decl. ¶ 59).

141.    Additionally, of the Comparison Group, in 2016, NYU Langone Group ranked in
the second highest quartile of plan assets, and the second lowest quartile of fees paid to TIAA.
(Rezler Decl. ¶ 59).[60]

---

[59] *See also* Heming Dep. Designation 262:4-20, 258:4-12,  258:15-259:2 (explaining that asset-based revenue sharing arrangements are common and that flat per-participant fees are no more transparent than revenue sharing arrangements).

[60] Further, Mr. Rezler's declaration explains that although "the number of record-keepers used by a program is one factor affecting the pricing of record-keeping services, other factors also typically affect pricing, including: (a) the level of average account balances across the plan or program's participant base; (b) the breadth of services being provided by the record-keeper to the program; (c) the actual usage by the plan sponsor and participants of the record-keeper's services; and (d) the level of competition in the record-keeping marketplace."  (Rezler Decl. ¶19).

## V.     NYU'S PROCESS FOR MONITORING THE CREF STOCK ACCOUNT AND THE TIAA REAL ESTATE ACCOUNT.

142.     The Committee exercised a prudent process in monitoring the CREF Stock Account and the TIAA Real Estate Account.  (Surh Decl. ¶ 28; Wagner Revised Decl. ¶ 7; Wagner Trial Testimony 1413:16-20).

143.     The Committee closely monitored the performance of all of the investment alternatives offered in the Plans.  (Surh Trial Testimony, Tr. at 1152:20-1153:2, Meagher Trial Testimony, Tr. at 338:7-339:19; Petti Decl. ¶¶ 17-18; Surh Decl. ¶¶ 11-12; Meagher Decl. ¶ 68; Halley Decl. ¶¶ 13-14).  Although not required under ERISA, the Committee constructed, used, and adopted an Investment Policy Statement ("IPS") and regularly reviewed and updated the terms of the IPS.  (Rezler Decl. ¶ 14; Surh Decl. ¶ 14; Meagher Decl. ¶ 69; Halley Decl. ¶¶ 16-18; Petti Decl. ¶ 22).[61]

---

[61] PX0476 (October 8, 2008 Meeting Minutes of the Committee, at NYU0003672 (Cammack to draft investment policies)); PX0473 (May 15, 2009 Due Diligence Meeting Notes, at NYU0003086 ("NYU will adopt an investment policy to establish guidelines for the maintenance of the investment arrays held under [the Plans]"); DX562 (June 14, 2010 Meeting Minutes of the Retirement Committee, at NYU0002882 (Cammack recommends using working draft of IPS until IPS is finalized and Committee agrees IPS will be reviewed by legal counsel and implemented)); PX0477 (January 10, 2011 Meeting Minutes of the Committee, at NYU0003677 (Committee will adopt an IPS)); PX0460 (March 21, 2011 Meeting Minutes of the Committee, at NYU0002102 (Committee expresses concerns regarding various aspects of the IPS and decides Cammack will provide a "customized and more detailed version to be reviewed by the Committee")); PX0481 (April 1, 2011 Meeting Minutes of the Committee, at NYU0004049 (Committee discusses fund performance in light of IPS draft and discusses final steps for finalizing IPS)); DX436 (Draft IPS distributed at April 1, 2011 Meeting of the Committee, at CLC0026042); PX0375 (June 9, 2011 Meeting Minutes of the Committee, at CLC0039006-07 (Committee approves updated version of IPS as working draft "to be modified ongoing as needed" and discusses fund performance in light of the IPS); PX0321-PX0322 (June 17, 2011 Email re: June 9 Retirement Committee Materials, at CLC0027134 (attaching for the Committee the approved working draft of the IPS); DX569 (August 15, 2011 Meeting Minutes of the Committee, at NYU0004043 ("[Cammack] comment[s] that by adopting an Investment Policy Statement and conducting periodic due diligence reviews. . . the committee is following . . . a sound process" to meet its fiduciary responsibilities)); PX0482 (May 17, 2012 Meeting Minutes of the Committee, at NYU0004057 (Committee discusses potential revisions to the IPS); PX0458 (November 25, 2013 Meeting Minutes of the Committee, at NYU0002093

- 58 -

144.     The IPS documents the Committee's strategy and criteria for evaluating funds, determining what those criteria are, stating how often funds are to be reviewed, and detailing Cammack's responsibilities.  (Rezler Decl. ¶ 14; Surh Decl. ¶¶ 15-16; Meagher Decl. ¶ 69; Halley Decl. ¶ 16).  Cammack advised the Committee that by utilizing an IPS along with "periodic due diligence reviews, the Committee is following a . . . sound process, which aids in meeting its fiduciary duty."  (DX569 (August 15, 2011 Meeting Minutes of the Committee, at NYU0004043)).  As intended, the Committee used the IPS to monitor the Plans' investment options even when the IPS was in draft form.  (Halley Trial Testimony, Tr. at 1004:11-1005-9; Rezler Decl. ¶ 14; Surh Decl. ¶ 15; Meagher Decl. ¶ 69, Halley Decl. ¶¶ 16-18).[62]

145.     Though ERISA does not set a specific frequency for fund performance review, in 2010, the Committee determined that it should review fund performance on a quarterly basis. (Rezler Decl. ¶¶ 9, 12, 70, 93; Meagher Decl. ¶ 68, PX0480 (April 19, 2010 Meeting Minutes of the Committee, at NYU0004041); *see also* Halley Decl. ¶ 11).[63]  As such, Cammack provides the Committee with quarterly due diligence reports on the funds at Committee meetings, which

---

(Cammack provides Committee with revised IPS for review and Committee determines that changes will be discussed and voted on in February 2014 meeting)); PX1240 (February 26, 2014 Meeting Minutes of the Committee, at CLC0040659 (Committee discusses possible changes to the IPS)); PX0461 (May 22, 2014 Meeting Minutes of the Committee, at  ("The Committee agreed to adopt the new version contingent upon a final review by NYU's in-house counsel.")).

[62] PX0482 (May 17, 2012 Meeting Minutes of the Committee, at NYU0004057 ("Regarding the watch list funds, [Cammack] commented that all funds in the TIAA-CREF array met the criteria of the draft IPS.")); PX0382 (September 4, 2012 Meeting Minutes of the Committee, at CLC0039029 ("Regarding the fund analysis in the report, [Cammack] commented that all funds in the TIAA-CREF array met the criteria of the draft investment policy.  [Cammack] noted that there were 8 funds plus the Vanguard Life Strategy Series that did not meet the criteria of the draft investment policy.  The Committee approved the funds for inclusion in the 2Q 2012 watch list.").

[63] *See* PX1039 (January 7, 2011 E-mail from J. Rezler re: NYU Retirement Committee meeting agenda, at CLC0025238).

- 59 -

the Committee analyzes prior to, at, and after their meetings.  (Rezler Decl. ¶ 12, Meagher Decl.

¶¶ 68-70; Halley Decl.¶¶ 10, 12, 14; Petti Decl. ¶ 10).[64]

---

[64] *See, e.g.*, PX0095-PX0096 (May 13, 2009 email with Cammack Due Diligence Report, at
CLC0021493-643); PX0473 (May 15, 2009 Meeting Minutes of the Committee, at
NYU0003086 (topic of discussion is investment performance));  DX562 (June 14, 2010 Meeting
Minutes of the Committee, at NYU0002883 (review of Due Diligence Report)); DX436 (March
29, 2011 email to Committee with Cammack Due Diligence Report, at CLC0025965-081);
PX0481 (April 1, 2011 Meeting Minutes of the Committee, at NYU0004047 (review of Due
Diligence Report); DX437 (June 2, 2011 email to Committee with Cammack Due Diligence
Report, at CLC0026870-7100) (DX437 contains necessary, additional pages from PX1087-
PX1096, although these exhibits are listed as duplicates on the list provided to the Court on April
30, 2018.  DX437 entered the record without objection by being cited in Margaret Meagher's,
Nancy Sanchez's and Tina Surh's declarations); PX0375 (June 9, 2011 Meeting Minutes of the
Committee, at CLC0039006 (review of Due Diligence Report); PX1102-PX1109 (August 8,
2011 email to Committee with Cammack Due Diligence Report, at CLC0027428-631); DX569
(August 15, 2011 Meeting Minutes of the Committee, at NYU0004044 (review of Due Diligence
Report and review of Plans' investments); PX1135-PX1145 (November 7, 2011 email to
Committee with Cammack Due Diligence Report, at CLC0028807-9081); PX0472 (November
14, 2011 Meeting Minutes of the Committee, at NYU0003084 (review of Due Diligence
Report)); DX019 (May 10, 2012 Email re: NYU/NYU Langone Retirement Committee Meeting
– May 17, 2012 with attachments, at CLC0033466); PX0482 (May 17, 2012 Meeting Minutes of
the Committee, at NYU0004056 (review of Due Diligence Report)); DX441 (August 28, 2012
email to Committee with Cammack Due Diligence Report, at CLC0034499-630); PX0382
(September 4, 2012 Meeting Minutes of the Committee, at CLC0039028-29 (review of Due
Diligence Report and discussion of whether funds are meeting IPS guidelines)); PX1187-
PX1191 (November 9, 2012 Email to Committee with Cammack Due Diligence Report, at
CLC0035959-6203); PX0380 (November 16, 2012 Meeting Minutes of the Committee, at
CLC0039024 (review of Due Diligence Report and discussion of whether funds are meeting IPS
guidelines)); PX1198-PX1203 (February 15, 2013 Email to Committee with Cammack Due
Diligence Report, at CLC0036610-737); PX0467 (February 22, 2013 Meeting Minutes of the
Committee, at NYU0002558 (review of Due Diligence Report discussion of whether funds are
meeting IPS guidelines)); DX444 (June 6, 2013 email to Committee with Cammack Due
Diligence Report, at CLC0037681-848); PX0368 (June 14, 2013 Meeting Minutes of the
Committee, at CLC0038983 (review of Due Diligence Report and discussion of whether funds
are meeting IPS guidelines)); PX1221-PX1228 (November 18, 2013 email to Committee with
Cammack Due Diligence Report, at CLC0038632-784); PX0458 (November 25, 2013 Meeting
Minutes of the Committee, at NYU0002093 (review of Due Diligence Report and discussion of
whether funds are meeting IPS guidelines)); PX1240 (February 16, 2014 Meeting Minutes of the
Committee, at CLC0040659-70 (review of Due Diligence Report)); PX1239-PX1249 (May 16,
2014 email to Committee with Cammack Due Diligence Report, at CLC0040656-861)); PX0461
(May 22, 2014 Meeting Minutes of the Committee, at NYU0002243 (review of Due Diligence
Report and discussion of whether funds are meeting IPS guidelines)); DX447 (August 15, 2014
email to Committee with Cammack Due Diligence Report, at CLC0041961-2104); PX0049

- 60 -

146.   The Committee's minutes reflect discussion of the investment performance at numerous meetings, including those held on:

- May 15, 2009[65]
- June 14, 2010[66]
- March 21, 2011[67]
- April 1, 2011[68]
- June 9, 2011[69]
- August 15, 2011[70]

---

(August 19, 2014 Meeting Minutes of the Committee, at CLC0016624 (review of Due Diligence Report)); PX1273-PX1279 (December 5, 2014 email to committee with Cammack Due Diligence Report, at CLC0043275-425); PX0469 (December 11, 2014 Meeting Minutes of the Committee, at NYU0002780-81 (review of Due Diligence Report)); DX449 (February 20, 2015 email to Committee with Cammack Due Diligence Report, at CLC0044170-318); PX0479 (February 26, 2015 Meeting Minutes of the Committee, at NYU0003948 (review of Due Diligence Report)); PX1291-PX1297, PX1101 (June 2, 2015 email to Committee with Cammack Due Diligence Report, at CLC0045592-781); PX1303 (June 9, 2015 Meeting Minutes of the Committee, at CLC0048250 (review of Due Diligence Report and discussion of whether funds are meeting IPS guidelines)); PX1300-PX1305 (September 11, 2015 email to Committee with Cammack Due Diligence Report, at CLC0048246-408); PX0484 (September 15, 2015 Meeting Minutes of the Committee, at NYU0005070 (review of Due Diligence Report and discussion of whether funds are meeting IPS guidelines)); PX1311-PX1319, PX1419 (December 10, 2015 email to Committee with Cammack Due Diligence Report, at CLC0049533-707); PX0474 (December 16, 2015 Meeting Minutes of the Committee, at NYU0003276 (review of Due Diligence Report)); PX1331 (March 2, 2016 Meeting Minutes of the Committee, at CLC0051780 (review of Due Diligence Report and discussion of whether funds are meeting IPS guidelines)); PX0520 (September 8, 2016 Meeting Minutes of the Committee, at NYU0026305 (review of Due Diligence Report)); PX0519 (December 12, 2016 Meeting Minutes of the Committee, at NYU0026299-300 (review of Due Diligence Report)); PX1366 (February 23, 2017 Meeting Minutes of the Committee, at CLC0063889-90 (review of Due Diligence Report )); PX0662 (May 24, 2017 Meeting Minutes of the Committee, at NYU0162851-52 (review of Due Diligence Report and discussion of whether funds are meeting IPS guidelines)).

[65] PX0473 (May 15, 2009 Meeting Minutes of the Committee, at NYU0003086 (topic of discussion is investment performance)).

[66] DX562 (June 14, 2010 Meeting Minutes of the Committee, at NYU0002882).

[67] PX0460 (March 21, 2011 Meeting Minutes of the Committee, at NY0002099).

[68] PX0481 (April 1, 2011 Meeting Minutes of the Committee, at NYU0004047).

[69] PX0375 (June 9, 2011 Meeting Minutes of the Committee, at CLC0039006).

[70] DX569 (August 15, 2011 Meeting Minutes of the Committee, at NYU0004044).

- November 14, 2011[71]
- May 17, 2012[72]
- September 4, 2012[73]
- November 16, 2012[74]
- February 22, 2013[75]
- June 14, 2013[76]
- November 25, 2013[77]
- February 26, 2014[78]
- May 22, 2014[79]
- August 19, 2014[80]
- December 11, 2014[81]
- February 26, 2015[82]
- June 9, 2015[83]
- September 15, 2015[84]
- December 16, 2015[85]
- March 2, 2016[86]

---

[71] PX0472 (November 14, 2011 Meeting Minutes of the Committee, at NYU0003084).

[72] PX0482 (May 17, 2012 Meeting Minutes of the Committee, at NYU0004056).

[73] PX0382 (September 4, 2012 Meeting Minutes of the Committee, at CLC0039029-30).

[74] PX0380 (November 16, 2012 Meeting Minutes of the Committee, at CLC0039022-23).

[75] PX0467 (February 22, 2013 Meeting Minutes of the Committee, at NYU0002558).

[76] PX0368 (June 14, 2013 Meeting Minutes of the Committee, at CLC0038983).

[77] PX0458 (November 25, 2013 Meeting Minutes of the Committee, at NYU0002093).

[78] PX1240 (February 26, 2014 Meeting Minutes of the Committee, at CLC0040658).

[79] PX0461 (May 22, 2014 Meeting Minutes of the Committee, at NYU0002243).

[80] PX0049 (August 19, 2014 Meeting Minutes of the Committee, at CLC0016624-25).

[81] PX0469 (December 11, 2014 Meeting Minutes of the Committee, at NYU0002780).

[82] PX0479 (February 26, 2015 Meeting Minutes of the Committee, at NYU0003948).

[83] PX1303 (June 9, 2015 Meeting Minutes of the Committee, at CLC0048250).

[84] PX0484 (September 15, 2015 Meeting Minutes of the Committee, at NYU0005070).

[85] PX0474 (December 16, 2015 Meeting Minutes of the Committee, at NYU0003276).

- June 1, 2016[87]
- September 8, 2016[88]
- December 12, 2016[89]
- February 23, 2017[90]
- May 24, 2017[91]

147.    The due diligence reports provided by Cammack and reviewed by the Committee

contain detailed information regarding the Plans and the Plans' investments, including

summaries of the Plans' total assets, summaries of the Plans' asset allocations (*e.g.*, bond, money

market, fixed income, large cap, small cap, etc.), a capital markets review and analysis, quarterly

economic reports (including discussion of equities, bonds, real estate markets, consumer

sentiment, energy prices, and expert predictions), and detailed analysis of the Plans' investment

alternatives (including managers, ratings, expense ratios, and performance against benchmarks

on a quarterly, year to date, 1-year, 3-year, 5-year and 10-year basis).  (Rezler Decl. ¶¶ 9-13, 15;

Sanchez Decl. ¶ 44; Halley Decl. ¶ 15; Petti Decl. ¶ 23).[92]

---

[86] PX1331 (March 2, 2016 Meeting Minutes of the Committee, at CLC0051780).

[87] PX0471 (June 1, 2016 Meeting Minutes of the Committee, at NYU0002890).

[88] PX0520 (September 8, 2016 Meeting Minutes of the Committee, at NYU0026304).

[89] PX0519 (December 12, 2016 Meeting Minutes of the Committee, at NYU0026299).

[90] PX1366 (February 23, 2017 Meeting Minutes of the Committee, at CLC0063889).

[91] PX0662 (May 24, 2017 Meeting Minutes of the Committee, at NYU0162851).

[92] *See, e.g.*, PX0095-PX0096 (May 13, 2009 email with Cammack Due Diligence Report, at CLC0021493-643); PX1135-PX1145 (November 7, 2011 email to Committee with Cammack Due Diligence Report, at CLC0028807-9081); DX44 (February 15, 2012 email re: Agenda and Materials for 2/21 Retirement Committee Meeting, at NYU0012454-567); DX019 (May 10, 2012 Email re: NYU/NYU Langone Retirement Committee Meeting – May 17, 2012 with attachments, at CLC0033466-666); PX1221-PX1228 (November 18, 2013 email re: Retirement Committee Meeting Materials for November 25, 2013, at CLC0038654-783); PX1239-PX1249 (May 16, 2014 email re: Retirement Committee Meeting on May 22, 2014, at CLC0040669-836); PX1300-PX1305 (September 11, 2015 email re: Retirement Committee Meeting on September 15, 2015, at CLC0048252-408).

- 63 -

148.    The due diligence reports also included various methodologies employed by Cammack to analyze the Plans' investments, including manager tenure, category ranking, risk, risk adjusted return, net expense ratio, style drift, sharpe ratio, turnover ratio, and Morningstar rating.  (Rezler Decl. ¶¶ 11, 15).[93]

149.    In its review of the Plans' investment alternatives, the Committee also considered the respective investments' alphas.  (Rezler Decl. ¶ 15).[94]  Alpha is the difference between a fund's actual returns and its expected performance, given its level of risk measured by beta.[95]  Positive alpha indicates that the fund has performed better than its beta would predict.  (DX891A (Revised Declaration of Dan Fischel ("Fischel Revised Decl.") ¶ 7 (incorporating App. C ¶ 4)).  Negative alpha indicates that the fund underperformed given the expectations established by the fund's beta.  (Fischel Revised Decl. ¶ 7 (incorporating App. C ¶ 4)).[96]

150.    The Committee devotes a significant amount of its time during its meetings to monitor the funds.  (Sanchez Trial Testimony, Tr. at 391:4-23; Halley Decl. ¶¶ 13-14; Meagher

---

[93] *See, e.g.*, DX019 (May 10, 2012 Email re: NYU/NYU Langone Retirement Committee Meeting – May 17, 2012 with attachments, at CLC0033466-666); PX1221-PX1228 (November 18, 2013 email re: Retirement Committee Meeting Materials for November 25, 2013, at CLC0038654-783); PX1239-PX1249 (May 16, 2014 email re: Retirement Committee Meeting on May 22, 2014, at CLC0040669-836); PX1300-PX1305 (September 11, 2015 email re: Retirement Committee Meeting on September 15, 2015, at CLC0048252-408).

[94] *See, e.g.*, DX019 (May 10, 2012 Email re: NYU/NYU Langone Retirement Committee Meeting – May 17, 2012 with attachments, at CLC0033585); PX1221-PX1228 (November 18, 2013 email re: Retirement Committee Meeting Materials for November 25 2013 meeting with attachments, at CLC0038720); Wagner Revised Decl. ¶6 (incorporating ¶108).

[95] *See, e.g.*, DX019 (May 10, 2012 Email re: NYU/NYU Langone Retirement Committee Meeting – May 17, 2012 with attachments, at CLC0033585); PX1221-PX1228 (November 18, 2013 email re: Retirement Committee Meeting Materials for November 25 2013 meeting with attachments, at CLC0038720).

[96] *See, e.g.*, DX019 (May 10, 2012 Email re: NYU/NYU Langone Retirement Committee Meeting – May 17, 2012 with attachments, at CLC0033585); PX1221-PX1228 (November 18, 2013 email re: Retirement Committee Meeting Materials for November 25 2013 meeting with attachments, at CLC0038720).

Decl. ¶ 74).  To monitor the investments on a quarterly basis, consistent with the IPS, the Committee evaluates performance versus peer group, performance versus standard benchmark, risk, risk-adjusted performance, and manager fees.  (Halley Decl. ¶ 15; Rezler Decl. ¶ 11).  The Committee further reviews the one, three, five year Morningstar ratings for all of the appropriate funds.  (DX891A Fischel Revised Decl. ¶ 22 (incorporating ¶ 4); Rezler Decl. ¶¶ 1, 73; Surh Decl. ¶ 19).

151.    Certain funds are highlighted and discussed in greater detail than others, although monitoring is provided on all the funds available in the plan.  (Halley Decl. ¶ 13).  Every fund was discussed on a quarterly basis, whether that fund was individually addressed or whether it was addressed as part of the group of funds to which it belongs, such as target date funds. (Rezler Decl. ¶¶ 9, 12, 72; Halley Decl. ¶ 11).

152.    Committee members were provided with the Quarterly Due Diligence Reports approximately a week in advance of the Committee meetings for review, and Committee meetings typically involved questions raised by Committee members regarding the Reports. (Surh Decl. ¶¶ 10, 29; Meagher Decl. ¶¶ 20, 70; Meagher Trial Testimony, Tr. at 338:7-339:19).[97]

153.    Using the IPS for guidance on the types of metrics used to evaluate and monitor investments, the Committee also reviewed a watch list to help monitor certain funds as part of its quarterly review.  (Rezler Decl. ¶¶ 13-14; Surh Decl. ¶ 17; Halley Decl. ¶ 13; Meagher Trial

---

[97] *See, e.g.*, DX437 (June 2, 2011 email to Committee with Cammack Due Diligence Report , at CLC0026870-7100); PX0375 (June 9, 2011 Meeting Minutes of the Committee, at CLC0039006 (review of Due Diligence Report)); PX1102-PX1109 (August 8, 2011 email to Committee with Cammack Due Diligence Report, at CLC0027428-631); DX569 (August 15, 2011 Meeting Minutes of the Committee, at NYU0004044 (review of Due Diligence Report and review of Plans' investments)); PX1135-PX1145 (November 7, 2011 email to Committee with Cammack Due Diligence Report, at CLC0028807-9081); PX0472 (November 14, 2011 Meeting Minutes of the Committee, at NYU0003084 (review of Due Diligence Report)),

Testimony, Tr. at 302:4-303:9; PX0481 (April 1, 2011 Meeting Minutes of the Committee, at

NYU0004049)).  Funds may be put on the watch list for a number of different reasons, such as a

fund manager change, a sub-adviser change, or underperformance.  (Surh Trial Testimony, Tr. at

1154:17-1155:10; Halley Decl. ¶ 13).

154.    The watch list is included in the due diligence report, which is reviewed by the

Committee at every meeting.  (Rezler Decl. ¶ 13; Petti Decl. ¶ 21; Meagher Decl. ¶¶ 20, 70;

Halley Decl. ¶ 13).[98]  The Committee analyzes the funds on the watch list at almost every

Committee meeting and discusses the addition or removal of funds to or from the watch list

where applicable.  (Rezler Decl. ¶ 13; Halley Decl. ¶ 13; Sanchez Trial Testimony, Tr. at 372:21-

373:17;Meagher Trial Testimony, Tr. at 302:4-303:9).[99]

---

[98] *See, e.g.*, *supra* fn 58.

[99] DX562 (June 14, 2010 Meeting Minutes of the Committee, at NYU0002883 (recommending
certain funds be placed on watch list)); PX0460 (March 21, 2011 Meeting Minutes of the
Committee, at NYU0002099-102 (reviewing funds listed on watch list and scheduling a meeting
specifically for "a full investment review with a focus on the Watch List funds and
recommendations for elimination of any of the Watch List funds should the Committee deem it
necessary")); PX0481 (April 1, 2011 Meeting Minutes of the Committee, at NYU0004047-49
(review of funds on watch list)); PX0375 (June 9, 2011 Meeting Minutes of the Committee, at
CLC0039007 (discussing potential addition of fund to watch list and directing Cammack to
provide a timeline for mapping assets out of Vanguard watch list funds)); PX0472 (November
14, 2011 Meeting Minutes of the Committee, at NYU0003084 (discussing funds on watch list));
PX0482 (May 17, 2012 Meeting Minutes of the Committee, at NYU0004057 (discussing funds
on watch list)); PX0382 (September 4, 2012 Meeting Minutes of the Committee, at
CLC0039028-29 (discussing funds on watch list)); PX0380 (November 16, 2012 Meeting
Minutes of the Committee, at CLC0039022-23 (Vanguard discussing Vanguard funds on watch
list)); PX0458 (November 25, 2013 Meeting Minutes of the Committee, at NYU0002093
(removing funds from watch list)); PX1240 (February 26, 2014 Meeting Minutes of the
Committee, CLC0040659-60 (discussing funds on watch list)); PX0461 (May 22, 2014 Meeting
Minutes of the Committee, at NYU0002243 (discussing funds on watch list and removing fund
from watch list)); PX0049 (August 19, 2014 Meeting Minutes of the Committee, at
CLC0016625 (discussing funds on watch list and adding fund to watch list)); PX0469
(December 11, 2014 Meeting Minutes of the Committee, at NYU0002780-81 (discussing funds
on watch list)); PX0479 (February 26, 2015 Meeting Minutes of the Committee, at
NYU0003948 (discussing funds on watch list)); PX1303 (June 9, 2015 Meeting Minutes of the
Committee, at CLC0048250 (discussing funds on watch list and adding new funds to watch

- 66 -

155.    Funds on the watch list are not automatically removed from the investment

lineup; rather, they are analyzed and discussed by the Committee at length.  (Sanchez Trial

Testimony, Tr. at 372:21-373:17; Rezler Decl. ¶ 13; Surh Decl. ¶ 18; Halley Decl. ¶ 13).

Determining whether to remove or replace an investment option on the watch list from the

investment lineup requires the consideration of multiple factors, including whether a fund is

unique and whether difficulty benchmarking could impact performance.  (Rezler Decl. ¶ 13;

Surh Decl. ¶ 18).

156.    The Committee considers removing and has removed funds on the watch list for

underperformance.  (Halley Decl. ¶ 21).  For instance, the Committee removed the Vanguard

Precious Metals and Mining Fund.  (Halley Decl. ¶¶ 21-22; DX569 (August 15, 2011 Meeting

Minutes of the Committee, at NYU0004044; PX0471 (June 1, 2016 Meeting Minutes of the

Committee, at NYU0002890)).

157.    The Committee also requested that representatives of TIAA and Vanguard attend

Committee meetings to present information and answer questions regarding such topics as fund

---

list)); PX0484 (September 15, 2015 Meeting Minutes of the Committee, at NYU0005070
(discussing funds on watch list)); PX0474 (December 16, 2015 Meeting Minutes of the
Committee, at NYU0003276 (discussing funds on watch list)); PX1331 (March 2, 2016 Meeting
Minutes of the Committee, at CLC0051780 (discussing funds on watch list and adding new fund
to watch list)); PX0471 (June 1, 2016 Meeting Minutes of the Committee, at NYU0002889
(discussing funds on watch list and voting to replace underperforming fund)); PX0520
(September 8, 2016 Meeting Minutes of the Committee, at NYU0026305 (discussing funds on
watch list and removing fund from watch list and adding funds to watch list)); PX0519
(December 12, 2016 Meeting Minutes of the Committee, at NYU0026300 (discussing funds on
watch list and replacing fund on watch list and adding fund to watch list)); PX1366 (February
23, 2017 Meeting Minutes of the Committee, at CLC0063890 (discussing funds on watch list
and replacing funds and removing funds from watch list)); PX0662 (May 24, 2017 Meeting
Minutes of the Committee, at NYU0162851 (adding fund to watch list).

- 67 -

performance, including indices for measuring fund performance and funds on the watch list, fund selection, participant communications, and fees.  (Rezler Decl. ¶ 35; Surh Decl. ¶ 22).[100]

## A.    NYU's Monitoring of the CREF Stock Account and the TIAA Real Estate Account.

### 1.    The CREF Stock Account

158.    The CREF Stock Account is a tax-deferred variable annuity offered by CREF. (Chittenden Decl. ¶ 47; DX761 (CREF Stock Account Factsheet, as of December 31, 2009; DX759 (May 1, 2016 CREF Prospectus)).  It provides participants an opportunity to invest in a unique investment and is popular—93% of TIAA's largest 200 clients offered the fund in their investment lineup in 2010 and 2016.  (Chittenden Decl. ¶ 54).

159.    The "CREF Stock was the first stock fund established in 1952" and was therefore "developed to be an all-cap fund, containing large, mid and small cap stocks as well as international exposure."  (Chittenden Decl. ¶¶ 47-48; PX0380 (November 16, 2012 Meeting Minutes of the Committee, at CLC0039024)).

160.    The account's "Investment Objective" is to provide "[a] favorable long-term rate of return through capital appreciation and investment income by investing primarily in a broadly diversified portfolio of common stocks."  (Chittenden Decl. ¶ 48; DX759 (May 1, 2016 CREF Prospectus, at 27)).  Three different investment strategies are used—active management,

---

[100] *See, e.g.*, PX0472 (November 14, 2011 Meeting Minutes of the Committee, at NYU0003083-85 (Vanguard invited to discuss funds that have not met the criteria of the draft Investment Policy Statement and consequent action to be taken)); PX0482 (May 17, 2012 Meeting Minutes of the Committee, at NYU0004055-56 (TIAA invited to discuss communications campaign to participants on topics such as participation, diversification and retirement readiness)); PX0380 (November 16, 2012 Meeting Minutes of the Committee, at CLC0039022-23 (Vanguard invited to discuss changes to indices used by Vanguard index funds and funds on the watch list)); PX0467 (February 22, 2013 Meeting Minutes of the Committee, at NYU0002557-58 (TIAA invited to present annual review and specifically discussed TIAA Traditional Annuity, CREF Stock and TIAA Real Estate Accounts).

quantitative, and indexing—to manage the account.  (Chittenden Decl. ¶ 48; DX759 (May 1, 2016 CREF Prospectus, at 27)).

161.    The CREF Stock Account is unique because it invests in a mix of domestic and international securities.  (Chittenden Decl. ¶ 48; DX759 (May 1, 2016 CREF Prospectus, at 28 ("Under normal circumstances, the Account seeks to maintain the weightings of its holdings as approximately 70-75% domestic equities and 25-30% foreign equities.")); PX0481 (April 1, 2011 Meeting Minutes of the Committee, at NYU0004048)).  As a result, however, the CREF Stock Account is difficult to benchmark.  (Rezler Decl. ¶¶ 72-74; PX0380 (November 16, 2012 Meeting Minutes of the Committee, at CLC0039024)).

162.    The Committee reviewed the CREF Stock Account on a quarterly basis and in the context of the Plans' total investment lineup, which also included stock index funds for participants who preferred that style of investment.  (Rezler Decl. ¶ 72; Surh Decl. ¶ 20; Halley Decl. ¶¶ 13, 20; Petti Decl. ¶ 18).[101]  The Committee commonly focused on the difficulties with benchmarking that the CREF Stock Account presents due to its composition.  (Rezler Decl. ¶¶ 72-74).  The Committee determined that, as a result of these benchmarking concerns, the CREF Stock Account was one that warranted "specialized discussions."  (PX0481 (April 1, 2011 Meeting minutes of the Committee, at NYU0004048)).  The Committee specifically noted that the CREF Stock Account was getting benchmarked against "large cap domestic equities only," when that was not how the fund invested.  (Rezler Decl. ¶ 72).

---

[101]  *See, e.g.*, DX019 (May 10, 2012 Email re: NYU/NYU Langone Retirement Committee Meeting – May 17, 2012 with attachments, at CLC033484, CLC0033525, CLC0033531); PX1221-PX1228 (November 18, 2013 email re: Retirement Committee Meeting Materials for November 25 2013, at CLC0038671, CLC0038699); PX1239-PX1249 (May 16, 2014 email re: Retirement Committee Meeting May 22, 2014, at CLC0040692, CLC0040705, CLC0040725); PX1300-PX1305 September 11, 2015 email re: Retirement Committee Meeting for September 15, 2015, at CLC0048271, CLC0048307); PX1335-PX1341 (September 1, 2016 email re: Retirement Committee Meeting Materials, at CLC0054834, CLC0054868).

- 69 -

163.     In April 2011, the Committee asked Cammack to shed light on the fact that although the CREF Stock Account "invests in small/mid/large company domestic equities and as much 30% of [its] assets in foreign equities," the Fund "gets benchmarked against large company domestic funds."  (PX0481 (April 1, 2011 Meeting Minutes of the Committee, at NYU0004048)).

164.     As of 2009, As of 2009, the account's publically stated (and available) composite benchmark was the Russell 3000® Index, the MSCI Barra EAFE® + Canada Index, the MSCI Emerging Markets Index and the MSCI EAFE + Canada Small Cap Index.[102]  In mid-2011, the account's publically stated (and available) composite benchmark in its prospectus was changed to a composite index of two unmanaged indices: (1) Russell 3000® Index (70%); and (2) the MSCI All Country World ex-US Investable Market Index (30%).  (Chittenden Decl. ¶ 51).[103] TIAA makes the prospectuses available to the participants.  (Chittenden Decl. ¶ 55).  Also, publically available to participants and provided to participants by TIAA are the CREF Semiannual and Annual Reports, which show performance of the CREF Stock Account against that of the prospectus's stated composite benchmark.[104]  (Halley Trial Testimony, Tr. at 1010:12-16, 1011:20-1012:5).

---

[102] See, e.g., DX752 (CREF 2009 Prospectus, at 17).

[103] PX0467 (February 22, 2013 Meeting Minutes of the Committee, at NYU0002558); DX727 (June 30, 2011 CREF Semiannual Report, at 3, 7); DX754 (CREF 2011 Prospectus, at 19 ("As of July 1, 2011, the Account's composite benchmark index will consist of two unmanaged indices: the Russell 3000® Index and the MSCI ACWI ex-US IMI.")); DX755 (2012 CREF Stock Account Prospectus, at 18-19); DX756 (2013 CREF Stock Account Prospectus, at 19); DX757 (2014 CREF Stock Account Prospectus, at 16); DX758 (2015 CREF Stock Account Prospectus, at 18); DX759 (2016 CREF Stock Account, at 28).

[104] See, e.g., DX727 (2011 CREF Semiannual Report as of June 30, 2011, at 7); DX733 (2017 CREF Semiannual Report as of June 30, 2017, at 11).

165.     Starting in 2012, as required by the Department of Labor Regulations, TIAA also

provides NYU with the information to provide 404a5 disclosures to participants, and TIAA

assists in their delivery to participants.  (Chittenden Decl. ¶ 108).  As required by the Department

of Labor Regulations, in the 404a5 disclosures TIAA shows the performance of the CREF Stock

Account versus a broad-based securities market index, the Russell 3000® Index, as opposed to

using the account's composite benchmark stated in its prospectus because the Department of

Labor Regulations do not permit the use of composite benchmarks or customized benchmarks in

the 404a5 disclosures and only permits the use of one benchmark for each investment option.[105]

(Halley Trial Testimony, Tr. at 1010:12-16, 1011:20-1012:5).

