UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: July 31, 2018

-------------------------------------------------------------- X
:
DR. ALAN SACERDOTE, DR. HERBERT :
SAMUELS, MARK CRISPIN MILLER, :
PATRICK LAMSON-HALL, MARIE E. :
MONACO, DR. SHULAMITH LALA :
STRAUSSNER, and JAMES B. BROWN, :
individually and as representatives of a :
class of participants and beneficiaries on :
behalf of the NYU School of Medicine :          16-cv-6284 (KBF)
Retirement Plan for Members of the :
Faculty, Professional Research Staff and :       OPINION & ORDER
Administration and the New York :
University Retirement Plan for Members of :
the Faculty, Professional Research Staff :
and Administration, :
:
                              Plaintiffs, :
:
            -v- :
:
NEW YORK UNIVERSITY, :
:
                              Defendant. :
:
-------------------------------------------------------------- X

KATHERINE B. FORREST, District Judge:

        Each week, to ensure a more secure future, employees throughout the United

States contribute portions of their paychecks to retirement savings accounts. An

employer sponsoring a retirement plan becomes a fiduciary under the Employee

Retirement Income Savings Act ("ERISA") and is required to act vis-à-vis a plan

with the care, skill, and diligence that a prudent person would use in a similar

situation. See Tibble v. Edison Int'l, 135 S. Ct. 1823, 1828 (2015). Employees rely

on such fiduciaries to perform their duties with appropriate dedication and

attention.  The fiduciary duty imposed by ERISA reflects congressional recognition of the importance of workers' retirement savings.

Plaintiffs here are employees of New York University ("NYU") who claim that NYU, through its Retirement Plan Committee (the "Committee"), failed to fulfill certain of its fiduciary obligations under ERISA.  According to plaintiffs, NYU's imprudence resulted in losses totaling more than $358 million.  They are one of at least eleven groups of plaintiffs—all represented by the same counsel—asserting ERISA claims against their university-employers.[1]  This is the first of those cases to proceed to trial.

Plaintiffs assert that the Committee breached its duty of prudence with regards to two NYU retirement plans: the New York University Retirement Plan for Members of the Faculty, Professional Research Staff and Administration (the "Faculty Plan") and the New York University School of Medicine Retirement Plan for Members of the Faculty, Professional Research Staff and Administration (the "Medical Plan") (together, the "Plans").  The same Committee oversees both Plans. Plaintiffs' first claim is that the Committee imprudently managed the selection and monitoring of recordkeeping vendors resulting in excessively high fees.  According

---

[1] See, e.g., Munro v. Univ. of S. Calif., 16-cv-6191 (C.D. Cal.); Vellali v. Yale Univ., 16-cv-1345 (D. Conn.); Henderson v. Emory Univ., 16-cv-2920 (N.D. Ga.); Divane v. Northwestern Univ., 16-cv-8157 (N.D. Ill.); Kelly v. Johns Hopkins Univ., 16-cv-2835 (D. Md.); Tracey v. Mass. Inst. Tech., 16-cv-11620 (D. Mass.); Clark v. Duke Univ., 16-cv-1044 (M.D.N.C.); Cates v. Columbia Univ., 16-cv-6524 (S.D.N.Y.); Sweda v. Univ. of Pa., 16-cv-4329 (E.D. Pa.); Cunningham v. Cornell Univ., 16-cv-6525 (S.D.N.Y.); Cassell v. Vanderbilt Univ., 16-cv-2086 (M.D. Tenn.).

2

to plaintiffs, the Committee could have reduced such fees by "consolidating" its use of two recordkeepers into one, and also by negotiating a lower overall rate. Plaintiffs include in this claim arguments that the Committee: (1) failed to prudently manage a request-for-proposal ("RFP") process relating to recordkeeping vendors; (2) failed to allow respondents to propose pricing for all Plan assets (versus only non-annuity assets); and (3) had pre-determined that TIAA (already a recordkeeper for annuity assets) was the favored vendor.

Plaintiffs' second claim is that the Committee acted imprudently by failing to remove the TIAA Real Estate Account and the CREF Stock Account as investment options (thereby continuing to allow plaintiffs to invest in such funds). Plaintiffs assert that the Committee used confusing and inappropriate financial benchmarks to review their performance and that these funds objectively underperformed, resulting in significant losses.

After careful review of the record, the Court finds by a preponderance of the evidence that while there were deficiencies in the Committee's processes—including that several members displayed a concerning lack of knowledge relevant to the Committee's mandate—plaintiffs have not proven that the Committee acted imprudently or that the Plans suffered losses as a result.

Accordingly, the Court finds in favor of NYU on all claims.

I.      PROCEDURAL HISTORY

This action was far more expansive at the time of initial filing.  The first

complaint, filed on August 9, 2016, contained seven counts.[2]  In a decision dated

August 25, 2017, the Court dismissed several claims in the Amended Complaint,

(ECF No. 39), leaving only the two which proceeded to trial.  Sacerdote v. New York

Univ., No. 16-cv-6284, 2017 WL 3701482 (S.D.N.Y. Aug. 25, 2017).

On February 13, 2018, the Court certified a class consisting of:

> All participants and beneficiaries of the NYU School of Medicine
> Retirement Plan for Members of the Faculty, Professional Research
> Staff and Administration and the New York University Retirement
> Plan for Members of the Faculty, Professional Research Staff and
> Administration from August 9, 2010, through the date of judgment,
> excluding the Defendant and any participant who is a fiduciary to the
> Plans.

Sacerdote v. New York Univ., No. 16-cv-6284, 2018 WL 840364, at *7 (S.D.N.Y. Feb.

13, 2018).  The "Class Period" is therefore August 9, 2010 to the present.

---

[2] Initially, plaintiffs alleged that NYU breached its fiduciary duties of loyalty and prudence (Claims I, III, and V) by failing to use "the Plans' bargaining power to reduce expenses and [to exercise] independent judgment to determine what investments to include in the Plans."  (ECF No. 39, Am. Compl. ¶ 4.)  Plaintiffs also claimed that NYU allowed the Plans' "conflicted third party service providers—TIAA-CREF and Vanguard—to dictate the Plans' investment lineup, to link its recordkeeping services to the placement of investment products in the Plans, and to collect unlimited asset-based compensation from their own proprietary products."  (Id.)  Claims II, IV, and VI alleged that NYU engaged in prohibited transactions because plaintiffs, through their investments, allegedly "paid a portion of the Plans' excessive administrative and recordkeeping fees, [costs] which would not have been incurred had defendants discharged their fiduciary duties to the Plan."  (Id. ¶ 8(c).)  In addition, Claim VII asserted that, to the extent NYU delegated any of its fiduciary responsibilities to another fiduciary, NYU breached its duty to monitor.  (Id. ¶¶ 236-39.)

4

The Court held an eight-day bench trial in April 2016; post-trial submissions were filed on May 13, 2018 and closing arguments were held on May 16, 2018. Twenty witnesses testified at trial (seventeen by trial declaration,[3] with live cross and redirect, and three by deposition designation), including: named plaintiffs (Marie Monaco,[4] Alan Sacerdote,[5] Mark Crispin Miller,[6] and Shulamith Straussner[7]); six former and current members of NYU's Retirement Committee

---

[3] The Court's procedure for bench trials provides for direct examination by trial declaration, with live cross-examination and redirect.

[4] Monaco is a participant in the Medical Plan. (PX1683 ("Monaco Decl.").) She has been invested in the TIAA Real Estate Account and the CREF Stock Account since 1980. (Tr. at 1041:14-1042:2; see also Monaco Decl. ¶ 3.) She has never sought to reduce her investments in these funds. (Tr. at 1041:17-1042:23.) As of December 31, 2017, 82.12% of her portfolio was invested in the CREF Stock Account, 0.48% was invested in the TIAA Real Estate Account, and the remainder was divided among other TIAA funds. (DX874.) She is also invested in two TIAA annuities. (See PX729, PX731.) Monaco testified that her Medical Plan account has not lost money. (Tr. at 1044:8-10.) She further conceded that she did not typically read the quarterly statements TIAA provides. (Tr. at 1046:8-13.)

[5] Sacerdote is a participant in the Medical Plan. (PX1685 ("Sacerdote Decl.").) He is not invested in the TIAA Real Estate Account or the CREF Stock Account. (Tr. at 1036:18-23.)

[6] Miller is a participant in the Faculty Plan. (PX1682 ("Miller Decl.").) He is not invested in any TIAA accounts through the Plans. (Tr. at 1031:5-13.) However, he is invested in the CREF Stock Account through retirement plans at universities where he was previously employed—Johns Hopkins University and the University of Pennsylvania. (Tr. at 1032:13-1032:17.) He has not altered his investments in any of those plans since this lawsuit commenced. (Id. at 1033:4-6.)

[7] Straussner is a participant in the Faculty Plan. (PX1684 ("Straussner Decl.").) She has been invested in the TIAA Real Estate Account and the CREF Stock Account since at least 2009. (Straussner Decl. ¶ 3.) Between July 1, 2009 and June 30, 2017, the value of her CREF Stock Account grew by 265%; the value of her TIAA Real Estate account grew by 538%; and her overall savings grew by 252%. (See DX344, DX377.) As of June 30, 2017, her savings in the TIAA Real Estate Account and the CREF Stock Account amounted to 43.05% of her total portfolio. (See DX344, DX377.) Straussner has not sought to reduce her investment in either account. (Tr. at 1027:4-1028:1.) Straussner is also invested in a retirement annuity account, described in more detail below. (See PX739.)

5

(Margaret Meagher,[8] Nancy Sanchez,[9] Patricia Halley,[10] Tina Surh,[11] Martin

Dorph,[12] and Linda Woodruff[13]); two NYU staff members (Mark Petti[14] and

Susanna Hollnsteiner[15]); one TIAA representative (Douglas Chittenden[16]); one

Vanguard representative (George Heming[17]); and one Cammack LaRhette

---

[8] Meagher has been the co-chair of the Committee since its inception.  (DX883 ("Meagher Decl.").)
She testified regarding the Committee's due diligence activities and her role.  The Court found her
testimony concerning—she did not demonstrate the depth of knowledge one would expect from a
fiduciary.

[9] Sanchez, Meagher's supervisor, is another Committee member.  (DX885 ("Sanchez Decl.").)  Her
testimony was also troubling.  Not only did she fail to demonstrate a satisfactory understanding of
key documents and her role as a fiduciary, but she also relied on Meagher to review certain key
documents, (Tr. at 385:3-9) and noted that she did not consider herself a fiduciary (but rather
believed the Committee was the fiduciary), (id. at 386:20-387:9).

[10] Halley is NYU's Assistant Vice President of Global Benefits and another member of the
Committee; she testified about the Committee's processes and discussions.  (DX887 ("Halley Decl.").)
As part of this, she testified that the Committee's meeting minutes are intended to be summaries
and not to capture every detail and conversation.

[11] For the period of 2010-2014, Surh was NYU's Chief Investment Officer ("CIO") and a Committee
member.  (DX884 ("Surh Decl.").)  Of the Committee members who testified, she was the most
knowledgeable about the investment options in the Plans.  The Court found Surh to be a highly
credible witness and gives significant weight to her testimony.  Surh asked a number of probing
questions during Committee meetings and demonstrated that the Committee exerted
decisionmaking authority independent from its financial advisor, Cammack LaRhette Consulting
("Cammack").

[12] Dorph, now NYU's Executive Vice President and a Committee member until 2017, also provided
somewhat concerning testimony.  For instance, on the first day of his testimony, he did not even
know whether he was currently a member of the Committee (and, accordingly, whether he was a
fiduciary to thousands of employees).  (Tr. at 1311:3-6; see also DX888 ("Dorph Decl.").)  However,
his testimony regarding NYU's information technology ("IT") transitions and their impact on
recordkeeping consolidation was informative, detailed, consistent, and very credible.

[13] Woodruff was a Committee member from 2010-2012.  (ECF No. 283-1.)

[14] Petti was a Manager of Retirement Plans at NYU; he attended Committee meetings but was not a
member of the Committee.  (DX886 ("Petti Decl.").)

[15] Hollnsteiner was also a Manager of Retirement Plans at NYU; she similarly attended Committee
meetings but was not a member of the Committee.  (ECF No. 283-1.)

[16] Chittenden is the Executive Vice President and head of the Institutional Retirement business of
Institutional Financial Services ("IFS") at TIAA.  (DX892 ("Chittenden Decl.").)  He was a highly
credible witness and was very knowledgeable regarding NYU's Plans as well as TIAA's offerings and
capabilities.

[17] Heming is a principal at Vanguard.  (ECF No. 283-1.)  He displayed significant knowledge
regarding Vanguard's offerings and capabilities.

Consulting ("Cammack") representative (Jan Rezler[18]).  Plaintiffs also called two

expert witnesses: Michael Geist[19] and Gerald Buetow.[20]  NYU called three expert

witnesses: Marcia Wagner,[21] Daniel Fischel,[22] and Dr. Lassaad Adel Turki.[23]  The

Court also received over six hundred documents into evidence.

---

[18] Rezler has advised the Committee since Cammack's retention in 2009.  (DX893 ("Rezler Decl.").)
He displayed deep knowledge and understanding of the NYU Plans as well as the offerings and
capabilities of vendors such as TIAA and Vanguard.

[19] Plaintiffs retained Geist to provide analysis and opinions related to the Committee's
actions/inactions regarding recordkeeping fees.  (PX1681 ("Geist Decl.").)  Geist spent over ten years
in the Retirement Plan Services ("RPS") division of T. Rowe Price, during which time he "was
responsible for delivering, creating, and/or governing over 20,000 pricing proposals for over 10,000
retirement plans."  (Id. ¶ 3.)
      As discussed below, Geist lacked the particular expertise necessary to provide useful
opinions to the Court.  He has virtually no experience with: (1) the type of plans at issue here (403(b)
plans); (2) participants heavily invested in TIAA annuities; or (3) transitioning large plans from
multiple to single recordkeepers.  (See, e.g., Tr. at 702:15-703:2 (noting that a "small percentage of
the plans that [he] worked with at T. Rowe Price" were 403(b) plans); id. at 775:23-25, 784:19-785:4
(noting that had no experience with transitioning a 403(b) plan from dual record keeper to a single
recordkeeper, and while he had some experience in transitioning billion dollar plans from multi-
record keeper to single recordkeeper, he could not recall the name of one).) T. Rowe Price did not
recordkeep annuities while Geist worked there, (id. at 704:10:15; id. at 774:19-22), and Geist has no
specific knowledge of "what it costs to record-keep a fixed annuity," (id. at 706:23-707:1; id. at 712:24-
713:6).  The Court does not believe that he is a true "expert" on the pricing of the specific products at
issue here and he did not demonstrate to the Court that he possesses the requisite qualifications to
present reliable opinions on whether NYU's participants paid reasonable recordkeeping fees.

[20] Plaintiffs retained Buetow to provide expert testimony regarding the investment performance of
the TIAA Real Estate Account and the CREF Stock Account, as well as damages.  (PX1690 ("Buetow
Decl.").)  As discussed below, Buetow's testimony relied heavily on his view that the Committee used
inappropriate benchmarks against which to measure investment fund performance.  The Court was
not persuaded by this testimony.

[21] Defendant retained Wagner to provide expert testimony regarding NYU's processes relating to
recordkeeping fees and to rebut Geist's testimony on the same topic.  (DX889B ("Wagner Decl.").)
The Court found her experience with 403(b) plans impressive and her testimony consistent,
reasonable, logical, and ultimately highly credible.

[22] Defendant retained Fischel to analyze the investment performance of the CREF Stock Account and
TIAA Real Estate Accounts and to rebut Buetow's testimony on the same topic.  (DX891A ("Fischel
Decl.").)  The Court found him knowledgeable, reasonable, and consistent; overall, he was highly
credible and the Court gives great weight to his testimony.

[23] Defendant retained Turki as a damages rebuttal expert.  (DX890A ("Turki Decl.").)  He has a
wealth of experience in this area, and the Court relied on his opinions.

II.     LEGAL PRINCIPLES[24]

To prove a breach of the duty of prudence, plaintiffs bears the burden of showing: (1) that NYU failed to engage in a prudent process (here, with specific regard to how it monitored recordkeeping fees and certain investment options); and (2) that, on an objective basis, such breaches led to Plan losses.  Plaintiffs have failed to carry their burden.

