**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

DR. ALAN SACERDOTE et al.,

Plaintiffs,

v.

NEW YORK UNIVERSITY,

Defendant.

No. 1:16-CV-06284 (RWS)

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION**
**TO VACATE JUDGMENT AND FOR NEW TRIAL**

## CONTENTS

Authorities ............................................................................................................... iii

Preliminary Statement ................................................................................... 1

Background ...................................................................................................... 3

   I.   Cravath Chairman and NYU Trustee Evan R. Chesler was responsible for monitoring fiduciaries whose conduct was at issue and removing them. ............. 3

   II.   The fiduciaries' conduct and removal—responsibilities of NYU's Board of Trustees—were central to the case. ................................................................... 4

  III.  Mr. Chesler and other Cravath members were deeply involved with NYU in additional ways. ............................................................................................. 6

  IV.  The relationship between former Judge Forrest, Cravath Chairman and NYU Trustee Chesler, and the Cravath firm. ...................................................... 7

  IV.  Testimony of numerous witnesses and the Court's own comments at trial implicated NYU's Board of Trustees, including Cravath's Chairman, Mr. Chesler. ................................................................................................................. 9

      A.   Plaintiffs' expert Dr. Gerald W. Buetow's testimony regarding NYU Trustees' direct role in the conduct underlying Plaintiffs' fiduciary process and the recordkeeping claim. ........................................................... 10

      B.   Plaintiffs' expert Michael J. Geist's testimony regarding the role of the NYU Trustees' direct role in the conduct underlying Plaintiffs' recordkeeping claim. ..................................................................................... 10

      C.   The testimony of Mark Petti—NYU's Executive and Rule 30(b)(6) designee—that NYU's Board of Trustees retained authority over fiduciaries. .................................................................................................... 10

      D.   The testimony of Marcia Wagner—Defendant's expert—that fiduciaries report to NYU's Board of Trustees. ............................................ 11

      E.   The testimony of Susanna Hollnsteiner—NYU's Retirement Manager—that NYU's Board of Trustees had to approve recommendation of consolidation to a single recordkeeper, instead of two, to reduce recordkeeping costs. ............................................................. 11

      F.   The testimony of named Plaintiff Marie Monaco—38-year School of Medicine Professor and representative of Faculty Senate Councils— regarding the  Trustees' responsibility for administration of the Plans. ....... 12

      G.   Judge Forrest expressly recognized the Board of Trustees' role in setting up the Retirement Committee comprised of fiduciaries. ................... 12

V.   Former Judge Forrest was considering the possibility of employment with Cravath and rejoining the partnership with NYU Trustee Chesler while this case against NYU was under submission. ..................................... 14

   A.   While the case was under submission and before a decision, Judge Forrest announced that she was leaving the bench........................................ 14

   B.   After announcing she was leaving the bench, Judge Forrest ruled against Plaintiffs and in favor of NYU on all claims. ................................... 14

   C.   Forty three days after her trial ruling in favor of NYU, former Judge Forrest rejoined Cravath and resumed her partnership with firm Chairman and NYU Trustee Mr. Chesler, stating that returning to Cravath was "an easy choice" and she did not consider employment with any other firm. ..................................................................................... 15

Argument ...................................................................................................................... 16

   I.   Disqualification under Section 455(a) does not require an actual conflict. ........ 16

   A.   The standard for disqualification is whether a judge's partiality could reasonably be questioned by the appearances of the situation. ..................... 16

   B.   Any "doubt must be resolved in favor of recusal." ...................................... 17

   C.   The need to "preserve the appearance of impartiality is especially pronounced" in a bench-tried case. ................................................................ 18

   D.   Rule 60(b)(6) authorizes a court to vacate a judgment based on previously unknown facts requiring recusal. .............................................. 18

   II.  Judge Forrest was disqualified from presiding over this case once she decided to leave the bench because she was considering as her only choice the possibility of an employment relationship at a firm chaired by a NYU Trustee with direct responsibility for monitoring the fiduciary conduct at issue at the same time she was deciding a case against NYU. .......... 19

   III. Recusal is required in the opinion of national judicial ethics expert and former Chair of the ABA Commission to Revise the Model Code of Judicial Conduct. ................................................................................................ 22

   IV.  The proper remedy is to vacate the judgment and order a new trial. .................. 23

Conclusion ................................................................................................................... 25

# AUTHORITIES

**Cases**

*Aetna Life Ins. Co. v. Lavoie*,
    475 U.S. 813 (1986) ........................................................................................................... 16

*Alexander v. Primerica Holdings*,
    10 F.3d 155 (3d Cir. 1993) ........................................................................................... 18, 23

*Am. Textile Mfrs. Inst., Inc. v. Limited, Inc.*,
    190 F.3d 729 (6th Cir. 1999) .............................................................................................. 17

*Andros Compania Maritima, S.A. v. Marc Rich & Co., A.G.*,
    579 F.2d 691 (2d Cir. 1978) ................................................................................................. 9

*Chase Manhattan Bank v. Affiliated FM Ins. Co.*,
    343 F.3d 120 (2d Cir. 2003) ............................................................................ 16, 18, 23, 25

*DeNike v. Cupo*,
    958 A.2d 446 (N.J. 2008) .................................................................................................. 19

*Donovan v. Bierwirth*,
    680 F.2d 263 (2d Cir. 1982) ................................................................................................. 5

*In re Cont'l Airlines Corp.*,
    901 F.2d 1259 (5th Cir. 1990) ................................................................................. 19, 20, 21

*In re Kensington Int'l Ltd.*,
    368 F.3d 289 (3d Cir. 2004) .............................................................................................. 17

*In re Mason*,
    916 F.2d 384 (7th Cir.1990) .............................................................................................. 17

*In re Murchison*,
    349 U.S. 133 (1955) ........................................................................................................... 16

*In re United States (Franco)*,
    158 F.3d 26 (1st Cir. 1998) ................................................................................................ 17

*Liljeberg v. Health Servs. Acquisition Corp.*,
    486 U.S. 847 (1988) ........................................................................... 3, 16, 18, 23, 24, 25

*Listecki v. Official Comm. of Unsecured Creditors*,
    780 F.3d 731 (7th Cir. 2015) ............................................................................................. 17

*Murray v. Scott*,
    253 F.3d 1308 (11th Cir. 2001) ..................................................................................... 17, 23

*Nichols v. Alley*,
    71 F.3d 347 (10th Cir. 1995) .............................................................................................. 17

*Pepsico, Inc. v. McMillen*,
    764 F.2d 458 (7th Cir. 1985) .............................................................................................. 19

*United States v. Bayless*,
    201 F.3d 116 (2d Cir. 2000) ...................................................................................... 2, 16, 22

iii

*United States v. Dandy*,
   998 F.2d 1344 (6th Cir. 1993) ........................................................... 17

*United States v. DeTemple*,
   162 F.3d 279 (4th Cir.1998) .............................................................. 17

*United States v. Jordan*,
   49 F.3d 152 (5th Cir.1995) ................................................................ 17

*United States v. Kelly*,
   888 F.2d 732 (11th Cir. 1989) ............................................................. 9

*United States v. Lovaglia*,
   954 F.2d 811 (2d Cir. 1992) ............................................................. 16

*United States v. Robin*,
   553 F.2d 8 (2d Cir. 1977) (en banc) .................................................. 25

*United States v. Wolfson*,
   558 F.2d 59 (2d Cir. 1977) ................................................................ 17

**Statutes**

28 U.S.C. §455(a) ................................................... 2, 3, 16, 18, 22, 23, 24

28 U.S.C. §455(c) ................................................................................ 17

29 U.S.C. §1102(a) ............................................................................... 5

**Rules**

Fed. R. Civ. P. 60(b) ................................................................. 3, 18, 25

Fed. R. Civ. P. 62.1(a) .................................................................. 18, 25

Fed. R. Civ. P. 62.1(c) ......................................................................... 19

