H5GASAC1ps

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

DR. ALAN SACERDOTE, et al.,

              Plaintiffs,

         v.                             16 Civ. 6284 (KBF)

NEW YORK UNIVERSITY,

              Defendant.                Trial
------------------------------x
                                        New York, N.Y.
                                        May 16, 2018
                                        9:00 a.m.

Before:

              HON. KATHERINE B. FORREST,

                                        District Judge

                       APPEARANCES

SCHLICHTER BOGARD & DENTON, LLP
     Attorneys for Plaintiffs
BY:  JEROME J. SCHLICHTER, ESQ.
     JOEL D. ROHLF, ESQ.
     ETHAN D. HATCH, ESQ.

DLA PIPER US LLP
     Attorneys for Defendant
BY:  MARK MUEDEKING, ESQ.
     IAN TAYLOR, ESQ.
     JENNIFER SQUILLARIO, ESQ.
     EVAN D. PARNESS, ESQ.
     HARRY P. RUDO, ESQ.

Also Present:  Julie Boden Adams
               In-House Counsel, NYU

               Patricia Chew
               Sr. Litigation Support Analyst, DLA Piper US LLP
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**EXHIBIT 1**

1   they asked general questions: tell me about revenue sharing.
2   OK.  Ms. Sanchez's deposition, page 36, indicates that she
3   clearly understood revenue sharing.  They said, oh, they didn't
4   know what securities lending was.  Your Honor, there was no
5   securities lending in this plan, none at all.  There's no
6   record of it at all.  Oh, they didn't know what float was.
7           THE COURT:  We'll stop with those and focus on, let's
8   say, 75.  Because I'm not so concerned with securities lending.
9   I'm not so concerned with float.  I am concerned that we have
10  the co-chair of the committee who says it's not her job to
11  determine whether fees are appropriate, that she can rely
12  entirely on Cammack, because she can't rely entirely on
13  Cammack.  She can't.  She's got to participate in a
14  determination of kicking of the tires as to whether the fees
15  are appropriate.
16          MR. MUEDEKING:  OK.  But.
17          THE COURT:  Don't you think?
18          MR. MUEDEKING:  Oh, absolutely, or, let me put it this
19  way.  I think it is certainly appropriate if Margaret Meagher
20  sits in a committee meeting and somebody is asking that
21  question.  Right.  That somebody is saying, let's talk about
22  the fees.
23          THE COURT:  And she has to personally be satisfied
24  that she understands what's being said.  Otherwise she
25  shouldn't be on the committee.  If she's not intellectually or

**EXHIBIT 1**

1  educationally capable of listening to the information,
2  absorbing it, and deciding for herself and applying judgment to
3  that question, she should be off the committee.
4          MR. MUEDEKING:  Your Honor, the point is --
5          THE COURT:  Do you agree?
6          MR. MUEDEKING:  No, I don't agree.  I don't agree.
7          THE COURT:  So if she was intellectually incapable of
8  understanding the answer.
9          MR. MUEDEKING:  I'm sorry.  If she is intellectually
10 incapable, sure.  But she is not intellectually incapable.
11         THE COURT:  But she must, then, apply her intellect to
12 the answer given and render a personal judgment about that.
13         MR. MUEDEKING:  Right.
14         THE COURT:  Or raise a concern if her judgment is
15 contrary to the remainder of the committee.  She has an
16 obligation to raise her concern.  And the committee may or may
17 not vote on it.
18         MR. MUEDEKING:  That is true.  But what this says,
19 "It's not my job to determine whether the fees" -- I mean, this
20 is just one saying, sure, no, it wasn't her job to determine.
21 She was a member of the committee.
22         Your Honor, it is clear that, in the committee
23 minutes, they discuss fees 25 times during this period of time,
24 25 times.  Now, to the extent that she does not have her own
25 database about what fees are reasonable, to the extent that

**EXHIBIT 1**

1  have any idea.  That's the way it came across.

2         MR. MUEDEKING:  Your Honor, that explanation, do we
3  really believe if you ask, "What are the holdings of TIA real
4  estate account," somebody didn't know that it was real estate?
5  I mean --

6         THE COURT:  They may not have known that it was actual
7  commercial property, they may not have known the difference
8  between that and REIT, which is a critical distinction in this
9  context.

10        MR. MUEDEKING:  A critical distinction that is
11 reflected a number of times in the minutes as being discussed
12 by the committee, a number of times.

13        THE COURT:  I'll tell you, I'm not sure Ms. Meagher
14 knew what a REIT is.

15        MR. MUEDEKING:  Your Honor, I think a lot of people
16 don't understand what a REIT is.

17        THE COURT:  Then you can't be a chair of -- the
18 retirement committee chair.  This is the chair of a six billion
19 dollar committee.  It should have the best of the best.  And
20 she may be the best of best for human resources and benefits
21 and everything else within her job responsibilities, I'm not
22 suggesting she is not.  She seems like a very capable woman.
23 But this plan deserves the best of the best.

24        MR. MUEDEKING:  Your Honor, she testified that being
25 chair was not -- was nothing other than she was responsible for

**EXHIBIT 1**

1   making sure that the minutes got out.

2   　　　　THE COURT:  I know, but that's shocking, right?

3   　　　　MR. MUEDEKING:  No, your Honor.

4   　　　　THE COURT:  I know it's not shocking for you guys
5   because you prepared her to give that answer, but to me, that's
6   a shocking answer, because the chair of a $6 billion retirement
7   committee ought to be somebody who is as knowledgable as
8   Mr. Chittenden, whatever his name was.

9   　　　　We can go on.  I'm just giving you a reaction, so I
10  don't know that we should spend -- I think we should spend time
11  on the objective, whether there were objective problems with
12  the record keeping fees or the investments, as opposed to
13  process.

14  　　　　MR. MUEDEKING:  Okay.  But your Honor, may I just,
15  however, understand that it is clear, however, that the
16  committee didn't just blindly follow Cammack.  There's a lot of
17  evidence in the record that show here that they often asked
18  questions.  They had robust discussions regarding Cammack's
19  findings and conclusions.  They went back and sought out other
20  information provided by Cammack, challenged Cammack on the
21  Sharpe Ratio, questioned vendors, fund managers.

22  　　　　And there's a significant record here that the
23  committee as a whole -- no matter what you might think about
24  individual members, that the committee as a whole had a very
25  robust process.  I mean those are the due diligence reports

**EXHIBIT 1**