166.     The 404a5 disclosures also direct the participant to the prospectus for more

detailed information.  (Fischel Trial Testimony, Tr. at 1541:19-1542:12).[106]  Moreover, the

Plans' Summary Plan Descriptions inform participants to read all descriptions and disclosure

---

[105] PX0657 (2012 404a5 Part I (Faculty Plan), at NYU0161774); PX0656 (2013 404a5 Part I
(Faculty Plan), at NYU0161684); PX0654 (2014 404a5 Part I (Faculty Plan), at NYU0161620);
DX086 (2015 404a5 (Faculty Plan), at NYU0000086); DX087 (2016 404a5 (Faculty Plan), at
NYU0006845); PX1673 (2017 404a5 (Faculty Plan), at NYU0163970); DX145 (2012 404a5
Part I (School of Medicine Faculty Plan), at NYU0000503); PX0650 (2013 404a5 Part I (School
of Medicine Faculty Plan), at NYU0161165); DX147 (2014 404a5 (School of Medicine Faculty
Plan), at NYU0163386); DX148 (2015 404a5 (School of Medicine Faculty Plan), at
NYU0163445); DX149 (2016 404a5 (School of Medicine Faculty Plan), at NYU0163408-09);
PX1674 (2017 404a5 (School of Medicine Faculty Plan), at TIAA_NYU_00041783).

[106] PX0657 (2012 404a5 Part I (Faculty Plan), at NYU0161789); PX0656 (2013 404a5 Part I
(Faculty Plan), at NYU0161699); PX0654 (2014 404a5 Part I (Faculty Plan), at NYU0161635);
DX086 (2015 404a5 (Faculty Plan), at NYU0000103); DX087 (2016 404a5 (Faculty Plan), at
NYU0006862); PX1673 (2017 404a5 (Faculty Plan), at NYU0163987); DX145 (2012 404a5
Part I (School of Medicine Faculty Plan), at NYU0000517); PX0650 (2013 404a5 Part I (School
of Medicine Faculty Plan), at NYU0161177); DX147 (2014 404a5 (School of Medicine Faculty
Plan), at NYU0163397); DX148 (2015 404a5 (School of Medicine Faculty Plan), at
NYU0163458); DX149 (2016 404a5 (School of Medicine Faculty Plan), at NYU0163420);
PX1674 (2017 404a5 (School of Medicine Faculty Plan), at TIAA_NYU_00041794).

materials relative to investment options under the Plan before making investment decisions. (Fischel Trial Testimony, Tr. at 1542:6-12, 1543:3-20).[107]

167.     The CREF Stock Account closely tracked the performance of the CREF Stock Composite Benchmark during the one-, five-, and ten-year periods ending on December 31 of each year from 2009 to 2016, and the one-, five-, and ten-year periods ending June 30, 2017. (Fischel Revised Decl. ¶¶ 10, ¶ 7 (incorporating ¶¶ 13, 19 & Ex. 3); Meagher Trial Testimony, Tr. at 303:10-11, 344:17-346:149)).

168.     The Committee had representatives from TIAA discuss the CREF Stock Account with the Committee at the February 22, 2013 meeting, during which a TIAA representative explained the fund benchmark in the prospectus to the Committee.  (Petti Decl. ¶¶ 18-19; PX0467 (February 22, 2013 Meeting Minutes of the Committee, at NYU0002558)).

169.     The Committee further reviewed and specifically discussed the performance of the CREF Stock Account at the September 8, 2016 meeting.  (PX0520 (September 8, 2016 Meeting Minutes of the Committee, at NYU0026304)).

**2.     The TIAA Real Estate Account**

170.     The TIAA Real Estate Account is a tax-deferred variable annuity contract offered by TIAA.  (Chittenden Decl. ¶ 58; *see, e.g.*, DX689 (May 1, 2017 TIAA Real Estate Account Prospectus; DX679 (TIAA Real Estate Stock Account Factsheet, as of September 30, 2017)). The TIAA Real Estate Account invests in actual real estate properties.  (Chittenden Decl. ¶ 60). "[A]t least 75% of the Account's net assets have comprised . . . direct ownership interests in real estate" and typically less than 10% of the account's net assets have been comprised of interests

---

[107] *See, e.g.*, DX384 (2011 Faculty Summary Plan Description, at NYU0006429); DX387 (2012 School of Medicine Summary Plan Description, at NYU0111019); DX389 (2016 School of Medicine Summary Plan Description, at NYU0000649); DX383 (2016 Faculty Summary Plan Description, at NYU0037394); DX388 (2015 School of Medicine, Summary Plan Description, at NYU0037441)).

in liquid real estate securities.  (Chittenden Decl. ¶ 60; Meagher Trial Testimony, Tr. at 218:6-220:9; DX689 (May 1, 2017 TIAA Real Estate Prospectus, at 3)).

171.    Additionally, TIAA guarantees liquidity for the TIAA Real Estate Account via a "liquidity guarantee" under which the TIAA General Account will purchase accumulation units issued by the TIAA Real Estate Account if there are issues with liquidity.  (DX689 (May 1, 2017 TIAA Real Estate Prospectus, at 46-47); Chittenden Trial Testimony, Tr. at 645:12-22).

172.    The TIAA Real Estate Account gives investors the opportunity to invest in the types of investments that are typically only available to institutional investors and is therefore a very valuable diversifying element of a retirement portfolio.  (Chittenden Decl. ¶ 61; Chittenden Trial Testimony, Tr. at 646:6-14, 671:19-672:2).  Like the CREF Stock Account, the TIAA Real Estate Account is also a popular investment with participants.  (Chittenden Decl. ¶¶ 63-64).

173.    Similar to the CREF Stock Account, the TIAA Real Estate Account is difficult to benchmark.  (Rezler Decl. ¶¶ 63-65).  The TIAA Real Estate Account's performance had been compared to a Real Estate Investment Trust ("REIT") index, which was a concern as the TIAA Real Estate Account is not a REIT.  (Rezler Decl. ¶ 61).  Cammack realized the benchmarking issue early on and addressed it with the Committee.  (Rezler Decl. ¶ 64).

174.    The TIAA Real Estate Account was on the watch list throughout 2010 and the first three quarters of 2011 for underperforming in comparison to the Dow Jones U.S. Select Real Estate Investment Trust ("REIT") index.  (Surh Decl. ¶ 21).  The Committee, in consultation with Cammack, considered the reasons for its placement on the watch list and whether to replace it.  (Surh Decl. ¶ 21; Meagher Trial Testimony, Tr. at 236:19-237:5, 255:14-19, 256:5-14).

175.    The Committee's discussions of the fund consistently focused on the fact that the TIAA Real Estate Account is unique because it "provides participants with the ability to gain exposure to actual real estate" given that it "actually holds real property," and that this unique feature makes the fund extremely difficult to benchmark.  (Rezler Decl. ¶ 64).[108]

176.    The uniqueness of the TIAA Real Estate Account and the attendant difficulties in benchmarking that fund were a critical factor discussed during the Committee's quarterly evaluations of the fund's performance.  (Surh Decl. ¶¶ 21, 27-28).

177.    At the April 1, 2011 meeting, the Committee discussed that, due to the fund's unique nature, the methodology used for placing other funds on the watch list cannot be utilized for the TIAA Real Estate Account.  (Rezler Decl. ¶ 64; PX0481 (April 1, 2011 Meeting Minutes of the Committee, at NYU0004048)).  Further, for the April 1, 2011 meeting, TIAA provided the Committee with a detailed analysis of the TIAA Real Estate Account, which contained over 25 pages of detailed information regarding the TIAA Real Estate Account, its composition, investment strategy, account management, risks, liquid asset holdings, and performance versus various comparisons and indexes.  (PX0481 (April 1, 2011 Meeting Minutes of the Committee, at NYU0004048); DX436 (TIAA Quarterly Analysis of the TIAA Real Estate Account, attached to March 29, 2011 e-mail from J. Rezler (CLC0026015-40)).

178.    In June 2011, the Committee discussed the difficulties in benchmarking the TIAA Real Estate Account and determined that the fund should not be put on the watch list because it began to "recover along with the general recovery of the US commercial real estate market.

---

[108] PX0380 (November 16, 2012 Meeting Minutes of the Committee, at CLC0039024)); *see also* PX0481 (April 1, 2011 Meeting Minutes of the Committee, at NYU0004048); PX0375 (June 9, 2011 Meeting Minutes of the Committee, at CLC0039007); DX569 (August 15, 2011 Meeting Minutes of the Committee, at NYU0004044); PX0467 (February 22, 2013 Meeting Minutes of the Committee, at NYU0002558).

(Rezler Trial Testimony, Tr. at 1275:21-2; PX0375 (June 9, 2011 Meeting Minutes of the Committee, at CLC0039007)).

179.    The Committee continued to discuss the TIAA Real Estate Account's performance in August 2011 and, on Cammack's recommendation, determined that the fund should not be replaced at that time because "of the difficulty in obtaining comparative statistics for both the index and peer group due to the fund's unique structure" and because "the fund has positive of 8% and it is expected to continue to recover as the U.S. commercial real estate market recovers."  (Rezler Trial Testimony, Tr. at 1275:21-2; Rezler Decl. ¶¶ 64-65; DX569 (August 15, 2011 Meeting Minutes of the Committee, at NYU0004044)).

180.    At the February 21, 2012 meeting, TIAA informed the Committee that they were working to develop a benchmark for the fund due to the challenges in benchmarking.  (Surh Decl. ¶¶ 21, 24; Rezler Decl. ¶ 66; PX0040 (February 21, 2012 Meeting Minutes of the Committee, at CLC0013701)).

181.    The difficulties in benchmarking were relayed to investors via TIAA's quarterly performance analyses for the TIAA Real Estate Account, which explained that "there are relatively few sources of returns that can be used as a direct comparison for assessing the performance of the [a]ccount."  (*See, e.g.*, DX693 (TIAA Real Estate Account Quarterly Performance for Quarter Ending December 31, 2011, at 1).

182.    During 2009, 2010 and 2011, TIAA compared the performance of the TIAA Real Estate Account with the performance of a composite index comprised of (i) the total return for all real estate properties owned or managed in commingled open-end funds, as derived from the NCREIF database ("NCREIF Open-end"); (ii) the FTSE Group ("FTSE") NAREIT Equity REIT Index or, for periods prior to the third quarter of 2009, the Dow Jones Wilshire Real Estate

Securities Index, and (iii) the iMoneyNet All-Taxable Average for short-term, cash-like investments, with weights of 75%, 5%, and 20%, respectively (the "REA Composite Index"). (*See, e.g.*, DX701 (TIAA Real Estate Account Quarterly Performance Analysis for Quarter Ending December 31, 2011, at 2)).  As the quarterly reports explain, however, "[a] comparison between the standard performance of the [TIAA Real Estate] Account … and the REA Composite Index typically results in differences stemming mainly from the different methodologies used in computing the performance of the properties held by the Account versus those in the NCREIF Open-end" including differences with respect to the "frequency of valuation and appraisals," the "treatment of leverage" and the "timing of activity."  (*See, e.g.*, DX701 (TIAA Real Estate Account, Quarterly Performance Analysis for, Quarter Ending December 31, 2011, at 2)).  Therefore, "[i]n order to compare the performance of the TIAA Real Estate Account with the returns of the REA Composite Index, the Account's direct real estate property returns must first be calculated using NCREIF's methodology."  (DX701 (TIAA Real Estate Account, Quarterly Performance Analysis for Quarter Ending December 31, 2011, at 2)). The resulting returns are then combined with the TIAA-CREF calculated returns for the real estate securities and the short-term/cash portions of the Account to compute "TIAA REA-with NCREIF Calculated Property Returns," which can be compared with the REA Composite Index. (DX701 (TIAA Real Estate Account Quarterly Performance Analysis for Quarter Ending December 31, 2011, at 2-3)).

183.    The performance of the TIAA REA-with NCREIF Calculated Property Returns closely tracked the performance of the REA Composite Index during the one-, five-, and ten-year periods ending on December 31 of each year from 2009 to 2011.  (Fischel Revised Decl. ¶ 17).

Therefore, these comparisons do not support Plaintiffs' claim of "consistent underperformance." (Fischel Revised Decl.¶ 17).

184.    Since 2012, TIAA has compared the Real Estate Account's performance with the performance of "two widely used indices" that TIAA "believes are most appropriate to compare to the performance of the Account":  the NCREIF Fund Index – Open End Diversified Core Equity ("NFI-ODCE") and the NCREIF Property Index ("NPI").  (DX70 (TIAA Real Estate Account, Quarterly Performance Analysis, for the quarter ended December 31, 2012, at 2); DX709 (TIAA Real Estate Account, Quarterly Performance Analysis, for the quarter ended December 31, 2013, at 2).  NFI-ODCE is an equal-weighted index of the investment returns from a collection of open end commingled funds which focus on a core real estate investment strategy, and TIAA uses the "Net of Fees" returns that are calculated by the NCREIF in its analyses. (DX70 (TIAA Real Estate Account, Quarterly Performance Analysis, for the quarter ended December 31, 2013, at 2)).  Moreover, "[i]n order to more appropriately compare the performance of the Account with its peers in the NFI-ODCE," TIAA adjusts "certain aspects of the Account's historical performance to arrive at the Account's 'Adjusted Total Return.'" (DX709 (TIAA Real Estate Account, Quarterly Performance Analysis, for the quarter ended December 31, 2013, at 2)).   In particular, "the Account's total return is adjusted by removing the effect of (i) cash and all non-real estate-related marketable securities (collectively, "Liquid Assets") held by the Account at the end of each period (only to the extent such Liquid Assets comprised 15% of the Account's net assets as of such dates), and (ii) the actual expense charge associated with the liquidity guarantee provided to the Account by TIAA."  (DX709 (TIAA Real Estate Account, Quarterly Performance Analysis, for the quarter ended December 31, 2013, at 2)).  TIAA believes that "[a]djusting the total return of the Account allows for a more equitable

assessment and comparison with the other open-ended direct real estate products contained in the NFI-ODCE that may not have a guaranteed liquidity feature and [its] accompanying costs and cash drag." (DX709 (TIAA Real Estate Account, Quarterly Performance Analysis, for the quarter ended December 31, 2013, at 2); Chittenden Trial Testimony, Tr. 644:17-646:4).

185.    The Adjusted Total Return of the TIAA Real Estate Account has closely tracked the performance of NFI-ODCE during the one-, five-, and ten-year periods ending on December 31 of each year from 2012 to 2016, and the one-, five-, and ten-year periods ending September 30, 2017. (Fischel Revised Decl. ¶ 7 (incorporating ¶ 26)). Therefore, these performance comparisons do not support Plaintiffs' claim of "consistent underperformance." (Fischel Revised Decl. ¶ 7 (incorporating ¶ 26)).

186.    In February 2013, a TIAA representative discussed the usage of a custom index for the TIAA Real Estate Account with the Committee, explaining that the custom index was "designed to assist plan sponsors with the challenge of benchmarking the [TIAA Real Estate Account] due to the lack of peer funds." (Surh Decl. ¶¶ 25-26; PX0467 (February 22, 2013 Meeting Minutes of the Committee, at NYU0002558)).

187.    At the September 8, 2016 meeting, the Committee reviewed the TIAA Real Estate Account's performance and found that the fund underperformed the NCREIF benchmark, but that this was "driven by the fact that the Real Estate Account is less leveraged and has lower risk than the index." (Halley Decl. ¶ 20; PX0520 (September 8, 2016 Meeting Minutes of the Committee, at NYU0026304)). Accordingly, the Committee concluded that no further action was needed at the time. (PX0520 (September 8, 2016 Meeting Minutes of the Committee, at NYU0026304)).

B.     **Additional Facts Supporting the Objective Prudence of the CREF Stock Account and the TIAA Real Estate Account.**

188.     Virtually all of TIAA's top clients offered the CREF Stock Account and TIAA Real Estate Account in the investment lineup for their 403(b) plans.  (Chittenden Decl. ¶¶ 53-54, 63-64).  Of TIAA's 200 largest institutional clients with at least one 403(b) plan, all 200 clients held assets in the CREF Stock Account for the period 2010 through 2014.  (Chittenden Decl. ¶ 53).  In 2015 and 2016, all but one of TIAA's largest institutional clients held assets in the CREF Stock Account.  (Chittenden Decl. ¶ 53).  Of TIAA's 200 largest institutional clients with at least one 403(b) plan, all but one client held assets in the TIAA Real Estate Account for the period 2010 through 2014.  (Chittenden Decl. ¶ 63).  In 2015 and 2016, all but two of TIAA's largest institutional clients held assets in the TIAA Real Estate Account.  (Chittenden Decl. ¶ 63).

189.     Of those 200 clients, over 93% had plans that received contributions into the CREF Stock Account for the period 2010 through 2016.   (Chittenden Decl. ¶ 54).  Of those 200 clients, over 84% had plans that received contributions into the TIAA Real Estate Account for the period 2010 through 2016.   (Chittenden Decl. ¶ 64).

190.     The alphas analysis for both the TIAA Real Estate Account and the CREF Stock Account confirm that each performed well based on their relative level of risk.  (Fischel Revised Decl. ¶ 7 (incorporating ¶¶ 23-24, 29-30)).

191.     The CREF Stock Account had a 1-year return of 32% in 2009, followed by 15.72% in 2010.  (Fischel Revised Decl. ¶ 7 (incorporating Ex. 3)).  The TIAA Real Estate Account's returns in 2010 were 13.3% (PX0867 (TIAA Real Estate Account 8-K for period ending June 30, 2014, at TIAA_NYU_00081753)), and by 2014, the account had 3-year returns of 10.64% and 5-year returns of 11.63%.  (DX 668 (TIAA Real Estate Account Fact Sheet as of December 31, 2014, at TIAA_NYU_00081398)).

- 79 -

## PROPOSED CONCLUSIONS OF LAW

**I.      DEFENDANT IS ENTITLED TO JUDGMENT ON THE MERITS BECAUSE PLAINTIFFS HAVE FAILED TO PROVE THE ELEMENTS FOR BREACH OF FIDUCIARY DUTY.**

1.       Plaintiffs allege that Defendant breached the duty of prudence due to (1) excessive administrative fees and (2) imprudent retention of the CREF Stock Account and TIAA Real Estate Account.  To prevail on a claim for breach of the duty of prudence under ERISA, Plaintiffs must demonstrate that the Plan fiduciaries did not act as a "prudent man acting in a like capacity and familiar with such matters" would have acted "under the circumstances then prevailing."  ERISA § 404(a)(1)(B).

2.       The duty of prudence under ERISA focuses only on the *process* employed by the fiduciary in making decisions.  Recognizing that fiduciary decisions are almost never black-and-white and that it is easy to second-guess decisions with 20/20 hindsight, the ERISA "prudent person" standard asks "'whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of [any decision or action].'"  *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984); *see also Pension Benefit Guar. Corp. ex rel St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 716 (2d Cir. 2013) (The standard focuses on "whether [the] fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment."); *Taylor v. United Techs. Corp.*, No. 3:06cv1494 (WWE), 2009 WL 535779, at *8 (D. Conn. Mar. 3, 2009) (citing *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 424 (4th Cir. 2007)) ("Whether a fiduciary's actions are prudent cannot be measured from the vantage point of hindsight; the prudent person standard is not concerned with results but is a test of how the fiduciary acted when viewed from the perspective of the time of the challenged decision.").

3.      Plaintiffs cannot challenge NYU's actions even if, in their opinion, another approach might have been preferable, more to their liking, or even more beneficial to the Plans from a financial standpoint, because NYU followed a robust and prudent process.  *Diduck v. Kaszycki & Sons Contractors, Inc.*, 874 F.2d 912, 917 (2d Cir. 1989).

4.      NYU's decisions are entitled to deference by this Court.  *Birmingham v. SoGen-Swiss Int'l Corp. Ret. Plan*, 718 F.2d 515, 522 (2d Cir. 1983) (the court's authority "does not include the power to overrule a specific and valid exercise of the Retirement Committee's authority under the Plan and ERISA."); *Oster v. Barco of Cal. Emps.' Ret. Plan*, 869 F.2d 1215, 1220 (9th Cir. 1988) ("We will not second-guess the Committee unless its actions were unreasonable."); *Jenkins v. Yager*, 444 F.3d 916, 924-26 (7th Cir. 2006) (fiduciary's decisions are not actionable if they are the result of an appropriate process); *Sweda v. Univ. of Pa.*, No. CV 16-4329, 2017 WL 4179752, at *8 (E.D. Pa. Sept. 21, 2017) ("It is not up to courts to second-guess how fiduciaries allocate that cost, only that the fiduciary 'discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries' as a whole."); *Tussey v. ABB, Inc.*, 746 F.3d 327, 335 (8th Cir. 2014) (deference "reflects our general hesitancy to interfere with the administration of a benefits plan").

5.      To prevail on a claim for a breach of the duty of prudence, Plaintiffs must also prove that they were harmed by the breach.  "ERISA requires plaintiffs to prove losses to the plan for any breach of fiduciary duty claim." *Brotherston, v. Putnam Invs., LLC*, No. 15-13825-WGY, 2017 WL 2634361, at *5 (D. Mass. June 19, 2017) (citing *Evans v. Akers*, 534 F.3d 65, 74 (1st Cir. 2008)).  Plaintiffs bear the burden of establishing that they suffered harm.  As the Second Circuit held in *Silverman*, "[c]ausation of damages . . . is an element of the claim, and the plaintiff bears the burden of proving it." *Silverman v. Mut. Benefit Life Ins. Co.*, 138 F.3d 98,

105 (2d Cir. 1998); *see also Brotherston*, 2017 WL 2634361 at *5 ("Courts have consistently

ruled that plaintiffs bear the burden of persuasion to establish loss to the plan as a result of the

breach.").  This Court has refused to adopt burden shifting in ERISA breach of fiduciary duty

claims.  *See Board of Trustees of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, 860 F.

Supp. 2d 251, 260-61 (S.D.N.Y. 2012) (rejecting burden-shifting argument based on same case

on which Plaintiffs rely in argument to adopt burden shifting); *N.Y. Teamsters Council Health &*

*Hosp. Fund v. Estate of DePerno*, 18 F.3d 179 (2d Cir. 1994); *In re State Street Bank & Trust*

*Co. Fixed Income Inv. Litig.*, 842 F. Supp. 2d 614, 653 (S.D.N.Y. 2012) (same); *see also*, *Tatum*

*v. RJR Pension Inv. Committee*, 761 F.3d 346, 375 (4th Cir. 2014) (citing *Silverman* for the

proposition that the burden does not shift in a breach of fiduciary duty claim and distinguishing

*DePerno* because it is a prohibited transaction claim involving self-dealing).

6.       Therefore, even if Plaintiffs could establish that NYU did not follow a prudent

process in monitoring administrative fees and investments, to recover any damages they must

also prove that a similarly situated fiduciary would not have paid similar administrative fees or

offered similar investments.  ERISA § 404(a)(1)(B); *see also DiFelice v. U.S. Airways, Inc.*, 436

F. Supp. 2d 756, 785-86 (E.D. Va. 2006) (fiduciary behavior is assessed in light of industry

standards).  "Even if a [fiduciary] failed to conduct an investigation before making a decision, he

is insulated from liability if a hypothetical prudent fiduciary would have made the same decision

anyway." *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 919 (8th Cir. 1994).

7.       Plaintiffs have failed to satisfy the requisite elements for a breach of fiduciary

duty claim because (1) Plaintiffs cannot demonstrate that Defendant did not engage in a prudent

process, (2) Plaintiffs cannot meet their burden of proving that the Plans' administrative fees and

the TIAA Real Estate Account or the CREF Stock Account were objectively imprudent; and (3) Plaintiffs cannot establish loss to the Plans as a result of the breach.

> **A.      Plaintiffs Have Failed to Demonstrate that Defendant Acted Imprudently With Respect to Administrative Fees.**

8.      This Court previously ruled that Plaintiffs' Amended Complaint stated a claim only to the extent that it alleged that NYU failed to (1) solicit competitive bids; (2) monitor and control recordkeeping fees by not (a) monitoring the amount of revenue sharing received by Plan recordkeepers, (b) determine the competitiveness/reasonability of those amounts, or (c) leveraging the Plans' size to reduce fees, and (3) engage in a timely and reasoned decisionmaking process to determine whether the Plan should use a single recordkeeper.  (ECF No. 79 at 18.)  With respect to the amount of those fees, Plaintiffs alleged that "[e]xperts in the recordkeeping industry" determined that the "market rate" for reasonable annual recordkeeping fees is approximately $35 per-participant.  (ECF No. 79 at 20.)  Plaintiffs' allegations fail, however, because NYU (1) carefully monitored administrative services and fees, (2) retained an industry expert to assist in the process, (3) negotiated significant fee reductions, (4) conducted two requests for proposals for administrative services, and (5) consolidated administrative services with a single vendor for the School of Medicine Faculty Plan and the NYU Faculty Plan.  Further, Plaintiffs failed to provide any credible expert to provide any evidence that a reasonable per-participant recordkeeping fee for the Plans is $35 or that NYU's administrative fees were not objectively prudent.

> **1.      NYU Engaged in A Prudent Process in Reviewing and Monitoring Administrative Fees.**

9.      Plaintiffs failed to demonstrate that NYU employed an imprudent process in reviewing and monitoring administrative fees.  Accordingly, Plaintiffs cannot prevail even if they could prove that it may have been possible to have negotiated or obtained lower fees at any

- 83 -

point in time. *Taylor*, 2009 WL 535779 at *8 ("The prudent person standard does not require the fiduciary to take any particular course of action even if another approach seems preferable." (citing *Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006))).  NYU was not required to scour the market to find the lowest fees available.  *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009).

> **a.     NYU Had a Robust Process for Monitoring Administrative Fees.**

10.     NYU engaged in a robust and prudent process for monitoring administrative fees paid to Vanguard and TIAA.  NYU's robust and prudent process is evidenced by hundreds of pages of Committee records documenting the Committee's analysis of the administrative fees, including Committee meeting minutes (FOF at ¶ 67; DX887 Halley Decl. ¶¶ 23-37), Committee materials prepared by Cammack (FOF at ¶¶ 67-69), and responses to RFPs from various vendors (including but not limited to Vanguard and TIAA) (FOF at ¶¶ 71-106).  NYU carefully reviewed all of the materials received from Cammack regarding the investments in the Plans.  (*See, e.g.*, DX884 (Surh Decl. ¶ 8); DX885 (Sanchez Decl. ¶ 7)).

11.     The fact that NYU closely monitored the Plan's fees is also evidenced by the fact that, throughout the putative class period, the Committee and Cammack negotiated reductions in the administrative fees paid to Vanguard and TIAA.  (*See infra* ¶¶ 16-21.)

12.     NYU received and reviewed detailed statements from Vanguard and TIAA that provided specific total dollar amounts for their respective fees for the respective Plans.  (FOF ¶¶ 67-70; PX0752 (2012 Service Provider Summary for School of Medicine Faculty Plan)); DX053 (2012 Investment Options Comparative Chart for School of Medicine Faculty Plan); DX886 (Petti Decl. ¶¶ 51-55); DX883 (Meagher Decl. ¶¶ 50-55).

13.     Defendant's expert Marcia Wagner, a well-recognized employee benefits attorney with over 30 years of experience advising plan sponsors, fiduciaries, and service providers, reviewed the Committee's due diligence process and decisions and rendered a detailed opinion that concluded that:

> Based on the forgoing analysis and my extensive experience in counseling 403(b) and 401(k) fiduciaries responsible for selecting plan menus and hiring plan service providers with respect to their fiduciary duties, I conclude without reservation that during the class period, the NYU Retirement Committee followed procedures that were prudent and fully consistent with its fiduciary duties under ERISA with respect to its decision to retain TIAA as the recordkeeper for the Faculty and Medical Plans and with respect to the related fees paid as compensation for these services.

(DX889B (Wagner Revised Decl. ¶ 6 (incorporating ¶ 109)).

### b.     NYU Retained an Industry Expert to Analyze the Plans' Administrative Fees.

14.     NYU also retained an industry expert, Cammack, to analyze and assist in monitoring the Plans' administrative fees.  (FOF at ¶¶ 57-70.)  The Committee, with the assistance of Cammack, repeatedly analyzed whether the fees paid to Vanguard and TIAA were competitive and reasonable.  That process included multiple RFPs, numerous discussions with Cammack, and negotiations with Vanguard and TIAA.  (FOF at ¶¶ 57-138.)  This process allowed the Committee to benchmark the administrative fees paid to TIAA and Vanguard against those charged to other plans and those charged by other providers.  (FOF at ¶¶ 57-140.)  Based on this record, Cammack concluded that NYU went through "a due diligence exercise to provide participants with a *low cost and competitive* plan."  (FOF at ¶ 92; DX560 (March 18, 2010 Meeting Minutes of the Committee (mistakenly marked March 18, 2009), at NYU0002875) (emphasis added)).

- 85 -

15.     In considering the reasonableness of the fees, the Committee gave appropriate consideration to the type, nature, and quality of the administrative services the Plans required, the different needs and circumstances of the two Plans, the different expectations of participants in the two Plans, the capabilities of various vendors to provide all of the services required by the Plans, the unique nature of the TIAA annuities, the fact that no other vendor could administer the TIAA annuities, the fact that participants in the Plans had previously invested billions of dollars in these TIAA annuities, the fact that the Committee could not override the participants' investment elections in the TIAA annuities without their consent, and the fact that participants were provided detailed information regarding the Plans and the Plans' Investment alternatives. (FOF at ¶ 68.)

> ### c.     NYU Negotiated Significant Reductions in Administrative Fees.

16.     The Committee negotiated administrative fee agreements with Vanguard and TIAA in which administrative fees were expressed in basis points, each of which represented one-hundredth of one percent of plan assets being administered, and were paid with revenue sharing credits that were fully disclosed to the Committee, the Plans, and their participants.  This method of paying administrative fees is normal, customary and well-accepted as a matter of law. (ECF No. 79, Opinion and Order, at p. 21 (recognizing that revenue sharing is a "common industry practice")); *Tussey*, 746 F.3d at 336 (asset-based revenue sharing is a "common" and "acceptable investment industry practice[]"); *see also Renfro v. Unisys Corp.*, 671 F.3d 314, 326-28 (3d Cir. 2011); *Hecker*, 556 F.3d at 585; *White v. Chevron Corp.*, No. 16-cv-0793-PJH, 2016 WL 4502808, at *15 (N.D. Cal. Aug. 29, 2016); DX893 (Rezler Decl. ¶¶ 23; 24); ECF No. 283, ECF No. 283-1, Heming Dep. Designation at 258:4-12, 258:15-259:2 (explaining that asset-based revenue sharing arrangements are common and that flat per-participants fees are no more

transparent than revenue sharing arrangements)); DX889B (Wagner Revised Decl. ¶ 6 (incorporating ¶¶ 44-45).

17.     The Committee negotiated significant reductions in the administrative fees paid by the Plans.  During the past 6 years, the Committee successfully negotiated an *84% reduction* in the rate of administrative fees charged by TIAA.  When the Committee began its review of fees in 2009, TIAA was receiving administrative fees of approximately 19.9 basis points on the individual annuity contracts in effect prior to the effective date of the new 403(b) regulations.  (FOF at ¶ 112).  In response to the first RFP issued by the Committee for administrative services in 2009, TIAA initially offered to reduce that rate to 15 basis points for new investments if TIAA was selected as the sole administrator for all plans across the NYU system (including the Plans at issue and over a dozen more).  (FOF at ¶ 112).  The Committee rejected this proposal because it would have allowed TIAA to continue to earn the 19.9 basis points on existing contracts.  (FOF at ¶¶ 112-114).  As a result, TIAA offered 10 basis points, again with the same conditions that TIAA become sole recordkeeper for the entire system and that the fees would apply only to new investments.  (FOF at ¶¶ 114).  The Committee rejected that offer, and TIAA countered with an offer of 13.8 basis points on all plans and all contracts, subject, again, to the Committee agreeing that TIAA would be the sole administrator of all NYU Plans.  (FOF at ¶¶ 115-116).  Finally, after further negotiations with TIAA, TIAA agreed to a fee of 13.8 basis points on all TIAA assets for the NYU Faculty Plan, despite NYU not agreeing to have TIAA serve as the sole recordkeeper for all of NYU's plans, and 10 basis points on all assets for the School of Medicine Faculty Plan.  (FOF at ¶¶ 116-118).

18.     The Committee continued to monitor and negotiate reductions of TIAA's administrative fees over the entire putative class period.  In 2014, the Committee negotiated a

further reduction of TIAA's fees for the School of Medicine Faculty Plan from 10 to 9 basis points and, in 2016 the Committee negotiated a reduction of the NYU Faculty Plan's fees from 13.8 to 10 basis points. (FOF at ¶¶ 119, 121). TIAA agreed to reduce the NYU Faculty Plan fees to 3.2 basis points effective April 1, 2017. and then again to 3.0 basis points, effective April 2018. (FOF ¶ 120). Likewise, TIAA agreed to reduce the School of Medicine Faculty Plan fees to 4 basis points, effective January 1, 2017. (FOF at ¶ 122).

19.    The Committee also continually monitored and negotiated Vanguard's fees. During this period, the Committee negotiated a *40% reduction* in Vanguard's administrative fees for the NYU Faculty Plan, reducing them from approximately 10 basis points to 6 basis points. (FOF at ¶¶ 126.)

20.    In summary, between 2012 and 2016, total administrative fees for the NYU Faculty Plan were reduced from $2.88 million to $2.37 million. (FOF at ¶ 130). During this period, assets increased from $1.98 billion to $2.62 billion and the number of Plan participants increased from 14,368 to 18,551. (FOF at ¶ 130). Likewise, the School of Medicine Faculty Plan's total administrative fees fell from $1.56 million in 2013 to $1.48 million in 2016, despite the fact that during that period of time that Plan's assets grew from $1.65 billion to $2.02 billion and the number of Plan participants grew from 7,765 to 8,560. (FOF at ¶ 131.)

21.    Vanguard and TIAA are known to be low-cost providers of mutual funds and annuities, respectively. *See Amron v. Morgan Stanley Inv. Advisors Inc.*, 464 F.3d 338, 345 (2d Cir. 2006) ("That a mutual fund has an expense ratio higher than Vanguard, a firm known for its emphasis on keeping costs low, raises little suspicion"); TIAA, *Ratings and Rankings*, *available at* https://www.tiaa.org/public/about-tiaa/awards-recognition (last accessed Jan. 7, 2018).

- 88 -

     **d.**  **NYU Conducted Two Requests for Proposals During the Class Period.**

  22.  NYU conducted two RFPs for administrative services during the alleged putative class period.  The first recordkeeping RFP and consolidation was initiated in 2009 and completed in March 2013, and the second RFP began approximately 3 years later, in June 2016.  (PX0471, June 1, 2016 Retirement Committee Meeting Minutes (NYU0002889)).

  23.  In 2009, NYU issued its first RFP to a number of potential vendors, including TIAA, Vanguard, Fidelity, Diversified Investment Advisors, Great West, Prudential, Hewitt, and ACS.  (FOF at ¶¶ 76, 83.)  The Committee received and carefully reviewed proposals from all of these vendors except Prudential, Hewitt, and ACS, who declined to respond.  (FOF at ¶ 79.)  The Committee considered various factors with respect to the vendors' proposals, including critical technological capabilities, ability to provide enhanced and branded electronic messaging, ability to provide NYU-dedicated web and phone assistance, on-site participant investment education, investment alternatives, and, of course, fees and expenses.  (FOF at ¶¶ 76-82.)  As part of this review, the Committee reviewed Fidelity's fees to determine whether Fidelity would be an appropriate and favorable vendor.  The October 2009 summary of the responses to the RFP prepared by Cammack discussed Fidelity's "flat dollar per participant fee," but found that it did not include the same services "e.g. employee education/counseling" that was included in the prices of the other offers.  (PX0133-PX0134 (403(b) and 457(b) Plans Request for Proposal Results at CLC0022543); *see also* PX0470 (December 9, 2009 Retirement Committee Meeting Minutes  at NYU0002886 (discussing review of Cammack's summary and discussion that "Fidelity will need to be considered")).)  After an extensive review of these proposals, consideration of the needs of the Plans and their participants, the capabilities of each of the vendors submitting proposals, advice from Cammack, and consideration of fees, the Committee

engaged TIAA and Vanguard to provide administrative services to the NYU Faculty Plan and

TIAA to provide administrative services to the School of Medicine Faculty Plan.  (FOF at ¶¶ 70-

91.)