A.      ERISA Generally

Under ERISA, the duties owed by fiduciaries to plan participants "are those of trustees of an express trust—the highest known to the law." Donovan v. Bierwirth, 680 F.2d 263, 272 n.8 (2d Cir. 1982).  ERISA § 404(a)(1) (codified at 29 U.S.C. § 1104(a)(1)) imposes twin duties of prudence and loyalty on fiduciaries of retirement plans.  The duty of loyalty—not principally at issue in this case—is codified in ERISA § 404(a)(1)(A).  It requires fiduciaries to act "solely in the interest of the participants and beneficiaries," and "for the exclusive purpose of providing benefits to participants and their beneficiaries; and defraying reasonable expenses of administering the plan." ERISA § 404(a)(1)(A).  "The most fundamental duty owed by the trustee to the beneficiaries of the trust is the duty of loyalty. . . .  It is the duty of a trustee to administer the trust solely in the interest of the

---

[24] The remainder of this Opinion constitutes the Court's conclusions of law and findings of fact.  The Court makes its findings of fact by a preponderance of the credible evidence.  While this Opinion contains some citations to evidence, they should be considered examples only.  The Court has not attempted to recite all supportive citations in the record.

beneficiaries." <u>Pegram v. Herdrich</u>, 530 U.S. 211, 224 (2000) (internal quotation omitted).

The duty of prudence requires a fiduciary to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  ERISA § 404(a)(1)(B).  The "prudent person" standard asks whether "the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment." <u>Katsaros v. Cody</u>, 744 F.2d 270, 279 (2d Cir. 1984) (quoting <u>Donovan v. Mazzola</u>, 716 F.2d 1226, 1232 (9th Cir. 1983), cert. denied, 464 U.S. 1040 (1984); <u>see also</u> <u>Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.</u> (PBGC), 712 F.3d 705, 716 (2d Cir. 2013) (noting that the standard "focus[es] on a fiduciary's conduct in arriving at an investment decision, not on its results, and ask[s] whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment" (quoting <u>In re Unisys Sav. Plan Litig.</u>, 74 F.3d 420, 434 (3d Cir. 1996)) (alterations in <u>PBGC</u>)).  "In short, ERISA's 'fiduciary duty of care . . . requires prudence, not prescience.'" <u>PBGC</u>, 712 F.3d at 716 (quoting <u>DeBruyne v. Equitable Life Assurance Soc'y of the U.S.</u>, 920 F.2d 457, 465 (7th Cir. 1990)).  Fiduciaries' prudence is measured against an objective standard, and their own "lack of

9

familiarity with investments is no excuse" for failing to act with the care, skill,

prudence and diligence required under the circumstances then prevailing.

Katsaros, 744 F.2d at 279.  Participants may bring civil actions for failures in

fiduciary performance.  29 U.S.C. § 1132(a)(2).  An action under § 1132(a)(2) is

"brought in a representative capacity on behalf of the plan."  L.I. Head Start Child

Dev. Servs. v. Econ. Opportunity Council of Suffolk, Inc., 710 F.3d 57, 65 (2d Cir.

2013) (quoting Coan v. Kaufman, 457 F.3d 250, 257 (2d Cir. 2006)).

 B. Principles Related to an Imprudent Process Claim

 A fiduciary breaches its duty of prudence when it fails to "employ[] the

appropriate methods" in making investment decisions.  See Katsaros, 744 F.2d at

279 (quoting Mazzola, 716 F.2d at 1232).

> Pursuant to ERISA implementing regulations, promulgated by the
> Secretary of Labor, a fiduciary's compliance with the prudent-man
> standard requires that the fiduciary give "appropriate consideration"
> to whether an investment "is reasonably designed, as part of the
> portfolio . . . to further the purposes of the plan, taking into
> consideration the risk of loss and the opportunity for gain (or other
> return) associated with the investment."

PBGC, 712 F.3d at 716 (quoting 29 C.F.R. § 2550.404a–1(b)(2)(i)).  Fiduciaries

should consider the prudence of each investment as it relates to the portfolio as a

whole, rather than in isolation.  Id., 712 F.3d at 717.  Accordingly, courts must look

to "not only to [a fiduciary's] investigation procedures, but also to the methods used

to carry out those procedures as well as the thoroughness of their analysis of the

data collected in that investigation."  Chao v. Tr. Fund Advisors, No. Civ. A. 02-559,

2004 WL 444029, at *3 (D.D.C. Jan. 20, 2004); see also Henry v. Champlain Enters.,
Inc., 445 F.3d 610, 620 (2d Cir. 2006) (holding that a failure to produce notes
documenting an investigation did not, on its own, indicate that the defendant failed
to employ an "appropriate method"); United States v. Mason Tenders Dist. Council
of Greater N.Y., 909 F. Supp. 882, 890 (S.D.N.Y. 1995) (holding that a fiduciary
failed to discharge its obligation to investigate various purchases of property).

      C.    Principles Relevant to Monitoring and Removing Investments

     Fiduciaries have a "continuing duty to monitor investments and remove
imprudent ones[.]" Tibble, 135 S. Ct. at 1829. This means that a fiduciary "cannot
assume" that investments that were prudent at one time "will remain so
indefinitely." Id. at 1828 (quoting A. Hess, G. Bogert & G. Bogert, Law of Trusts
and Trustees ("Bogert 3d") § 684, pp. 145-146 (3d ed. 2009)).  Rather, the fiduciary
"must 'systematic[ally] conside[r] all the investments of the trust at regular
intervals' to ensure that they are appropriate." Id., 135 S. Ct. at 1828 (quoting
Bogert 3d § 684) (alterations in Tibble).  In short, a fiduciary "'who simply ignores
changed circumstances that have increased the risk of loss to the trust's
beneficiaries is imprudent.'" PBGC, 712 F.3d at 717 (quoting Armstrong v. LaSalle
Bank Nat'l Ass'n, 446 F.3d 728, 734 (7th Cir. 2006)).

     In order to prevail in their claims here, plaintiffs bear the burden of
establishing that the Plans suffered a loss due to the breach.  Silverman v. Mutual
Ben. Life Ins. Co., 138 F.3d 98, 104 (2d Cir. 1998).  Specifically, under ERISA:

> Any person who is a fiduciary . . . who breaches any of the
> responsibilities, obligations, or duties . . . shall be personally liable to
> make good to such plan any losses to the plan <u>resulting from</u> each such
> breach, and to restore to such plan any profits of such fiduciary which
> have been made through use of assets of the plan by the fiduciary, and
> shall be subject to such other equitable or remedial relief as the court
> may deem appropriate, including removal of such fiduciary.

29 U.S.C. § 1109(a) (emphasis added); <u>see also</u> <u>PBGC</u>, 712 F.3d at 730 (noting that a

claim for breach of fiduciary duty under ERISA requires an alleged loss to the plan

at issue); <u>Mira v. Nuclear Measurements Corp.</u>, 107 F.3d 466, 473 (7th Cir. 1997)

("In light of our holding that the plaintiffs suffered no economic loss, we hold that

this case falls within the 'no harm, no foul' rule.  It is a longstanding principle in

civil law that there can be no monetary recovery unless the plaintiff has suffered

harm."); <u>Silverman</u>, 138 F.3d at 105 ("Causation of damages . . . is an element of the

claim, and the plaintiff bears the burden of proving it.").

Therefore, even if plaintiffs had established that NYU did not follow a

prudent process in monitoring administrative fees and investments (which, as

discussed below, they have failed to do), in order to be entitled to recover damages,

the Plan(s) must have also suffered a causally related loss.[25]  ERISA § 404(a)(1)(B);

---

[25] Plaintiffs argue that once a plaintiff has proven a breach of a fiduciary duty and loss to the plan,
the burden of explanation or justification shifts to defendant.  <u>See</u> <u>N.Y. State Teamsters Council
Health & Hosp. Fund v. Estate of DePerno</u>, 18 F.3d 179, 182 (2d Cir. 1994).  In other words,
according to plaintiffs, defendant then bears the burden of disproving causation (i.e., that its
decisions were objectively prudent, in that any prudent fiduciary would have made the decisions it
made).  Defendant counters that the Second Circuit has rejected such burden-shifting, citing
<u>Silverman</u>, 138 F.3d at 105.  The Court need not resolve this question, as plaintiffs acknowledge that

see also Roth v. Sawyer-Cleator Lumber Co., 16 F.3d 915, 919 (8th Cir. 1994) ("Even if a [fiduciary] failed to conduct an investigation before making a decision, he is insulated from liability if a hypothetical prudent fiduciary would have made the same decision anyway.").

       D.      Principles Particularly Relevant to Excessive Fee Claims

A fiduciary also has the responsibility of ensuring that fees paid to recordkeepers are not excessive relative to services rendered. Young v. Gen. Motors Inv. Mgmt. Corp., 325 Fed. App'x 31 (2d Cir. 2009). In Young, the Second Circuit held that a prudence claim based on excessive fees must be supported by facts that take the particular circumstances into account. Id., 325 Fed. App'x at 33 (citing Gartenberg v. Merrill Lynch Asset Mgmt., 694 F.2d 923, 928 (2d Cir. 1982) and Krinsk v. Fund Asset Mgmt., Inc., 875 F.2d 404, 409 (2d Cir. 1989)). These facts may go to fiduciaries' "independence and conscientiousness," Krinsk, 875 F.2d at 409, and they may tend to show whether a fiduciary failed to adequately tether fees to services rendered or employed an imprudent process. ERISA does not dictate "any particular course of action" with regards to fees, but it does require a "fiduciary . . . to exercise care prudently and with diligence under the circumstances then prevailing." Chao v. Merino, 452 F.3d 174, 182 (2d Cir. 2006) (internal quotation

_____

they bear the initial burden of proving both (1) that a breach occurred and (2) the Plans suffered a loss as a result. As discussed below, plaintiffs have not proven either.

omitted).  For example, competitive bidding is not <u>per se</u> required under ERISA, but it can be an example of an action taken to ensure fees are appropriate.  <u>See</u> <u>White v. Chevron Corp.</u>, 16-cv-0793, 2016 WL 4502808, at *14 (N.D. Cal. Aug. 16, 2016); <u>see also</u> <u>George v. Kraft Foods Glob., Inc.</u>, 641 F.3d 786, 800 (7th Cir. 2011) (holding "a trier of fact could reasonably conclude that defendants did not satisfy their duty to ensure that [the recordkeeper's] fees were reasonable" where plan fiduciaries failed to, <u>inter alia</u>, solicit competitive bidding for more than fifteen years).  As with other ERISA claims, plaintiffs must show that demonstrated imprudence in fact "resulted in monetary loss."  <u>George</u>, 641 F.3d at 797.

  E. <u>Reliance Between and Among Fiduciaries</u>

  As discussed below, in April 2009, the Committee retained Cammack to act as an investment advisor to the Committee; Cammack thus became a co-fiduciary.[26] During the trial, certain witnesses testified that they—in effect—assumed that on financial issues (which constituted a significant portion of the Committee's mandate), they could defer virtually entirely to Cammack for expertise and information and rely on its recommendations.  This is incorrect.

  The hiring or appointment of a co-fiduciary does not relieve the original fiduciary of its independent duties; no fiduciary may passively rely on information provided by a co-fiduciary.  <u>Bierwirth</u>, 680 F.2d at 272.  A fiduciary who delegates

---

[26] The parties agree that Cammack is a co-fiduciary.  (<u>See</u> ECF Nos. 301 at 1, 302 at 4.)

14

fiduciary responsibilities nonetheless retains a duty to exercise prudence "in continuing the allocation or designation." 29 U.S.C. § 1105(c)(A)(iii). In this regard, good old-fashioned "kicking the tires" of the appointed fiduciary's work is required: "ERISA's duty to investigate requires fiduciaries to review the data a consultant gathers, to assess its significance and to supplement it where necessary." In re Unisys, 74 F.3d at 435. "In order to rely on an expert's advice, a 'fiduciary must (1) investigate the expert's qualifications, (2) provide the expert with complete and accurate information, and (3) make certain that reliance on the expert's advice is reasonably justified under the circumstances.'" Bussian v. RJR Nabisco, Inc., 223 F.3d 286, 301 (5th Cir. 2000) (quoting Howard v. Shay, 100 F.3d 1484 at 1489 (9th Cir. 1996)); see also Hugler v. First Bankers Tr. Servs., Inc., No. 12-cv-8649, 2017 WL 1194692, at *11 (S.D.N.Y. Mar. 30, 2017) (outlining the same three requirements).[27]

Put otherwise, Cammack's appointment does not now and never has entitled the Committee or its members to unthinkingly defer to Cammack's expertise—even when Cammack was hired because it possessed expertise Committee members did not. To fulfill their duties, the Committee members must meaningfully probe Cammack's advice and make informed but independent decisions. See In re Unisys,

---

[27] The parties agree that NYU has not delegated its fiduciary responsibilities pursuant to 29 U.S.C. § 1105. (ECF No. 301 at 3, ECF No. 302 at 4.)

74 F.3d at 434-35; <u>Bussian</u>, 223 F.3d 286.  Certainly, a fiduciary is within its

rights—and likely well-advised—to seek advice from experts.  <u>Hightshue v. AIG</u>

<u>Life Ins. Co.</u>, 135 F.3d 1144, 1148 (7th Cir. 1998 ("Seeking independent expert

advice is evidence of a thorough investigation . . . .").  However, this comes with the

proviso that the fiduciary "investigate[s] the expert's qualifications . . . and

determine[s] that reliance on the expert's advice is reasonably justified under the

circumstances."  <u>Id.</u>, 135 F.3d at 1148.  While the fiduciary need not "duplicate the

expert's analysis," it must "review that analysis to determine the extent to which

any emerging recommendation can be relied upon."  <u>Bussian</u>, 223 F.3d at 301.  This

can take various forms, such as "an honest, objective effort to read the valuation,

understand it, and question the methods and assumptions that do not make sense."

<u>Howard v. Shay</u>, 100 F.3d 1484, 1490 (9th Cir. 1996).

III.   THE PLANS

     NYU established both the Faculty and Medical Plans in 1952.  (PX940;

DX386.)  NYU is the designated "Sponsor" of both.  (Tr. at 369:10.)  They are

defined-contribution, participant-directed 403(b) plans available to employees.

     A.   <u>The Faculty Plan</u>

     In 2010, the Faculty Plan had 12,868 participants and $1.79 billion in assets;

by the end of 2016, the number of participants had grown to 18,551 and assets had

increased to $2.62 billion.  (DX46 at 2, 18; DX3 at 2, 19.)  Each participant has the

independent ability to decide how his/her money should be invested.  (PX940 at 14.)

16

The Plan provides for 103 investment options.  During the Class Period, the Faculty Plan offered investment options comprised of funds managed by TIAA (twenty-five options) and Vanguard (seventy-eight options).  (See, e.g., PX497; PX718; DX87.) These options included fixed and variable annuities, as well as mutual funds.  (Id.) The Faculty Plan offers participants both actively- and passively-managed index funds. (Active management typically carries higher fees.)

B.  The Medical Plan

The Medical Plan is available to employees of the NYU School of Medicine. (Meagher Decl. ¶ 8; DX386 at 11.)  In 2010, the Medical Plan had 9,153 participants and $1.29 billion in assets; by the end of 2016, it had actually shrunk in size to 8,560 participants but its assets increased to $2.02 billion.  (DX27 at 2, 18; DX4 at 2, 19.)  Like the Faculty Plan, each participant may choose among investment options.  (DX386 at 18.)  And like the Faculty Plan, the Medical Plan offers diverse investment options (of which there are eighty) including funds managed by TIAA (nine options) and Vanguard (seventy-one options); among the options are fixed and variable annuities as well as actively- and passively-managed index funds.  (PX688; DX149.)

C.  An Overview of Recordkeeping Services

Retirement accounts require management.  As part of this, information regarding account balance and investment performance must be calculated and provided to participants.  Necessary services also include preparing enrollment kits

17

and delivering information such as fund notices, prospectuses, and financial statements; additional and optional services might also include providing investment and savings advice.  (Halley Decl. ¶ 30; DX526 at 11-13; DX532 at 13-16.)  "Recordkeeper" is the shorthand term for a vendor who provides recordkeeping services, and payment for such services are designated as "recordkeeping" or "administrative" fees.

During the Class Period, the Plans' recordkeeping services were provided by TIAA[28] and Vanguard; Prudential also serviced only the Medical Plan until that Plan's consolidation to a single recordkeeper in 2013 (at which time it was eliminated).  (See, e.g., Rezler Decl. ¶¶ 20-31.)  In 2013, TIAA became the sole service provider to the Medical Plan.  (Meagher Decl. ¶ 45; Petti Decl. ¶ 30; see also DX532; DX533.)  Until May 2018, both Vanguard and TIAA provided services to the Faculty Plan: Vanguard provided recordkeeping services for the Vanguard investment options, and TIAA provided recordkeeping services for the TIAA

---

[28] As of December 1, 2009, $2.41 billion of the Plans' combined $3.01 billion in assets were in TIAA funds and annuities.  (PX128 at 4-5.)  As of September 30, 2017, $2.8 billion of the Faculty Plan's $4.1 billion assets were in TIAA funds and annuities, and all (100%) of the Medical Plans $3.6 billion in assets were in TIAA funds and annuities.  (PX959 at 30-31.)  TIAA's services included investment and savings advice to participants at no additional cost by TIAA.  (Chittenden Decl. ¶¶ 85-109; Halley Decl. ¶ 31.)  TIAA's website provided content, videos, and tools on topics such as saving for retirement, building a legacy, and living well in retirement.  (Chittenden Decl. ¶ 102.)  TIAA also provided financial education webinars on several topics, such as the basics of investing, asset allocation, staying on track in a volatile market, and receiving retirement income.  (Id.)  Likewise, Vanguard's recordkeeping fees included services such as participant calls, participant education, and quarterly summary participant statements.  (Halley Decl. ¶ 32; Heming Dep. Designation 44:4-47:12.)

investment options.  In May 2018, the Faculty Plan eliminated Vanguard as a
recordkeeper and consolidated to TIAA as the single vendor.  (Rezler Decl. ¶ 56;
DX520 at 5.)