# PRELIMINARY STATEMENT

This motion arises from former Judge Katherine B. Forrest's resignation from the bench while this case was under submission after a bench trial and before she reached a decision. It is now clear that, between submission of the case and the decision adverse to NYU employees and retirees in favor of NYU, Judge Forrest was considering employment with Cravath, Swaine & Moore LLP, whose chairman, Evan Chesler, is a key member of the Board of Trustees of NYU and its Executive Committee, Finance Committee, and Compensation Committee. As a Trustee, Mr. Chesler is a principal of NYU. Under the Charter of NYU's Retirement Plan Committee, the Board of Trustees was directly responsible for monitoring the fiduciary conduct at issue and removing the fiduciaries if they failed to perform their duties. Thus, Cravath's Chairman was directly responsible for actions at issue in this case. Once former Judge Forrest had made a decision to leave the bench, if not before that time, and before deciding whether NYU must pay millions of dollars for breaching its fiduciary duties as to matters for which Cravath's Chairman had direct responsibility, she was clearly considering and in fact hoping, if not actually planning, for employment with the Cravath firm based on her recent statement that she did not consider any other firm and Cravath was "the only firm" she considered joining.[1] Indeed, because Judge Forrest only considered Cravath, it was "an easy decision" for her.[2] Thus, this is not a situation with a prospective employee considering multiple firms. While the Cravath firm was the only firm she was considering for employment, former Judge Forrest then ruled, across the board, in favor of NYU. Forty-three days later she was at the Cravath firm.

---

[1] Sara Randazzo, *Judge Who Oversaw Silk Road Case Rejoins Cravath*, WALL ST. J. (Sept. 12, 2018), https://www.wsj.com/articles/judge-who-oversaw-silk-road-case-rejoins-cravath-1536746401, attached as Ex. 1. All exhibits are attached to the Declaration of Jerome J. Schlichter, filed herewith.
[2] Rick Archer, *Former SDNY Judge Katherine Forrest Rejoins Cravath*, LAW360 (Sept. 12, 2018), https://www.law360.com/articles/1082030/former-sdny-judge-katherine-forrest-rejoins-cravath, attached as Ex. 2.

Beyond the fact that former Judge Forrest was considering the Cravath firm as her only choice for private employment while deciding whether NYU's Board and Cravath Chairman Chesler carried out their responsibilities, a decision adverse to NYU could have had a material negative impact on Mr. Chesler's effectiveness in leading NYU's $1 billion endowment campaign, which Mr. Chesler chaired. In light of Mr. Chesler's generous charitable support for NYU, a decision against NYU would have been counter to Mr. Chesler's enormous charitable priority, while former Judge Forrest was hoping to return to the firm he chairs.

Plaintiffs wish to make clear that they are not accusing the Cravath firm of impropriety, and respect Mr. Chesler's generous commitment of time and resources to a charitable cause. Further, there is no need for this Court to conclude that former Judge Forrest was, in fact, "actually partial or biased."[3] However, the standard for recusal, whether an objective, reasonable person informed of the facts would "conclude that the trial judge's impartiality *could reasonably be questioned*,"[4] is clearly met. Because of the direct responsibility of Mr. Chesler as a Trustee and principal of NYU for monitoring the conduct of the fiduciaries and for their removal, and because of the exceptionally close relationship between NYU and the Cravath firm and its Chairman and the potential impact of a decision against NYU, former Judge Forrest was required to recuse herself once she had decided to change her employment before rendering a decision in the case.

Although Plaintiffs recognize that this motion comes after an adverse ruling, the critical facts related to former Judge Forrest's resignation from the bench occurred after submission of the case and before the ruling, and the fact that former Judge Forrest was considering returning to her old firm only became known 19 days ago on September 12, 2018, when she publicly announced she had returned to Cravath. Under these circumstances, the proper remedy is to

---

[3] *United States v. Bayless*, 201 F.3d 116, 126 (2d Cir. 2000) (emphasis added).
[4] *Id.*; *see* 28 U.S.C. §455(a).

vacate the judgment and order a new trial. *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 862–70 (1988) (granting Rule 60(b) motion and ordering a new trial where facts showing that trial judge violated 28 U.S.C. §455(a) were not known until 10 months after judgment was affirmed on appeal).

## BACKGROUND

I.  **Cravath Chairman and NYU Trustee Evan R. Chesler was responsible for monitoring fiduciaries whose conduct was at issue and removing them.**

Evan R. Chesler currently presides as Cravath's Chairman. Ex. 3 (current Cravath website bio).[5] He is the first person to be given that title in the firm's history. *Id.* Chesler received both his undergraduate and law degrees from NYU. *Id.* He attended NYU on a full scholarship, and has stated in an NYU-published interview: "I owe my career to the scholarship I received to NYU."[6] He has received three awards from the University: the Alumni Achievement Award from the School of Law (2015); the Alumni Distinguished Service Award (2001); and the Alumni Meritorious Service Award (2004). Ex. 3.

Chesler has been a longtime member of the Board of Trustees of NYU, including throughout the entire class period at issue in this case (since 2010). Ex. 3; Ex. 4 (June 2010 Cravath bio).[7] In 2014, Mr. Chesler nearly became the Chairman of NYU's Board of Trustees,[8] but was "edg[ed] out" by William R. Berkeley.[9]

---

[5] https://www.cravath.com/echesler/.

[6] New York Univ., "*I Owe My Career to the Scholarship I Received*," youtube.com (Oct. 24, 2013), https://www.youtube.com/watch?v=pU_Dez56C1o.

[7] https://web.archive.org/web/20100628111113/http://www.cravath.com:80/echesler/.

[8] Harris Mateen, *Potential NYU Chairman Evan Chesler Talks The Past And Future of NYU*, NYULocal (May 8, 2014) (calling Chesler a likely candidate to replace outgoing NYU Chairman and referring to Chesler as "the man who may soon be responsible for choosing NYU's next president[.]"), https://nyulocal.com/potential-nyu-chairman-evan-chesler-talks-the-past-and-future-of-nyu-51db7f778246, attached as Ex. 5; Geraldine Fabrikant, *The Power Broker at N.Y.U.*, N.Y. TIMES (April 11, 2014), available at:) (calling Chesler "a leading candidate[]" to replace Chairman, who the article describes as "[t]he power broker of N.Y.U."), https://www.nytimes.com/2014/04/13/education/edlife/the-power-broker-of-nyu.html, attached as Ex. 6.

[9] James Covert, *Insurance tycoon gets nod to chair NYU board of trustees*, N.Y. POST (June 12, 2014),

NYU's Charter provides that "*[t]he property and estate of New York University are vested in, and all of its rights, powers, and privileges shall be exercised by, its Board of Trustees*."[10] Thus, Mr. Chesler is a Principal of NYU. The members of the Board of Trustees are NYU. Under NYU's bylaws, the Board's mandate is to "establish policy and strategic direction for the University and oversee the business and affairs of the University. The Board may exercise all powers and take all actions not prohibited by law, the Charter or these Bylaws."[11] The bylaws further provide that "[t]he University will have one class of members, which will consist of those persons serving as the voting Trustees of the Board." *Id*. at 2. Such voting Trustees "are the members of the University for the purposes of any statutory provision or rule of law relating to members of a non-stock, not-for-profit education corporation." *Id*. Mr. Chesler's role is even greater than other board members. Chesler serves on the Executive Committee of NYU's Board of Trustees (Ex. 3), which "will have and exercise all of the powers and authority of the Board," (Ex. 9, NYU Bylaws at 15). Chesler is also a member of the Board's Compensation, Development, and Finance Committees.[12]

## II. The fiduciaries' conduct and removal—responsibilities of NYU's Board of Trustees—were central to the case.

Plaintiffs are six NYU and NYU School of Medicine professors who participate in two retirement plans sponsored by NYU.[13] Am. Compl., Doc. 39 ¶¶19–25. Their claims directly