24.    The Committee conducted a second RFP in 2016.  (FOF at ¶ 95.)  The Committee

chose to wait until 2016 due to a number of factors, including the fact that NYU was engaged in

a long-term project to implement  new computer and operating systems which was a "massive'

undertaking that prevented NYU from implementing a change in recordkeepers for the NYU

Faculty Plan; NYU was incorporating the NYU Polytechnic school into NYU, which was not

completed until September 2014; there was a vote of "no confidence" by NYU faculty in

President John Sexton, resulting in a period of disruption" concerns over adverse impacts of

"participant disruption."  (FOF at ¶¶ 95-97; Petti Trial Testimony, Tr. at 542:1-16.)

25.    The 2016 RFP was sent to TIAA, Vanguard, Fidelity, VALIC, and Voya

Financial.  (FOF at ¶ 98.)  The Committee received and carefully reviewed responses from all of

these vendors other than Fidelity, which declined to submit a proposal.  (FOF at ¶ 93.)  Again,

the Committee considered hundreds of pages of responses that provided detailed information

regarding the capabilities and experience of these vendors, their ability to provide the nature and

quality of the services expected by Plan participants, and the fees and expenses they proposed to

provide those services.  (FOF at ¶ 96.)  As a result of this competitive RFP process, the

Committee retained TIAA as the sole administrator, but only after it agreed to a 70% reduction

in the rates it was then charging for administrative services.  (FOF at ¶¶ 97, 106.)

###### e.    NYU Consolidated Vendors.

26.    The Committee employed a robust and prudent process to determine whether and

when to consolidate recordkeeping services.  Early on, the Committee began to consider the

potential benefits of vendor consolidation, although it noted that this was not a short-term

priority because of the history and complexity of the Plans, the unique nature of the TIAA

contracts, the expectations of Plan participants, and other operational considerations.  (FOF at ¶¶

73-93; DX889B (Wagner Revised Decl. ¶ 6 (incorporating ¶ 87)).

      27.     In 2012, the Committee consolidated the School of Medicine Faculty Plan's

administrative services with TIAA but did not make the same decision for the NYU Faculty Plan.

(FOF at ¶¶ 70-99.)  In doing so, the Committee discussed and considered the fact that the NYU

Faculty Plan and the School of Medicine Faculty Plan had different participant needs and

expectations, and determined that the advantages of consolidation outweighed the costs and

perceived risks and would be beneficial and appropriate for the School of Medicine Faculty Plan

at that time.  (FOF at ¶ 88.)  Further, the Committee believed that consolidation to one vendor for

the NYU Faculty Plan was particularly difficult due to the ongoing massive project of updating

NYU's technology and operating systems and the need to anticipate and consider potential

faculty input, therefore delaying consolidation to provide time to ensure that the necessary time,

attention and care could be given to the project.  (FOF at ¶¶ 93-95.)

      28.     After significant TIAA fee reductions negotiated in 2017 in connection with the

second RFP, the Committee decided that it was appropriate to consolidate the administration of

the NYU Faculty Plan with TIAA effective in 2018.  (FOF at ¶¶ 21, 93-96, 114.)

      29.     The fact that the School of Medicine Faculty Plan consolidated services with a

single provider before the NYU Faculty Plan did the same does not support a claim of

imprudence because of significantly different facts and considerations applicable to NYU and the

Medical School.  Moreover, even if the circumstances were comparable, prudent conduct is not

evidence of imprudent conduct. *Laboy v. Bd. of Trs. of Bldg. Serv. 32 BJ SRSP*, No. 11 Civ. 5127

(HB), 2012 WL 3191961, at *3 (S.D.N.Y. Aug. 7, 2012) ("It would turn the law on its head were

we to embrace a concept where a plaintiff could use allegations of prudent measures to prove a defendant's imprudence . . . .").

30. Further, although Plaintiffs allege that a single vendor is always in the best interests of plan participants because the consolidation will always result in lower administrative fees, they are wrong.  (ECF No. 39, Am. Compl. ¶ 95, 99, 102-103).  In this case, administrative fees for the NYU Faculty Plan were actually *lower* than for the School of Medicine Faculty Plan in every year following the School of Medicine Faculty Plan's vendor consolidation in 2012. (FOF at ¶ 133)  On average, in each of those years, although School of Medicine Faculty Plan total administrative fees went down as described in ¶¶ 11-15 *supra*, the administrative fees in the NYU Faculty Plan, when analyzed on the per-participant basis which Plaintiffs seem to prefer, were 6%-26% *less* than in the School of Medicine Faculty Plan.  (FOF at ¶ 133)

31. Plaintiffs failed to meet their burden in this case because they failed to establish that the Plans' administrative fees were excessive under the circumstances.  *Young v. Gen. Motors Inv. Mgmt. Corp.*, 325 F. App'x 31, 33 (2d Cir. 2009) (citing *Krinsk v. Fund Asset. Mgmt., Inc.*, 875 F.2d 404, 409 (2d Cir. 1989)).  Plaintiffs have not offered any evidence sufficient to support the conclusion that the fees paid by the Plans were excessive to the services rendered by the Plans' service providers.

## 2. NYU's Decisions Regarding Administrative Fees Were Objectively Prudent.

32. Plaintiffs cannot establish that a fiduciary standing in NYU's shoes would have acted differently, would have consolidated vendors earlier than it did, or would have negotiated even lower administrative fees.  ERISA § 404(a)(1)(B); *see also DiFelice*, 436 F. Supp. 2d at 785-86 (fiduciary behavior is assessed in light of industry standards); *Roth*, 16 F.3d at 919 ("Even if a [fiduciary] failed to conduct an investigation before making a decision, he is

- 92 -

insulated from liability if a hypothetical prudent fiduciary would have made the same decision anyway.").

33.     Plaintiffs did not establish that they suffered any harm based on their "one vendor is prudent but two vendors is imprudent" argument.  Due to the structure and history of 403(b) plans, it is typical to have more than one vendor, especially where 403(b) plans have legacy TIAA annuity contracts that can only be administered by TIAA.  In fact, a review of TIAA's 200 largest clients with at least one 403(b) plan for the period of 2010 through 2016, demonstrates that between 110 and 147 of those TIAA clients employed a multi-vendor approach.  (FOF at ¶ 137) In other words, for every year during the putative class period, the *majority* of TIAA's largest 200 clients with at least one 403(b) plan used a multi-vendor approach.  (FOF at ¶ 137)  Similarly, Cammack reviewed its relevant client base and confirmed that in 2016, among the 13 relevant Cammack clients (403(b) plans with TIAA assets ranging from approximately $900 million to more than $7 billion), 6 of those clients used more than one administrator.  (FOF at ¶ 139; DX893 (Rezler Decl. ¶ 16.))

34.     As discussed in ¶ 32 *supra*, Plaintiffs' cut-and-paste argument that a single vendor always results in lower administrative fees is wrong.  This is another example of why courts are reluctant to draw bright-line standards in ERISA contexts.  *See, e.g., Tibble v. Edison Int'l*, 729 F.3d 1110, 1135 (9th Cir. 2013) ("There are simply too many relevant considerations for a fiduciary" for a court to adopt a "bright-line approach to prudence."); *Martinez v. Schlumberger, Ltd.*, 338 F.3d 407, 428 (5th Cir. 2003) (rejecting a bright-line approach to ERISA fiduciary duties); *Manning v. Hayes*, 212 F.3d 866, 872 (5th Cir. 2000) (rejecting a bright-line rule and noting that "simplicity comes at too great a cost").

35.     Plaintiffs cannot establish that the administrative fees paid by the Plans were objectively imprudent because the fees were objectively prudent based on comparison to fees paid by similar plans for similar services.  During the period from 2011 through December 31, 2016, Cammack provided consulting and investment advisory services to several 403(b) plans of similar size that were maintained by similar universities and medical centers.  (FOF at ¶ 129) Thirteen of those plans included assets held on TIAA's recordkeeping platform ranging from approximately $900 million to more than $7 billion, with an average of $2.3 billion.  (FOF at ¶¶ 139-41)  The administrative fees across that comparison group in 2011 ranged from 18 basis points to 9 basis points and, in 2016, ranged from 12 basis points to 5 basis points.  (FOF at ¶ 130)  In 2011, the NYU Faculty Plan had plan assets in the highest quartile and was in the second-lowest quartile for fees paid to TIAA in the comparison group, and in 2016 the NYU Faculty Plan and the School of Medicine Faculty Plan were in the second-lowest quartile of fees paid to TIAA in the comparison group.  (FOF at ¶¶ 130-131; DX893 (Rezler Decl.))

36.     With respect to Vanguard, a number of courts, including the Second Circuit, have recognized that Vanguard is a well-recognized low cost provider.  *See Amron*, 464 F.3d at 345 ("That a mutual fund has an expense ratio higher than Vanguard, a firm known for its emphasis on keeping costs low, raises little suspicion"); *Kasilag v. Hartford Inv. Fin. Servs., LLC*, No. 11-1083 (RMB/KMW), 2012 WL 6568409, at *5 (D.N.J. Dec. 17, 2012) ("To be sure, the Vanguard comparison is extremely limited.").

37.     Vanguard is owned by the Vanguard mutual funds and operates "at cost" and specifically markets itself as a low-cost mutual fund provider.  (FOF at ¶ 24.)

38.     In fact, in numerous other cases, Plaintiffs' counsel has repeatedly touted Vanguard as a low-cost alternative.  *See, e.g.*, Mem. in Opp'n to Def.'s Mot. to Dismiss First Am.

- 94 -

Compl. at 10, 12, *Moreno v. Deutsche Bank Americas Holding Corp.*, No. 1:15cv9936 (S.D.N.Y. 2016), ECF No. 34; Mem. in Opp'n to Mot. to Dismiss at 10, 12, *Smith v. BB&T Corp*, No. 1:15-cv-841-CCE-JEP (M.D.N.C. 2016), ECF No. 51; Pl.'s Opp'n to Mot. to Dismiss at 16, *Kruger v. Novant Health Inc.*, 131 F. Supp. 3d 470 (M.D.N.C. 2015) (No. 1:14-cv-208), ECF No. 26; Mem. in Opp'n to Mot. for Summ. J. at 20, *Abbott v. Lockheed Martin Corp.*, 286 F.R.D. 388 (S.D. Ill. 2012) (No. 06-cv-0701-MJR), ECF No. 164; Pl.'s Mem. in Opp'n to Mot. to Dismiss at 9, 30, *Gordan v. Mass. Mut. Life Ins. Co.*, No. 13-CV-30184-MAP (D. Mass. 2015), ECF No. 26; Mem. in Supp. of Am. Mot. for Class Certification at 6-7, *George v. Kraft Foods Glob., Inc.*, No. 08 C 3799, (N.D. Ill. 2011), ECF No. 271; Pl.'s Mem. of Law in Opp. to Def.'s Mot. to Dismiss First Am. Compl. at 14-15, *Krueger v. Ameriprise Fin., Inc.*, No. 11-cv-02781 (SRN/JSM) (D. Minn. 2012), ECF No. 63; Mem. in Opp'n to Def.'s Mot. for Partial Summ. J. at 10, *Beesley v. Int'l Paper Co.*, No. 3:06-cv-00703-DRH –SCW (S.D. Ill. 2009), ECF No. 276.

39.     Plaintiffs cannot prove that the Plans' administrative fees were objectively imprudent merely by the fact that some similar plans may have paid less fees during this period of time.  *Hecker*, 556 F.3d at 586 (explaining that fees need only be reasonable and that the "fact that it is possible that some other funds might have had even lower ratios is beside the point"); *Young*, 325 F. App'x at 33 (explaining that an excessive fee claim is one of imprudent investment and requiring excessive fee claim plaintiffs to establish that fees "were excessive relative 'to the services rendered'" (quoting *Gartenberg v. Merrill Lynch Asset Mgmt.*, 694 F.2d 923, 928 (2d Cir. 1982))).

B.     **Plaintiffs Cannot Demonstrate That Defendant Acted Imprudently With Respect to the Monitoring of the CREF Stock Account and the TIAA Real Estate Account.**

1.     **The Committee Had a Robust and Prudent Process in Reviewing the Plans' Investment Options, Including the TIAA Real Estate Account and the CREF Stock Account.**

40.     Plaintiffs alleged that (1) NYU failed to monitor the performance of the CREF Stock Account and TIAA Real Estate Account, and (2) the CREF Stock Account did not have a realistic expectation of higher returns than an index fund.  (ECF No. 79 at pp. 23-25.)  Plaintiffs' claims fail, however, because (1) NYU had a robust and prudent process for reviewing the performance of all of the investment funds offered by the Plans, including the CREF Stock Account and TIAA Real Estate Account, and (2) the CREF Stock Account actually outperformed those index funds more than 50% of the time.  (FOF at ¶¶ 162-168; DX891A (Fischel Revised Decl. ¶ 13)).

41.     The Committee had a robust and prudent process that monitored the performance of all investment options including the CREF Stock Account and the TIAA Real Estate Account, "taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment" and the overall menu of investment options available to Plan participants.  29 C.F.R. § 2550.404a-1(b)(2)(i).  ERISA requires only that the Committee engage in a reasonable process, and Plaintiffs' opinions, investment theories, and preference for one style of investment over another cannot overturn the prudent process followed by the Committee and its expert advisers.  *Taylor*, 2009 WL 535779 at *8 ("The prudent person standard does not require the fiduciary to take any particular course of action even if another approach seems preferable." (citing *Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006))).

42.     NYU employed a highly sophisticated, systematic review of all of the Plans' investment options, including the CREF Stock Account and the TIAA Real Estate Account.  The

Retirement Committee's independent expert, Cammack, provided detailed due diligence reports on all of the Plans' investment alternatives, including the CREF Stock Account and the TIAA Real Estate Account.  (FOF at ¶¶ 66, 132-145; Rezler Trial Testimony, Tr. at 1263:3-7.)  The Committee met on a regular and consistent basis, and met at least 25 times in the six years preceding the filing of the Complaint in this case, to review and monitor the performance of Plan investment alternatives.  (FOF at ¶ 69.)  The process included the review of voluminous materials regarding the Plans' investment alternatives, including the CREF Stock Account and the TIAA Real Estate Account.  (FOF at ¶¶ 132-145.).  The process also included in-person meetings with TIAA personnel specifically regarding the performance and evaluation of the CREF Stock Account and the TIAA Real Estate Account.  (FOF at ¶¶ 143, 145-187.)

43.     The Committee considered several factors commonly used by fiduciaries in reviewing plan investment funds, including volatility, ratings, risk and return characteristics, risk-adjusted returns, performance deviations, and style drift.  (FOF at ¶¶ 65, 148; DX889B (Wagner Revised Decl. ¶ 6 (incorporating ¶ 108)).  One of the factors used by Cammack and the Committee to analyze the funds was a widely-used measure of performance called "alpha," which is defined as the difference between the actual return and expected return.  (FOF at ¶ 65.)  This is an important and relevant measure of a fund's performance and, as summarized by Defendant's expert Dan Fischel, the alphas analysis for both the CREF Stock Account and the TIAA Real Estate Account confirm that each performed well based on their relative level of risk.  (DX891A (Fischel Revised Decl. ¶ 7 (incorporating ¶¶ 23-25, 29-30)).

44.     The CREF Stock Account was never on the watch list because nothing regarding its performance warranted including it on the list.  (FOF at ¶¶ 158-169.)  Nevertheless, the Committee specifically analyzed and considered the CREF Stock Account's performance,

considering its unique diversified blend of small, mid, and large company domestic equities and up to 30 percent foreign equities.  (FOF at ¶¶ 158-169.)  Cammack and the Committee analyzed the performance of the CREF Stock Account in light of a composite benchmark comprised of 70 percent domestic equities and 30 percent foreign equities mixture, in addition to reviewing its performance compared to the Russell 3000, which does not have this level of diversification. (FOF at ¶¶ 158-169.)  The Committee also analyzed the CREF Stock Account in the context of the Plans' total investment lineup, which also included stock index funds for participants who preferred that style of investment.  (FOF at ¶¶ 158-169.)

45.     Starting in 2012, as required by the Department of Labor Regulations, TIAA also distributed 404a5 disclosures to participants.  (FOF at ¶ 154.)

46.     NYU properly described the CREF Stock Account as a "Large Blend" domestic fund.  The CREF Stock Account is characterized by Morningstar as "Large Blend."  (PX0657 (TIAA NYU Investment Options Comparative Chart (explaining that the "category" is the Morningstar Category))).  Further, Morningstar's publicly available information illustrates that the fund's holdings satisfy Morningstar's criteria for "Large Blend."  Morningstar's publicly available data definitions explain that "Large" refers to capitalization and "Blend" refers to Domestic Stock funds "with at least 70% of assets in domestic stocks."  *See* Morningstar Report: Mutual Fund Data Definitions, https://quicktake.morningstar.com/DataDefs/FundSnapshot.html (last accessed March 20, 2018).  Further, those same definitions explain that an international stock fund is a fund that has "invested 40% or more of their equity holdings in foreign stocks." *See also*, CREF Stock R1, http://quote.morningstar.com/fund/chart.aspx?t=QCSTRX (last accessed March 20, 2018) (Morningstar category for CREF Stock is "Large Blend")).

47.     From Q1 2010 through Q3 2011, the Committee did put the TIAA Real Estate Account on the watch list based on Cammack's advice, considering the account's then 3 and 5 year trailing performance following the crash of the U.S. real estate market, and its performance compared to the Dow Jones U.S. Select Real Estate Investment Trust ("REIT") index.  (FOF at ¶¶ 174-187.)  During that period of time, the Committee acted prudently by questioning Cammack and TIAA regarding the fund's management, investments, performance, and benchmark.  (FOF at ¶¶ 174-187.)

48.     At its April 1, 2011 meeting, the Committee raised concerns about benchmarking the Real Estate Account against a REIT index because of the significant differences between the Real Estate Account, which held direct investments in real property, and REITs, which were publicly traded and derived value from market perceptions of value.  (FOF at ¶¶ 177-187.)  Cammack and the Committee understood and considered that because of these differences, the Real Estate Account was difficult to benchmark.  (FOF at ¶¶ 177-187.)  At that time, the Committee also reviewed supplemental meeting materials provided by Cammack, which contained over 25 pages of detailed information regarding the TIAA Real Estate Account, its composition, investment strategy, account management, risks, liquid asset holdings, and performance versus various comparisons and indexes.  (FOF at ¶¶ 177-186.)

49.     At its next meeting two months later, the Committee again discussed the TIAA Real Estate Account's performance and at that time, Cammack noted that the Account continued to recover from the financial downturn along with the rest of the U.S. real estate market.  (FOF at ¶ 178.)  Although the account remained on the watch list, based on this review, Cammack did not recommend removal of the fund because the Account had "begun to recover along with the general recovery of the US commercial real estate market."  (FOF at ¶ 178.)

- 99 -

50.     Two months after that, at the Committee's August 2011 meeting, Cammack advised that the Committee continue to carefully monitor the TIAA Real Estate Account, but not remove it from the Plans' menus because it had positive returns and was "expected to continue to recover as the U.S. commercial real estate market recovers."  (FOF at ¶ 179.)

51.     The Committee continued to give this Account special scrutiny and invited TIAA representatives to attend its February 21, 2012, Committee meeting to address its concerns and provide further information about the performance of the Real Estate Account.  (FOF at ¶¶ 180-187).  TIAA representatives addressed the Account's performance, which was strong in 2011 and was expected to continue to perform well in 2012.  TIAA also addressed the Committee's questions about appropriate measures for evaluating the Account's performance, acknowledging the unique nature of the Account, and provided an additional benchmark, which was designed to provide the Committee with additional information regarding the performance of that fund based on its unique structure and lack of peer funds.  (FOF at ¶¶ 177-187).  Thereafter, the Committee continued to closely monitor the Real Estate Account, and continues to do so to this day.

52.     Based on her review of the Committee's process for monitoring the Plans' Investment options, including the TIAA Real Estate Account and the CREF Stock Account, Defendant's expert Marcia Wagner concluded:

> Based on my experience in advising plan fiduciaries with respect to plan investment menus, I further conclude that the NYU Retirement Committee followed appropriate procedures and exercised prudent judgment in retaining the TIAA Real Estate Account and CREF Stock Account on the investment menus of the Plans.

(DX889B (Wagner Revised Decl. ¶ 6 (incorporating ¶ 109)).

2.     **The TIAA Real Estate Account and CREF Stock Account are Objectively Prudent Investment Alternatives for the Plans.**

53.     Plaintiffs cannot meet their burden of proving that the TIAA Real Estate Account or the CREF Stock Account were objectively imprudent.  ERISA's prudence standard is objective and a large number of similarly situated fiduciaries have determined that the CREF Stock Account and the TIAA Real Estate Account are prudent investment options for their plans. *La Scala v. Scrufari*, 479 F.3d 213, 219 (2d Cir. 2007).  In the six years prior to the filing of the Complaint, 99% of TIAA's 200 largest 403(b) plan clients had investments in the CREF Stock Account and the TIAA Real Estate Account.  (FOF at ¶¶ 158, 188-191).  During that same time, 99% of TIAA's 200 largest 403(b) plan clients offered the CREF Stock Account as an investment option for ongoing 403(b) contributions, and between 86% and 95% of those same clients offered the TIAA Real Estate Account as an investment option for ongoing 403(b) contributions.  (FOF at ¶¶ 188-189)  As a further indication of the objective prudence of these funds, the CalTech 403(b) plan, which Plaintiffs hold out as an example of prudent management, offers the TIAA Real Estate Account.  (DX891A (Fischel Revised Decl. ¶ 7 (incorporating ¶¶ 22, 28)).

54.     Plaintiffs' allegation that these funds consistently underperformed based on 20/20 hindsight is simply wrong.  Dan Fischel demonstrates that both the CREF Stock Account and the TIAA Real Estate Account performed well over the putative class period.  (DX891A (Fischel Revised Decl. ¶ 7 (incorporating ¶ 25)); FOF at ¶¶ 176-180; DX889B (Wagner Revised Decl. ¶ 8 (incorporating ¶ 100)).  Both closely tracked the performance of their respective benchmarks during the one, five, and ten-year periods ending on December 31 of each year from 2009 through 2016, and the one, five and ten-year periods ending June 30, 2017.  (FOF at ¶¶ 188-191; DX891A (Fischel Revised Decl. ¶ 7 (incorporating ¶¶ 22, 28)).  And, although Plaintiffs allege

- 101 -

that the CREF Stock Account should have been removed from the Plans based on its performance as of December 31, 2009, the CREF Stock Account had a 1-year return of 32.04 in 2009, followed by 15.73 in 2010.  (FOF at ¶¶ 191; DX891A (Fischel Revised Decl. ¶ 7 (incorporating ¶¶ 22, 28)).  The TIAA Real Estate Account's returns in 2010 were 13.3, and by 2014, the account had 3-year returns of 10.64 and 5-year returns of 11.63.  (FOF at ¶ 191; DX891A (Fischel Revised Decl. ¶ 7 (incorporating ¶¶ 22, 28)).

55.     The fact that the CREF Stock Account and the TIAA Real Estate Account have performed well has not been lost on Plaintiffs.  Plaintiffs Crispin Miller, Monaco, Samuels and Straussner remain invested in the CREF Stock Account to this day.  (FOF at ¶¶ 38, 41, 44, 51.) Plaintiff Straussner invests a third of her School of Medicine Faculty Plan account in the CREF Stock Account.  (FOF at ¶ 44.)  Likewise, Plaintiffs Monaco and Straussner apparently do not believe the allegations made in the Amended Complaint regarding the performance of the TIAA Real Estate Account, as they both continue to maintain significant investments in that fund. (FOF at ¶¶ 41, 44.)

56.     Plaintiffs' assertion that NYU breached ERISA's duty of prudence by offering the actively managed CREF Stock Account instead of a passive index account is simply wrong. Nothing in ERISA creates a preference for one type of fund over another.  *See Hecker*, 556 F.3d at 586 ("We see nothing in [ERISA] that requires plan fiduciaries to include any particular mix of investment vehicles in their plan.").  Indeed, the U.S. Department of Labor recognizes that plans typically offer "actively managed" funds.  U.S. Dep't of Labor, Emp. Benefits Sec. Admin., *A Look at 401(k) Plan Fees*, at 7 (Aug. 2013).

57.     The law of trusts, upon which the ERISA duty of prudence is based, recognizes the prudence of using active management.  Restatement 3d of Trusts, § 90 cmts. e(1) and f at

304, 307 (observing that "active management strategies" are permissible and "[t]here are no universally accepted and enduring theories of financial markets or prescriptions for investment that can provide clear and specific guidance to trustees and courts, varied approaches to the prudent investment of trust funds are therefore permitted by the law").  Finally, courts have specifically rejected the theory that a plaintiff can establish a breach of the duty of prudence by comparing a passively-managed Vanguard index fund to an actively-managed fund.  *See, e.g.,* *Brotherston v. Putnam Invs., LLC*, No. 15-13825-WGY, 2017 WL 1196648, at *7 (D. Mass. Mar. 30, 2017) (rejecting, on written record, damage model that compared active and passive funds as "apples and oranges").

58.     Moreover, Plaintiffs' claim that the CREF Stock Account consistently underperformed the Russell 3000 Index and two passively managed index funds (VITPX and VIIIX) is also wrong.  On a monthly basis during the period selected by Plaintiffs for comparison (10-year periods ending December 31, 2009 and 2014), the CREF Stock Account actually *outperformed* these index funds about 50% of the time.  (FOF at ¶¶ 179-180; DX891A (Fischel Revised Decl. ¶ 13).

59.     It is important to recognize that the Plans in this case offered participants *both* actively and passively managed index funds, including the passively managed Vanguard funds Plaintiffs use as inapt comparisons to the CREF Stock Account.  (FOF at ¶¶ 15, 20.) Thus, NYU "left choice to the people who have the most interest in the outcome, and it cannot be faulted for doing this." *Loomis v. Exelon Corp.*, 658 F.3d 667, 673-74 (7th Cir. 2011).  The Plans disclosed to participants the CREF Stock Account's investment managers, performance, investment strategy, fees, and that it was an actively managed fund.  (FOF at ¶¶ 68, 166; DX053 (2012 Investment Options Comparative Chart for School of Medicine Faculty

Plan).  "Given the numerous investment options, varied in type and fee, [defendants] . . . can be held responsible for those choices."  *Hecker*, 556 F.3d at 590.

60.     Finally, even if Plaintiffs were able to satisfy the requisite elements of a breach of fiduciary duty claim, which they cannot, Plaintiffs' claims based on allegations prior to August 9, 2013 are barred by ERISA's statute of limitations.

61.     ERISA's statute of limitations requires that a plaintiff bring suit within the earlier of six years after "the date of the last action which constituted part of the breach" or "three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation."  ERISA § 412(2).  "A plaintiff has 'actual knowledge' of a breach 'when he has knowledge of all the material facts necessary to understand that an ERISA fiduciary has breached his or her duty or otherwise violated the Act.'"  *Young v. Gen. Motors Inv. Mgmt. Corp.*, 550 F. Supp. 2d 416, 418 (S.D.N.Y. 2008) (citing *Caputo v. Pfizer*, 267 F.3d 181, 193 (2d Cir. 2001)).  Likewise, a plaintiff has "actual knowledge" of an alleged prohibited transaction when has "knowledge of the facts of the underlying transaction—without more."  *Krueger v. Ameriprise Fin. Inc.*, No. 11-cv-02781 (SRN/JSM), 2014 WL 1117018, at *10 (D. Minn. Mar. 20, 2014).

62.     A plaintiff has "actual knowledge" of the facts necessary to bring an excessive fee claim when fees are "readily apparent from the information provided to all Plan participants more than three years before Plaintiffs filed th[e] suit."  *Young*, 550 F. Supp. 2d at 418, 420.

63.     Prior to three years before they filed suit (August 9, 2013), Plaintiffs were provided detailed disclosures required by ERISA that included the investment alternatives available under the Plans, the expense ratio for each of the investments, each investment's

benchmark, summaries of each investment's performance, and a description of the various funds and related fees.  (FOF at ¶¶ 68, 166; DX080 (2012 404a5 (NYU Faculty Plan)); DX145 (2012 404a5 (School of Medicine Faculty Plan)).  Plaintiffs, therefore, had all of the information they needed to raise claims challenging the Plans' fees and the performance of the CREF Stock Account and the TIAA Real Estate Account before August 9, 2013. Accordingly, Plaintiffs' claims based on allegations prior to August 9, 2013 are barred by ERISA's statute of limitations.

64.    The Court enters judgment in favor of the Defendant.

<u>DEFENDANT'S SUPPLEMENTAL FINDINGS OF FACT AND</u>
<u>CONCLUSIONS OF LAW</u>

**I.     NYU DID NOT HAVE FIDUCIARY AUTHORITY OR CONTROL OVER THE TIAA ANNUITY CONTRACTS.**

      **A.     Additional Facts Regarding the Plans and the TIAA Annuity Contracts.**

            **1.     The TIAA Annuity Contracts.**

    1.    Participants in the NYU Faculty Plan and the School of Medicine Faculty Plan have over a period of many years elected to invest their contributions in annuity contracts issued by TIAA to the individual participants.  Each of these contracts issued to participants provides for a fixed annuity referred to as "TIAA Traditional" and a companion CREF Certificate which provides for a variable annuity.  These contracts are referred to as "legacy" or "Retirement Annuity" contracts.  (DX892 Chittenden Decl. ¶¶ 22-37, 84; DX883 Meagher Decl. ¶¶ 27-29).

    2.    TIAA was established in 1918 by Andrew Carnegie and the Carnegie Foundation for the Advancement of Teaching as a New York insurance company to provide retirement solutions and life insurance to educators.  (Chittenden Decl. ¶ 5).  TIAA has operated without profit over the past 100 years, and historically has limited its institutional clients to tax-exempt, non-profit, and governmental clients.  (Chittenden Decl. ¶¶ 7, 9).

    3.    TIAA is not publicly traded and therefore not subject to short-term shareholder interests.  TIAA has subsidiaries, affiliates and businesses it owns that operate for profit. The revenues earned by those entities are held internally, reinvested in the business, or used to make supplemental payments (in addition to contractually required ones) to plan participants who have TIAA Traditional fixed annuity accounts.  (Chittenden Decl. ¶ 10).

    4.    TIAA holds the highest rating currently awarded from all four leading independent insurance industry ratings agencies, and has been awarded numerous best-in-class awards for retirement plan participant and plan sponsor services.  (Chittenden Decl. ¶ 11).

- 106 -

5.      TIAA Traditional is a fixed annuity that provides contract holders with guaranteed principal and a minimum guaranteed crediting rate, as well as the option for additional amounts and guaranteed lifetime income (among other payout options available to retiring participants).  (Chittenden Decl. ¶ 12).

6.      Over the last 100 years, TIAA Traditional has never missed a payout – even during periods of war, recession, and financial turmoil.  (Chittenden Decl. ¶ 13).

7.      Like any annuity, TIAA Traditional has two distinct phases: accumulation and payout.  A participant puts money into Traditional during the accumulation phase, and then may receive a lifetime income stream (or other income options) during the payout phase.  (Chittenden Decl. ¶ 14).

8.      Contributions to TIAA Traditional during the accumulation phase are guaranteed to earn a minimum crediting rate (*i.e.*, a guaranteed minimum rate of return), which varies depending upon the annuity contract purchased by contract holders.  (Chittenden Decl. ¶ 15).

9.      TIAA also may declare additional amounts to be credited to annuitants in excess of the guaranteed minimum crediting rate.  TIAA has declared additional amounts in every year since 1948.  (Chittenden Decl. ¶ 16).

10.     Total crediting rates (guaranteed minimum plus additional amounts credited) vary depending upon the annuity contract type and the date of contribution.  TIAA Traditional credits interest based on the period during which the participant makes each contribution.  (Chittenden Decl. ¶ 17).

11.     In addition to the guaranteed minimum crediting rates and additional crediting amounts that TIAA may declare, TIAA also periodically returns unused contingency reserves to participants who accumulated over time in TIAA Traditional and then annuitized.  As an

- 107 -

insurance company, TIAA is required to maintain contingency reserves to ensure that it will be able to fulfill its contractual obligations to policyholders, even in the face of unexpected adverse circumstances.  To the extent that built-up reserves on older contributions are not needed over time, TIAA makes distributions to accumulating participants in the form of additional annuity income during the payout phase.  A typical stock insurance company can distribute unneeded reserves to its stockholders, but TIAA distributes unneeded reserves to its participants.  This is a unique and significant benefit for participants in TIAA Traditional that accumulate over longer periods of time (as opposed to transferring in shortly before selecting lifetime income). (Chittenden Decl. ¶ 18).

12.     At the payout phase, a participant has the flexibility to take accumulated money out of TIAA Traditional in many ways. These include several lifetime income options (guaranteed lifetime payments) and several non-lifetime income options.  (Chittenden Decl. ¶ 19).

13.     The TIAA General Account backs the guarantees and benefits of TIAA Traditional.  (Chittenden Decl. ¶ 20).

14.     As of the end of 2016, TIAA has paid over $394 billion in benefits to retired participants.  (Chittenden Decl. ¶ 21).

15.     TIAA has offered several different TIAA Traditional contracts to plan participants and sponsors over time.  These contracts include Retirement Annuity ("RA"), Group Retirement Annuity ("GRA"), Supplemental Retirement Annuity ("SRA"), and Group Supplemental Retirement Annuity ("GSRA") – colloquially known collectively as "legacy" contracts – as well as the more-recent Retirement Choice ("RC") and Retirement Choice Plus ("RCP").  (Chittenden Decl. ¶ 22).

16.     Participants in the NYU Faculty Plan and the NYU School of Medicine Faculty Plan have over a period of many years elected to invest their contributions in legacy annuity contracts issued by TIAA to the individual participants.  (Chittenden Decl. ¶¶ 22-37; Meagher Decl. ¶¶ 27-29).  The NYU Faculty Plan utilizes RA annuity contracts, while the School of Medicine Faculty Plan utilizes RA, GRA and GSRA Contracts.  (PX0729; PX0731; PX0734; PX0737; PX0739; PX0887).

17.     The Retirement Annuity ("RA") contract is an individually-owned contract between the participant and TIAA.  Employers make contributions to RA contracts but the contracting parties are the participant and TIAA.  The plan sponsor cannot direct the transfer of assets to another investment offered in its retirement plan.  Specifically, the plan sponsor does not have any discretion or authority to change a participant's investment elections or to "map" an individual participant's existing RA assets into any other vehicle or investment.  (Chittenden Decl. ¶ 23).

18.     Lump-sum withdrawals or transfers are not available from TIAA Traditional contributions made to, and earnings in, the RA contract.  Withdrawals and transfers must be paid in 10 annual installments.  These provisions are designed to allow the TIAA General Account, which backs the guarantees and benefits under TIAA Traditional, to invest in longer-dated assets that typically offer higher yields than shorter-term assets.  (Chittenden Decl. ¶ 24).

19.     The minimum guaranteed crediting rate for contributions made in the RA contract is 3.0%.  (Chittenden Decl. ¶ 25).

20.     In 1973, TIAA introduced the Supplemental Retirement Annuity contract.  The SRA contract permits additional tax-deferred annuity contributions, deducted from the

participant's paycheck.  It is a supplement to the standard employer-funded retirement plan.
(Chittenden Decl. ¶ 26).

21.     The SRA contract is also an individually-owned contract between the participant
and TIAA, and the plan sponsor does not have any discretion or authority to change a
participant's investment elections or "map" an individual participant's existing SRA assets into
any other vehicle or investment.  (Chittenden Decl. ¶ 27).

22.     The minimum guaranteed crediting rate for contributions made in the SRA
contract is 3.0%.  (Chittenden Decl. ¶ 29).

23.     In 1984, TIAA introduced the Group Retirement Annuity.  The GRA contract
offers plan participants an additional liquidity option as compared to the RA contract, the other
employer-funded contract.  (Chittenden Decl. ¶ 30).