Like a number of large 403(b) plans, the NYU Plans pay recordkeeping fees
by way of "revenue sharing."  In a revenue sharing arrangement, a portion of
investment earnings are used to pay the fund's expenses.  Participants do not "write
checks" for such fees; rather, fees are deducted automatically.  (Halley Decl. ¶ 24;
Rezler Decl. ¶¶ 23-24; Wagner Decl. at 27-28.)  See also Tussey v. ABB, Inc., 746
F.3d 327, 331 (8th Cir. 2014) ("Revenue sharing is "a common method of
compensation whereby the mutual funds on a defined contribution plan pay a
portion of investor fees to a third party.").

D.    The Role of Annuities in the Plans

403(b) plans may be set up to pay out a stream of income at retirement.  In
order to fund this future income stream, participants may elect to contribute to an
annuity.  Most Plan participants have elected to do so, and the amount of assets
invested in annuities constitutes a sizable majority (three quarters) of the Plans'
assets under management.  Annuities are established through contracts (referred to
as "annuity contracts") between participants and the investment entity (for
instance, TIAA).  Annuity contracts may be between individuals and the investment
entity or on a group basis; they may also provide for "fixed" or "variable" payouts.

19

Here, the individual annuities are contracts issued in a Plan participant's name; the annuities guarantee periodic payments at retirement, determined on the basis of premium payments and credited interest or investment earnings during a participant's working years.  (Chittenden Decl. ¶¶ 23-25; Wagner Decl. at 6.) Unlike mutual funds, a fixed annuity is considered to be an insurance product.  An institution offering annuities (such as TIAA) has to maintain reserves to fund its future obligations.

     E.    <u>Background on the Committee</u>[29]

In the fall of 2007, NYU determined that a Retirement Plan Committee (the "Committee") should be formed to provide "consistency and clarity in plan governance."  (Meagher Decl. ¶ 10; Dorph Decl. ¶ 4; PX462.)  The Committee was established effective June 1, 2008.  (Meagher Decl. ¶ 12; Dorph Decl. ¶ 5; PX533 at 2-5.)[30]

The Committee has nine members who hold employment positions with NYU: the NYU Chief Investment Officer, the NYU Senior Vice President of Finance, the

_____

[29] From the time of its creation until the end of 2017, the Committee met approximately once per quarter; meetings often lasted about two hours.  (<u>See, e.g.</u>, PX45 at 7; PX1209 at 1.)  The Committee met forty-three times, twenty-five of which occurred in the six years preceding the filing of the Complaint on August 9, 2016.

[30] Prior to 2009, employers with 403(b) plans were protected by Department of Labor ("DOL") regulation (the "Safe Harbor"), under which 403(b) plans were treated as exempt from ERISA if employers limited their administrative involvement.  (Wagner Decl. at 7.).  However, the 2009 IRS regulations required tax-exempt employers to assume a deeper involvement in 403(b) plan administration.  (<u>Id.</u>)  403(b) plans no longer qualify for the DOL Safe Harbor.  (<u>Id.</u>)

20

NYULMC Senior Vice President of Finance, the NYU Langone Medical Center

("NYULMC") Controller, the NYU Vice President of Human Resources, the

NYULMC Senior Vice President of Human Resources, the NYU Director of

Benefits, the NYULMC Director of Benefits, and the NYU Provost or his/her

designee.[31]  (PX533 at 3.)  In addition, the NYU Director of Benefits and NYULMC

Senior Vice President of Human Resources were designated as co-chairs, and the

Committee was allowed to appoint a secretary.  (Id.)

In February 2009, the Committee decided to engage Cammack as an

investment advisor to help with management and monitoring of the financial

aspects of plan management, including evaluating, selecting, and managing the

Plans' recordkeepers as well as advising them on the selection and monitoring of

plan investments.  (DX554 at 1-2; see also Meagher Decl. ¶¶ 16-17, Rezler Decl.

¶¶ 6-7, 9.)[32]

---

[31] Some of the positions identified in the Committee's original charter changed over time.  (Sanchez Decl. ¶ 7, n.1.)  Currently the Charter designates the following members: (1) NYU Associate Vice President, Global Compensation and Benefits; (2) NYU Chief Financial Officer; (3) NYU Chief Investment Officer; (4) NYU Provost; (5) NYU Senior Vice President of Human Resources; (6) NYULMC Senior Director of Benefits; (7) NYULMC Senior Vice President of Finance; (8) NYULMC Senior Vice President of Human Resources; and (9) NYULMC Vice President for Finance.  (PX518; Sanchez Decl. ¶ 7, n.1.)

[32] The record is not clear as to when Cammack initially began advising the Committee.  The minutes for the Committee's February 4, 2009 meeting indicate that an RFP for an outside investment advisor had been issued and that Cammack had been selected, but the minutes for the October 8, 2008 meeting—four months earlier—indicate that the Committee was already discussing Cammack's role.  (PX476 at 1.)

F.     Quarterly Meetings

During the Class Period, Cammack provided the Committee with quarterly

updates on various financial aspects of the Plans.  (See, e.g., PX34, PX36, PX43,

PX44, PX530, PX1073, PX1093, PX1107, PX1294, PX1314, PX1390, PX1676.)  Its

reports were typically distributed to all Committee members one week before a

meeting.  The evidence at trial supported receipt and review of these reports by

Committee members.  (Halley Decl. ¶ 10; Meagher Decl. ¶ 20; Rezler Decl. ¶ 12; see

also DX456-DX521 (the "Reports").)  At the meetings, and prior to making final

decisions, Committee members asked questions about the information Cammack

provided and its recommendations.  (Tr. at 372:21-373:17, 424:8-19, 425:1-18,

1152:20-1153:20.)  The evidence supports the Committee having made decisions

based on adequate investigation and independent decisionmaking.

Cammack's quarterly reports (referred to as "due diligence reports"),

reviewed, inter alia, the performance of investment options.  Its analyses included

recommendations as to when the performance of a fund is sufficiently concerning

that it has become a candidate for placement on a list established for additional

scrutiny and monitoring (the "Watch List").  (Rezler Decl. ¶ 10.)  Cammack's

analyses included comparisons of funds' performance against peer groups as well as

benchmark indices; the analyses also set forth each fund's risk-adjusted return, fees

22

in comparison to peer funds, portfolio manager tenure, and Morningstar[33] ratings. (Rezler Decl. ¶¶ 11, 15.)  The reports additionally included: reminders as to members' fiduciary duties, including their duty to ensure the "plan is competitive, meets the needs of participants and complies with ever-changing regulatory requirements"; asset allocation, including the amount allocated to TIAA traditional accounts, the TIAA Real Estate Account, and the CREF Stock Account; expenses; a financial market overview; an overview of investment options; industry trends; and regulatory updates.  (See, e.g., the Reports (DX456-DX521).)

During the Class Period, the Committee's quarterly meetings tracked many of the topics in the Cammack reports included discussions on topics that included review of investment options and performance, recordkeeping and other fees, overviews of fiduciary responsibility, (see, e.g., PX478; PX1303); streamlining the fund lineup, (see, e.g., PX480); converting to lower-cost share classes, (see, e.g., PX368; PX1331); amendments to the Committee charter, (see, e.g., PX380); and reviews of the differences between certain annuity contracts and more recently available annuity offerings, (see, e.g., PX662; PX959).

In 2011, and annually thereafter, the Committee approved an Investment Policy Statement ("IPS") that it used in connection with decisionmaking with respect to fund options.  (Tr. at 1005:8-17; Meagher Decl. ¶ 69.)  The IPS sets forth

---

[33] Morningstar is commonly used for independent investment research and analysis.

criteria for evaluating funds, how often funds are to be reviewed, and Cammack's responsibilities.  (Rezler Decl. ¶ 14; Surh Decl. ¶¶ 15-16; Meagher Decl. ¶ 69; Halley Decl. ¶ 16.)[34]

G.    Trial Testimony Regarding Committee Meetings and Processes

Five current and former Committee members testified at trial: Margaret Meagher, Nancy Sanchez, Patricia Halley, Tina Surh, and Martin Dorph.  Mark Petti, who attended many meetings but was not a voting member, also testified.  In addition, Linda Woodruff (a Committee member) and Susanna Hollnsteiner (not a Committee member) testified by deposition designation.  (ECF No. 283-1.)

Since the Committee's inception, Meagher has been one of its two co-chairs.[35] The second co-chairs were, at various times, Linda Woodruff, Patricia Halley, and others.  Meagher's testimony was concerning.[36]  She made it clear that she viewed her role as primarily concerned with scheduling, paper movement, and logistics; she displayed a surprising lack of in-depth knowledge concerning the financial aspects

_____

[34] At trial, plaintiffs argued that the Committee failed to approve or use an IPS, and that such failure evidences an imprudent process.  This assertion is incorrect.  While the IPS was not formally signed, the evidence at trial supports that it was in fact adopted and used throughout the Class Period.

[35] Meagher has been employed by NYU since 1989 and has been the Senior Director of Benefits for NYU Langone since December 2009; prior to that position, she was the Senior Director of Benefits at NYU Washington Square.  (Meagher Decl. ¶ 1.)  Her job responsibilities include the "day to day operation" of the Medical Plan.  (Id. ¶ 2.)

[36] The Court finds that Meagher does not have the depth of knowledge appropriate to oversee a plan the size of the NYU Faculty and Medical Plans.  For example, she was unable to state which Plan was bigger, even though the Faculty Plan has (and always has had) thousands more members, and she was uncertain of whether there was a difference in fees between the Plans.

24

of managing a multi-billion-dollar pension portfolio and a lack of true appreciation for the significance of her role as a fiduciary.  In a number of instances, she appeared to believe it was sufficient for her to have relied rather blindly on Cammack's expertise.  As a matter of law, blind reliance is inappropriate.  See In re Unisys, 74 F.3d 420; Bussian, 223 F.3d 286.  For instance, she testified that it was entirely appropriate for her, as well as the other Committee members, to rely upon Cammack to determine the reasonableness of fees and that she did not do anything to test the reliability of their information.  (Tr. at 126:13-128:8.)  She bluntly testified that "[i]t's not my job to determine whether the fees are appropriate" for the Plans.  (Id. at 126:3-9.)

Meagher's supervisor, Sanchez,[37] also a Committee member, was similarly unfamiliar with basic concepts relating to the Plans, such as who fulfilled the role of administrator for the Faculty Plan.  (Id. at 368:8-374:11.)  When asked about her inability to remember Plan details, Sanchez responded that she has a "big job" (referring to her human resources role, not her Committee membership) and that her role on the Committee is one of many responsibilities she has.  (Id. at 386:5-387:24.)  This suggested that Sanchez does not view herself as having adequate time to serve effectively on the Committee.

_____

[37] Sanchez is the Senior Vice President and Vice Dean, Human Resources and Organizational Development and Learning of NYU Langone Health (i.e., the "chief human resource executive for the NYU Langone Health System").  (Sanchez Decl. ¶¶ 1-2.)

Sanchez further testified that she did not "know enough about variable annuities to be able to comment on whether they should be in these plans," and she could not recall whether there were "specific underperformance metrics or thresholds that have to be triggered for a fund to be put on the watch list."[38]  (Id. at 368:8-374:7.)  When asked who the plan administrator was, she responded, "I don't review the plan documents.  That's what I have staff for."  (Id. at 383:1-6.)  Specifically, she noted that Meagher is the "one that reviews the plan documents for [her]."  (Id. at 384:19-385:1.)  However, as noted, Meagher—Sanchez's direct report—also failed to demonstrate a firm grasp on these documents.  (Meagher and Sanchez, of course, each have a vote in Committee decisions.)

This under-preparedness was not limited to just these two Committee members.  Linda Woodruff, who was Meagher's co-chair during 2010-2012, testified that did not know whether NYU was a large plan relative to others in the United States, (Woodruff Dep. Tr. at 81:11-19[39]), and she could not recall the TIAA Real Estate Account at all, (id. at 274:2-16)—even though it was discussed at multiple meetings at which she was in attendance and was on the Watch List during her tenure, (see, e.g., PX375, DX569).  Martin Dorph, a Committee member until July 2017, testified that he did not even know whether he was, at the time of trial (in

---

[38] Sanchez's statements during her deposition were admissible at trial as opposing party statements under Federal Rule of Evidence 801(d)(2) were used for the purpose of impeachment.

[39] The Court relies on certain designated deposition testimony, portions of which were objected to by one or more parties.  The Court overrules those objections.

26

April 2018), still a member of the Committee—and thus whether he bore a fiduciary responsibility to thousands of NYU participants.  (Tr. 1304:3-9, 1311:3-6, 1312:8-15, 1338:11-1339:21.)[40]  After the Court questioned how he could be unaware of his membership status, he endeavored to learn; the next day at trial he reported that he was in fact no longer a Committee member.  (Tr. at 1338:11-1339:21.)[41]

Several Committee members stated that they did not independently seek to verify the quality of Cammack's advice; rather, they simply relied on it.  (See, e.g., Tr. at 1014:2-10; Woodruff Dep. Tr. at 90:10-91:12, 180:6-13.)

---

[40] Dorph, who is now Executive Vice President at NYU, previously served as NYU's Senior Vice President for Finance and Budget; through this position, he held a seat on the Committee.  (Dorph Decl. ¶ 1; PX191.)  However, between September 2007 and November 2013, he attended only sixteen of twenty-six meetings.  (Tr. at 1341:8-24.)  He missed meetings for a full year and a half, from May 18, 2009 to September 23, 2010.  (Id. at 1304:10-18.)  After this prolonged absence, he attended meetings only intermittently, (Id. at 1308:17-25), and he never attended a meeting after November 25, 2013; instead, he designated a representative pursuant to the Charter, (Dorph Decl. at ¶ 7).  He testified that he "had a very busy schedule" and that he "didn't review all of the materials," but did so only on occasion.  (Tr. at 1305:19-1306:2.)

[41] Additionally, the Court heard from two witnesses who attended many meetings but were not voting members of the Committee.  Mark Petti is NYU's Associate Director of Retirement Plans and Global Benefits.  (Petti Decl. ¶ 1.)  He is not a voting member of the Committee, though he has attended meetings since May 17, 2012 and oversees various aspects of the Faculty Plan's administration.  He advised the Committee on, inter alia, administration matters and compliance; he also serves as one point of contact for vendors.  (Id. ¶ 7.)  He appeared knowledgeable on the areas for which he is responsible.

Susanna Hollnsteiner—who testified by deposition designation only—began working at NYU in April 1989; she retired on March 1, 2017.  (Hollnsteiner Dep. Tr. at 7:3-23.)  She began as a Manager for Retirement Plans and Health and Welfare Benefits, and in 2001, she became Manager for NYU's Retirement Plans only.  (Id. at 8:17-9:18.)  In this capacity, she reported to Meagher.  (Id. at 21:6-10.)  At that time, she also gave up her supervisory duties.  (Id. at 9:15-18.)  She testified that she was "there more as a subject-matter expert" for the benefit specialists, but that specialists no longer reported to her.  (Id. at 10:20-12:20.)  She was not a member of the Committee, but she attended many meetings during her tenure.

27

In contrast, Tina Surh, who served as NYU's Chief Investment Officer ("CIO")[42] and a Committee member from 2010-2014, "questioned [Cammack's] recommendations all the time." (Tr. at 365:16-25; Surh Decl. ¶¶ 3-4.) Surh appeared to be very knowledgeable in the area of investing generally. She attended a majority of Committee meetings held between 2010-2014. Surh testified that she remembers "speaking up a lot beyond what's contained in the minutes . . . many more times than two times over the course of [her] tenure . . . ." (Tr. at 1133:12-22.) As the CIO, Surh saw her role as providing "specialized knowledge relating to investing" to the Committee. (Id. at 1155:11-1156:3.) She testified that she "questioned [Cammack] and discussed . . . the basis for their views" on the Plans' investment options. (Id. at 1154:17-23.) Outside Committee meetings, Surh read plan material prospectuses and met with portfolio managers at TIAA as well as TIAA's CEO, Roger Ferguson, who would update her on TIAA's progress and increasing efficiency. (Id. at 1153:7-22.) She also met with Cammack team members to discuss general market trends and investment options as well as specifics around NYU's IPS. (Id. at 1154:1-16.)