---

https://nypost.com/2014/06/12/insurance-tycoon-gets-nod-to-chair-nyu-board-of-trustees/, attached as Ex. 7.
[10] New York University, "The Charter" at 2,
https://www.nyu.edu/content/dam/nyu/generalCounsel/documents/NYU-Charter-CURRENT-2011-12-13.pdf,
attached as Ex. 8 (emphasis added).
[11] Bylaws of New York University, Amended and Restated: Effective June 13, 2018 at 4 ("NYU Bylaws"),
https://www.nyu.edu/content/dam/nyu/generalCounsel/documents/University-Bylaws-Effective-6-13-2018.PDF,
attached as Ex. 9.
[12] NYU Board of Trustees, Committees, https://www.nyu.edu/about/leadership-university-administration/board-of-trustees/committees.html, attached as Ex. 10 and Finance Committee excerpt as Ex. 11.
[13] The "Plans" are the New York University Retirement Plan for Members of the Faculty, Professional Research Staff and Administration ("Faculty Plan"), and NYU School of Medicine Retirement Plan for Members of the Faculty, Professional Research Staff and Administration ("School of Medicine Plan"). Doc. 39, Amended Complaint

implicate NYU's Board of Trustees, which has ultimate responsibility for the conduct at issue in this case.

In the Plans' governing documents, NYU is listed as the Plans' "named fiduciary" in accordance with 29 U.S.C. §1102(a). Doc. 46-1 at 5 (§2.1), 26 (§7.2); Doc. 46-2 at 6 (§2.1), 38 (§7.2). As a fiduciary, NYU is subject to ERISA's strict fiduciary standards, duties described by the Second Circuit as "the highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982). Plaintiffs contend that NYU, through its Trustees, breached their duty to the Plans' participants by causing them to pay excessive fees and by retaining certain imprudent investment options. Doc. 39 ¶¶3–4.

In April 2009, to handle the day-to-day administration of the Plans, NYU, acting through the Executive Committee of the Board of Trustees, created a fiduciary committee consisting of NYU executives, known as the "Retirement Plan Committee" ("Committee"). Doc. 258-8 (PX0533), attached as Ex. 12. Under the Committee's charter, *the Board of Trustees, including Mr. Chesler*, is responsible for monitoring the Committee's performance as fiduciaries. *Id*. (NYU00034912 at 14–15, 18–21); Ex. 13 at 2 (NYU0094316).[14] *The Board of Trustees, including Mr. Chesler*, is also responsible for determining whether to remove or replace any member of the Committee, which is what Plaintiffs have contended from the time of filing the complaint should be done. Ex. 13 at 1 (NYU0094315). The Retirement Committee is required to report to *the Board of Trustees, including Mr. Chesler*, on at least an annual basis "on the actions taken by the Committee to discharge its duties under the Plans." *Id*. at 2. Moreover, "*the Finance Committee,*" *including Mr. Chesler*, "of the Board of Trustees of [NYU]" is responsible for reviewing and accepting any investment policy statement ("IPS") to evaluate, select, and monitor the Plans'

(AC) ¶¶19–25. ¶¶1, 9, 13.

[14] An identical version of Ex. 13 was admitted as PX1210.

investment options. *Id.* (emphasis added); *see* Ex. 11. An issue at trial was whether compliance with the IPS was carried out by the Retirement Plan Committee.[15] The Committee's Charter requires the Board of Trustees to approve any discretionary changes to the Plans involving "more than modest additional costs," including those that would cost more than $3 million or result in an annual increase in cost of over $2 million. Ex. 13 at 2 (NYU0094316).

### III. Mr. Chesler and other Cravath members were deeply involved with NYU in additional ways.

Aside from his roles on NYU's Board of Trustees, Mr. Chesler has been deeply involved with NYU in numerous additional capacities. In 2014, Chesler was a member of the NYU Presidential Search Committee,[16] which appointed NYU's current president in January 2016.[17] In 2013, Chesler donated $3 million to NYU and was selected to lead the NYU Momentum Campaign, which seeks to raise $1 billion in endowment funds.[18] Literature regarding the Momentum Campaign, uses Mr. Chesler as the face of the program.[19] He was also part of a group that committed $75 million as a leadership gift to the endowment campaign. Ex. 18.

---

[15] Doc. 321, Pt. 2, Plaintiffs' Closing Argument Slides at 42, excerpt attached as Ex. 14; Doc. 272-15 – Declaration of Dr. Buetow at 26–27, 49, excerpt attached as Ex. 15.

[16] *The Members of the NYU Presidential Search Committee* (July 2, 2014), https://www.nyu.edu/about/leadership-university-administration/board-of-trustees/the-members-of-the-ny-presidential-search-committee.html, attached as Ex. 16.

[17] *The Appointment of Andrew Hamilton as 16th President of NYU* (Mar. 18, 2015), https://www.nyu.edu/about/leadership-university-administration/board-of-trustees/the-appointment-of-andrew-hamilton-as-the-16th-president-of-nyu.html, attached as Ex. 17.

[18] *NYU Launches $1 Billion Campaign For Scholarship Aid* (Oct. 19, 2013), https://www.nyu.edu/about/news-publications/news/2013/october/nyu-launches-1-billion-campaign-for-scholarship-aid.html, attached as Ex. 18; Melanie Grayce West, *Paying It Backward: NYU Alum Funds Scholarships*, WALL ST. J. (Oct. 17, 2013), https://www.wsj.com/articles/paying-it-backward-nyu-alum-funds-scholarships-1382060219, attached as Ex. 19; NYU Presidential Communications, *The Momentum Campaign to Raise Funds for Financial Aid* (Oct. 3, 2013), https://www.nyu.edu/about/leadership-university-administration/office-of-the-president/communications/the-momentum-campaign-to-raise-funds-for-financial-aid.html, attached as Ex. 20.

[19] *Momentum, A Scholarship Campaign for NYU*, *The Mission* (photo and statement of Chesler: "I may be a member of NYU's Board of Trustees now, but I once was a high school student who couldn't have attended NYU if not for the generous scholarship I received. NYU put me on a course to make an impact in my profession—and bring my experience back to my alma matter."), https://www.nyu.edu/about/giving/momentum/mission.html, attached as Ex. 21; *Momentum: A Scholarship Campaign for NYU* at pdf page 6 (same) (https://www.nyu.edu/content/dam/nyu/univDvlpmntAlumRltns/documents/giving/momentum/momentum-brochure.pdf, attached as Ex. 22.

In 2013, Chesler served on the steering committee of the Joint Committee of NYU Stakeholders.[20] Still another role Mr. Chesler holds is Co-Chair of the Trustee Development Committee. Ex. 10, Ex. 17. Chesler also serves as the Chairman of NYU's Board of Overseers of the Faculty of Arts and Science. Ex. 3.

In addition, Mr. Chesler is a member of the Board of Trustees of the NYU School of Law and is a member of that Board's Executive Committee as well. Ex. 3.

Mr. Chesler is not the only Cravath firm member serving on the Board of Trustees of NYU Law School. Retired Cravath partner Thomas R. Brome is the Board's Vice Chairman, and Cravath Senior Counsel George T. Lowy is a Board member.[21]

In 2011, Mr. Chesler served as chairman of a special strategy committee of NYU School of Law's Board of Trustees to revise the curriculum.[22] In 2013, he served on an NYU Law dean search committee.[23] Further, he is President of the NYU Law Institute of Judicial Administration Board of Advisors.[24] Mr. Chesler is also an adjunct professor of law at NYU School of Law, and has been an adjunct faculty member at NYU College of Arts and Science. Ex. 3.