24.     The GRA contract is a group contract between TIAA and the plan sponsor.  The
sponsor makes contributions to GRA contracts.  Participants receive certificates, and their rights
are enforceable directly against TIAA.  Because the certificates under the GRA contract are
individually-controlled, the plan sponsor does not have any discretion or authority to change a
participant's investment elections or to "map" an individual participant's existing GRA assets
into any other vehicle or investment.  (Chittenden Decl. ¶ 31).

25.     The GRA contract permits lump-sum withdrawals and transfers from TIAA
Traditional, subject to certain limitations.  Within 120 days of termination of employment, the
participant may take a lump-sum withdrawal, subject to a 2.5% surrender charge.  All other
withdrawals and transfers from the account must be paid out in 10 annual installments.
(Chittenden Decl. ¶ 32).

26.     The minimum guaranteed crediting rate for contributions in the GRA contract is 3.0%.  (Chittenden Decl. ¶ 33).

27.     In 1991, TIAA introduced the Group Supplemental Retirement Annuity contract ("GSRA" contract), a group version of the SRA contract.  Contributions to the GSRA contract are employee elective deferrals deducted from the participant's paycheck.  Like the SRA, the GSRA contract supplements the standard employer-funded retirement plan.  (Chittenden Decl. ¶ 34).

28.     The GSRA contract is a group contract between TIAA and the plan sponsor. Participants receive certificates, and their rights are enforceable directly against TIAA.  Because the certificates under the GSRA contract are individually-controlled, the plan sponsor does not have any discretion or authority to change a participant's investment elections or to "map" an individual participant's existing GSRA assets into any other vehicle or investment.  (Chittenden Decl. ¶ 35).

29.     The GSRA contract permits lump-sum withdrawals and transfers from TIAA Traditional without any restrictions or charges.  Total crediting rates are typically lower than for contributions made in the RA and GRA contracts.  The minimum guaranteed crediting rate for contributions made in the GSRA contract is 3.0%.  (Chittenden Decl. ¶ 36).

30.     The RA, SRA, GRA and GSRA contracts include provisions that require the sponsor to offer CREF Stock Account and the CREF Money Market Account as companion investment options on the sponsor's retirement plan menu.  As a result, participants are assured access to diversified retirement offerings through CREF Stock and the CREF Money Market Account and the plan sponsor does not have any discretion or authority to take those investment options away from plan participants.  TIAA does not require that participants in TIAA

Traditional invest in the CREF Stock Account or the CREF Money Market Account.  The individually-controlled contracts cannot be amended by plan sponsors to remove the requirement that CREF Stock Account and the CREF Money Market Account are a bundled offering with TIAA Traditional.  (Chittenden Decl. ¶ 38).

31.     The TIAA annuity contracts available to participants in the NYU Plans are very typical for 403(b) plans.  In fact, many of TIAA's largest institutional clients continue to have 403(b) plans funded with these legacy contracts.  (Chittenden Decl. ¶ 38).  The higher minimum crediting rate guaranteed by these contracts makes them attractive to plan sponsors, which frequently value higher guaranteed returns for their participants over the ability to map assets.  (Chittenden Decl. ¶ 37).

32.     At trial, Mr. Chittenden testified that the legacy contracts available under the NYU Plans are probably TIAA's "largest contract type still, in terms of contributions" and that they are "used by lots of universities" to this day.  (Chittenden Trial Testimony, Tr. at 587:1-10).

33.     TIAA's most recent contracts are the Retirement Choice ("RC") and Retirement Choice Plus ("RCP") contracts.  (Chittenden Decl. ¶ 39).

34.     TIAA introduced Retirement Choice and Retirement Choice Plus contracts in 2005 and 2006, respectively.  The RC contract is generally offered to employer retirement plans.  The RCP contract is generally offered to supplemental retirement plans.  (Chittenden Decl. ¶ 40).

35.     RC and RCP contracts are institutionally-controlled group contracts between TIAA and the plan sponsor.  Participants receive a certificate.  Upon 90 days-notice, the plan sponsor can map assets in these contracts over the course of 60 months without any surrender charge.  Plan sponsors have the discretion to include or exclude any of the offered TIAA and CREF annuities on the plan investment menu.  (Chittenden Decl. ¶ 41).

36.     Participants may take lump-sum withdrawals from the RC contract within 120 days after termination of employment, subject to a 2.5% surrender charge.  All other withdrawals and transfers by participants must be paid in 84 monthly installments.  Participants may take lump-sum withdrawals from the RCP contract without any restrictions or charges.  (Chittenden Decl. ¶ 42).

37.     The RC and RCP contracts have a minimum guaranteed crediting rate between 1.0% and 3.0%, determined annually.  The minimum guaranteed crediting rate applies to contributions deposited during the applicable period.  The lower minimum guaranteed crediting rate for the RC and RCP contracts reflects, in part, the mapping options available to plan sponsors under these contracts.  Moreover, because there is higher risk to TIAA from a contract that provides a static 3% minimum crediting rate (legacy contracts), as compared to an "indexed" or floating minimum crediting rate (RC/RCP), RC and RCP participants are generally credited slightly higher total interest crediting rates on accumulations in RC and RCP contracts. (Chittenden Decl. ¶ 43).

38.     In the scenario where a plan sponsor moves from a legacy TIAA contract, such as an RA contract, to a RC or RCP contract, all of the participants' investments under the legacy contracts are frozen, and will continue to earn interest only on those amounts previously invested based on the rates then in effect.  (Chittenden Trial Testimony, Tr. at 662:23-665:1).  All of the participants' new investments would be invested in the RC or RCP contract and subject to the respective crediting rates then in effect under those contracts.  (Chittenden Trial Testimony, Tr. at 662:23-665:1).

2.     **The Terms of the TIAA Legacy Contracts Provide Participants with Exclusive Control and Do Not Give NYU any Authority or Discretion to Override Participant Investment Elections or to Map Participant Investments to Other Investments.**

39.     The terms of the TIAA legacy contracts held by the Plans' participants make clear that NYU does not have any authority or discretion to unilaterally alter the arrangement between the participant and TIAA.  The legacy contracts provide that "[t]his is a contract between *you*, the annuitant, and us, Teachers Insurance and Annuity Association of America (TIAA)." (PX0887 at 1, TIAA_NYU_00086135 (emphasis added)).  They further provide that the "contract" is "[t]his document (and any endorsements and amendments to it) is the entire contract between *you* and TIAA."  (PX0887 at TIAA_NYU_00086145 (emphasis added); PX0734 at TIAA_NYU_00014443).

40.     Although the TIAA legacy contracts provide that the "contract is subject to the provisions, terms and conditions of the employer plan," the same paragraph further explains that "*under no circumstances can the employer plan expand the rights or terms under the contract or impose any responsibilities or duties on TIAA not specifically set forth in the contract*." (PX0887 at TIAA_NYU_00086167 and 00086203 (emphasis added); PX0734 at TIAA_NYU_00014475).

41.     With respect to investment elections, the RA Contracts explicitly provide that "*you* [the participant] may transfer" investments from the Real Estate Account or CREF (PX0887 at ¶ 48 (TIAA_NYU_00086156 (emphasis added)); that "*you* [the participant] may elect" to have systematic transfers made from the Real Estate Account (PX0887 at ¶ 49 (TIAA_NYU_00086156 (emphasis added)); and that "*you* [the participant] may transfer" Traditional Annuity accumulation to companion CREF certificates or to the TIAA Real Estate

Account (PX0887 at ¶ 45 (TIAA_NYU_00086156 (emphasis added); PX0734 at

TIAA_NYU_00014489).

42.     With respect to allocation of premiums, the CREF Certificates further explain that

"*you* [the participant] may allocate premiums among the CREF accounts available to this

certificate under the Rules of the Fund" and that "*you* [the participant] may change your

allocation for future premiums at any time."  (PX0887 at TIAA_NYU_00086187 (emphasis

added); *see also* PX0734 at TIAA_NYU_00014508).

43.     The RA Contracts further make clear that the TIAA Real Estate Account, the

TIAA Traditional, the CREF Stock Account, and the CREF Money Market will be available

investments for the participant.  The RA Contracts explain that the "following Accounts *are*

*available* as a destination for allocation of premiums and internal transfers:  TIAA Real Estate,

TIAA Traditional RA."  (PX0887 at TIAA_NYU_00086168 (emphasis added); PX0734 at

TIAA_NYU_00014476).

44.     The CREF Certificates further provide that "[y]our employer plan may limit your

right to allocate premiums remitted under the plan to any account *other than* the CREF Stock

Account and the CREF Money Market Account."  (PX0887 at E1, TIAA_NYU_00086181

(emphasis added)).  And the CREF Certificates explain again, under "Allocation of premiums"

that "[y]our employer may limit your right to allocate premiums remitted under that plan to any

account *other than* the CREF Stock Account and the CREF Money Market Account."  (PX0887

at TIAA_NYU_00086187 (emphasis added)).

45.     The TIAA annuity contracts entered into by the participants in the Plans are

insurance company contracts issued directly to the Plans' participants.  As TIAA explained,

"TIAA Traditional Annuity is not an investment for purposes of federal securities laws; it is a

guaranteed insurance contract." (PX0670 at 4). Similarly, the "CREF Accounts are variable annuity investments offered to the plans under CREF variable annuity contracts." (PX0670 at 5). Thus, as Ms. Wagner explained, Mr. Geist and Plaintiffs are simply wrong in their assertions that the assets of the Plans are held in a single trust. (Wagner Decl. ¶ 50).

### 3. The Plans' Terms are Consistent with the Provisions of the TIAA Legacy Contracts.

46. The NYU Faculty Plan and the School of Medicine Faculty Plan provide that the contributions under the Plans "will be applied to one or more Annuity Contracts or Custodial Accounts for the benefit of Participants and their beneficiaries." (PX0940 at Art. I; DX386 at Art. I).

47. The Plans' definition of "Annuity Contract" states that the "provisions of each Annuity Contract are hereby incorporated by reference into the Plan to the extent not inconsistent with the provisions of the Plan." (PX0940 at § 2.3; DX386 at § 2.2). Thus, the Plans expressly incorporate the terms of the annuity contracts but do not purport to invalidate anything that is not consistent with the terms of the Plans. (PX0940 at § 2.3; DX386 at § 2.2).

48. The Plans give participants sole authority over the "selection of investments" and provide that all "contributions made for the benefit of a Participant shall be invested in the Annuity Contract or Custodial Account made available by the University under the plan" and that, if "one or more Annuity Contract or Custodial Account or both, are made available by the University, *a participant may direct* the investment of the contributions made for his or her benefit among such Annuity Contracts and/or Custodial Accounts." (PX0940 at § 4.11(a) (emphasis added); DX386 at § 4.10(a) (emphasis added)).

49. The Plans further provide that each "Participant may direct the investment of contributions made for his or her benefit among the funds available with any one Annuity

- 116 -

Contract or Custodial Account, may change such investment directions, and may transfer amounts among such funds, in each case in accordance with such rules and procedures as may be prescribed by the Administrator or by the Vendor."  (PX0940 at § 4.11(a); DX386 at § 4.10(a)).

50.     The Plans further provide that "[i]n the case of a Participant's direction of the investment of the contributions made for his or her benefit, *no person, including the University, the Participating Employers, the Vendors or the Administrator, will be liable for any loss or for any breach of fiduciary duty which is the direct and necessary result of investment instructions given by such Participant*."  ((PX0940 at § 4.11(b) (emphasis added); DX386 at § 4.10(b) (emphasis added)).

51.     The Plans also make clear that although NYU may change the investment options offered under the Plans, and can "cause the assets of a terminated option to be transferred to any other investment option," that authority is expressly limited "to the extent consistent with the Annuity Contracts or Custodial Agreements."  (PX0940 at § 4.11(c); DX386 at § 4.10(c)).

### 4.     NYU Has No Authority or Discretion to Change Participant Investment Elections in the TIAA Annuity Contracts.

52.     No plan sponsor has ever unilaterally moved or "mapped" assets from a TIAA legacy annuity Contract.  "The plan sponsor cannot direct the transfer of assets to another investment offered in its retirement plan (i.e., it cannot 'map' an individual participant's existing RA assets.)"  (Chittenden Decl. ¶¶ 27, 31).

53.     The testimony at trial was unequivocal:  "Q.  Has a plan sponsor ever mapped, without a participant's consent, investments held under an RA contract to an RC contract?  A. No."  (Chittenden Trial Testimony, Tr. at 658:4-7; *see also* Rezler Trial Testimony, Tr. at 1232:17-19 (same); Wagner Trial Testimony, Tr. at 1217:11-16 (same); Meagher Trial Testimony, Tr. at 284:24-286:5 (same)).

54.     Further, the record reflects that the Committee considered whether it had the authority to move assets held in employee-controlled TIAA legacy contracts.  (December 9, 2009 Minutes of the Committee, PX0470 ("Much of the TIAA money cannot be moved and the asset base they hold is very large."); PX0134 at CLC0022538-39 ("Existing assets with TIAA-CREF will remain under the current participant-controlled certificates.  The proposed platform would apply to future contributions only.")).

55.     Although Plaintiffs argue that NYU and other plan sponsors can and have mapped assets from legacy contracts in forfeiture accounts and the CREF Money Market Account, Plaintiffs offered no evidence to support that argument.  To the contrary, there are no forfeitures in the NYU Plans, as all of the investments are 100% vested.  *See* PX0887 at TIAA Page E1 (TIAA_NYU_00086167) and CREF Page E1 (TIAA_NYU_00086203) explaining "100% vested in all employee and employer contributions").

56.     Further, there is no evidence in the record that NYU (or any other plan sponsor) ever unilaterally mapped assets from the CREF Money Market Account.  Contrary to Plaintiffs' allegations, as Jan Rezler testified, what "TIAA offered, based on money market reform just a couple of years ago, is that plan sponsors had the ability to switch the investment elections for future deposits from CREF money market to some other investment in the plan.  But that would not have moved existing balances.  And the participants could immediately have turned around and transferred or rather switched their investment elections back to CREF money market.  But that's different than moving the existing dollars."  (Rezler Trial Testimony, Tr. at 1238:19-1239:22).

57.     During trial, Mr. Rezler further explained:  "Q.  You learned, did you not, that TIAA was willing to facilitate mapping out of the money market fund for plan sponsors, is that

correct?  A.  But not mapping existing balances; only transferring future investment elections.
Q.  I'm talking about in general, not just the NYU plans.  A.  So am I.  They didn't make the
offer to any plan that I'm aware of to transfer existing dollars out of CREF money market."
(Rezler Trial Testimony, Tr. at 1242:4-14).

58.     Mr. Rezler's testimony is consistent with the minutes of the Committee, which
reflect discussion of the CREF Money Market Account and the "one-time redirection of assets."
(December 12, 2016 Meeting Minutes of the Committee, PX0519 at NYU0026299; *see also*
June 1, 2016 Meeting Minutes of the Committee, PX0471 at NYU0002889; September 8, 2016
Meeting Minutes of the Committee, PX0520 at NYU0026303 (discussing money market fund
changes due to money market reform)).

59.     Mr. Rezler's testimony and the minutes of the Committee are consistent with the
requirement that the CREF Money Market be made available in the legacy annuity contracts.

60.     Plaintiffs offered no evidence that any plan sponsor has ever mapped any assets
held in any TIAA annuity contracts.  Likewise, Plaintiffs offered no evidence that NYU could
have mapped any of the assets of the Plans held in TIAA legacy contracts.

61.     Further, none of the individual Plaintiffs testified that they would have wanted
NYU to unilaterally move any of their respective account balances to other investments.

**B.      Conclusions of Law Regarding the Plans and the Annuity Contracts.**

62.     Section 3(21) of ERISA, 29 U.S.C. § 1002(21) provides that "a person is a
fiduciary with respect to a plan *to the extent* (i) he exercises any discretionary authority or
discretionary control respecting management of such plan or exercises any authority or control
respecting management or disposition of its asset, (ii) he renders investment advice for a fee or
other compensation, direct or indirect, with respect to any moneys or other property of such plan,

or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."  (Emphasis added).

63.     It is well recognized that the definition of fiduciary for purposes of ERISA is a functional definition which is based not on a person's title but rather on the extent to which the person is given discretionary authority or control respecting a plan or its assets.  *Coulter v. Morgan Stanley & Co. Inc.*, 753 F.3d 361, 366-67 (2d Cir. 2014) ("[F]iduciary status exists only 'to the extent' that the person 'has or exercises the described authority or responsibility' over a plan."); *Walker v. Merrill Lynch & Co. Inc.*, 181 F. Supp. 3d 223, 230-31 (S.D.N.Y. 2016) ("[A] person or entity may also be a fiduciary under ERISA if that person or entity acts 'in the capacity of manager, administrator, or financial adviser to a "plan,"' thereby becoming a 'functional fiduciary.'") (Citation omitted).

64.     Neither the terms of the Plans nor the contractual provisions of the TIAA annuity contracts allow NYU to override participant investment elections.  NYU did not have any authority or other right to "map" any participant's investments in those TIAA annuity contracts to any other investment.  Specifically, NYU had no discretionary authority or control over amounts that individual participants in the Plans had invested in either the TIAA Real Estate Account or the CREF Stock Account.

65.     The Plans in this case are designed to meet the requirements for tax deferral under Section 403(b) of the Internal Revenue Code of 1986, as amended (the "Code"), which provides for the taxation of employee annuity contracts for employees of organizations such as NYU that are exempt from tax under section 501(c)(3) of the Code.  The TIAA annuity contracts at issue in this case qualify as annuity contracts that are subject to Code section 403(b).

66.     While 403(b) plans have some similarities to employer-sponsored plans that are designed to meet the requirements of Code section 401(k) which are applicable to plans maintained by corporate and taxable employers, there are several differences which are dispositive of the issues in this case.  Thus, in a report to the US Secretary of Labor, the ERSIA Advisory Council concluded that "the differences far exceed the similarities."[109]

67.     Plaintiffs assert that ERISA section 403(a), 29 U.S.C. § 1103(a) requires that all plan assets be held in trust by one or more trustees.  (Pls.' Proposed Findings of Fact and Conclusions of Law, ¶ 15).  Likewise, Plaintiffs' expert Michael Geist stated that all assets of a plan must be held in trust and managed by a trustee.  (Wagner Decl. ¶ 50).  Plaintiffs are incorrect.

68.     As a general rule, ERISA Section 403(a) requires that all assets of a retirement plan must be held in trust by a trustee that has exclusive authority and discretion to manage those assets.  These requirements are applicable to 401(k) plans.  However, Plaintiffs failed to recognize that ERISA Section 403(b) provides an exception to these requirements for Code section 403(b) plans to the extent that assets of those plans consist of insurance contracts or any assets held by an insurance company qualified to do business in any State.  This exception applies to the TIAA annuity contracts in this case.

69.     In a 401(k) plan, all of the assets are held in a trust.  Consistent with ERISA section 403(a) the trustee or a named fiduciary, by virtue of ERISA Section 403(a), has the statutory authority and discretionary authority over the plan assets, which includes the duty to monitor plan investments.  All of the cases on which Plaintiffs rely regarding the alleged duty of

---

[109] Advisory Council on Employee Welfare and Pension Benefit Plans, Report to the Honorable Hilda L. Solis, United States Secretary of Labor, *Current Challenges and Best Practices for ERISA Compliance for 403(b) Plan Sponsors*, 5 (Nov. 2011), https://www.dol.gov/sites/default/files/ebsa/about-ebsa/about-us/erisa-advisorycouncil /2011ACReport1 .pdf., at 6.

NYU to monitor and change participant investment elections are 401(k) plans that are subject to
ERISA section 403(a). *Tibble v. Edison Int'l*, No. CV-07-5359 SVW (AGRx), 2017 WL
3523737, at *1 (C.D. Cal. Aug. 16, 2017) ("[Plaintiffs] filed this class action on August 16, 2007
on behalf of Edison 401(k) Savings Plan."); *Abbott v. Lockheed Martin Corp.*, 725 F.3d 803, 805
(7th Cir. 2013) ("The Plan is a defined-contribution plan, often referred to as a 401(k), which
allows employees to direct a portion of their earnings to a tax-deferred retirement savings
account . . . ."); *Spano v. The Boeing Co.*, 633 F.3d 574, 576-77 (7th Cir. 2011) ("[P]laintiffs
complain that Boeing breached its fiduciary duties to participants in The Boeing Company
Voluntary Investment Plan [a 401(k) plan]."); *Kruger v. Novant Health, Inc.*, 131 F. Supp.3d
470, 472 (M.D.N.C. Sept. 17, 2015) ("The [401(k)] Plan is offered to Novant employees to
manage their retirement savings."); *George v. Kraft Foods Global, Inc.*, Nos. 07-C-1713, 07-C-
1954, 2008 WL 780629, at *1 (N.D. Ill. Mar. 20, 2008); *George v. Kraft Foods Global, Inc.*, 800
F. Supp. 2d 911 (N.D. Ill. 2011) ("Plaintiffs allege that in managing a 401(k) retirement plan
('the Plan'), defendants paid service providers excessive and unreasonable fees and expenses,
which were not incurred solely for the benefit of the Plan and its participants and which were not
disclosed to the participants."); *Kanawi v. Bechtel Corp.*, 590 F. Supp.2d 1213, 1219 (N.D. Cal.
Nov. 3, 2008) ("The Bechtel Corporation offers a 401(k) retirement plan for its employees."); *In
re Northrop Grumman Corp. ERISA Litig.*, No. CV-06-06213 MMM (JCx), 2015 WL 10433713,
at *3 (C.D. Cal. Nov. 24, 2015) ("The NGSP, which is the larger of the two plans, is a defined
contribution plan, commonly referred to as a 401(k) plan."); *Will v. Gen. Dynamics Corp.*, Civil
No. 06–698–GPM, 2009 WL 3835883, at *1, (S.D. Ill. Nov. 14, 2009) ("The Plans are employee
pension benefit plans, specifically, defined contribution plans and eligible individual account
plans (commonly known, of course, as '401(k) plans.'"); *Martin v. Caterpillar, Inc.*, No. 07–

CV–1009, 2008 WL 5082981, at *1, (C.D. Ill. Sept. 25, 2008) ("The retirement plan offered by

Defendants (commonly called a '401K plan') allows employees to contribute pre-tax earnings in

various investment vehicles."); *Beesley v. Int'l Paper Co.*, No. 06-CV-703-DRH, 2007 WL

2458228, at *1 (S.D. Ill. Aug. 24, 2007) ("Plaintiffs allege that they are participants in [401(k)]

employee benefit plans of which Defendants are fiduciaries.").

70.    However, because of the exception provided by ERISA section 403(b) for

insurance contracts, the NYU 403(b) Plans in this case do not have trustees, and ERISA does not

require or authorize NYU to take any actions, or impose any fiduciary duty on NYU, to override

investment elections made by participants with respect to TIAA annuity contracts entered into

between TIAA and Plan participants.

71.    In their Supplemental Findings of Fact and Conclusions of Law, Plaintiffs also

allege that ERISA section 514(a), 29 U.S.C. § 1144(a), preempts the provisions of the TIAA

annuity contracts and New York Insurance laws to the extent that they do allow NYU to override

a participant's investment elections in the TIAA annuity contracts.  (ECF No. 305 at ¶¶ 40-48).

As with Plaintiffs' defective reading of Section 403(a) of ERISA, Plaintiffs reference to the

provisions of Section 514(a) of ERISA fails to acknowledge that that subsection applies

"[e]xcept as provided in subsection (b)" which provides that ERISA does not preempt "any laws

of any State which regulates insurance."  29 U.S.C. § 1144(a).  Consequently, Plaintiffs

preemption arguments fail as a matter of law.[110]

---

[110] *See, e.g.*, *Franklin H. Williams Ins. Tr. v. Travelers Ins. Co.*, 50 F.3d 144, 149-50 (2d Cir.
1995) (holding that ERISA's saving clause saved from preemption a New York statute requiring
that interest on proceeds of life insurance policy be computed from date of death because the
statute passed commonsense saving clause test in that it was directed specifically at insurance
industry, governing payments associated with death benefits, and there was no clear failure on
part of statute to satisfy test used to interpret whether a particular practice involved "business of
insurance" under McCarran–Ferguson Act).

72.     Based on the functional definition of "fiduciary" in ERISA, Plaintiffs have failed to prove that NYU is a fiduciary that has any discretionary authority or control under the Plans, under the TIAA annuity contracts or pursuant to ERISA to override any participant's election to invest in the TIAA Real Estate Account or the CREF Stock Account or map any of those investments into another investment option.

73.     Plaintiffs' pleadings in this case do not claim that NYU breached any fiduciary duty under ERISA by failing to change from legacy contracts to TIAA's more recently-offered contracts, the RC and RCP contracts.  And as discussed *infra*, NYU gave appropriate consideration to making such a change and determined that the change would not be in the best interests of participants in the Plans.  (*See infra* Section II.A.ii).

74.     In this case, the record establishes that the delegated fiduciary—the Committee— had no fiduciary duty with respect to the investments in participant-controlled individual annuity contracts.  NYU had no authority to make retroactive changes to the individual contracts entered into by the Plans' participants.

## II.     NYU'S PRUDENT PROCESS

### A.     Additional Facts Regarding NYU's Prudent Process.

#### 1.     Additional Facts Regarding the Committee and Cammack.

75.     Under the terms of the Charter, the Committee was comprised of nine Committee members serving *ex-officio*: (1) NYU Chief Investment Officer; (2) NYU Senior Vice President of Finance; (3) NYU Langone Medical Center ("NYULMC") Senior Vice President of Finance; (4) NYULMC Controller; (5) NYU Vice President of Human Resources; (6) NYULMC Senior Vice President of Human Resources; (7) NYU Director of Benefits; (8) NYULMC Director of Benefits; and (9) NYU Provost or designee.  (Meager Decl. ¶ 12; DX885, Declaration of Nancy

Sanchez ("Sanchez Decl.") ¶ 6 n.1; PX0533 (Retirement Plan Committee Charter (NYU0034914))).

76. The Committee was designated as a fiduciary for a number of plans, including the NYU Faculty Plan and the School of Medicine Faculty Plan. (PX0533). Each Committee member serves "ex officio and not in his or her individual capacity." (PX0533). Further, the Charter provides that the Committee members "may designate a representative in writing to attend and participate in one or more Committee meetings on his or her behalf." (PX0533).

77. Some of the *ex officio* positions identified in the original charter changed over time due to organizational and personnel changes. (Sanchez Decl. ¶ 7, n.1). Currently the Charter designates the following members, serving *ex officio*: (1) NYU Associate Vice President, Global Compensation and Benefits; (2) NYU Chief Financial Officer; (3) NYU Chief Investment Officer; (4) NYU Provost; (5) NYU Senior Vice President of Human Resources; (6) NYULMC Senior Director of Benefits; (7) NYULMC Senior Vice President of Finance; (8) NYULMC Senior Vice President of Human Resources; and (9) NYULMC Vice President for Finance. (Sanchez Decl. ¶ 7, n.1; PX0518).

78. The Committee as a whole is the fiduciary of the NYU Faculty Plan and the School of Medicine Faculty Plan. (PX0940 at §§ 7.2, 2.1; DX386 at §§ 7.2, 2.1; PX0533 at NYU0034913-14). The individual ex officio members are not fiduciaries in their individual capacities. (Sanchez Trial Testimony, Tr. at 386:20-387:2; Dorph Trial Testimony, Tr. at 1351:21-22).

79. By design, the Committee is comprised of *ex officio* members with expertise relevant to the administration of the Plans, including significant experience and day-to-day responsibilities for human resources, compensation, benefits, finance and University

administration.  Committee members with expertise in human resources, benefits, administration, investments, and finance have attended every meeting of the Committee since its formation.[111]

80.    The Committee makes decisions collectively and based on the collective knowledge and experiences the committee members possessed in administration, finance, and investments.  (Meagher Trial Testimony, Tr. at 122:16-18; Sanchez Trial Testimony, Tr. at 425:1-18; Surh Trial Testimony, Tr. at 1106:6-15, 1155:20-1156:3).  As Ms. Meagher explained at trial:  "So the committee is responsible for making the decisions.  It's collective decision making.  These are not individual decisions that I make on my own."  (Meagher Trial Testimony, Tr. at 122:16-18).

81.    Marcia Wagner, a well-recognized employee benefits attorney with over 30 years of experience advising plan sponsors, fiduciaries and service providers, and who has personally attended numerous meetings of plan committees similar to the NYU Committee, testified that the structure of NYU's Committee was "above the norm with the amount of people and the quality and caliber of people."  (Wagner Trial Testimony, Tr. at 1410:10-12).  Ms. Wagner further explained that "to have members of Langone and also Washington Square from finance, HR, employee benefits, and also the CIO [Chief Investment Officer], which is something somewhat new to me, it's a developing issue.  That's ahead of the curve.  I had never in 2008 seen a CIO named in a charter to be on a plan committee."  (Wagner Trial Testimony, Tr. at 1410:18-23).

82.    Even in its inception, the NYU Committee was ahead of the curve.  As Defense Expert Marcia Wagner observed, in her experience a retirement committee usually has around

---

[111] *See* Meeting Minutes of the Committee, PX0462, PX0478, PX0476, DX554, PX0473, PX0470, PX0494, PX0553, DX560, PX0480, DX562, PX0463, PX0485, PX0477, PX0460, PX0481, PX0375, DX569, PX0472, PX0040, PX0482, PX0382, PX0380, PX0467, PX0368, PX0458, PX1240, PX0461, PX0049, PX0468, PX0469, PX0479, PX1303, PX0484, PX0474, PX1331, PX0471, PX0520, PX0519, PX1366, DX513, PX0662, PX0959, PX0962.

four members, and many of which segregate the administration of the plans to subcommittees. (Wagner Trial Testimony, Tr. at 1410:8-1411:4).  The NYU Committee, however, had nine members with a diverse range of experiences in finance, human resources, employee benefits, and investments, who provided their own expertise and perspective to all aspects of the plans. (Wagner Trial Testimony, Tr. at 1410:8-1411:4; Meager Decl. ¶ 12; DX885; Sanchez Decl. ¶ 6 n.1; PX0533 (Retirement Plan Committee Charter (NYU0034914)).

83.      By isolating limited testimony of only a limited number of individual members, Plaintiffs alleged the Committee showed a "lack of knowledge" as to the management of the Plans.  (Plaintiffs' Opening Statement, Tr. at 53:25-55:13).  The record does not support Plaintiffs' contention.

84.      For example, Plaintiffs criticize Margaret Meagher for her lack of alleged investment knowledge, which Plaintiffs' allege is alarming given her role as co-chair of the Committee.  (Plaintiffs' Opening Statement, Tr. at 54:21-55:13).  Ms. Meagher's role on the Committee, however, is not as an expert in investments, but based on her extensive experience in benefits administration over the last three decades.  (Meagher Decl. ¶¶ 1-3; Meagher Trial Testimony, Tr. at 132:23-133:5).  While Ms. Meagher does serve as a co-chair for the Committee, and has since 2010, that role is not hierarchical in nature nor does it bestow any higher duty on Ms. Meagher than any other committee member.  (Meagher Trial Testimony, Tr. at 308:22-309:9).  In fact, as Ms. Meagher explained, as the co-chair her role was to serve as a facilitator for the Committee, which included, among other responsibilities: the day-to-day management of the Plans, setting the agenda and planning the committee meetings, updating plan documents, handling compliance inquiries, and managing day-to-day interactions with recordkeeper(s) of the Plans.  (Meagher Trial Testimony, Tr. at 306:7-308:6).  The Plans

benefitted from the inclusion of Ms. Meagher on the Committee, due in large part to her experience and insight in the administrative logistics of running defined contribution plans.

85.     Plaintiffs also criticize Nancy Sanchez for her failure to answer certain questions concerning the variable annuities and for allegedly not reading "the plan documents for a number of years." (Plaintiffs' Opening Statement, Tr. at 54:7-13; Sanchez Trial Testimony, Tr. at 433:7-435:3). Ms. Sanchez's role on the Committee was not as an expert in investments, but based on her extensive experience in human resources over the last four decades, including over nineteen years of experience managing the NYU Benefits Program. (Sanchez Decl. ¶¶ 1-4, 26). Moreover, Plaintiffs' complaint that Ms. Sanchez did not review the Plan documents, is undermined by the fact that Ms. Sanchez, with the help of outside counsel, actually drafted the Plan documents. (Sanchez Trial Testimony, Tr. at 423:1-10). Over the years, Ms. Sanchez has frequently reviewed portions of the plan document and consulted with legal counsel and others to answer questions and draft revisions to the plan documents where necessary. (Sanchez Trial Testimony, Tr. at 382:21-383:22). Ms. Sanchez and Ms. Meagher met frequently to address questions on how to administer the Plans under the Plan documents. (Sanchez Trial Testimony, Tr. at 387:15-17).

86.     Plaintiffs only criticize three members of the Committee for their alleged lack of knowledge, all three of whom serve *ex officio* due to their titles in the human resources department. This Court, however, heard the testimony from several other Committee members representing human resources, finance, and investments. (Halley Decl. ¶¶ 1, 4; Dorph Decl. ¶¶ 1, 5, Surh Decl. ¶¶ 3-5, Petti Decl. ¶¶ 1-3). The committee minutes further reflect that the Committee members with day-to-day responsibilities and expertise in finance participated in every Committee meeting from its inception. (PX0462, PX0478, PX0476, DX554, PX0473,

PX0470, PX0494, PX0553, DX560, PX0480, DX562, PX0463, PX0485, PX0477, PX0460,
PX0481, PX0375, DX569, PX0472, PX0040, PX0482, PX0382, PX0380, PX0467, PX0368,
PX0458, PX1240, PX0461, PX0049, PX0468, PX0469, PX0479, PX1303, PX0484, PX0474,
PX1331, PX0471, PX0520, PX0519, PX1366).

87.     In addition to the wealth of knowledge and experience on the Committee, NYU
hired Cammack as a co-fiduciary to the Plans with respect to investment advisory services.
(Rezler Decl. ¶ 7; Meagher Decl. ¶ 17; PX0114 (2009 Cammack LaRhette Advisors, LLC
Investment Advisory Services Agreement ¶ 5b (NYU0096711))).

88.     In hiring Cammack, NYU was again ahead of the curve.  As Ms. Wagner
explained, when Cammack was hired in 2008, it was not common for plan fiduciaries to hire an
investment advice fiduciary.  (Wagner Trial Testimony, Tr. at 1407:5-24).  Moreover, it was
even less common for those investment advice fiduciaries to agree to serve as a co-fiduciary to
the retirement plans.  (*Id.*).

89.     The presence of Cammack further strengthened the Committee's processes.  The
Committee reviewed the detailed due diligence reports and other supplemental materials and
often asked questions about Cammack's information and recommendations before deciding on a
course of action.  (Meagher Trial Testimony, Tr. at 126:15-17; Sanchez Trial Testimony, Tr. at
372:21-373:17, 424:8-19, 425:1-18; Surh Trial Testimony, Tr. at 1152:20-1153:2).  While
Cammack assisted the Committee in managing the plans, it was the Committee, not Cammack,
who made the final decisions on how best to manage the Plans.  (Sanchez Decl. ¶ 15; Surh Trial
Testimony, Tr. at 1152:20-1153:2).

2.      **Additional Facts Regarding NYU's Prudent Process for Monitoring and Negotiating Administrative Fees.**

        a.      **The 2009 RFP.**

                i.      **The Committee Did Not Wait Seven Years to Complete an RFP.**

90.     Plaintiffs allege that the Committee failed to leverage the plans assets to obtain lower recordkeeping and administrative fees.  (Plaintiffs' Opening Statement, Tr. at 18:10-19:19).  More specifically, Plaintiffs claim that NYU waited seven years between RFPs and that the failure caused the Plans to pay unreasonable recordkeeping fees.  (Plaintiffs' Opening Statement, Tr. at 19:11-19).  The record does not support Plaintiffs' claims.