While the Court finds the level of involvement and seriousness with which several Committee members treated their fiduciary duty troubling, it does not find

---

[42] Over the Class Period, several people served as NYU's CIO: Maurice Maertens, Tina Surh, Martin Kelly, and Kathleen Jacobs. (Tr. at 367:7-377:16.) Surh was the only one of these individuals to testify at trial.

that this rose to a level of failure to fulfill fiduciary obligations.  Between Cammack's advice and the guidance of the more well-equipped Committee members (such as Surh), the Court is persuaded that the Committee performed its role adequately.[43]  As discussed below, the evidence does not support a failure or loss with regard to recordkeeping fees, or with regard to the two Plans investment options at issue here.

## IV.   RECORDKEEPING FEES

Plaintiffs' first claim is that NYU breached its duty of prudence with regard to recordkeeping fees.  According to plaintiffs, the breach arose from the following actions or inactions:

(1) A failure to conduct a competitive RFP process that could have driven fees down;

(2) A failure to engage in a timely and reasoned decisionmaking process to consolidate the two recordkeepers each Plan had into a single recordkeeper for each Plan; and

(3) Use of uncapped revenue-sharing to pay recordkeeping fees led to improperly high payments.

---

[43] As discussed below, plaintiffs also fail to demonstrate loss to the Plans as these result of an alleged breaches of fiduciary duty.  While loss is not required to show that a breach of the duty of prudence occurred, the lack of loss does suggest that there was not some obvious danger to the Plans that the Committee failed to recognize, and therefore no recovery is appropriate.

According to plaintiffs these actions or inactions resulted in an overpayment by (or loss to) the Plans in the amount of $25,818,880 for the Faculty Plan and $17,074,702 for the Medical Plan.  As discussed below, the Court finds that plaintiffs have failed to prove that the Committee acted imprudently with regard to recordkeeping fees.  The evidence supports that during the Class Period, the Committee prudently managed its recordkeepers: it ran prudent RFP processes, was able to obtain lower fees for the Faculty Plan when consolidation was impractical (as discussed further below), and it consolidated recordkeepers for the Medical Plan (and, in 2018, the Faculty Plan).  In addition, plaintiffs have not proven that the allegedly imprudent actions/inactions resulted in losses.

A.    Recordkeeper Consolidation

As of 2009, each Plan had multiple recordkeepers: the Faculty Plan had TIAA and Vanguard, and the Medical Plan had those two vendors along with Prudential. (See Tr. at 312:11-25, 1223:22-24.)  Early on, the Committee began discussing whether to consolidate recordkeepers, so that each Plan would have only one. Consolidation may lead to lower recordkeeping fees.  However, recordkeepers may offer a variety of collateral services to participants which also have value.  Thus, any examination of fees needs to account for total value—that is, both recordkeeping and collateral services.  Finally, when reviewing a recordkeeping vendor's RFP response, a fiduciary needs to examine both fees, the services offered, and total value.  The Committee performed this holistic review appropriately.

30

Over a period of several years, the Committee issued several RFPs regarding recordkeeping services.  Plaintiffs have argued that the RFP process was generally and specifically infirm and inadequate.  The Court finds otherwise.  In connection with the RFPs the Committee issued, a persistent criticism was that the RFPs only sought bids for a portion of the asset base.  According to plaintiffs, this prevented potential vendors from seeing and contemplating the full opportunity, thereby driving further price concessions.  However, as discussed below, defendant argues that consolidation of recordkeepers was simply not possible for assets held in TIAA annuities, which constituted three quarters of the Plans' assets.[44]

The evidence at trial supports defendant's contention that technical and other requirements prevented immediate consolidation of the Faculty Plan.  Under the circumstances, the Committee ran an appropriate RFP process both in terms of number and with regard to the asset base up for bid.

Embedded in plaintiffs' overall "failure to consolidate to a single recordkeeper" argument are the assumptions that (1) a single vendor is always in the best interests of plan participants, and (2) consolidation necessarily results in lower overall fees.  The record is not supportive.  In this case alone, administrative fees for the Faculty Plan (which had two recordkeepers throughout the Class

---

[44] At trial, the parties referred to the TIAA annuity portion of assets as amounting to "two-thirds" of the Plans' total assets.  In fact, $675 million out of $3.1 billion amounts to just less than one quarter of total assets.

31

Period) were actually lower than for the Medical Plan (which had one recordkeeper as of 2013). (Wagner Decl. at 29-30.) In any case, even assuming that a single recordkeeper might have resulted in lower fees, the Court is not persuaded that the Committee was imprudent for failing to consolidate the Plans sooner.[45]

A principal point plaintiffs made at trial was that on a number of occasions spanning several years, Cammack advised the Committee that consolidating recordkeepers would result in savings. (See, e.g., PX972 at 8; PX480 at 1; PX463 at 2-3; PX976 at 1; PX235 at 4; PX504 at 4; PX368 at 3; PX9 at 7; PX971.) For example, in its report dated June 14, 2010, Cammack listed certain advantages of consolidation to a single vendor arrangement. (PX1248 at 10-13.) These included, inter alia: increased purchasing power resulting in lower cost investments; ease in the administrative burden; simplification of compliance costs; enhanced control of NYU over assets; and more efficient fiduciary monitoring. (Id. at 11.) On July 14, 2010, Cammack provided a report focused solely on vendor consolidation, which added details on TIAA-CREF pricing according to the 2009 RFP. (DX462 at 10.) A similar report was provided on September 23, 2010, (PX598), and in November 2010, (DX465). In December 2010, Cammack's report noted:

---

[45] It is also notable that the majority of TIAA's largest two hundred clients use multiple recordkeepers. (Chittenden Decl. ¶ 45.) Of the clients that have consolidated to a sole recordkeeper, the overwhelming majority chose to consolidate with TIAA as their sole recordkeeper. (Id.) Two of Cammack's three relevant clients in 2011 employed a multiple-recordkeeper arrangement at that time; as of 2016, six of thirteen relevant clients employed a multiple record-keeper arrangement. (Rezler Decl. ¶ 58.)

- It is extremely difficult, if not impossible, to effectively manage the existing multi-vendor arrangement while meeting the compliance requirements of the regulations cited previously.
- Multi-vendor arrangements are not cost-efficient, as vendors are forced to compete for assets contributed to the plan, and therefore cannot offer lower cost fund options or lower administrative expenses (higher fees cause participants to realize lower investment returns).
- The arrangement requires plan participants to follow an unnecessarily complicated process if they want to move account balances from one investment with one vendor to another vendor.
- Many functions, such as loan processing and new participant enrollments, cannot be fully automated online as no single vendor has all required information.
- Participant communications for newly eligible participants and educational campaigns for all active participants are extremely difficult to coordinate across multi-vendor programs.

(PX232 at 4.)  The same report stated that the "disadvantages to consolidating the program to a single vendor are few," but included: a disruption to participants using Vanguard or Prudential, a possibility that employees would view it as a "take away," and considerable work for the NYU benefits team.  (Id. at 7.)  A similar report was issued the following month.  (PX246.)

There is no evidence that in making its recommendations in favor of consolidation, Cammack considered: (1) certain technical issues pertinent to consolidation of the Faculty Plan; or (2) that over three quarters of the Faculty Plan's assets were in TIAA annuities that only TIAA had any experience recordkeeping (that is, literally no other vendor had ever recordkept TIAA

33

annuities).  Thus, the Court does not view the existence of the Cammack recommendations, and any failure to follow those recommendations, as strong evidence of imprudence.  Indeed, it demonstrates Committee decisionmaking independent of Cammack.

Recordkeeper consolidation at an institution such as NYU is a complex and time-consuming process.  (Meagher Decl. ¶ 42; Dorph Decl. ¶ 18; Petti Decl. ¶¶ 25-28.)  It requires significant planning and a long, detailed process involving coordination of vendors and the plan sponsor, as well as a detailed rollout plan.[46] (Meagher Decl. ¶ 42; Dorph Decl. ¶ 18; Petti Decl. ¶¶ 25-28.)  This is in addition to any technical systems reconfiguration that has to be made and tested for new or changing file interfaces.  (Meagher Decl. ¶ 42; Dorph Decl. ¶ 18; Petti Decl. ¶¶ 25-28.)  A move to consolidate retirement plan vendors requires a substantial amount of organizational resources in technology, time, personnel, and money.  (Meagher Decl. ¶ 42; Dorph Decl. ¶ 18; Petti Decl. ¶¶ 25-28.)

The evidence at trial persuasively demonstrated that, unlike the Medical Plan, the Faculty Plan was subject to administrative and technological issues that made a switch to a single recordkeeper practically quite difficult.  In and around

---

[46] The rollout plan would include drafting detailed notices and communications to participants, negotiation of legal agreements, disruption of plan operations as a result of the need to temporarily freeze contributions, distributions, loans, changes in investment elections, a blackout period with applicable notices to participants, fund mapping (to the extent that is possible), reconfiguration of existing support systems, default investment processes and multistage communication to plan participants, all with appropriate review and auditing of implementation.

2008-2010, NYU Washington Square (the employees of which utilize the Faculty Plan) was in the midst of a number of human resources and technological system switchovers; NYU Langone (the employees of which utilize the Medical Plan) was not.  Credible testimony at trial supported IT concerns as a significant factor the Committee considered in determining whether or not to go to a single record keeper.[47]  As Petti testified:

> in order to implement a single-record keeper process, there needed to be a facility that was actually implemented and so the underlying resources, the underlying technology, the underlying support by the university in order to be able to do that.  And so in order to successfully implement a single-record keeper process, the university has to provide the resources and make them available in order to make it a successful implementation.

(Tr. at 442:6-13.)

In 2008, Washington Square (for the Faculty Plan) was beginning the complex process of updating multiple computer systems and programs at the University, including updating and modernizing all of NYU's systems for payroll, finance, student records, and human resources.  (Dorph Decl. ¶ 15; Tr. at 535:16-21.)  A series of major system implementation projects followed.  (Dorph Decl. ¶ 15.)  The new human resources ("HR") operating system "went live in May 2014," but implementation was not complete until 2015.  (Tr. at 1364:2-8.)  The result—which

---

[47] Plaintiffs assert that the lack of reference to technical issues in the Committee minutes means it was not a material issue.  The Court disagrees.  Rather, the Court credits the CFO's (Dorph's) testimony in which he described his knowledge of the issue and a technical presentation made to individuals who sat on the Committee.  (See generally Tr. at 1358-1361.)

took several years—was one system for all of the university's HR needs.  (Id. at 535:16-21.)  It is clear that the technological issues at Washington Square were a very real concern on which NYU spent significant time and money.[48]  (These problems did not exist at Langone (i.e., for the Medical Plan), which had already converted to a new HR system.  (Id. at 1365:8-17.))

The primary trial witness on the technical issues impeding recordkeeper consolidation was Dorph, NYU's then-CFO.  Dorph's testimony on this issue was detailed, thorough, consistent, and credible.  He testified that as of his arrival at NYU in 2007, NYU's finance system, human resources system, and student information systems were "considered to be legacy systems, meaning systems of previous generations of software."  (Id. at 1358:3-5.)  He was "quickly confronted with the question of . . . if and how, and how best to implement changes to the systems."  (Id. at 1358:6-10.)  His team thus conducted a "readiness assessment" and hired an IT consulting firm to plan out the system changes.  Dorph testified:

> What they basically told us in 2008 or whenever their report was issued is that we weren't ready.  There were a lot of steps we needed yet to take to be ready to implement changes to our systems. And it's really important to understand when we talk about changes to

_____

[48] Plaintiffs argue that technical issues are an ex post justification for the failure to consolidate; plaintiffs point to the absence of such concern reflected in the Committee's meeting minutes.  (Tr. at 154:7-155:17.)  Woodruff, for example, served as a fiduciary for two years but was unable to recall during her deposition why the Faculty Plan did not consolidate.  (Woodruff Dep. Tr. at 332:5-336:4.)  However, the Court credits the evidence that the meeting minutes were not meant to reflect all discussions and considerations by the Committee.  (Halley Decl. ¶ 9; Surh Decl. ¶ 8.)  The Court thus finds, by a preponderance of the evidence, that technology concerns were a real issue for the Committee and a major and sufficient reason that the Faculty Plan's consolidation was delayed.

36

our system, we are not talking about unplugging one plug and putting in another plug.  If you think about the HR system, there's records of literally tens of thousands of people in the system, there are hundreds of users of the system, there's processes that flow through not only the HR process itself but then connect to things like the finance system, to our budget systems and so forth.

So when we talk about readiness, it's not a question of just replacing one app with another app the way you do on your phone, it's a question of do we have people in place who actually can take us through the process of figuring out what functionality we need, what software vendors can meet the functionality, what changes we need to make to the software to provide the functionality that we need to have to maintain our services to our employees.  We asked that question with regard to all of the systems, including our HR system, and we were told we didn't have the people and sophistication in place.  We proceeded almost immediately to do that.  One of the recommendations was to create something called a program services office who could help us navigate—think about it as a three-part triangle.  There are the IT folks who plug things in and make them run, there are the business process owners, the people like the HR department or the accounting department and so forth who actually in some respects own the systems, and then the users who are out there in the university using the systems every day in schools or who might be finance officers in the schools and so forth.

(Id. at 1358:16-1359:22.)  Thus, the NYU team sat down with stakeholders to

determine which systems would be updated and in what order.  It brought in a

consultant to analyze "the finance system, the HR system, the student information

system.  We also talked about the need for a data warehouse so we could get up-to-

date reports out of all of these systems." (Tr. at 1360:8-11.)  Dorph further testified:

Just to make sure you understand the magnitude of what we're talking about, the three systems at the end of the day that we replaced we probably spent between [$]80 and $100 million replacing these systems, I assure you software was only a small component of that.  The need for all of this process, design, figuring out which software could actually do the best job, bringing on the consultants to help us

37

> figure out how to connect systems to each other—just by way of
> example, when we actually put in the HR system . . . a couple of years
> ago, we had to create what we call interfaces to other systems.  The HR
> system required 136 interfaces to other systems.  I remember that
> number because we quoted it often because we were often explaining to
> people the complexity of our IT environment.  So the software is a
> small piece of the overall system requirements.
>
> But at the core of this is the need to make sure that the
> functionality continues and is not interrupted.  To go back to HR
> system, what was then the [Human Resources Information System]
> and the payroll systems, as I said, were legacy systems.  They were old.
> They were repeatedly patched. They were systems that were
> connecting to all these other systems.  And when you . . . don't change
> that and then you start putting more functionality on top of it, you
> take the risk that things will go wrong.

(Id. at 1360:20-1361:18.)  A change in recordkeepers would entail significant

coordination with and changes to the new systems being implemented; NYU

believed any recordkeeper switch could not be completed without risk of significant

errors or additional changes prior to completion of this global update of NYU's

systems and technology.  (Dorph Decl. ¶ 15; Meagher Decl. ¶¶ 22, 38.)

In sum, the Court finds that these technical issues meant that consolidation

of the Faculty Plan prior to completion of the systems update was likely to result in

substantial participant disruption.  Thus, until the other system updates were

completed, it would not have been prudent for the Committee to consolidate

recordkeepers for the Faculty Plan.[49]  Certainly a decision not to consolidate at this time was not imprudent.[50]

1. RFP Frequency

Plaintiffs assert that more frequent RFP processes for both Plans would have exerted competitive pressure on recordkeeping vendors, resulting in either a reduction of fees by an existing vendor or a better deal altogether.[51]  According to plaintiffs, the Committee was imprudent in issuing infrequent RFPs.  The Court

---

[49] NYU also appropriately considered that certain participants viewed Vanguard as a valuable vendor and viewed the Vanguard website as having value.  Elimination of Vanguard (if that was the result of consolidation) thus constituted a loss of a valuable tool to some participants.  (Tr. at 158:7-160:14.)

[50] As of trial, the Faculty Plan was converting to a single recordkeeper, a process which had taken 12-18 months.  It has required:

> all sorts of tests of the software and the connections and the data flowing back and forth, we've had to change the way the actual calculations of these contributions are made and have had to test that numerous times, and we've had to spend a lot of time dealing with the employee communication issue, which, as we discussed earlier, . . . started, among other times, with the faculty around their benefits committees, but now is in the actual process of describing the changes themselves, how they can get access to . . . their retirement funds.  When we are on the new sole recordkeeper system, to be honest, it's— the complications, although they exist on both sides, it's the Vanguard funds that people would be particularly upset about, because here was someone that used to have a Vanguard account, and even though Vanguard will still hold the funds, they will need to access information about those funds by going through a TIAA-CREF portal.  We've already had people who have received communications and had suspicions that that meant we were trying to force them into TIAA-CREF.  So it's those kind of communications, to say nothing of the legally required ERISA communications, to say nothing of blackout periods and so forth that have to happen.
>
> So bottom line, an incredibly extended period of time involving dozens upon dozens of people and consultants and software folks and so forth.