## IV. The relationship between former Judge Forrest, Cravath Chairman and NYU Trustee Chesler, and the Cravath firm.

Judge Forrest was nominated to serve as a U.S. District Judge in 2011. Ex. 30 (Cravath

---

[20] Report from the first meeting of the Joint Committee of NYU Stakeholders (Nov. 6, 2013), https://www.nyu.edu/about/leadership-university-administration/board-of-trustees/report-from-the-first-meeting-of-the-joint-committee-of-nyu-stakeholders.html, attached as Ex. 23.

[21] NYU Law, Board of Trustees, http://www.law.nyu.edu/about/trustees, attached as Ex. 24.

[22] *A Blue Chip Change Agent*, NYU Law Magazine (Sept. 6, 2012), https://blogs.law.nyu.edu/magazine/2012/a-blue-chip-change-agent/, attached as Ex. 25; Peter Lattman, *N.Y.U. Law Plans Overhaul of Students' Third Year*, THE NEW YORK TIMES (Oct. 16, 2012), available at: https://dealbook.nytimes.com/2012/10/16/n-y-u-law-plans-overhaul-of-students-third-year/?mtrref=www.google.com&gwh=3AA83ACB208BC985A4661F0804F43182&gwt=pay, attached as Ex. 26; N.Y.U. School of Law Board of Trustees Strategy Committee, *Report and Recommendations* (Oct. 5, 2012), http://www.law.nyu.edu/sites/default/files/ECM_PRO_073898.pdf, attached as Ex. 27.

[23] *Trevor Morrison, constitutional scholar, named 17th dean of NYU School of Law* (Apr. 4, 2013), http://www.law.nyu.edu/news/trevor_morrison_new_dean, attached as Ex. 28

[24] NYU Law Institute of Judicial Administration, Board of Advisors, http://www.law.nyu.edu/centers/judicial/boardofdirectors, attached as Ex. 29.

bio).[25] Between her graduation from NYU School of Law in 1990 and her government service, Forrest "spent 20 years as a litigator at Cravath." *Id.*

During her 20-year tenure at Cravath before serving on the bench, Ms. Forrest had a close working relationship with Mr. Chesler. In her first years at Cravath, Ms. Forrest was paired with Mr. Chesler. Charles D. Ellis, *What it Takes: Seven Secrets of Success from the World's Greatest Professional Firms* at 72, Wiley & Sons, Inc. (Feb. 11, 2013) (excerpt attached Ex. 31). Describing the training she received from Mr. Chesler and Cravath partner Tom Barr, Ms. Forrest stated that the opportunity to learn from Chesler and Barr was "a great compliment" that made her "feel like a star." *Id.* Ms. Forrest and Mr. Chesler served as co-counsel in numerous cases in trial and appellate courts.[26] In 2010, they were both listed among "The 10 Most Powerful Partners at Cravath."[27] At her 2011 confirmation hearing before the Committee on the Judiciary of the U.S. Senate, Ms. Forrest noted that three Cravath partners were with her in attendance, including "Evan Chesler, the presiding partner" of the firm.[28]

After she left the firm, Cravath has been paying Judge Forrest $95,715 per quarter—over $380,000 annually, in addition to her judicial salary, in an arrangement that was scheduled to last for 10 years, until 2021.[29]

---

[25] https://www.cravath.com/kforrest/.

[26] *See e.g.*, *In re: Aimster Copyright Litig.*, 334 F.3d 643 (7th Cir. 2003) (Chesler and Forrest among counsel for appellees), https://law.justia.com/cases/federal/appellate-courts/F3/334/643/636193/, attached as Ex. 32; Reply Mem. at 10, No. 01-8933 (N.D.Ill. Feb. 28, 2002) (Chesler and Forrest on signature block), https://www.eff.org/files/filenode/Aimster/district_plaintiff_reply_brief.pdf, excerpt attached as Ex. 33; *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 520 (4th Cir. 2003) (Chesler and Forrest were counsel to Amicus Netscape).

[27] Erin Geiger Smith, *The 10 Most Powerful Partners at Cravath* (Feb. 10, 2010), https://www.businessinsider.com/the-10-most-powerful-partners-at-cravath-2010-2?op=1, copy attached as Ex. 34.

[28] S. Hrg. 112-72, Pt. 3, Confirmation Hearings on Federal Appointments, at 127 (June – July 2011), https://ia601604.us.archive.org/15/items/gov.gpo.fdsys.CHRG-112shrg76350/CHRG-112shrg76350.pdf, excerpt attached as Ex. 35.

[29] *See* U.S. Senate Committee on the Judiciary, Questionnaire For Judicial Nominees at 32 (Question 20, Deferred Income/Future Benefits), https://ia601604.us.archive.org/15/items/gov.gpo.fdsys.CHRG-112shrg76350/CHRG-112shrg76350.pdf, excerpt attached as Ex. 36.

**IV. Testimony of numerous witnesses and the Court's own comments at trial implicated NYU's Board of Trustees, including Cravath's Chairman, Mr. Chesler.**

Plaintiffs filed this action on August 9, 2016, alleging fiduciary breaches and seeking removal of fiduciaries, which was the responsibility of NYU's Board of Trustees, including Mr. Chesler. Doc. 1; Doc. 39 at 115–116 (Prayer for Relief).

When the case was first assigned to Judge Forrest, she notified the parties that she would "be serving as an adjunct professor at New York University School of Law for the fall semester this year," and did "not believe that this poses any issues as to whether it should preside over this action," but that if either side disagreed, to inform the Court. Doc. 5.[30] Given that the adjunct professorship was former Judge Forrest's only ongoing known relationship to NYU at the time, Plaintiffs did not object.

Former Judge Forrest held an eight-day bench trial that commenced on April 16, 2018. The trial involved claims that NYU breached its duty of prudence in two ways: (1) causing the Plans' participants—NYU employees and retirees—to pay excessive recordkeeping fees, and (2) failing to properly monitor and remove certain imprudent investment options, all costing the employees and retirees hundreds of millions of dollars. Doc. 348 at 2–3.

Direct testimony in the bench trial was submitted by declaration and deposition designation. The following summarizes the testimony of numerous witnesses who expressly testified about the NYU Board of Trustees' role in the alleged breaches, as well as the discussion of the Board's oversight role by counsel and the Court.

---

[30] *Cf. Andros Compania Maritima, S.A. v. Marc Rich & Co., A.G.*, 579 F.2d 691, 699 (2d Cir. 1978) ("Generally, a federal judge may not state for the record possible disqualifying circumstances and ask the parties to decide whether they want him to continue."); *United States v. Kelly*, 888 F.2d 732, 745–46 (11th Cir. 1989) (finding the practice "of calling upon counsel to express their views" on recusal undesirable due to "potential coercive elements").

**A.** **Plaintiffs' expert Dr. Gerald W. Buetow's testimony regarding NYU Trustees' direct role in the conduct underlying Plaintiffs' fiduciary process and the recordkeeping claim.**

Plaintiffs' primary expert witness, Dr. Gerald W. Buetow, testified that his assignment was to "provide expert analysis and opinions related to the fiduciary process and investment decisions made by [NYU] and its officers *and trustees*." Trial Decl. of Gerald W. Buetow, Jr., Ph.D., CFA, CIPM at 2 (Doc. 279-3) (emphasis added). As Plaintiffs' recordkeeping fee claims, due in part to the fact that the Plans had two recordkeepers and failing to consolidate, as recommended, to one (Doc. 348 at 29), Buetow testified that because "[t]he *NYU Board of Trustees* is *the only entity authorized to amend both Plans*," "*the decision to consolidate to a single recordkeeper is ultimately one for NYU's Board of Trustees*." Buetow Decl., 279-3 at 14 (emphasis added). The Retirement Plan Committee "deferred to Senior Leadership and/*or the Board of Trustees at [NYU]* or the Medical School for critical decisions related to the Plans, including the decision to consolidate recordkeepers." *Id.* at 13–14 (emphasis added).