91.     On September 3, 2009, NYU sent out its first RFP for Recordkeeping and Plan Administrative Services.  (PX0128 (2009 Request for Proposal), at 1).  The RFP required that all vendors must submit its initial RFP responses by September 25, 2009.  (PX0128 (2009 Request for Proposal), at p. 6).

92.     In October 2009, Cammack reviewed the RFP responses from five vendors – TIAA, Vanguard, Great West, Diversified, and Fidelity – and provided the Committee with a report summarizing the vendors' bids.  (Rezler Decl.¶ 20).  All of the bids received, with the exception of TIAA's, were subject to the same proviso: that the proposed recordkeeping fee assumed that there would be no participant directed transfers from participants with individual annuity contracts.  (PX0133-PX0134 (October 27, 2009 email to Meagher with Cammack's RFP Analysis, at CLC0022541)).  In December 2009, the Committee held a meeting to discuss the RFP responses and narrowed the responses to two finalists: Fidelity and TIAA.  (PX0470 (December 9, 2009 Meeting Minutes of the Committee, at NYU0002885)).

93.     Although the Committee normally meets on a quarterly basis, the Committee met

seven times in 2010 to discuss the RFP.  (Meagher Trial Testimony, Tr. at 334:15-335:20).

These seven meetings included:

- January 21, 2010: the Committee met to hear Fidelity's Second RFP presentation,[112]

- February 17, 2010: the Committee met to hear TIAA's Second RFP presentation,[113]

- March 18, 2010: where the Committee met to discuss the vendor's capabilities to recordkeep the Plans,[114]

- April 19, 2010: the Committee met to review next steps in the RFP process and to discuss the additional information provided by TIAA in response to the Committee's questions during the March 2010 meeting,[115]

- June 14, 2010: the Committee met to discuss whether, in light of the information received, it would be beneficial to the Plans to consolidate to a single recordkeeper,[116]

- September 23, 2010: the Committee met to continue to discussion on whether consolidating to a single recordkeeper, including a negotiated reduction of TIAA's RFP offer from 15 bps to 10 bps but only on the new Plan menu,[117]

- November 2, 2010: the Committee discussion of adding a brokerage window as part of the consolidation and the further negotiations with TIAA on recordkeeping fees.[118]

---

[112] PX0494 (January 21, 2010 Meeting Minutes of the Committee).

[113] PX0553 (February 18, 2010 Meeting Minutes of the Committee).

[114] DX560 (March 18, 2010 Meeting Minutes of the Committee (mistakenly marked March 18, 2009)).

[115] PX0480 (April 19, 2010 Meeting Minutes of the Committee).

[116] DX562 (June 14, 2010 Meeting Minutes of the Committee).

[117] PX0463 (September 23, 2010 Meeting Minutes of the Committee).

[118] PX0485 (November 2, 2010 Meeting Minutes of the Committee).

94.     On January 10, 2011 the Committee met to continue to discuss a further reduction in TIAA's RFP pricing at 13.8 bps on all assets, including old RA contracts at 19.9 bps. (PX0477 (January 10, 2011 Meeting Minutes of the Committee)).

95.     On March 21, 2011, the Committee decided to consolidate the School of Medicine Faculty Plan.  (PX0460 (March 21, 2011 Meeting Minutes of the Committee)).  Less than two weeks later, the Committee met again to formally vote to approve consolidation of the School of Medicine Faculty Plan with TIAA.  (PX0481 (April 1, 2011 Meeting Minutes of the Committee)).

96.     Cammack and the Committee continued to negotiate with TIAA such that, upon consolidation of the School of Medicine Faculty Plan with TIAA as sole recordkeeper, TIAA agreed to further reduce its required return rate to 10 basis points for that plan.  (Chittenden Decl. ¶ 74; Rezler Decl. ¶ 37; Meagher Decl. ¶¶ 58-64; DX532 (October 1, 2012 TIAA-CREF Recordkeeping Services Agreement (School of Medicine Faculty Plan), Schedule A ¶ 16, at NYU0000578-79)).  Specifically, in 2012, the required revenue rate was negotiated down to 16 basis points and was then further negotiated down to 10 basis points for the School of Medicine Faculty Plan when TIAA became the sole recordkeeper.  (Chittenden Decl. ¶ 74; Rezler Decl. ¶ 37; Meagher Decl. ¶ 61; Hueber Dep. Designation 47:3-25; DX532 (October 1, 2012 TIAA-CREF Recordkeeping Services Agreement (School of Medicine Faculty Plan), Schedule A ¶ 16, at NYU0000578-79)).  The Committee further convinced TIAA to agree to a 13.8 bps required revenue rate for the NYU Faculty Plan, even though the NYU Faculty Plan did not chose to consolidate with TIAA.  (Chittenden Decl. ¶¶ 74, 76; Petti Decl. ¶ 42; Rezler Decl. ¶ 33; Meagher Decl. ¶¶ 58-59; PX0460 (March 21, 2011 Meeting Minutes of the Committee, at NY0002099)).  And, all of these fee reductions were made retroactive to January 2011.

97.     NYU continued to work to implement consolidation of the School of Medicine Faculty Plan in December 2012, however the actual implementation was delayed until April 2013 due to Superstorm Sandy.  (Meagher Trial Testimony, Tr. at 333:20-334:14).

98.     In October 2016, NYU sent out a second RFP for consolidation of the NYU Faculty Plan.  (DX042 (October 2016 RFP for Defined Contribution Recordkeeping Services, at CLC0056516-43)).  NYU's Second RFP was issued only three years after the completion of the first RFP and less than four years from NYU's target date for implementing the RFP.  As part of the Second RFP, the Committee ultimately negotiated TIAA's required revenue rate for the NYU Faculty Plan down to 3.0 basis points and TIAA's required revenue rate for the School of Medicine Faculty Plan down to 4.0 basis points.  (Chittenden Decl. ¶¶ 70-84; PX1366).

ii.     **Ms. Meagher's Communications with TIAA Benefited the Plans and Did Not Taint the RFP Process.**

99.     In avoiding summary judgment, Plaintiffs argued that the 2009 RFP was "tainted" by Ms. Meagher.  (ECF No. 162, 2-3).  The record again does not support Plaintiff's allegations. First, Ms. Meagher, by nature of her position as the person responsible for the day-to-day management of the Plans' recordkeepers, was required to discuss with TIAA regularly talk with TIAA to ensure that the Plans were receiving the required administrative services.  (Meagher Trial Testimony, Tr. at 306:7-308:6).  One area of focus for Ms. Meagher was the updates to TIAA's internal technology.  (Meagher Trial Testimony, Tr. at 316:20-318:3).  As Ms. Meagher explained, because no other vendor recordkept TIAA annuities and, therefore, TIAA would remain a recordkeeper for those products, Ms. Meagher wanted to ensure that, regardless of the outcome of the RFP, that NYU would not lose ground with TIAA on implementing the required technological upgrades necessary to service the NYU plans.  (Meagher Trial Testimony, Tr. at 325:8-328:7).

100.     Regardless, as the documents and testimony clearly established, Ms. Meagher did not communicate with TIAA during the RFP bidding period as Plaintiffs' alleged.  PX0128 (2009 Request for Proposal); PX0842 (August 26, 2009 email from P. Hueber to M. Meagher ); Meagher Trial Testimony, Tr. at 316:20-318:3).

101.     Plaintiffs further repeatedly alleged that Ms. Meagher was biased due to conferences "paid for by TIAA" that Ms. Meagher attended.  (ECF No. 162, at 3; Plaintiffs' Opening Statement, Tr. at 29:15).  The allegation was incorrect because NYU paid for Ms. Meagher to attend the conference on NYU's behalf.  (Plaintiffs' Opening Statement, Tr. at 30:5; Meagher Decl. ¶ 34; Meagher Trial Testimony, Tr. at 328:25-329: 9).  Plaintiffs' contention that Ms. Meagher kept these conferences a secret from NYU cannot be true when NYU was the one paying for Ms. Meagher to attend.  (Meagher Decl. ¶ 34; Meagher Trial Testimony, Tr. at 328:25-329: 9).  Moreover, Plaintiffs have offered no evidence that Ms. Meagher ever partook in any entertainment or received any personal benefits from TIAA while attending these conferences.  (*See* Meagher Trial Testimony, Tr. at 199:20-200:7).  As Ms. Meagher explained, her attendance at these conferences benefitted the Plans as it allowed Ms. Meagher to benchmark what NYU was receiving against the services provided to other peer institutions and to meet with TIAA representations to discuss ways to better service the NYU Plans.  (Meagher Trial Testimony, Tr. at 328:8-24).

102.     Plaintiffs further alleged that Ms. Meagher was unduly influenced by a small number of "lunches" paid for by TIAA.  (Plaintiffs' Opening Statement, Tr. at 29:24-30:6).  Once again, Plaintiffs allegations find no support in the record.  While it is true Ms. Meagher did attend a very limited number of lunches paid for by TIAA, TIAA also attended lunches with Ms. Meagher where NYU covered the costs.  (Meagher Trial Testimony, Tr. at 336:24-337:25).

During these lunches, Ms. Meagher would discuss with TIAA technical issues that had occurred in servicing the Plans, whether TIAA had the technological capabilities to service the plan as a sole recordkeeper, and ways TIAA could improve the plan experience for the Plans' participants. (Meagher Trial Testimony, Tr. at 336:24-337:25).

103.    Plaintiffs allege that the 2009 RFP was flawed because one of the stated goals was "reducing NYU's administrative burden."[119]  (Plaintiffs' Opening Statement, Tr. at 24:25-25:1). As Ms. Meagher explained, the reduction of the burden of administering the Plans was just one of several factors that the Committee considered in evaluating the 2009 RFP.  (Meagher Trial Testimony, Tr. at 162:3-163:15).  As Ms. Meagher further explained, the reduction of NYU's administrative burden would actually improve the participant experience as data entry would become streamlined and no longer require manual data entry from different recordkeepers. (Meagher Trial Testimony, Tr. at 310:1-311:3).  Without a single recordkeeper, participants would be required a file paper salary reductions and contracts with each vendor, including for changes to their elections, which would then have to be manually entered by the NYU Human Resources department.  (Meagher Trial Testimony, Tr. at 310:1-311:3).  The ability to streamline this process and, therefore, reduce administrative burdens would therefore improve not only NYU but also the participant experience.  (Meagher Trial Testimony, Tr. at 310:1-311:3).

104.    Plaintiffs allege that the 2009 RFP was flawed because it had a "preordained outcome," citing Ms. Meagher's statement that TIAA was always going to remain a recordkeeper.  (Plaintiffs' Opening Statement, Tr. at 29:24-30:6).  Ms. Meagher's testimony is not evidence of bias but a stated fact.  During both the 2009 and 2016 RFPs, when NYU asked whether any of the vendors were capable of recordkeeping TIAA's annuity and variable annuity

---

[119] To the extent Plaintiffs are alleging a breach of the duty of loyalty, this Court has already considered and dismissed those claims in their entirety.  (ECF No. 79).

products, every other vendor said they could not.  (Meagher Trial Testimony, Tr. at 323:8-13;

Petti Trial Testimony, Tr. at 520:6-14; PX0133-PX0134 (October 27, 2009 e-mail to Ms.

Meagher with Cammack's RFP Analysis, at CLC0022541)).  As Mr. Chittenden made clear, no

outside vendor has ever recordkept any of TIAA's annuity products.  (Chittenden Trial

Testimony, Tr. at 595:24-596:10; Chittenden Decl. ¶ 44).  Because all of the TIAA annuity

contracts are individually controlled and, therefore, cannot be mapped by NYU, as long as there

remains an active annuity contract TIAA will always be recordkeeper for the NYU Plans.

(Meagher Trial Testimony, Tr. at 341:24-344:16).

### iii.   It was Not Feasible to Consolidate the NYU Faculty Plan to a Single Recordkeeper Prior to 2015.

105.   Plaintiffs claim that the 2009 RFP was never "completed" for the NYU Faculty

Plan.  (Plaintiffs' Opening Statement, Tr. at 32:10-15).  Plaintiffs' allegations fail for two

reasons.  First, Plaintiffs complaint ignores the fact that the RFP process obtained valuable

information for the Committee and significant reduction in NYU Faculty Plan's fees from TIAA.

(Chittenden Decl. ¶¶ 74, 76; Petti Decl. ¶ 42; Rezler Decl. ¶ 33; Meagher Decl. ¶¶ 58-59;

PX0460 (March 21, 2011 Meeting Minutes of the Committee, at NY0002099); Wagner Trial

Testimony, Tr. at 1398:20-1399:23).

106.   Second, even if the NYU Faculty Plan had received no benefits at all from the

failure to consolidate, Plaintiffs complaint regarding the RFP would still fail because it would

have require holding the Committee liable for a course of action that was not actually feasible.

In fact, as Mr. Dorph testified, it was actually the University that determined it was not feasible

for the NYU Faculty Plan to convert to a single recordkeeper.  (Dorph Trial Testimony, Tr. at

1365:2-24).  As Mr. Dorph explained, the decision that it was not feasible to consolidate

recordkeepers prior to updating the University's operating systems was the University's

decision: "It wasn't the Retirement Committee's job.  It was my job as CFO and the one responsible for the systems, but not the Committee's job." (Dorph Trial Testimony, Tr. at 1365:22-24).

107.    This Court heard testimony from several Committee members who each explained that, while the School of Medicine had previously updated its HR computing system so that it was capable of handling a sole recordkeeping arrangement, the NYU operating system needed substantial upgrades which precluded consolidation of recordkeepers for the NYU Faculty Plan. (Meagher Trial Testimony, Tr. at 156:12-157:3, 164:15-165:13; Petti Trial Testimony, Tr. at 530:9-531:3; Dorph Trial Testimony, Tr. at 1315:8-25, 1365:8-17).  Martin Dorph, a former Committee member, testified that, as the former Executive Vice President for Finance and Information Technology, Mr. Dorph was responsible for overseeing the complex process of updating NYU Washington Square's multiple computer systems and programs at the University, including updating and modernizing all of NYU's systems for payroll, finance, student records and human resources systems.[120] (Dorph Decl. ¶¶ 1, 15; Dorph Trial Testimony, Tr. at 1357:23-1360:11, 1365:19-24).  Mr. Dorph testified extensively about the various measures NYU took to overhaul its IT and operating systems, which covered finance, payroll, HR and student information.  (Dorph Trial Testimony, Tr. at 1357:23-1364:8).  The entire project required extensive consultation with each of the affect NYU departments, outside experts, and IT vendors, took over 8 years to fully implement and cost between $80 and $100 million.  (Dorph Trial Testimony, Tr. at 1357:23-1364:8).

---

[120] Mr. Dorph further testified that the process of updating NYU's computer systems, including those systems required to service the Faculty Plan, was outside the scope of the Committee. (Dorph Trial Testimony, Tr. at 1365:19-24).

- 137 -

108.    Mr. Dorph further explained that the consolidation of the Faculty Program to single vendor could not occur without upgrading NYU's multiple computer systems and programs.[121]  As Mr. Dorph explained:

> There are other costs to participants than just dollar costs.  There are risks of substantial problems with their pension, with the record keeping on the pension, whether the data is properly transferred, whether monies are timely transferred to the investment managers.  Those were clearly part of the weighing that went into the process in my mind of thinking about improving our HR, payroll, financial systems and other systems, versus immediately moving to a sole record keeper with which there might be substantial risk of other kinds of loss to the many employees other than the risk of the fees themselves.  (Dorph Trial Testimony, Tr. at 1355:20-22, 1356:1-11).

He concluded that NYU "would be taking a substantial risk" if it chose to consolidate prior to the overhaul of NYU's computing systems "because of the fact that [NYU was] dealing with these old systems that were patched together."  (Dorph Trial Testimony, Tr. at 1365:2-7).

109.    Mr. Dorph explained that the new HR system went live in May of 2014, but that the entire system required additional testing and a full cycle of tax filings before the process was completed in 2015.  (Dorph Trial Testimony, Tr. at 1366:7-1367:10).  Soon thereafter, the Committee began discussing a second RFP to consolidate the NYU Faculty Plan, which would require an additional 12 to 18 months of testing to ensure that the updated computing systems could successful interact with the sole recordkeepers platform and accurately transfer participant data and contributions.  (Petti Trial Testimony, Tr. at 508:4-6).  The Committee's decision to consolidate occurred shortly after NYU completed the upgrade of its computing system was entirely prudent.

---

[121] For example, in order to consolidate to a single recordkeeper, the vendors would need to be able to scrape data from NYU's computer systems. (Dorph Trial Testimony, Tr. at 1315:8-25). In addition, the new system would also have to address software glitches that effected employer matches for employee elections. (Dorph Trial Testimony, Tr. at 1361:19-22).

EAST\154252389.9

          iv.       **The Committee Prudently Evaluated the 2009 RFP Responses.**

110.    The Committee also considered how consolidation would best support the Plans' participants.  First, the Committee was particularly attentive to ensuring that any changes to the Plans were effectively communicated to the participants.  (Meagher Trial Testimony, Tr. at 158:7-11; Petti Trial Testimony, Tr. at 476:5-478:2).  Several Committee members testified that Plans' participants often voiced their concerns about the changes to the Plans, which the Committee correctly took into consideration when evaluating a course of action.  (Meagher Trial Testimony, Tr. at 159:16-25, 160:7-14, 163:3-15; Dorph Trial Testimony, Tr. at 1366:7-1367:10).  Recognizing the diverse interests of the NYU faculty and consistent with the shared governance model of representation, consultation, and communication NYU employs, the Retirement Plan consistently worked to provide the Retirement Plan with the "high-touch" services the NYU Faculty Plan required.  (Halley Decl. ¶ 34; PX1451-PX1452; Dorph Decl. ¶¶ 14-18; Meagher Trial Testimony, Tr. at 158:7-11; Petti Trial Testimony, Tr. at 476:5-478:2).

111.    The Committee carefully evaluated the level and quality of services vendors would provide to the Plans.  (Meagher Trial Testimony, Tr. at 150:21-151:1; Sanchez Trial Testimony, Tr. at 400:2-10; Surh Trial Testimony, Tr. at 1140:10-1141:2, 1139:22-1140:3).  As Ms. Meagher testified, Plan participants had the:

> luxury historically of on-site counseling about their retirement accounts, they could have used wealth managers if they had high account balances, they had access to both TIAA and Vanguard on campus if they wanted to come and meet with someone face to face; if they wanted to do business over the phone, they could transact over the phone, they could transact online.  They want all of that. (Meagher Trial Testimony, Tr. at 163:3-15).

Tina Surh, a former CIO of NYU and a former member of the Committee testified, that the "retirement committee has always been sensitive to the variation in service capability that existed among different vendors," and that a competitive, detailed bidding process was required to

ensure that the Committee received competitive pricing without sacrificing the quality of services.  (Surh Trial Testimony, Tr. at 1136:24-1137:2, 1140:10-1141:2).

112.    In evaluating the bids of the various recordkeepers, NYU evaluated whether the bids received were for the same level of services the Plans were already receiving.  (Meagher Trial Testimony, Tr. at 150:21-151:1; Surh Trial Testimony, Tr. at 1140:10-1141:2, 1139:22-1140:3).  After reviewing each of the bids, the Committee observed that the level of services across the board were not the same and that, when viewed in terms of expenses and quality of services, "TIAA's pricing was more competitive than any of the other proposals."  (Surh Trial Testimony, Tr. at 1135:19-20; PX0477 (January 10, 2011 Meeting Minutes of the Committee, at NYU0003674)).

113.    Plaintiffs' insistence that a per-participant fee structure is common and less expensive than an asset based approach is further not supported by the record.  As Mr. Rezler explained, in 2009/2010, when vendors like Fidelity or Transamerica began offering per participant flat dollar annual fees, that quote was often "in excess of the amount generated under the basis point model."  (Rezler Trial Testimony, Tr. at 1257:6-16).  When vendors submit a bid

> under a basis point pricing model, well, they have growth built into the model because it's based on assets increasing over time.  So their pricing model would make assumptions on how fast assets would increase.  If they quote in a flat dollar fee per participant per year model, well, of course that asset growth no longer has the ability to increase their revenue.

> So therefore, the class then looks over the fee guarantee period, let's say three or five years, and they have a target for the amount of fees that they want to earn to provide the services that they're quoting, and they are effectively ensuring themselves that they're going to get to that level of revenue even under the flat dollar fee, because again, as it I think would be apparent, the only way their fee would go up is when more participants signed up for the plan and there would be more accounts that they're managing and earning fees from.  (Rezler Trial Testimony, Tr. at 1258:2-20).

114.    Mr. Rezler testified that this exact scenario occurred with Fidelity's 2009 RFP bid.  (Rezler Trial Testimony, Tr. at 1257:16-24).  During the 2009 RFP Fidelity submitted two proposed fee arrangements, an 18 bps asset based fee and an $85 per participant fee.  (PX0133-PX0134 (October 27, 2009 email to Meagher with Cammack's RFP Analysis); Rezler Trial Testimony, Tr. at 1257:16-20).  However, when Fidelity "supplied an analysis of how that would work out . . . that analysis showed that in year one [Fidelity] would earn close to twice as much in revenue under the per participant methodology as opposed to the basis point methodology." (Rezler Trial Testimony, Tr. at 1257:16-24).

115.    Not only are per-participant fees often higher than asset based fees, per-participant fee structures are not common in the 403(b) industry.  As Ms. Wagner explained, in her experience, the rise of per-participant fee prices have only become common in the 401(k) industry fairly recently.  (Wagner Trial Testimony, Tr. at 1402:8– 1043:5).  Due to the "differences in the way 403(b) and 401(k) evolved," recordkeeping the 403(b) sector is still primarily on an asset-based model.  (Wagner Trial Testimony, Tr. at 1402:8– 1043:5).  Ms. Wagner described the use of asset based recordkeeping fees in the 403(b) sector as "extremely common."  (Wagner Trial Testimony, Tr. at 1402:8– 1403:5).  Even Plaintiffs' own expert Michael Geist, whose experience is almost exclusively limited to the 401(k) market, testified that as of 2009 between forty to sixty percent of 401(k) plans still used asset based recordkeeping fees.  (Geist Trial Testimony, Tr. at 849:20-853:16).

### b.      NYU Weighed and Considered TIAA's RC and RCP Contracts.

116.    The record demonstrates that NYU appropriately weighed and considered the various potential benefits and disadvantages to Plan participants of moving from the TIAA legacy annuity contracts to RC and RCP contracts.  (Rezler Decl. ¶¶ 91-93).

- 141 -

117.    Mr. Chittenden testified that many of TIAA's clients did not move to the RC and RCP contracts because they do not offer the same guaranteed crediting rate that the legacy contracts provide.  (Chittenden Trial Testimony, Tr. at 587:1-588:7).  As Mr. Chittenden explained, the "3 percent guarantee looked appealing."  (Chittenden Trial Testimony, Tr. at 587:1-588:7).

118.    Some of TIAA's largest clients continue to use legacy contracts instead of RC and RCP contracts.  As Mr. Chittenden testified, "I just came from a conversation at Harvard, and they use retirement annuity as part of their plan.  And they, you know, expressly say, because we like that 3 percent guarantee and, you know, we feel that that, backed by a company with TIAA's financial stake, is advantageous."  (Chittenden Trial Testimony, Tr. at 587:1-588:7).

119.    Mr. Chittenden further testified "[t]he fact is, some of our largest universities, the State University System of New York, which is the single largest university that we serve because of the system, elects to use RA, and they want RA.  They've looked at RC and they've decided RA is a product they want."  (Chittenden Trial Testimony, Tr. at 590:8-11).

120.    Similarly, NYU weighed and considered the potential benefits and drawbacks to moving from TIAA's legacy contracts to RC and RCP contracts, and elected to stay with the legacy contracts.  (Rezler Decl. ¶ 92).  The minutes of the Committee's meetings reflect that the Committee considered TIAA' new contracts as early as May of 2009, and as recently as May of 2017.  (May 15, 2009 Meeting Minutes of the Committee, PX0473, at NYU0003088; May 24, 2017 Meeting Minutes of the Committee, PX0662, at NYU0162851).

121.    In addition, the Committee and Cammack periodically discussed the different TIAA contract types and the pros and cons of remaining with the legacy contracts versus moving to the newer contract types.  (Rezler Decl. ¶ 92).  Committee members, however, expressed

- 142 -

concern that forcing participants into the new contracts, which would take away the 3%

minimum guarantee and replace it with the 1% guaranteed minimum rate for monies put into the

new contracts, would not be in the participants' best interest."  (Rezler Decl. ¶ 93; Meagher Trial

Testimony, Tr. at 284:24-286:5).

122.    The RC contracts also have restrictions on liquidity, although those provisions are

slightly different than those in the RA.  As Mr. Chittenden explained, under the RC contracts,

participants have "a 120-day window following your termination of employment to elect to

receive a lump-sum distribution.  And if you take a lump-sum distribution there is also a

surrender charge of 2 ½ percent on that distribution.  If that 120-day window expires, then the

most liquidity that you have is the – a ten-year payout in the way – one tenth of a year for

essentially ten years."  (Chittenden Trial Testimony, Tr. at 591:2-15).  Further, even if a plan

sponsor moves to the RC contract, the liquidity provisions of the RA contract would still remain

in place for the assets that were invested under the RA Contract.  (Chittenden Trial Testimony,

Tr. at 664:12-23).

123.    Although the NYU Faculty Plan and the School of Medicine Faculty Plan use

RCP contracts, those contracts are only used for the revenue credits that are received from TIAA

and are allocated back to the accounts of the Plan participants.  (Chittenden Decl. ¶¶ 22-37;

Meagher Decl. ¶¶ 27-29).

124.    The record contains no evidence offered by Plaintiffs (or Defendant or any third

party) that moving the NYU Plans from legacy contract to RC and RCP contracts would have

resulted in reduced fees.  All of the negotiated rates of TIAA's required revenue rates in

evidence were made by TIAA and negotiated by NYU and Cammack without regard to whether

the contracts were legacy or RC/RCP contracts.

c.      **NYU Negotiated Significant Administrative Fee Reductions.**

125.    Even if Plaintiffs were correct that the Committee waited seven years between RFPs, that fact alone would not support a claim that the Committee failed to monitor and negotiate reasonable recordkeeping fees.  As an initial matter, Mr. Rezler testified that because Cammack is in RFP processes all of the time they are well aware of the market and continually discussed fees with the Committee.  (Rezler Trial Testimony, Tr. 1248:18-1251:4, 1289:6-12). Further, as Ms. Wagner observed, there is no requirement or standard in the industry that an RFP must be conducted every three years.  (Wagner Trial Testimony, Tr. at 1398:7-17).  Ms. Wagner further testified that in her experience "the concept of RFP itself is almost becoming antiquated because as recordkeeping becomes increasingly commoditized" because recordkeeping vendors are now "voluntarily reducing their fees in order to maintain, if not increase, their footprint" in the market.  (Wagner Trial Testimony, Tr. at 1398:13-16).  Because an RFP is not the only way to obtain lower recordkeeping fees for the plan, this Court must look at the totality of the actions taken by the Committee to determine whether the Committee engaged in a prudent process monitoring the Plans' expenses.

126.    Although Plaintiffs claim that NYU's failure to conduct a second RFP until 2016 is evidence that the Committee did not prudently monitor expenses, the timeline between the two RFPs demonstrate that this is not true.

127.    Beginning January 1, 2014, less than one year after implementing TIAA as the sole recordkeeper for the School of Medicine Faculty Plan, the Committee negotiated further reductions of TIAA's administrative fees from 10bps to 9 bps.  (PX0458 (November 25, 2013 Meeting Minutes of the Committee, at NYU0002093)).

128.    The Committee negotiated another reduction in recordkeeping fees for the NYU Faculty Plan from 13.8 bps to 10 bps beginning in January 2016.  (PX1303 (June 9, 2015

- 144 -

Meeting Minutes of the Committee)).  The Committee continued to negotiate fee reductions

"even without consolidation to a sole record keeper."  (Dorph Trial Testimony, Tr. at 1354:17-

23).

129.    In the Spring of 2015, having completed the computer systems upgrade, the

Committee began discussing a second RFP for consolidating the NYU Faculty Plan to a single

recordkeeper.  (Petti Trial Testimony, Tr. at 508:4-6).  The Committee decided to move forward

with second RFP on June 1, 2016.  (PX0471 (June 1, 2016 Meeting Minutes of the Committee

(NYU0002890)).

130.    On October 26, 2016, the Committee sent out its second RFP.  (PX0519

(December 12, 2016 Meeting Minutes of the Committee, at NYU0026298)).

131.    On February 23, 2017, the Committee selected TIAA as the sole recordkeeper for

the NYU Faculty Plan.  (Halley Decl. ¶ 45; Petti Decl. ¶ 72; PX1366 (February 23, 2017

Meeting Minutes of the Committee, at CLC0063888)).  As a result of the 2016 RFP, the

Committee further negotiated a reduction in NYU Faculty Plan's administrative fees from 10 bps

down to 3 bps.  (Chittenden Decl. ¶ 82; Halley Decl. ¶¶ 46-47; PX1366 (February 23, 2017

Meeting Minutes of the Committee, at CLC0063888)).  Despite not being included as part of the

2016 RFP, the Committee also negotiated a reduction of the School of Medicine Faculty Plan's

administrative fees from 9 bps down to 4 bps.  (Halley Decl. ¶ 46).

132.    As the timeline of event demonstrates, the Committee continued to negotiate

lower the recordkeeping expenses with TIAA throughout the class period.  The Committee was

always looking for opportunities to decrease costs while maintaining the high-level of services

for the plan.  (Meagher Trial Testimony, Tr. at 121:11-16).  The Committee frequently reviewed

the actual fees paid by the Plans, sometimes on a per-participant basis, and frequently challenged

TIAA on their administrative fees.  (Sanchez Trial Testimony, Tr. at 394:13-19, 395:24-396:2, 400:21-401:1, Petti Trial Testimony, Tr. at 495:24-496:1, 539:8-20).

133.    Plaintiffs further criticize the Committee for utilizing an uncapped asset-based recordkeeping fee.  NYU, however, negotiated a cap on fees at the required revenue level, with all fees paid in excess of the negotiated basis points returned to the Plan participants' accounts.  (Sanchez Trial Testimony, Tr. at 394:13-19).  Plaintiffs allege that that the asset based fees could have been capped at a per-participant level.  However, such a cap is not typical and Mr. Rezler testified that he has never seen that arrangement used for a 403(b) retirement plan.  (Rezler Trial Testimony, Tr. at 1248:6-15).

134.    The record further reflects that the Committee was well aware that an increase in assets would result in an increase in the total fees paid under an asset based model, and took the necessary steps to account for that occurrence.  As the assets in the Plans increased over time, the Committee continued to negotiate lower asset-based fees, causing aggregate fees to decrease as assets increased.  (Sanchez Trial Testimony, Tr. at 399:1-11; Surh Trial Testimony, Tr. at 1148:19-1149:11).  Further, as Ms. Surh correctly observed, in an asset based model the vendor assumes the risk when the market declines resulting in a decrease in recordkeeping fees.  (Surh Trial Testimony, Tr. at 1148:19-1149:11).

### 3.    Additional Facts Regarding NYU's Prudent Process for Monitoring the Plans' Investment Alternatives.

#### a.    NYU Conducted Regular and Extensive Due Diligence on All of the Plans' Investments.

135.    Plaintiffs allege that the Committee did not monitor any of the funds until June 2010 and did not regularly monitor the funds until 2011.  (Plaintiffs' Opening Statement, Tr. at 42:3-15)  The record once again does not support Plaintiffs contention.

136.     NYU began monitoring the funds in 2009 when the Committee engaged Cammack to serve as a co-fiduciary to the fund.  (Meagher Trial Testimony, Tr. at 113:16-114:6; Tr. at 237:12-238:13, 246:10-248:10, 303:12-304:25).  The due diligence materials were reviewed before, during and after the Committee meeting and the discussion of the due diligence reports often eclipsed the time allotted to the materials in the agenda.  (Meagher Trial Testimony, Tr. at 113:16-114:6, 303:12-304:25; Sanchez Trial Testimony, Tr. at 372:21-373:17).

137.     During the two year period from 2009-2010 in which Plaintiffs allege NYU only monitored the funds once, the record reflects five Cammack due diligence reports which were provided to the Committee, including reports dated:

- May 2009,[122]

- March 2010,[123]

- June 2010, [124]

- September 2010,[125] and

- December 2010.[126]

138.     As the documents and testimony showed, the Committee, with the assistance of Cammack, conducted due diligence reviews at the May 2009 meeting, which developed into a quarterly review in 2010 prior to the class period.  (Meagher Trial Testimony, Tr. at 297:11-302:1).  The due diligence reports listed above are only five of the sixty-five due diligence reports created by Cammack and reviewed by the Committee from 2009 to the present.  (DX456,

---

[122] PX0095-PX0096 (May 13, 2009 Email to Meagher and Sanchez, attaching May 2009 Cammack Due Diligence Report).

[123] PX0034 (March 31, 2010 Cammack Fiduciary Due Diligence Report).

[124] PX1248 (June 14, 2010 Cammack Fiduciary Due Diligence Report).

[125] PX0036 (September 30, 2010 Cammack Fiduciary Due Diligence Report).

[126] PX0232 (December 2010 Cammack Due Diligence Report).

PX0034, PX1001, DX459, PX1676, PX1248, DX462, PX0598, PX0036, DX465, PX0232, PX1073, PX0603, PX0246, DX470, PX1092, PX1093, DX473, PX1107, PX0500, PX0499, DX477, PX1143, DX479, PX0508, PX0043, PX0531, PX0044, DX484, PX0530, PX1201, PX1202, PX1212, PX1213, PX1218, PX0529, PX1390, DX493, PX1233, PX1234, PX0538, DX497, PX0388, PX0389, PX1278, PX1279, PX0549, PX1294, PX0544, PX1314, PX1324, PX0647, PX1340, PX1348, DX511, PX0433, DX513, PX1362, PX0662, PX0663, PX0959, PX0960, PX0962, DX520, DX521).

139.     The due diligence reports reviewed by the Committee are the result of Cammack's detailed and extensive three-level analysis.  (Rezler Trial Testimony, Tr. at 1258:21-1259:23).  The first level of review is performed by sector analysts, each of whom are assigned to particular asset category (*e.g.*, large cap, small cap, international, bonds, etc.).  (Rezler Trial Testimony, Tr. at 1259:1-9).  Cammack's sector analysts evaluate each fund using a number of metrics including, but not limited to: performance, fees, and risk level.  (Rezler Trial Testimony, Tr. at 1259:1-9).  These sector analysts will also engage in discussions with fund managers to discuss, among other issues, changes in performance and risk in the fund.  (Rezler Trial Testimony, Tr. at 1259:1-9).

140.     After each sector analyst complete their evaluation for each fund, all of the sector analysts meet as an investment team to discuss each of the funds.  (Rezler Trial Testimony, Tr. at 1259:10-17).  As part of that discussion, the investment team decides whether further information is required from the fund or portfolio manager.  (Rezler Trial Testimony, Tr. at 1259:10-17).  Upon completion of their review, the investment team provides written findings and recommendations to Cammack's investment committee for a final level of review.  (Rezler Trial Testimony, Tr. at 1259:10-17).

141.     Cammack's investment committee is comprised of Cammack senior management. (Rezler Trial Testimony, Tr. at 1259:15-23).  Cammack's investment committee reviews all the findings from the investment teams' research and makes the final recommendations concerning whether a fund should be removed, placed on watch, or can be removed from the watch list. (Rezler Trial Testimony, Tr. at 1259:15-23).

142.     Plaintiffs, citing Cammack's due diligence materials, suggest that the number of funds offered in the Plans prevented NYU from monitoring all of the funds in the Plan. (Plaintiffs' Opening Statement, Tr. at 49:10-12).  However, when asked whether the number of funds effected Cammack's ability to review all of the investment options in the Plans, Mr. Rezler testified that, while it creates more work for Cammack and the Committee, the number of funds did not impact Cammack's "ability to analyze all of those funds."  (Rezler Trial Testimony, Tr. at 1262:3-20, 1263:3-7).