(Tr. at 1366:9-1367:10.)

[51] Cammack recommended conducting an RFP every three to five years "to ensure continued competitive pricing."  (PX477.)

finds otherwise.  The record at trial persuasively demonstrated that NYU had particular needs, a particular technological environment, and infrastructure that made the frequency of its RFP process during the Class Period adequate.  In addition, plaintiffs ignore that over the course of several years, NYU's recordkeeping fees consistently <u>decreased</u> as NYU obtained repeated rate reductions.

The Committee issued its first RFP in September 2009; this eventually resulted in the Medical Plan's consolidation of recordkeepers in March 2013.  It did not result in consolidation for the Faculty Plan.  The Committee did not issue another RFP for the Faculty Plan until 2016.[52]

Vendors submitted detailed responses to the 2009 RFP.  TIAA, which was already a recordkeeper, itself submitted a substantial and detailed response.  It provided extensive answers to all questions and provided an expense projection.  (Chittenden Decl. ¶ 21; Rezler Decl. ¶ 21; DX21.)[53]  Vanguard and Fidelity likewise provided detailed information in their response to the RFP, including extensive

---

[52] That RFP resulted in the Faculty Plan's consolidation with TIAA, which became effective in May 2018.  (Tr. at 1189:5-9.)
[53] TIAA also created a Microsoft Excel spreadsheet detailing an investment array for the plan that included information regarding performance history versus benchmarks and standard deviation versus benchmarks as well as all fees, including investment management fees, revenue sharing, and the total expense ratio.  (Rezler Decl. ¶ 21; DX21 (and following non-Bates labeled printout of corresponding Excel document)).

information detailing fees, fund performance, and fund expenses.[54]  (Rezler Decl. ¶ 22; PX65; DX395.)  Aside from price alone, the Committee was "sensitive to the variation in service capability that existed among different vendors."  (Tr. at 1136:24-1137:2.)[55]

At meetings in April and September of 2010 and January and March of 2011, the Committee worked to finalize its decision.  It reviewed the advantages of consolidation with a single recordkeeper, highlighted the reduction of fees that would result from consolidating with TIAA, and discussed streamlining the fund lineup.  (See, e.g., PX480, PX463, PX460.)  They also noted that Langone (for the Medical Plan) and the University (for the Faculty Plan) would need approval from

---

[54] The 2009 RFP resulted in a range of price proposals: the lowest fee proposed was from Great West at 13 basis points; TIAA and Diversified both bid 15 basis points; Vanguard bid 17 basis points; and Fidelity bid 18 basis points.  (Rezler Decl. ¶ 26; Chittenden Decl. ¶ 72; PX133; PX134 at 21.)  Prudential, Affiliated Computer Services ("ACS"), and Hewitt each declined to submit a proposal.  (PX134 at 8.)  Fidelity also offered a flat dollar per participant fee of $80-85 per year, but this excluded certain services such as employee education and counseling, which would be offered only on a "fee for service" basis.  (Id. at 21 n.2, 24.)  The bidders' proposed rates were based on an assumption that not "all plans and all assets would be able to be mapped" to the respondent.  (Tr. at 319:22-320:17, 1245:3-17; Rezler Decl. ¶ 16; PX134 at 21.)  Rather, each expected to receive about $675 million in assets, with the remainder staying with TIAA.  (Each bidder's specific assumption was slightly different, though those differences are immaterial to the Court's conclusion here.)
[55] For example, Fidelity's flat fee bid did not "necessarily include services—so for example, on-site education, mailings."  (Tr. at 1247:5-15.)  Thus, while certain vendors had lower rates than others, the Committee wanted to ensure that participants would receive a high level of service.  TIAA's services to NYU are included in the bundled recordkeeping price and is referred to as a "high-touch" service model that includes, inter alia, an interactive online tool, a call center (which had 120 representatives trained on NYU's Faculty Plan during its transition to NYU as sole recordkeeper), and a minimum of 150 days per year of on-site education (e.g., one-on-one counseling and/or group meetings on campus—some of which is outside normal business hours at no extra cost.  (Chittenden Decl. ¶¶ 85-88, 95-98.)  The Committee appropriately weighed and considered the entire array of services and overall value presented by each RFP respondent.

41

senior management before making a move (or "map") to a single recordkeeper, (PX463 at 3), and discussed moving assets between vendors or types of products (a process generally referred to as "mapping") as well as their understanding that "NYU has the capability to move the assets at Vanguard to TIAA" but that "the existing contract [i.e., the annuity contracts] with TIAA does not allow NYU to move [TIAA] assets to another vendor."[56]  (PX460 at 2.)  (This "mapping" issue is discussed further below.)

On April 1, 2011, the Committee formally approved consolidation to TIAA as a single recordkeeper for the Medical Plan.  (PX481 at 1.)  In 2013, the "Committee determined that due to the complexities of a consolidation and the perceived expectations of faculty and staff for the NYU retirement program, a move to vendor consolidation [would] not be undertaken [for the Faculty Plan] at [that] time." (DX576 at 3.)

In 2016, the Committee issued a second RFP for the Faculty Plan.[57]  (DX42.) Four responses were received and Cammack crafted a detailed presentation comparing them.  (DX404 at 2, 8-32.)  In response to this second RFP, TIAA offered further reduced rates.  (PX1366 at 1.)  A key issue on which the Committee focused was disruption to the Faculty Plan's participants.  (Petti Decl. ¶¶ 32, 36; Dorph

---

[56] The Court discusses this understanding in more detail below.
[57] Consolidation of the Faculty Plan to a single recordkeeper was raised on February 26, 2015, but discussion was postponed to another meeting.  (PX479 at 2.)

Decl. ¶¶ 16-18.)  It also considered its understanding that, because a significant amount of the Faculty Plan's assets were held in annuity contracts, there were questions as to whether any vendor other than TIAA could or had the appropriate expertise to recordkeep them.  In this regard, the Committee either was unwilling or believed it could not move participants' investments in TIAA traditional annuities, the CREF Stock Account, or the TIAA Real Estate Account to other investments.  (Halley Decl. ¶ 39.)  In addition, the Committee also knew that no other vendor had ever recordkept TIAA annuities on their own platforms.  Thus, as a practical matter, the Committee viewed TIAA as an entrenched recordkeeper for its own annuity products—and that the concept of "consolidation" would need to account for TIAA's continued role.  (Halley Decl. ¶ 40.)  On February 23, 2017, the Committee voted unanimously to move to TIAA as the sole recordkeeper.  (DX592 at 1.)[58]  This decisionmaking process was considered, careful, and prudent under the particular circumstances here.

---

[58] Plaintiffs also argue that both RFPs improperly favored TIAA, as evidenced by, inter alia, alleged secret meetings or communication with TIAA by a Committee co-chair, Meagher. (Tr. at 188:22-189:14, 190:24-191:23, 193:3-10, 194:9-196:25; PX831; PX845.)  The evidence does not support this. The Court has considered the evidence plaintiffs have proffered in this regard.  While it might have been more advisable for Meagher not to have communicated with TIAA at this time as she did, ultimately the communications played no role in the decisionmaking process.  Meagher was only one vote and there is no indication that she could have or did sway the Committee's decisionmaking on recordkeeping fees based on her views of TIAA or influence potentially exerted by TIAA.  TIAA was selected after a fair review process.  (See, e.g., PX128.)

2.    Fee Negotiations

While plaintiffs assert that the Committee did not negotiate fee reductions zealously enough, the record reflects a number of serious—and successful—efforts by the Committee to reduce recordkeeping fees.  As of 2018, both Plans' fees for the TIAA assets decreased substantially—from 19.9 basis points in 2008 to 3.0 basis points for the Faculty Plan and to 4.0 basis points for the Medical Plan in 2018. (Chittenden Decl. ¶¶ 70-84; Rezler Decl.  ¶¶ 27, 33-34; Halley Decl. ¶ 25; PX477 at 1; DX529 at 1; DX592 at 1.)  Vanguard's fees for the Faculty Plan also decreased, from 10.0 to 6.0 basis points.  (DX144 at 2.)

In addition, while the number of Plan participants and total Plan assets increased during this same period, the amount of fees decreased.[59]  Indeed, at several junctures, the Committee secured retroactivity for the lower rates it secured, and participants received revenue credits.

3.    The Portion of Plan Assets Available for Bid

More than three quarters of the Plans' assets are held in legacy TIAA annuities, or about $2.4 billion of the $3.1 billion in Plan assets (as of 2009).  In

---

[59] Between 2012 and 2016, for example, assets in the Faculty Plan increased from $1.98 billion to $2.62 billion, and the number of Faculty Plan participants increased from 14,368 to 18,551.  (DX48 at 2, 18; DX3 at 2, 19).  However, in 2012, the total administrative fees for the Faculty Plan were $2.88 million, (PX700 at 2), but in 2016, total fell to $2.10 million in 2016.  (PX718 at 2.)

Likewise, the Medical Plan's assets grew from $1.43 billion to $2.02 billion (even though the number of Plan participants fell from 11,876 to 8,560) between 2012 and 2016.  (DX28 at 2, 18; DX4 at 2, 19.)  However, the Plan's total administrative fees fell from $1.90 million in 2012 to $1.49 million in 2016.  (PX672 at 4; PX688 at 4.)

connection with the 2009 RFP, the Committee requested bids for recordkeeping on only the non-annuity assets, which amounted to $675 million (or less than one quarter of total assets). Plaintiffs argue that limiting the RFP to non-annuity assets was imprudent because it prevented competitive bidding on the fees for over three quarters of Plan assets, thereby (according to plaintiffs) preventing potential cost reductions. They contend that any recordkeeper could have recordkept the TIAA annuities or, in the alternative, the legacy TIAA assets could have been "mapped" (i.e., moved) to similar funds held by a different vendor. The Court disagrees.

Under the circumstances here, limiting the RFP to the non-annuity assets was reasonable. A primary reason not to include the annuity assets in the RFP was that they were maintained and funded by TIAA, and other entities lacked the experience and ability to recordkeep such assets. As discussed below, the preponderance of the evidence supports defendant's position that TIAA annuities have never been recordkept by a different vendor (anywhere, at any time), and that they have only once (and under very different circumstances) been mapped to non-TIAA funds.

i.    <u>Background on TIAA Annuity Products</u>

TIAA annuities are insurance policies governed by contracts between TIAA and individual participants; a plan sponsor is not a party to the contracts. The annuity contract states that it is a "contract between you, as its owner (Annuitant),

45

and TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA

(TIAA).  No other person or institution is a party to this contract."[60]  (See, e.g.,

PX731 at 5.)

TIAA offers four types of TIAA traditional annuity contracts.  The oldest, now

known as the Retirement Annuity ("RA"), limits withdrawals and transfers to ten

annual installments; while other annuities have more liquidity, the RAs have lower

total crediting rates.  (Chittenden Decl. ¶¶ 23-24.)  As April 2018, the RAs were still

TIAA's largest contract type in terms of contributions, and there is no indication

that RA plans will be discontinued in the future.  (Tr. at 587:1-16, 590:2-14.)  TIAA

also offers a Supplemental Retirement Annuity ("SRA"); this contract is similar to

the traditional RA, but allows for lump-sum withdrawals without restrictions or

charges.  (Chittenden Decl. ¶¶ 27-29.)  Both RA and SRA contracts are individually-

owned contracts between an NYU participant and TIAA.  (Id.  ¶¶ 23, 27; Tr. at

596:16-18.)

The third traditional TIAA annuity type is referred to as the Group

Retirement Annuity ("GRA").  (Chittenden Decl. ¶ 31.)  Participants receive

individually-controlled certificates, enforceable directly against TIAA.  (Id.)  Like

the SRA, the GRA allows lump-sum withdrawals and transfers, though there are

limitations.  (Id. ¶ 28.)  Unlike the RA and SRA, within 120 days of termination of

---

[60] While the annuity contracts changed over time, they always included some form of this language.

employment, a participant in the GRA may take a lump-sum withdrawal, subject to a 2.5% surrender charge.  (Id. ¶ 32.)  The same is true for yet another annuity type, the Group Supplemental Retirement Annuity ("GSRA").  (Id. ¶¶ 34-35.)  When sponsors (such as NYU) offer these TIAA annuity contracts, TIAA requires that the sponsor also offers the CREF Stock Account and CREF Money Market Account. According to TIAA's Chittenden, TIAA views these offerings as ensuring that participants will have a minimum ability to diversify their retirement accounts. (Other fund offerings determined by the sponsor may provide additional diversification opportunities.)  TIAA does not require that participants in TIAA traditional annuities invest in these options.  (Id. ¶ 38.)

In 2005-2006, TIAA introduced two additional forms of annuity contracts—respectively, the Retirement Choice ("RC") and Retirement Choice Plus ("RCP") contracts.  (Id. ¶¶ 39, 40; Tr. at 586:15-18.)  Unlike TIAA traditional annuity accounts, these are group contracts institutionally controlled by the sponsor. (Chittenden Decl. ¶ 41.)  For purposes of this case, the key difference between the TIAA traditional annuities and these "group choice" annuities concerns the ability to move (or "map") the assets to another vendor or vehicle.  With ninety days' notice,

47

a plan sponsor can elect to map assets over the course of sixty months without a surrender charge.  (Id.)[61]

> ii.   Recordkeeping TIAA Annuities by Non-TIAA Vendors

Plaintiffs first contend that the Committee should have anticipated an RFP outcome in which some entity—that had never before recordkept TIAA annuities—could have bid to recordkeep all assets (including the TIAA annuities) and won. However, the evidence conclusively demonstrated that the "only firm that record-keeps TIAA annuities . . . is TIAA."  (Tr. at 595:24-25.)  At the very least, no other vendor has any experience recordkeeping TIAA annuities.

The most impressive witness at trial was a TIAA employee, Douglas Chittenden.[62]  He acknowledged "the complexity associated with the TIAA product, the vintages [referring to the dates of annuity offerings] that are available to you as you save your money over time, the different mortality basis that you are able to purchase annuity benefits under as you're saving, [and] all the range of payout options that are available . . . ."  (Tr. at 596:1-5.)[63]  Similarly, Vanguard's George

---

[61] The NYU Plans do not and have never offered RC or RCP contracts.  (Tr. at 470:17-471:12, 520:6-521:4.)

[62] Chittenden, an Executive Vice President at TIAA who oversees the institutional servicing and relationship division, is extremely knowledgeable in the area of 403(b) and other retirement plans, as well as on the pricing, substance, and mechanics of TIAA's products and recordkeeping.  (See Tr. at 559:13-19; Chittenden Decl. ¶ 1.)  His testimony was well-grounded, based on articulated facts, consistent, and forthright.

[63] Plaintiffs themselves offered consistent testimony.  Plaintiffs' own expert, Michael Geist, conceded that while in his experience at T. Rowe price several of its seven university plans included TIAA annuities, those plans required multiple recordkeepers.  (Tr. at 705:2-706:7.)  In other words, if T. Rowe Price was going to recordkeep for a plan that offered annuities, the plan remained with (at

Heming[64] testified at his deposition that "Vanguard is not able to record keep the

TIAA annuities."[65]  (Heming Dep. Tr. at 174:22-175:3.)  Thus, he explained, NYU

would have had "to maintain a recordkeeping relationship with TIAA if they want

to keep [existing] annuities active."  (Id. at 175:20-23.)

Simply put, on the record before the Court, no other vendor has ever

recordkept TIAA annuities; even if it were legally possible to have another vendor

do so, the Committee was not imprudent in preventing Plan participants from being

a vendor's "guinea pigs" for whom it tries recordkeeping TIAA products for the first

time.  Accordingly, the Court is not persuaded that the Committee acted

imprudently in limiting the asset base up for bid in the RFPs to non-TIAA annuity

assets.

---

least) two recordkeepers (so that someone else—likely TIAA—could recordkeep the annuities).  (Id. at 781:7-10.)  When T. Rowe Price bid on a higher-education institution's plan that had existing annuities, T. Rowe Price would not bid to recordkeep for the annuities.  Instead it would "propose a different investment lineup," (i.e., that "whoever is in annuities move their money from annuities to something else").  (Id. at 723: 9-24.)  If people wanted to keep annuities, T. Rowe Price "would not be able to provide what they were asking for, with respect to those investments."  (Id. at 724:1-10.)  While they would be able to "do something," it "wouldn't necessarily have been automated.  So it would have probably required more manual work if you hadn't built the infrastructure to do something like that. . . .  It just wouldn't be as efficient."  (Id. at 704:16-705:1.)