**B.** **Plaintiffs' expert Michael J. Geist's testimony regarding the role of the NYU Trustees' direct role in the conduct underlying Plaintiffs' recordkeeping claim.**

Plaintiffs' expert witness, Michael Geist, similarly provided expert analysis regarding "the fiduciary process and decisions made by [NYU] and its officers *and trustees* regarding the [Plans'] recordkeeping and administrative services." Trial Declaration of Michael J. Geist, Doc. 279-4 at 2 (emphasis added). Geist specifically testified that "[w]hile the *Board of Trustees*" of NYU created the Retirement Committee to administer the Plans, "*some amount of discretion was retained by the Board* and other officers of NYU." *Id.* at 26 ¶69 (emphasis added).

**C.** **The testimony of Mark Petti—NYU's Executive and Rule 30(b)(6) designee— that NYU's Board of Trustees retained authority over fiduciaries.**

Geist's opinion was based on the testimony of NYU's Rule 30(b)(6) designee and Associate Director of Retirement Plans and Benefits Mark Petti. *Id.* Petti considered the Retirement Plan

Committee and NYU to be "one and the same," meaning that NYU, through the Board of Trustees, retained authority over the Committee. *Id.* (quoting Petti Dep. at 82:25–83:11). As Petti elaborated at deposition in an excerpt filed before Judge Forrest in a related case, "the Compensation Committee of the Board of trustees"—of which Mr. Chesler is a member—was the specific Board of Trustees committee that established the Retirement Plan Committee.[31] Ex. 12 at 10 (NYU 0034913).

### D. The testimony of Marcia Wagner—Defendant's expert—that fiduciaries report to NYU's Board of Trustees.

Defendants' expert Marcia Wagner also discussed the NYU Board of Trustees' direct oversight of the Plans. Wagner testified that the Retirement Plan Committee's Charter required it to "annually report to *NYU's Board of Trustees* and Advisory Board on the actions it has taken to discharge its duties under the Plans." Expert Rpt. of Marcia S. Wagner, Doc. 134-4 at 9 (¶28) (emphasis added). [32] Wagner further testified that "[u]nder the Charter, the Committee has the express duty to evaluate, select and monitor the Plans' investment options in accordance with an investment policy approved by the NYU Investment Committee and *Board of Trustees*." *Id.* (emphasis added).

### E. The testimony of Susanna Hollnsteiner—NYU's Retirement Manager—that NYU's Board of Trustees had to approve recommendation of consolidation to a single recordkeeper, instead of two, to reduce recordkeeping costs.

As NYU's Manager of Retirement Plans for 27 years, Doc. 283-1 at 37–38 (7:3–23, 13:14–19), Ms. Hollnsteiner acknowledged that senior NYU management teams—*which she understood meant the Board of Trustees*— had to approve a 2010 recommendation to

---

[31] Petti Dep. at 61:4–19, Doc. 150-1 at 9 in *Sacerdote v. N.Y. Univ. School of Med.*, No. 17-8834 (S.D.N.Y.), filed April 11, 2018.
[32] Wagner incorporated her expert reports into her trial declaration. Doc. 272-27 ¶3; Tr. at 1299:18–1300:22.

consolidate to a single recordkeeper. Doc. 283-1 at 62 (106:11–109:15).[33] When Hollnsteiner

retired nearly seven years later, recordkeeper consolidation had still not been approved for the

Faculty Plan, which Plaintiffs claimed was a breach. *Id*. at 62–63 (109:16–110:12).

**F.**   **The testimony of named Plaintiff Marie Monaco—38-year School of Medicine Professor and representative of Faculty Senate Councils—regarding the Trustees' responsibility for administration of the Plans.**

Plaintiff Marie Monaco, a faculty member in the Department of Neuroscience and

Physiology of NYU School of Medicine since 1980 and a longtime elected member of two

Faculty Senate Councils, also testified about the Board of Trustees' responsibility for the Plans.

Monaco Trial Decl., Doc. 272-14 ¶¶2, 7. Monaco explained that during the time she served on

various benefits and finance committees as a member of the faculty councils, retirement plans

were not discussed because "it was everyone's understanding that this was controlled by NYU,

and that *the board of trustees was responsible, basically, for administering this plan*." Tr. at

1050:14–25 (emphasis added).

Monaco's testimony is consistent with the testimony of named Plaintiff and NYU professor

of Media, Culture, and Communications Mark Crispin-Miller, who similarly testified that he

relied on *NYU's Board of Trustees* to prudently manage the Plans. Crispin-Miller explained that

as someone who is "not at all financially savvy," he relied on NYU's representations to him "and

others on the faculty that *such [retirement] programs at NYU are carefully monitored by our

board of trustees who are outstanding fiduciary guardians of faculty and student welfare*," and

"left it to them to make the most prudent decisions on our behalf." Ex. 37 at 50:17–51:10.

**G.**   **Judge Forrest expressly recognized the Board of Trustees' role in setting up the Retirement Committee comprised of fiduciaries.**

Judge Forrest's comments demonstrate awareness of the Board of Trustees' role. At the final

---

[33] The Court overruled Defendants' objections to this testimony. Doc. 348 at 26 n.39.

pretrial conference on April 11, Plaintiffs' counsel expressed concern that NYU would attempt to argue that it was not responsible for the actions of the Retirement Plan Committee, given that NYU is the sole defendant and the Court had denied leave to add the Committee and its members, all of whom are NYU officers and executives, as additional defendants. Doc. 295 at 47:11–48:8. Judge Forrest explained her understanding that NYU remained responsible for the Committee: "I certainly am proceeding on the basis that the *NYU board of trustees set up a retirement committee* … and that NYU has people who are on that committee" who act on behalf of NYU. *Id*. at 50:10–16. At trial, NYU's counsel confirmed that Judge Forrest's understanding was correct, representing to the Court that "New York University is not … and has never" taken the position that it is not responsible for the conduct of the Committee. Tr. at 418:1–23.

Further, at trial, Judge Forrest inquired of Retirement Plan Committee Co-Chair Patricia Halley as to whether there was "a formal approval process" to seek "board approval of the IPS." Tr. 1005:13–17. The Charter requires the *Finance Committee of the Board of Trustees to do so*. Doc. 121-16 at 2. The Court ultimately ruled on the issue of proper approval of the IPS, rejecting Plaintiffs' assertion that the IPS was never properly approved or adopted. Doc. 348 at 24 n.34.

Counsel for the parties also brought the Board of Trustees' role to Judge Forrest's attention in opening statements and closing arguments. This demonstrates that the prudence of the Board of Trustees' actions, including Mr. Chesler's, was central to the case. In opening statement, Plaintiffs' counsel noted the Board's long delay in forming the Retirement Plan Committee, and that "[i]t took over two years for *the board of trustees of NYU* to officially recognize the committee and delegate authority to it." Tr. 20:4–7. Plaintiffs' counsel raised the same point in closing. *Id*. at 1803:16–24. Moreover, counsel for NYU itself stated in opening that "[i]n 2008, NYU formed a retirement committee, and a charter was approved by the *board of trustees*

*executive committee* of New York University"—of which Cravath Chairman Mr. Chesler is a member. *Id.* at 75:7–12 (emphasis added); *see* Ex. 3, Ex. 10.

## V. Former Judge Forrest was considering the possibility of employment with Cravath and rejoining the partnership with NYU Trustee Chesler while this case against NYU was under submission.

### A. While the case was under submission and before a decision, Judge Forrest announced that she was leaving the bench.

On May 16, 2018, the Court heard closing arguments and took the case under submission. Doc. 342 (Transcript). On July 18, 2018, while the case was under submission and before a decision, the New York Law Journal and other sources reported that Judge Forrest was retiring from the federal bench.[34] Although Judge Forrest had no immediate comment, two judges in the Southern District of New York confirmed the departure.[35] While an anonymous source speculated that a return to Cravath was a "distinct possibility," a spokesperson for Cravath declined to comment as to whether Forrest was returning to the firm. Ex. 38; Ex. 39.[36] No public statement was made regarding when the decision to leave the bench was made.