143.     Mr. Rezler further noted that the number of funds offered by NYU was not an outlier among NYU's peers.  (Rezler Trial Testimony, Tr. at 1261:11-17).  Mr. Rezler testified that Cammack has other university clients that have more recordkeepers than NYU and that those plans offered every investment option their recordkeepers offered.  (Rezler Trial Testimony, Tr. at 1261:1-17).  Mr. Rezler testified that some Cammack clients offered as many as 150 different investment options, almost double the number of options in the either of the Plans.  (Rezler Trial Testimony, Tr. at 1261:18-24).

144.     Although the Committee engaged Cammack to assist NYU in monitoring the funds, the Committee did not blindly rely on Cammack's findings and recommendations.  Before engaging the Company as an investment advisor, NYU conducted a thorough and rigorous assessment of quality and independence Cammack's work.  (Sanchez Trial Testimony, Tr. at

429:11-18; Meagher Decl. ¶ 16; Dorph Decl. ¶ 8; Rezler Decl. ¶ 6; DX554 (February 4, 2009

Meeting Minutes of the Committee, at NYU00833304-05); PX0462 (September 13, 2007

Meeting Minutes of the Committee)).

145.    The Committee ultimately selected Cammack, because the Company had

specialized in working with 403(b) plans.  (Rezler Decl. ¶ 3; PX0002 (May 2008 Cammack

Defined Contribution Retirement Plan Investment Consulting Services Proposal, at

CLC0000287, CLC0000289-90)).  Cammack's independence was ensured by the fact that it is a

privately held company and is compensated directly by NYU, not by fees or commissions from

investment providers.  (Rezler Decl. ¶ 4; Wagner Revised Decl. ¶ 6 (incorporating ¶ 31)).

Further, there is no question that Cammack conducted a detailed and thorough analysis that is

abundantly supported by relevant data.  (*See, e.g.*, DX456, PX0034, PX1001, DX459, PX1676,

PX1248, DX462, PX0598, PX0036, DX465, PX0232, PX1073, PX0603, PX0246, DX470,

PX1092, PX1093, DX473, PX1107, PX0500, PX0499, DX477, PX1143, DX479, PX0508,

PX0043, PX0531, PX0044, DX484, PX0530, PX1201, PX1202, PX1212, PX1213, PX1218,

PX0529, PX1390, DX493, PX1233, PX1234, PX0538, DX497, PX0388, PX0389, PX1278,

PX1279, PX0549, PX1294, PX0544, PX1314, PX1324, PX0647, PX1340, PX1348, DX511,

PX0433, DX513, PX1362, PX0662, PX0663, PX0959, PX0960, PX0962, DX520, DX521,

DX893).

146.    Further, the record contains ample evidence of NYU reasonably challenging

Cammack's assessments and exercising its independent judgment in managing the Plans. When

Cammack presented their due diligence findings to the Committee, the Committee often asked

questions about both the fund's performance and expenses.  (Meagher Trial Testimony, Tr. at

126:21-127:3, Sanchez Trial Testimony, Tr. at 365:22-25, 424:8-19).  Cammack's findings and

recommendations concerning the watch list often resulted in a "robust discussion associated with the rationale for that recommendation." (Sanchez Trial Testimony, Tr. at 372:21-373:17).

147.    The record also demonstrates that members of the Committee have, on a number of occasions, gone "back and [sought] out further information" "if there was a question about information that Cammack would provide."  (Sanchez Trial Testimony, Tr. at 424:8-19; Surh Trial Testimony, Tr. at 1154:17-23).  For example, Mr. Rezler recalls being challenged by a member of the Committee on Cammack's use of Sharpe Ratio.  (Rezler Trial Testimony, Tr. at 1283:18-1293:12; Surh Trial Testimony, Tr. at 1154:17-1155:10).

148.    Ms. Surh testified that she had conversations with vendors, fund managers, and with Cammack agents to discuss the investments and fees related to the Plans, asset allocation philosophy, and general market performance.  (Surh Trial Testimony, Tr. at 1153:23-1154:16, 1160:2-14).  Ms. Surh further testified that she did her own independent research outside of Cammack including, but not limited to, reviewing plan material prospectuses, engaging in discussions with the portfolio managers at TIAA, holding one-on-one meetings with Roger Ferguson, President and CEO of TIAA, and discussions with others in the investment industry concerning TIAA.  (Surh Trial Testimony, Tr. at 1153:3-20).  Ms. Surh would then discuss her observations, compare Cammack's recommendations with her own notes and research, and discuss the recommendations with the rest of the Committee.  (Surh Trial Testimony, Tr. at 1154:17-1155:10).

149.    While the Committee valued the research and recommendations of Cammack, the Committee exercised its own independent judgment in managing the plan. [127]  (Sanchez Trial Testimony, Tr. at 424:8-19; Surh Trial Testimony, Tr. at 1152:20-1153:2).

150.    Even if the Committee took no action to challenge or verify Cammack's findings and recommendations, Plaintiffs' have failed to allege any error or improper recommendation from Cammack that the Committee was not entitled to rely upon.

151.    Plaintiffs allege that Cammack's inclusion of Morningstar fee data was inappropriate and that the Committee never questioned the inclusion of Morningstar fee data in the due diligence reports.  (Plaintiffs' Opening Statement, Tr. at 22:21-23:22).  Committees frequently rely on Morningstar data in evaluating their investment options.  (Wagner Trial Testimony, Tr. at 1413:12-20).  Even if Morningstar data was not commonly relied upon, Plaintiffs misrepresent the way Cammack uses Morningstar data.  When asked about Cammack's statement that Morningstar fee data was inappropriate for a fund of NYU's size, Mr. Rezler clarified that the Morningstar data is used "in a similar manner [as] performance benchmarks" where the "analysis always goes beyond those numbers."  (Rezler Trial Testimony, Tr. at 1203:16-25).

152.    The Committee fully understood the purpose of including the Morningstar fee data in its due diligence reports.  As Ms. Surh explained, "Cammack early on acknowledged that Morningstar data has its own inherent limitations because of the nature of the data, and that any

---

[127] The meeting minutes alone demonstrate the prudent and independent review the Committee conducted based on Cammack's assessment. *See, e.g.*, PX0460 (challenging Cammack's advice concerning the IPS's watch-list provisions); PX0481 (asking Cammack about the methodology concerning the TIAA Real Estate Account given the unique nature of the fund); DX569 (reviewing Cammack's draft participant communication and challenging Cammack on the level of information included); PX0467 (evaluating Cammack's recommendation on the number of funds and stated that such a change would need to be carefully crafted); DX578 (reviewing and expressing concern about Cammack's use of Sharpe Ratio as an investment option scorecard).

information presented needs to be understood as to its appropriateness or usefulness." (Surh Trial Testimony, Tr. at 1118:23-1119:16).  Ms. Surh further explained that Morningstar data had to be viewed in light of the various share classes a fund may offer.  (Surh Trial Testimony, Tr. at 1118:23-1119:16).  The Committee "discussed the choice of Morningstar as a data source and the committee felt comfortable with that practice because Morningstar data is very widely available and referenceable and comprehensive, and as part of that, making use of many data points from that data set, such as expense data, was reasonable." (Surh Trial Testimony, Tr. at 1120:9-21).

153.    Furthermore, the Morningstar data was only one of many data points that Cammack and the Committee reviewed in evaluating a fund's investment fees.  As the record reflects, Cammack evaluated investment fees based on their own experience in the market.  (Sanchez Trial Testimony, Tr. at 393:3-10, 432:23-433:2).  In addition, Cammack also reviewed an "Ivy Plus" analysis, which compared the fees in the Plans to the fees against other comparable university plans.  (Petti Trial Testimony, Tr. at 444:17-19, 515:5-23).  In evaluating the investment fees of the funds, the Committee reasonably relied on Cammack's reporting of Morningstar data as one of several reference points.

### b.    NYU Prudently Monitored the CREF Stock Account.

154.    The Committee reviewed the CREF Stock Account beginning in May 2009 and on a quarterly basis beginning in 2010.  This review was conducted in the context of the Plans' total investment lineup which also included stock index funds for participants who preferred that style of investment.  (Rezler Decl. ¶ 72; Surh Decl. ¶ 20; Halley Decl. ¶¶ 13, 20; Petti Decl. ¶ 18).[128]  The Committee understood and focused on the difficulties with comparing the CREF

---

[128]  *See, e.g.*, DX019 (May 10, 2012 Email re: NYU/NYU Langone Retirement Committee Meeting – May 17, 2012 with attachments, at CLC033484, CLC0033525, CLC0033531);

Stock Account to various indexes due to the Account's diversified composition.  (Rezler Decl. ¶ 72-74).  The Committee determined that, as a result of the unique nature of the CREF Stock Account, it warranted "specialized discussions."  (PX0481 (April 1, 2011 Meeting minutes of the Committee, at NYU0004048)).  The Committee specifically noted that the comparison of the CREF Stock Account to "large cap domestic equities only," would not reflect the diversification among domestic and international investments of that fund.  (Rezler Decl. ¶ 72).

155.     In April 2011, the Committee asked Cammack to shed light on the fact that although the CREF Stock Account "invests in small/mid/large company domestic equities and as much 30% of [its] assets in foreign equities," the Fund "gets benchmarked against large company domestic funds."  (PX0481 (April 1, 2011 Meeting Minutes of the Committee, at NYU0004048)).

156.     The Committee never had any reason to consider removing the CREF Stock Account from the account.  (Meagher Trial Testimony, Tr. at 265:1-9, 303:10-11).  As Mr. Rezler explained, at no time did the CREF Stock Account ever perform at such a level that Cammack would consider the fund for removal.  (Rezler Trial Testimony, Tr. at 1276:16-1277:16).

### c.      NYU Prudently Monitored the TIAA Real Estate Account.

157.     The record reflects that the Committee understood the unique nature of the TIAA Real Estate Account, because it invested directly in commercial properties, had a low correlation

---

PX1221-PX1228 (November 18, 2013 email re: Retirement Committee Meeting Materials for November 25 2013, at CLC0038671, CLC0038699); PX1239-PX1249 (May 16, 2014 email re Retirement Committee Meeting May 22, 2014, at CLC0040692, CLC0040705, CLC0040725); PX1300-PX1305 (September 11, 2015 email re: Retirement Committee Meeting for September 15, 2015, at CLC0048271, CLC0048307); PX1335-PX1341 (September 1, 2016 email re: Retirement Committee Meeting Materials, at CLC0054834, CLC0054868).

to stocks and, therefore, operated differently from a REIT index.  (Meagher Trial Testimony, Tr. at 218:6-220:9, 236:19-237:5).[129]

158.   The Committee took additional steps to evaluate the performance of the TIAA Real Estate Account and whether the fund should be included in the Plans. For example, the Committee requested that TIAA explain to the Committee the strategy of the fund and the appropriateness of TIAA's chosen benchmark.  (Meagher Trial Testimony, Tr. at 257:8-14, 305:1-14; PX0481 (April 1, 2011 Meeting Minutes of the Committee, at NYU0004048); DX436 (TIAA Quarterly Analysis of the TIAA Real Estate Account, attached to March 29, 2011 email from J. Rezler, at CLC0026015-40); PX0375 (June 9, 2011Meeting Minutes of the Committee, at CLC0039007)).

159.   Plaintiffs criticize Ms. Meagher for allegedly not understanding the role that cash played in the TIAA Real Estate Account.  (Plaintiffs' Opening Statement, Tr. at 54:21-55:8). The record, however, reflects that the Committee understood, not only that the TIAA Real Estate fund had a cash component, but also the valuable role that cash played in the Account.  (Meagher Trial Testimony, Tr. at 218:6-220:9; Surh Trial Testimony, Tr. at 1121:2-1122:1).  As Ms. Surh explained, the that:

> cash in the real estate account plays a role as a strategic asset that the portfolio management team believes it needs in order to manage the vehicle. . . .  When you're looking underneath the hood into a fund vehicle, it's important to understand -- or an investment vehicle, it's important to understand the manager's strategy and their intentions and what assets and tools they're using to implement their strategy.  In the case of a TIAA real estate fund, cash plays a role as strategic assets within that portfolio for the purposes of managing the portfolio.  So it may have to do with liquidity, it may have to do with funding acquisitions, it may be

---

[129] PX0380 (November 16, 2012 Meeting Minutes of the Committee, at CLC0039024); *see also* PX0481 (April 1, 2011 Meeting Minutes of the Committee, at NYU0004048); PX0375 (June 9, 2011Meeting Minutes of the Committee, at CLC0039007); DX569 (August 15, 2011 Meeting Minutes of the Committee, at NYU0004044); PX0467 (February 22, 2013 Meeting Minutes of the Committee, at NYU0002558).

the result of acquisitions, it's integral to the running of that portfolio.  (Surh Trial Testimony, Tr. at 1122:19-1125:5).

160.    The Committee further demonstrated its understanding of the intricacies of the TIAA Real Estate fund through the Committee's detailed discussion of the fund's strategy, liquidity requirements, and benchmarks.  (PX0481 (April 1, 2011 Meeting Minutes of the Committee, at NYU0004048); DX436 (TIAA Quarterly Analysis of the TIAA Real Estate Account, attached to March 29, 2011 email from J. Rezler, at CLC0026015-40), Halley Decl. ¶ 20; PX0520 (September 8, 2016 Meeting Minutes of the Committee, at NYU0026304)).

> **d.    NYU Analyzed the Performance of the CREF Stock Account and the TIAA Real Estate Account using Appropriate Benchmarks and Other Comparison Data.**

161.    Plaintiffs argue that NYU did not have a prudent process for reviewing the CREF Stock and TIAA Real Estate Accounts s because allegedly NYU had a combined fifteen benchmarks between the funds.  (Plaintiffs' Opening Statement, Tr. at 51:7-9).  According to Plaintiffs, different benchmarks were used by TIAA, by the Committee, and in disclosures to Plan participants.  (Plaintiffs' Opening Statement, Tr. at 49:20-51:7).  Plaintiffs also alleged that the Committee acted imprudently by failing to explain or question the use of these various benchmarks.  (Plaintiffs' Opening Statement, Tr. at 51:7-9).  Plaintiffs' allegations find no support in the record.

162.    Plaintiffs benchmark criticisms stem from Plaintiffs' misunderstanding of benchmarks and how comparative criteria were used by TIAA, Cammack, and the Committee, and for purposes of legally required disclosures.

i.     **The Accounts' Actual Benchmarks.**

163.     As required for TIAA's SEC filings, TIAA created a benchmark for both the CREF Stock[130] and TIAA Real Estate Account,[131] investments which have been historically difficult to benchmark due to their unique investment strategies.  Even Plaintiffs' own expert Gerald Buetow admits that **"**[s]electing a proper benchmark is, in many cases, not an easy thing to do" describing the process as "extraordinarily complicated." (Buetow Trial Testimony, Tr. at 1646:1-2, 1646:23-24).

164.     The TIAA benchmarks are the most appropriate benchmarks for evaluating the performance of the CREF Stock and TIAA Real Estate Accounts because those benchmarks are created by the fund manager to reflect "a similar investment style and a similar risk class." (Fischel Trial Testimony, Tr. at 1471:4-21, 1590:2-24).  The unique investment strategies of the CREF Stock and TIAA Real Estate funds made it difficult to create a benchmark that had a similar investment style and risk categorization.

165.     The CREF Stock Account is "an all-cap fund, containing large, mid and small cap stocks as well as international exposure."  (Chittenden Decl. ¶¶ 47-48; PX0380 (November 16, 2012 Meeting Minutes of the Committee, at CLC0039024)). The account incorporates three different investment strategies to manage the account: active management, quantitative, and

---

[130] *See, e.g.*, DX752 (CREF 2009 Prospectus, at 17); DX727 (June 30, 2011 CREF Semiannual Report, at 3, 7); DX754 (CREF 2011 Prospectus, at 19 ("As of July 1, 2011, the Account's composite benchmark index will consist of two unmanaged indices:  the Russell 3000® Index and the MSCI ACWI ex-US IMI.")); DX755 (2012 CREF Stock Account Prospectus, at 18-19); DX756 (2013 CREF Stock Account Prospectus, at 19); DX757 (2014 CREF Stock Account Prospectus, at 16); DX758 (2015 CREF Stock Account Prospectus, at 18); DX759 (2016 CREF Stock Account, at 28); DX760 (2017 CREF Stock Account Prospectus, at 28).

[131] *See, e.g.*, DX701 (TIAA Real Estate Account, Quarterly Analysis, Quarter Ending December 31, 2011, at 2).

indexing.  (Chittenden Decl. ¶ 48; DX760[132] (May 1, 2017 CREF Prospectus, at 27)).  The CREF Stock Account is also unique because it invests in a mix of domestic and international securities.  (Chittenden Decl. ¶ 48; DX760 (May 1, 2017 CREF Prospectus, at 28); PX0481 (April 1, 2011 Meeting Minutes of the Committee, at NYU0004048)).  As a result, however, the CREF Stock Account is difficult to benchmark.  (Rezler Decl. ¶¶ 72-74; PX0481 (November 16, 2012 Meeting Minutes of the Committee, at CLC0039024)).

166.    TIAA only changed the benchmark for the CREF Stock Account once during the relevant timeframe.  As of 2009, the account's publically stated (and available) composite benchmark was the Russell 3000® Index, the MSCI Barra EAFE® + Canada Index, the MSCI Emerging Markets Index and the MSCI EAFE + Canada Small Cap Index.[133]  In mid-2011, the account's publically stated (and available) composite benchmark in its prospectus was changed to a composite index of two unmanaged indices: (1) Russell 3000® Index (70%); and (2) the MSCI All Country World ex-US Investable Market Index (30%).  (Chittenden Decl. ¶ 51).[134]

167.    The TIAA Real Estate Account poses similar benchmarking challenges because it invests in actual real estate properties and has a cash component.  (Chittenden Decl. ¶ 60; Rezler Decl. ¶¶ 63-65).  "[A]t least 75% of the Account's net assets have comprised . . . direct

---

[132] DX760 is cited in DX891A (the Revised Declaration of Dan Fischel) and is publically available.  *See, e.g.*, Fischel Revised Decl. ¶7 (incorporating ¶13 nn. 14-15).  It was mistakenly left off of the list provided to the Court on April 30, 2018, although the other CREF prospectuses were included on the list as DX752 (May 1, 2009 CREF Prospectus) through DX759 (May 1, 2016 CREF Prospectus).

[133] *See, e.g.*, DX752 (CREF 2009 Prospectus, at 17).

[134] PX0467 (February 22, 2013 Meeting Minutes of the Committee, at NYU0002558); DX727 (June 30, 2011 CREF Semiannual Report, at 3, 7); DX754 (CREF 2011 Prospectus, at 19 ("As of July 1, 2011, the Account's composite benchmark index will consist of two unmanaged indices: the Russell 3000® Index and the MSCI ACWI ex-US IMI.")); DX755 (2012 CREF Stock Account Prospectus, at 18-19); DX756 (2013 CREF Stock Account Prospectus, at 19); DX757 (2014 CREF Stock Account Prospectus, at 16); DX758 (2015 CREF Stock Account Prospectus, at 18); DX759 (2016 CREF Stock Account, at 28); DX760 (2017 CREF Stock Account Prospectus, at 28).

- 158 -

ownership interests in real estate" and typically less than 10% of the account's net assets have been comprised of interests in liquid real estate securities. (Chittenden Decl. ¶ 60; DX689 (May 1, 2017 TIAA Real Estate Prospectus, at 3)). Additionally, TIAA guarantees liquidity for the TIAA Real Estate Account via a "liquidity guarantee" under which the TIAA General Account will purchase accumulation units issued by the TIAA Real Estate Account if there are issues with liquidity. (DX689 (May 1, 2017 TIAA Real Estate Prospectus, at 46-47)).

168.    TIAA only changed the benchmark for the TIAA Real Estate Account one time during the class period. From 2009 to 2011, TIAA compared the performance of the TIAA Real Estate Account with the performance of a composite index comprised of (i) the total return for all real estate properties owned or managed in commingled open-end funds, as derived from the NCREIF database ("NCREIF Open-end"); (ii) the FTSE Group ("FTSE") NAREIT Equity REIT Index or, for periods prior to the third quarter of 2009, the Dow Jones Wilshire Real Estate Securities Index, and (iii) the iMoneyNet All-Taxable Average for short-term, cash-like investments, with weights of 75%, 5%, and 20%, respectively (the "REA Composite Index"). (*See, e.g.*, DX701 (TIAA Real Estate Account, Quarterly Analysis, Quarter Ending December 31, 2011, at 2)). Since 2012, TIAA has compared the Real Estate Account's performance with the performance of "two widely used indices" that TIAA "believes are most appropriate to compare to the performance of the Account": the NCREIF Fund Index – Open End Diversified Core Equity ("NFI-ODCE") and the NCREIF Property Index ("NPI"). (DX701 (TIAA Real Estate Account, Quarterly Analysis, Quarter Ending December 31, 2011, at 2)).

### ii.    ERISA's Required Participant Fee Disclosures.

169.    Starting in 2012, the Plans were required to provide participants with certain information required by the Department of Labor Regulation 29 CFR § 2550.404a-5. (Chittenden Decl. ¶ 108). These new regulations mandated certain specific types of disclosures,

including a benchmark for each fund consisting of a single broad-based index.[135]  (Wagner Trial Testimony, Tr. at 1419:16-1420:9, 1421:9-13).

170.    Plaintiffs' criticize NYU because these required fee disclosures did not use the same composite benchmarks that TIAA and Cammack used to evaluate the performance of the CREF Stock and TIAA Real Estate Accounts.  (Plaintiffs' Opening Statement, Tr. at 50:22-51:7).  Plaintiffs complaint, however, is inconsistent with the plain language of Department of Labor regulation 29 CFR § 2550.404a-5(d)(1)(iii), which requires the use of a single broad-based securities market index that is not a composite index of the type used by TIAA for the Real Estate and Stock Accounts.  29 CFR § 2550.404a-5(d)(1)(iii); 75 Fed. Reg. 202 at 64916 (Oct. 20, 2010) (rejecting suggestion that plans be permitted to use composite or customized benchmarks and instead requiring that the participant fee disclosure's "benchmark must be a broad-based securities market index and it may not be administered by an affiliate of the investment issuer, its investment adviser, or a principal underwriter, unless the index is widely recognized and used").

---

[135] On cross-examination, Plaintiffs asked Ms. Wagner about the benchmark provided for the Vanguard Life Strategy Growth Fund Investor fund in NYU 404(a)(5) fee disclosure. (Wagner Trial Testimony, Tr. at 1422:16-1423:9 (showing the witness DX082 (duplicative of PX0656) (NYU Retirement Plan Investment Options Comparative Chart, as of 3/31/2013)). Plaintiffs' counsel then insinuated that the benchmark listed for this fund, the DJUS Total Float Adjusted TRUSD was not a broad-based index.  This Court takes judicial notice, however, that the DJ US Total Float Adjusted TRUSD is the Dow Jones U.S. Total Stock Market Index, a broad-based index.  *See, e.g.*, S&P Dow Jones Indices, Dow Jones U.S. Total Stock Market Index Methodology, at 3, 6 (available https://us.spindices.com/documents/methodologies/methodology-dj-us-total-stock-market-indices.pdf?force_download=true) (describing the index as a "broad index" where the "market representation threshold is 100% of the float-adjusted market capitalization for the U.S. indices."); Vanguard LifeStrategy Growth Fund Profile, available at (https://personal.vanguard.com/us/funds/snapshot?FundIntExt=INT&FundId=0122&funds_disable_redirect=true) (listing the Dow Jones U.S. Total Stock Market Index among its composite index).

171.   TIAA chose the closest broad base index available.  (Chittenden Trial Testimony, Tr. at 627:4-12).  For the CREF Stock Account, Mr. Chittenden explained, the "best single benchmark . . . would likely be the Russell 3000" given that seventy percent of the CREF Stock Account was comprised of U.S. equities.  (Chittenden Trial Testimony, Tr. at 627:4-12).  Given 29 CFR § 2550.404a-5(d)(1)(iii)'s "particular limitation of using a single benchmark the Russell 3000 index" was the best option available.  (Chittenden Trial Testimony, Tr. at 627:4-12).

172.   Due to the constraints of 29 CFR § 2550.404a-5(d)(1)(iii), the Plans' participant fee disclosures directed participants to the prospectuses for more detailed information.  (DX384 (November 2011 NYU Faculty Summary Plan Description); PX0656 (NYU Retirement Plan Investment Options Comparative Chart, as of 3/31/2013, at NYU0161683); Rezler Trial Testimony, Tr. at 1197:19-25; Fischel Trial Testimony, Tr. at 1541:19-1542:5, 1543:3-20). Moreover, the Plans' Summary Plan Descriptions informed participants to read all descriptions and disclosure materials relative to investment options under the Plan before making investment decisions.  (DX384 (November 2011 NYU Faculty Summary Plan Description); PX0656 (NYU Retirement Plan Investment Options Comparative Chart, as of 3/31/2013, at NYU0161683); Rezler Trial Testimony, Tr. at 1197:19-25; Fischel Trial Testimony, Tr. at 1541:19-1542:5, 1543:3-20).

173.   Finally, NYU TIAA-CREF website provides plan participants with direct access to other documents including Fund FAQs and Quarterly Statements, which provide a detailed description of the fund and the same benchmark used by TIAA and later Cammack to evaluate performance.  (Fischel Trial Testimony, Tr. at 1541:19-1542:5, 1543:3-20).

### iii.   Committee and Cammack Performance Data.

174.   In evaluating the performance of the funds, including the CREF Stock and TIAA Real Estate Accounts, the Committee did not limit themselves to a single metric.  As Mr. Rezler

explained, in evaluating the performance of a fund, Cammack provided the Committee with an "analysis of fund performance, including regularly analyzing performance versus the fund's peer group and relevant benchmark index and evaluating each fund's standard deviation, risk-adjusted return (Sharpe ratio), fees in comparison to peer funds, portfolio manager tenure, and Morningstar ratings." (Rezler Decl. ¶ 11). The Committee further considered "several factors commonly used by fiduciaries in monitoring plan investment funds, including volatility (standard deviation), risk and return characteristics, risk-adjusted returns (Sharpe ratio), up capture and down capture, expense ratio, category rankings, alpha, portfolio turnover, R-squared, and style drift." (Rezler Decl. ¶ 15). This analysis goes beyond what TIAA provides, but includes other data sources from Morningstar and Fiduciary Analytics. (Rezler Trial Testimony, Tr. at 1263:13-1264:9).

175.    Plaintiffs criticize the Committee for considering data in addition to the benchmark set by TIAA for the TIAA Real Estate and CREF Stock Accounts. (Plaintiffs' Opening Statement, Tr. at 49:20-51:7). Plaintiffs' criticisms contradict their entire prudence argument that NYU cannot rely solely on TIAA's data. (Plaintiffs' Opening Statement, Tr. at 21:11-14). Plaintiffs' position is that the Committee should have reviewed less data and information.

176.    Further, Plaintiffs contention that the Committee did not question or consider the changes in the TIAA Real Estate and CREF Stock Accounts' benchmarks is directly contradicted by the record. (Petti Decl. ¶¶ 18-19; Surh Decl. ¶¶ 21, 24, 27-28; Rezler Decl. ¶¶ 64-66; PX0481 (April 1, 2011 Meeting Minutes of the Committee, at NYU0004048); DX569 (August 15, 2011 Meeting Minutes of the Committee, at NYU0004044); PX0040 (February 21, 2012 Meeting Minutes of the Committee, at CLC0013701); PX0467 (February 22, 2013 Meeting Minutes of

- 162 -

the Committee, at NYU0002558); PX0520 (September 8, 2016 Meeting Minutes of the

Committee, at NYU0026304)).

      **B.**     **Conclusions of Law Regarding NYU's Prudent Process.**

     177.    To prevail on a claim for breach of the duty of prudence under ERISA, Plaintiffs

must demonstrate that the Plan fiduciaries did not act as a "prudent man acting in a like capacity

and familiar with such matters" would have acted "under the circumstances then prevailing."

ERISA § 404(a)(1)(B).  Plaintiffs have failed to meet their burden in this case.

     178.    The duty of prudence under ERISA focuses only on the *process* employed by the

fiduciary in making decisions.  Recognizing that fiduciary decisions are almost never black-and-

white and that it is easy to second-guess decisions with 20/20 hindsight, the ERISA "prudent

person" standard asks "'whether the individual trustees, at the time they engaged in the

challenged transactions, employed the appropriate methods to investigate the merits of [any

decision or action].'"  *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984); *see also Pension

Benefit Guar. Corp. ex rel St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv.

Mgmt. Inc.*, 712 F.3d 705, 716 (2d Cir. 2013) (The standard focuses on "whether [the] fiduciary

employed the appropriate methods to investigate and determine the merits of a particular

investment."); *Taylor v. United Techs. Corp.*, No. 3:06cv1494 (WWE), 2009 WL 535779, at *8

(D. Conn. Mar. 3, 2009) (citing *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 424 (4th Cir.

2007)) ("Whether a fiduciary's actions are prudent cannot be measured from the vantage point of

hindsight; the prudent person standard is not concerned with results but is a test of how the

fiduciary acted when viewed from the perspective of the time of the challenged decision.").

1.      **The Committee, and not the Individual Members Serving Ex Officio,
         is the Fiduciary.**

179.    A properly functioning retirement committee should include members whose

"backgrounds run the gamut, from finance to HR to legal to those from the corporate side,"

because the "diverse backgrounds means that these disciplines all lend their expertise to the

committee."  Jill Cornfield, PlanSponsor, *What Retirement Plan Committees Should Know and*

*Discuss: Retirement Plan Committees Need Knowledge and Continuing Education About a*

*Number of Key Subjects,* https://www.plansponsor.com/what-retirement-plan-committees-

should-know-and-discuss/ (last accessed May 8, 2018); *see also see Thompson v. Avondale*

*Indus., Inc.*, No. CIV.A. 99-3439, 2003 WL 359932, at *18 (E.D. La. Feb. 14, 2003) (rejecting

claim that management "failed to select the best qualified persons" to serve on the Committee in

part because chosen members "represented a substantial cross-section of the employees' work

force").  Accordingly, "[d]ifferent committee members can find topics that play to their

professional strengths."  Cornfield, *What Retirement Plan Committees Should Know and*

*Discuss*.  "The ideal committee environment creates an opportunity for people to share and help

other committee [members] learn from their peers."  *Id.*

180.    It is not necessary for every member to have the same level of expertise,

knowledge and involvement.  *See Brieger v. Tellabs, Inc.*, 659 F. Supp. 2d 967 (N.D. Ill. 2009)

(holding that investment committee engaged in a prudent process where a group of the members

had extensive knowledge and considered the necessary issues, even though all of the members

were not involved and there were no formal discussions including all of the committee

members).

181.    It is not necessary (or even desirable, given the need for diversity on the

Committee) for every single member of the Committee to have the same level of expertise and

knowledge with respect to investments.  Indeed, ERISA does not require any specific

qualifications to act as a fiduciary.  *See, e.g.*, 29 U.S.C. §§ 1102(a), 1104(a).  Committee

members do not need to be experts in any specific area in order satisfy their fiduciary

obligations.  *See Gregg v. Transp. Workers of Am.*, 343 F.3d 833 (6th Cir. 2003) ("[f]iduciaries

need not become experts in employee benefits, and may rely on independent expert advice"); *see*

*also Foltz v. U.S. News & World Report, Inc.*, 663 F. Supp. 1494, 1536 (D.D.C. 1987), *aff'd*, 865

F.2d 364 (D.C. Cir. 1989) ("Plaintiffs charge those defendants with a lack of knowledge and

clear understanding of their responsibility and an inability to make the decisions necessary to

protect adequately their interests and the interests of the employee-shareholders in general. The

case law is clear that ERISA fiduciaries need not themselves possess experience or expertise in

accounting, appraisal or actuarial sciences as they relate to the many facets of plan

administration, as present here.").

182.    NYU created a Committee comprised of nine senior level officials servicing *ex*

*officio*. The individual members of the Committee had a diverse range of knowledge and

experience that were beneficial to the operation of the plan, including the administrative,

financial, compliance, and investment functions of operating a defined benefits plan.  The

construction of a retirement committee and the quality of its individual members were consistent

with, and in many ways exceeded, the actions of similarly situated fiduciaries throughout the

class period.

183.    The Committee is the fiduciary for the Plans, not the individual members.  Each

member of the committee served an important function in management of the retirement plan.

As a natural consequence, the Committee Members varied in their degree of individual

investment expertise.  However, the Committee is comprised of many members who have

extensive investment knowledge and expertise.  For example, senior level Human Resources and Benefits employees on the committee, including Ms. Meagher, Mr. Petti, Ms. Halley, and Ms. Sanchez who testified in this case, provided the Committee with extensive knowledge on the day-to-day administration of the Plans.  The Chief Investment Officer and senior level Finance employees, including Ms. Surh and Mr. Dorph who testified in this case, provided the Committee with extensive investment, financial, and market knowledge necessary to monitor the investment options within the Plan.  Mr. Dorph, who was also the Vice President of Information Technology, also provided the Committee with a detailed understanding of NYU's internal computing infrastructure necessary to operate a defined benefits committee.

> **2.     NYU Acted Prudently in Engaging and Relying on Cammack as a Co-Fiduciary to the Plans.**

184.    NYU acted prudently by engaging Cammack as a co-fiduciary to bolster the knowledge and experience of the Committee.

185.    The Second Circuit and the District Court for the Southern District of New York have specifically acknowledged that there are often situations where ERISA fiduciaries lack the requisite knowledge to make various decisions necessary to fulfill their fiduciary duties.  Rather than determining that these fiduciaries are in breach due to their lack of knowledge, courts have stated that, in these circumstances, fiduciaries may, and sometimes must, engage an independent expert or consultant to assist them in their decision-making.  *Liss v. Smith*, 991 F. Supp. 278, 297 (S.D.N.Y. 1998) ("In such circumstances, where the trustees lack the requisite knowledge, experience and expertise to make the necessary decisions with respect to investments, their fiduciary obligations require them to hire independent professional advisors."); *Trapani v. Consol. Edison Emps.' Mut. Aid Soc., Inc.*, 693 F. Supp. 1509, 1516 (S.D.N.Y. 1988) ("A fiduciary who is ill-equipped to evaluate a claim may have a duty to seek outside assistance.");

*Katsaros*, 744 F.2d at 279  ("The trustees, being ill-equipped to evaluate the soundness of the proposed loan, failed to observe their duty to seek outside assistance."); *Perez v. First Bankers Trust Servs., Inc.*, No. 12-cv-8648 (GBD), 2016 WL 5475997, at *9 (S.D.N.Y. Sept. 28, 2016) ("When a fiduciary does not itself possess the requisite education, experience and skill to determine the fair market value of an asset, it has a duty to seek independent advice from experts that do."); *see also* DOL Interpretive Bulletin 95-1 ("Unless they possess the necessary expertise to evaluate such factors [specified by the DOL as relevant to the selection of annuity providers], fiduciaries would need to obtain the advice of a qualified independent expert."); *Donovan v. Cunningham*, 716 F.2d 1455, 1474 (5th Cir. 1983) ("ERISA fiduciaries need not become experts . . . they are entitled to rely on the expertise of others."); *Thompson*, 2003 WL 359932, at *19 (rejecting claim that defendants failed to select the best qualified persons to serve on the committee which administered the ESOP plan because "the Committee members could hire financial and legal experts for advice where they lacked experience or specialized knowledge"); *Foltz*, 663 F. Supp. at 1536 (holding that fiduciaries did not breach their fiduciary duties because they lacked knowledge in certain areas because "[t]he law is also clear that fiduciaries may rely on expert and professional advice in administering a plan"); *Harley v. Minn. Mining & Mfg. Co.*, 42 F. Supp. 2d 898, 907 (D. Minn. 1999), *aff'd sub nom. Harley v. Minn. Min. & Mfg. Co.*, 284 F.3d 901 (8th Cir. 2002) (finding that a fiduciary breached its fiduciary duties when the fiduciary lacked knowledge critical to understanding a certain investment because "if a fiduciary lacks the education, experience, or skills to be able to conduct a reasonable, independent investigation and evaluation of the risks and other characteristics of the proposed investment, it must seek independent advice").