[64] While not intimately familiar with NYU's Plans, Heming appeared to be very knowledgeable on Vanguard's services and abilities generally.  He has been a principal at Vanguard for twenty years. (Heming Dep. Tr. at 8:5-10.)

[65] He elaborated that, based on his understanding, "TIAA doesn't permit the annuities to be record kept on any other . . . platforms but theirs.  They haven't opened up their architecture."  (Heming Dep. Tr. at 175:7-11.)

### iii.   Mapping Assets to Different Funds

Plaintiffs next claim that, even if a non-TIAA vendor would not be able to recordkeep the <u>TIAA</u> legacy assets, the Committee should still have put all Plan assets up for bid because legacy assets could have been moved or mapped to different funds; these different funds could, then, be recordkept by a non-TIAA vendor.  The Court finds otherwise.  The evidence demonstrates that TIAA annuity assets have not previously been "mapped" into similar funds with a different recordkeeper.[66]

Defendant's retirement plan expert, Marcia Wagner,[67] testified that she had never seen a situation where a plan sponsor moved assets out of TIAA annuities

---

[66] As discussed, defendant asserts that the annuity contract, to which NYU is not a party, prevents it from moving a participant's assets without his or her consent.  Plaintiffs counter that even if that is true, ERISA's duty of prudence and/or the Plan document supersede the annuity contract, such that defendant was still obligated to map the assets to different funds.  The Court need not resolve this question; as a matter of fact, it was not imprudent to put only the non-legacy assets up for bid in the RFP on the assumption that TIAA would continue to recordkeep the legacy annuities, as no other vendor had ever done so.

[67] Wagner was highly credible; the Court finds her qualified as an expert on retirement plan processes.  She provided opinions on the processes NYU followed after 2009 with respect to (i) selecting and monitoring plan administrative service providers and reviewing their fees as well as (ii) offering and monitoring the TIAA Real Estate Account and CREF Stock Account under the Plans.  In particular, she provided helpful information to the Court on industry standard processes during the relevant time frame.  Wagner has extensive experience designing and consulting with respect to 403(b) plans, including the types of 403(b) plans involved in this case.  (<u>Id.</u> ¶ 2.)

Wagner is the principal of The Wagner Law Group, which she founded more than twenty-one years ago.  (Wagner Decl. ¶ 1.)  Her firm employs more than thirty lawyers, who collectively focus exclusively on ERISA employee benefits and executive compensation.  (Tr. at 1401:14-22.)  She has extensive experience designing and consulting on 403(b) plans.  (Wagner Decl. ¶¶ 1-2.)  She has worked with dozens of 403(b) plan sponsors on their request for proposal ("RFP") processes.  (<u>Id.</u> at 1402:1-7.)  Wagner's experience includes (i) advice on the structure and establishment of plan investment and administrative committees, (ii) counseling such bodies on the design of investment menus and recommending the processes to be used for selecting investment options to be included thereon, as well as monitoring their performance and expenses, (iii) preparing investment policy

without a participant's consent.  (Tr. at 1418:3-8.)  TIAA's Chittenden agreed, and

testified that TIAA Traditional annuities could not be mapped out.[68]  (Tr. at 587:1-

3.)  The "vast majority of [NYU] participants are invested in funds which NYU

cannot transfer."  (Id. at 1235:22-24 (Rezler testimony)).)  Even Geist, plaintiffs'

expert, could not recall a time when a "plan sponsor forced participants to move

their money from an RA contract to an RC contract."  (Id. at 885:10-13.)[69]  Geist

------------------

statements that allocate fiduciary responsibilities and provide guidance on the criteria and processes
involved in investment selection and monitoring, (iv) guiding plan committees on due diligence
processes for issuing requests for proposals relating to a plan's engagement of recordkeepers and
other service providers and the information to be considered, decision-making process and
documentation recommended before making a final selection, (v) advising plan committees on the
criteria for evaluating the performance and fees of service providers, and (vi) attending meetings of
fiduciary committees to provide advice regarding issues arising in the performance of their duties.
(Id.)  She has advised fiduciary committees, including committees responsible for large plans, on the
process and criteria to be used in the selection of recordkeepers.  (Wagner Decl. ¶ 2.)
[68] There was a single occasion on which TIAA mapped assets in certain money market accounts
without permission or voluntary participation by investors; this was due to "an opportunity because
of the very low interest rates to do things with the money market account when needed, if
applicable."  (Tr. at 677:19-678:9.)  He explained:

> But there was a period of time when interest rates were so low and . . . the view was
> that people who held assets in the retirement plan in a money market account was
> not a good thing, because they were earning basically nothing on it, that on a one-
> time basis we went to the plan sponsor, said, look, if you want to do something
> proactively with these people's assets so that they, you know, don't hold the money
> there for a long period of time when the prospects are so bleak, we can work with you
> to do that.

(Tr. at 678:14-21.)  Those circumstances were not present here and thus, the Court does not find it
unusual that the Committee did not attempt a similar resolution.
[69] Plaintiffs also claim that RA contracts are themselves imprudent, and that only RC contracts
should have been offered.  However, plaintiffs concede that RC contracts have advantages and
disadvantages, and they also elicited testimony that the RC return or income guarantee—between 1-
3%—is lower than the RA guarantee.

As Chittenden explained, TIAA does not view RC contracts as simply a better version of RA
contracts.  When asked by the Court if the introduction of RC plans indicated the "death of the RA
plans," he responded that "certainly some plans adopted RC," but that the RA contracts "had a 3
percent guarantee, [which] looked appealing" to participants.  (Tr. at 587:17-588:2.)  He also noted

recalled only one situation in which he was able to convince an institution to move assets out of fixed annuities into other products; that institution was a high school with a plan of only about $5 million in assets.  (733:24-737:17.)[70]

Accordingly, the Court finds that the RFP's treatment of the legacy assets was not imprudent for failing to allow for "mapping" to non-TIAA funds.[71]

### B.   The Committee's Fee Negotiations Outside the RFPs

Plaintiffs argue that the use of revenue sharing that was not capped at a particular dollar amount was an imprudent way to collect fees.  According to plaintiffs, this arrangement allowed the overall collection of fees to exceed that which was reasonable when calculated on a per-participant basis.  Instead, according to plaintiffs, if allowed at all, revenue sharing should have been capped at

---

that TIAA Traditional annuities are still being used by universities all over the country and that it is likely still TIAA's largest contract type in terms of contributions.  (Id. at 587:-14.)

[70] Specifically, the institution stopped new contributions into the TIAA annuities, but the assets already in fixed annuities still could not be mapped to new accounts by the plan sponsor, (Tr. at 735:10-23); the plan would need to keep two recordkeepers unless it consolidated with TIAA, who managed the annuities, (id. at 735:24-736:2.)

[71] Plaintiffs also asserted that even if the assets in individual annuities were not mappable, NYU should have "frozen" the existing accounts and encouraged participants to move assets to other investments.  They claim that this would have given the Committee leverage in negotiations to secure a lower fee arrangement.  However, the evidence in the record on this topic—of which there is not much—does not support this assertion.  Geist testified that he could not think of any plan where T. Rowe Price "successfully convinced the plan sponsor to freeze their annuity product and move to a T. Rowe Price investment lineup."  (Tr. at 736:16-20.)  Additionally, Cammack's Rezler testified that even if the funds had been frozen, this would not have allowed them to be removed from the relevant TIAA fund.  (Id. at 1237:14-16.)  The evidence in the record does not support the assertion that freezing TIAA annuities would have been likely to lead to lower fees for the Plans.  Additionally, given the plaintiffs' ongoing and rigorous negotiations regarding fees (discussed in greater detail elsewhere), the Court is not persuaded that the Committee acted imprudently by not freezing—or threatening to freeze—any TIAA funds.

some amount that would translate into a specific per-participant fee of (for instance) not more than $35 annually. The Court finds otherwise.

In addition and along the same lines, plaintiffs argue that NYU acted imprudently by failing to move away from revenue sharing altogether and instead negotiate a flat per-participant recordkeeping fee (e.g., $35 per participant per year instead of 10 basis points per year). The Court is also not persuaded, on the record here, that a flat rate would have been a more prudent way to collect fees than through revenue-sharing.

Plaintiffs proffered Geist's testimony in support of these positions. For the reasons already discussed, the Court did not find Geist a reliable expert in this area and does not rely on his testimony. But in all events, even his testimony was not supportive of plaintiff's positions. While he testified that, as of the mid-2000s, plans were moving away from revenue sharing, (Tr. at 843:21-845:9), he also testified that, as recently as 2010, 40-60% of big plans still used revenue-sharing models, (id. at 850:15-853:16). Moreover, when he left T. Rowe Price in 2016, 25% or more of large plans may still have been using revenue-sharing models. (Id.)

In contrast to Geist, defendant's expert, Wagner, provided reasoned, factually-based testimony supportive of defendant's position. She testified that it is "extremely common" for 403(b) plans to price administrative services by basis points of assets under management. (Id. at 1402:23-1403:5.) She further testified that it is "highly uncommon" for pricing in 403(b) plans to be on a flat per-participant

53

basis.  (Id. at 1403:9-17 (emphasis added).)  Furthermore, Cammack's Rezler testified credibly that with regard to Fidelity's per-participant quote, the total fees actually worked out to twice as much as a 15 basis point arrangement would have cost in the first year.[72]  (Tr. at 1257:12-24.)  He thus testified that in 2009-10, when vendors began offering per participant flat dollar annual fees, their quotes were often "in excess of the amount generated under the basis point model."[73]  (Id. at 1257:6-16.)[74]

In all events, the trial record here reflects due consideration of the appropriate pros and cons and rejection of using a flat per-participant model. (Halley Decl. ¶ 37.)  For instance, the Committee considered a number of issues related to paying for services on a flat per-participant basis, including whether they thought the arrangement would be fair, given that a participant with a large account balance might pay the same as a participant with a relatively small account

---

[72] Recordkeepers build growth into a basis point pricing model (i.e., build in assumptions about how quickly assets will grow); they cannot do this for per-participant fees and as a result, per-participant arrangements can sometimes end up being more expensive.  (Tr. at 1258:2-10.)

[73] Cammack's Rezler testified that this scenario was demonstrated by Fidelity's 2009 RFP bid.  (Id. at 1257:16-24.)  During the 2009 RFP, Fidelity submitted two proposed fee arrangements, an 18 basis points asset-based fee and an $85 per participant fee.  (PX134; Tr. at 1257:16-20).  However, when Fidelity "supplied an analysis of how that would work out . . . that analysis showed that in year one [Fidelity] would earn close to twice as much in revenue under the per participant methodology as opposed to the basis point methodology."  (Tr. at 1257:16-24).

[74] Plaintiffs also argue that as the Plans' asset base grew, the cost to participants should have fallen, as the cost of recordkeeping is the same regardless of the number of participants or their account sizes.  Thus, as the Plans' assets grew, so did the revenue share that was paid to the recordkeepers as fees.  However, this fact alone does not render the model imprudent.  The totality of circumstances must be considered, as they were here.

balance.  (Id.)  The Committee also inquired as to whether TIAA could charge for recordkeeping services on a flat per-participant fee basis.  (Id.)  TIAA explained, however, that flat dollar fees cannot be assessed against the TIAA and CREF annuity account balances in the Plans.  (Id. at ¶¶ 37, 48.)

Accordingly, the Court is not persuaded that a revenue-sharing model itself or the Committee's choice to employ that model here was imprudent.[75]

### C.    Objective Prudence of Plan Fees

Plaintiffs assert that a reasonable recordkeeping fee would have been between $23-31 per year for the Faculty Plan and between $27-35 per year for the Medical Plan (as opposed to what plaintiffs calculated the revenue share to have amounted to: $140-270 paid for the Faculty Plan and the $152-274 paid for the Medical Plan).  (Geist Decl. ¶¶ 185.)  However, plaintiff's expert on this topic, Geist, failed to provide adequate data to back his numbers up.[76]

---

[75] Additionally, the required revenue rates for the Plans had no "cap"—that is to say, there was no ceiling on the amount that any participant might pay.  Plaintiffs assert that as assets under management increase, a revenue-sharing arrangement without a cap on fees leads to an ever-increasing dollar amount in fees paid to the recordkeeper.  The preponderance of the evidence demonstrates otherwise.  The concept of "capped" versus "uncapped" fees matters only in a theoretical sense; as assets under management increase, so may efficiencies, and a fiduciary can thus negotiate to reduce the basis point charge.  (Tr. at 1148:19-1149:3.)  Arrangements where fees are based on basis points but "capped out at a certain dollar maximum" are, at the very least, highly unusual.  (Id. at 1248:6-25.)

[76] Additionally, Turki conducted a calculation to demonstrate the flaws in Geist's numbers by making three adjustments.  (Turki Decl. at 7-8.)  The Court found him highly credible.  Turki he has extensive experience as a damages rebuttal expert in ERISA matters.

Turki's first adjustment took into account that TIAA has disclosed to the Plans that approximately 40% of the total Plan services expense dollar amount is allocable to "recordkeeping services" as defined by DOL regulations.  (Id.)  Turki's second adjustment is based on the TIAA traditional annuity requiring separate recordkeeping, and as such, those recordkeeping fees should

Accordingly, plaintiffs fail to demonstrate by a preponderance of the evidence that their proposed fee ranges were the only plausible or prudent ones—or, indeed, that any comparable Plan has ever charged within that range.  Plaintiffs thus have not met their burden of proof as to damages for excessive recordkeeping fees. Indeed, on a per participant basis in every year following the consolidation of the Medical Plan with a sole recordkeeper in 2012, administrative fees for the Faculty Plan were actually lower than for the Medical Plan.  (Wagner Decl. at 30-31, 79.)

## V.    MONITORING FUND OPTIONS

Plaintiffs' second claim of imprudence relates to monitoring the performance of specific investment options.  Plaintiffs assert that the Committee did not analyze fund performance on a regular basis and did not timely remove two funds in particular that allegedly underperformed.  Plaintiffs also argue that the Committee acted imprudently by allowing the Plans to include too many investment options.[77] The evidence does not support these claims.

---

be subtracted from the total recordkeeping fees and considered separately.  (Id.)  Turki's third adjustment assumes "that any excessive annual fees should be allocated to Plan participants' accounts and reinvested in the Plan."  (Id.)  The Court agrees with each of these adjustments. Adjusting for these three factors, Turki shows that recordkeeping fees paid by the Medical Plan for assets other than the TIAA traditional annuity were less than Mr. Geist's admittedly "hypothetical" recordkeeping fees of $27 - $35 per participant/per year."  (Id.)

Turki correctly concludes that the "Geist damages for the alleged excessive recordkeeping fees are not predicated on a proper economic analysis, and when corrected for some obvious flaws do not establish that the [Faculty Plan] or the [Medical Plan] paid excessive recordkeeping fees over the period where the data are available."  (Id. at 8.)

[77] The Court previously dismissed this argument as a stand-alone claim, Sacerdote 2017 WL 3701482, though it allowed in some evidence to the extent it went specifically to the Committee's process.

The evidence demonstrates that the Committee closely monitored the performance of the investment alternatives offered in the Plans. (Tr. at 338:7-339:19, 1152:20-1153:20; Petti Decl. ¶¶ 17-18; Surh Decl. ¶¶ 11-12; Halley Decl. ¶¶ 13-14.) Prior to each meeting, the Committee received and reviewed a detailed report from Cammack that analyzed the investment options. In evaluating specific funds, Cammack reviewed, inter alia, the fund's performance against its peers', investment objectives and risk, and expenses. (<u>See, e.g.</u>, DX456 at 50; PX34 at 45.) One of the factors used by Cammack and the Committee to analyze the funds was a widely-used measure of performance called "alpha," which is defined as the difference between the actual return and expected return. (Tr. at 1263:24-1264:9; Rezler Decl. ¶ 15.)

The Committee's minutes reflect discussion of the investment performance at numerous meetings, including those held on:

- June 14, 2010[78];

- March 21, 2011[79];

- April 1, 2011[80];

- June 9, 2011[81];

---

[78] DX562 at 3.
[79] PX460 at 3-4.
[80] PX481 at 3.
[81] PX375.

- August 15, 2011[82];

- November 14, 2011[83];

- May 17, 2012[84];

- September 4, 2012[85];

- November 16, 2012[86];

- February 22, 2013[87];

- June 14, 2013[88];

- November 25, 2013[89];

- February 26, 2014[90];

- May 22, 2014[91];

- August 19, 2014[92];

- December 11, 2014[93];

- February 26, 2015[94];

- June 9, 2015[95];

---

[82] DX569 at 2-3.
[83] PX472.
[84] PX482 at 2-3.
[85] PX382 at 2-3.
[86] PX380 at 1-2.
[87] PX467 at 2-3.
[88] PX368 at 3.
[89] PX458 at 2-3.
[90] PX1240 at 2-3.
[91] PX461 at 2.
[92] PX49 at 1-2.
[93] PX469 at 2-3.
[94] PX479 at 1-2.
[95] PX1303 at 2.