### B. After announcing she was leaving the bench, Judge Forrest ruled against Plaintiffs and in favor of NYU on all claims.

On July 31, 2018, Judge Forrest issued her opinion entering judgment for NYU on all claims. Doc. 348. The opinion specifically noted that Dr. "Buetow was retained by plaintiffs to opine on the fiduciary process and investment decisions made by NYU and its officers *and trustees.*" *Id.* at 66 n.110 (emphasis added). The opinion directly addressed the conduct of the

---

[34] Colby Hamilton, *U.S. Judge Katherine Forrest Retiring From Federal Bench in Manhattan*, N.Y. LAW J. (July 18, 2018), https://www.law.com/newyorklawjournal/2018/07/18/us-judge-katherine-forrest-retiring-from-federal-bench-in-manhattan/?slreturn=20180825140312, attached as Ex. 38.

[35] Pete Brush, *SDNY Judge Forrest, Known For Tough Sentences, To Retire*, LAW360 (July 18, 2018), https://www.law360.com/articles/1064626/sdny-judge-forrest-known-for-tough-sentences-to-retire, attached as Ex. 39.

[36] *See also* Kathryn Rubino, *Breaking: S.D.N.Y. Judge Forrest is Leaving the Bench*, Above the Law (July 18, 2018) (noting N.Y. Law Journal report of "speculation" Forrest would return to Cravath), https://abovethelaw.com/2018/07/breaking-s-d-n-y-judge-katherine-forrest-is-leaving-the-bench/, attached as Ex. 40.

Committee members for whom the Board of Trustees had responsibility for oversight and removal. Doc. 348 at 3, 6 & n.8, pp. 24–26 & n. 36; *see also* Tr. at 1780:10–13.

Judge Forrest found "that several members displayed a concerning lack of knowledge relevant to the Committee's mandate," that the longtime Co-Chair of the Retirement Committee, Margaret Meagher ,"*does not have the depth of knowledge appropriate to oversee a plan the size of the*" Plans [37] and did not understand she had a duty to determine whether the Plans' fees were reasonable, She also found that Committee member Nancy Sanchez (Meagher's boss) lacked a "satisfactory understanding of … her role as a fiduciary" and "basic concepts relating to the Plans," and otherwise appeared to be unwilling or unable "to serve effectively on the Committee." *Id*. at 3, 6 n.9, 24–26 & n.36 (emphasis added). As Judge Forrest stated at trial, the performance of these members fell short of the standard expected of fiduciaries of a $6 billion retirement program, which "deserves the best of the best." Tr. at 1891:17–1892:13. Despite these findings of serious failures to fulfill fiduciary duties, Judge Forrest nonetheless ruled in favor of NYU. Doc. 348 at 3. As noted, Plaintiffs' complaint sought removal of any fiduciaries found to be in breach, also a direct responsibility of NYU's Board of Trustees. Doc. 39 at 115–116. This necessarily implicates the Board of Trustees and Mr. Chesler's discharge of their oversight and removal responsibilities. Based on the trial findings regarding the two fiduciaries' failures, Plaintiffs have renewed that request in a pending post-trial motion seeking to remove Meagher and Sanchez as fiduciaries. Docs. 350, 351.

**C.     Forty three days after her trial ruling in favor of NYU, former Judge Forrest rejoined Cravath and resumed her partnership with firm Chairman and NYU Trustee Mr. Chesler, stating that returning to Cravath was "an easy choice" and she did not consider employment with any other firm.**

On September 12, 2018—43 days after the trial decision in favor of NYU—Cravath issued a

---

[37]     The Plans had a combined $7.7 billion in assets as of September 30, 2017. Doc. 348 at 18 n.28.

press release announcing that Forrest had rejoined Cravath as a partner.[38] Former Judge Forrest stated that while it was a "hard decision" to leave the bench, "it was an easy decision" to return to Cravath. Ex. 2. Indeed, Cravath "*is the only firm she said she considered joining.*" Ex. 1, Thus, former Judge Forrest made it clear that no other firms were considered. In fact, she stated she was "thrilled to be coming home" to Cravath. Ex. 41.

## ARGUMENT

### I. Disqualification under Section 455(a) does not require an actual conflict.

#### A. The standard for disqualification is whether a judge's partiality could reasonably be questioned by the appearances of the situation.

A judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. §455(a). The test for disqualification is whether a "reasonable person, knowing all the facts, [would] conclude that the trial judge's impartiality could reasonably be questioned." *United States v. Lovaglia*, 954 F.2d 811, 815 (2d Cir. 1992); *United States v. Bayless*, 201 F.3d 116, 127 (2d Cir. 2000).

Whether the judge is actually biased is irrelevant; "the goal of section 455(a) is to avoid even the appearance of partiality." *Chase Manhattan Bank v. Affiliated FM Ins. Co.*, 343 F.3d 120, 128 (2d Cir. 2003); *Liljeberg*, 486 U.S. at 860. The appearance of impartiality is required as a matter of due process. *See, e.g.*, *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 825 (1986) ("The Due Process Clause 'may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way, justice must satisfy the appearance of justice.'") (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)).

---

[38] *Katherine B. Forrest, Former U.S. District Judge For The Southern District Of New York, Rejoins Cravath* (Sept. 12, 2018),
https://www.cravath.com/files/Uploads/Documents/publications/2483169_1.PDF, attached as Ex. 41.

It is the judge's duty under §455 "to ensure any potentially disqualifying information is brought to the attention of the litigants"; it is not the parties' duty to investigate the judge's background. *Listecki v. Official Comm. of Unsecured Creditors*, 780 F.3d 731, 750 (7th Cir. 2015); 28 U.S.C. §455(c). "Both litigants and counsel should be able to rely upon judges to comply with their own Canons of Ethics." *Id*. (quoting *Am. Textile Mfrs. Inst., Inc. v. Limited, Inc*., 190 F.3d 729, 742 (6th Cir. 1999)).

Because the purpose of §455 is to engender public confidence in the judicial system, the hypothetical reasonable person under §455(a) is someone outside the judicial system. Judges, who are "accustomed to the process of dispassionate decision making and keenly aware of their Constitutional and ethical obligations to decide matters solely on the merits, may regard asserted conflicts to be more innocuous than an outsider would." *In re Kensington Int'l Ltd*., 368 F.3d 289, 303 (3d Cir. 2004) (quoting *United States v. DeTemple*, 162 F.3d 279, 287 (4th Cir.1998)); *see also United States v. Jordan*, 49 F.3d 152, 156–57 (5th Cir.1995) (remarking that average person on street "is less likely to credit judges' impartiality than the judiciary"); *In re Mason*, 916 F.2d 384, 386 (7th Cir.1990) (noting that lay observer is less inclined to presume judge's impartiality than members of judiciary).

## B.     Any "doubt must be resolved in favor of recusal."

Courts recognize the critical importance of the appearance of impartiality, consistently ruling that, in a close case, any "doubt must be resolved in favor of recusal." *Murray v. Scott*, 253 F.3d 1308, 1310 (11th Cir. 2001); *In re United States (Franco)*, 158 F.3d 26, 30 (1st Cir. 1998); *Nichols v. Alley*, 71 F.3d 347, 352 (10th Cir. 1995); *United States v. Dandy*, 998 F.2d 1344, 1349 (6th Cir. 1993); *see also United States v. Wolfson*, 558 F.2d 59, 63 & n.13 (2d Cir. 1977) (enactment of §455(a) "is designed to negate the 'duty to sit'" recognized under prior version of statute).

**C. The need to "preserve the appearance of impartiality is especially pronounced" in a bench-tried case.**

Strict adherence to §455(a) and the need to "preserve the appearance of impartiality is especially pronounced" in a bench-tried case, because the judge is the sole fact-finder and "will be deciding each and every substantive issue at trial." *Alexander v. Primerica Holdings*, 10 F.3d 155, 163, 166 (3d Cir. 1993); *accord Chase Manhattan*, 343 F.3d at 129 (discussing significance of judge having "presided over a bench trial and rendered a decision on the merits").