EAST\154252389.9

186.     Specifically, fiduciaries often lack the expertise necessary to properly evaluate and analyze disclosures obtained from service providers in order to minimize fees.  Accordingly, where fiduciaries lack this knowledge, fiduciaries should engage outside experts to assist them with this analysis in particular.  *See* John B. Brescher, Jr., *Leading Lawyers on Understanding ERISA Changes, Navigating Disclosure Guidelines, and Designing Compliance Strategies*, Recent Changes in Employee Benefits and Executive Compensation (2015 ed.), 2015 WL 831978, at *6 (January 2015) ("With the information under the ERISA §2550.408b-2(c) regulation in hand, a plan fiduciary is, effectively, bound to analyze that information and make a determination as to whether there should be any modifications of the plan investments to minimize fees. Many plan fiduciaries and plan administrative committees may not have the expertise to conduct this sort of analysis. To deal with this, the plan fiduciary should engage an outside expert to assist it with the analysis.").

187.     "Seeking independent expert advice is evidence of a thorough investigation." *Hightshue v. AIG Life Ins. Co.*, 135 F.3d 1144, 1148 (7th Cir. 1998); *see also Perez v. Bruister*, 54 F. Supp. 3d 629, 660 (S.D. Miss. 2014) ("[F]iduciaries may point to an expert's guidance as evidence of a good-faith investigation.").  Recognizing that the assistance of an industry expert would be beneficial to the Committee in analyzing fees and investment performance, the Committee conducted an RFP, to which four different firms responded.  The Committee ultimately determined that Cammack was most qualified to assist the Committee because: (i) Cammack had specialized in working with 403(b) plans since its inception in 1958, and (ii) over 90% of Cammack's clients were large, tax exempt organizations.  (FOF¶¶ 57-59).  Cammack serves as a co-fiduciary to the Plans with respect to investment advisory services.

188.     Accordingly, since 2009, Cammack has provided the Committee with help in evaluating, selecting, and managing the Plans' recordkeepers and advising them on the selection and monitoring of plan investments.  Cammack specifically provides the Plans with investment analysis, plan design, plan administration, vendor services, RFP projects and pricing.

189.     Courts will generally defer to a fiduciary's decision to rely on the advice of an expert where "the fiduciary has investigated the expert's qualifications, has provided the expert with complete and accurate information, and determined that reliance on the expert's advice is reasonably justified under the circumstances."  *Hightshue*, 135 F.3d at 1148; *see also Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 301 (5th Cir. 2000) ("A determination whether a fiduciary's reliance on an expert advisor is justified is informed by many factors, including the expert's reputation and experience, the extensiveness and thoroughness of the expert's investigation, whether the expert's opinion is supported by relevant material, and whether the expert's methods and assumptions are appropriate to the decision at hand."); DOL Interpretive Bulletin 95-1.  This duty "'requires prudence, not prescience.'" *DeBruyne v. Equitable Life Assurance Soc'y of the U.S.*, 920 F.2d 457, 465 (7th Cir. 1990). "One extremely important factor is whether the expert advisor truly offers independent and impartial advice." *Transp. Workers of Am. Int'l*, 343 F.3d at 841.

190.     The Committee acted reasonably when it relied upon the advice and analysis of Cammack.  First, the record shows that the Committee thoroughly investigated the qualifications and independence of Cammack prior to engaging Cammack as a co-fiduciary.  Cammack has a strong, well-establish reputation for providing investment advice, particularly in the 403(b) community, and that Cammack was well qualified to provide prudent and independent

investment advice to the Committee.  *Hightshue*, 135 F.3d at 1148; *Bussian*, 223 F.3d at 301;

*Transp. Workers of Am. Int'l*, 343 F.3d at 841.

191.    Second, Cammack conducted a detailed and thorough analysis that is abundantly

supported by relevant data.  (*See, e.g.*, DX456, PX0034, PX1001, DX459, PX1676, PX1248,

DX462, PX0598, PX0036, DX465, PX0232, PX1073, PX0603, PX0246, DX470, PX1092,

PX1093, DX473, PX1107, PX0500, PX0499, DX477, PX1143, DX479, PX0508, PX0043,

PX0531, PX0044, DX484, PX0530, PX1201, PX1202, PX1212, PX1213, PX1218, PX0529,

PX1390, DX493, PX1233, PX1234, PX0538, DX497, PX0388, PX0389, PX1278, PX1279,

PX0549, PX1294, PX0544, PX1314, PX1324, PX0647, PX1340, PX1348, DX511, PX0433,

DX513, PX1362, PX0662, PX0663, PX0959, PX0960, PX0962, DX520, DX521, DX893). The

record contains thousands of pages of due diligence materials that provide a detailed analysis of

the performance, risk, and fees for each fund in the Plan.  These materials were produced

through a thorough and prudent process, involving multiple levels of careful review and scrutiny.

Cammack's advice and analysis was the result of an extensive and thorough investigation and

well supported by relevant material. *Bussian*, 223 F.3d at 301.

192.    While a fiduciary may not "rely blindly" on the advice of an expert, the courts are

clear that a fiduciary is not required "to duplicate the expert's analysis, but to review that

analysis to determine the extent to which any emerging recommendation can be relied upon."

*Bussian*, 223 F.3d at 301; *see also In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 435 (3d Cir. 1996)

(Courts "do not expect fiduciaries to duplicate their advisers' investigative efforts").  Instead, to

demonstrate reasonable reliance a fiduciary need only show that they made "an honest, objective

effort to read the [analysis], understand it, and question the methods and assumptions that do not

make sense."[136] *Howard v. Shay*, 100 F.3d 1484, 1490 (9th Cir. 1996); *see also Chesemore v. All. Holdings, Inc.*, 886 F. Supp. 2d 1007, 1042 (W.D. Wis. 2012) (quoting *Jenkins v. Yager,* 444 F.3d 916, 927-28 (7th Cir.2006) (requiring that a fiduciary "evaluate the advice given and 'exercise his own judgment' about the transaction").  Plaintiffs have failed to provide any evidence that Cammack's advice or analyses contained any mistakes, flaws or inaccuracies.

193.    Furthermore, the record contains ample evidence of NYU regularly challenging Cammack's assessments and exercising its independent judgment in managing the Plans.  The record also demonstrates that members of the Committee have, on a number of occasions, gone "back and [sought] out further information," spoke directly with fund managers, and compared their own research against Cammack's. NYU did not blindly rely on Cammack.  Rather, the Committee prudently evaluated the advice and analyses of Cammack before making an independent judgment on the proper course of action in managing the plans.

194.    Obtaining advice and guidance from Cammack was prudent and is evidence that NYU conducted "a thorough investigation" of the recordkeeping fees and the performance of the investment alternatives in the Plans.  *Hightshue*, 135 F.3d at 1148.  The evidence demonstrates that NYU's decision to engage an investment advisor as a co-fiduciary was consistent with, and

---

[136] Any obligation to corroborate an investment advisor's  underlying data arises in cases involving allegations of self-dealing or in the context of stock valuations required when an employee stock ownership plan buys or sells employer stock from or to corporate insiders.  *See, e.g.*, *Donovan v. Bierwirth*, 680 F.2d 263 (2d Cir 1982); *Howard v. Shay*, 100 F.3d 1484, 1489 (9th Cir. 1996); *Donovan v. Cunningham*, 716 F.2d 1455 (5th Cir. 1983).  As these cases make clear, the requirement to verify the underlying raw financial data furnished to the expert by the fiduciary, as well the appraisal's methodology and assumptions (*e.g.*, calculation of minority discounts and earnings projections) used by the expert, is explicitly tethered to the heightened scrutiny applied to cases involving self-dealing and employer stock.  This requirement is not relevant in the present case because all Plaintiffs' duty of loyalty claims have all been dismissed and there are no allegations of self-dealing.

in many ways exceeded, the actions of similarly situated 403(b) fiduciaries throughout the class period.

195.    Moreover, the evidence on the record shows that Cammack was not merely a consultant, but agreed to be a co-fiduciary tasked with a number of responsibilities including "performing quarterly investment reviews." (PX0404). As a co-fiduciary to the Plan, Cammack was required to perform its duties subject to the fiduciary duties imposed by ERISA. Because Cammack is a co-fiduciary, the Plaintiffs are required to prove an "antecedent breach[] of fiduciary dut[y]." *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 580-81 (S.D.N.Y. 2011). To put it another way, if Cammack acted prudently, there can be no breach on the part of NYU. *Id.* Plaintiffs have failed to provide any evidence that Cammack acted imprudently in its role as a co-fiduciary.

196.    Even if Cammack did commit a breach of their fiduciary duty, NYU could only be held responsible for Cammack's breach if: (1) NYU "participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;" (2) if, by NYU's "failure to comply with section 1104(a)(1) of this title [the prudent man standard of care] in the administration of [their] specific responsibilities which give rise to his status as a fiduciary, [NYU] has enabled such other fiduciary to commit a breach; or (3) if [NYU] has knowledge of a breach by such other fiduciary, unless [NYU] makes reasonable efforts under the circumstances to remedy the breach." 29 U.S.C. § 1105(a); *see also In re WorldCom, Inc. ERISA Litig.*, 354 F. Supp. 2d 423, 445-46 (S.D.N.Y. 2005). No evidence has been presented to satisfy any of these requirements.

3.      **NYU Employed A Prudent Process for Monitoring and Negotiating Administrative Fees.**

197.     NYU prudently monitored and negotiated the recordkeeping expenses for the plan.  NYU successfully conducted two RFPs over a seven year period, both of which resulted in lower fees for both the Faculty and School of Medicine Faculty Plans, even though only one Plan consolidated to a sole recordkeeping arrangement with TIAA during each RFP.  NYU continued to diligently negotiate fee reductions on behalf of the Plans between RFPs.

198.     NYU prudently evaluated whether it was beneficial to consolidate the Plans to a single recordkeeper.  In evaluating the advantages and disadvantages to consolidation, the NYU Committee considered a number of relevant factors including, but not limited to: the savings obtained from a single recordkeeper, the level of services each vendor could provide, whether the plan participants' experience would be improved by a single recordkeeper, and whether NYU was technologically capable of efficiently and safely transferring to a single recordkeeping arrangement.

199.     Plaintiffs' contention that NYU failed to leverage the assets in the Plan in moving sole recordkeeper fails as a matter of law.  Contrary to Plaintiffs' Amended Complaint, NYU did ask each vendor in the 2009 and 2016 RFP whether the vendor was capable of recordkeeping TIAA annuities, which were unmappable because the annuity contracts were controlled by the individual.  The record reflects that every vendor told NYU that they could not recordkeep TIAA annuities, and in fact no recordkeeper has ever recordkept TIAA annuities.  NYU prudently evaluated whether TIAA annuities could be mapped, whether another vendor could recordkeep TIAA annuities, whether it would be beneficial to freeze the legacy TIAA annuities  in order to move to a single-recordkeeper, and whether NYU should move from the TIAA legacy contracts to employer controlled RC contracts.  NYU conducted a thorough and diligent review of whether

- 173 -

the Plans should consolidate recordkeepers.  This Court, therefore, will not second-guess those decisions. *Katsaros*, 744 F.2d at 279.

200.    Further, Plaintiffs argue that NYU's RFP process was infirm because NYU did not tell vendors that it could map all of the Plans' assets, even if NYU did not believe that was the case.  (Geist Decl. ¶¶ 97-103).  Plaintiffs even argue that NYU should have claimed that TIAA was negotiating in bad faith, gone "to the press" or even "threatened to file suit," in an attempt to increase leverage.  (Id.)

201.    As an initial matter, Plaintiffs offer no basis for these claims, either in fact or law. As Mr. Rezeler testified, he has never even heard of a situation where a plan sponsor put out a blind RFP and told vendors that it could map all of the assets in the plan when it did not have the right to do so.  (Rezler Trial Testimony, Tr. at 1252:12-18).

202.    Regardless, ERISA requires prudence, not deception.  ERISA's fiduciary duties do not, as a matter of law, include the requirement of deception.  NYU was, obviously, under no obligation to deceive potential vendors in an attempt to gain additional negotiating leverage.

203.    Plaintiffs claim that NYU breached its fiduciary duty by failing to move to a per-participant recordkeeping arrangement fails as a matter of law.  First, the record contains no evidence of that any 403(b) plan fiduciary would have negotiated recordkeeping fees on a per-participant basis let alone that the Plans would have benefited from moving to a per-participant structure.  The record demonstrates that per-participant fees are not common among 403(b) plans and are often most expensive then asset based recordkeeping fees.  Plaintiffs have, therefore, provided no evidence that a similarly situated fiduciary would have negotiated on a per-participant fee basis.  ERISA § 404(a)(1)(B).

204. Plaintiffs likewise, have provided no evidence to support the conclusion that the Committee somehow breached a fiduciary duty by failing to unilaterally map assets from the TIAA legacy annuity contracts to RC or RCP contracts. The Court finds that even if there were evidence that NYU could have unilaterally altered the individual annuity contracts or mapped assets from those contracts, Plaintiffs failed to establish that the Plans' fiduciaries did not act as a "prudent man acting in a like capacity and familiar with such matters" would have acted "under the circumstances then prevailing." ERISA § 404(a)(1)(B).

205. Here, the Court can find no fault with the Committee's process regarding the different contract types offered by TIAA. First, there is evidence in the record from numerous sources indicating that NYU did not have the authority to unilaterally map assets from the TIAA legacy contracts, and that is what the Committee was told. That includes what the Committee was told by Cammack, TIAA, and other vendors in response to the first RFP in 2009-2010.

206. Second, there is no evidence in the record that the Committee was ever advised that it in fact did have the authority to map assets from TIAA's legacy contracts.

207. Third, and most importantly, the record is clear that the Committee, in consultation with its co-fiduciary investment consultant, considered the RC and RCP contracts, weighed and considered the various differences between the types of contracts (*e.g.*, mappability, minimum crediting rates) and decided to continue to use the TIAA legacy contracts. The Court can find no fault in this process, and Plaintiffs offer no evidence upon which the Court could conclude that the Committee's process was infirm.

    **4.**    **NYU Employed A Prudent Process for Monitoring the Plans' Investment Alternatives, Including the CREF Stock Account and the TIAA Real Estate Account.**

208. The record establishes that NYU, with the assistance of Cammack, conducted an initial due diligence assessment and 2009 and regular due diligence assessments in 2010 before

the class period began.  Over the entire class period, the full allotment of funds in both plans were subject to sixty-five due diligence reports.  (DX456, PX0034, PX1001, DX459, PX1676, PX1248, DX462, PX0598, PX0036, DX465, PX0232, PX1073, PX0603, PX0246, DX470, PX1092, PX1093, DX473, PX1107, PX0500, PX0499, DX477, PX1143, DX479, PX0508, PX0043, PX0531, PX0044, DX484, PX0530, PX1201, PX1202, PX1212, PX1213, PX1218, PX0529, PX1390, DX493, PX1233, PX1234, PX0538, DX497, PX0388, PX0389, PX1278, PX1279, PX0549, PX1294, PX0544, PX1314, PX1324, PX0647, PX1340, PX1348, DX511, PX0433, DX513, PX1362, PX0662, PX0663, PX0959, PX0960, PX0962, DX520, DX521). These due diligence reports were the result of Cammack's thorough, three-level analysis, which the Committee reviewed before, during, and after Committee meetings.

209.   Plaintiffs further claim that the number of funds in the Plan prevented NYU from prudently monitoring the CREF Stock and TIAA Real Estate Accounts.  The record, however, demonstrated that the number of funds did not affect Cammack's ability to monitor any of the funds, let alone the CREF Stock and TIAA Real Estate accounts.  Furthermore, the record reflects that the Committee regularly evaluated both the CREF Stock and TIAA Real Estate Accounts at Committee meetings.

210.   The Committee prudently evaluated the CREF Stock and TIAA Real Estate funds by reviewing several valid and relevant data points, including Morningstar Data, Fiduciary Analytics, and benchmark data received from TIAA and Cammack.  Plaintiffs' complaint that NYU should not have considered alternative benchmarks is antithetical to their entire prudence argument that NYU cannot merely rely on what the investment company says about a given fund.  Plaintiffs seemingly take the position that the Committee should have reviewed less data and information. Moreover, the record contains clear evidence of at least one other similarly

situated fiduciary using an alternative benchmark to evaluate the CREF Stock and TIAA Real Estate Accounts.

211.    Plaintiffs criticize NYU because the legally mandated fee disclosures did not use the composite benchmarks that TIAA and Cammack used to evaluate the performance of the CREF Stock and TIAA Real Estate Accounts.  (Plaintiffs' Opening Statement, Tr. at 50:22-51:7).  Plaintiffs complaint, however, is inconsistent with the plain language of Department of Labor regulation 29 CFR § 2550.404a-5(d)(1)(iii), which requires that those disclosures use a benchmark that is a single "broad-based securities market index" and "which is not administered by an affiliate of the investment issuer, its investment adviser, or a principal underwriter, unless the index is widely recognized and used."  29 CFR § 2550.404a-5(d)(1)(iii); (Wagner Trial Testimony, Tr. at 1420:3-1421:13; Fischel Trial Testimony, Tr. at 1509:6-24).

212.    As the legislative history of the Department of Labor's regulation demonstrates, TIAA was *required* to provide a broad-based index as the benchmark for each designated investment alternative.  The legislative history demonstrates that, with respect to the requirement of a "broad-based securities market index," some "commenters suggested permitting composite or customized benchmarks," and requested permitting "multiple benchmarks for each designated investment option," nothing "the existence of such flexibility under SEC Rules."  75 Fed. Reg. 202 at 64916 (Oct. 20, 2010).  The Department of Labor rejected this approach, and concluded that the final rule would retain the "requirement that a benchmark must be a broad-based securities market index and it may not be administered by an affiliate of the investment issuer, its investment adviser, or a principal underwriter, unless the index is widely recognized and used."  75 Fed. Reg. 202 at 64917 (Oct. 20, 2010).

III. **PLAINTIFFS FAILED TO MEET THEIR BURDEN OF PROVING THAT NYU'S DECISIONS WERE NOT OBJECTIVELY PRUDENT AND HAVE NOT PROVEN THAT PLAN PARTICIPANTS INCURRED ANY DAMAGES**

    A. **Additional Facts Regarding the Objective Prudence of NYU's Decisions.**

        1. **Plaintiffs Have Not Met Their Burden of Proving that the NYU Plans Paid Excessive Administrative Fees.**

            a. **Annuities are Different than Mutual Funds, Resulting in Differences in Administrative Fees and Costs.**

213.     Annuities have different fees than mutual funds because they require substantial additional services and administration. (Chittenden Trial Testimony, Tr. at 661:19-21; 666:14-24). TIAA annuities are insurance contracts that provide both for the accumulation of amounts during the participant's working life and for guaranteed payment of monthly income following retirement. (Chittenden Trial Testimony, Tr. at 661:22-662:11). Accordingly, TIAA is required to calculate and set aside reserves to make certain that these guarantees are met presently and can meet those obligations in the future. (Chittenden Trial Testimony, Tr. at 661:22-662:11). As a result, annuities necessarily have mortality and other insurance charges that a mutual fund does not have. (Chittenden Trial Testimony, Tr. at 661:22-662:11).

214.     The annuity contract provides for two stages—accumulation and payout. (Chittenden Trial Testimony, Tr. at 662:14-22). The accumulation phase is the stage during which a participant is accumulating benefits. (Chittenden Trial Testimony, Tr. at 662:15-17). The second phase—the payout phase—is the stage during which the participant is drawing down, *i.e.*, receiving monthly payments during retirement. (Chittenden Trial Testimony, Tr. at 662:17-18). There are benefits provided during both stages, including the various payout options available to the participant during the payout phase. (Chittenden Trial Testimony, Tr. at 662:19-22).

215.    As for the various payout options available with annuities, when a participant

retires with a retirement annuity account, the annuity contract entitles the participant to a "wide

variety of ways" for which the participant can elect to receive payments.  (Chittenden Trial

Testimony, Tr. at 660:23-25).  For example, the participant can choose to get her money over a

ten-year period; the participant can take only the interest accumulations; or the participant can

choose to take an annuity for herself and a designated beneficiary.  (Chittenden Trial Testimony,

Tr. at 660:25-661:8).  The participant can also choose a combination of these options.

(Chittenden Trial Testimony, at 661:8-13).

216.    There are also complexities related to the TIAA Traditional annuity, a fixed

annuity, such as the vintages available to participants as they save money over time, the different

mortality basis that the participant is able to purchase annuity benefits under as she saves, and

the various payout options available to the participant.  (Chittenden Trial Testimony, Tr. at

596:1-10).

217.    Vintage refers to the ability of each TIAA participant to purchase his or her own

unique total rate of return, depending upon when the participant pays into the account.

(Chittenden Trial Testimony, Tr. at 659:3-6).  The vintage then is the "bucket of money" that the

participant has "accumulating under that interest rate."  (Chittenden Trial Testimony, Tr. at

659:7-24).  So participants' accounts are each getting "their own unique interest rate" if they

have deposited money at "different periods of time under different vintages, which requires

essentially each account to be kept individually."  (Chittenden Trial Testimony, Tr. at 666:14-

24).  The different vintages have "to be held on an individual's record."  (Chittenden Trial

Testimony, at 666:14-24).  It is this difference, which is "at the heart of a lot of the increased

- 179 -

costs and complexities associated with TIAA versus variable annuities such as CREF or mutual funds." (Chittenden Trial Testimony, Tr. at 666:25-667:9).

218.    Mr. Rezler testified that for these reasons, the fees for annuities are higher than the fees for simple mutual funds. (Rezler Trial Testimony, Tr. at 1201:8-14).

219.    Ms. Wagner testified that there are "additional administrative duties" which "add to the cost of administering insurance products and annuities, in particular when compared to the cost of administering mutual funds." (DX889B, Wagner Revised Decl. ¶ 6 (incorporating ¶ 43 n.4), ¶ 12 (incorporating ¶ 3); Wagner Trial Testimony, Tr. at 1406:24-25).

**b.    Plaintiffs Offered No Evidence to Support Their Claim That the NYU Plans Paid Excessive Administrative Fees.**

220.    The only evidence that Plaintiffs proffered at trial to support their claim that NYU paid excessive administrative fees is testimony of their Michael Geist. (Geist Trial Testimony; Geist Decl.). When asked at trial how administration of annuities differed from mutual funds, Mr. Geist responded, "[w]ell, you know, I don't specifically know because I didn't work at a company that had annuities." (Geist Trial Testimony, Tr. at 725:3-4). Mr. Geist repeatedly admitted that he has no experience and no basis to assess the difference in administrative costs between annuities and mutual funds. (Geist Trial Testimony, Tr. at 704, 722, 724, 725, 775, 810-811).

221.    Mr. Geist also has little, if any, experience with 403(b) plans, let alone university plans, and no basis to compare the administrative fees paid by the NYU Plans to similarly-situated plans. (Geist Trial Testimony, Tr. at 702-703, 705-706, 737, 868).

222.    Mr. Geist is also not aware of any entity, other than TIAA, that recordkeeps TIAA's annuities. (Geist Trial Testimony, Tr. at 705, 901-902, 905, 906). He also does not know the costs related to and does not have experience recordkeeping the TIAA Traditional

Annuity or any other annuity, fixed or variable.  (Geist Trial Testimony, Tr. at 713, 718).  Mr. Geist even testified that he did not base his "opinions on specific plans that had TIAA annuities." (Geist Trial Testimony, Tr. at 718).

223.    Mr. Geist also admitted that, in his experience, 403(b) plans ordinarily had annuity investments that were not movable, which was different from 401(k) plans.  (Geist Trial Testimony, Tr. at 808-809).

224.    Mr. Geist further admitted that he could not identify a single 403(b) plan that paid the allegedly "reasonable fees" alleged in paragraph 189 of his Declaration, let alone any higher education plans with the same services and investment options offered by the NYU Plans.  (Geist Trial Testimony, Tr. at 871:13-20).

225.    After formulating his opinions, Mr. Geist claimed to have identified 8 plans, both 401(k) and 403(b), similar to the NYU plans but that paid less for recordkeeping fees than the School of Medicine Faculty Plan and the NYU Faculty Plan.  (Geist Decl. ¶ 27; PX1681A,[137] ECF No. 233-5; Geist Trial Testimony, at 875:13-876:16).  However, none of these plans were similar to the NYU Plans, and only one of them was a 403(b) plan.  (PX1681A, ECF No. 233-5; Geist Trial Testimony, Tr. at 870:24-871:3).  Mr. Geist also did not compare the nature and level of any of the recordkeeping or administrative services provided to those 8 plans by T. Rowe Price, his former employer, to actual services proved by the recordkeepers for the NYU Plans.  (Geist Trial Testimony, Tr. at 8323:25).  He admitted that the best way to know what a plan pays for recordkeeping services is to look at the contract with the recordkeeper.  (Geist Trial Testimony, Tr. at 838:1-14).  But, he did not review the contracts for any of these 8 plans.  (Geist

---

[137] PX1681A, a document prepared by Mr. Geist and provided by Plaintiffs' counsel to defense counsel, was discussed on the record with Mr. Geist on April 19, 2018.  It was not included on the list provided to the Court on April 30, 2018, but was previously filed as ECF No. 233-5.

Trial Testimony, Tr. at 832:8-10 ("I did not go back to T. Rowe Price and ask for their contract or anything else like that."); *see* Geist Trial Testimony, Tr. at 838:24-839:4, 875:13-20).

226.   Mr. Geist also used a different methodology for analyzing the NYU Plans than he used to analyze the 8 plans in paragraph 27 of his Declaration and PX1681A.  (Geist Trial Testimony, Tr. at 840:7-841:15; PX1681A, ECF No. 233-5).  Moreover, Mr. Geist admitted that the methodology he used to analyze the recordkeeping fees of the NYU Plans "probably is not correct."  (Geist Trial Testimony, Tr. at 840:16-23).

227.   In formulating what he believes the NYU Plans should have paid for recordkeeping fees (Geist Decl. ¶ 189), Mr. Geist used only what he allegedly remembered from working at T. Rowe Price, but he admittedly did not have the same tools and resources available to him as he had when pricing recordkeeping fees at T. Rowe Price.  (Geist Trial Testimony, Tr. at 860:4-867:13).  He did not even do any math to come up with the numbers in paragraph 189 of his Declaration.  (Geist Trial Testimony, Tr. at 875:4-12).

228.   In determining what the NYU Plans paid per participant in recordkeeping fees, Mr. Geist's methodology did not use what TIAA reported to NYU as being the actual amount paid by NYU for recordkeeping minus any revenue credit received back from TIAA, which are evident in the fee disclosures mandated by ERISA section 408(b)(2) which were provided by TIAA to NYU.  (Geist Trial Testimony, Tr. at 876:17-883:8; 886:14-891:8).

229.   Mr. Geist admitted at trial that the fees that set out in paragraph 189 of his Declaration are purely hypothetical.  (Geist Trial Testimony, Tr. at 906:14-907:23).

230.   Mr. Geist does not provide any data or other scientific or economic evidence to support his assertion that the NYU Plan participants should have paid no more than $23 - $31 and $27 - $35 per year for recordkeeping fees for the Faculty Plan and the Medical Plan."

(DX890A, Turki Revised Decl. ¶ 12).  Accordingly, Mr. Geist's damages do not constitute proper damages for the allegation that the recordkeeping fees for the NYU Faculty Plan and the School of Medicine Faculty Plan were excessive.  (DX890A, Turki Revised Decl. ¶ 13).

231.    Dr. Turki conducted a calculation to demonstrate the flaws in Mr. Geist's numbers in paragraph 189 of Mr. Geist's Declaration by making three adjustments.  (DX890A, Turki Revised Decl. ¶ 14).  Dr. Turki's first adjustment takes into account that TIAA has disclosed to the Plans that approximately 40% of the total Plan Services Expense dollar amount is allocable to "recordkeeping services" as defined by DOL regulations.  (DX890A, Turki Revised Decl. ¶ 14).  Dr. Turki's second adjustment is based on the TIAA Traditional Annuity requiring separate recordkeeping, and as such, those recordkeeping fees should be subtracted from the total recordkeeping fees and considered separately.  (DX890A, Turki Revised Decl. ¶ 14).  Dr. Turki third adjustment assumes "that any excessive annual fees should be allocated to Plan participants' accounts and reinvested in the Plan." (DX890A, Dr. Turki Revised Decl. ¶ 14).  Adjusting for these three factors, Dr. Turki shows that recordkeeping fees paid by the Medical School Plan for assets other than the TIAA Traditional Annuity were *less* than Mr. Geist's admittedly "hypothetical" recordkeeping fees of $27 - $35 per participant/per year."  (DX890A, Turki Revised Decl. ¶ 14).

232.    Dr. Turki correctly concludes that the "Geist damages for the alleged excessive recordkeeping fees are not predicated on a proper economic analysis, and when corrected for some obvious flaws do not establish that the NYU Faculty Plan or the School of Medicine Faculty Plan paid excessive recordkeeping fees over the period where the data are available. (DX890A, Turki Revised Decl. ¶ 15).

> 2.   The CREF Stock Account and the TIAA Real Estate Account are
>      Objectively Prudent Investment Options.
>
>      a.   The CREF Stock Account.

233.   When analyzing the performance of the CREF Stock Account, the proper

benchmark for purposes of this case is to use TIAA's publically stated actual benchmarks for the

fund.  (DX891A, Fischel Revised Decl. ¶ 7 (incorporating ¶ 19); *see, e.g.*, Fischel Trial

Testimony, Tr. at 1458:20-1459:9, 1473:4-25).

234.   Since mid-2011, TIAA's publically stated benchmark for the CREF Stock

Account has been "a composite index composed of two unmanaged indices:  the Russell 3000

Index and the MSCI All Country World Ex USA Investable Market Index ("MSCI ACWI Ex

USA IMI"), which had assigned weight of 70.0% and 30.0%, respectively."  (DX891A, Fischel

Revised Decl. ¶ 7 (incorporating ¶ 13)).  The benchmark for the CREF Stock Account prior to

mid-2011 was a composite index comprised of a weighted average of the Russell 3000 Index, the

MSCI EAFE + Canada Index, the MSCI Emerging Markets Index, and the MSCI EAFE +

Canada Small Cap Index.  (DX891A, Fischel Revised Decl. ¶ 7 (incorporating  ¶ 19)).

235.   The CREF Stock Account "closely tracked the performance of its benchmark

during the one-, five-, and ten-year periods ending on December 31 of each year from 2009 to

2016, and the one-, five-, and ten-year periods ending June 30, 2017).  (DX891A, Fischel

Revised Decl. ¶ 7 (incorporating ¶¶ 10, 19, Ex. 3); *see* Fischel Trial Testimony, Tr. at 1484:16-

1485:14).  Professor Fischel explained that to the extent his Exhibit 3 appears to show some

slight underperformance by the CREF Stock Account, "you have to be a little careful because

you're comparing an investible account with a non-investable index.  The non-investible index

does not include expenses.  And I think if you included expenses, those very minor negative

numbers would become positive." (Fischel Trial Testimony, Tr. at 1478:5-9, 1567:9-18; *see also* Fischel Trial Testimony, Tr. at 1495:13-1498:22).

236.    Moreover, Professor Fischel's analysis of the performance of the CREF Stock Account indicates that the fund "performed as well as would have been expected given its risk, notwithstanding the costs of providing liquidity and other services, and, therefore, contradict Plaintiffs' claim that the CREF Stock Account 'consistently underperformed.'" (DX891A, Fischel Revised Decl. ¶ 7 (incorporating ¶ 24, Ex. 6)), ¶ 11).

237.    Plaintiff's expert Dr. Buetow claimed to have looked at the CREF Stock Account against its publically stated actual benchmark as of December 31, 2009, concluding that the CREF Stock Account had a period of "longstanding underperformance over 3, 5, and 10 years as December 31, 2009." (PX1690, Buetow Decl., at 35). But, Dr. Buetow incorrectly used the benchmark for the CREF Stock Account that was not in place until mid-2011 to cover a period prior to mid-2011. (*Compare* DX891A, Fischel Revised Decl. ¶ 7 (incorporating ¶¶ 13, 19), *with* PX1690, Buetow Decl., at 35; *see* Buetow Trial Testimony, Tr. at 1664:6-15, 1667:23-1668:14, 1670:16-20, 1675:20-1676:15; Fischel Trial Testimony, Tr. at 1476:2-13, 1575:18-1576:17; DX890A, Turki Revised Decl. ¶ 20). In fact, Mr. Buetow created his own benchmark for his analysis on page 35 of his Declaration. (Buetow Trial Testimony, Tr. at 1664:6-15, 1667:16-1668:14, 1670:16-20, 1675:20-1676:15, 1677:11-1678:20, 1682:7-1683:10, 1692:2-16, 1693:17-1694:8).

238.    Other than the incorrect use of the benchmark on page 35 of Buetow's Declaration, Professor Fischel also pointed out that if "you add the fees for services, the three-year number would turn positive . . . and the five and the ten would be correspondingly reduced as well." (Fischel Trial Testimony, Tr. at 1576:9-1577:6). According to Professor Fischel, it

was also misleading for Dr. Buetow to cite to a "TIAA-CREF Annual Review" apparently provided by an accountant to the State University Retirement System of Illinois (the "SURS" document) (DX901) because that DX901 supports Professor Fischel's conclusion regarding the market acceptance of the CREF Stock Account.  (Fischel Trial Testimony, Tr. at 1578:7-17). Further, DX901 shows that the CREF Stock returned 32.04 percent in 2009, "outperforming the composite benchmark of 29.65 percent by 239 basis points."  (Fischel Trial Testimony, Tr. at 1578:7-1579:22).  Accordingly, a prudent fiduciary looking at DX901 would draw the opposite conclusion from Dr. Buetow.  (Fischel Trial Testimony, Tr. at 1578:7-1579:22).  Moreover, based on its analysis of the performance of the CREF Stock Account, the SURS investment committee concluded that as of April 2, 2010:  "The CREF Stock Account is a stand-alone equity allocation that offers a well-diversified portfolio of domestic and foreign equity holdings of all sectors, styles and market caps, using a combination of active management, enhanced indexing and pure indexing.  It has closely tracked the benchmark over longer time periods.  We recommend retention of this option."  (Fischel Trial Testimony, Tr. at 1579:2-1582:11; DX901, at 20).

239.    Page 36 of Dr. Buetow's Declaration compares the performance of the CREF Stock Account against the Russell 3000 Index alone, claiming that this chart "illustrates that the plan participants were expecting the Russell 3000 benchmark" and "the underperformance that they would have realized during the period that is under consideration."  (PX1690, Buetow Decl, at 36; Buetow Trial Testimony, Tr. at 1696:12-1697:6).  However, Dr. Buetow did not interview any plan participants to determine what they would have expected.  (Buetow Trial Testimony, Tr. at 1697:7-1698:15).  And, Dr. Buetow conducted this analysis even though he does not believe that the Russell 3000 Index is the correct benchmark.  (Buetow Trial Testimony, Tr. at

- 186 -

4

1699:3-1703:2; PX1690, Buetow Decl. at 56 (providing damages calculations using the Vanguard Total Stock Market Index Institutional Shares, which is the "investable version of the Russell 3000 Index")).

240. Professor Fischel also testified that Dr. Buetow's Declaration page 36 chart was highly misleading. (Fischel Trial Testimony, Tr. at 1572:8-1573:14). As Professor Fischel explained, the sentence describing the page 36 chart purports to conclude that a prudent fiduciary would have eliminated the CREF Stock Account as of December 31, 2009, but the chart does not provide any performance data prior to 2011. (PX1690, Buetow Decl., at 36; Fischel Trial Testimony, Tr. at 1572:8-1573:14). This chart is also "profoundly misleading" because "if you look at the comparison between the CREF Stock Account and the Russell 3000 index for 2009 and 2010, the CREF Stock Account outperforms the Russell 3000." (Fischel Trial Testimony, Tr. at 1573:10-14).