58

- September 15, 2015[96];

- December 16, 2015[97];

- March 2, 2016[98];

- June 1, 2016[99];

- September 8, 2016[100];

- December 12, 2016[101];

- February 23, 2017[102];

- May 24, 2017;[103]

- September 7, 2017;[104] and

- December 11, 2017.[105]

Cammack's reports contain detailed information regarding the Plans and the Plans' investments, including summaries of the Plans' total assets, summaries of the Plans' asset allocations (e.g., bond, money market, fixed income, large cap, small cap, etc.), capital markets reviews and analyses, quarterly economic reports (including discussion of equities, bonds, real estate markets, consumer sentiment, energy prices, and expert predictions), and detailed analyses of the Plans'

---

[96] PX484 at 2-3.
[97] PX474 at 2.
[98] PX1331 at 2.
[99] PX471 at 2.
[100] PX520 at 2-3.
[101] PX519 at 2-3.
[102] PX1366 at 2-3.
[103] PX662 at 2-3.
[104] PX959 at 2-3
[105] PX962 at 2-3.

investment alternatives (including managers, ratings, expense ratios, performance against benchmarks on a quarterly, year-to-date, 1-year, 3-year, 5-year and 10-year basis.)  (Rezler Decl. ¶¶ 9-13, 15; Halley Decl. ¶ 15; Petti Decl. ¶ 23.)

These same reports also included analyses of manager tenure, category ranking, risk, risk adjusted return, net expense ratio, style drift, turnover ratio, and Morningstar rating.  (Rezler Decl. ¶¶ 11, 15.)  The reports were prepared using various software tools.  (Tr. at 1263:15-23.)  The software programs "filter[] in information from thousands of funds that are available and that are being used . . . by the plans that [Cammack's] clients offer."  (Id. at 1263:20-23.)

Cammack's Rezler[106] testified that the Committee asked questions of Cammack regarding its advice, (id. at 1283:18-25), and that, on at least one occasion, the Committee questioned the viability of a metric Cammack used to analyze the investment options, (id. at 1284:1-12).  The meeting minutes show that the Committee "voted to accept all fund recommendations presented by Cammack." (See, e.g., DX589; PX519; DX517.)  It rarely deviated, although on at least one occasion (March 2, 2016) it placed a fund on a watch list rather than replacing it, as

---

[106] Cammack's Rezler was a careful and credible witness who is well-versed in reviewing a fund's invetsments.  He is a VP for Client Consulting and oversees Cammack's seven client consulting teams in New York City.  (Rezler Decl. ¶¶ 1, 5.)  Since joining Cammack in 2005, he has focused primarily on 403(b) plans and helps fiduciaries: (1) evaluate, select, and manage their plans' recordkeepers; (2) monitor the amount of revenue sharing and recordkeeping fees; and (3) select and monitor plan investments.  (Id.)  He has worked in the ERISA-regulated retirement plan services industry for over twenty years.  (Id.)

Cammack had suggested.  (DX587.)  This acceptance of Cammack's recommendations does not mean the Committee improperly deferred to Cammack; it could just as easily mean (and the Court views it as such) that Cammack's recommendations also happened to be appropriate.

On a quarterly basis, and using the IPS for guidance (which set forth the types of metrics used to evaluate and monitor investments), the Committee also compiled and reviewed the Watch List to monitor certain funds.  (Rezler Decl. ¶¶ 13-14; Surh Decl. ¶ 17; PX481 at 3.)  Funds were put on the Watch List for a number of reasons, such as a fund manager change, a sub-adviser change, or underperformance.  (Tr. at 1276:3-10; Halley Decl. ¶ 13; Surh Decl. ¶ 18.)  The Committee analyzed the funds on the Watch List at almost every Committee meeting and discussed the addition or removal of funds to or from the Watch List where applicable.  (Rezler Decl. ¶ 13; Halley Decl. ¶ 13.)  Funds on the Watch List were not automatically removed from the investment lineup; rather, they were initially analyzed and discussed by the Committee at length.  (Rezler Decl. ¶ 13; Surh Decl. ¶ 18; Halley Decl. ¶ 13.)

VI.    CLAIM REGARDING TWO SPECIFIC FUNDS

In Claim V, plaintiffs assert that NYU failed to prudently monitor the Plans' investment Options by continuing to offer two funds with what plaintiffs assert were high fees and poor performance—namely, the CREF Stock Account and the TIAA Real Estate Account.  (Am. Compl. ¶ 217-229.)  In particular, plaintiffs argue

that the Committee used improper benchmarks to evaluate the performance of the TIAA Real Estate Account and the CREF Stock Account.  They further argue that this improper benchmarking both reveals a process failure and masks objective poor performance.  The Court finds otherwise.

A.    The TIAA Real Estate Account

The TIAA Real Estate Account is a tax-deferred variable annuity contract offered by TIAA.  (Chittenden Decl. ¶ 58; see, e.g., DX689; DX679.)  It is an unusual fund because it invests in actual real estate properties.  (Id. ¶ 60.)  "[A]t least 75% of the Account's net assets have . . . direct ownership interests in real estate" and typically less than 10% of the account's net assets have been comprised of interests in liquid real estate securities, such as real estate investment trusts ("REITs") and commercial mortgage-backed securities ("CMBSs").  (Id.; Fischel Decl. at 9-10.)

This fund provides investors with an opportunity to participate in investments typically only available to institutional investors; it is therefore a valuable diversifying element of a retirement portfolio.  (Chittenden Decl. ¶ 61; Tr. at 646:6-14, 671:19-672:2.)  As of September 30, 2017, it held $24.8 billion in net assets.  (Fischel Decl. at 9.)  Its annual return in 2010 was 13.3%, (DX648 at 19); in 2014, it was 12.22%, (DX668 at 1); and in 2016, it was 5.20%, (DX676 at 1).[107]

---

[107] TIAA also guarantees liquidity for the TIAA Real Estate Account via a "liquidity guarantee" under which the TIAA General Account will purchase accumulation units issued by the TIAA Real Estate Account if there are issues with liquidity.  (Fischel Decl. at 10.)

Ten to twenty percent of this fund's holdings are in cash or other short-term securities and short-term higher quality liquid investments that are easily converted to cash.  (Tr. at 642:25-643:3; Fischel Decl. at 10.)  This provides a level of liquidity that would be otherwise difficult to achieve in a real estate portfolio, (Tr. at 645:12-22), and ensures that the Account can meet participant redemption requests, purchase or improve properties, or cover other expense needs, (Fischel Decl. at 10).

Plaintiffs contend that the fund's cash holdings create a "drag" on overall return.  However, whether cash increases or lowers returns (i.e., whether it is a "drag" or a boost) depends on the health of the real estate market:

> When real estate values are increasing, then cash lowers returns, because the zero return on cash is averaged against deposited returns on real estate, and in that situation, the cash lowers risk and also lowers returns.  But in down markets, when real . . . estate values are falling, then the zero return on cash improves performance because the zero return is averaged against negative numbers as opposed to positive numbers.  And therefore, you can't say that lowering risk either improves performance or hurts performance without specifying what period of time you're looking at . . . .

(Tr. at 1525:14-25.)  Fischel[108] testified credibly that "there's no doubt that REITs are riskier" than the TIAA Real Estate Account because REITs lack cash, which means they may have to operate using leverage or debt as part of their capital structure.  (Id. at 1524:1-1524:5.)

---

[108] Fischel has significant expertise in various relevant areas and the Court found him to highly credible and relies heavily on his testimony.  Fischel was retained by NYU to analyze plaintiffs' claims concerning the performance of the CREF Stock Account and the TIAA Real Estate Account from an economics perspective.  (Id. ¶ 5.)

63

Surh, NYU's CIO who was a Committee member from 2010-2014, testified that the TIAA Real Estate Account is a "really unique and useful instrument," as a strategic asset and stabilizer, because it is not highly correlated to the equities markets. (Id. at 1152:1-11.) The fund offers diversification that can lead to a better overall return for a participant. (Id. at 644:23-645:3, 646:6-14.) Chittenden testified that the fund is a:

> great diversifier to individuals for their retirement savings. To be able to say that you, as part of your retirement savings, as a man on the street, the average NYU participant, you can have a return that's based off of commercial, directly held commercial real estate which is typically only available to large institutional investors is a special thing . . . .

(Tr. at 639:12-18.)

### 1. Benchmarks Utilized for the TIAA Real Estate Account

During the Class Period, TIAA provided a number of benchmarks that the Committee and participants could use to assert the performance of the TIAA Real Estate Account. The Committee took additional steps to evaluate the performance of the TIAA Real Estate Account and to determine whether the fund should continue to be included in the Plans. For example, the Committee requested that TIAA explain the strategy of the fund and the appropriateness of its chosen benchmark. (Tr. at 257:8-14, 305:1-14.) The Committee also had detailed discussions of the fund's strategy, liquidity requirements, and benchmarks. (Halley Decl. ¶ 20.)

64

While the benchmarks for the TIAA Real Estate Account did change during the Class Period,[109] the mere fact that the Committee, Cammack, and TIAA itself changed benchmarks during the relevant time period does not indicate that the Committee acted imprudently, or that the fund was imprudently included as an option.  Indeed, one of the factors that makes it a useful product—the diversification it offers vis-à-vis its unique holdings—also makes it difficult to benchmark.  There simply are not similar funds in the market.  The fact that the benchmarks shifted over time indicates that the Committee <u>was</u> performing its review function appropriately—it carefully considered the benchmarks being used, whether they were appropriate, and whether a more apt benchmark existed, and it altered the benchmarks when a more useful one was proffered.  These shifts in benchmarks are not evidence of imprudence.

### 2.   Objective Prudence of the TIAA Real Estate Account

Ultimately, benchmarks are useful to objectively evaluate fund performance.  The Court credits and relies on Fischel's thoughtful analysis regarding the objective

---

[109] For example, at the February 21, 2012 meeting, TIAA informed the Committee that they were working to develop a benchmark for the fund due to the challenges in benchmarking.  (Surh Decl. ¶¶ 21, 24; Rezler Decl. ¶ 66; PX40 at 2).)  Since 2012, TIAA has compared the Account's performance with the performance of "two widely used indices" that TIAA "believes . . . are most appropriate to compare to the performance of the Account":  the NCREIF Fund Index—Open End Diversified Core Equity ("NFI-ODCE") and the NCREIF Property Index ("NPI").  (DX709 at 7.)  NFI-ODCE is an equal-weighted index of the investment returns from a collection of open-end commingled funds which focus on a core real estate investment strategy, and TIAA uses the "Net of Fees" returns that are calculated by the NCREIF in its analyses.  (<u>Id.</u>)

performance of this fund.  Fischel's analysis makes clear that retention of the TIAA Real Estate Account was not imprudent. In contrast to Fischel's analysis, plaintiffs' expert, Buetow,[110] failed to adjust for cash and compared the fund to a REIT.

The TIAA Real Estate Account's adjusted performance "has closely tracked the performance of its benchmark during the one-, five-, and ten-year periods ending on December 31 of each year from 2009 to 2016, and the one-, five-, and ten-year periods ending September 30, 2017." (Fischel Decl. at 18, 24.)  The Account "performed at least as well as would have been expected given its risk, notwithstanding the costs of providing liquidity and other services."  (Id. at 19, 45.) The "alpha analyses" for the TIAA Real Estate Account (which measure the difference between the actual return and expected return (Tr. at 1264:2-9; Rezler Decl. ¶ 15)), which the Court finds are reliable, also demonstrated that the fund performed at least as well as expected, given its risk and notwithstanding the costs of providing liquidity and other services.  (Fischel Decl. at 20.)[111]

---

[110] Buetow was retained by plaintiffs to opine on the fiduciary process and investment decisions made by NYU and its officers and trustees.  (Id. at 1.)  The Court discounts Buetow's testimony; as described above, his analysis of fund performance did not account for a number of important factors and the Court is not persuaded that he compared the funds in question to appropriate benchmarks.

[111] Specifically, the one-factor alpha analysis for the TIAA Real Estate Account resulted in an estimated alpha that is positive and not statistically significant in the ten-year period ended December 31, 2009, positive and statistically significant (at the 10% level) in the ten year period ending December 31, 2014, and positive and statistically significant (at the 1% level) in the period from August 2010 to September 2017.  A three-factor analysis resulted in estimated alphas that were positive but not statistically significant in the ten-year period ended December 31, 2009 and the ten-year period ended December 31, 2014, and negative but not statistically significant in the period from August 2010 to September 2017.  (Fischel Decl. at 19-20.)

Plaintiffs compare the TIAA Real Estate Account to the Vanguard REIT Index over the one-, five-, and ten-year periods ending December 31, 2009, and the one-, five-, and ten-year periods ending December 31, 2014.  But as described above, the evidence shows that a REIT is not a proper comparison for the TIAA Real Estate Account, which invested directly in commercial properties, had a low correlation to stocks and, therefore, operated differently from a REIT index.  (Tr. at 218:6-220:9, 236:19-237:5, 1583:5-1587:23; see also Turki Decl. at 15.)  But in any case, on a month-to-month basis, the TIAA Real Estate Account still outperformed the REIT Index more often than not.  (DX456 at 60.)

In concluding that the TIAA Real Estate Account should have been removed as an investment option by December 31, 2009, Buetow also compared the Account's performance to the NCREIF Fund Index—Open Fund Diversified Core Equity ("NCREIF Index").  (Buetow Decl. at 57; Tr. at 1707:1-1709:23.)  However, this is not the benchmark that was used by TIAA as of December 31, 2009.  (Fischel Decl. at 10, 18).  Additionally, Buetow did not adjust the returns to account for cash as TIAA did.  (Tr. at 1710:12-15.)[112]

---

[112] Buetow does not use reliable economic methods to analyze damages related to the TIAA Real Estate Account or appropriate benchmarks against which to measure damages; he also fails to take into account that the annuities would not be mapped.  Accordingly, the Court does not rely on Buetow's damages calculations.  See Ruggiero v. Warner-Lambert Co., 424 F.3d 249, 255 (2d Cir. 2005) (affirming district court's decision to exclude expert opinion and noting that "[f]ollowing Joiner, we held that 'when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that

It is notable that TIAA Real Estate account is also widely accepted as an appropriate and desirable investment by other market participants.  Of TIAA's 200 largest institutional clients with at least one 403(b) plan, all but one client held assets in the TIAA Real Estate Account for the period 2010 through 2014. (Chittenden Decl. ¶ 63.)  In 2015 and 2016, all but two of TIAA's largest institutional clients held assets in the TIAA Real Estate Account.  (Id.)  And, of those 200 clients, over 84% had plans that received contributions into the TIAA Real Estate Account for the period 2010 through 2016.  (Id. ¶ 64.)[113]

Accordingly, plaintiffs have not demonstrated that the TIAA Real Estate Account underperformed so significantly that the Committee was imprudent for failing to remove it as an option.  See Taylor v. United Techs. Corp., No. 03:06-cv-1494, 2009 WL 535779, at *9-10 (D. Conn. Mar. 3, 2009) (finding that defendant acted prudently in maintaining cash in a Stock Fund, while noting that plaintiffs provided no evidence to the contrary and finding that defendant did not breach a fiduciary duty by offering actively managed funds, and noting that "ERISA does not require a fiduciary to take 'any particular course' so long as the fiduciary's decision meets the prudent person standard"); PBGC, 712 F.3d at 721 (holding that defendant's actions were objectively prudent because none of plaintiff's "warning

---

unreliable opinion testimony" (quoting Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 266 (2d Cir. 2002))).

[113] Chittenden explained that this historical data is that which he uses in connection with his duties and responsibilities at TIAA in the last couple of years.  (Tr. at 567:16-21, 652:13-653:15.)

signs" demonstrated defendant "knew, or should have known, that the securities in the Portfolio were imprudent investments"); cf. Bd. of Trs. of Local 295/Local 851-IBT Emp. Pension Fund v. Callan Assocs., Inc., No. 97 Civ. 1741(HB), 1998 WL 289697, at *3-4 (S.D.N.Y. June 4, 1998) (finding defendant acted with objective prudence in liquidating the funds' portfolio to cash).