**D. Rule 60(b)(6) authorizes a court to vacate a judgment based on previously unknown facts requiring recusal.**

Where the grounds for disqualification are not discovered until after judgment and after the 28-day period to move for a new trial under Rule 59, the appropriate procedure is a motion to vacate the judgment under Rule 60(b). *See Liljeberg*, 486 U.S. at 862–64, 866–67. *Chase Manhattan*, 343 F.3d at 124–25, 128–32; Fed.R.Civ.P. 60(b)(6). In *Liljeberg*, the plaintiff did not learn of the facts requiring the trial judge's disqualification until 10 months after the Fifth Circuit had affirmed the original trial judgment in favor of the defendant. 486 U.S. at 850–51. The Supreme Court held that a motion under Rule 60(b)(6) was the proper means to raise the disqualification issue, and held that a new trial was necessary given that a reasonable observer informed of the facts would have questioned the trial judge's impartiality. *Id.* at 861–70. The Second Circuit reached a similar conclusion in *Chase Manhattan*, 343 F.3d at 128–32.

When a Rule 60(b) motion is filed while an appeal is pending, the district court may issue an indicative ruling. Fed.R.Civ.P. 62.1(a). If the Court states that it "would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue," Fed.R.Civ.P. 62.1(a)(3), the court of appeals may then remand for the district court to rule on the motion. Fed.R.Civ.P. 62.1(c).

II. **Judge Forrest was disqualified from presiding over this case once she decided to leave the bench because she was considering as her only choice the possibility of an employment relationship at a firm chaired by a NYU Trustee with direct responsibility for monitoring the fiduciary conduct at issue at the same time she was deciding a case against NYU.**

"[A] judge cannot have a prospective financial relationship with one side yet persuade the other that he can judge fairly in the case." *Pepsico, Inc. v. McMillen*, 764 F.2d 458, 461 (7th Cir. 1985). When a prospective employment relationship exists, the judge's impartiality is reasonably questioned. *Id.*; *In re Cont'l Airlines Corp.*, 901 F.2d 1259, 1261–63 (5th Cir. 1990); *see also DeNike v. Cupo*, 958 A.2d 446, 456–57 (N.J. 2008) (under rules of professional conduct, "judges may not discuss or negotiate for employment with any parties or attorneys involved in a matter in which the judge is participating personally and substantially.") (emphasis added).

In *Pepsico*, the Seventh Circuit issued a writ of mandamus directing the trial judge to recuse himself when a recruiter working on the judge's behalf mistakenly contacted both law firms in a pending antitrust action to discuss employment of the judge, who had announced his intent to retire from the bench. 764 F.2d at 459–61. Even though there was no allegation of actual bias, and there was "no realistic prospect" that the judge would ever actually work for either law firm, the court was "nevertheless forced to the conclusion" than an objective, disinterested observer "would entertain significant doubt that justice would be done" absent recusal. 764 F.2d at 460–61. The court reasoned that "a judge cannot have a prospective financial relationship with one side yet persuade the other than he can judge fairly in the case." *Id.* at 461. Given that the prospective relationship was with both sides of the case, "the element of bias [was] less distinct" than if the prospective relationship was with only one side, but recusal was still required because public confidence in the "dignity and independence of the judiciary" is undermined when the judge's role is as "a suppliant for employment." *Id.*

Here, Mr. Chesler is a Principal of one side—NYU—and Judge Forrest had a prospective

relationship with him and the firm he chaired at the time she rendered her decision. Moreover, her statement that she did not consider any other employment and that she was "thrilled" to be "coming home" unequivocally demonstrate that the Cravath firm was her intended destination from at least that moment. These facts, plus the fact that Judge Forrest went directly from the bench to immediate partnership at the Cravath firm, also suggest that Mr. Chesler and the Cravath firm were considering re-hiring Judge Forrest, once she announced she was retiring on July 18, 2018.

In *Continental Airlines*, a bankruptcy judge who had announced his intention to enter private practice issued summary judgment in favor of Continental and adverse to its creditors, and entered an order approving a fee request of $700,000 to Continental's counsel, the Sheinfeld firm. 901 F.2d at 1261–62. The day after the fee award, Sheinfeld contacted the judge about joining their partnership. *Id*. at 1262. About a month later the judge agreed to join the firm, and began his employment just over two months after entering the orders in favor of Continental and Sheinfeld. *Id.* The Fifth Circuit held that the judge's partiality could reasonably be questioned, even though there was no evidence that the judge was seeking employment with the Sheinfeld firm when he entered the orders, and no evidence that the judge knew prior to his rulings that the Sheinfeld firm was considering making him an employment offer. *Id.* The court reasoned that "[t]he close coupling of Judge Roberts's rulings with the employment offer and his acceptance of it," "*does create the appearance that he may have been pursuing employment with Sheinfeld while he was presiding over the case*." *Id.* (emphasis added).

While the judge obviously was not "required to stand recused before discovering that he was being considered for employment," "when an offer of employment was received the day after his approval of $700,000 in legal fees to the firm making the offer," the judge "was 'required to take

steps necessary to maintain public confidence in the judiciary,'" meaning he should have either rejected the offer or "*stood recused and vacated the rulings made shortly before the offer was made.*" *Id.* at 1262–63 (quoting *Liljeberg*, 486 U.S. at 861) (emphasis added). Although the court was "confident that Judge Roberts committed no substantive impropriety," it "nevertheless conclude[d] that recusal was mandated by the appearances of the situation." *Id.* at 1263.

Here, unlike Continental, where the prospective employment arose after the decision, Judge Forrest had a disqualifying relationship because of her prospective employment relationship with Cravath and Mr. Chesler at the time she was deciding the case. As an NYU Trustee and member of the Board's Executive Committee, NYU's Charter specifically states that Mr. Chesler is a member of NYU, effectively a principal of the University, and part of a Committee with full authority to act for the University. The conduct of the Board, including Mr. Chesler, and even more so, the Executive Committee, was directly at issue and went to the heart of the case, given that the Board was responsible for (1) monitoring and removing Committee members, (2) approving the changes to the Plans that would have been necessary to consolidate recordkeepers, (3) approving the IPS used by the Committee to make investment decisions, through the Finance Committee of which Mr. Chesler was a member, and (4) approving the Plans' investment options, through the Investment Committee. While the case was before her as the sole trier of fact and before she rendered a decision as to whether to hold NYU liable for millions of dollars in claimed losses or to exonerate it from liability, Judge Forrest was considering resuming her desired partnership with Mr. Chesler, an NYU Trustee and Principal. The overnight shift from the bench to the Cravath firm and former Judge Forrest's description of the firm as "home" also create a reasonable conclusion that firm members were considering her for a return to Cravath after her announcement that she was leaving the bench. Under the circumstances, a reasonable

person informed of the facts would "conclude that the trial judge's impartiality could reasonably be questioned." *Bayless*, 201 F.3d at 126; 28 U.S.C. §455(a).

Beyond this, a significant judgment in Plaintiffs' favor would have been detrimental to Mr. Chesler's personal strong charitable interest in NYU, not only in his role as a Trustee. A judgment could well have detrimentally affected NYU's endowment campaign, both directly and by causing a loss of confidence in NYU's retirement plan governance and treatment of its employees and retirees. Mr. Chesler considers "the Momentum Campaign so important." Ex. 18. He also has said that he "owe[s] [his] career to the scholarship [he] received to NYU." *Supra* at 3 & n.6. A substantial judgment against NYU would be contrary to Mr. Chesler's charitable efforts on behalf of NYU. Thus, once Judge Forrest was considering resuming her partnership with Mr. Chesler and the Cravath firm, recusal was separately required based on the passionate interest of Mr. Chesler in serving NYU 's interests, particularly in light of Judge Forrest's prior 20-year relationship with Mr. Chesler as her law partner and mentor.