241. Exhibit 1 to Professor Fischel's Declaration shows, as of December 31, 2009, the relationship between the performance of the CREF Stock Account and the Russell 3000 Index "based on a one-year return, a five-year return, and the bottom is a ten-year return." (Fischel Trial Testimony, Tr. at 1574:1-1575:1; DX891A, Fischel Revised Decl. ¶ 7 (incorporating Ex.1)). All three periods compared show that the CREF Stock Account outperforms the Russell 3000 index. (Fischel Trial Testimony, at 1574; DX891A, Fischel Revised Decl. ¶ 7 (incorporating Ex. 1)). Professor Fischel concluded that if you "ask the question that Dr. Buetow asked in the sentence above his graph [on page 36], if you were a prudent fiduciary in 2009 asking about the relationship between the CREF Stock Account and the Russell 3000, you would draw exactly the opposite conclusion" than Dr. Buetow did. (Fischel Trial Testimony, Tr. at 1574:18-1575:1).

242.     Dr. Buetow also purported to calculate damages related to the CREF Stock Account, using the Vanguard Institutional Index Fund Institutional Plus Shares (VIIIX), which is the investable version of the S&P 500.  (PX1690, Buetow Decl., at 55-56).  However, Defendant's expert, Dr. Turki, explains that this is not an appropriate comparison as it "does not account for the broader U.S. equity and international equities exposure of the CREF Stock Account."  (DX890A, Turki Revised Decl. ¶ 21).

243.     Additionally, inconsistent with the evidence in this case, Dr. Buetow assumed that NYU had the ability to map assets out of the CREF Stock Account and the TIAA Real Estate Account.  (Buetow Trial Testimony, Tr. at 1710:-1711:23).  Dr. Buetow did not know what the damages would be if his assumption was incorrect.  (Buetow Trial Testimony, Tr. at 1711:13-21; see DX890A, Turki Revised Decl. ¶ 25 ("These admissions undermine the basic assumptions of Dr. Buetow's damages calculations rendering them wholly unreliable and incorrect.")).

244.     In their Amended Complaint, Plaintiffs alleged that the CREF Stock Account had a "sustained track record of underperformance" and that it had been "recognized as imprudent in the industry."  (ECF No. 39 at ¶¶ 104, 180).  However, as Defendant's expert Professor Fischel testified that the "CREF Stock Account is well established in the industry as it has been in operation since 1952 and had net assets of $123.08 billion as of September 30, 2017."  (DX891A, Fischel Revised Decl. ¶ 7 (incorporating ¶ 21)).  Professor Fischel reviewed the data from TIAA on their top 200 institutional clients and drafted Exhibit 4 to his testimony to show "that virtually all of these clients had at least one 403(b) plan with assets in the CREF Stock Account in each year."  (DX891A, Fischel Revised Decl. ¶ 7 (incorporating ¶ 21, Ex. 4)).  Exhibit 5 to Professor Fischel's testimony "shows that the percentage of actively remitting

clients that had contributions into the CREF Stock Account each year ranged from 93.7% and 97.8% during this period."  (DX891A, Fischel Revised Decl. ¶ 7 (incorporating ¶ 21, Ex. 5)).

245.    Professor Fischel concluded that "[b]road acceptance by other 403(b) plans is evidence that the CREF Stock Account is a prudent investment because it is highly improbable that multiple independent fiduciaries would continue to offer an obviously imprudent investment alternative."  (DX891A, Fischel Revised Decl. ¶ 9).

246.    Mr. Chittenden testified that of TIAA's 200 largest institutional clients with at least one 403(b) plan, all 200 clients held assets in CREF Stock for the period 2010 through 2014.  In 2015 and 2016, all but one of TIAA's largest clients held assets in CREF Stock. (DX892, Chittenden Decl. ¶ 53).  Of those 200 clients, over 93% had plans that received contributions into CREF Stock for the period 2010 through 2016.  (DX892, Chittenden Decl. ¶ 55).

247.    Mr. Chittenden explained that this historical data is that which he uses in connection with his duties and responsibilities at TIAA in the last couple of years.  (Chittenden Trial Testimony, Tr. at 567, 652-653).

248.    Plaintiffs' request to exclude Mr. Chittenden's testimony regarding TIAA's clients which hold assets in and receive contributions to the CREF Stock Account and the TIAA Real Estate Account is denied as Plaintiffs did not request this information during discovery. (*See* ECF No. 306, April 23, 2018 Letter to the Court from Mr. Taylor).

### b.    TIAA Real Estate Account.

249.    As is the case with the CREF Stock Account, the proper benchmark for analyzing the TIAA Real Estate Account is to use TIAA's publically stated actual benchmarks for the fund. (DX891A, Fischel Revised Decl. ¶ 7 (incorporating ¶ 15); *see, e.g.*, Fischel Trial Testimony, Tr. at 1459, 1473).

- 189 -

250.    Since 2012, TIAA has compared the TIAA Real Estate Account's "performance with the performance of the NCREIF Fund Index – Open End Diversified Core Equity ("NFI-ODCE"), an equal weighted index of investment returns from a collection of open end comingled funds which focus on core real estate investment strategy."  (DX891A, Fischel Revised Decl. ¶ 7 (incorporating ¶ 15)).  "TIAA adjusts the total return of the account to take into account the 'costs and cash drag embedded in the product' as result of the account's unique guaranteed liquidity feature."  (DX891A, Fischel Revised Decl. ¶ 7 (incorporating ¶ 15)). "TIAA also compares the account's unlevered property level returns with the performance of the NCREIF Property Index ("NPI"), which is a market value weighted composite of commercial and residential properties in the United States held by tax-exempt institutions."  (DX891A, Fischel Revised Decl. ¶ 7 (incorporating ¶ 15)).  Prior to 2012, TIAA compared the performance of the Account "with the performance of the REA composite index."  (DX891A, Fischel Revised Decl. ¶ 7 (incorporating ¶ 26)).

251.    The adjusted performance of the TIAA Real Estate Account "has closely tracked the performance of its benchmark during the one-, five-, and ten-year periods ending on December 31 of each year from 2009 to 2016, and the one-, five-, and ten-year periods ending September 30, 2017."  (DX891A, Fischel Revised Decl. ¶ 7 (incorporating ¶ 26, Ex. 8)), ¶ 18. Professor Fischel explained Exhibit 8:

> This is a comparison of the TIAA adjusted returns the way they were reported by TIAA relative to the actual benchmark used by TIAA at different points in time . . . .  It reports the adjusted returns for TIAA as reported by TIAA.  It reports the benchmark return, and then it reports the difference based on a one-year, five-year, and ten-year basis, and . . . you can see there's some negatives, some positives.  If I look at the comparison that Mr. Schlichter asked me to make yesterday of the differences over five years and then years, there are a couple of negatives, but the strong majority of the differences are positive, and that's true for the five-year.  For the ten-year, they're all positive.

(Fischel Trial Testimony, Tr. at 1590,:4-16, 1591:25- 1592:5).

252.    Moreover, Professor Fischel's analysis of the TIAA Real Estate Account indicates that the Account "performed at least as well as would have been expected given its risk, notwithstanding the costs of providing liquidity and other services.  Therefore these findings contradict Plaintiffs' claim that the TIAA Real Estate Account 'consistently underperformed.'" (DX891A, Fischel Revised Decl. ¶ 7 (incorporating ¶ 30), ¶ 19).

253.    In concluding that the TIAA Real Estate Account should have been removed as an investment option by December 31, 2009, Dr. Buetow compared the Account's performance to the NCREIF Fund Index – Open Fund Diversified Core Equity ("NCREIF Index").  (PX1690, Buetow Decl. at 57; Buetow Trial Testimony, Tr. at 1706-1709).  However, this is not the appropriate benchmark that was used by TIAA as of December 31, 2009.  (DX891A, Fischel Revised Decl. ¶ 7 (incorporating ¶¶ 15, 26)).  And, Mr. Buetow did not adjust the returns to account for cash as TIAA did.  (Buetow Trial Testimony, Tr. at 1710).

254.    Dr. Buetow also compared the TIAA Real Estate's Account performance against that of a REIT index.  (PX1690, Buetow Decl. at 43, 47-48, 57-58).  But the evidence in this case shows that a REIT is not a proper comparison for the TIAA Real Estate Account's performance. (*See* FOF ¶ *1*57; Fischel Trial Testimony, Tr. at 1583-87; *see also* DX890A, Turki Decl. ¶ 23).

255.    Moreover, the chart on page 47 of Mr. Buetow's Declaration cites to DX901. (PX1690, Buetow Decl., at 47).  As was the case with the CREF Stock Account, Dr. Buetow's source document, the SURS document (DX901), actually recommends the retention of the of the TIAA Real Estate Account, noting that over "longer periods of time the account has provided positive performance."  (DX901 at 30; Fischel Trial Testimony, Tr. at 1589:4-18).

256.    As is the case with the CREF Stock Account, the evidence supports the conclusion that the TIAA Real Estate account is widely accepted in the market.  Of TIAA's 200

- 191 -

largest institutional clients with at least one 403(b) plan, all but one client held assets in the TIAA Real Estate Account for the period 2010 through 2014.  (DX892, Chittenden Decl. ¶ 63). In 2015 and 2016, all but two of TIAA's largest institutional clients held assets in the TIAA Real Estate Account.  (DX892, Chittenden Decl. ¶ 63).  And, of those 200 clients, over 84% had plans that received contributions into the TIAA Real Estate Account for the period 2010 through 2016. (DX892, Chittenden Decl. ¶ 64).

257.    Mr. Chittenden explained that this historical data is that which he uses in connection with his duties and responsibilities at TIAA in the last couple of years.  (Chittenden Trial Testimony, at 567, 652-653).

258.    Defendant's expert Professor Fischel testified that the TIAA Real Estate Account "has been in operation since 1995 and had net assets of $24.8 billion as of June 30, 2017." (DX891A, Fischel Revised Decl. ¶ 7 (incorporating ¶ 28)).

259.    Professor Fischel reviewed the data from TIAA on their top 200 institutional clients and drafted Exhibit 4 to his testimony, which shows that "virtually all of these clients had at least one 403(b) plan with assets in the TIAA Real Estate Account in each year."  (DX891A, Fischel Revised Decl. ¶ 7 (incorporating ¶ 28, Ex. 4).

260.    Exhibit 5 to Professor Fischel's testimony shows "that the percentage of actively remitting clients that had contributions into the TIAA Real Estate Account in each year ranged between 84.8% and 95.3% during this period."  (DX891A, Fischel Revised Decl. ¶ 7 (incorporating ¶ 28, Ex. 5).

261.    Professor Fischel concludes that "[b]road acceptance by other 403(b) plans is evidence that the Account is a prudent investment because it is highly improbable that multiple

independent fiduciaries would continue to offer an obviously imprudent investment alternative."
(DX891A, Fischel Revised Decl. ¶ 17).

262.    Plaintiffs have argued that the TIAA Real Estate Account's potential cash
component from its liquid holdings makes it an imprudent investment, but this argument is not
supported by the record.  (*See* Chittenden Trial Testimony; Surh Trial Testimony; Fischel Trial
Testimony).  Plaintiffs refer to this as "cash drag."  (*See, e.g.*, Chittenden Trial Testimony, at
644).

263.    The TIAA Real Estate Account's Prospectus' Investment Objective disclose that
the Account owns real estate-related investments, but "will also invest in non-real estate-related
publicly traded securities and short-term higher quality liquid investments that are easily
converted to cash to enable the Account to meet participant redemption requests, purchase or
improve properties or cover other expense needs."  (DX041, May 1, 2017 TIAA Real Estate
Account Prospectus, at 3).

264.    Defendant's expert Professor Fischel testified that this potential cash component
has an impact on risk; it decreases the risk of the TIAA Real Estate Account relative to a typical
REIT.  (Fischel Trial Testimony, Tr. at 1524).  REIT's are typically "significantly riskier."
(Fischel Trial Testimony, Tr. at 1523).  Accordingly, a REIT index is not a proper benchmark for
the TIAA Real Estate Account.  (Fischel Trial Testimony, Tr. at 1583).

265.    According to Professor Fischel, REIT's are riskier because they may hold debt,
and it is difficult to ascertain what kind of assets REIT's are investing in—the underlying assets
may be risky as well.  (Fischel Trial Testimony, Tr. at 1524-25).  The lack of cash may also
make REITs risky.  (Fischel Trial Testimony, Tr. at 1525).  Moreover, a "publically traded RET"
is "more sensitive to fluctuations of the overall market increasing the volatility of returns in ways

- 193 -

that appraisal based valuations for the properties held by or invested in by the TIAA real estate

account would be less sensitive to."  (Fischel Trial Testimony, Tr. at 1569.)

266.    Professor Fischel further testified:

[T]his is another sort of misunderstanding of the effect of cash.  When real estate values are increasing, then cash lowers returns, because the zero return on cash is averaged against deposited returns on real estate, and in that situation, the cash lowers risk and also lowers return.

But in down markets, when real estate values are falling, then the zero return on cash improves performance because the zero return is averaged against the negative numbers as opposed to positive numbers.  And therefore, you can't say that lowering risk either improves performance or hurts performance without specifying what period of time you're looking at, whether real estate values are increasing or decreasing.

(Fischel Trial Testimony, Tr. at 1525-1526, 1583-84, 1623-24).

267.    When questioned specifically about the Account's "cash drag," Fischel explained

that there is "zero return on cash, or for all practical purposes, a zero return, so in that sense it's a

drag.  But it's not correct to say that that drag will always adversely affect performance, because

in down markets, which is exactly what occurred . . . it dramatically can improve performance.

So it just depends on how real estate values, whether they're increasing or decreasing, to analyze

what the effects of cash is."  (Fischel Trial Testimony, Tr. at 1526.)

268.    Professor Fischel demonstrated the impact of cash on the Real Estate Account by

comparing the Account's performance to a REIT index in the May 15, 2009 Due Diligence

Report (DX456) to that in the March 31, 2010 Due Diligence Report (PX0034), which was used

by Plaintiffs' expert Buetow in his declaration.  (Fischel Trial Testimony, Tr. at 1584-1587).

Referring to PX0034, Professor Fischel explained that PX0034 is "analogous to the document

which is the basis for Dr. Buetow's graph on page 43 [of his Declaration] showing what is

claimed to be abysmal performance of the TIAA real estate account relative to a REIT index."

(Fischel Trial Testimony, Tr. at 1585).  But, if you look at the 2009 timeframe, DX456, which is

closer to a time when "a performance comparison would capture a declining real estate market," it shows the "beneficial effect of cash in the declining real estate market as opposed to in a period where real estate values are rapidly increasing." (Fischel Trial Testimony, Tr. at 1585-86).

269.    In PX0034, in looking at the Account's peer rankings, the TIAA Real Estate Account "was among the worst in terms of its ranking relative to peers." (Fischel Trial Testimony, Tr. at 1586; PX0034, at CLC0008036).  But, when you look at DX456, the TIAA Real Estate Account was among the best when compared to its peers. (Fischel Trial Testimony, Tr. at 1586; DX456, at CLC0006242).  In DX456, the TIAA Real Estate Account also "vastly" outperformed its REIT index. (Fischel Trial Testimony, Tr. at 1586-1587; DX456, at CLC0006242).

270.    Mr. Chittenden provided similar testimony. (Chittenden Trial Testimony, at 642-643). Mr. Chittenden explained that the TIAA Real Estate Account "holds 10 percent of its assets in cash or other short-term securities that can go up to higher percentages, 20, or 25 percent maximum, if market conditions require it." (Chittenden Trial Testimony, Tr. at 642-643). This requirement provides for liquidity. (Chittenden Trial Testimony, Tr. at 643).

271.    Mr. Chittenden further testified:  "how we think of it is that it's the best of both worlds. You get a return that is derived primarily from your direct ownership of real estate, yet you still have liquidity. . . . [I]f we didn't have cash withdrawal," then you could not then "sell an office building overnight. So you need to have some amount of liquidity within the portfolio to provide for both money coming in and money going out." (Chittenden Trial Testimony, Tr. at 643).

272.     With the liquidity requirement, if the real estate is performing better than the cash, the cash has a "negative drag on the total return." (Chittenden Trial Testimony, Tr. at 644). But if the real estate is doing well enough, the overall performance of the Account could still be above that of other asset classes regardless of the liquidity requirement. (Chittenden Trial Testimony, Tr. at 644).

273.     Chittenden further explained:

> The reason to have money in the real estate account is to diversify your assets, you know, so you have yet another asset class. You know, stocks go up and down. The guaranteed product . . . chugs along at a nice interest rate, but it chugs along, and . . . this can dampen some of that volatility and give you a chance for some extra returns if the market conditions warrant it.

(Chittenden Trial Testimony, Tr. at 646).

274.     When asked about the Account's potential cash component, Ms. Surh, NYU's former Chief Investment Officer and former Committee member, testified that she does not consider the Account holding cash as a "cash drag" as it plays "a role as a strategic asset that the portfolio management team believes it needs in order to manage the vehicle." (Surh Trial Testimony, Tr. at 1122-24; DX884, Surh Decl. ¶¶ 3, 4, 27). Access to cash is necessary for the Account to meet routine obligations relating to owning real estate and to meet fund liquidity needs for purposes of redemptions. (Surh Trial Testimony, Tr. at 1124-25). "The cash and easily convertible investments are an asset, as it provides a source of liquidity and a diversifier from other forms of investment risks." (DX884, Surh Decl. ¶ 27).

- 196 -

B.      **Conclusions of Law Regarding the Objective Prudence of NYU's Decisions.**

1.      **Plaintiffs Bear the Burden of Establishing A Breach, Causation and Damages.**

275.    The law in the Second Circuit is clear that Plaintiffs bear the burden of establishing that NYU breached ERISA's duty of prudence and that they suffered harm as a result of the breach.

276.    Plaintiffs seek compensatory damages under 29 U.S.C. § 1132(a)(2), which permits a fiduciary to bring a civil action "for appropriate relief under section 1109 of this title." (ECF. No. 39, Am. Compl. ¶ 5); 29 U.S.C. § 1132(a)(2). Section 1109(a) in turn provides that "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations or duties imposed upon fiduciaries by this subchapter shall be personal liable to make good to such plan any losses to the plan *resulting from* each such breach. . . ."  29 U.S.C. § 1109(a) (emphasis added).  The Second Circuit explained that "[t]his statute therefore requires a plaintiff to demonstrate in a suit for compensatory damages that the plan's losses "resulted from" [the breach]."  *Silverman v. Mut. Benefit Life Ins. Co.*, 138 F.3d 98, 104 (2d Cir. 1998). Specifically, the language "resulting from" indicates that "[c]ausation of damages . . . is an element of the claim, and the plaintiff bears the burden of proving it."  *In re State St. Bank & Trust Co. Fixed Income Funds Inv. Litig. v. State St. Bank & Trust Co.*, 842 F. Supp. 2d 614, 653 (S.D.N.Y 2012) (quoting *Silverman*, 138 F.3d at 105); *Bd. of Trs. of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, 860 F. Supp. 2d 251, 261 (S.D.N.Y. 2012) ("The Second Circuit interpreted the language "resulting from" to make causation an element of the claim, for which plaintiffs have the burden of proof.").

277.    Accordingly, a plaintiff must show a "causal link between the alleged breach . . . and the loss plaintiff seeks to recover."  *State Street*, 842 F. Supp. 2d at 653.  Specifically,

Plaintiffs must show that NYU breached its fiduciary duties by either: (1) demonstrating that there is a "significant causal link" between Defendant's alleged breaches and Plaintiffs' losses; or (2) that Defendant's alleged breaches proximately caused Plaintiffs' losses.  *Id.* at 654.

278.    Plaintiffs argue that the burden of proof switches to NYU as soon as Plaintiffs have proven a "prima facie case of breach of fiduciary duty and loss to the plan" and refer to the duty to "prove objective prudence."  (ECF No. 162 at 10, n.27).  Plaintiffs are wrong.

279.    Plaintiffs fail to cite a single case suggesting that the burden shifts to the Defendant or even that the burden shifts to the Defendant to just prove objective prudence. Plaintiffs' sole support for their argument is *N.Y. State Teamsters Council Health & Hosp. Fund v. Estate of DePerno*, 18 F3d 179 (2d Cir. 1994).  In *DePerno*, the Second Circuit affirmed the district court's finding that plaintiffs had proven that the defendants "had violated several provisions of ERISA."  *Id.* at 180.  Indeed, the court specifically stated that the case presented a question of whether the burden should shift to the defendants regarding various questions pertaining to damages "after the plaintiffs sustained their burden of showing the defendants' violation of their fiduciary duty to the Fund and the payment of money as a result of that violation"—*i.e.* breach of duty and causation.  *Id.* at 180-81.  The court found that, with respect to damages, "the burden should have shifted to the defendants to demonstrate factors mitigating costs incurred by the plaintiffs."  *Id.*

280.    This Court has specifically declined to extend the holding in *DePerno* outside of the limited exception for burden-shifting that it represents.  In *Board of Trustees of AFTRA Retirement Fund*, plaintiffs, relying heavily on *DePerno*, sought an *in limine* ruling that the burden shifts to the defendant on the element of causation after plaintiffs "established a breach of fiduciary duty and *prima facie* case of loss."  *Id.* at 259.  The court disagreed and stated that that

"plaintiffs have the burden of proof on causation in ERISA actions," and that the court is "bound by the Second Circuit's decision in *Silverman.*"  *Id.* at 261; *see also In re Unisys Sav. Plan Litig.*, 173 F.3d 145, 160 n.23 (3d Cir. 1999) (noting that the Second Circuit, under *Silverman,* places the "burden of proof on plaintiff").  The court then explained that plaintiffs overstated the significance of *DePerno*; *DePerno* stands only for the limited proposition that "where there is uncertainty in damages, there is a presumption that the fund plans would have been invested in the most profitable of equally plausible investment strategies" and, in this limited instance where such a presumption is made, "[d]efendants have the burden to prove that the damages would have, in fact, been less."  *Bd. of Trs. of AFTRA Ret. Fund*, 860 F. Supp. at 260.

281.    Even ignoring the fact that *DePerno's* holding is limited, *DePerno* is distinguishable and its holding is inapplicable to this case.  *DePerno* involved significant allegations of self-dealing and prohibited transactions claims.  The court in *DePerno* acknowledged that the plaintiff generally bears the burden of proving the fact of damages, but determined that the circumstances of the case warranted application of the principles of the law of trusts.  *Id.* at 182-83.[138]  The court relied on the fact that "'the burden of proof is always on the party to the *self-dealing* transaction to justify its fairness'" in making this decision.  *Id.* at 183 (emphasis added).  Plaintiffs have not made any such allegations of self-dealing here.  *See Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 375 (4th Cir. 2014) (refusing to shift the burden of proof with respect to causation of damages and finding *DePerno* distinguishable because it

---

[138] The common law of trusts is not necessarily applicable to ERISA § 409.  *See In re State St.*, 842 F. Supp. 2d at 653 (explaining that "ERISA section 409 departed from the common law of trusts by placing the burden to prove causation on the plaintiff" therefore one should be cautious in "drawing too much upon the law of trusts for the causation analysis in ERISA") (internal quotations omitted) (citing *Silverman*, 138 F.3d at 104).

"deal[t] with self-dealing, a far more serious breach of fiduciary duty than simple lack of prudence").

282.    This Court has stated that Plaintiffs have the "burden of proving an *amount* of damages caused by" Defendant's alleged breaches.  *State Street*, 842 F. Supp. 2d at 655 (stating also that the court needed to examine whether plaintiff had "sustained its burden of proving an *amount* of damages") (quoting *Diduck v. Kaszycki & Sons Contractors,* 974 F.2d 270, 279 (2d Cir. 1992), *abrogated on other grounds*)).

### 2.    Plaintiffs Failed to Meet Their Burden of Demonstrating that NYU Paid Excessive Administrative Fees.

283.    Plaintiffs failed to demonstrate that NYU employed an imprudent process in monitoring administrative fees.  Therefore, this Court's inquiry could end there.  *See supra* Defendant's Supplemental Findings of Fact and Conclusions of Law, Section II.

284.    Even if Plaintiffs could demonstrate that it may have been possible to have negotiated or obtained lower fees at any point in time, which Plaintiffs did not do, Plaintiffs cannot satisfy their obligations in this way.  *Taylor*, 2009 WL 535779, at *8 ("The prudent person standard does not require the fiduciary to take any particular course of action even if another approach seems preferable" (citing *Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006))).  NYU was not required to scour the market to find the lowest fees available.  *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009).

285.    Plaintiffs failed to satisfy their burden to establish recordkeeping damages.  *See State Street*, 842 F. Supp. 2d at 655 (plaintiffs bear the "burden of proving an *amount* of damages caused by" Defendant's alleged breaches).  Plaintiffs failed to provide any evidence that NYU overpaid for recordkeeping fees.  Indeed, the only evidence that Plaintiffs provide relating to their argument that NYU overpaid for recordkeeping fees is the testimony of Mr. Geist.  But

Geist's purported recordkeeping damages are flawed and based on a lack of any relevant data and a faulty analysis, which underscores Geist's lack of relevant experience in this case.

286.     As an initial matter, Plaintiffs willfully ignore the impact of TIAA annuities on recordkeeping fees.  TIAA annuities require additional administrative duties which drive up the costs of recordkeeping annuities.  Further, the costs of recordkeeping annuities are significantly higher due to the complexities of administering vintages.

287.     Further, the testimony of Mr. Geist is Plaintiffs' only purported basis for establishing that NYU paid excessive recordkeeping fees.  But Mr. Geist has no experience recordkeeping annuities, let alone TIAA annuities.  (*See* FOF ¶¶ 220-222).  Mr. Geist also has very little experience, if any, with university 403(b) plans like that of NYU.  (*See* FOF ¶ 221). Accordingly, Mr. Geist lacks the pertinent experience to opine on the proper recordkeeping fees for the NYU Plans.  *See Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 530 (S.D.N.Y. 2001) (excluding expert opinion and explaining that an expert basing his opinion on experience "must do more than aver conclusorily that his experience led to his opinion"), *abrogated on other grounds Casey v. Merck & Co., Inc.*, 653 F.3d 95 (2d Cir. 2011); *Lippe v. Bairnco Corp.*, 288 B.R. 678, 686 (S.D.N.Y. 2003) (precluding testimony of two expert witnesses on the basis of lack of experience, noting that one proffered expert had no experience in the area for which she was being offered); *Scentsational Techns. v. Pepsi, Inc.*, No. 13-cv-8645 (KBF), 2018 WL 910587, at *6 (S.D.N.Y. Feb. 14, 2018) (excluding expert testimony and noting that the expert "has no demonstrated expertise"); *SEC v. Tourre*, 950 F. Supp. 2d 666, 677-78 (S.D.N.Y. 2013) (excluding expert opinion and noting that the expert did not have the requisite knowledge to testify).

288.     Mr. Geist's methodology for determining what he believed NYU should have paid for recordkeeping fees is fundamentally flawed.  He has no experience with annuities, but he also did not consider other plans like that of NYU (*supra* ¶¶ 222-224, 227); he used a different methodology to come up with fees than he used while he was at T. Rowe price (FOF ¶ 225-227); Mr. Geist did not consider the actual amounts that NYU paid for recordkeeping services (FOF ¶ 230); Mr. Geist agreed that his recordkeeping fees are purely hypothetical (FOF ¶ 229).  For these reasons, the Court will not rely on Mr. Geist's opinions as they amount to *ipse dixit*.  *See Pepsi*, 2018 WL 910587, at *6 (excluding expert and not that expert's opinion was "neither supported by data or analysis"); *SEC v. Tourre*, 950 F. Supp. 2d at 678 (excluding expert opinion and noting that the expert did not have a reliable methodology; the opinion was *ipse dixit*).

289.     Geist calculated his purported recordkeeping damages without considering the fact that a very significant percentage of the Plans' assets are in TIAA annuities, and these annuities can only be recordkept by TIAA.  Geist admitted, however, that he is not aware of any entity, other than TIAA, that recordkeeps TIAA's annuities and that most 403(b) plans have assets which are not moveable, unlike 401(k) plans.  Geist's purported recordkeeping damages are accordingly inaccurate because they fail to account for the fact that almost half of the Plans' assets could not be moved to another recordkeeper.

290.     Further, Plaintiffs cannot rely on Geist in order to establish recordkeeping damages because, as Geist himself admitted, the methodology that he used to calculate damages "probably is not correct."  The only "facts" allegedly underlying Geist's purported recordkeeping damages (which he identified only after formulating his opinion), are 8 plans, none of which are higher education plans and only one of which is even a 403(b) plan.

291.    Even if these plans were comparable, Geist also did not compare any actual services provided to those 8 plans to the services provided to the Plans at issue and he failed to review any of the contracts for these 8 plans in order to determine what they paid for recordkeeping.  Geist even admitted that he used a different methodology to analyze the recordkeeping fees for the 8 plans than he did for the NYU Plans.  Not surprisingly, Geist cannot identify one plan that paid his "reasonable fees" in paragraph 189 of his Declaration and that are higher education plans with the same services and investment options offered by the NYU Plans.

> **3.      Plaintiffs Failed to Meet Their Burden of Establishing that a Similarly Situated Fiduciary Would Not Have the Same Decisions Regarding Maintaining the CREF Stock Account and the TIAA Real Estate Account.**

292.    ERISA Section 404(a)(1)(B), 29 U.S.C. 1104(a)(1)(B) states that the prudent man standard of care, applicable here, requires a fiduciary to discharge his duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  Plaintiffs have failed to meet their burden of proving that Defendant has not satisfied this standard care.

293.    Plaintiffs offer no support for their claim that the CREF Stock Account has consistently underperformed.  To the contrary, the undisputed facts demonstrate that the account closely tracked the performance of its benchmark during the one-, five-, and ten-year periods ending on December 31 of each year from 2009 to 2016, and the one-, five-, and ten-year periods ending June 30, 2017.  (DX891A, Fischel Revised Decl. ¶ 7 (incorporating ¶¶ 10, 19, Ex. 3); *see* Fischel Trial Testimony, Tr. at 1483).

294.    Moreover, as demonstrated by Professor Fischel's alpha analysis, the CREF Stock Account performed as well as would have been expected given its risk, notwithstanding the costs

of providing liquidity and other services.  (DX891A, Fischel Revised Decl. ¶ 7 (incorporating ¶ 24, Ex. 6), ¶ 11).

295.     Likewise, the adjusted performance of the TIAA Real Estate Account closely tracked the performance of its benchmark during the one-, five-, and ten-year periods ending on December 31 of each year from 2009 to 2016, and the one-, five-, and ten-year periods ending September 30, 2017.  (DX891A, Fischel Revised Decl. ¶ 7 (incorporating ¶ 26, Ex. 8), ¶ 18).

296.     And, as demonstrated by Professor Fischel's alpha analysis, the TIAA Real Estate Account performed at least as well as would have been expected given its risk, notwithstanding the costs of providing liquidity and other services.  (DX891A, Fischel Revised Decl. ¶ 7 (incorporating ¶ 30), ¶ 19).

297.     Further, as Mr. Chittenden testified, nearly all of TIAA's top 200 institutional clients have maintained assets in both the CREF Stock and the TIAA Real Estate Account between 2010 and 2016.  (*See* FOF ¶¶ 246-247, 256-257).  Moreover, Professor Fischel, using TIAA's top 200 institutional clients, demonstrated that both funds are broadly accepted in the 403(b) market which is evidence that the funds are prudent investments "because it is highly improbable that multiple independent fiduciaries would continue to offer an obviously imprudent investment alternative."  (*See* FOF ¶¶ 245, 259-261).

298.     Plaintiffs provide no reliable evidence to the contrary.  *See Taylor*, 2009 WL 535779, at *9-10 (finding that defendant acted prudently in maintaining cash in a Stock Fund, while noting that Plaintiffs provided no evidence to the contrary and finding that defendant did not breach a fiduciary duty by offering actively managed funds, noting that "ERISA does not require a fiduciary to take 'any particular course' so long as the fiduciary's decision meets the prudent person standard"); *Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs.*

- 204 -

*Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d at 721 (holding that defendant's actions

were objectively prudent because none of plaintiff's "warning signs" demonstrated defendant

"knew, or should have known, that the securities in the Portfolio were imprudent investments");

*Ulico Cas. Co. v. Clover Capital Mgmt.*, 335 F. Supp.2d 335, 340-41 (N.D.N.Y. 2004) (finding

defendant acted with objective prudence in liquidating the funds' portfolio to cash); *Bd. of Trs. of*

*Local 295/Local 851-IBT Emp. Pension Fund v. Callan Assocs., Inc.*, No. 97 Civ. 1741(HB),

1998 WL 289697, at *3-4 (S.D.N.Y. June 4, 1998) (finding defendant acted with objective

prudence in liquidating the funds' portfolio to cash).

299.    Plaintiffs' expert Dr. Buetow does not use reliable economic methods to analyze

damages related to the CREF Stock Account and the TIAA Real Estate Account.  Dr. Buetow

does not use appropriate benchmarks against which to measure damages and fails to take into

account that the annuities are not mappable.  Accordingly, the Court finds that Dr. Buetow's

opinions relating to damages cannot be relied upon here to establish damages.  *See Ruggiero v.*

*Warner-Lambert Co.*, 424 F.3d 249, 255 (2d Cir. 2005) (affirming district court's decision to

exclude expert opinion and noting that "[f]ollowing *Joiner*, we held that 'when an expert opinion

is based on data, a methodology, or studies that are simply inadequate to support the conclusions

reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony"

(quoting *Amorgianos v. Nat'l R.R. Passenger Corp*, 303 F.3d 256, 266 (2d Cir. 2002))).

## IV.     EVEN IF PLAINTIFFS HAD ESTABLISHED ANY BREACH OF FIDUCIARY DUTY, THEIR CLAIMS ARE LIMITED BY ERISA'S THREE-YEAR STATUTE OF LIMITATIONS.

300.    Any alleged breaches before August 9, 2013, are time-barred.  ERISA's statute of

limitations requires that a plaintiff bring suit within the earlier of six years after "the date of the

last action which constituted a part of the breach," or "three years after the earliest date on which

the plaintiff had actual knowledge of the breach or violation." ERISA § 413(1) & (2). "A

- 205 -

plaintiff has 'actual knowledge' of a breach 'when he has knowledge of all material facts necessary to understand that an ERISA fiduciary has breached his or her duty or otherwise violated the Act.'" *Young v. Gen. Motors Inv. Mgmt. Corp.*, 550 F. Supp. 2d 416, 418 (S.D.N.Y. 2008) (citing *Caputo v. Pfizer*, 267 F.3d 181, 193 (2d Cir. 2001)).

301.    Plaintiffs allege that the performance of the TIAA Real Estate Account and CREF Stock Account as of December 31, 2009 was sufficient to cause the fiduciaries to discontinue investments on that date.  Moreover, the undisputed facts establish that, prior to three years before they filed suit, Plaintiffs were provided with detailed disclosures required by ERISA that included the expense ratio for each of the investments available, summaries of each investment's performance, and a description of the various funds.  Plaintiffs, therefore, had all of the information they needed to raise claims challenging the Plans' administrative fees and the performance of the CREF Stock Account and the TIAA Real Estate Account.

302.    For all of the foregoing reasons, the Court enters judgment in favor of the Defendant.

Dated:  New York, New York             Respectfully submitted,
        May 13, 2018

                                       DLA PIPER LLP (US)


                                       /s/ Ian C. Taylor
                                       Mark Muedeking (*pro hac vice*)
                                       Ian C. Taylor (*pro hac vice*)
                                       Jennifer K. Squillario (*pro hac vice*)
                                       Adam Pié (*pro hac vice*)
                                       Harry P. Rudo (*pro hac vice*)
                                       Emily Steiner (*pro hac vice*)

- 206 -

DLA Piper LLP (US)
500 8th Street, NW
Washington, DC 20004
(202) 799-4000
Mark.Muedeking@dlapiper.com
Ian.Taylor@dlapiper.com
Jennifer.Squillario@dlapiper.com
Adam.Pie@dlapiper.com
Harry.Rudo@dlapiper.com
Emily.M.Steiner@dlapiper.com

Evan D. Parness
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020
(212) 335-4500
Evan.Parness@dlapiper.com

*Counsel for Defendant New York University*