      B.    The CREF Stock Account

The College Retirement Equities Fund ("CREF") was the first variable annuity; the CREF Stock Account was CREF's first offering. (Chittenden Decl. ¶ 47.) It first began receiving investments in 1952 and, as of September 30, 2017, had net assets of $123.08 billion. (Fischel Decl. at 8.) It is a tax-deferred variable annuity that was offered by 93% of TIAA's largest 200 clients in 2010 and 2016. (Id. ¶¶ 47, 54; DX763; DX760).) The CREF Stock Account is a broadly diversified investment, investing across all major equity market segments, including large-, mid, and small-cap stocks, both domestically and within foreign developed and emerging markets. (Chittenden Decl. ¶ 48.) It had an annual rate of return of 32% in 2009, followed by 15.72% in 2010. (Fischel Decl. at 38.)

As of December 31, 2017, the CREF Stock Account had approximately $127 billion in assets under management. (Chittenden Decl. ¶ 52.) The Account's "Investment Objective" is to provide "[a] favorable long-term rate of return through capital appreciation and investment income by investing primarily in a broadly diversified portfolio of common stocks." (DX760 at 27; Chittenden Decl. ¶ 48.)

69

Three different investment strategies are used to manage the account —active management, a quantitative approach, and an indexing comparison. (Chittenden Decl. ¶ 48; DX760 at 27).)[114]  Under normal circumstances, the CREF Stock Account seeks to maintain approximately 65-75% domestic equities and 25-35% foreign equities.  Its mix of domestic and international securities is unique.  (Chittenden Decl. ¶ 48; DX760 at 28 ("Under normal circumstances, the Account seeks to maintain the weightings of its holdings as approximately 65-75% domestic equities and 25-35% foreign equities.").  Participants who invest in the CREF Stock Account

---

[114] Plaintiffs' assertion in Claim V is that NYU breached ERISA's duty of prudence by offering the actively-managed CREF Stock Account instead of a passive index account is also without merit. ERISA does not mandate passive management (with lower fees) over active management.  See Hecker v. Deere & Co., 556 F.3d 575, 586 (7th Cir. 2009) ("We see nothing in [ERISA] that requires plan fiduciaries to include any particular mix of investment vehicles in their plan.").  The U.S. Department of Labor recognizes that plans typically offer "actively managed" funds.  U.S. Dep't of Labor, Emp. Benefits Sec. Admin., A Look at 401(k) Plan Fees, at 7 (Aug. 2013).

      The law of trusts, upon which the ERISA duty of prudence is based, recognizes that actively managed funds may be prudent.  Restatement 3d of Trusts, § 90 cmts. e(1) and f at 304, 307 (observing that "active management strategies" are permissible and "[t]here are no universally accepted and enduring theories of financial markets or prescriptions for investment that can provide clear and specific guidance to trustees and courts, varied approaches to the prudent investment of trust funds are therefore permitted by the law").  Courts have specifically rejected the theory that a plaintiff can establish a breach of the duty of prudence by comparing a passively-managed Vanguard index fund to an actively-managed fund.  See, e.g., Brotherston v. Putnam Invs., LLC, No. 15-13825-WGY, 2017 WL 1196648, at *7 (D. Mass. Mar. 30, 2017) (rejecting damage model that compared active and passive funds as "apples and oranges").

      The Plans here offered participants both actively and passively managed index funds, including the passively managed Vanguard funds Plaintiffs use as comparisons to the CREF Stock Account.  Thus, NYU "left choice to the people who have the most interest in the outcome, and it cannot be faulted for doing this."  Loomis v. Exelon Corp., 658 F.3d 667, 673-74 (7th Cir. 2011).  The Plans disclosed to participants the CREF Stock Account's investment managers, performance, investment strategy, fees, and that it was an actively managed fund.  (DX053 (2012 Investment Options Comparative Chart for School of Medicine Faculty Plan).)  "Given the numerous investment options, varied in type and fee, [defendants] . . . can be held responsible for those choices."  Hecker, 556 F.3d at 590.

      Accordingly, the Court does not find that the inclusion of actively managed funds was imprudent.

have the option to transfer their investment to a TIAA traditional annuity in the future.  (Chittenden Decl. ¶ 55.)

1.    Benchmarks Utilized for the CREF Stock Account

Like the TIAA Real Estate Account, a number of benchmarks were used to assess the performance of the CREF Stock Account during the Class Period. Because of its unique domestic-foreign securities mix, it is challenging to find an appropriate benchmark.  (Rezler Decl. ¶ ¶ 72-74; PX380 at CLC003902.)  The Committee reviewed the CREF Stock Account on a quarterly basis and in the context of the Plans' total investment lineup.  (Rezler Decl. ¶ 72; Surh Decl. ¶ 20; Halley Decl. ¶ ¶ 13, 20; Petti Decl. ¶ 18).  The Committee focused on the difficulties with benchmarking that the CREF Stock Account presented due to its composition. (Rezler Decl. ¶ 72-74.)  It determined that, as a result of these benchmarking difficulties, the CREF Stock Account was one that warranted "specialized discussions."  (PX481 at 2).)[115]  Such discussions occurred.

As with the TIAA Real Estate Account, the mere fact that benchmarks changed for the CREF Stock Account does not make its inclusion as a Plan option imprudent.  The Committee was actively engaged with the Fund and its benchmarks, asking for clarification at several points throughout the Class Period.

---

[115] For example, the Committee specifically noted in April 2011 that the CREF Stock Account was benchmarked against "large cap domestic equities only," when that was not how the fund invested. (Rezler Decl. ¶ 72.)

2.   Objective Prudence of the CREF Stock Account

Plaintiffs have also failed to prove that the Committee's inclusion of this fund was objectively imprudent.  In support of objective underperformance, plaintiffs compare the fund to the Russell 3000 Index, two passively managed index funds (VITPX and VIIIX), and three purportedly comparable actively managed funds (VDEQX, VPMAX, and VHCAX).  However, plaintiffs' comparisons are misleading. They present data for the one-, five- and ten-year periods ending December 31, 2014 and, with respect to the purportedly comparable actively-managed funds, the one-, five- and ten-year periods ending December 31, 2009.  However, a more accurate comparison shows the CREF Stock Account did not underperform.

Looking at the one-, five-, and ten-year periods ending December 31, 2009, plaintiffs compare the CREF Stock Account with the performance of the purportedly comparable actively managed funds during these periods, but do not compare its performance with the Russell 3000 Index or the two passive index funds.  (Fischel Decl. at 12.)  When that comparison is made, the CREF Stock Account outperforms during that period.  (Id. at 12, 36.)  For example, the one-year total return for 2009 for the CREF Stock Account was 32.15%; for the VITPX, VIIIX, and Russell 3000, it was 28.92%, 26.66%, and 28.29%, respectively.  (Id. at 36.)  The five-year average annual return as of December 31, 2009 was 1.64%; for the VITPX, VIIIX, and Russell 3000, it was 0.65%, -0.02%, and 0.75%, respectively.  (Id.)

72

With regard to monthly performance, the CREF Stock Account did not consistently underperform any of the alternatives identified by Plaintiffs during either ten-year period ending December 31, 2009 or the ten-year period ending December 31, 2014.  (Id. at 12.)  With respect to each alternative and time period, the CREF Stock Account performed better in a substantial fraction of the months during both of these ten-year periods.  (Id. at 12, 37.)  For example, on a monthly basis for the ten-year period ending December 31, 2009, the CREF Stock Account performed better than the Russell 3000 Index 53% of the time and better than the VIIIX Fund 57% of the time.  However, on a monthly basis in the ten-year period ending December 31, 2014, the CREF Stock Account performed better than the Russell 3000, VIIIX, VITPX, VDEQX, VPMAX, and VHCAX between 41-48% of the time.  In other words, those funds saw higher returns slightly more than half of the time period.  (Id. at 37.)

The CREF Stock Account closely tracked the performance of its benchmark index during the one-, five-, and ten-year periods ending on December 31 of each year from 2009 to 2016, and the one-, five-, and ten-year periods ending June 30, 2017.[116]  (See id. at 13, 38.)  In that time period, the fund rarely deviated from the

---

[116] As discussed above, as of 2009, the CREF Stock Account's publicly stated (and available) composite benchmark was the Russell 3000 Index, the MSCI Barra EAFE® + Canada Index, the MSCI Emerging Markets Index and the MSCI EAFE + Canada Small Cap Index.  In mid-2011, the account's publicly stated (and available) composite benchmark in its prospectus was changed to a composite index of two unmanaged indices: (1) Russell 3000® Index (70%); and (2) the MSCI All Country World ex-US Investable Market Index (30%).

composite benchmark index by more than one percent.  (See id. at 38.)  In addition,

alpha estimates[117] of the CREF Stock Account demonstrate that the fund performed

as well as would have been expected, given its risk profile, notwithstanding the

costs of providing liquidity and other services.[118]  (Id. at 16-17, 41.)

Plaintiffs' comparisons between the CREF Stock Account's performance and

that of passively and actively managed index funds (VITPX, VIIIX, VDEQX,

VPMAX, and VHCAX) are inapposite, because those funds do not account for the

foreign stock market's performance or the performance of the relevant segments of

the U.S. and foreign markets.[119]  (Id. at 13.)

---

[117] As discussed above, alpha is a measure of the difference between the actual return of a portfolio and the expected return of that portfolio (which depends upon the underlying risk of the portfolio) during a specific period of interest.  (Fischel Decl. at 16.)

[118] Specifically, one-factor models using only US market factors result in alpha estimates that are not significantly different from zero (both positive and negative depending on which index is used) in the ten-year period ended December 31, 2009 and alpha estimates that are negative and statistically significant in both the ten-year period ended December 31, 2014 and the period from August 2010 to September 2017.  Two-factor models that use both a US market index and an international market index result in alpha estimates that are not significantly different from zero in all estimation periods.

[119] Specifically, the Vanguard Institutional Total Stock Market Index Fund (i.e., VITPX) "employs an indexing investment approach designed to track the performance of the CRSP US Total Market Index, which represents approximately 100% of the investable U.S. stock market and includes large-, mid-, small-, and microcap stocks regularly traded on the New York Stock Exchange and Nasdaq." The Vanguard Institutional Total Stock Market Index Fund (i.e., VITPX) "employs an indexing investment approach designed to track the performance of the CRSP US Total Market Index, which represents approximately 100% of the investable U.S. stock market and includes large-, mid-, small-, and microcap stocks regularly traded on the New York Stock Exchange and Nasdaq."  The Vanguard Diversified Equity Fund (i.e., VDEQX) "invests in a diversified group of other Vanguard equity mutual funds, rather than in individual securities," and "[t]he underlying funds' holdings mainly consist of large-, mid-, and small capitalization equity securities of domestic companies."  The Vanguard PRIMECAP Fund (i.e., VPMAX) "invests in stocks considered to have above-average earnings growth potential that is not reflected in their current market prices" (i.e., growth stocks) and its "portfolio consists predominantly of large- and mid-capitalization stocks."  The Vanguard Capital Opportunity Fund (i.e., VHCAX) "invests mainly in U.S. stocks, with an emphasis on

Additionally, it is not clear the Russell 3000 Index is the appropriate benchmark by which to measure the CREF Stock Account's objective performance. In December 2017, TIAA changed its benchmark from the Russell 3000 Index to the Morningstar Aggressive Target Risk Index.  (Tr. at 629:23-630:3; PX929.)  At that time, the fund's one-year returns were 23.43%, compared with 21.95% for the Morningstar Aggressive Target Risk Index and 23.13% for the CREF Composite Benchmark.  (PX929.)  Its 10-year return were 6.44%, compared with 6.50% or the Morningstar Aggressive Target Risk Index and 6.71% for the CREF Composite Benchmark.  (Id.)

Plaintiffs' expert, Buetow, claimed to have looked at the CREF Stock Account against its publicly stated actual benchmark as of December 31, 2009, concluding that the CREF Stock Account had a period of "longstanding underperformance over 3, 5, and 10 years as December 31, 2009."  (Buetow Decl. at 35).  But Buetow incorrectly used the benchmark for the CREF Stock Account that was not in place until mid-2011 to cover a period prior to mid-2011.  (Compare Fischel Decl. at 8-9, 13-14, with Buetow Decl. at 35; see also Tr. at 1476:2-13, 1575:18-1576:17, 1667:23-1668:14; Turki Decl. ¶ 20.)  In fact, the benchmark Buetow used was his own creation.  (Tr. at 1667:16-1668:14, 1670:16-20, 1675:20-1676:15).

---

companies that are considered to have prospects for rapid earnings growth" and "emphasize[s] mid-cap stocks."  (Fischel Decl. at 13-14.)

In addition to Buetow's use of an incorrect benchmark, Fischel pointed out that if "you add the fees for services, the three-year number would turn positive and the five and the ten . . . would be correspondingly reduced as well." (Tr. at 1577:2-6). It was misleading for Buetow to cite to a "TIAA-CREF Annual Review" apparently provided by an accountant to the State Universities Retirement System ("SURS") (DX901) because that exhibit supports Fischel's conclusion regarding the market acceptance of the CREF Stock Account. (Tr. at 1578:7-17.) Further, DX901 shows that the CREF Stock returned 32.04 percent in 2009, "outperforming the composite benchmark of 29.65 percent by 239 basis points." (Tr. at 1578:7-1579:22). Accordingly, a prudent fiduciary looking at DX901 would draw the opposite conclusion from Buetow. (Tr. at 1578:7-1579:22).

Moreover, based on its analysis of the performance of the CREF Stock Account, the SURS investment committee concluded that as of April 2, 2010, "[t]he CREF Stock Account is a stand-alone equity allocation that offers a well-diversified portfolio of domestic and foreign equity holdings of all sectors, styles and market caps, using a combination of active management, enhanced indexing and pure indexing. It has closely tracked the benchmark over longer time periods. We recommend retention of this option." (Tr. at 1579:2-1582:11; DX901 at 20.)

Accordingly, plaintiffs have not demonstrated that the CREF Stock Account was objectively imprudent or that participants suffered losses due to its inclusion in the Plan.[120]

--------------------------------------------------

[120] Plaintiffs have also argued that in failing to identify the correct benchmark for the TIAA Real Estate Account and the CREF Stock Account, the Committee acted imprudently. But the benchmarking was adequate. Plan participants received a wealth of information about the funds, including materials pointing them to alternative benchmarks for each. For example, TIAA quarterly performance analyses are available on TIAA's website as well as the SEC's website. The reports provide two indices to assess the TIAA Real Estate Account's performance, including the REA Composite Index for comparison. This Index is comprised of (1) the total return for all real estate properties owned or managed in commingled open-end funds, as derived from the database of the National Council of Real Estate Investment Fiduciaries ("NCREIF"), an independent party (hereinafter, "NCREIF Open-end"), (2) the FTSE Group (FTSE) NAREIT Equity REIT Index or, for periods prior to the second quarter of 2009, the Dow Jones Wilshire Real Estate Securities Index, and (3) the iMoneyNet All-Taxable Average for short-term, cash-like investments. (DX724; see also DX900.) Additionally, the Plan summary is given to every participant, (Tr. at 1543:3-7), and it directs participants to the TIAA and Vanguard websites to see the various funds' prospectuses, (DX384).

In 2012, TIAA began to provide NYU with information to provide 404a5 disclosures to participants, and TIAA assists in their delivery to participants. (Chittenden Decl. ¶ 108.) As required by the Department of Labor Regulations, in the 404a5 disclosures TIAA shows the performance of the CREF Stock Account versus a broad-based securities market index, the Russell 3000 Index, as opposed to using the account's composite benchmark stated in its prospectus because the Department of Labor Regulations do not permit the use of composite benchmarks or customized benchmarks in the 404a5 disclosures and only permits the use of one benchmark for each investment option. (Tr. at 1010:12-16, 1011:20-1012:5.) However, the Russell 3000 Index is not necessarily sufficient, on its own, to help participants understand whether the CREF Stock Fund is performing well vis-à-vis comparable stock funds because it is comprised entirely of domestic holdings (and the CREF Stock Fund has 30% international holdings). (Id. at 1440:21-1441:3.)

The 404a5 disclosures also direct the participant to the prospectus for more detailed information. (Id. at 1541:19-1542:12.) Moreover, the Plans' Summary Plan Descriptions inform participants to read all descriptions and disclosure materials relative to investment options under the Plan before making investment decisions. (Id. at 1542:6-12, 1543:3-20.) The CREF Stock Account closely tracked the performance of the CREF Stock Composite Benchmark during the one-, five-, and ten-year periods ending on December 31 of each year from 2009 to 2016, and the one-, five-, and ten-year periods ending June 30, 2017. (Fischel Decl. at 20-21, 38.)

Accordingly, any argument that participants received inadequate information is without merit.

VII.    CONCLUSION

For the reasons stated above, the Court finds in favor of defendant NYU on all claims.  The Clerk of Court is directed to enter judgment for NYU, close all open motions in 16-cv-6284, and terminate the case.

SO ORDERED.

Dated:        New York, New York
              July 31, 2018

                                    _____
                                    KATHERINE B. FORREST
                                    United States District Judge

78