III. **Recusal is required in the opinion of national judicial ethics expert and former Chair of the ABA Commission to Revise the Model Code of Judicial Conduct.**

The conclusion that recusal was necessary is further powerfully supported by the expert opinion of Mark I. Harrison, a national expert with 25 years of experience in the field of judicial ethics and discipline, and former Chair of the American Bar Association Commission to Revise the Model Code of Judicial Conduct. Decl. of Mark I. Harrison at 1 (¶4), attached hereto. Plaintiffs retained Mr. Harrison to analyze whether former Judge Forrest's consideration of returning to Cravath required recusal. *Id*. at 2 (¶5). After extensive review and analysis of this case, particularly Mr. Chesler's status as an NYU Trustee with oversight responsibility of the Plans at issue and the timing of former Judge Forrest's considering returning to Cravath, Mr. Harrison reached the clear conclusion that recusal was mandated, stating:

- "Disclosure and recusal were required because Judge Forrest was considering employment with, and presumably hoping to be rehired by the Cravath firm before she decided the case, as shown by her comments shortly after the decision that Cravath was "an easy choice" and the only firm she considered. Since Judge Forrest was considering employment with Cravath specifically, her impartiality in deciding a case in which the Cravath Chairman's conduct as an important member of NYU's Board of Trustees and of its Executive Committee was at issue—both in monitoring the fiduciaries and removing them—could reasonably be questioned. The Board of Trustees was directly implicated in the claims that proceeded to trial, because the Board would have had to approve consolidation of the Plans' recordkeepers, and the Investment Committee was ultimately responsible for determining the Plans' investment options."

- "Because of the close and longstanding relationship between Judge Forrest and the Cravath firm and in particular, Evan Chesler, a key member of the defendant NYU Board (*which had oversight responsibility for the pension plans in issue*) and also the Chairman of Cravath (and a former colleague and mentor to Judge Forrest during her prior 20-year tenure at Cravath), and the fact that Judge Forrest was presumably considering re-joining Cravath as a partner of Mr. Chesler at the time the case was under submission, 28 U.S.C.§455(a) required Judge Forrest to timely disclose these facts to all counsel and parties and to recuse herself before rendering her decision in the case."

*Id.* at 13–14 (¶¶1–2).

## IV. The proper remedy is to vacate the judgment and order a new trial.

In determining whether the judgment should be vacated based on a violation of §455(a), the Court considers "the risk of injustice to the parties in the particular case, the risk that the denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process." *Liljeberg*, 486 U.S. at 864. The mere fact that a new trial may be "burdensome" to the opponent is not a reason to deny relief. *Chase Manhattan*, 343 F.3d at 132. These factors alone compel the conclusion that the judgment must be vacated and the case re-tried. Further, any doubt must be resolved in favor of recusal. *Supra*, Part I.B; *Murray*, 253 F.3d at 1310. This is even more the case in a bench tried case such as this. *Alexander*, 10 F.3d at 166.

*First*, the risk of injustice to Plaintiffs is high. The result in this case involved judging the facts and making credibility determinations by a lone fact-finder who was considering returning to her old firm, getting approval to return from, and partnering with, a Principal of the Defendant who cares deeply about the Defendant. *See* Doc. 348 at 6 nn.11–12, 16, p. 7 n.21, pp. 35–36, 50 n.67, p. 55 n.76, p. 60 n.106, p. 63 n.108 (credibility determinations). Moreover, an unjust result does not only affect the six named Plaintiffs themselves, but also the certified class of 24,000 NYU employees and retirees who suffered alleged losses of retirement savings due to NYU's asserted breaches of fiduciary duty. *See* Doc. 168 at 2, 6, 17–18 (order certifying class).

*Second*, there is a high risk that the denial of relief will produce injustice in other cases. Before this case was filed, there had never been a case brought for excessive fees and fiduciary breaches in a 403(b) plan. As former Judge Forrest noted in her opinion, there are 11 other cases pending around the country in which university employees are making similar ERISA claims on behalf of themselves and potential or certified classes of tens of thousands of employees. Doc. 348 at 2. As the Court stated, "[t]his is the first of those cases to proceed to trial." *Id*. Because former Judge Forrest was first to address the merits of any of these claims, her decision has the potential to significantly influence the result in the trials of the other cases. Given that the claims in those cases are collectively proceeding on behalf of hundreds of thousands of individuals, there is significant risk that their claims will be unjustly and adversely affected if relief is not granted. Further, enforcing §455(a) here "may prevent a substantive injustice in some future case by encouraging a judge or litigant to more carefully examine possible grounds for disqualification and to promptly disclose them when discovered." *Liljeberg*, 486 U.S. at 868.

*Third*, if the Court were to deny Plaintiffs the relief requested here, the risk of undermining the public's confidence in the judicial process is very substantial. The facts described above

24

"create precisely the kind of appearance of impropriety that § 455(a) was intended to prevent," and "[t]he violation is neither insubstantial nor excusable." *Chase Manhattan*, 343 F.3d at 132 (quoting *Liljeberg*, 486 U.S. at 867). Further, this litigation has received considerable coverage in the press.[39] Retirement savings plans and the fees associated with them have also been topics of frequent press coverage.[40] The public deserves to know that if retirement plan fiduciaries take actions that cause losses of retirement savings, claims challenging that conduct will be decided by an impartial adjudicator who scrupulously avoids the appearance of partiality. Accordingly, ordering a new trial will help ensure that justice "satisf[ies] the *appearance* of justice.'" *Liljeberg*, 486 U.S. at 864–65; *see also United States v. Robin*, 553 F.2d 8, 10 (2d Cir. 1977) (en banc) (discussing the "public interest" in "the appearance of justice" and "minimiz[ing] even a suspicion of partiality.") (citation omitted).

## CONCLUSION

Plaintiffs request that the Court enter an indicative ruling stating "either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue." Fed. R. Civ. P. 62.1(a)(3). If the Court of Appeals remands the case, for the foregoing reasons, this Court should vacate the judgment and order a new trial. Fed. R. Civ. P. 60(b)(6).

---

[39] Anne Turgeson, *Judge Rules for NYU in $358 Million Retirement Fees Case*, WALL ST. J., July 31, 2018, https://www.wsj.com/articles/u-s-judge-rules-for-nyu-in-358-million-retirement-fees-case-1533078966, attached as Ex. 42; Tara Siegal Bernard, *N.Y.U. Prevails in Case That Said It Let Retirement Plans Reap Excess Fees*, N.Y. TIMES, (Aug. 1, 2018), https://www.nytimes.com/2018/08/01/business/nyu-employee-retirement-plans.html, attached as Ex. 43.

[40] *E.g.*, John F. Wasik, *Finding and Battling Hidden Costs of 401(k) Plans*, N.Y. TIMES, (Nov. 7, 2014), https://www.nytimes.com/2014/11/08/your-money/hidden-costs-of-401-k-plans.html, attached as Ex. 44; John Coumarianos, *Why You Should Check Your 401(k) Plan's Fees*, WALL ST. J. (Nov. 8, 2015) https://www.wsj.com/articles/why-you-should-check-your-401-k-plans-fees-1447038127, attached as Ex. 45.

October 1, 2018

Respectfully submitted,

/s/ Jerome J. Schlichter
SCHLICHTER, BOGARD & DENTON, LLP
Andrew D. Schlichter, Bar No. 4403267
Jerome J. Schlichter (*pro hac vice*)
Heather Lea (*pro hac vice*)
Joel Rohlf (*pro hac vice*)
Ethan Hatch (*pro hac vice*)
100 South Fourth Street, Suite 1200
St. Louis, MO 63102
Phone: (314) 621-6115
Fax: (314) 621-5934

*Counsel for Plaintiffs*